UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

FILIBERTO J. GARZA MORENO                    §
                                             §
                                             §
                                             §
VS.                                          §    CIVIL ACTION NO. 7-21-CV-00247
                                             §
                                             §
ALLEGIANT TRAVEL COMPANY,                    §
ALLEGIANT AIR LLC, AND AIRPORT               §
TERMINAL SERVICES INC.                       §

## INDEX OF AUTHORITIES CITED

*Walker v. Beaumont Indep. Sch. Dist.*
    938 F.3d 724, 734 (5th Cir. 2019);

*Linicomm v. Hill*
    902 S.W.3d 529, 533 (5th Cir. 2018);

*Magee v. Reed*
    912 F.3d 820, 823 (5th Cir. 2019);

*Bosarge v. Mississippi Bureau of Narcotics*
    796 F.3d 435, 439 (5th Cir. 2015);

*Gentilello v. Rege*
    627 F.3d 540, 544 (5th Cir. 2010);

*Ashcroft v. Iqbal*
    556 U.S. 662, 129 S.Ct. 1937, 1949 (2009), 677;

*Bell Atlantic Corp. v. Twombly*
    550 U.S. 544, 127 S.Ct. 1955 (2007), 550 U.S. at 555-56;

*Hershey v. Energy Transfer Partners, L.P.*
    610 F.3d 239, 245 (5th Cir. 2010);

*In re Katrina Canal Breaches Litig.*
    495 F.3d 191, 205 (5th Cir. 2007);

*Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*
    892 F.3d 719, 726 (5th Cir. 2018);

*Cuvillier v. Taylor*
    503 F.3d 397, 401 (5th Cir. 2007);

*Doe v. Columbia-Brazoria Indep. Sch. Dist. ex rel. Bd. of T'ees*
    855 F.3d 681, 686 (5th Cir. 2017);

*McLin v. Ard*
    866 F.3d 682, 688 (5th Cir. 2017) *cert. denied,* ___ U.S. ___, 138 S.Ct. 739
    (2018);

*Lormand v. US Unwired, Inc.*
    565 F.3d 228, 232 (5th Cir. 2009);

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*
    551 U.S. 308, 322, 127 S.Ct. 2499 (2007);

*Turner v. Pleasant*
    663 F.3d 770, 775 (5th Cir. 2011);

*Hack v. Wright*
    396 F.Supp.3d 720, 747 (S.D. Tex. 2019);

*Stokes v. Southwest Airlines*
    887 F.3d 199 (5th Cir. 2018), 203;

*Smith v. Merritt*
    940 S.W.2d 602 (Tex. 1997), 604;

*Armstrong v. Southwest Airlines*
    3:20-CV-3610-BT, 2021 WL 4391247 (N.D. Tex. Sept. 24, 2021);

*Bryant v. CIT Gp./Consumer Finance*
    H-16-1840, 2018 WL 1740075 at * 7 (S.D. Tex. Apr. 11, 2018);

*Perry v. S.N.*
    973 S.W.2d 301, 309 (Tex. 1998);

*Cerda v. RJL Entertainment, Inc.*
    443 S.W.3d 221, 227 (Tex. App. — Corpus Christi 2013, pet. denied);

*Davis v. Union Pac. R.R. Co.*
        B:12-212, 2015 WL 12768697 at * 4-5 (S.D. Tex. Oct. 2, 2015);
*Trimble v. Millwood Hosp.*
        420 F.Supp.3d 550, 557-58 (N.D. Tex. 2016);

*McMahon v. Smith & Nephew Richards, Inc.*
        14-99-00616-CV, 2000 WL 991697 (Tex. App. — Houston [14th Dist.] July 20,
        2000, no pet.);

*Rabon v. Automatic Fasteners, Inc.*
        672 F.2d 1231, 1238 (5th Cir. 1982);

*Jeter v. St. Regis Paper Co.*
        507 F.2d 131, 134 (5th Cir. 1975);

*Sinegal v. Ryan Marine Svcs.*
        712 F.Supp.2d 597, 608 (S.D. Tex. 2008);

Violation of criminal statute as negligence per se; and

Fed. R. Civ. Pro. 12(b)(6), 12(d), 56.

938 F.3d 724
United States Court of Appeals, Fifth Circuit.

Calvin Gary WALKER; Walker's
Electric; Walkers Electric; Jessie
Haynes, Plaintiffs - Appellants

v.

BEAUMONT INDEPENDENT SCHOOL
DISTRICT; Aaron Covington; Leroy Saleme;
Vernon Butler; Jane Kingsley; Terry Ingram;
Michael "Mike" Neil; Tom Neild; Venice
Monroe; A. B. Bernard; Jimmy Simmons;
Robert Turner; Joe Domino; Lenny Cabarello;
Jack Carroll; Beaumont Examiner; Don Dodd;
Jennifer Johnson; Beaumont Enterprise;
Brooke Crum; International Brotherhood
of Electrical Workers; Local Union 479,
International Brotherhood of Electrical
Workers; Steven Lisle; Duwayne Herrmann,
Also Known as Dwayne Hermann; Chris
Kibby; David Gonzales; Wayne Reaud;
Michael Getz; Cory Crenshaw; Malcolm Bales;
Jerry Jordan; Bob Rawls; Timothy Brewer;
Deanna Stevens, Defendants - Appellees

No. 17-40752
|
FILED September 18, 2019

## Synopsis

**Background:** Minority individuals brought actions alleging that union members, prosecutors, school district, and media conspired to ruin their reputations and businesses, in violation of Racketeer Influenced and Corrupt Organizations Act (RICO), Equal Protection Clause, and state law. Actions were consolidated and transferred. The United States District Court for the Eastern District of Texas, Marcia A. Crone, J., 2016 WL 3672224, 2016 WL 1156852, 2016 WL 2843996, 2016 WL 3621120, 2016 WL 4198279, 2016 WL 6693170, 2017 WL 946688, 2017 WL 1166779, adopted reports and recommendations of Keith F. Giblin, United States Magistrate Judge, 2016 WL 3456983, 2016 WL 6666828, 2016 WL

2854543, 2016 WL 6666831, 2016 WL 6823512, 2016 WL 6666833, 2017 WL 928458, 2017 WL 928459, and dismissed complaints, and appealed.

**Holdings:** The Court of Appeals, Engelhardt, Circuit Judge, held that:

[1] there was insufficient evidence of enterprise to support contractor's RICO claim;

[2] prosecutors were entitled to absolute immunity;

[3] National Labor Relations Act preempted contractor's claim against union and its members;

[4] contractor failed to plead actual malice required to state defamation claim; and

[5] fair reporting privilege protected newspaper and its reporter from liability for allegedly making defamatory statements about contractor.

Affirmed.

West Headnotes (56)

**[1]**    **United States** ⟜ Immunity in General
Sovereign immunity deprives court of subject matter jurisdiction.

4 Cases that cite this headnote

**[2]**    **Federal Courts** ⟜ Jurisdiction
Court of Appeals reviews dismissal for lack of subject matter jurisdiction de novo.

4 Cases that cite this headnote

**[3]**    **Federal Courts** ⟜ Pleadings and motions
**Federal Courts** ⟜ Evidence; Affidavits
Lack of subject matter jurisdiction may be found in any one of three instances: (1) complaint alone; (2) complaint supplemented by undisputed facts evidenced in record; or

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

(3) complaint supplemented by undisputed facts plus court's resolution of disputed facts.

6 Cases that cite this headnote

**[4]    Federal Courts** ⟵ Pleading

Appellate court conducts de novo review of district court's dismissal of complaint for failure to state claim. Fed. R. Civ. P. 12(b)(6).

9 Cases that cite this headnote

**[5]    Federal Courts** ⟵ Theory and Grounds of Decision of Lower Court

**Federal Courts** ⟵ Pleading

Court of Appeals may affirm district court's order dismissing claim for failure to state claim on any basis supported by record. Fed. R. Civ. P. 12(b)(6).

**[6]    Federal Civil Procedure** ⟵ Insufficiency in general

**Federal Civil Procedure** ⟵ Matters deemed admitted; acceptance as true of allegations in complaint

In ruling on motion to dismiss for failure to state claim, complaint's allegations must make relief plausible, not merely conceivable, when taken as true. Fed. R. Civ. P. 12(b)(6).

15 Cases that cite this headnote

**[7]    Federal Civil Procedure** ⟵ Insufficiency in general

Facial plausibility required to avoid dismissal for failure to state claim exists when plaintiff pleads factual content that allows court to draw reasonable inference that defendant is liable for misconduct alleged. Fed. R. Civ. P. 12(b)(6).

61 Cases that cite this headnote

**[8]    Federal Civil Procedure** ⟵ Construction of pleadings

**Federal Civil Procedure** ⟵ Matters deemed admitted; acceptance as true of allegations in complaint

In evaluating motions to dismiss for failure to state claim, court must accept all well-pleaded facts as true, and view them in light most favorable to plaintiff. Fed. R. Civ. P. 12(b)(6).

79 Cases that cite this headnote

**[9]    Federal Civil Procedure** ⟵ Determination

On motion to dismiss for failure to state claim, all questions of fact and any ambiguities in controlling substantive law must be resolved in plaintiff's favor, but courts are not bound to accept as true legal conclusion couched as factual allegation. Fed. R. Civ. P. 12(b)(6).

19 Cases that cite this headnote

**[10]    Federal Civil Procedure** ⟵ Matters considered in general

In determining whether plaintiff's claims survive motion to dismiss for failure to state claim, factual information to which court addresses its inquiry is limited to (1) facts set forth in complaint, (2) documents attached to complaint, and (3) matters of which judicial notice may be taken. Fed. R. Civ. P. 12(b)(6).

77 Cases that cite this headnote

**[11]    Evidence** ⟵ Public records and documents in general

Judicial notice may be taken of matters of public record. Fed. R. Evid. 201.

30 Cases that cite this headnote

**[12]    Federal Civil Procedure** ⟵ Matters considered in general

When defendant attaches documents to its motion that are referred to in complaint and are central to plaintiff's claims, court may properly consider those documents in ruling on motion to dismiss for failure to state claim. Fed. R. Civ. P. 12(b)(6).

35 Cases that cite this headnote

**[13]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ Separateness from
predicate acts, pattern, or persons

To establish "enterprise" under Racketeer
Influenced and Corrupt Organizations Act
(RICO), plaintiff must provide evidence of
existence of entity separate and apart from
pattern of racketeering activity. 18 U.S.C.A. §
1961 et seq.

4 Cases that cite this headnote

**[14]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ Informal entities;
associations-in-fact

To qualify as "enterprise" under Racketeer
Influenced and Corrupt Organizations Act
(RICO), entity does not have to be formal or legal
entity, but it must have some sort of hierarchical
or consensual decision-making structure, and it
must exist for purposes other than just to commit
predicate acts. 18 U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

**[15]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ What constitutes enterprise
in general

Plaintiff asserting claim under Racketeer
Influenced and Corrupt Organizations Act
(RICO) establishes existence of enterprise by
providing evidence of ongoing organization,
formal or informal, and by evidence that
various associates function as continuing unit. 18
U.S.C.A. § 1961 et seq.

3 Cases that cite this headnote

**[16]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ Informal entities;
associations-in-fact

To constitute informal enterprise under
Racketeer Influenced and Corrupt Organizations
Act (RICO), known as association-in-fact
enterprise, group need not have hierarchical

structure or chain of command; decisions may
be made on ad hoc basis and by any number of
methods—by majority vote, consensus, show of
strength, etc. 18 U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

**[17]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ What constitutes enterprise
in general

For group to qualify as enterprise under
Racketeer Influenced and Corrupt Organizations
Act (RICO), group's members need not have
fixed roles; different members may perform
different roles at different times. 18 U.S.C.A. §
1961 et seq.

**[18]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ Enterprise

Plaintiffs asserting claim under Racketeer
Influenced and Corrupt Organizations Act
(RICO) must plead specific facts—not
mere conclusory allegations—that establish
enterprise. 18 U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

**[19]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ Pleading

Plaintiff asserting claim under Racketeer
Influenced and Corrupt Organizations Act
(RICO) must plead specified facts as to each
defendant; it cannot lump defendants together. 18
U.S.C.A. § 1961 et seq.

2 Cases that cite this headnote

**[20]    Racketeer Influenced and Corrupt**
**Organizations** ⟜ Particular enterprises

There was insufficient evidence that union
members, prosecutors, school district, and media
operated as ongoing organization to support
minority contractor's claim that they constituted
"enterprise" under Racketeer Influenced and
Corrupt Organizations Act (RICO), even if they
shared some connection with him, were similarly
critical of his dealings with school district, and/

or have sought or supported the imposition of criminal and/or civil penalties against him relating to his dealings with school district, absent evidence that they worked as continuing unit, or that there was threat of continuing criminal activity. 18 U.S.C.A. § 1961 et seq.

**[21]    Racketeer Influenced and Corrupt Organizations** ⟺ Particular acts

Neither defamation, intentional interference, nor online harassment qualifies as predicate act under Racketeer Influenced and Corrupt Organizations Act (RICO). 18 U.S.C.A. § 1961(1).

**[22]    District and Prosecuting Attorneys** ⟺ Liabilities for official acts, negligence, or misconduct

Prosecutors enjoy absolute immunity for conduct intimately associated with judicial phase of criminal process.

**[23]    District and Prosecuting Attorneys** ⟺ Liabilities for official acts, negligence, or misconduct

Prosecutor remains entitled to absolute immunity even if he or she acted maliciously, wantonly, or negligently.

**[24]    District and Prosecuting Attorneys** ⟺ Liabilities for official acts, negligence, or misconduct

Actions to which prosecutorial immunity applies include professional evaluation of evidence, initiation of prosecution, interviewing witnesses in preparation for trial, and other actions taken throughout judicial process.

**[25]    District and Prosecuting Attorneys** ⟺ Liabilities for official acts, negligence, or misconduct

Absolute prosecutorial immunity does not apply when prosecutor is engaged in investigative or administrative tasks.

**[26]    District and Prosecuting Attorneys** ⟺ Liabilities for official acts, negligence, or misconduct

United States attorney, Assistant United States attorney, and county district attorney were entitled to absolute prosecutorial immunity from liability in criminal defendants' action against them, where all of defendants' allegations arose solely from their acts as prosecutors and officers of court.

1 Cases that cite this headnote

**[27]    Civil Rights** ⟺ Good faith and reasonableness;  knowledge and clarity of law; motive and intent, in general

Once public official raises qualified immunity, court evaluates objective legal reasonableness of official's conduct in light of legal rules clearly established as of time of official's action.

**[28]    Labor and Employment** ⟺ Preemption
**States** ⟺ Labor and Employment

National Labor Relations Act preempted non-union contractor's claim that local union and its members engaged in decades-long conspiracy to ruin his reputation and business in retaliation for his refusal to join union. National Labor Relations Act, § 1 et seq., 29 U.S.C.A. § 151 et seq.

**[29]    Libel and Slander** ⟺ Time to sue and limitations

Under Texas law, one-year statute of limitations for defamation claims applies to causes of actions for which gravamen of complaint is injury to plaintiff's reputation because of allegedly defamatory statements. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a), 16.003(a).

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

10 Cases that cite this headnote

**[30]    Limitation of Actions** 👓 Torts

For traditional printed statements, Texas adopted "single-publication rule," i.e., that defamation claims may be brought within first year from first date of publication. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a), 16.003(a).

**[31]    Federal Courts** 👓 Sources of authority; assumptions permissible

In making *Erie* guess as to unresolved issue of state law, federal courts should defer to intermediate state appellate court decisions, unless convinced by other persuasive data that state's highest court would decide otherwise.

1 Cases that cite this headnote

**[32]    Limitation of Actions** 👓 Torts

Under Texas law, single publication rule requiring that defamation claims be brought within one year of publication applies to information made publicly available on internet. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.002(a), 16.003(a).

4 Cases that cite this headnote

**[33]    Federal Courts** 👓 Depositions and discovery

District court's decision to limit discovery is reviewed for abuse of discretion.

**[34]    Federal Courts** 👓 Depositions and discovery

Although district court is afforded broad discretion when deciding discovery matters, court abuses its discretion when its decision is based on erroneous view of law.

**[35]    Libel and Slander** 👓 Nature and elements of defamation in general

Texas law establishes following elements to state actionable claim of defamation: (1) publication

of false statement of fact to third party, (2) statement must concern plaintiff and be defamatory, (3) publication must be made with requisite degree of fault, and (4) publication must cause damages.

5 Cases that cite this headnote

**[36]    Libel and Slander** 👓 Actionable Words in General

**Libel and Slander** 👓 Imputation of falsehood, dishonesty, or fraud

Under Texas law, statement is defamatory if it tends to injure person's reputation and thereby expose person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation.

5 Cases that cite this headnote

**[37]    Libel and Slander** 👓 Injury from Defamation

**Libel and Slander** 👓 Presumption as to damage; special damages

Under Texas law, damages must be shown to establish defamation claim unless statements are defamatory per se such that damages are presumed.

5 Cases that cite this headnote

**[38]    Libel and Slander** 👓 Presumption as to damage; special damages

Under Texas law, "defamation per se" refers to statements that are so obviously harmful that general damages may be presumed.

2 Cases that cite this headnote

**[39]    Libel and Slander** 👓 Presumptions and Burden of Proof

Under Texas law, in defamation suit against media defendant over matter of public concern, plaintiff bears burden of proving falsity.

2 Cases that cite this headnote

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

[40]    **Libel and Slander** ⟜ Truth of part of defamatory matter; substantial truth

In determining whether allegedly defamatory statement is false, Texas has adopted "substantial-truth doctrine," under which plaintiff is precluded from recovery when publication correctly conveys story's gist or sting although erring in details.

[41]    **Libel and Slander** ⟜ Falsity

Under Texas law, in determining whether statement is defamatory, court must determine if broadcast taken as a whole is more damaging to plaintiff's reputation than truthful broadcast would have been in average person's mind.

[42]    **Libel and Slander** ⟜ Malice

**Libel and Slander** ⟜ Criticism and Comment on Public Matters; Public Figures

Under Texas law, private individual asserting defamation claim need only prove negligence, whereas public figure or official must prove actual malice.

[43]    **Libel and Slander** ⟜ Criticism and comment on public matters and publication of news

Under Texas law, actual malice required to establish defamation claim against public figure does not mean bad motive or ill will; rather, it means that statement was made with knowledge of its falsity or with reckless disregard for its truth.

[44]    **Libel and Slander** ⟜ Criticism and comment on public matters and publication of news

Under Texas law, publisher of allegedly defamatory statement about public figure acted with "reckless disregard" required to establish actual malice if he entertained serious doubts as to truth of his publication.

[45]    **Libel and Slander** ⟜ Criticism and comment on public matters and publication of news

Under Texas law, neither failure to investigate fully nor understandable misinterpretation of ambiguous facts constitutes actual malice required to establish defamation claim against public figure.

[46]    **Libel and Slander** ⟜ Intent and malice

Under Texas law, contractor failed to plead actual malice required to state defamation claim by alleging that newspaper and its reporter made false statements about him "with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements" and "failed to retract, correct, or clarify the statements," absent allegations regarding existence or contents of specific discussions, correspondence, or supporting documentation provided to any media defendants—either prior to or shortly after publications in questions—purporting to correct any errors or misstatements in publications.

1 Cases that cite this headnote

[47]    **Libel and Slander** ⟜ Reports

**Libel and Slander** ⟜ Judicial proceedings

Under Texas law, fair reporting privilege against defamation claims for reporting judicial proceedings, official proceedings to administer law, or other public proceedings extends to information newspaper receives from press release issued by law enforcement or governmental agency. Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a).

[48]    **Libel and Slander** ⟜ Reports

**Libel and Slander** ⟜ Privilege

Under Texas law, given that statutory fair reporting privilege is defense to defamation, defendant has burden of proving privilege's applicability, i.e., that defendant is part of media and that statements were account of official proceedings of public concern. Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a).

**[49]**    **Libel and Slander** ⟨⟩ Reports

**Libel and Slander** ⟨⟩ Justification and mitigation

Under Texas law, private individual suing media defendant for defamation over report on official proceedings of public concern has burden of proving that gist of report was not substantially true—that is, that report was not fair, true, and impartial account of proceedings; that burden is not met with proof that report was not substantially true account of actual facts outside proceedings. Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a).

**[50]**    **Libel and Slander** ⟨⟩ Reports

Under Texas law, when statutory fair reporting privilege applies, gist of allegedly defamatory broadcast must be compared to truthful report of official proceedings, not to actual facts. Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a).

**[51]**    **Libel and Slander** ⟨⟩ Reports

Under Texas law, to determine whether publication is protected by fair reporting privilege, court must interpret account in sense that ordinary reader would understand, and even greatly exaggerated accounts are substantially true if no more opprobrium would be attached to plaintiff's actions merely because of such exaggeration. Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a).

**[52]**    **Libel and Slander** ⟨⟩ Privilege

Under Texas law, court may determine fair reporting privilege as matter of law where facts are undisputed and language used in publication is not ambiguous. Tex. Civ. Prac. & Rem. Code Ann. § 73.002(a).

**[53]**    **Libel and Slander** ⟨⟩ Judicial proceedings

Under Texas law, fair reporting privilege protected newspaper and its reporter from liability for defamation based on allegedly inaccurate statements about contractor in articles reporting that, as part of his guilty plea to willful failure to pay income taxes, contractor had admitted to falsifying invoices for which school district had paid, that he had agreed to repay district for money that he had stolen, and/or that "in exchange for" his pleading guilty to federal tax violation, he had agreed to forfeit $3.2 million and to acknowledge he altered invoices presented to school district, where ordinary reader would not discern difference in meaning between contractor's plea agreement and newspapers' accounts after comparing plea agreement, government documents, and articles. Tex. Civ. Prac. & Rem. Code Ann. § 73.002.

**[54]**    **Torts** ⟨⟩ Contracts

To prove tortious interference with existing contract under Texas law, plaintiff must show (1) he had valid contract, (2) defendants willfully and intentionally interfered with contract, (3) interference proximately caused plaintiff's injuries, and (4) he incurred actual damage or loss.

6 Cases that cite this headnote

**[55]**    **Contracts** ⟨⟩ Sufficiency of allegations to show breach

Under Texas law, merely alleging nonrenewal does not equate to actionable breach of contract.

**[56]**    **Torts** ⟨⟩ Prospective advantage, contract or relations; expectancy

Under Texas law, to prevail on claim for tortious interference with prospective business relations, plaintiff must establish that (1) there was reasonable probability that plaintiff would have entered into business relationship with third party; (2) defendant either acted with conscious desire to prevent relationship from occurring or knew interference was certain or substantially certain to occur as result of conduct; (3)

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

defendant's conduct was independently tortious or unlawful; (4) interference proximately caused plaintiff injury; and (5) plaintiff suffered actual damage or loss as result.

7 Cases that cite this headnote

**\*729** Appeal from the United States District Court for the Eastern District of Texas, Marcia A. Crone, U.S. District Judge

**Attorneys and Law Firms**

Murphy S. Klasing, Attorney, Misty Gasiorowski, Weycer, Kaplan, Pulaski & Zuber, P.C., Houston, TX, for Plaintiffs - Appellants.

Clay Thomas Grover, Esq., Jonathan Griffin Brush, Rogers, Morris & Grover, L.L.P., Houston, TX, for Defendants - Appellees BEAUMONT INDEPENDENT SCHOOL DISTRICT, AARON COVINGTON, VERNON BUTLER, JANE KINGSLEY, TERRY INGRAM, VENICE MONROE, A. B. BERNARD, JIMMY SIMMONS, ROBERT TURNER, JOE DOMINO, LENNY CABARELLO, JACK CARROLL.

Christopher Blewer Gilbert, Thompson & Horton, L.L.P., Houston, TX, for Defendant - Appellee MICHAEL "MIKE" NEIL.

Thomas S. Leatherbury, Esq., Marc Aaron Fuller, Vinson & Elkins, L.L.P., Dallas, TX, Larry DeWayne Layfield, Law Office of L. DeWayne Layfield, P.L.L.C., Gilbert I. Low, Gary Neale Reger, Esq., Orgain, Bell & Tucker, L.L.P., Beaumont, TX, Harry Max Reasoner, Esq., Vinson & Elkins, L.L.P., Houston, TX, Margaret Dunlay Terwey, Vinson & Elkins, L.L.P., San Francisco, CA, for Defendants - Appellees BEAUMONT EXAMINER, DON DODD, JENNIFER JOHNSON, WAYNE REAUD.

Jonathan R. Donnellan, Eva M. Saketkoo, Esq., Counsel, Hearst Corporation, New York, NY, for Defendants - Appellees BEAUMONT ENTERPRISE, BROOKE CRUM.

Patrick M. Flynn, Esq., Houston, TX, Robert David Kurnick, Sherman, Dunn, Cohen, Leifer & Yellig, P.C., Washington, DC, for Defendant - Appellee INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS.

Wyatt D. Snider, Snider Law Firm, P.L.L.C., Beaumont, TX, for Defendants - Appellees LOCAL UNION 479,

INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, STEVEN LISLE, DUWAYNE HERRMANN, CHRIS KIBBY, DAVID GONZALES.

David Vann deCordova, Jr., Esq., Counsel, Law Office of David Vann deCordova, Jr., Beaumont, TX, for Defendant - Appellee MICHAEL GETZ.

Kathleen Marie Kennedy, Chief Counsel, District Attorney's Office for Jefferson County - Civil Division, Beaumont, TX, for Defendant - Appellee CORY CRENSHAW.

Bradley Elliot Visosky, Assistant U.S. Attorney, U.S. Attorney's Office, Eastern District of Texas, Plano, TX, for Defendant - Appellee LCOLM BALES, BOB RAWLS, TIMOTHY BREWER, DEANNA STEVENS.

Jerry Jordan, Pro Se.

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

**Opinion**

KURT D. ENGELHARDT, Circuit Judge:

**\*730** With this appeal, we review the district court's dismissal of the entirety of Appellants' claims pursuant to the Texas Citizens' Participation Act, ("TCPA"), Tex. Civ. Prac. & Rem. Code, § § 27.001-27.011 (West) and Rule 12 of the Federal Rules of Civil Procedure. For the reasons stated herein, we AFFIRM that dismissal as to all claims and all parties named herein as defendants.[1]

**\*731 BACKGROUND**

Plaintiff Calvin Gary Walker ("Walker"), Walkers Electric, and Walker's Electric originally filed suit in July 16, 2015, in the United States District Court for the Eastern District of Texas, Marshall Division. The *Walker* action was consolidated, on February 23, 2016, with a related case, *Haynes v. Crenshaw, et al.* (civ. action no. 1:15-CV-437), filed by Plaintiff Jessie Haynes ("Haynes"). Following transfer from the Marshall Division to the Beaumont Division, Plaintiffs-Appellants ("Appellants" or "Plaintiffs") Walker and Haynes filed a consolidated Fourth Amended Complaint on December 22, 2015.

As set forth in the Fourth Amended Complaint, Appellants assert that they are the victims of an extensive, long-

lasting conspiracy ("conspiracy" or "Conspiracy") designed to prevent African-American individuals in Beaumont from gaining power and influence in order to perpetuate "white dominion over Beaumont local politics." This conspiracy, spanning approximately a decade, allegedly involved approximately 35 residents and organizations in the Beaumont area, including the Beaumont Independent School District ("BISD"), the BISD Board of Trustees and subsequent BISD Board of Managers, two local newspapers and their employees, two online journalists, the local chapter of the International Brotherhood of Electrical Workers ("IBEW") and several of its members, a Beaumont City Councilperson, two local attorneys, the United States Attorney for the Eastern District of Texas, two Assistant United States Attorneys, and two agents with the Federal Bureau of Investigation ("FBI"). The objective of this alleged conspiracy was to ruin Appellants' reputations and businesses as part of a larger campaign to harm minority individuals who "stepped out of line" and "defied the status quo."

## I. Walker

Walker is a Master Electrician and owner of Walker's Electric Company, which offers electrical services in Beaumont. He asserts that the conspiracy against him began around 2004 when members of IBEW asked him to join and he refused, at which point he was told that the union would "get him one way or another." Walker then contracted to provide electrical services to the BISD, a position that had previously been held by an IBEW member. In April 2008, IBEW filed a complaint against Walker with the Texas Department of Licensing and Registration ("TDLR"), asserting that Walker had obtained his electrician's license through fraud. Although Walker initially contested the matter and continues to assert that IBEW was behind and heavily involved with the investigation, he ultimately agreed to pay a fine, relinquish his Master Electrician's license, and re-take the required licensing exam.

Walker asserts that IBEW then conspired with BISD board members to ruin Walker's reputation and business. According to Walker, the BISD board members complained at BISD Executive Cabinet meetings that he was making too much money for a minority and was a sloppy businessman. He additionally avers that BISD personnel sought to ensure that he did not get any other contracts with the BISD and imposed onerous record-keeping requirements upon him. Specifically, Walker contends that he, a black non-union electrician, was the only contractor required to submit detailed invoices. He further alleges that, in 2008, BISD Chief Financial Officer

Jane Kingsley, acting on behalf of the BISD, attempted (unsuccessfully) *732 to ensure Walker's contract with the BISD was not renewed by illegally conducting the bid process.

Having failed to prevent Walker from contracting with the BISD, the IBEW and the BISD allegedly next turned to Malcolm Bales, the United States Attorney for the Eastern District of Texas, to prompt Walker's May 2011 indictment on 37 counts of fraud. In addition, Walker alleges that Deanna Stevens and Timothy Brewer—the FBI agents involved in his prosecution—tampered with potential witnesses during his trial, offering bribes to one and threatening two others. Members of the United States Attorney's Office also allegedly leaked information about Walker's case to members of the IBEW and the BISD. Walker was tried on the fraud counts in December 2011, which resulted in a hung jury and mistrial.

Subsequently, on July 17, 2012, Walker pleaded guilty to one count of willful failure to pay income taxes. He complains that members of the conspiracy, including members of the press and the BISD's Board of Trustees, thereafter relentlessly smeared him by wrongfully stating that he had pleaded guilty to defrauding the BISD and that he had agreed to repay it for the money that he had stolen. Walker asserts that, although the records of the BISD contained altered documents, there was no evidence admitted at trial that Walker or his wife submitted those documents to the BISD in connection with receiving payments for projects. Walker additionally alleges that Bob Rawls, the Assistant United States Attorney assigned to the case, urged the BISD to cease doing business with Walker and sent letters to a number of government entities and individuals, falsely informing them that Walker was a thief.

Walker complains that members of the conspiracy continued to engage in a smear campaign against him and that BISD board members and other conspirators repeatedly stated that Walker had admitted to submitting fraudulent invoices. Walker further contends that members of this conspiracy joined with their media allies at *The Examiner*, The *Beaumont Enterprise*, and two websites to spread these allegedly unfounded allegations. Unidentified members of the conspiracy also purportedly interfered with Walker's existing contract with BISD by improperly terminating his contract in 2014. Accordingly, Walker alleges he was prevented from being awarded the BISD contract and lost substantial business from other prospective customers because the BISD's "Evaluation Matrix," prepared by BISD (Employee) Appellees – Leroy Saleme (BISD Chief Financial Officer),

*Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)*

Aaron Covington (BISD Director of Contracts), and Vernon Butler (BISD Superintendent) – to compare contractors, falsely represented that he had admitted to padding BISD invoices, along with other purported falsehoods.

Walker further contends that the conspiracy has continued such that that United States Attorney Bales, unsatisfied with Walker's plea of guilty to willful failure to file income taxes, has conspired with the Jefferson County District Attorney Cory Crenshaw, a former Assistant United States Attorney, to form a joint task force in order to prosecute Walker in state court, despite the BISD's internal audit's having revealed he had not defrauded the BISD.

## II. Haynes

Haynes, too, allegedly was victimized by the conspiracy for supporting (former) BISD Superintendent Carroll Thomas. Specifically, she claims that BISD Board of Trustees member Michael Neil pushed her away from a door leading to a press conference at BISD after she prevented Jerry Jordan, a journalist for SETInvestigates.com, from entering the press conference. **\*733** Additionally, rather than Neil's being prosecuted for assault, Haynes was prosecuted and subsequently convicted in state court for obstruction of a public passageway. She additionally claims that, at her trial, at which Neil, Jordan, and City Councilperson Michael Getz (who was also present outside the press conference) testified, and Wayne Reaud, owner of the Beaumont *Examiner*, a Media-Appellee, was present, was a product of the RICO racketeering enterprise and conspiracy. She alleges "the Conspiracy engaged in a concerted campaign to harass [her], tarnish her reputation, attack her integrity, and threat[en] criminal and/or administrative repercussions." Also allegedly included in the campaign was Neil's attendance at an incident where individuals marched down the BISD's hallways chanting "Fire Jessie [Haynes] now," responding "lol" to an online comment about Haynes' criminal conviction and involvement in a verbal altercation in a parking lot with two of Haynes's supporters. Haynes adds that that the conspiracy also attacked a book that she wrote.

To aid the panel's understanding of their claims, Appellants' brief includes the chart set forth below, which generally identifies the claims asserted along with the corresponding appellant(s) and appellee(s). Appellants identify six categories of Appellees. "Conspiracy" refers to all of the Appellees collectively. The other five categories of Appellees identified by Appellants are: the Media Appellees,

City Councilperson Getz, the IBEW Appellees, the BISD Appellees, and the Prosecutors.

| Claim | Appellant(s) | Appellee(s) |
|---|---|---|
| Defamation | Walker | |
| Libel | Walker | Media Appellees |
| Slander | Walker | Conspiracy |
| Tortious Interference | | |
| With Existing Contract | Walker | Conspiracy |
| With Prospective Contracts | Walker | Conspiracy |
| Civil Rights Violation | Walker | BISD Appellees |
| Civil Conspiracy (State-Law) | Walker | Conspiracy |
| RICO | | |
| §1962(c) – racketeering | Walker | BISD Appellees |
| | Havens | Neil, Crenshaw, Jordan, Reaud, and Getz |
| §1962(a) – use of means from pattern of racketeering | Walker | IBEW Appellees |
| §1962(d) – Conspiracy | Walker and Haynes | Conspiracy |
| Assault | Haynes | Neil |

In response to the Fourth Amended Complaint, the Appellees filed multiple motions to dismiss. The IBEW Appellees moved pursuant to Federal Rule of Civil Procedure ("FRCP") 12(c). All other Appellees moved for dismissal under FRCP 12(b)(6) and/or the Texas Citizens Participation Act ("TCPA"). In addition, the BISD Appellees moved for dismissal under **\*734** FRCP 12(b)(1), and the BISD moved for dismissal of the individual BISD Employees, Board of Managers,[2] and Trustees (collectively the "BISD Agents") under the Texas Tort Claims Act ("TTCA"), Tex. Civ. Prac. & Rem. Code § 101.106.

With the issuance of eleven written rulings by District Judge Crone (considering nine "Reports and Recommendations" issued by Magistrate Judge Giblin), all claims against all defendants were dismissed on one or more grounds. This appeal followed.

## Standard of Review

[1] [2] [3] Under FRCP 12(b)(1), a party may challenge the subject matter jurisdiction of the court to hear a case. Sovereign immunity deprives the court of subject matter jurisdiction. *Iraheta v. Linebarger Goggan Blair & Sampson, L.L.P.*, 734 F. App'x 216, 219 (5th Cir. 2018). We review dismissal for lack of subject matter jurisdiction *de novo*. *Id.* Lack of subject matter jurisdiction may be found in any one of three instances: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

FRCP 12(c) permits a party to move for a judgment on the pleadings. "A Rule 12(c) motion may dispose of a case when there are no disputed material facts and the court can render a judgment on the merits based on 'the substance of the pleadings and any judicially noted facts.'" *Linicomn v. Hill,* 902 F.3d 529, 533 (5th Cir. 2018) (quoting *Machete Prods., L.L.C. v. Page,* 809 F.3d 281, 287 (5th Cir. 2015)). A Rule 12(c) motion is subject to the same standard as a motion to dismiss under FRCP 12(b)(6). *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir. 2008).

**[4]    [5]** An appellate court conducts a *de novo* review of a district court's dismissal of a complaint under FRCP 12(b)(6). *See Clyce v. Butler,* 876 F.3d 145, 148 (5th Cir. 2017). We may affirm a district court's order dismissing a claim under Rule 12(b)(6) "on any basis supported by the record." *Taylor v. City of Shreveport,* 798 F.3d 276, 279 (5th Cir. 2015)

**[6]** FRCP 12(b)(6) authorizes the filing of motions to dismiss asserting, as a defense, a plaintiff's "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6). Thus, claims may be dismissed under Rule 12(b)(6) "on the basis of a dispositive issue of law." *Neitzke v. Williams,* 490 U.S. 319, 326, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). Dismissal under FRCP 12(b)(6) also is warranted if the complaint does not contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). Where the well-pleaded facts of a complaint do not permit a court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—"that the pleader is entitled to relief." *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting Fed. Rule Civ. P. 8(a)(2)). Accordingly, a complaint's allegations "must make relief plausible, not merely conceivable, when taken as true." *United States ex rel. Grubbs v. Kanneganti,* 565 F.3d 180, 186 (5th Cir. 2009); *see also Twombly,* 550 U.S. at 555, 127 S.Ct. 1955 ("Factual allegations must be enough to raise a right to relief above the speculative **\*735** level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").

**[7]** "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Factual allegations that are "merely consistent with a defendant's liability, stop short of the line between possibility and plausibility of entitlement

to relief," and thus are inadequate. *Id.* (internal quotations omitted). Accordingly, the requisite facial plausibility exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (emphasis added). Even so, however, a "well-pleaded complaint may proceed even if it appears that a recovery is very remote and unlikely." *Twombly,* 550 U.S. at 556, 127 S.Ct. 1955. Finally, "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937 (internal citations omitted). *See also Robbins v. Oklahoma,* 519 F.3d 1242, 1248 (10th Cir. 2008) (degree of required specificity depends on context, i.e., the type of claim at issue).

**[8]    [9]** In evaluating motions to dismiss filed under Rule 12(b)(6), the Court "must accept all well-pleaded facts as true, and ... view them in the light most favorable to the plaintiff." *Campbell v. Wells Fargo Bank, N.A.,* 781 F.2d 440, 442 (5th Cir.). Further, "[a]ll questions of fact and any ambiguities in the controlling substantive law must be resolved in the plaintiff's favor." *Lewis v. Fresne,* 252 F.3d 352, 357 (5th Cir. 2001). On the other hand, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986); *see also Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 ("tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal,* 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly,* 550 U.S. at 557, 127 S.Ct. 1955); *see also Christopher v. Harbury,* 536 U.S. 403, 416, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002) (elements of a plaintiff's claim(s) "must be addressed by allegations in the complaint sufficient to give fair notice to a defendant").

**[10]    [11]    [12]** In determining whether a plaintiff's claims survive a Rule 12(b)(6) motion to dismiss, the factual information to which the court addresses its inquiry is limited to the (1) the facts set forth in the complaint, (2) documents attached to the complaint, and (3) matters of which judicial notice may be taken under Federal Rule of Evidence 201. *See Norris v. Hearst Trust,* 500 F.3d 454, 461, n. 9 (5th Cir. 2007); *R2 Invs. LDC v. Phillips,* 401 F.3d 638, 640, n. 2 (5th Cir. 2005). Judicial notice may be taken of matters of public record. *Firefighters' Retirement Sys., v. EisnerAmper,* 898 F.3d 553, 558 n.2 (5th Cir. 2018). When a defendant

attaches documents to its motion that are referred to in the complaint and are central to the plaintiff's claims, the court may also properly consider those documents. *Causey v. Sewell Cadillac-Chevrolet, Inc.*, 394 F.3d 285, 288 (5th Cir. 2004); *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007). "In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated." *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 499 (5th Cir. 2000).

**\*736  Analysis**

In presenting the issues for review on appeal, Appellants generally assert the district court erred in dismissing their claims on pleading grounds and/or defenses asserted by Appellees, including statute of limitations, pre-emption by the National Labor Relations Act ("NLRA"), 29 U.S.C. § 151, *et seq.*, and federal and state immunity (prosecutorial, official/absolute, or qualified.) Appellants provide the following summary of their argument:

This case is about a conspiracy between union members, prosecutors, a school district, and the media to remove African Americans such as Walker and Haynes from positions of power in Beaumont, Texas. After their initial efforts to prosecute Walker for allegedly defrauding [the] BISD through its electrical services contract failed, the Conspiracy ramped up their efforts to tarnish Walker's reputation and destroy his career. When Haynes, a member of [the] BISD's Superintendent's Executive Cabinet, supported the Superintendent and stood up for Walker, the Conspiracy turned to her.

The district court erred in dismissing Appellants' claims by demanding more than is required under Rule 12(b) and the TCPA. The court treated Appellees' motions to dismiss as if they had been summary judgment motions but did not give Appellants an opportunity to conduct even limited discovery before deciding they did not have sufficient allegations or evidence to support their claims. In determining the sufficiency of Appellants' allegations, the court pulled statements out of context, and demanded allegations specific to each individual Appellee notwithstanding the rule that co-conspirators are responsible for each other's acts. The court also erred in finding Appellants' claims against the IBEW Defendants preempted under the NLRA, and that the BISD Defendants and Prosecutors are entitled to immunity. The

BISD Defendants were not acting within the scope of their employment – particularly Neil when he physically assaulted Haynes. At a minimum, fact issues exist.

**I. The Texas Citizens Participation Act ("TCPA")**
As an initial matter, we note that, until recently, uncertainty existed in this circuit relative to the applicability of the Texas Citizens Participation Act ("TCPA") Tex. Civ. Prac. & Rem. Code, § § 27.001-27.011, in federal courts.[3] *See, e.g., Cuba v. Pylant*, 814 F.3d 701, 706 n.6 (5th Cir. 2016) (assuming without deciding that the TCPA's (state) procedural rules apply in federal court); *Cuba*, 814 F.3d at 718 (Graves, J., dissenting) (the TCPA conflicts with FRCP 12); *NCDR, L.L.C. v. Mauze & Bagby, P.L.L.C.*, 745 F.3d 742, 746 (5th Cir. 2014) (arguments that TCPA conflicts with FRCP 12(d) and Federal Rule of Appellate Procedure 4 waived because not raised in district court). In this matter, the district court determined that dismissal of Appellants' claims was warranted regardless of whether its analysis was governed by the TCPA or the FRCP.

**\*737**  Recently, however, another panel of this court held: "[b]ecause the TCPA's burden-shifting framework imposes additional requirements beyond those found in [FRCP] 12 and 56 and answers the same question as those rules, the state law cannot apply in federal court." *Klocke v. Watson*, No. 17-11320, 936 F.3d 240, 245, 2019 WL 3977545, at \*4 (5th Cir. Aug. 23, 2019). Further, " '[i]n contrast to the federal procedural requirements, the TCPA imposes additional requirements that demand judicial weighing of evidence.' " *Id.* "Because the TCPA imposes evidentiary weighing requirements not found in the Federal Rules, and operates largely without pre-decisional discovery, it conflicts with those rules." *Id.*

Within a few days of the issuance of the *Klocke* opinion, we received a letter from counsel, submitted pursuant to Federal Rule of Appellate Procedure 28(j),[4] discussing *Klocke's* potential relevance to the *Examiner* Appellees.[5] As part of its discussion, the *Examiner* Appellees reiterate their assertion that Appellants have waived, abandoned, or are estopped from asserting any objection to the application of the TCPA in federal court. Moreover, the *Examiner* Appellees argue, the district court's orders of dismissal should be affirmed under FRCP 12(b)(6).

To date, none of the other parties have submitted a FRAP 28(j) letter regarding *Klocke*. We anticipate, however, that the other

Appellees likely agree with the *Examiner* Appellees' position, whereas Appellants will argue that their position is and always has been that they, by conceding their *state* law claims involve statements to which the TCPA applies (except for the assault claim against Appellee Neil), did not concede, waive, or abandon the argument that the TCPA's heightened pleading/ evidentiary standard runs afoul of the pleading/discovery/ evidentiary requirements of FRCP 8, 12, and 56.[6] We need not resolve this particular dispute, however, **\*738** because we, like the district court, find dismissal warranted under the Federal Rules of Civil Procedure, for the reasons stated herein, without consideration of the TCPA.

## II. RICO claims

Walker and Haynes assert RICO violations against various Appellees pursuant to 18 U.S.C. § § 1962(a), 1962(c), and 1962(d). These claims require Appellants to properly allege a RICO "enterprise" and "pattern" of "racketeering activity." The district concluded Appellants failed to satisfy these duties. We agree.

**[13]    [14]    [15]    [16]    [17]    [18]    [19]**    To establish a RICO "enterprise," a plaintiff must provide evidence of the existence of an entity separate and apart from the pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). The entity does not have to be a formal or legal entity, but it must have some sort of hierarchical or consensual decision-making structure, and it must exist for purposes other than just to commit predicate acts. *In re McCann*, 268 F. App'x 359, 366 (5th Cir. 2008); *United States v. Bledsoe*, 674 F.2d 647, 663 (8th Cir. 1982). A plaintiff establishes the existence of an enterprise by providing "evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. For an informal enterprise, known as an association-in-fact enterprise, the "group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc." *Boyle v. United States*, 556 U.S. 938, 948, 129 S.Ct. 2237, 173 L.Ed.2d 1265 (2009). "Members of the group need not have fixed roles; different members may perform different roles at different times ...." *Id.* Further, "while the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The 'enterprise' is not the 'pattern of racketeering activity.' " *Id.* Plaintiffs must "plead specific facts, not mere conclusory allegations

which establish the enterprise." *Manax v. McNamara*, 842 F.2d 808, 811 (5th Cir. 1988). Finally, "a RICO plaintiff must plead the specified facts as to each defendant. It cannot ... 'lump[ ] together the defendants.' " *In re MasterCard Int'l, Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468, 476 (E.D. La. 2001), *aff'd*, 313 F.3d 257 (5th Cir. 2002) (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 730 (7th Cir. 1998)).

**[20]**    As discussed by the district court, Appellants' pleading of an enterprise in the Fourth Amended Complaint is wholly conclusory and unsupported by facts. Walker asserts that all Appellees shared some connection with him, were similarly critical of his dealings with the BISD, and/or have sought or supported the imposition of criminal and/or civil penalties against him relating to his dealings with the BISD. Nevertheless, assuming all of that to be true, the facts alleged are insufficient to render plausible Walker's attempted characterization of the various unrelated Appellees as an "ongoing organization, formal or informal, that functions as a continuing unit." The same is true of the conspiracy allegations relative to a knowing agreement to commit at least two predicate acts in furtherance of a substantive RICO offense.

**[21]**    Turning to the element of "racketeering activity," neither defamation, intentional interference, nor online harassment qualifies as a RICO predicate act. *See* 18 U.S.C. § 1961(1). Absent a taking of property sufficient to establish extortion for purposes of § 1961(1), the same is true **\*739** of the IBEW members' alleged threatening of Walker when he refused to join the union. And although Haynes contends that she suffered state prosecution in retaliation for seeking redress for Neil's alleged physical assault her (when he forced her away from a doorway), witness tampering and witness retaliation for purposes of § 1961(1), § 1512, § 1513, and § 1515(a)(1) involve only federal proceedings and offenses. Finally, although the district court concluded Walker had properly alleged four predicate acts (witness tampering and retaliation by the FBI and FBI agent Stevens against her ex-husband, Luke Stevens, and witness tampering and bribery by FBI agents Stevens and Brewer), the district court also aptly concluded the acts presented no threat of continuing criminal activity because all four acts occurred during a limited period of time and solely by certain federal officers in relation to Walker's criminal trial.

## III. Law Enforcement Appellees

**[22]    [23]**    Prosecutors enjoy absolute immunity for conduct "intimately associated with the judicial phase of the criminal

process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342–43, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). Prosecutorial immunity is based upon the concern that "harassment by unfounded litigation would cause a deflection of the prosecutor's energies from his public duties, and the possibility that he would shade his decisions instead of exercising the independence of judgment required by his public trust." *Imbler*, 424 U.S. at 422, 96 S.Ct. 984; *Culbertson v. Lykos*, 790 F.3d 608, 627 (5th Cir. 2015) ("This immunity arises from the public interest in shielding prosecutors from liability so they may exercise independent judgment when deciding which suits to bring and how to present them in court."); *Cousin v. Small*, 325 F.3d 627, 635-36 (5th Cir. 2003) (citations omitted). A prosecutor remains entitled to absolute immunity even if he or she acted "maliciously, wantonly[,] or negligently." *Rykers v. Alford*, 832 F.2d 895, 897 (5th Cir. 1987) (quoting *Morrison v. City of Baton Rouge*, 761 F.2d 242, 248 (5th Cir. 1985)).

[24] [25] Actions to which prosecutorial immunity applies include professional evaluation of the evidence, initiation of prosecution, interviewing witnesses in preparation for trial, and other actions taken throughout the judicial process. *Buckley v. Fitzsimmons*, 509 U.S. 259, 272-73, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); *Brown v. Dove*, 519 F. App'x 237, 238 (5th Cir. 2013); *Hoog-Watson v. Guadalupe Cty., Tex.*, 591 F.3d 431, 438 (5th Cir. 2009) (citations omitted). This immunity does not apply when a prosecutor is engaged in investigative or administrative tasks. *Van de Kamp*, 555 U.S. at 342, 129 S.Ct. 855; *Culbertson*, 790 F.3d at 627; *Hoog-Watson*, 591 F.3d at 438 ("In other words, prosecutorial immunity protects 'the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial,' but not 'the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested.' ") (quoting *Buckley*, 509 U.S. at 273, 113 S.Ct. 2606).

[26] Addressing each of the pertinent allegations outlined in the Fourth Amended Complaint, the district court concluded that all of Appellants' allegations against government attorneys Bales, Rawls, and Crenshaw arose solely from their acts as prosecutors and officers of the court. On the record before us, we find no error in that determination.

[27] Although the immunity status of the FBI agents (Stevens and Brewer) differs from the prosecutors given the agents' investigatory rather than prosecutorial \*740

roles, qualified immunity principles shield both federal and state law enforcement personnel. Once a defendant raises qualified immunity, the court evaluates the objective legal reasonableness of the defendant's conduct in light of legal rules clearly established as of the time of the defendant's action. *Ziglar v. Abbasi*, —— U.S. ——, 137 S. Ct. 1843, 1866, 198 L. Ed. 2d 290 (2017). Appellants' claims relative to Stevens and Brewer, however, are RICO claims as to which we have affirmed the district court's dismissal. Accordingly, further discussion of qualified immunity principles relative to them is unnecessary.

## IV. **IBEW Appellees**

At oral argument, Appellants' counsel identified *Windfield v. Groen Div. Dover Corp.*, 890 F.2d 764, 766-68 (5th Cir. 1989) as Appellants' "best pre-emption case." In *Windfield*, we addressed the National Labor Relations Act's ("NLRA") federal preemption of state law claims as articulated by the Supreme Court in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 244, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959). Specifically, "*Garmon* recognized that in enacting federal labor legislation through the NLRA, 'Congress did not exhaust the full sweep of legislative power ...' " *Id.* at 767 (internal citations omitted). "Nevertheless, the NLRA was enacted because 'Congress evidently considered that centralized administration of specially designed procedures was necessary to obtain uniform application of its substantive rules. ...' " *Id.* (quoting *Garmon*, 359 U.S. at 242–43, 79 S.Ct. 773). Hence, *Garmon* announced a general rule of preemption:

[w]hen it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by § 7 of the National Labor Relations Act, or constitute an unfair labor practice under § 8, due regard for the federal enactment requires that state jurisdiction must yield."

*Windfield*, 890 F.2d at 767 (quoting *Garmon*, 359 U.S. at 244, 79 S.Ct. 773).

[28] Several significant exceptions to *Garmon* exist. *Id.* When the issue under state law is arguably prohibited by the NLRA, the Court has refined the analytical framework:

"[t]he critical inquiry, therefore, is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner* [v. Teamsters, 346 U.S. 485, 74 S.Ct. 161, 98 L.Ed. 228 (1953)]) or different from (as in *Farmer* [v. v. United

*Brotherhood of Carpenters,* 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977)]) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Windfield,* 890 F.2d at 767. Here, the district court, reviewing Appellants' objections to the Magistrate Judge's Report and Recommendation reasoned:

> Plaintiffs do not contest the determination that Walker's claims against the IBEW allege conduct that is arguably prohibited by the NLRA. Instead, they argue that Judge Giblin erred in finding that Walker's claims against the IBEW should be dismissed for the same reasons articulated in *Jones. See Local 926, Int'l Union of Operating Eng'rs, AFL-CIO v. Jones,* 460 U.S. 669, 682, 103 S.Ct. 1453, 75 L.Ed.2d 368 (1983). They aver that Walker's case is more analogous to *Belknap* [*v. Hale*, 463 U.S. 491, 103 S.Ct. 3172, 77 L.Ed.2d 798 (1983)], wherein the Supreme Court found that claims of breach of contract and misrepresentation ***741** against an employer brought by replacement workers, hired to replace a number of union members who went on strike, did not fall under either *Garmon* preemption or *Machinists* preemption. *See [Belknap,]* 463 U.S. at 498, 103 S.Ct. 3172; *see also Machinists v. Wis. Emp't Relations Comm'n,* 427 U.S. 132, 140, 96 S.Ct. 2548, 49 L.Ed.2d 396 (1976). Regarding *Garmon* preemption, the Supreme Court determined that the dispute at issue was between the replacement workers and their employer and, thus, did not present an identical controversy to the one that would be before the NLRB, which would be between the striking union workers and the employer, and thus *Garmon* preemption did not apply. [ ]

In contrast to the *Belknap* and *Windfield* decisions, however, both of which were addressed in the report and recommendation, the heart of Walker's complaint against the IBEW is a labor dispute. He asserts that the entire, decades-long conspiracy to ruin his reputation and business stems from the IBEW's attempt to force him to join the union; when he refused, the IBEW allegedly masterminded an elaborate conspiracy in retaliation. Accordingly, the court agrees that *Jones,* which held that an employee's claims of tortious interference and civil conspiracy were *Garmon* preempted where the employee alleged that the union coerced his employer into breaching his employment contract, is more applicable to Walker's case, and, thus,

his claims are preempted for the reasons laid out therein. [*Jones*], 460 U.S. at 682, 103 S.Ct. 1453 [ ].

Furthermore, the court rejects Walker's contention that it should assert jurisdiction over Walker's claims because some of the IBEW's purported conduct after its initial attempt to coerce Walker into joining the union "goes far beyond a union-nonmember relationship and outside a 'labor dispute.' " In making this argument, Walker asks the court to distinguish between conduct purportedly undertaken to coerce Walker into joining the union and conduct allegedly undertaken purely in retaliation for his refusal. As was addressed in Judge Giblin's report and recommendation, a nearly identical argument was rejected by the Supreme Court in *Jones.* 460 U.S. at 682, 103 S.Ct. 1453. Therefore, Walker's objection is overruled.

We find no error in the lower court's careful analysis. The NLRB undoubtedly has a strong interest in addressing alleged coercive "recruiting" and retaliatory measures undertaken by and in the name of labor unions seeking to increase union membership and market power. Accordingly, we affirm the district court's dismissal of the IBEW Appellees.[7]

## V. Statute of Limitations

Walker asserts defamation claims, as well as other tort claims based on the alleged defamation. Before delving into the merits, we first address the timeliness of those claims premised upon pre-July 26, 2014 conduct.

**[29]  [30]** Under Texas law, defamation claims generally are subject to a one-year statute of limitations. Tex. Civ. Prac. & Rem. Code, § § 16.002(a), 16.003(a); *Jackson v. W. Telemarketing Corp.*, 245 F. 3d 518, 523 (5th Cir. 2001). The one-year limitation ***742** likewise applies to other causes of actions for which the gravamen of the complaint is injury to a plaintiff's reputation because of allegedly defamatory statements. *Hamad v. Center for Jewish Cmty. Studies,* 265 F. App'x 414, 417 (5th Cir. 2008) (citing *Holloway v. Butler,* 662 S.W.2d 688, 692 (Tex. App. 1983, writ ref'd n.r.e.)). Whether the statute of limitations has expired depends on when the claims accrued. *See, e.g., Velocity Databank, Inc. v. Shell Offshore, Inc.*, 456 S.W.3d 605 (Tex. App. 2014, pet. denied). Typically, a defamation claim accrues when the matter is published. For traditional printed statements, Texas adopted the "single-publication rule," i.e., that defamation claims may be brought within the first year from the first date of publication. *Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 173 (Tex. 2003); *Holloway,* 662 S.W.2d at 692

(concluding "publication is complete on the last day of the mass distribution of copies of the *printed* matter") (emphasis added).

[31]  When we heard oral argument in this matter, the Texas Supreme Court had not yet decided whether to extend this rule to internet publications. In those circumstances, federal courts "must make an *Erie* guess and determine ... how that court would resolve the issue if presented with the same case." *City of Alexandria v. Brown*, 740 F.3d 339, 351 (5th Cir. 2014) (quoting *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206) (internal quotations omitted). In 2007, in *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 141–46 (5th Cir. 2007), we, considering cases from other jurisdictions and Texas public policy interests, predicted that the Texas Supreme Court would extend the single publication rule to internet publications.[8] Thus, we rejected Nationwide's assertion that internet publications are subject to the continuous publication rule, such that "each time a viewer accesses the article from the website a 'republication' occurs for statute of limitations purposes," rather than single publication rule.

[32]  Since oral argument in this matter, however, the Texas Supreme Court, in *Glassdoor, Inc. v. Andra Group, LP*, 575 S.W.3d 523, 529 (Tex. 2019) confirmed the accuracy of the *Nationwide* prediction by adopting "a single publication rule [for] information made publicly available on the internet." Under a single publication standard, the (allegedly defamatory) statements and articles on which Walker's claims are premised that were published more than one year prior to the July 16, 2015 filing date of his original complaint are time-barred. *See, e.g. Jones v. Alcoa, Inc.*, 339 F.3d 359, 366 (5th Cir. 2003) ("A statute of limitations may support dismissal under Rule 12(b)(6) where it is evident from the plaintiff's pleadings that the action is barred and the pleadings fail to raise some basis for tolling or the like.").

Nevertheless seeking to avoid dismissal on grounds of timeliness, Walker emphasizes that courts have long considered amendments to and re-publication of defamatory material to be a new "publication."[9] On this basis, he contends the district court erred in dismissing his claims at the pleading stage of the proceeding without **\*743** giving him an opportunity to conduct discovery to determine if the pre-July 16, 2014 statements had been "re-published, re-stated, edited, retracted, or modified since the original publications, or if the statements meet any other exception to the statute,"

as discussed in *Mayfield v. Fullhart*, 444 S.W.3d 222 (Tex. App. 2014, pet. denied).

[33]  [34]  In the district court, however, Appellants did not plead possible re-publication of statements that, as alleged, are untimely on the face of the Fourth Amended Complaint Nor did Appellants oppose Appellees' motion seeking an expedited hearing under the TCPA, § 27.006, or *The Examiner* Appellees' motion to stay discovery in the case.[10] Indeed, it is not apparent that Walker, at any time between the July 2015 filing of the original complaint and the district court's 2016 and 2017 orders granting dismissal, ever sought discovery regarding possible re-publication – either by leave of court or by agreement of the parties. Accordingly, as determined by the district court, this argument fails to resuscitate claims premised on allegedly defamatory statements made prior to July 16, 2014.[11]

## VI. Defamation

[35]  [36]  [37]  [38]  Relative to Appellants' *timely* filed defamation claims, Texas law establishes the following elements an actionable claim of defamation: (1) publication of a false statement of fact to a third party, (2) the statement must concern the plaintiff and be defamatory, (3) the publication must be made with the requisite degree of fault, and (4) the publication must cause damages. *Lipsky*, 460 S.W.3d at 593. A statement is defamatory "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Lipsky*, 460 S.W.3d at 593 (citing *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). Damages must be shown unless the statements are defamatory *per se* such that damages are presumed. Defamation *per se* refers to statements that are so obviously harmful that general damages may be presumed. *Id.*

[39]  [40]  In a defamation suit against a media defendant over a matter of public concern, the plaintiff bears the burden of proving falsity. *Neely v. Wilson*, 418 S.W.3d 52, 62 (Tex. 2013) (citing *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986)); *McIlvain v. Jacobs*, 794 S.W.2d 14, 15 (Tex. 1990). In determining whether a statement is false, Texas has adopted the substantial-truth doctrine, under which a plaintiff is precluded from recovery when a "publication ... correctly conveys a story's 'gist' or 'sting' although erring in

the details." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).

[41] This evaluation involves looking at the "gist," or meaning, of a broadcast [or article], which is determined "by examining how a person of ordinary intelligence would view it." *Neely*, 418 S.W.3d at 63-64, 66-67. Thus, the court must determine "if a broadcast taken as a whole is more damaging **\*744** to the plaintiff's reputation than a truthful broadcast would have been," in the mind of the average person. *Id.* at 63 (*citing Turner*, 38 S.W.3d at 115); *accord McIlvain*, 794 S.W.2d at 16; *see AOL, Inc. v. Malouf,* No. 05-13-01637-CV, 2015 WL 1535669, at \*4 (Tex. App. Apr. 2, 2015, no pet.) (mem. op.) (holding news article was not substantially false even though it stated that plaintiff had been charged with criminal Medicaid fraud when the charges were civil and despite the article using the words "charged" and "stolen"); *Basic Capital Mgmt., Inc. v. Dow Jones & Co.*, 96 S.W.3d 475, 481-82 (Tex. App. 2002, no pet.) (newspaper article stating that investment firm had been involved in money laundering was substantially true when only two employees had been charged with fraud and conspiracy, not money laundering, and company was only mentioned in indictment, but not charged).

[42] Regarding the element of fault, the status of the person alleging defamation determines the requisite degree of fault. A private individual need only prove negligence, whereas a public figure or official must prove actual malice. *Lipsky*, 460 S.W.3d at 593. Here, as noted by the district court in its February 11, 2016 Memorandum Order, Appellants have conceded that they are limited-purpose public figures. Accordingly, Walker must have sufficiently alleged actual malice in order to state a defamation claim.

[43] " 'Actual malice' in this context does not mean bad motive or ill will." *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016). Rather, it means that the statement was made with knowledge of its falsity or with reckless disregard for its truth. *Huckabee v. Time Warner Entm't Co.*, 19 S.W.3d 413, 420 (Tex. 2000). "Thus, the constitutional focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff." *Greer*, 489 S.W.3d at 444.

[44] [45] To establish reckless disregard, the publisher must have " 'entertained serious doubts as to the truth of his publication.' " *Huckabee*, 19 S.W.3d at 420 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968)). Neither a failure to investigate fully nor an understandable misinterpretation of ambiguous

facts constitutes actual malice. *Schofield v. Gerda*, No. 02-15-00326-CV, 2017 WL 2180708, at \*19-20 (Tex. App. May 18, 2017); *see also Weber v. Fernandez*, No. 02-18-00275-CV, 2019 WL 1395796, at \*18 (Tex. App. Mar. 28, 2019) (failure to investigate is not evidence of actual malice unless publisher purposefully avoided the truth).

On this point, the district court concluded, with regard to the *Examiner* Appellees, Jordan, and Getz, that Walker had failed to allege clear and specific evidence of actual malice – a required element for public figure plaintiffs – such that his defamation claims were dismissed for that reason, "without regard to the outcome of the limitations and substantial-truth issues." Although this ruling refers to the "clear and specific" evidence standard imposed by the TCPA, Walker's allegations regarding actual malice likewise fail when considered under the Federal Rules of Civil Procedure. *See Taylor v. City of Shreveport*, 798 F.3d 276, 288 (5th Cir. 2015) ("we may affirm an order granting a motion to dismiss 'on any basis supported by the record' ")(quoting *Asadi v. G.E. Energy (USA), L.L.C.*, 720 F.3d 620, 622 (5th Cir. 2013)).

[46] Specifically, the Fourth Amended Complaint alleges only that the "members of the Conspiracy making [defamatory] statements acted with actual malice, knowledge, negligence and/or recklessness as to the truth of those statements" and that "Walker repeatedly and timely asked the members of the Conspiracy making **\*745** defamatory statements to cease and desist from making such false statements [but they] failed to retract, correct, or clarify the statements." Appellants' brief is similarly deficient, adding only that "[t]he Conspiracy was fully aware of the falsity of their statements but continued making them ...." Such scant assertions are insufficient to allow the court to infer more than the mere possibility of misconduct. Significantly, Walker has not alleged, for example, relative to *any* of the Appellees, the existence or contents of specific discussions, correspondence, or supporting documentation provided to any of the media defendants – either prior to or shortly after the publications in questions – purporting to correct any errors or misstatements in the publications. On this very limited showing, we agree with the district court that the deficiency of Appellants' "actual malice" allegations provides an independent, standalone basis for dismissal of Walker's defamation claims.

Texas law recognizes a "fair reporting privilege" as a defense to defamation. As codified in § 73.002(a)–(b), "[t]he publication by a newspaper or other periodical material ...

is privileged" when that newspaper presents "a fair, true, and impartial account" of a judicial proceeding, an official proceeding to administer the law, or other public proceeding, including a proceeding before "a managing board of an educational ... institution [or] ... of a public school board." *See* Tex. Civ. Prac. & Rem. Code, § 73.002(a)-(b); *see also Dallas Morning News, Inc. v. Hall*, No. 17-0637, 2019 WL 2063576, at *8 (Tex. May 10, 2019), reh'g denied (Aug. 30, 2019) (media outlets enjoy a privilege that protects publications describing official proceedings of public concern).[12]

[47] This privilege extends to information a newspaper receives from a press release issued by law enforcement or a governmental agency. *Freedom Commc'ns, Inc. v. Sotelo*, No. 11-05-00336-CV, 2006 WL 1644602, at *4 (Tex. App. June 15, 2006, no pet.) (mem. op.). The privilege, however, "does not extend to the republication of a matter if it is proved that the matter was republished with actual malice after it had ceased to be of public concern." Tex. Civ. Prac. & Rem. Code, § 73.002(a).

[48] [49] [50] Given that the fair reporting privilege is a defense, the defendant has the burden of proving the applicability of the privilege, i.e., that the defendant is part of media and the statements were an account of official proceedings of public concern. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 715 (Tex. 2016). "A private individual suing a media defendant for defamation over a report on official proceedings of public concern, however, has the burden of proving that the gist of the report was not substantially true—that is, that the report was not a fair, true, and impartial account of the proceedings." *Id.* "That burden is not met with proof that the report was not a substantially true account of the actual facts outside the proceedings." *Id.* Rather, "[w]hen the privilege applies, the gist of an allegedly defamatory broadcast must be compared to a truthful report of the official proceedings, not to the actual facts."

[51] [52] To determine whether a publication is protected by the fair reporting privilege, a court must interpret the account "in the sense that the ordinary reader would understand." **\*746** *Tex. Monthly, Inc. v. Transamerican Nat'l Gas Corp.*, 7 S.W.3d 801, 805 (Tex. App. 1999, no pet.) (citing *Crites v. Mullins*, 697 S.W.2d 715, 717 (Tex. App. 1985, writ ref'd n.r.e.). "The critical test is the effect on the mind of the reader or listener; if the effect on the mind of the recipient would be the same, any variance between the actions charged and the actions proved should be disregarded."). *Finklea v. Jacksonville Daily Progress*,

742 S.W.2d 512, 515 (Tex. App. 1987), writ dismissed w.o.j. (Mar. 30, 1988) (citations omitted). Even greatly exaggerated accounts are substantially true "if no more opprobrium would be attached to the [plaintiff's] actions merely because of such exaggeration." *Id.* A court may determine privilege as a matter of law "[w]here the facts are undisputed and the language used in the publication is not ambiguous." *Klentzman v. Brady*, 456 S.W.3d 239, 252-53 (Tex. App. 2014), *aff'd*, 515 S.W.3d 878 (Tex. 2017).

In this case, the *Beaumont* Enterprise Appellees (The Hearst Corporation d/b/a The *Beaumont Enterprise* and writer Brooke Crum) assert that all of the news articles at issue are privileged accounts of the following four government proceedings and records: (1) a July 17, 2012 press release from the United States Attorney's Office stating that (a) Walker had willfully failed to report approximately $1.5 million in income to the federal government, (b) a bid altered to look like an invoice for labor in the amount of $382,975.32 had been submitted to the BISD, and (c) Walker had agreed to forfeit $3.2 million, out of which the BISD could seek restitution; (2) a July 17, 2012 letter from the United States Attorney's Office (to the BISD) informing the BISD that Walker would be forfeiting $3.2 million and that the BISD could potentially seek restitution for at least $1.8 million that it had overpaid Walker; (3) the July 17, 2012 factual basis and stipulation attached to Walker's plea agreement, in which he agreed that bid documents altered to look like invoices were submitted to the BISD; and (4) the August 28, 2012 finding by the Texas Comptroller that Walker's admissions in his plea agreement "constitute[d] sufficient admitted evidence of fraudulent behavior in a procurement setting" to support its decision to debar Walker from working for the State of Texas for five years. The *Beaumont Enterprise* Appellees also assert that Walker cannot prevail on his defamation claims against them because he has failed to provide evidence of the falsity of any of the allegedly defamatory articles.[13]

Regarding the issue of falsity (as an element of Walker's claim) and the "fair reporting" privilege, the main focus of Walker's defamation claims against the *Beaumont Enterprise* Appellees concerns their articles reporting that, as part of his guilty plea to willful failure to pay income taxes, he had admitted to falsifying invoices for which the BISD had paid, that he had agreed to repay the BISD for the money that he had stolen, and/or that "in exchange for" his pleading guilty to a federal tax violation, "he had agreed to forfeit $3.2 million and to acknowledge he altered electrical invoices presented to the school district." Walker asserts that, although the records

of the BISD contained altered documents, there was no evidence admitted at trial that Walker or his wife submitted those documents to the BISD in connection with receiving payments for projects. Rather, as set forth in Appellants' brief, he explains:

> **\*747** Nowhere does Walker admit to *submitting* altered documents to [the] BISD, seeking payment from [the] BISD based on such documents, receiving money from [the] BISD on the basis of altered documents, or unlawfully appropriating property of [the] BISD. Even [the] BISD agreed Walker did not unlawfully appropriate property of or defraud [the] BISD after conducting its own internal audit, being under months of pressure and scrutiny created by the Conspiracy to terminate its contract with Walker, and having employees actually testify at Walker's criminal trial. Former superintendent Dr. Carroll Thomas drafted a glowing letter of recommendation for Walker. Though [the] BISD did not agree it was a victim, the perpetrator steadfastly denied fraud, and the government was never able to prove it, the Conspiracy created a fictitious tale of fraud.

The declaration of [Mr. DeGuerin, Walker's criminal defense attorney] and testimony from Walker's trial further support Walker's position that he did not submit altered invoices to the BISD, and did not expect, demand payment, or receive payment based on the invoices. DeGuerin explained, "[T]he plea agreement does not say that Mr. Walker submitted altered documents to [the] BISD. [...] Walker steadfastly denied submitting any false documents to [the] BISD." The evidence introduced at trial concerning the "altered invoices" was that Ms. Walker mistakenly sent them to [the] BISD instead of her tax accountant. DeGuerin explained how Walker used uncashed checks as an accounting method, and his wife mistakenly sent the documents to [the] BISD. As soon as Walker realized the documents had been sent to [the] BISD, he went to [the] BISD to retrieve them. "Neither Mr. Walker nor his wife submitted the documents in connection with requesting or receiving payments for the project; Mr. Walker did not intend to defraud or deceive BISD, [the] BISD was not defrauded or deceived, and Mr. Walker completed his work to the satisfaction of [the] BISD." Nothing in the plea agreement or related documentation supports Appellees' defamatory statements. The statements are not privileged as fair reports of official documents or as substantially true.

Relative to these contentions, Walker's factual basis, in addition to describing his failure to pay certain income taxes for the 2009 tax year, states in pertinent part:

> Records of the [the] BISD contained copies of bills of materials from third party electrical wholesale companies along with copies of unnegotiated checks drawn on defendant's bank account in the same amounts, payable to said wholesalers. Included in the wholesale invoice was an invoice in the amount of $382,975.32 which had been altered to reflect it was an invoice when in fact the document was a quote and not an actual purchase. The defendant's check to that wholesaler in the amount of $383,975.32 was never presented to the wholesaler or negotiated. Records of the BISD also contained similar altered documents purportedly from the same electrical supplier matching invoices submitted by the defendant for materials in other projects.

The Magistrate Judge found that Walker failed to specifically address the fair reporting privilege set forth in § 73.002. Nor did he address any of the governmental documents provided to the court by the *Beaumont Enterprise* Appellants, aside from the factual basis and stipulation attached to his plea agreement. Instead, the Magistrate Judge concluded, Walker simply argued generally that the articles are not substantially true or fair, or, at the very least, are ambiguous in meaning.

**\*748** Examining each of those governmental documents and the articles that Walker attacks, the Magistrate Judge summarized Walker's position as arguing generally that the first three articles are false and misleading for two reasons: (1) the monetary amounts listed for Walker's forfeiture agreement and the BISD's possible forfeiture claims are too high and (2) the articles imply that Walker admitted to defrauding the BISD in his plea agreement.[14] As to the first issue, the Magistrate Judge concluded that the effect of the *Beaumont Enterprise* Appellees' articles on the mind of the ordinary reader would not be altered even if the *Beaumont Enterprise* Appellees exaggerated the monetary amounts at issue.

As to the second, Walker, as noted by the Magistrate Judge, contends that the *Beaumont Enterprise* Appellees' first three articles are defamatory because they state that Walker admitted to falsifying invoices in his plea agreement and factual stipulation, which implies that Walker defrauded the BISD. The Magistrate Judge concluded:

> Comparing the *Enterprise* Defendants' articles to the listed government documents, particularly Walker's plea

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

agreement, it becomes clear that the differences in wording are minor and merely semantic. In Walker's plea agreement, he admitted that multiple bid quotes were submitted to [the] BISD that had been altered to look like invoices, one such "invoice" was accompanied by a check payable to a wholesaler for the same amount that was never presented to that wholesaler or negotiated, and the "invoice" came from Walker's company. An ordinary reader would not discern a difference in meaning between Walker's plea agreement and the *Enterprise* Defendants' accounts after comparing Walker's plea agreement, the various government documents provided by the *Enterprise* Defendants in their motion to dismiss, and these three articles. Therefore, these three articles are privileged under Texas law.

Continuing to a fourth article, dated July 30, 2014 and titled "Grand jury indicts BISD electrician for fraud," Walker contends the article is defamatory because it suggests that the only reason that the BISD would not recover $343,000 from Walker was because it refused to say it was a crime victim. The Magistrate Judge, questioning first whether an article reporting the BISD's insistence that it had *not* been defrauded is defamatory, concluded the article was privileged, reasoning that, as a whole, it presented a true, fair, and accurate account of Walker's indictments in state court, previous criminal proceedings, and related government documents. The Magistrate Judge reached the same conclusions regarding a fifth article published on October 2, 2014, titled "U.S. Attorney: **\*749** BISD restitution money is gone," and a sixth article, published on October 15, 2014 article, titled "BISD board ditches electrician."

[53]  Reviewing Walker's objections to the Magistrate Judge's report and recommendations, the District Judge found the Magistrate Judge's lengthy assessment thorough, well-reasoned, and supported by the record. We agree. Although someone trained in the law, carefully parsing through the various articles, and government/official documents to which they were compared, might take issue with the literal truth of certain of the statements, the legal authorities cited above clearly establish that literal truth is *not* the applicable standard. Rather, it is the ordinary person's assessment that is determinative, not Walker's preferred account of events.[15] Accordingly, as the district court aptly concluded, Walker's timely filed defamation claims, asserted against the *Beaumont Enterprise* Appellees fail on the elements of actual malice and falsity, and when considered against the fair reporting defense.

## VII. Tortious Interference Claims

### A. Tortious Interference with Existing Contract

[54]  To prove tortious interference with an existing contract, Walker must show (1) he had a valid contract, (2) the defendants willfully and intentionally interfered with the contract, (3) the interference proximately caused Walker's injuries, and (4) he incurred actual damage or loss. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 207 (Tex. 2002). In response to a motion to dismiss under the TCPA, Walker must "present evidence that some obligatory provision of a contract has been breached." *Better Bus. Bureau of Metro. Houston, Inc. v. John Moore Servs., Inc.*, 441 S.W.3d 345, 361 (Tex. App. 2013, pet. denied) (quoting *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App. 2011, pet. denied)).

In support of this claim, Walker alleges "the Conspiracy, including the Media Defendants, Getz, BISD Trustees, and Prosecutors, harassed BISD for its decision to continue working with Walker and refuse to demand restitution from Walker." Additionally, "BISD Trustees regularly requested documents related to African-American employees and vendors of [the] BISD from the Office of the Superintendent, and then gave them to Media Defendants for publication with inflammatory headlines – at the direction of Reaud." Walker contends: "Such publications disrupted [the] BISD's operations and were intended to interfere with Walker's contract with BISD." He adds: "Neil was **\*750** quoted in July of 2014 saying he would seek to have Walker's contract cancelled.". Further, "Rawls sent [the] BISD a memorandum essentially demanding [that the] BISD not release the sums owed to Walker and terminate his maintenance contract."

Thereafter, in 2014, Walker alleges, the "BISD Board of Managers did not renew and improperly terminated the contract, without notice, and awarded it to a white union electrical contractor." Further, the BISD supported its decision on scores derived from an Evaluation Matrix prepared by BISD (Employee) Appellees Saleme, Covington, and Butler, which falsely stated "District's Previous Provider Admitted guilt to padding BISD invoices. Paid back over $2,000,000." Walker contends these actions, alone and in agreement with others in the conspiracy, were a proximate cause of actual damages to him.

[55]  Although Walker asserts this claim and provides the foregoing assertions, he does not identify an actual breach of the contract. Rather, his actual complaint appears to be

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

that his contract was not renewed at the end of its term. Merely alleging nonrenewal, however, does not equate to an actionable breach of contract.[16]

### B. Tortious Interference with Prospective Contract

[56] Under Texas law, "[t]o prevail on a claim for tortious interference with prospective business relations, a plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result." *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909 (Tex. 2013) (*citing Wal–Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) (addressing requirement of predicate tort or unlawful conduct)). Establishing that defendant's conduct was independently tortious or wrongful does not require that the plaintiff be able to prove an independent tort. *See Wal–Mart Stores, Inc,* 52 S.W.3d at 726. Rather, proof that the defendant's conduct would be actionable (as to someone) under a recognized tort is sufficient.

Walker's brief confirms that he asserts this claim against all members of the Conspiracy *except* the BISD. He contends the same facts relevant to the existing contract interference claim are also relevant to the claim of interference with prospective contracts. He maintains that, because he did not receive a notice regarding renewal (or termination) in the summer of 2014, as he previously had, he turned down several lucrative contracts, including one with Northwest ISD Dallas for $500,000, thinking the BISD intended to continue his existing contract. He maintains that there was a reasonable probability that he would have entered into the Northwest ISD Dallas and other prospective contracts such as **\*751** DCP Midstream, Dickerson Group, Inc., and Bennett Electric. According to Walker, Appellees' actions in defaming and conspiring against him were independently tortious and unlawful, and prevented the prospective contracts from occurring. Further, he contends that Appellees engaged in these acts with the conscious desire to prevent him from securing business from anyone in the Beaumont community and, as a result, he suffered actual harm or damage as a result of interference.

Given the nature of this claim, its survival turns on the viability of the other tort claims asserted by Walker. Because we conclude none is successful, this one likewise fails.

### VIII. Equal Protection and Immunity of BISD Personnel

Lastly, we briefly consider Appellants' claims asserted under 42 U.S.C. § 1983, urging equal protection violations, specifically Walker's allegations of race discrimination relative to BISD Chief Financial Officer Appellee Kingsley's allegedly onerous invoicing requirements, and the immunity of BISD Board of Managers, BISD Board of Trustees, and BISD (Employee) Appellees Butler, Covington, Saleme, and Terry Ingram. The district court dismissed the equal protection claim, concluding Walker had not alleged that similarly situated white business owners were treated differently. The district court additionally found Kingsley entitled to qualified immunity based on objective reasonableness, i.e., Kingsley's awareness of Walker's licensing investigation by the Texas Department of Licensing and Regulation based on allegations of falsified work history, as well as being subject to criminal investigation and prosecution, and then convicted of tax fraud. Based on these facts, Walker's challenge to the district court's qualified immunity ruling on this issue is unwarranted.

Regarding Walker's assertions concerning document requests that BISD Board of Trustee Appellants Michael Neil and Tom Neild made regarding African American employees of the BISD who had attended the Texas Alliance of Black School Educators meetings, the district court found dismissal warranted because Walker had not alleged he was one of the participants. This challenge likewise is unavailing.

Appellants additionally contest the district court's dismissal of their claims on state law immunity grounds against BISD (Employee) Appellees Saleme, Covington, and Butler, who prepared the "Evaluation Matrix" utilized by the BISD in rejecting Walker's contract renewal bid in 2014, and includes the (allegedly false) statement: "Previous Provider Admitted guilt to padding BISD invoices. Paid back over $2,000,000." All of these issues and rulings are discussed at length in the Magistrate Judge's August 18, 2016 Report and Recommendation and the District Judge's September 14, 2016 Order approving and adopting the Magistrate Judge's recommended rulings. We find no error in the district court's assessment.

Section 22.051 of the Texas Education Code defines "professional employee of a school district" to include

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

superintendents, board of trustee members, and "any other person employed by a school district whose employment requires certification and the exercise of discretion." Tex. Educ. Code § 22.051 The BISD Board of Managers, BISD Board of Trustees, and BISD Employees Butler, Covington, Saleme, and Ingram qualify as professional employees under § 22.051, acting within the scope of their authority.

Regarding Haynes' assault claims against Neil, involving his alleged physical removal of Haynes from blocking the doorway of a BISD press conference, the district court found that he, a member of the **\*752** BISD Board of Trustees, qualified as a professional employee of the school district, and thus was entitled to dismissal based on the election of remedies provision of the Texas Tort Claims Act ("TTCA"), § 101.106 of the Texas Civil Practice and Remedies Code, so long as he acted within the scope of his employment. *See* Tex. Civ. Prac. & Rem. Code § 101.106 (suing governmental unit bars any suit or recovery against individual employee of the unit regarding the same matter). Based on § 22.051 and the version of § 37.105 of the Texas Education Code in effect prior to the June 15, 2017 effective date of its 2017 amendment,[17] the District Judge determined that Neil, as a member of the Board of Trustees, qualified as a professional employee, was authorized to remove persons from school property, and thus was acting in the scope of his employment. Tex. Educ. Code § 22.051 (definition of professional employee of school district includes member of the board of trustees of an independent school district); Tex. Educ. Code § 37.105 (pre-2017 amendment) (authorizing board of trustees of a school district or authorized representative to eject any undesirable person from the property upon refusal to leave peaceably).

For that reason, the district court found that that BISD Board of Trustee member Neil was entitled to dismissal under the election of remedies provision of the TTCA. We find no error in this assessment under applicable law. *See also* Tex. Educ. Code § 22.0511 (immunity of professional employee of school district from personal liability for act incident to or within the scope of duties that involves exercise of judgment or discretion except for using excessive force with discipline or negligence resulting in bodily injury to student).

## IX. State-Law Civil Conspiracy

To the extent that none of Appellants' other tort claims survive, this claim likewise falls. *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, No. 17-0630, 580 S.W.3d 136, 138–39, 2019 WL 1495211, at \*1 (Tex. Apr. 5, 2019) ("civil conspiracy is a derivative tort that 'depends on participation in some underlying tort' ")(quoting *Tilton v. Marshall*, 925 S.W.2d 672, 681 (Tex. 1996) ("liability for conspiracy depends on participation in some underlying tort for which the plaintiff seeks to hold at least one of the named defendants liable")). Furthermore, Appellants' allegations of an "agreement" amongst the various groups of defendants are largely conclusory and speculative and thus legally deficient.

## Conclusion

Finding no reversible error in the district court's dismissal of the entirety of Appellants' claims, we AFFIRM.

## All Citations

938 F.3d 724

## Footnotes

1    As the record reflects, Appellants have asserted numerous claims against approximately 35 defendants. The Fourth Amended Complaint is 52 pages long and contains 222 numbered paragraphs. In the interest of brevity, all natural persons will first be identified herein by their first and last names, and titles, if known. Subsequent references to these persons shall be to be only their last names.

2    The Fourth Amended Complaint lists the following defendants as members of the BISD Board of Managers: Venice Monroe, A.B. Bernard, Jimmy Simmons, Robert Turner, Joe Domino, Lenny Cabarello, and Jack Carroll.

3    The TCPA, an anti-SLAPP (Strategic Litigation Against Public Participation) statute, was enacted to "encourage and safeguard the constitutional rights of persons to petition, speak freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury." Tex. Civ. Prac. & Rem. Code, § 27.002. To that end, the TCPA creates an expedited process for

defendants to quickly obtain dismissal of "retaliatory lawsuits that seek to intimidate or silence them on matters of public concern." *In re Lipsky*, 460 S.W.3d 579, 586 (Tex. 2015).

4     Rule 28 (j) of the Federal Rules of Appellate Procedure provides:

> **(j) Citation of Supplemental Authorities.** If pertinent and significant authorities come to a party's attention after the party's brief has been filed--or after oral argument but before decision--a party may promptly advise the circuit clerk by letter, with a copy to all other parties, setting forth the citations. The letter must state the reasons for the supplemental citations, referring either to the page of the brief or to a point argued orally. The body of the letter must not exceed 350 words. Any response must be made promptly and must be similarly limited.

See Fed. R. App. P. 28 (j).

5     The letter identifies the "*Examiner* Appellees" as the *Beaumont Examiner*, Don Dodd, Jennifer Johnson, and Wayne Reaud.

6     The Magistrate Judge's March 11, 2016 Report and Recommendation notes that, during the January 14, 2016 TCPA hearing regarding the motion to dismiss filed by the *Examiner* Appellees, Appellee Jordan, and Appellee Getz, Plaintiffs [Appellants] conceded that their claims involve statements to which the TCPA applies. As of the Magistrate Judge's March 11, 2016 consideration of the *Beaumont Enterprise* Defendants' motion to dismiss, however, Plaintiffs argued that the TCPA cannot be applied to federal claims asserted in federal court. ("All parties agree that the TCPA applies to Walker's claims of defamation, tortious interference, and civil conspiracy, but contest whether it can be applied to his claims of RICO conspiracy.") In response, the *Beaumont Enterprise* Defendants asserted that Plaintiffs are judicially estopped from contesting whether the TCPA can be applied to Plaintiffs' RICO claims and also waived this argument by not addressing it in Plaintiffs' response to the *Beaumont Enterprise* Defendants' motion. Additionally, they argued that because Walker's RICO claims against them are entirely based on defamation, the court could properly dismiss the RICO claims under the TCPA. Finding that Appellants failed to adequately plead their RICO claims under Rule 12(b)(6), the Magistrate Judge concluded the issue need not be addressed.

7     Paragraphs 31-37 of the Fourth Amended Complaint list the following persons as IBEW Defendants (in addition to the International Brotherhood of Electrical Workers): the IBEW Local Union 479, Steven Lisle, Dwayne or Duwayne Hermann, Chris Kibby, David Gonzales, and Wayne Reaud.

8     In making an *Erie* guess, federal courts should "defer to intermediate state appellate court decisions, unless convinced by other persuasive data that the highest court of the state would decide otherwise." *City of Alexandria*, 740 F.3d at 351 (quoting *Mem'l Hermann Healthcare Sys. Inc. v. Eurocopter Deutschland, GMBH*, 524 F.3d 676, 678 (5th Cir. 2008)) (internal quotations omitted).

9     *See, e.g.*, *Nationwide*, 512 F.3d at 146; *In re Philadelphia Newspapers, LLC*, 690 F.3d 161, 174 (3d Cir. 2012) (an exception to the single publication rule is republication; republishing, editing and reissuing, or placing material in a new form that includes the defamatory material resets the statute of limitations.).

10    "A court's decision to limit discovery is reviewed for abuse of discretion." *Crosby v. Louisiana Health Serv. & Indem.* Co., 647 F.3d 258, 261 (5th Cir. 2011). Although a court is afforded broad discretion when deciding discovery matters, the court abuses its discretion when its decision is based on an erroneous view of the law. *Id.* The district court concluded the Magistrate Judge stayed discovery under a federal trial court's inherent power to stay discovery and the FRCP, not the TCPA

11    These claims include all those asserted against the *The Examiner* Appellees and those asserted against journalist Jerry Jordan.

12    This statute, § 73.002(a)-(b), enacted in 1901, codifies the common-law privilege the media have to report on judicial proceedings without regard for whether the information from such proceedings is actually true. *KBMT Operating Co., LLC v. Toledo*, 492 S.W.3d 710, 713 (Tex. 2016).

Walker v. Beaumont Independent School District, 938 F.3d 724 (2019)

13    Given the 2012 and 2013 publication dates of the articles attached to the Fourth Amended Complaint, occurring well before July 2014 (one-year prior to the July 2015 filing date of this action), it unnecessary for this panel to discuss the merits of the defamation claims asserted against any media defendant other than the *Beaumont Enterprise* Appellees.

14    As described by the Magistrate Judge in the March 11, 2016 Report and Recommendation, the first *Beaumont Enterprise* article, dated October 19, 2012, is titled "BISD will not seek Calvin Walker restitution." Walker asserts that this article is defamatory because, by announcing that BISD could seek $2 million in restitution, it misleads readers into believing that Walker had defrauded BISD by that amount. The second *Beaumont Enterprise* article, dated March 11, 2014, is titled "TEA report questions BISD's employment of Calvin Walker." Walker contends that it is defamatory because it states: "In his plea agreement, Walker signed a statement that he knowingly altered invoices that were submitted to the school district for repayment in the amount of $2 million. He forfeited a total of $3.5 million in his plea agreement, $2 million of which the school district could have sought." Third, Walker identifies an article published by Crum on July 28, 2014, titled "BISD will rebid contract given to Calvin Walker." Walker argues the article is defamatory because it states that he admitted in his plea agreement to "falsifying" invoices submitted to BISD, thus implying that he had defrauded the BISD.

15    Although Appellants' brief characterizes Walker's wife's trial testimony, as well as his lawyer's subsequent declaration, as explaining that Walker used the "uncashed checks [made payable to third-party suppliers] as an accounting method," no logical explanation of the purported accounting procedure has been identified in the record. Similarly, despite Walker's assertion that neither he nor his wife ever "submitted the documents in connection with requesting or receiving payment for the project," and that he "did not intend to defraud or deceive [the] BISD," the factual basis executed in connection with his plea agreement expressly references "[r]ecords of the BISD contain[ing] ... an invoice ... altered to reflect that it was an invoice when in fact the document was a quote and not an actual purchase" and then states "[r]ecords of the BISD also contained similar altered documents purportedly from the same electrical supplier matching invoices submitted by the defendant for materials in other projects."

To the extent that Walker complains about the adverse inferences reasonably drawn from the language in his factual basis, perhaps he should have insisted that additional clarifying language be included prior to adopting it in connection with his guilty plea.

16    Relative to any other state-law tort claims asserted against the BISD, Appellants have not identified a valid waiver of the sovereign immunity applicable in Texas to school districts. *See, e.g. City of Houston v. Williams*, 353 S.W.3d 128, 134 (Tex. 2011) (governmental units such as school districts are immune from suit unless that immunity has been waived by the legislature); *see also* Tex. Civ. Prac. & Rem. Code § § 101.001, 101.051 (under the TTCA the only permissible tort claim against a school is one based on misuse of a motor vehicle).

17    *See* Acts 2017, 85th Tex. Leg., ch. 924 (S.B. 1553), § 5, eff. June 15, 2017.

---

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

Linicomn v. Hill, 902 F.3d 529 (2018)

902 F.3d 529
United States Court of Appeals, Fifth Circuit.

Vernon LINICOMN, Plaintiff-Appellant,
v.
Maurico HILL; Cheryl Matthews; Does
1-3, Inclusive, Defendants-Appellees.

No. 17-10101
|
FILED September 5, 2018

**Synopsis**
**Background:** Arrestee brought § 1983 action in state court against police officers for allegedly violating his Fourth Amendment rights by forcibly entering his house without a warrant, and by assaulting and arresting him with excessive force. Following removal, the United States District Court for the Northern District of Texas, Sidney A. Fitzwater, J., 2016 WL 6893627, granted judgment on the pleadings to the officers. Arrestee appealed.

**Holdings:** The Court of Appeals, James L. Dennis, Circuit Judge, held that:

[1] arrestee plausibly alleged that exigent circumstances did not justify officers' warrantless entry into his home; but

[2] officers had qualified immunity from arrestee's claim that the warrantless entry violated his Fourth Amendment rights;

[3] officer, who allegedly did not have any contact with arrestee until she helped escort him outside his home for medical treatment, did not use excessive force; and

[4] second officer's alleged use of force in restraining arrestee inside his home was objectively reasonable.

Affirmed.

West Headnotes (30)

[1]    **Federal Courts**  ⇌  Judgment on the pleadings

Court of Appeals reviews a district court's grant of a motion for judgment on the pleadings de novo. Fed. R. Civ. P. 12(c).

1 Cases that cite this headnote

[2]    **Federal Civil Procedure**  ⇌  Want of Fact Issue
**Federal Civil Procedure**  ⇌  Matters considered
A motion for judgment on the pleadings may dispose of a case when there are no disputed material facts and the court can render a judgment on the merits based on the substance of the pleadings and any judicially noticed facts. Fed. R. Civ. P. 12(c).

15 Cases that cite this headnote

[3]    **Federal Civil Procedure**  ⇌  Claim for relief in general
A pleading offering only labels and conclusions, naked assertions, or a formulaic recitation of the elements of a cause of action will not satisfy the short and plain statement requirement. Fed. R. Civ. P. 8(a).

2 Cases that cite this headnote

[4]    **Federal Civil Procedure**  ⇌  Insufficiency in general
**Federal Civil Procedure**  ⇌  Matters deemed admitted; acceptance as true of allegations in complaint
To avoid dismissal, a plaintiff must plead sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 8(a).

9 Cases that cite this headnote

[5]    **Federal Courts**  ⇌  Judgment or dismissal on the pleadings
On appeal from the grant of a motion for judgment on the pleadings, Court of Appeals must construe the complaint in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(c).

3 Cases that cite this headnote

**[6]**    **Civil Rights** ⟿ Government Agencies and Officers

**Civil Rights** ⟿ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

**Civil Rights** ⟿ Defenses; immunity and good faith

Public officials are entitled to qualified immunity unless the plaintiff can plead specific allegations demonstrating (1) the violation of a constitutional right that (2) was clearly established at the time of the alleged misconduct.

3 Cases that cite this headnote

**[7]**    **Civil Rights** ⟿ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

A right is "clearly established," for qualified immunity purposes, when the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right.

3 Cases that cite this headnote

**[8]**    **Federal Civil Procedure** ⟿ Matters deemed admitted; acceptance as true of allegations in complaint

At the motion to dismiss stage, the court takes the facts, as alleged or admitted by plaintiff, as true.

**[9]**    **Civil Rights** ⟿ Government Agencies and Officers

**Civil Rights** ⟿ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Even where defendants are clearly entitled to qualified immunity under the second prong of the qualified immunity analysis, which asks whether the right violated was clearly established at the time of the alleged misconduct, undertaking the two-step procedure is often beneficial because

it promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable.

5 Cases that cite this headnote

**[10]**    **Searches and Seizures** ⟿ Persons, Places and Things Protected

Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[11]**    **Searches and Seizures** ⟿ Persons, Places and Things Protected

A warrantless search of a person's home is presumptively unreasonable, unless an exception to the warrant requirement applies. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[12]**    **Searches and Seizures** ⟿ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Whether exigent circumstances exist to justify a warrantless search depends on whether, given the totality of the circumstances, the search was objectively reasonable. U.S. Const. Amend. 4.

3 Cases that cite this headnote

**[13]**    **Searches and Seizures** ⟿ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Officers cannot manufacture exigency to justify a warrantless search through their own action or inaction. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[14]**    **Searches and Seizures** ⟿ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Linicomn v. Hill, 902 F.3d 529 (2018)

In assessing whether the officers impermissibly created the exigency to justify their warrantless search, the court focuses on the reasonableness of their investigative tactics leading up to the warrantless entry. U.S. Const. Amend. 4.

1 Cases that cite this headnote

[15]    **Searches and Seizures** ⟜ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Exigent circumstances that justify a warrantless search exist where, inter alia, officers must enter a home to provide emergency assistance to preserve life or prevent serious injury. U.S. Const. Amend. 4.

3 Cases that cite this headnote

[16]    **Searches and Seizures** ⟜ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury. U.S. Const. Amend. 4.

4 Cases that cite this headnote

[17]    **Searches and Seizures** ⟜ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception to the Fourth Amendment's warrant requirement. U.S. Const. Amend. 4.

2 Cases that cite this headnote

[18]    **Searches and Seizures** ⟜ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

Arrestee facially pleaded plausible § 1983 claim that exigent circumstances did not justify police officers' warrantless entry into his home, in response to his ex-wife's uncorroborated 911 call that their daughter was lethargic and sick;

although arrestee did not answer his cell phone and did not initially respond to the officers' repeated knocks at his front door, and after opening the door he attempted to close it and retreat into his house, he allegedly did so as a result of the officers' request to enter without a warrant, the officers allegedly did not inquire into basis for ex-wife's claim regarding her daughter when they spoke with her outside the house, they arrived at relatively calm scene with no external signs of struggle, and they observed no fact or circumstance tending to give rise to an objectively reasonable concern for the safety of arrestee's children. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[19]    **Searches and Seizures** ⟜ Presumptions and Burden of Proof

Officers have the burden of proving the existence of exigency, in order to justify a warrantless search. U.S. Const. Amend. 4.

1 Cases that cite this headnote

[20]    **Searches and Seizures** ⟜ Emergencies and Exigent Circumstances; Opportunity to Obtain Warrant

An appearance of anger, without more, does not establish an exigency that would justify a warrantless search. U.S. Const. Amend. 4.

[21]    **Civil Rights** ⟜ Sheriffs, police, and other peace officers

Although arrestee plausibly alleged that exigent circumstances did not justify police officers' warrantless entry into his home, in response to his ex-wife's uncorroborated 911 call that their daughter was lethargic and sick, the officers did not violate a clearly established right under the circumstances, and thus they had qualified immunity from arrestee's § 1983 claim; ex-wife's 911 call asking for assistance checking on her lethargic and sick child could reasonably be construed as evidence that her daughter

was physically ill. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Cases that cite this headnote

[22]    **Civil Rights** ⟺ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The law is "clearly established," for qualified immunity purposes, when there is controlling authority, or a robust consensus of persuasive authority, that defines the contours of the right in question with a high degree of particularity.

5 Cases that cite this headnote

[23]    **Civil Rights** ⟺ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

The court does not require a case directly on point for a right to be clearly established, for qualified immunity purposes, but existing precedent must have placed the statutory or constitutional question beyond debate.

[24]    **Civil Rights** ⟺ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

An officer is entitled to qualified immunity unless all reasonable officials in the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution.

1 Cases that cite this headnote

[25]    **Arrest** ⟺ Use of force

Police officer, who allegedly did not have any contact with arrestee until she helped escort him outside his home for medical treatment after he was pepper sprayed by officer's supervisor, did not use excessive force against arrestee. U.S. Const. Amend. 4.

[26]    **Arrest** ⟺ Use of force

To prevail on an excessive force claim, the plaintiff must show (1) an injury (2) that resulted directly and only from the use of force that was clearly excessive to the need and that (3) the force used was objectively unreasonable. U.S. Const. Amend. 4.

2 Cases that cite this headnote

[27]    **Arrest** ⟺ Use of force

Excessive force claims are fact-intensive, and courts must consider the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight. U.S. Const. Amend. 4.

[28]    **Arrest** ⟺ Use of force

The reasonableness under the Fourth Amendment of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. U.S. Const. Amend. 4.

[29]    **Arrest** ⟺ Use of force

When considering an excessive force claim, the court evaluates the reasonableness of each officer's actions separately. U.S. Const. Amend. 4.

[30]    **Arrest** ⟺ Use of force

Police officer's alleged use of force in restraining arrestee inside his home was objectively reasonable under the Fourth Amendment; arrestee admitted that officer used force only after he made physical contact with officer and officer's supervisor, arrestee further admitted that he fled to the back of his house and engaged in a physical struggle with officer, and he admitted that officer handcuffed and escorted him outside for medical treatment after he was pepper sprayed by officer's supervisor. U.S. Const. Amend. 4.

Linicomn v. Hill, 902 F.3d 529 (2018)

---

**\*532** Appeal from the United States District Court for the Northern District of Texas, Sidney A. Fitzwater, U.S. District Judge

**Attorneys and Law Firms**

Kenneth Stuart Harter, Law Offices of Kenneth S. Harter, Carrollton, TX, for Plaintiff-Appellant.

Barbara Elaine Rosenberg, Esq., Jennifer Carter Huggard, James Bickford Pinson, Assistant City Attorney, Tatia R. Wilson, City Attorney's Office for the City of Dallas, for Defendants-Appellees.

Before KING, DENNIS, and COSTA, Circuit Judges.

**Opinion**

JAMES L. DENNIS, Circuit Judge:

**\*533** Vernon Linicomn brought this 42 U.S.C. § 1983 action asserting that Dallas, Texas, police officers violated his Fourth Amendment rights by forcibly entering his house without a warrant, without his consent, and without reason to believe that any person inside was in imminent danger of harm; and by assaulting and arresting him with excessive force. Two of the officers, Maurico Hill and Cheryl Matthews, filed a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), which the district court granted. Vernon now appeals.

**I**

**A**

**[1]** **[2]** **[3]** **[4]** **[5]** We review a district court's grant of a Rule 12(c) motion for judgment on the pleadings de novo. *Machete Prods., L.L.C. v. Page*, 809 F.3d 281, 287 (5th Cir. 2015). A Rule 12(c) motion may dispose of a case when there are no disputed material facts and the court can render a judgment on the merits based on "the substance of the pleadings and any judicially noticed facts." *Id.* An adequate pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). A pleading offering only "labels and conclusions," "naked assertions," or "a formulaic recitation

of the elements of a cause of action will not do." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ). To avoid dismissal, a plaintiff must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). We must construe the complaint in the light most favorable to the plaintiff. *Id.*

**[6]** **[7]** Public officials are entitled to qualified immunity unless the plaintiff can plead specific allegations demonstrating (1) the violation of a constitutional right that (2) was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). A right is "clearly established" when "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Rice v. ReliaStar Life Ins. Co.*, 770 F.3d 1122, 1130 (5th Cir. 2014) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) ).

**B**

**[8]** Vernon Linicomn alleged the following facts in his pleadings.[1] He was awarded primary custody of his two minor children in his divorce from their mother, Linda, who suffers from mental disorders that render her unfit to be a custodial parent. After the divorce, and prior to the incident involved in this lawsuit, Linda falsely reported to the City of Dallas's Police Department on numerous occasions that the welfare of the children was endangered while they resided with Vernon. **\*534** However, although the police responded on each occasion, no action was taken against Vernon because each of the reports proved to lack substance or justification.

On October 23, 2011, at approximately 4:40 p.m., Linda called 911 regarding the welfare of the children and told dispatch that Vernon was "abusing" the children. Officers Gilbert and Oliver went to Vernon's house, knocked on the door, but received no response; they departed without taking further action. At 9:20 p.m. that same night, Linda again called the police department and reported a "disturbance" pertaining to the children at Vernon's residence. The Defendants, Officers Hill and Matthews, responded[2] and

Linicomn v. Hill, 902 F.3d 529 (2018)

arrived at Vernon's house between 9:30 and 10:41 p.m.[3] Upon arrival, the officers met Linda and Dallas paramedics and firefighters outside. Linda informed the officers that her daughter was "lethargic and sick" inside Vernon's house. The paramedics stated that they had been unable to gain entry to Vernon's house. The officers tried to contact Vernon by calling his cell phone and knocking repeatedly at his front door. Vernon did not respond.

Officer Hill contacted his supervisor, Sergeant Melquiades Irizarry, who arrived on the scene soon after. Sergeant Irizarry spoke with Linda and directed Hill to announce through the police public address system that they would enter the house—with or without Vernon's cooperation. Eventually, Vernon answered the door. Vernon advised Sergeant Irizarry and Officer Hill, who were standing at the threshold of the doorway, that his daughter was asleep and did not need medical assistance. Meanwhile, Officer Matthews stood off to the side of the door with her back to Vernon and the other officers. The officers did not have a warrant to enter Vernon's house.

Vernon refused to allow anyone entry without a warrant. Sergeant Irizarry placed his hand on Vernon's shoulder and asked him to step aside so that paramedics could enter and verify that Vernon's daughter was safe. Vernon pushed Sergeant Irizarry's hand away. Officer Hill then clasped Vernon's right arm and shoulder. Vernon pushed Officer Hill away, retreated, and tried to close the door to the house. Officer Hill and Sergeant Irizarry prevented Vernon from closing the door, and Vernon ran toward the back of the house. Officer Hill ran after Vernon. Officer Matthews entered the house but remained near the front door. Inside the house, a struggle ensued. Officer Hill grabbed Vernon and tried to take him to the floor. Vernon resisted. Sergeant Irizarry sprayed Vernon with pepper spray. Vernon was then handcuffed, escorted outside, and treated by paramedics. The officers spoke with Vernon's children and confirmed that they had been asleep and were not ill. The children also confirmed that Linda had a history of making exaggerated claims about their welfare.

## C

Vernon filed suit in Texas state court against Officers Hill and Matthews,[4] alleging *535 assault and battery as well as claims under 42 U.S.C. § 1983 for violations of his Fourth Amendment rights. The state court dismissed the assault and battery claims, and Officers Hill and Matthews removed the case to federal court. Officers Hill and Matthews affirmatively asserted the defense of qualified immunity, and the district court ordered Vernon to reply to that defense under Federal Rule of Civil Procedure 7(a). The district court ultimately granted the officers' motion for a judgment on the pleadings under Federal Rule of Civil Procedure 12(c), dismissing Vernon's § 1983 claims with prejudice. Vernon appeals that judgment. For the following reasons, we AFFIRM.

## II

The district court granted the officers' Rule 12(c) motion for judgment on the pleadings, holding that Vernon's amended complaint and Rule 7(a) reply to the Officers' answers did not overcome the officers' qualified immunity defense.[5] Vernon challenges that order, arguing that his pleadings sufficiently demonstrate that the officers acted objectively unreasonably and violated his clearly established Fourth Amendment rights by (1) entering his house without a warrant and (2) using excessive force by assaulting and pepper spraying him.

## A

[9]   The Supreme Court has held that we have discretion to address either prong of the qualified immunity analysis first. *See Pearson*, 555 U.S. at 236, 129 S.Ct. 808 (holding that the two-step, qualified-immunity sequence set forth in *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), "should not be regarded as mandatory in all cases"). Further, the Court recognized that, even where defendants are clearly entitled to qualified immunity under the second prong, undertaking the two-step procedure "is often beneficial ... [because it] promotes the development of constitutional precedent and is especially valuable with respect to questions that do not frequently arise in cases in which a qualified immunity defense is unavailable." *Id.* We believe this to be the case here. Accordingly, although we ultimately conclude that the officers were entitled to a judgment on the pleadings based on the second prong of the qualified-immunity inquiry, we begin our analysis with the first prong. *See id.*

1

Linicomn v. Hill, 902 F.3d 529 (2018)

Under the first prong of the qualified-immunity analysis, we consider whether the officers' actions violated Vernon's Fourth Amendment rights. *See Trammell v. Fruge*, 868 F.3d 332, 339 (5th Cir. 2017) (citing *Saucier*, 533 U.S. at 201, 121 S.Ct. 2151). Vernon argues that the officers entered his house without a warrant and absent exigent circumstances or any other exception to the warrant requirement.

**[10]    [11]    [12]    [13]    [14]** "Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist. Ct.*, 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972). *536 A warrantless search of a person's home is presumptively unreasonable, unless an exception to the warrant requirement applies. *Carroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (citing *Brigham City v. Stuart*, 547 U.S. 398, 404, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006) ). One exception is the existence of exigent circumstances justifying immediate action. *Rice*, 770 F.3d at 1130–31 (citing *Stuart*, 547 U.S. at 403, 126 S.Ct. 1943). Whether exigent circumstances exist to justify a warrantless search depends on whether, given the totality of the circumstances, the search was objectively reasonable. *See Stuart*, 547 U.S. at 404, 126 S.Ct. 1943. Officers cannot manufacture exigency through their own action or inaction. *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001). In assessing whether the officers created the exigency, we focus on the "reasonableness of [their] investigative tactics leading up to the warrantless entry." *Id.* at 720.

**[15]    [16]    [17]** Exigent circumstances exist where, inter alia, officers must enter a home to provide emergency assistance to preserve life or prevent serious injury. Officers may enter a home "without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Stuart*, 547 U.S. at 403, 126 S.Ct. 1943 (finding exigent circumstances where officers looked through a window and witnessed a bloody fight inside the house). "Officers do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception." *Michigan v. Fisher*, 558 U.S. 45, 48, 130 S.Ct. 546, 175 L.Ed.2d 410 (2009) (internal quotation marks omitted). The Supreme Court has found exigent circumstances where the responding officers "encountered a tumultuous situation in the house—and ... also found signs of a recent injury." *Id.* at 49, 130 S.Ct. 546; *see also Stuart*, 547 U.S. at 400–01, 126 S.Ct. 1943.

We have declined to apply the emergency aid exception absent strong evidence of an emergency at the scene or an imminent need for medical attention. In *Gates v. Tex. Dep't of Protective & Reg. Servs.*, 537 U.S. 404, 422 (5th Cir. 2008), we concluded that there were no exigent circumstances justifying the warrantless entry of social workers into a home to investigate whether children were being abused and neglected. This conclusion was based on several findings: the alleged abuser was not at home and the children were not in immediate danger; the purpose of the entry was to interview the children and not to guard them against immediate danger; and one of the social workers testified that he did not witness any exigent circumstances or emergencies at the home. *Id.* at 422–23. Additionally, in *United States v. Troop*, we held that it was unreasonable for border patrol agents to conclude that the persons they tracked to a house needed immediate aid based solely on the fact that their footprints showed signs of fatigue. 514 F.3d 405, 410 (5th Cir. 2008). We found that signs of fatigue alone, absent evidence "of medical distress requiring immediate aid, such as loss of blood, signs of physical illness, or evidence that the individual had been carried or dragged," did not constitute exigent circumstances justifying immediate entry into the house. *Id.*

**[18]    [19]** The officers argue that they acted reasonably in entering Vernon's house, claiming that they were unaware of Linda's mental illness and history of making groundless 911 calls and therefore had reason to take her call seriously that day, as she was the children's mother. Even so, under the facts alleged and admitted by Vernon, their warrantless entry was still not justified by exigent circumstances. Linda's 911 call that night alleged that *537 there was a "disturbance" at Vernon's address. But the officers had the burden of proving the existence of exigency, and failed to corroborate her call. *See Welsh v. Wisconsin*, 466 U.S. 740, 750, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1984) ("Before agents of the government may invade the sanctity of the home, the burden is on the government to demonstrate exigent circumstances that overcome the presumption of unreasonableness that attaches to all warrantless home entries."); *see also United States v. Rico*, 51 F.3d 495, 500–01 (5th Cir. 1995) (officers have the burden of proving the existence of exigency). The record reflects that the officers spoke to Linda outside Vernon's house, but the officers allege only that Linda informed them that her daughter was "lethargic and sick" before they decided to enter. The officers' responsive pleadings do not demonstrate that they inquired into the basis for Linda's assertion that the children were "lethargic and sick," or the circumstances surrounding Vernon's possession of the

children on that day. Moreover, the officers do not contend that Linda told them Vernon hurt either child or in any way caused his daughter's condition; nor do they claim that they were aware of Linda's first 911 call that day, alleging that Vernon was abusing the children. *Cf. Gates*, 537 F.3d at 422 (finding "no immediate danger" to the children where the alleged abuser was not home); *Wernecke v. Garcia*, 591 F.3d 386, 389, 396 (5th Cir. 2009) (holding that the warrantless entry of a state official to investigate the medical neglect of a child was justified by exigent circumstances, where the investigator had a temporary-custody order based on a court's finding that the child's physical health and safety were in "immediate danger," the child was known to have Hodgkin's disease, and the child's parents had refused to consent to radiation treatment).

The officers arrived at Vernon's house up to one hour and twenty-one minutes after Linda placed the call. Unlike the tumultuous situations the officers encountered in *Stuart* and *Fisher*, the officers arrived at Vernon's house to find a relatively calm scene outside with no external signs of struggle indicating the need to prevent violence or restore order.

 **[20]** Although Vernon did not answer his cell phone and did not initially respond to the repeated knocks at his front door, his failure to respond did not constitute exigency. *See Troop*, 514 F.3d at 411 (holding that when a person does not answer the door, officers should "change[ ] their strategy by retreating cautiously, seeking a search warrant, or conducting further surveillance." (citing *United States v. Gomez-Moreno*, 479 F.3d 350, 355–56 (5th Cir. 2007) )); *see also United States v. Hill*, 649 F.3d 258, 266 (4th Cir. 2011) (an officer's belief that there was someone inside the house who was not answering the door "is simply not sufficient evidence to support a warrantless entry into a private home without some articulable fact that justified urgent entry by police"). And when Vernon eventually did come to the front door, he told the officers that his daughter "was asleep, not ill, and not in need of assistance."[6] The officers have not **\*538** demonstrated that they observed or received any information, aside from Linda's 911 call, indicating that Vernon's daughter's condition had devolved beyond "lethargic and sick," or that she needed immediate emergency aid.[7] *Cf. United States v. Flores-Castaneda*, 384 Fed.Appx. 364, 367 (5th Cir. 2010) (finding imminent danger justifying warrantless entry where smugglers held hostages inside a home; they had a cell phone and possible weapons; the officers heard movement inside, but no one opened the

door for two minutes; and a man inside the residence spotted the officers, turned, and ran back into the interior of the house). Thus, the officers did not show that they reasonably believed their warrantless entry was justified by exigent circumstances.

Finally, the officers contend that they were justified in entering Vernon's home to prevent him from obtaining a weapon inside. However, the officers do not allege that they had any information indicating the presence of a weapon inside the home, nor did they articulate such a suspicion before entering. And the pleadings demonstrate that Vernon attempted to close the door and retreat into his house as a result of the officers' request to enter without a warrant. Vernon's retreat in response to the officers' actions did not give rise to exigent circumstances. *Cf. Jones*, 239 F.3d at 720 (finding that the suspect, not the officers, created the exigency where the suspect left the door open with a handgun in plain view). In sum, as Vernon adequately alleged in his amended complaint, "[a]t the time of Defendants' warrantless entry, Defendants observed no crime being committed, and observed no fact or circumstance tending to give rise to an objectively reasonable concern for the safety of Plaintiff's children," apart from Linda's uncorroborated statement that her child was "lethargic and sick." We therefore conclude that Vernon has facially pleaded sufficient facts to support a plausible claim that the officers violated his Fourth Amendment rights when they entered his house without a warrant and absent proof or showing of exigent circumstances. *See In re Great Lakes*, 624 F.3d at 210 (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

**2**

 **[21]    [22]    [23]    [24]** Though we find plausible Vernon's allegations that the officers' warrantless entry into his house violated his Fourth Amendment right, we cannot conclude, under the second prong of the qualified immunity analysis, that this right was clearly established under the circumstances of this case at the time of the officers' entry. *See Trammell*, 868 F.3d at 343. The law is clearly established when there is "controlling authority—or a 'robust consensus of persuasive authority'—that defines the contours of the right in question with a high degree of particularity." *Hogan v. Cunningham*, 722 F.3d 725, 735 (5th Cir. 2013) (citing *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) ). The Supreme Court "does not require a case directly on point for a right to be clearly established, [but] existing precedent must

have placed the statutory or constitutional question beyond debate." *See Kisela v. Hughes*, —— U.S. ——, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (quoting *White v. Pauly*, —— U.S. ——, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) ). An officer is entitled to qualified immunity "unless *all* reasonable officials in **\*539** the defendant's circumstances would have then known that the defendant's conduct violated the United States Constitution." *Thompson v. Upshur Cty.*, 245 F.3d 447, 457 (5th Cir. 2001).

Vernon argues that, under *Troop*, the Officers should have known that no exigent circumstances existed to justify their warrantless entry into his house. In *Troop*, we found that signs of fatigue in footsteps "alone [were] insufficient to demonstrate exigent circumstances requiring an immediate entry into the house," noting the lack of evidence "of medical distress requiring immediate aid, such as loss of blood, [or] signs of physical illness." 514 F.3d at 410. Here, however, the officers acted in response to Linda's 911 call asking for assistance checking on her sick and lethargic child. Because Linda's call could reasonably be construed as evidence that her daughter was physically ill, *Troop* does not clearly establish that the officers' actions were unreasonable in light of clearly established law. While *Troop* may be relevant to the question of whether the exigent circumstances exception applies, it is not "controlling authority ... that defines the contours of the right in question with a high degree of particularity." *Hogan*, 722 F.3d at 735. Nor does *Troop* "place[ ] the statutory or constitutional question beyond debate." *See Kisela*, 138 S.Ct. at 1152.

Vernon does not cite to any controlling authority establishing that the officers' entry into his house would have violated a clearly established right under the circumstances. Accordingly, we affirm the district court's decision to grant the officers' motion for judgment on the pleadings on the basis of qualified immunity.

**B**

**[25]** The district court concluded that the officers used reasonable force in light of the clearly established law at the time. The court noted Vernon's admission that he was not pepper sprayed by the officers, but by Sergeant Irizarry. It further concluded that Officer Matthews did not touch Vernon, except to assist him outside of the house to receive medical care. Finally, the court found that Vernon failed to allege any facts to negate the assertion that Officer Hill's use

of force was reasonable to prevent him from accessing any weapons inside his house.

**[26]** **[27]** **[28]** **[29]** Vernon argues that his pleadings demonstrate that he was assaulted and pepper sprayed and suffered great bodily harm as a result of the officers' unreasonable use of force. To prevail on an excessive force claim, the plaintiff must show (1) an injury (2) that resulted directly and only from the use of force that was clearly excessive to the need and that (3) the force used was objectively unreasonable. *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000). Excessive force claims are fact-intensive, and courts must consider "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ). "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Hogan v. Cunningham*, 722 F.3d 725, 734 (5th Cir. 2013) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). We evaluate the reasonableness of each officer's actions separately. *Poole v. City of Shreveport*, 691 F.3d 624, 628 (5th Cir. 2012).

We agree with the district court's findings and conclusions as to the officers' use of force. First, Vernon conceded that he **\*540** was pepper sprayed by the officers' supervisor, Sergeant Irizarry. Sergeant Irizarry is not a defendant in this case.[8] Vernon's allegations of being pepper sprayed therefore do not "focus[ ] specifically on the conduct of" Officers Hill and Matthews and cannot help him overcome their defense of qualified immunity. *See Reyes v. Sazan*, 168 F.3d 158, 161 (5th Cir. 1999) (a plaintiff must allege facts focusing specifically on the conduct of the individuals who caused the plaintiff's injury). Second, Vernon did not allege any facts demonstrating that Officer Matthews used any force on him at all. And he admitted the allegations contained in Officer Matthews's answer to his complaint, which does not describe Officer Matthews as having any contact with Vernon until she helped escort him outside for medical treatment.

**[30]** Finally, Vernon claims that Officer Hill used excessive force in restraining him. However, his claim is undermined by his admission of the facts in Officer Hill's answer to his complaint.[9] Vernon admitted that Officer "Hill clasped [Vernon's] right arm and shoulder" *after* Vernon pushed

Linicomn v. Hill, 902 F.3d 529 (2018)

Sergeant Irizarry's hand away. Vernon next admitted that Officer Hill "grabbed [him] and attempted to take him to the ground" *after* he pushed Officer Hill's hand away and ran into the house. Vernon further admitted that he and Officer Hill struggled in the hallway. Lastly, Vernon admitted that Officer Hill handcuffed and escorted him outside for medical treatment *after* Vernon was pepper sprayed by Sergeant Irizarry. In light of Vernon's admission that Officer Hill used force only after Vernon made physical contact with him and Sergeant Irizarry, and again after Vernon fled to the back of his house and engaged in a physical struggle with Officer Hill, we conclude that Vernon's pleadings do not sufficiently establish that Officer Hill's use of force was objectively unreasonable. *See Poole,* 691 F.3d at 629 (finding that officers responded to plaintiff's "escalating verbal and physical resistance" with "measured and ascending" actions where plaintiff persistently resisted the officers' commands); *Galvan v. City of San Antonio,* 435 Fed.Appx. 309, 311 (5th Cir. 2010) (finding the same where officers reacted with verbal warnings, then pepper spray, then hand-and-arm manipulation techniques, then a Taser, after plaintiff ran from officers, responded aggressively when they caught him, and engaged in a physical struggle). Accordingly, we affirm the district court's judgment as to this claim.

* * *

For these reasons, we AFFIRM the district court's judgment.

**All Citations**

902 F.3d 529

Footnotes

1    At the motion to dismiss stage, we take the facts, as alleged or admitted by Vernon, as true. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 589, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

2    We note that the Defendants, Officers Hill and Matthews, claim that they were not aware of Linda's prior false reports to the Dallas Police Department, including Linda's report earlier on the day of the incident giving rise to this litigation.

3    The pleadings are inconsistent with respect to when the officers arrived at Vernon's house.

4    Vernon also sued the City of Dallas and three unidentified officers (Does 1–3). However, Vernon abandoned his claims against the City in the district court by failing to name it as a defendant in his amended complaint. *MacArthur v. Univ. Tex. Health Ctr.,* 45 F.3d 890, 896 (5th Cir. 1995). The district court ultimately dismissed the claims against Does 1–3, after Vernon did not show good cause for his failure to effect service on them. *See* Fed. R. Civ. P. 4(m) and 6(b). Vernon has abandoned these claims by failing to brief them on appeal. *MacArthur,* 45 F.3d at 896.

5    The court assumed, arguendo, that Vernon sufficiently alleged violations of his constitutional rights, deciding only whether the Officers' conduct was objectively reasonable in light of the clearly established law at the time.

6    In their answer to the amended complaint, the officers stated that Vernon appeared "irate and upset" upon answering the door, and Vernon admitted the allegation. But an appearance of anger, without more, does not establish exigency. *Cf. Thacker v. City of Columbus,* 328 F.3d 244, 254 (6th Cir. 2003) (finding that the totality of the circumstances justified entry to secure the safety of the police, paramedics, and other people possibly inside the home where "[s]omeone had placed a 911 call reporting an emergency—a cutting or stabbing—at the residence. [The plaintiff] answered the door shirtless, with blood on his legs and boxer shorts. It was apparent that [the plaintiff] himself was injured ... [he] acted belligerently and used profanity. ... [and] [h]e appeared intoxicated.").

7    As explained above, Officers Hill and Matthews claim they had no knowledge of Linda's call earlier that day, alleging that Vernon was abusing the children. *See supra* note 2.

8    In Vernon's original petition in state court, he alleged that Doe 1 "entered Plaintiff's home without a warrant" and "assaulted Plaintiff, causing great bodily harm." To the extent that Vernon intended to name Sergeant Irizarry as Doe 1, he has abandoned this claim, as discussed above. *See supra* note 3.

Linicomn v. Hill, 902 F.3d 529 (2018)

9     Vernon admitted the facts in Officer Hill's answer to his complaint "with the exception that he [had] no information and belief with respect to the beliefs or mental status of the officers."

End of Document                                      © 2022 Thomson Reuters. No claim to original U.S. Government Works.

912 F.3d 820
United States Court of Appeals, Fifth Circuit.

Roger D. MAGEE, Plaintiff–Appellant,

v.

Walter P. REED, in his official capacity as
District Attorney for Washington Parish;
Walter P. Reed, in his personal capacity;
Jerry Wayne Cox, Defendants–Appellees.

No. 17-30353
|
FILED January 8, 2019

**Synopsis**

**Background:** Arrestee brought § 1983 action against a district attorney and minister, alleging false imprisonment, free speech retaliation, and a procedural due process violation related to his arrest for failure to pay child support after he informed the Federal Bureau of Investigation (FBI) about unlawful business dealings of district attorney and minister and the denial of his request for bail based on an unheard-of "DA hold." The United States District Court for the Eastern District of Louisiana, Ivan L.R. LeMelle, Senior District Judge, 2015 WL 5020252, 2015 WL 6605548, 2017 WL 930650, dismissed the free speech retaliation claim against minister, dismissed the false imprisonment ad free speech claims against district attorney, and granted summary judgment for district attorney on the procedural due process claim. Arrestee appealed.

**Holdings:** The Court of Appeals held that:

[1] district court erred by relying on *Heck* doctrine to dismiss free speech retaliation and false imprisonment claims, and

[2] genuine issues of material fact precluded summary judgment on procedural due process claim.

Reversed and remanded.

**West Headnotes (7)**

[1] **Federal Courts** ⟲ Pleading

Court of Appeals review dismissals for failure to state a claim and for judgment on the pleadings de novo. Fed. R. Civ. P. 12(b)(6), (c).

5 Cases that cite this headnote

[2] **Federal Civil Procedure** ⟲ Judgment on the Pleadings

The standard for dismissal by judgment on the pleadings is the same as that for dismissal for failure to state a claim; to survive either motion, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6), (c).

7 Cases that cite this headnote

[3] **Federal Courts** ⟲ Summary judgment

Court of Appeals reviews de novo a district court's grant of summary judgment. Fed. R. Civ. P. 56(a).

5 Cases that cite this headnote

[4] **Federal Civil Procedure** ⟲ Materiality and genuineness of fact issue

A dispute over a material fact is genuine for summary judgment purposes if the evidence would enable a reasonable jury to return a verdict for the non-movant. Fed. R. Civ. P. 56(a).

3 Cases that cite this headnote

[5] **Civil Rights** ⟲ Criminal prosecutions

Under the *Heck* doctrine, a plaintiff's § 1983 claim for damages is not cognizable if it challenges the validity of his criminal conviction or sentence, and he cannot show that the such conviction or sentence has been reversed; however, if a successful civil rights claim will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the claim

Magee v. Reed, 912 F.3d 820 (2019)

should be allowed to proceed, in the absence of some other bar to the suit. 42 U.S.C.A. § 1983.

21 Cases that cite this headnote

[6]     **Civil Rights** ⟜ Arrest and detention

District court erred by relying on the *Heck* doctrine to dismiss arrestee's free speech retaliation claims against minister and false imprisonment and free speech retaliation claims against district attorney related to his arrest for failing to pay child support after he informed the Federal Bureau of Investigation (FBI) about the unlawful business dealings of district attorney and minister; contrary to district court's reasoning, success on these claims would not render arrestee's guilty plea convictions invalid, because claims stemmed not from his arrest but from his denial of bail, which he was entitled to under state's constitution even if he was guilty of the crime for which he was arrested. U.S. Const. Amends. 1, 4; La. Const. art. 1, § 18.

1 Cases that cite this headnote

[7]     **Federal Civil Procedure** ⟜ Civil rights cases in general

Genuine issues of material fact as to whether a District Attorney hold or "DA hold" existed and whether it was improperly used to deny arrestee bail precluded summary judgment on arrestee's procedural due process claim against district attorney that was based on allegations that he was denied bail subject to an unheard-of "DA hold" after he was arrested for failure to pay child support after he informed the Federal Bureau of Investigation (FBI) about the unlawful business dealings of district attorney and a minister. U.S. Const. Amend. 14.

**\*821** Appeal from the United States District Court for the Eastern District of Louisiana, Ivan L.R. Lemelle, U.S. District Judge

**Attorneys and Law Firms**

Philip Jeremy Kaplan, Esq., Los Angeles, CA, Randall Alan Smith, Smith & Fawer, L.L.C., New Orleans, LA, for Plaintiff-Appellant.

Richard T. Simmons, Jr., Attorney, Hailey, McNamara, Hall, Larmann & Papale, L.L.P., Metairie, LA, Cary Joseph Menard, Assistant District Attorney, District Attorney's Office for the 22nd JDC-State of Louisiana, Covington, LA, for Walter P. Reed.

James Stephen Knight, Knight Law Office, L.L.C., Franklinton, LA, for Jerry Wayne Cox.

Before STEWART, Chief Judge, DENNIS, and WILLETT, Circuit Judges.

**Opinion**

PER CURIAM:

Roger D. Magee appeals the dismissal of his wrongful imprisonment, free speech retaliation, and procedural due process claims against Walter P. Reed (District Attorney for Washington Parish, Louisiana) and Jerry Wayne Cox (a minister in Franklinton, Louisiana). We conclude that the district court erred by (1) relying on *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), to dismiss Magee's wrongful imprisonment and free speech retaliation claims, and (2) resolving a genuine dispute of material fact at the summary judgment stage to dismiss Magee's due process claim. Accordingly, we REVERSE the district court's dismissal and REMAND for further proceedings.

**I. Background**

**A. Factual**

Between 2010 and 2012, Magee informed the FBI about Cox and Reed's unlawful business dealings, including tax fraud. After learning of Magee's conversations with the FBI, Cox threatened Magee, claiming that Reed was "ex-FBI" and had "t[aken] care of it." Cox also told Magee that if he ever came to Louisiana, Reed would "handle" him. Two years later, in 2014, Magee traveled to Louisiana and was soon arrested for failure to pay child support. During his 101-day incarceration, Magee made many requests for bail through both his family and criminal defense counsel but was refused due to a "DA Hold," a type of hold both parties agree is not

Magee v. Reed, 912 F.3d 820 (2019)

recognized by law. Magee's eventual release was conditioned on his agreement to plead guilty **\*822** to failure to pay child support and to resisting an officer.

Shortly after his release, Magee received a phone call from Cox's daughter asking if he intended to "pursue this any further." Taking the question as a reference to his cooperation with the FBI, Magee told her he was "done."

**B. Procedural**

Magee's First Amended Complaint alleged various violations of his rights—both under the U.S. Constitution and under Louisiana tort law—against assorted defendants. Some claims went to trial while others were dismissed. Reed and Cox each filed motions to dismiss all claims against them under Rule 12(b)(6), or, in the alternative, under Rule 12(c) or Rule 56. The district court granted both motions, dismissing all claims.

The only claims before us are Magee's § 1983 claims against Reed (in both his official and personal capacities) for false imprisonment, free speech retaliation, and procedural due process violations, and against Cox for free speech retaliation.

**II. Standard of Review**

**[1]** **[2]** We review dismissals under Rule 12(b)(6) and 12(c) de novo. *Lampton v. Diaz*, 639 F.3d 223, 225 (5th Cir.2011); *Johnson v. Johnson*, 385 F.3d 503, 529 (5th Cir.2004). And the standard for dismissal under Rule 12(c) is the same as under Rule 12(b)(6): "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Edionwe v. Bailey*, 860 F.3d 287, 291 (5th Cir.2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ).

**[3]** **[4]** We also review de novo a district court's grant of summary judgment under Rule 56. *Hyatt v. Thomas*, 843 F.3d 172, 176 (5th Cir.2016). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the summary judgment evidence would enable a reasonable jury to return a verdict for the non-movant. *Hyatt*, 843 F.3d at 177.

**III. Discussion**

**A. The District Court Erred by Relying on *Heck* to Dismiss the Free Speech Retaliation Claim Against Cox and the False Imprisonment and Free Speech Retaliation Claims Against Reed.**

**[5]** In *Heck*, the Supreme Court held that if a plaintiff's civil rights claim for damages challenges the validity of his criminal conviction or sentence, and the plaintiff cannot show that such conviction or sentence has been reversed, invalidated, or otherwise set aside, the claim is not cognizable under § 1983. 512 U.S. at 486–87, 114 S.Ct. 2364. However, if a successful civil rights claim will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the claim should be allowed to proceed, in the absence of some other bar to the suit. *Id.* at 487, 114 S.Ct. 2364.

**[6]** Here, the district court reasoned that the false imprisonment and free speech retaliation claims required proof that Magee's arrest was not supported by probable cause. Thus, success on these claims would render Magee's guilty plea convictions invalid under *Heck*.

We disagree. Magee's claims stem *not* from his arrest but from his denial of bail. In *Eubanks v. Parker County Commissioners Court*, we held that *Heck* was inapplicable to violations stemming from a denial of bail because a denial of bail has "no bearing" on the validity of the underlying **\*823** convictions. No. 94-10087, 1995 WL 10513, \*1, \*3 (5th Cir. Jan. 3, 1995) (unpublished but precedential under 5th Cir. R. 47.5.3). Even assuming Magee was guilty of the crime he was arrested for, he was still entitled to bail under the Louisiana Constitution. La. Const. art. I, § 18. Success on Magee's false imprisonment and free speech retaliation claims would not invalidate his initial arrest or guilty plea. Thus, the district court erred in relying on *Heck* to dismiss Magee's false imprisonment and free speech retaliation claims.

**B. The District Court Erred by Dismissing the Procedural Due Process Claim Against Reed.**

First, we must consider whether the district court converted a Rule 12 motion into a summary judgment proceeding by considering evidence outside the pleadings. "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed.

R. Civ. P. 12(d). If so, while review is still de novo, we must inquire whether there is a genuine dispute as to a material fact. *See* Fed. R. Civ. P. 56(a).

Reed attached to his motion to dismiss a trial court minute entry, which established that the district court set a $750 bond on Magee's charge for resisting arrest and did not set bond for his child support charge. Reed used this to try to establish that neither he nor anyone from his office was present at the bond hearing. The district court used the minute entry to conclude that Reed was not causally connected to the claim. Because the district court relied on evidence outside the pleadings, we must treat this as a review of summary judgment and ask whether there is a genuine dispute as to a material fact.

 [7]    While Reed attached evidence meant to establish that neither he nor his office was involved in Magee's bail hearings, Magee submitted evidence to establish the opposite. In response to Reed's motion, Magee submitted declarations from his criminal counsel, Marion Farmer, from his aunt, Ruby Magee, and from himself to establish that he had been denied bail subject to a "DA Hold," a type of hold that *both* parties agree is not recognized by law.

Magee has established evidence of the DA Hold by providing sworn affidavits from multiple parties. Resolving all reasonable inferences in favor of the nonmoving party,

as we must, we conclude that the existence of a mysterious and unheard-of "DA Hold" could lead a reasonable juror to believe that the District Attorney or his office was engaged in some sort of foul play or direct intervention with Magee's ability to receive bail. Thus, there is a genuine dispute as to a material fact—namely, whether such a "DA Hold" actually exists and whether it was used to deny Magee bail—meaning summary judgment was inappropriate.

The district court explicitly relied on the minute entry submitted by Reed. But it made no mention of Magee's contrary evidence, thus improperly resolving a genuine dispute of material fact at the summary judgment stage.

**IV. Conclusion**

The district court erred in concluding that Magee's false imprisonment and free speech retaliation claims were barred by *Heck*. It also erred in resolving a genuine dispute of a material fact at the summary judgment stage to dismiss Magee's due process claim. We REVERSE the district court's dismissal and REMAND for further proceedings.

**All Citations**

912 F.3d 820

---

End of Document                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

796 F.3d 435
United States Court of Appeals,
Fifth Circuit.

Charles C. BOSARGE, Plaintiff–Appellee

v.

MISSISSIPPI BUREAU OF
NARCOTICS; Cal Reynolds; Eric
Fulton, Defendants–Appellants.

No. 14–60242.
|
July 15, 2015.

**Synopsis**
**Background:** Arrestee brought § 1983 action against two state narcotics agents and state narcotics bureau alleging that he was unlawfully detained, and asserting violations of state law. The United States District Court for the Southern District of Mississippi denied defendants' motion for summary judgment on basis of qualified immunity. Defendants appealed.

**Holdings:** The Court of Appeals, Stephen A. Higginson, Circuit Judge, held that:

[1] arrestee failed to allege violation of his Fourth Amendment rights as required to prevent dismissal, and

[2] agents were entitled to discretionary function immunity under Mississippi Tort Claims Act (MTCA).

Affirmed.

West Headnotes (7)

[1]    **Federal Courts** ⟜ Immunity
       **Federal Courts** ⟜ As to immunity
       The denial of qualified or absolute immunity, to extent that it turns on an issue of law, is a final decision that may be immediately appealed as a collateral order; such denial is appealable

whether the ruling occurs at pleadings stage or at summary judgment.

3 Cases that cite this headnote

[2]    **Federal Courts** ⟜ Pleading
       **Federal Courts** ⟜ Judgment on the pleadings
       **Federal Courts** ⟜ Immunity
       The standard for dismissal of a motion for judgment on the pleadings is the same as that for dismissal for failure to state a claim, and courts reviewing denials of motions on the pleadings on immunity grounds also have jurisdiction review the sufficiency of the pleadings. Fed.Rules Civ.Proc.Rule 12(b)(6), (c), 28 U.S.C.A.

78 Cases that cite this headnote

[3]    **Civil Rights** ⟜ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general
       **Civil Rights** ⟜ Defenses; immunity and good faith
       Once a defendant raises qualified immunity defense in a civil rights case, plaintiff must plead that the defendant violated a clearly established statutory or constitutional right of which a reasonable person would have known.

19 Cases that cite this headnote

[4]    **Civil Rights** ⟜ Arrest, search, and detention
       Arrestee failed to sufficiently allege a violation of his Fourth Amendment rights by state narcotics agents' misidentification of him as party to an illegal drug deal that caused him to be unlawfully detained for six months, as required to prevent dismissal of its § 1983 complaint on qualified immunity grounds, absent specific allegations in his complaint that the agents' identification was reckless, intentional, or even unreasonable. U.S.C.A. Const.Amend. 4.

14 Cases that cite this headnote

[5]    **Municipal Corporations** ⟜ Nature and grounds of liability

Mississippi Tort Claims Act (MTCA) provides the exclusive civil remedy against a governmental entity and its employees for acts or omissions that give rise to a suit. West's A.M.C. § 11–46–5(1).

6 Cases that cite this headnote

[6]     **Municipal Corporations** ⟜ Discretionary powers and duties

Immunity from liability under Mississippi Tort Claims Act (MTCA) attaches to discretionary functions, that is, those requiring judgment or discretion, but not to ministerial functions which are those imposed by statute, regulation, or other binding directive. West's A.M.C. § 11–46–5(1).

4 Cases that cite this headnote

[7]     **Public Employment** ⟜ Law enforcement personnel

**States** ⟜ Liabilities for official acts

State narcotics agents who incorrectly identified arrestee as a participant in an illegal drug deal that caused him to be unlawfully detained for six months were entitled to discretionary function immunity from alleged state law violations under Mississippi Tort Claims Act (MTCA), absent sufficient allegations that agents' misidentifications were made knowingly or recklessly. West's A.M.C. § 11–46–5(1).

6 Cases that cite this headnote

**Attorneys and Law Firms**

**\*436** David Neil McCarty, David Neil McCarty Law Firm, P.L.L.C., Robert Bruce McDuff, Esq., Graham Patrick Carner, Jackson, MS, for Plaintiff–Appellee.

Brian Atkins Montague, Law Offices of Brian A Montague, P.L.L.C., Hattiesburg, MS, Wilson Douglas Minor, Esq., Assistant Attorney General, Office of the Attorney General for the State of Mississippi, Jackson, MS, for Defendant–Appellant.

Appeal from the United States District Court for the Southern District of Mississippi.

Before BARKSDALE, SOUTHWICK, and HIGGINSON, Circuit Judges.

**Opinion**

STEPHEN A. HIGGINSON, Circuit Judge:

Charles C. Bosarge sued the Mississippi Bureau of Narcotics and two state agents under 42 U.S.C. § 1983 and Mississippi state law. He alleged that the agents falsely identified him as a participant in a drug ring and caused him to be unlawfully detained for six months. The district court denied the Defendants' motion requesting judgment on the pleadings or summary judgment on the basis of qualified or absolute immunity. On interlocutory appeal, we hold that the district court erred in denying the Defendants' motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c).

**FACTS AND PROCEEDINGS**

On June 16, 2009, a federal grand jury indicted Charles C. Bosarge (a/k/a "Smooth") and eighteen others. The defendants were charged with conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846. Bosarge was subsequently arrested and detained for six months. In December 2009, six weeks before a scheduled trial, the District Court for the Southern District of Mississippi dismissed Bosarge from the indictment without prejudice, pursuant to the government's motion.

In his § 1983 lawsuit, Bosarge claimed that he "was prosecuted, arrested, and detained without probable cause and without due process of law, in violation of the Fourth and Fourteenth Amendments." He alleged that Defendants Eric Fulton and Kyle Reynolds,[1] agents with the Mississippi Bureau of Narcotics, caused these violations by intentionally or recklessly misidentifying him as the person they viewed participating in a drug transaction. In **\*437** addition, Bosarge sought to hold the agents and the Mississippi Bureau of Narcotics liable for the state law torts of false arrest, false imprisonment, and malicious prosecution, and for violations of unnamed provisions of the Mississippi Constitution.

Bosarge's pleadings alleged the following facts. Fulton and Reynolds, relying in part on wiretapped cell phone

conversations, planned to observe a drug deal between a man named Timothy Isom and another suspect in a Best Buy parking lot in Hattiesburg, Mississippi, on November 21, 2008. After witnessing the drug deal, Fulton and Reynolds identified Bosarge as the second suspect, and "[t]his information was either provided directly to federal officials by Defendants Reynolds and Fulton, or was provided to federal officials by other state agents who did so on the basis of claims by Defendants Reynolds and Fulton that it was true." However, Bosarge alleged that he was not the person in the Best Buy parking lot. He claimed that the agents "acted intentionally or recklessly in falsely identifying" him, and that they "knew or should have known that their identification of [him] was false." Bosarge alleged that the agents identified him to reinforce a previously-formed conclusion that the man who met with Isom at the Best Buy was named Charles Bosarge. The agents reached that conclusion because the license plate of the second suspect's car was registered to a woman named Mindi Bosarge, and Mindi Bosarge's father or brother, Charles Bosarge, owned the cell phone used to communicate with Isom. Mindi Bosarge's father or brother, Charles Bosarge, is a different person than the Plaintiff. While Bosarge (the Plaintiff) acknowledged that Fulton and Reynolds stated in affidavits that they "did not know the name of the Plaintiff prior to selecting his photograph as the person they saw at the Best Buy parking lot," Bosarge claimed that "those affidavits are not necessarily accurate."

Bosarge alleged that at the time of the meeting with Isom, he was working a 12–hour shift on a shrimp boat. He claimed that the person who participated in the drug deal with Isom was named Randall Eric Tillman. According to Bosarge, the agents "knew before the Best Buy surveillance that the person who was talking with Isom" on the cell phone "went by the nickname 'Smooth,' " which is the "same nickname used by Randall Eric Tillman." Bosarge alleged that Isom later identified the second person in the Best Buy parking lot as someone other than Bosarge. Bosarge alleged that that person, "whether Tillman or someone else," "does not look enough like the Plaintiff so that the Plaintiff could be reasonably mistaken for him."

Bosarge claimed that "[a]s a result of this false identification, federal prosecutors included Plaintiff in their request for an indictment." Bosarge further alleged that Fulton "repeated the false identification" before the grand jury, and that "no other evidence implicating the Plaintiff was presented to the grand jury." After Bosarge's indictment and subsequent arrest, Reynolds testified as to the identification in an initial

detention hearing in Mobile, Alabama, at which "[n]o other evidence was presented linking Plaintiff to this [drug] ring." At a second detention hearing in Hattiesburg, Mississippi, the identification by Fulton and Reynolds was "used as a ground for continuing to detain" Bosarge.

Bosarge stressed that his lawsuit is "based on the false identification" that the Defendants provided to state or federal officials, and "not based on Agent Fulton's testimony to the grand jury, Agent Reynolds'[s] testimony at the detention hearing in Mobile, the use of their prior testimony at the detention hearing in Hattiesburg, or their preparation to testify at any of these hearings." Bosarge further alleged that **\*438** "the Defendant agents' false testimony at those proceedings taints them so that those events do not break the chain of causation."

Bosarge originally filed his complaint in the Circuit Court of Hinds County, Mississippi, against the Mississippi Bureau of Narcotics, Fulton, Reynolds, and John Does 1–10. The Defendants removed the case to federal court on the basis of federal question jurisdiction and supplemental jurisdiction. *See* 28 U.S.C. §§ 1331, 1367.[2] The Defendants raised a number of affirmative defenses, including absolute and qualified immunity. The district court directed Bosarge to file a reply under Federal Rule of Civil Procedure 7(a) "alleging with particularity the specific facts which, if true, would overcome the qualified immunity defenses raised by Defendants." The district court also stayed all discovery.

After Bosarge filed his Rule 7(a) reply, the Defendants filed a "motion for judgment on the pleadings or, alternatively, [ ] summary judgment." The Defendants argued that Bosarge's pleadings are insufficient to state a claim under either federal or state law because he "offers no factual detail concerning how [the agents'] alleged error was the product of malice, intent, or recklessness." The Defendants further argued that even if the pleadings sufficiently alleged constitutional violations, three "breaks in the causal chain" insulated the agents from liability: the grand jury's finding of probable cause, the detention proceeding in Mobile, and the detention proceeding in Hattiesburg. Finally, the Defendants argued that the Mississippi Tort Claims Act immunizes them from suit for violations of state law. In the alternative, the Defendants argued that they are entitled to summary judgment under Federal Rule of Civil Procedure 56 on the basis of affidavits by Fulton and Reynolds, which were attached to the motion. These affidavits described the agents' surveillance at the Best Buy parking lot in November 2008 and their subsequent,

independent identifications of Bosarge from a number of photographs of potential suspects. Bosarge later filed an amended complaint, which incorporated facts from the agents' affidavits. The Defendants filed an answer realleging the same immunity defenses as in their first answer, and they filed a second motion for judgment on the pleadings or summary judgment. In the second motion, the Defendants raised the same arguments as they had in the first, and they further argued that the agents were entitled to absolute immunity under a recent Supreme Court case, *Rehberg v. Paulk*, —— U.S. ——, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012). The district court held a hearing on the Defendants' motion before issuing an oral ruling denying the motion. The district court found that Bosarge had "pled a claim that entitles him to discovery," and that the Defendants were not entitled to qualified or absolute immunity. The district court did not expressly consider the state law claims, and it did not issue a written opinion. The Defendants timely appealed.

## JURISDICTION

**[1]    [2]**    The denial of qualified or absolute immunity, "to the extent that it turns on an issue of law," is a "final decision" that may be immediately appealed as a collateral order. **\*439** *Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985); *see also Palmer v. Johnson*, 193 F.3d 346, 350 (5th Cir.1999). That denial is appealable "whether the ruling occurs at the pleadings stage or at summary judgment." *Johnson v. Johnson*, 385 F.3d 503, 528 (5th Cir.2004). The Supreme Court has held that appeals courts, in reviewing the denial of a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) on the basis of qualified immunity, have "jurisdiction to pass on the sufficiency of [the] pleadings," which is an "issue of law" that "is both inextricably intertwined with, and directly implicated by, the qualified immunity defense." *Ashcroft v. Iqbal*, 556 U.S. 662, 672–73, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (internal quotation marks and citations omitted). Given that "[t]he standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)," *Johnson*, 385 F.3d at 529, courts reviewing denials of Rule 12(c) motions on immunity grounds also have jurisdiction, under *Iqbal*, to review the sufficiency of the pleadings.

The Defendants also appeal the denial of their claim that the Mississippi Tort Claims Act ("MTCA") and state common law immunize them from suit for violations of state law. Our court has held that "an order denying qualified immunity

under state law is immediately appealable as a 'final decision,' provided that 'the state's doctrine of qualified immunity, like the federal doctrine, provides a true immunity from suit and not a simple defense to liability.' " *Cantu v. Rocha*, 77 F.3d 795, 803 (5th Cir.1996) (quoting *Sorey v. Kellett*, 849 F.2d 960, 962 (5th Cir.1988)). "[T]he MTCA contemplates immunity from both liability *and judicial proceedings.*" *Hinds Cnty. v. Perkins*, 64 So.3d 982, 986 (Miss.2011) (emphasis added); *see also Lampton v. Diaz*, 661 F.3d 897, 899 (5th Cir.2011) (per curiam) ("The denial of immunity under Mississippi law, like a denial under federal law, is appealable under the collateral order doctrine."). We may therefore review, as a final decision, the district court's denial of immunity to the Defendants with respect to Bosarge's state law claims.

## STANDARD OF REVIEW

The district court's denial of a Rule 12(c) motion for judgment on the pleadings is reviewed de novo. *Johnson*, 385 F.3d at 529. As noted, "[t]he standard for dismissal under Rule 12(c) is the same as that for dismissal for failure to state a claim under Rule 12(b)(6)." *Id.* "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *see also Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir.2012) ("[A] plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified immunity defense with equal specificity."). We will "accept all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *Gines v. D.R. Horton, Inc.*, 699 F.3d 812, 816 (5th Cir.2012) (internal quotation marks, citation, and alteration omitted).

**\*440**    In considering a motion for judgment on the pleadings under Rule 12(c), the court is generally limited

to "the contents of the pleadings, including attachments thereto." *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.,* 748 F.3d 631, 635 (5th Cir.2014) (internal quotation marks and citation omitted) (considering a Rule 12(b)(6) motion); Fed.R.Civ.P. 12(d) (applying the same standard to consideration of matters outside the pleadings in both the Rule 12(c) and Rule 12(b)(6) contexts). The "pleadings" include the complaint, answer to the complaint, and "if the court orders one, a reply to an answer." Fed.R.Civ.P. 7(a). However, we agree with Bosarge that we should evaluate his claims with reference to his amended complaint, which supersedes his earlier pleadings. *See King v. Dogan,* 31 F.3d 344, 346 (5th Cir.1994) ("An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading.").

We must decide whether, and in what manner, to consider the agents' affidavits, which were attached to the Defendants' original motion and were incorporated by reference into their second motion. The district court never ruled on Bosarge's motion to strike these affidavits,[3] and it is unclear whether the district court considered the affidavits in denying the Defendants' motion for judgment on the pleadings or for summary judgment. We have held that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir.2004). Given the similarities in the analyses under Rule 12(c) and Rule 12(b)(6), we will apply the same rule to documents attached to the Defendants' motion for judgment on the pleadings. *See Horsley v. Feldt,* 304 F.3d 1125, 1134 (11th Cir.2002).

Bosarge's amended complaint borrows a number of facts from the agents' affidavits, while disputing other claims made in these affidavits. The Defendants argue that Bosarge, by relying on these affidavits, "has elected to incorporate" them into his amended complaint. Bosarge counters that "[w]hile the amended complaint refers to various portions of the affidavits, it never 'incorporates' them." Because the amended complaint relies substantially on the affidavits, we believe these affidavits should be considered as part of the pleadings, such that the motion need not be treated as one for summary judgment. *See* Fed.R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56.").[4]

However, while the affidavits may be considered as an aid to evaluating the pleadings, they should not control to the extent that they conflict with Bosarge's allegations. We distinguish these affidavits from contracts and medical **\*441** records attached to a complaint, which we have held generally trump contradictory allegations in the complaint. *See, e.g., United States ex rel. Riley v. St. Luke's Episcopal Hosp.,* 355 F.3d 370, 377 (5th Cir.2004); *Nishimatsu Constr. Co. v. Hous. Nat'l Bank,* 515 F.2d 1200, 1206 (5th Cir.1975). Accepting the Defendant-agents' unilateral statements as true would deprive Bosarge of the presumption of truth to which he is entitled at this stage of the litigation. *See N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 455–56 (7th Cir.1998) (noting that while a "blanket adoption rule makes sense in the context of an attached contract" or other binding agreement, it "would be contrary to the concept of notice pleading" to apply such a rule "in the case of letters written by the opposition for what could be self-serving purposes"); *see also Carrier Corp. v. Outokumpu Oyj,* 673 F.3d 430, 441–42 (6th Cir.2012) (refusing to accept as true all findings contained in a European Commission decision, attached to a motion to dismiss, but rather allowing the plaintiff to "draw facts from the ... decision to provide a 'starting point' and then use those facts to construct a theory that differs from or even contradicts that of the [European Commission]"); *Scanlan v. Tex. A & M Univ.,* 343 F.3d 533, 537 (5th Cir.2003) (suggesting that even where a document attached to a motion to dismiss is incorporated into the pleadings, the district court still must "construe the plaintiffs' factual allegations in the light most favorable to the plaintiffs"). We therefore do not accept as true all allegations in the agents' affidavits, but rather consider these affidavits to better understand Bosarge's amended complaint, while ensuring that Bosarge does not misrepresent the agents' statements.

## I. Federal Law Claims

**[3]** To evaluate the Defendants' argument that Bosarge's amended complaint is insufficient, we begin by considering the legal principles that govern this case. *See Iqbal,* 556 U.S. at 675, 129 S.Ct. 1937. To overcome the qualified immunity defense, Bosarge must plead that the agents violated a clearly established statutory or constitutional right of which a reasonable person would have known. *See Pearson v. Callahan,* 555 U.S. 223, 231–32, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). Bosarge alleged that the agents violated his Fourth and Fourteenth Amendment rights by causing him to be prosecuted, arrested, and detained without probable cause and without due process of law. First, we find that Bosarge's allegation that he was "prosecuted ... without

probable cause" fails to state a claim because our court has held that "no ... freestanding constitutional right to be free from malicious prosecution exists." *Castellano v. Fragozo,* 352 F.3d 939, 945 (5th Cir.2003) (en banc). In addition, although the Fourteenth Amendment is relevant because it applies the Fourth Amendment to the states, Bosarge's claims of unlawful arrest and detention should be analyzed under the Fourth Amendment and not under the Fourteenth Amendment's Due Process Clause. *See Cuadra v. Hous. Indep. Sch. Dist.,* 626 F.3d 808, 814 (5th Cir.2010) ("Cuadra's Fourteenth Amendment claims are based on alleged pretrial deprivations of his constitutional rights and, under the holding in *Albright,* such claims should be brought under the Fourth Amendment.") (citing *Albright v. Oliver,* 510 U.S. 266, 274, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion)); *Blackwell v. Barton,* 34 F.3d 298, 302 (5th Cir.1994) (holding that while the plaintiff alleged that her arrest and detention violated both the Fourth and Fourteenth Amendments, her claim was "properly considered under the Fourth Amendment, the more specific constitutional right implicated by her allegations"); *see also Castellano,* 352 F.3d at 953 ("The initiation of **\*442** criminal charges without probable cause may set in force events that run afoul of explicit constitutional protection—the Fourth Amendment if the accused is seized and arrested, for example....").

Clearly established Fourth Amendment law at the time of the agents' conduct provided that an arrest must be based on probable cause. *See, e.g., Club Retro, L.L.C. v. Hilton,* 568 F.3d 181, 206 (5th Cir.2009). Probable cause exists when "the facts and circumstances within the officer's knowledge ... are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Id.* at 204 (internal quotation marks and citations omitted). Although generally "a grand jury indictment ... itself establishes probable cause," *Campbell v. City of San Antonio,* 43 F.3d 973, 976 (5th Cir.1995), we here examine the alleged pre-indictment events because Bosarge claims that the grand jury proceedings were tainted by Fulton's misrepresentations. *See McAllister v. Desoto Cnty., Miss.,* 470 Fed.Appx. 313, 319 n. 4 (5th Cir.2012) (per curiam).[5] Important here is the well-established rule that reasonable mistakes by police officers, even leading to the arrest of the wrong person, do not implicate the Fourth Amendment. *See Heien v. North Carolina,* — U.S. ——, 135 S.Ct. 530, 536, 539, 190 L.Ed.2d 475 (2014) (noting that the Fourth Amendment tolerates objectively reasonable mistakes); *Blackwell,* 34 F.3d at 304 (holding that an officer could not be held liable

under § 1983 for a Fourth Amendment violation for arresting the wrong person, pursuant to a valid warrant, where "no inference can be drawn that [the officer] knew or believed he was or likely was arresting someone other than" the person named in the warrant); *see also McAllister,* 470 Fed.Appx. at 319–20 (holding that officers who erroneously added the plaintiff's information to a suspect's case file did not violate the Fourth Amendment, noting that the officers' conduct was "objectively reasonable," and that there was no evidence that they acted "intentionally or maliciously").

With these principles in mind, we now consider the sufficiency of Bosarge's amended complaint. We first identify the allegations that are not entitled to the assumption of truth. *Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937. We will not assume the truth of Bosarge's claim that the officers "acted intentionally or recklessly in falsely identifying" him as the person whom they witnessed meeting with Isom in the Best Buy parking lot. The Supreme Court and our court have found similar claims to be too conclusory to survive a motion to dismiss without further allegations. *See id.* at 680–81, 129 S.Ct. 1937 (declining to assume the truth of the conclusory allegation that petitioners " 'knew of, condoned, and willfully and maliciously agreed to subject [respondent]' to harsh conditions of confinement 'as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest' " (second alteration in original) (citation omitted)); *Morin v. Caire,* 77 F.3d 116, 121 (5th Cir.1996) (dismissal proper where the complaint alleged that an officer " 'knew, or should have known, that the statements of [a witness] were false,' without pleading factual allegations indicating that [the] statement[s] are indeed false, or facts indicating **\*443** that no reasonable police officer would have believed [the] statement[s]"). We also will not assume the truth of Bosarge's bare assertion that the officers identified his photograph simply to reinforce their previously-formed conclusion that the suspect was named Charles Bosarge. *See Peñalbert–Rosa v. Fortuño–Burset,* 631 F.3d 592, 595 (1st Cir.2011) ( "[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.' " (quoting *Twombly,* 550 U.S. at 557 n. 5, 127 S.Ct. 1955)).

[4]     We next consider Bosarge's well-pleaded factual allegations to determine if they plausibly support his claim of an intentional or reckless misidentification. *See Iqbal,* 556 U.S. at 681, 129 S.Ct. 1937. Bosarge raises a plausible inference that the identification was erroneous: he alleged

Bosarge v. Mississippi Bureau of Narcotics, 796 F.3d 435 (2015)

that he was not the suspect in the Best Buy parking lot, that Isom identified another person as that suspect, and that the charges against him were dismissed. However, not all mistakes are reckless or intentional. The agents' knowledge that individuals named Mindi and Charles Bosarge were connected to the drug deal does not alone suggest that the agents identified Bosarge simply to reinforce a previously-formed conclusion. In addition, Bosarge did not expressly allege that the Defendants knew, before the photographic identification, that the person in the photograph was named Charles Bosarge.

Bosarge's counsel acknowledged at oral argument that his pleadings hinge on the allegation that the man identified by Isom, "whether Tillman or someone else," "does not look enough like the Plaintiff so that the Plaintiff could be reasonably mistaken for him." While we accept as true Bosarge's claim of a difference in appearance, Bosarge's characterization of the identification as unreasonable is a conclusion not entitled to the presumption of truth. *See id.* at 680, 129 S.Ct. 1937. In addition, without further allegations regarding the dissimilarities between Bosarge and the man Isom identified, Bosarge has not plausibly established that the identification was unreasonable, let alone reckless or knowingly false. Because a reasonable mistake does not implicate the Fourth Amendment, Bosarge fails to state a claim. The agents are entitled to qualified immunity, and we need not decide their claim of absolute immunity under *Rehberg.*

At oral argument, Bosarge's counsel requested limited discovery on the ground that he strongly suspected that exculpatory evidence exists. But suspicion alone is not enough: federal pleading rules "do[ ] not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79, 129 S.Ct. 1937. Indeed, "[o]ne of the most salient benefits of qualified immunity is protection from pretrial discovery, which is costly, time-consuming, and intrusive." *Backe,* 691 F.3d at 648.

In the analogous Rule 12(b)(6) context, our court has ordered the district court to dismiss insufficient pleadings where the plaintiff has had an opportunity to plead his best case. *See Geter v. Fortenberry,* 849 F.2d 1550, 1559 (5th Cir.1988) ("[W]e would normally order the district court to grant [the] motion to dismiss or for summary judgment, if we were to conclude that [the plaintiff] has had the opportunity to plead his best case."). Bosarge has had three opportunities to provide sufficient factual detail: his initial complaint, his

Rule 7 reply, and his amended complaint. Indeed, Bosarge's counsel stated to the district court: "Everything we have and we can marshal at this stage of the proceedings ... is contained in our amended complaint." Bosarge has had an opportunity **\*444** to plead his best case, and his claims under federal law should be dismissed.

## II. State Law Claims

[5]    [6]    The Mississippi Tort Claims Act "provides the exclusive civil remedy against a governmental entity and its employees for acts or omissions which give rise to a suit." *City of Jackson v. Sutton,* 797 So.2d 977, 980 (Miss.2001) (citation omitted). The Mississippi Bureau of Narcotics has been found to be a state entity within the language of the MTCA. *Lippincott v. Miss. Bureau of Narcotics,* 856 So.2d 465, 469 (Miss.Ct.App.2003). The MTCA provides the following general waiver of sovereign immunity: "[T]he immunity of the state and its political subdivisions from claims for money damages arising out of the torts of such governmental entities and the torts of their employees while acting within the course and scope of their employment is hereby waived...." Miss.Code Ann. § 11–46–5(1). However, that waiver is subject to various exceptions. The discretionary function exception, which the Defendants argue applies here, provides:

> A governmental entity and its employees acting within the course and scope of their employment or duties shall not be liable for any claim ... [b]ased upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or employee thereof, whether or not the discretion be abused....

*Id.* § 11–46–9(1)(d). Immunity attaches to discretionary functions (requiring judgment or discretion) but not to ministerial functions (imposed by statute, regulation, or other binding directive). *See Brantley v. City of Horn Lake,* 152 So.3d 1106, 1113–1115 (Miss.2014) (en banc); *Harris ex rel. Harris v. McCray,* 867 So.2d 188, 191 (Miss.2003) (en banc). In general, "acts performed in furtherance of a discretionary function or duty are themselves entitled to immunity." *Brantley,* 152 So.3d at 1113. However, "narrower duties encompassed in a broad discretionary function may be rendered ministerial through statute or regulation." *Id.* "[T]he plaintiff bears the burden of proving that the narrower function or duty at issue has lost its discretionary-function immunity." *Id.* at 1115.

[7]    In the absence of guidance from the Mississippi Supreme Court, we make an *Erie* guess as to whether the discretionary function exception applies here. *See Keen v. Miller Envtl. Grp., Inc.,* 702 F.3d 239, 243 (5th Cir.2012). Our own unpublished caselaw and Mississippi intermediate state court precedent indicate that the function of investigating criminal activity is discretionary. *See McAllister,* 470 Fed.Appx. at 320–21 (affirming the application of discretionary function immunity to a claim that an officer failed to investigate the case properly); *Estate of Carr ex rel. Macfield v. City of Ruleville,* 5 So.3d 455, 458 (Miss.Ct.App.2008) (upholding the application of discretionary function immunity to "basic investigative decisions" by a police chief, including "the decision of what type of investigation to conduct prior to the execution of the warrant"). Although a statute or regulation may render ministerial a particular duty within a broad discretionary function, Bosarge has not carried his burden of identifying any such statute or regulation, even though he had an opportunity to do so in his amended complaint, filed after the Defendants claimed the discretionary function exception. Bosarge argues on appeal that discretionary function immunity does not apply because "a law enforcement officer does not have the discretion to falsely or recklessly accuse someone of a crime he didn't commit." However, as explained above, Bosarge's amended complaint does not adequately allege that the misidentification was reckless or knowing. *See City* **\*445** *of Clinton, Ark. v. Pilgrim's Pride Corp.,* 632 F.3d 148, 155 (5th Cir.2010) (noting that federal pleading rules apply in diversity cases). We therefore find that discretionary function immunity protects both the Mississippi Bureau of Narcotics and the individual agents from suit for the alleged violations of state law.

## CONCLUSION

Bosarge has not stated a claim that the Defendants violated his federal constitutional rights, and the Mississippi Tort Claims Act immunizes the Defendants from suit under state law. Because we hold that the district court erred in denying the Defendants' motion for judgment on the pleadings, we do not consider the Defendants' argument that the district court should have granted their motion for summary judgment. We REVERSE the district court's denial of the Defendants' Rule 12(c) motion for judgment on the pleadings. We REMAND with instructions to dismiss Bosarge's claims.

**All Citations**

796 F.3d 435

---

Footnotes

1    The original complaint erroneously spelled Reynolds's first name as "Cal."

2    We question, but need not resolve, the Defendants' claim that we also have diversity jurisdiction under 28 U.S.C. § 1332. *See Frazier v. Pioneer Americas LLC,* 455 F.3d 542, 547 (5th Cir.2006) ("[I]t is long-settled that a state has no citizenship for § 1332(a) diversity purposes."); *Strawbridge v. Curtiss,* 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806) ("[E]ach of the plaintiffs must be capable of suing each of the defendants.").

3    The district court treated that motion as moot after granting Bosarge's motion for leave to file an amended complaint.

4    Given that the Defendants opposed discovery throughout the proceedings below, and the district court stayed discovery, it would be inequitable for our court to treat the Defendants' motion as one for summary judgment. *See Benchmark Elecs., Inc. v. J.M. Huber Corp.,* 343 F.3d 719, 726 (5th Cir.) (holding that the district court plainly erred in treating the defendant's motion for judgment on the pleadings as a motion for summary judgment without allowing discovery, noting that the plaintiff was "deprived of a full and fair opportunity to defend against summary judgment"), *modified on other grounds on denial of reh'g by* 355 F.3d 356 (5th Cir.2003).

5    Because we ultimately find that Bosarge has not adequately alleged that a Fourth Amendment violation occurred, we need not consider the Defendants' argument that the grand jury and detention proceedings break the causal chain between the agents' conduct and any subsequent violation. *See Cuadra,* 626 F.3d at 813.

Bosarge v. Mississippi Bureau of Narcotics, 796 F.3d 435 (2015)

End of Document                              © 2022 Thomson Reuters. No claim to original U.S.
                                                        Government Works.

Gentilello v. Rege, 627 F.3d 540 (2010)

263 Ed. Law Rep. 36, 31 IER Cases 937

627 F.3d 540
United States Court of Appeals,
Fifth Circuit.

Larry M. GENTILELLO,
M.D., Plaintiff–Appellant,

v.

Robert V. REGE, M.D.; Alfred G. Gilman,
M.D., Ph. D., Defendants–Appellees.

No. 09–11216.
|
Dec. 1, 2010.

**Synopsis**
**Background:** Tenured university professor brought § 1983
action against his supervisors, alleging that he was wrongfully
demoted from two chair positions without due process of law
in violation of the Fourteenth Amendment. The United States
District Court for the Northern District of Texas, James E.
Kinkeade, J., 2009 WL 3818204, granted supervisors' motion
for judgment on the pleadings and denied professor leave
to file an amended or supplemental complaint. Professor
appealed.

**Holdings:** The Court of Appeals, King, Circuit Judge, held
that:

[1] professor failed to establish a property interest in his two
chair positions, and

[2] district court did not abuse its discretion in denying
professor leave to amend.

Affirmed.

West Headnotes (14)

[1]    **Federal Courts**  ⟜ Judgment on the pleadings
       A district court's ruling on a motion for judgment
       on the pleadings is reviewed *de novo.*.

58 Cases that cite this headnote

[2]    **Federal Civil Procedure**  ⟜ Judgment on the
       Pleadings
       A motion for judgment on the pleadings is
       evaluated using the same standard as a motion
       to dismiss for failure to state a claim. Fed.Rules
       Civ.Proc.Rule 12(b)(6), (c), 28 U.S.C.A.

279 Cases that cite this headnote

[3]    **Public Employment**  ⟜ Qualified immunity
       A public official performing a discretionary
       function is entitled to qualified immunity in a
       civil action for damages, provided his conduct
       does not violate clearly established federal
       statutory or constitutional rights of which
       a reasonable person would have known; in
       determining whether a defendant is entitled to
       qualified immunity, a court decides whether facts
       alleged or shown by the plaintiff make out a
       violation of a constitutional right, and whether
       that right was "clearly established" at the time of
       the defendant's alleged misconduct.

24 Cases that cite this headnote

[4]    **Civil Rights**  ⟜ Particular Causes of Action
       To state a Fourteenth Amendment due process
       claim under § 1983, a plaintiff must first
       identify a protected life, liberty or property
       interest and then prove that governmental action
       resulted in a deprivation of that interest. U.S.C.A.
       Const.Amend. 14; 42 U.S.C.A. § 1983.

75 Cases that cite this headnote

[5]    **Constitutional Law**  ⟜ Rights and interests
       protected in general
       To enjoy a property interest in employment, in
       the context of a Fourteenth Amendment due
       process claim under § 1983, an employee must
       have a legitimate claim of entitlement created
       and defined by existing rules or understandings
       that stem from an independent source such
       as state law. U.S.C.A. Const.Amend. 14; 42
       U.S.C.A. § 1983.

Gentilello v. Rege, 627 F.3d 540 (2010)

263 Ed. Law Rep. 36, 31 IER Cases 937

53 Cases that cite this headnote

**[6]**    **Labor and Employment** ⇌ Definite or Indefinite Term; Employment At-Will

**Labor and Employment** ⇌ Manuals, Handbooks, and Policy Statements

Under Texas law, there exists a presumption that employment is at-will, unless that relationship has been expressly altered by contract or by express rules or policies limiting the conditions under which an employee may be terminated.

10 Cases that cite this headnote

**[7]**    **Labor and Employment** ⇌ Termination; cause or reason in general

Under Texas law, absent a specific agreement to the contrary, employment may be terminated by the employer or the employee at will, for good cause, bad cause, or no cause at all.

7 Cases that cite this headnote

**[8]**    **Constitutional Law** ⇌ Particular claims

Tenured university professor failed to point to a state or local law, contract, or understanding that created a property interest in his two chair positions, as required to establish a due process claim against his supervisors in connection with his demotion from the positions; in his amended complaint, professor alleged the bare legal conclusion that his supervisors wrongfully removed him from his chair positions, "positions in which he had a constitutionally protected property interest in occupying for a previously-determined period of time," but professor did not substantiate those allegations. U.S.C.A. Const.Amend. 14.

8 Cases that cite this headnote

**[9]**    **Federal Courts** ⇌ Pleading

A district court's denial of leave to amend is reviewed for abuse of discretion.

15 Cases that cite this headnote

**[10]**    **Federal Civil Procedure** ⇌ Time for amendment in general

**Federal Civil Procedure** ⇌ Pretrial Order

Where a movant seeks leave to amend after the pleadings deadline in the district court's scheduling order, the movant must demonstrate good cause.

12 Cases that cite this headnote

**[11]**    **Federal Civil Procedure** ⇌ Time for amendment

District court did not abuse its discretion in denying tenured university professor's leave to amend his § 1983 due process claim against his supervisors, alleging he was wrongfully demoted from two chair positions, as an alternative to granting supervisors judgment on the pleadings; throughout his briefing in opposition to the supervisors' motion for judgment on the pleadings, professor contended that his pleadings sufficed to state a due process claim, adamantly asserted that he was not required to plead additional facts to support his claim of entitlement to the chair positions, and failed to apprise the district court of the facts he would have pled in an amended complaint, if necessary, to cure any deficiencies in his pleadings, and, moreover, professor failed to tender a proposed amended complaint setting forth those facts. U.S.C.A. Const.Amend. 14; 42 U.S.C.A. § 1983.

26 Cases that cite this headnote

**[12]**    **Federal Civil Procedure** ⇌ Pleading, Defects In, in General

At some point a court must decide that a plaintiff has had a fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit.

15 Cases that cite this headnote

**[13]**    **Federal Civil Procedure** ⇌ Time for filing

**Federal Civil Procedure** ⇌ Effect

Gentilello v. Rege, 627 F.3d 540 (2010)

263 Ed. Law Rep. 36, 31 IER Cases 937

District court reasonably concluded that plaintiff's request for leave to supplement his pleadings was untimely; plaintiff did not move for leave to file his proposed supplemental complaint until almost nine months after the action giving rise to his new claim, and nearly four months after the pleadings deadline in the district court's scheduling order, and provided no justification for the delay.

6 Cases that cite this headnote

**[14]** **Federal Civil Procedure** ⇝ Discretion of court

The decision to grant or deny leave to supplement is within the sound discretion of the district court.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*542** Richard Brent Cooper (argued), Diana L. Faust, Cooper & Scully, P.C., Dallas, TX, for Plaintiff–Appellant.

Michael W. Youtt (argued), Jeremiah Johnson Anderson, William Robert Burns, King & Spalding, L.L.P., Houston, TX, for Defendants—Appellees.

Appeal from the United States District Court for the Northern District of Texas.

Before KING, GARWOOD and DAVIS, Circuit Judges.

**Opinion**

KING, Circuit Judge:

Larry M. Gentilello, M.D., a tenured professor at the University of Texas Southwestern Medical Center, brought suit under 42 U.S.C. § 1983 against his supervisors, alleging that he was wrongfully demoted without due process of law in violation of the Fourteenth Amendment. The district court granted the Defendants' motion for judgment on the pleadings and denied Gentilello leave to file an amended or supplemental complaint. Because we agree with the district court that Gentilello has failed to allege sufficient facts to state a claim for the deprivation of a protected property interest without due process of law, we affirm.

**I. BACKGROUND**

Appellant Gentilello was at all relevant times a tenured professor of surgery at the University of Texas Southwestern Medical Center at Dallas ("UT Southwestern"). Until March 2007, Gentilello also held the positions of Chair of the Division of Burns, Trauma and Critical Care and the Distinguished C. James Carrico, M.D. Chair in Trauma (the "Chair Positions"). Gentilello alleged that Robert V. Rege, M.D., Chairman of the Department of Surgery at UT Southwestern, and Alfred G. Gilman, M.D., Ph.D., Dean of the UT Southwestern Medical School, wrongfully removed him from the Chair Positions. According to Gentilello, the demotion occurred after Gentilello voiced his concerns to Rege about what he considered to be substandard patient care at Parkland Hospital, a hospital served by UT Southwestern. Gentilello alleged that Rege and Gilman demoted him in retaliation for speaking out about the "improper and illegal" practices at Parkland Hospital.

**\*543** Gentilello filed a complaint on September 13, 2007, against Rege and Gilman (the "Defendants"), seeking damages under 42 U.S.C. § 1983 for two claims of alleged civil rights violations in connection with his demotion. Gentilello claimed that the Defendants retaliated against him for exercising his right to free speech in violation of the First Amendment, and that the Defendants deprived him of his constitutionally-protected property interest in the Chair Positions without due process of law in violation of the Fourteenth Amendment. In response to the Defendants' pre-answer motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), Gentilello filed an Amended Complaint on October 22, 2007. The district court granted the Defendants' motion to dismiss Gentilello's First Amendment retaliation claim, but denied it as to his due process claim, stating that Gentilello's allegations sufficed to establish that he had been denied due process in connection with his demotion. Subsequently, on August 29, 2008, the Defendants filed an Answer in which they asserted, *inter alia,* a qualified immunity defense. On March 20, 2009, after the deadline for amendment of the pleadings in the district court's scheduling order, but before the deadline for dispositive motions, the Defendants moved for judgment on the pleadings pursuant to Rule 12(c). The Defendants contended that Gentilello had failed to allege sufficient facts to establish that he had a constitutionally-protected property interest in the Chair Positions, and, therefore, he had failed to allege that the

Defendants violated a clearly established right as required to overcome their qualified immunity defense.

Before the district court ruled on this motion, Gentilello moved for leave to supplement the pleadings. In his proposed Supplemental Complaint, Gentilello asserted a separate claim for damages under § 1983 against Defendants Rege and Gilman for wrongfully removing Gentilello from trauma call rotation at Parkland Hospital on July 29, 2008. Gentilello alleged that his removal was retaliatory, "arbitrary and capricious," and resulted in further deprivation of his property rights without due process of law in violation of the Fourteenth Amendment.

On November 13, 2009, the district court entered an order granting the Defendants' motion for judgment on the pleadings and dismissing Gentilello's claims with prejudice. The district court held that "Plaintiff has not plead [ed] the existence of an employment contract, nor has Plaintiff even plead[ed] facts that the employment at-will relationship was altered in any manner." Therefore, Gentilello had not sufficiently pleaded the existence of a constitutionally-protected property interest to state a due process violation and the Defendants were entitled to qualified immunity. The district court also denied Gentilello leave to amend his complaint to cure the deficiencies in his pleadings, stating that it was "unwilling to allow an amendment more than a year after Plaintiff initially amended his complaint." The district court also denied Gentilello's motion for leave to file a supplemental pleading to assert a claim in connection with his removal from trauma call rotation at Parkland Hospital, finding the motion untimely. Gentilello appeals.

## II. DISCUSSION

**[1]** **[2]** We review a district court's ruling on a Rule 12(c) motion for judgment on the pleadings *de novo. Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002) (citing *Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417, 420 (5th Cir.2001)). We evaluate a motion under Rule 12(c) for judgment on the pleadings using the same standard as a **\*544** motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Doe v. MySpace, Inc.,* 528 F.3d 413, 418 (5th Cir.2008). " '[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief.' " (quoting *Hughes,* 278 F.3d at 420). To avoid dismissal, a plaintiff must plead sufficient facts to " 'state a claim to relief that is plausible on its face.' " *Ashcroft*

*v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "We do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions." *Plotkin v. IP Axess Inc.,* 407 F.3d 690, 696 (5th Cir.2005); *see also Iqbal,* 129 S.Ct. at 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

**[3]** A public official performing a discretionary function is entitled to qualified immunity in a civil action for damages, provided his conduct does not "violate clearly established federal statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In determining whether a defendant is entitled to qualified immunity, we decide whether facts alleged or shown by the plaintiff make out a violation of a constitutional right, and whether that right was "clearly established" at the time of the defendant's alleged misconduct. *Pasco ex rel. Pasco v. Knoblauch,* 566 F.3d 572, 579 (5th Cir.2009). The district court held that the defendants were entitled to qualified immunity because Gentilello had not alleged sufficient facts to state a constitutional violation. We agree. *See Johnson v. Johnson,* 385 F.3d 503, 525 (5th Cir.2004) ("Of course, the defendant's conduct cannot constitute a violation of clearly established law if, on the plaintiff's version of the facts, there is no violation at all.").

**[4]** **[5]** **[6]** **[7]** To state a Fourteenth Amendment due process claim under § 1983, "a plaintiff must first identify a protected life, liberty or property interest and then prove that governmental action resulted in a deprivation of that interest." *Baldwin v. Daniels,* 250 F.3d 943, 946 (5th Cir.2001). To enjoy a property interest in employment, an employee must "have a legitimate claim of entitlement" created and defined "by existing rules or understandings that stem from an independent source such as state law ...." *Bd. of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In Texas, there exists a presumption that employment is at-will, unless that relationship has been expressly altered by contract or by express rules or policies limiting the conditions under which an employee may be terminated. *Muncy v. City of Dallas,* 335 F.3d 394, 398 (5th Cir.2003) (citations omitted). "[A]bsent a specific agreement to the contrary, employment may be terminated by the employer or

Gentilello v. Rege, 627 F.3d 540 (2010)
263 Ed. Law Rep. 36, 31 IER Cases 937

the employee at will, for good cause, bad cause, or no cause at all." *Montgomery Cnty. Hosp. Dist. v. Brown,* 965 S.W.2d 501, 502 (Tex.1998).

[8]    Here, it is not disputed that Gentilello, as a tenured professor, had a protected property interest in his continued employment at UT Southwestern. *See Roth,* 408 U.S. at 576–77, 92 S.Ct. 2701. However, the due process clause does not protect Gentilello's specific job duties or responsibilities absent a statute, rule, or express agreement reflecting an understanding that he had a unique property interest in those duties or responsibilities. *See DePree* **\*545** *v. Saunders,* 588 F.3d 282, 289–90 (5th Cir.2009); *Kelleher v. Flawn,* 761 F.2d 1079, 1087 (5th Cir.1985) (rejecting a public employee's claim of entitlement to specific duties, where neither state law nor the employee's contract supplied a basis for a claim of entitlement to those duties). Therefore, to establish a due process claim in connection with his demotion, Gentilello was required to point to some state or local law, contract, or understanding that created a property interest in the Chair Positions. "Absent a property interest, there is nothing subject to due process protections and our inquiry ends." *Cabrol v. Town of Youngsville,* 106 F.3d 101, 105 (5th Cir.1997).

Nowhere in Gentilello's Complaint, filed September 13, 2007, his Amended Complaint, filed October 22, 2007, or his proposed Supplemental Complaint, filed April 21, 2009, did Gentilello plead the factual basis for his alleged property interest in the Chair Positions. In his Amended Complaint, Gentilello alleged the bare legal conclusion that the Defendants "wrongfully removed Plaintiff from his [Chair Positions], positions in which Plaintiff had a constitutionally protected property interest in occupying for a previously-determined period of time." He further alleged that "Defendants' conduct caused Plaintiff to be deprived of his vested, constitutionally protected property right in his [Chair Positions]," and as a result, that he "was not merely deprived of duties and responsibilities, but rather, was deprived of the economic interests in and benefits associated with such positions." Gentilello did not substantiate these allegations by pointing to any ordinance, official policy, state or local law, contract, or other enforceable agreement to support his claim of entitlement to the Chair Positions. Therefore, his pleadings fail to state a due process claim. *See Blackburn v. City of Marshall,* 42 F.3d 925, 940 (5th Cir.1995) ("Because [plaintiff] does not allege that his property interest ... stems from a state statute or regulatory scheme, a contract, or any other independent source, we find

that [plaintiff] has failed to allege a property interest protected by the Due Process Clause of the Fourteenth Amendment.").

Nor did Gentilello alert the district court to the factual basis for his claim of entitlement to the Chair Positions in his extensive briefing in opposition to Defendants' motion for judgment on the pleadings. At best, Gentilello asserted that he had a property interest in the Chair Positions "based upon letters from Defendants," the contents of which he has not disclosed to the district court or even (when we made inquiry at oral argument) to this court. Apparently as a result of these letters, Gentilello asserted that he had a contract with UT Southwestern "which was subject to certain rules and regulations"—which Gentilello has not identified—"that required 'good cause' before his chaired positions could be terminated." Contrary to Gentilello's contentions, these "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a due process claim. *Iqbal,* 129 S.Ct. at 1949 (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955).

[9]    [10]    Gentilello also contends that the district court erred in denying leave to amend his pleadings as an alternative to dismissal. In response to the Defendants' motion for judgment on the pleadings, Gentilello averred that, if the district court found his pleadings deficient, he could submit "additional evidence to show a constitutionally-protected right to his position because he may only be terminated from this position for cause." Accordingly, Gentilello asserted that good cause exists to **\*546** allow him to amend his complaint. We review the district court's denial of leave to amend for abuse of discretion. *Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill,* 561 F.3d 377, 390 (5th Cir.2009). Where, as here, the movant seeks leave to amend after the pleadings deadline in the district court's scheduling order, the movant must demonstrate good cause. *S & W Enters., L.L.C. v. SouthTrust Bank of Ala.,* 315 F.3d 533, 535–36 (5th Cir.2003).

[11]    [12]    The district court was "unwilling to allow an amendment more than a year after Plaintiff initially amended his complaint," citing *Jacquez v. Procunier,* 801 F.2d 789, 792 (5th Cir.1986) ("[I]f the protections afforded public officials are not to ring hollow, plaintiffs cannot be allowed to continue to amend or supplement their pleadings until they stumble upon a formula that carries them over the threshold."). Gentilello argues that, because the district court initially found his pleadings sufficient to state a claim, he had no reason to amend to assert additional facts regarding his property interest in the Chair Positions until the Defendants

moved for judgment on the pleadings. Nonetheless, we find that the district court did not abuse its discretion in denying Gentilello leave to amend. Throughout his briefing in opposition to the Rule 12(c) motion, Gentilello contended that his pleadings sufficed to state a due process claim, adamantly asserted that he was not required to plead additional facts to support his claim of entitlement to the Chair Positions, and failed to apprise the district court of the facts that he would plead in an amended complaint, if necessary, to cure any deficiencies in his pleadings. Moreover, Gentilello failed to tender a proposed Amended Complaint setting forth these facts. Gentilello's counsel professed at oral argument before this court that evidence purportedly establishing a property interest in the Chair Positions was in Gentilello's possession. Gentilello had ample opportunity to present this evidence to the district court prior to dismissal, but he refused to do so. In similar circumstances, we have had little difficulty affirming a district court's denial of leave to amend. *See, e.g., Goldstein v. MCI WorldCom,* 340 F.3d 238, 254–55 (5th Cir.2003); *McKinney v. Irving Indep. School Dist.,* 309 F.3d 308, 315 (5th Cir.2002). "At some point a court must decide that a plaintiff has had a fair opportunity to make his case; if, after that time, a cause of action has not been established, the court should finally dismiss the suit." *Jacquez,* 801 F.2d at 792. Accordingly, we decline to remand to allow Gentilello further opportunity to state his claim.

**[13]** **[14]** Finally, we find that the district court did not err in denying Gentilello's request for leave to supplement his pleadings. The decision to grant or deny leave to supplement is within the sound discretion of the district court. *Burns v. Exxon Corp.,* 158 F.3d 336, 343 (5th Cir.1998) ("the court *may* permit a supplemental pleading") (emphasis in original). Gentilello did not move for leave to file his proposed Supplemental Complaint until April 21, 2009, almost nine months after he was removed from the trauma call list at Parkland Hospital, the action giving rise to his new claim, and nearly four months after the pleadings deadline in the district court's scheduling order. He has provided no justification for the delay. The district court reasonably concluded that Gentilello's motion was untimely. *See Lewis v. Knutson,* 699 F.2d 230, 239–40 (5th Cir.1983) (district court did not abuse its discretion in denying leave to supplement where, *inter alia,* plaintiff moved to supplement five months after the occurrence giving rise to the proposed supplemental claim).

**\*547** III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

627 F.3d 540, 263 Ed. Law Rep. 36, 31 IER Cases 937

---

End of Document                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Ashcroft v. Iqbal, 556 U.S. 662 (2009)
129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

129 S.Ct. 1937
Supreme Court of the United States

John D. ASHCROFT, Former
Attorney General, et al., Petitioners,
v.
Javaid IQBAL et al.

No. 07–1015
|
Argued Dec. 10, 2008.
|
Decided May 18, 2009.

**Synopsis**

**Background:** Muslim Pakistani pretrial detainee brought action against current and former government officials, alleging that they took series of unconstitutional actions against him in connection with his confinement under harsh conditions after separation from the general prison population. The United States District Court for the Eastern District of New York, John Gleeson, J., 2005 WL 2375202, denied in part defendants' motions to dismiss on ground of qualified immunity. Defendants appealed. The United States Court of Appeals for the Second Circuit, Jon O. Newman, Circuit Judge, 490 F.3d 143, affirmed in part, reversed in part, and remanded. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Kennedy, held that:

[1] Second Circuit had subject matter jurisdiction to affirm district court's order denying officials' motion to dismiss on grounds of qualified immunity, and

[2] detainee's complaint failed to plead sufficient facts to state claim for purposeful and unlawful discrimination.

Reversed and remanded.

Justice Souter filed dissenting opinion in which Justices Stevens, Ginsburg, and Breyer joined.

Justice Breyer filed dissenting opinion.

West Headnotes (16)

[1]  **Federal Courts**  ⟷  Necessity of Objection; Power and Duty of Court

**Federal Courts**  ⟷  Waiver, estoppel, and consent

Subject matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt.

252 Cases that cite this headnote

[2]  **Federal Courts**  ⟷  Interlocutory and Collateral Orders

Under "collateral-order doctrine," limited set of district court orders are reviewable though short of final judgment; orders within this narrow category are immediately appealable because they finally determine claims of right separable from, and collateral to, rights asserted in action, too important to be denied review and too independent of cause itself to require that appellate consideration be deferred until whole case is adjudicated. 28 U.S.C.A. § 1291.

42 Cases that cite this headnote

[3]  **Federal Courts**  ⟷  Immunity

District court decision denying Government officer's claim of qualified immunity can fall within narrow class of appealable orders despite the absence of a final judgment. 28 U.S.C.A. § 1291.

39 Cases that cite this headnote

[4]  **Civil Rights**  ⟷  Government Agencies and Officers

**Civil Rights**  ⟷  Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

"Qualified immunity," which shields Government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

rights, is both a defense to liability and limited entitlement not to stand trial or face the other burdens of litigation.

377 Cases that cite this headnote

[5]    **Federal Courts**  ⟜  Immunity

Provided it turns on issue of law, district court order denying qualified immunity can fall within narrow class of prejudgment orders reviewable under collateral order doctrine; such an order conclusively determines that defendant must bear burdens of discovery, conceptually distinct from merits of plaintiff's claim, and would prove effectively unreviewable on appeal from final judgment. 28 U.S.C.A. § 1291.

176 Cases that cite this headnote

[6]    **Federal Courts**  ⟜  Immunity

Second Circuit had subject matter jurisdiction to affirm district court's order denying government officials' motion to dismiss Muslim Pakistani pretrial detainee's *Bivens* action on grounds of qualified immunity; because the order turned on issue of law and rejected qualified immunity defense, it was a "final decision" subject to immediate appeal. 28 U.S.C.A. § 1291.

238 Cases that cite this headnote

[7]    **United States**  ⟜  Constitutional Violations; Bivens Claims

*Bivens* recognizes implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.

401 Cases that cite this headnote

[8]    **Civil Rights**  ⟜  Vicarious liability and respondeat superior in general; supervisory liability in general
**Civil Rights**  ⟜  Complaint in general
**United States**  ⟜  Personal involvement; vicarious liability and respondeat superior
**United States**  ⟜  Pleading

Government officials may not be held liable, under *Bivens* or § 1983, for unconstitutional conduct of their subordinates under theory of respondeat superior; because vicarious liability is inapplicable, plaintiff must plead that each government official-defendant, through his or her own actions, has violated Constitution. 42 U.S.C.A. § 1983.

13287 Cases that cite this headnote

[9]    **Constitutional Law**  ⟜  First Amendment in General
**Constitutional Law**  ⟜  Intentional or purposeful action requirement
**United States**  ⟜  Pleading

Factors necessary to establish *Bivens* violation will vary with constitutional provision at issue, and where claim is invidious discrimination in contravention of First and Fifth Amendments, plaintiff must plead and prove that defendant acted with discriminatory purpose; under extant precedent, "purposeful discrimination" requires more than intent as volition or intent as awareness of consequences and instead involves decisionmaker's undertaking course of action because of, not merely in spite of, action's adverse effects upon identifiable group. U.S.C.A. Const.Amends. 1, 5.

537 Cases that cite this headnote

[10]    **Federal Civil Procedure**  ⟜  Claim for relief in general

Requirement that pleading contain a short and plain statement of claim showing that pleader is entitled to relief does not require detailed factual allegations, but demands more than unadorned "the defendant unlawfully harmed me" accusation. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

87235 Cases that cite this headnote

[11]    **Federal Civil Procedure**  ⟜  Claim for relief in general

Pleading that offers labels and conclusions or formulaic recitation of elements of cause of

Ashcroft v. Iqbal, 556 U.S. 662 (2009)
129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

action will not do, nor does complaint suffice if it tenders naked assertions devoid of further factual enhancement. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

60473 Cases that cite this headnote

**[12]** **Federal Civil Procedure** ⬅ Insufficiency in general

**Federal Civil Procedure** ⬅ Matters deemed admitted; acceptance as true of allegations in complaint

To survive motion to dismiss, complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face; claim has "facial plausibility" when plaintiff pleads factual content that allows court to draw reasonable inference that defendant is liable for misconduct alleged. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

232583 Cases that cite this headnote

**[13]** **Federal Civil Procedure** ⬅ Insufficiency in general

"Plausibility" standard, for complaint to survive motion to dismiss for failure to satisfy short and plain statement requirement, is not akin to probability requirement, but asks for more than sheer possibility that defendant has acted unlawfully. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

51275 Cases that cite this headnote

**[14]** **United States** ⬅ Pleading

Muslim Pakistani pretrial detainee's *Bivens* complaint against government officials failed to plead sufficient facts to state claim for purposeful and unlawful discrimination; complaint challenged neither constitutionality of detainee's arrest nor his initial detention but rather policy of holding post-September 11th detainees once they were categorized as of "high interest," and complaint thus had to contain facts plausibly showing that officials purposefully adopted policy of so classifying detainees because of their race, religion, or

national origin. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

1244 Cases that cite this headnote

**[15]** **Public Employment** ⬅ Actions

Basic thrust of qualified immunity doctrine is to free officials from concerns of litigation, including avoidance of disruptive discovery.

243 Cases that cite this headnote

**[16]** **Federal Civil Procedure** ⬅ Sufficiency in general

**Federal Civil Procedure** ⬅ Fraud, mistake and condition of mind

Requirement that fraud be pled with particularity does not give party license to evade the less rigid, though still operative, strictures of plain and short statement requirement. Fed.Rules Civ.Proc.Rules 8, 9(b), 28 U.S.C.A.

230 Cases that cite this headnote

**\*\*1939 \*662 Syllabus**[*]

Following the September 11, 2001, terrorist attacks, respondent Iqbal, a Pakistani Muslim, was arrested on criminal charges and detained by federal officials under restrictive conditions. Iqbal filed a *Bivens* action against numerous federal officials, including petitioner Ashcroft, the former Attorney General, and petitioner Mueller, the Director of the Federal Bureau of Investigation (FBI). See *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619. The complaint alleged, *inter alia,* that petitioners designated Iqbal a person "of high interest" on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments; that the FBI, under Mueller's direction, arrested and detained thousands of Arab Muslim men as part of its September 11 investigation; that petitioners knew of, condoned, and willfully and maliciously agreed to subject Iqbal to harsh conditions of confinement as a matter of policy, solely on account of the prohibited factors and for no legitimate penological interest; and that Ashcroft was the policy's "principal architect" and Mueller was "instrumental"

Ashcroft v. Iqbal, 556 U.S. 662 (2009)
129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

in its adoption and execution. After the District Court denied petitioners' motion to dismiss on qualified-immunity grounds, they invoked the collateral-order doctrine to file an interlocutory appeal in the Second Circuit. Affirming, that court assumed without discussion that it had jurisdiction and focused on the standard set forth in *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, for evaluating whether a complaint is sufficient to survive a motion to dismiss. Concluding that *Twombly* 's "flexible plausibility standard" obliging a pleader to amplify a claim with factual allegations where necessary to render it plausible was inapplicable in the context of petitioners' appeal, the court held that Iqbal's complaint was adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law.

*Held:*

1. The Second Circuit had subject-matter jurisdiction to affirm the District **1940 Court's order denying petitioners' motion to dismiss. Pp. 1944 – 1947.

(a) Denial of a qualified-immunity claim can fall within the narrow class of prejudgment orders reviewable under the collateral-order doctrine *663 so long as the order "turns on an issue of law." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411. The doctrine's applicability in this context is well established; an order rejecting qualified immunity at the motion-to-dismiss stage is a "final decision" under 28 U.S.C. § 1291, which vests courts of appeals with "jurisdiction of appeals from all final decisions of the district courts." *Behrens v. Pelletier,* 516 U.S. 299, 307, 116 S.Ct. 834, 133 L.Ed.2d 773. Pp. 1945 – 1946.

(b) Under these principles, the Court of Appeals had, and this Court has, jurisdiction over the District Court's order. Because the order turned on an issue of law and rejected the qualified-immunity defense, it was a final decision "subject to immediate appeal." *Behrens, supra,* at 307, 116 S.Ct. 834. Pp. 1946 – 1947.

2. Iqbal's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination. Pp. 1947 – 1954.

(a) This Court assumes, without deciding, that Iqbal's First Amendment claim is actionable in a *Bivens* action, see *Hartman v. Moore,* 547 U.S. 250, 254, n. 2, 126 S.Ct. 1695, 164 L.Ed.2d 441. Because vicarious liability is inapplicable

to *Bivens* and § 1983 suits, see, *e.g., Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611, the plaintiff in a suit such as the present one must plead that each Government-official defendant, through his own individual actions, has violated the Constitution. Purposeful discrimination requires more than "intent as volition or intent as awareness of consequences"; it involves a decisionmaker's undertaking a course of action " 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870. Iqbal must plead sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason, but for the purpose of discriminating on account of race, religion, or national origin. Pp. 1947 – 1949.

(b) Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." "[D]etailed factual allegations" are not required, *Twombly,* 550 U.S., at 555, 127 S.Ct. 1955, but the Rule does call for sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face," *id.,* at 570, 127 S.Ct. 1955. A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. Two working principles underlie *Twombly.* First, the tenet that a court must accept a complaint's allegations as true is inapplicable to threadbare recitals of a cause of action's elements, supported by mere conclusory statements. *Id.,* at 555, 127 S.Ct. 1955. Second, determining whether a complaint states a plausible claim is context specific, requiring *664 the reviewing court to draw on its experience and common sense. *Id.,* at 556, 127 S.Ct. 1955. A court considering a motion to dismiss may begin by identifying allegations that, because they are mere conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded **1941 factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. Pp. 1948 – 1951.

(c) Iqbal's pleadings do not comply with Rule 8 under *Twombly.* Several of his allegations—that petitioners agreed to subject him to harsh conditions as a matter of policy, solely on account of discriminatory factors and for no

legitimate penological interest; that Ashcroft was that policy's "principal architect"; and that Mueller was "instrumental" in its adoption and execution—are conclusory and not entitled to be assumed true. Moreover, the factual allegations that the FBI, under Mueller, arrested and detained thousands of Arab Muslim men, and that he and Ashcroft approved the detention policy, do not plausibly suggest that petitioners purposefully discriminated on prohibited grounds. Given that the September 11 attacks were perpetrated by Arab Muslims, it is not surprising that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the policy's purpose was to target neither Arabs nor Muslims. Even if the complaint's well-pleaded facts gave rise to a plausible inference that Iqbal's arrest was the result of unconstitutional discrimination, that inference alone would not entitle him to relief: His claims against petitioners rest solely on their ostensible policy of holding detainees categorized as "of high interest," but the complaint does not contain facts plausibly showing that their policy was based on discriminatory factors. Pp. 1950 – 1953.

(d) Three of Iqbal's arguments are rejected. Pp. 1952 – 1954.

(i) His claim that *Twombly* should be limited to its antitrust context is not supported by that case or the Federal Rules. Because *Twombly* interpreted and applied Rule 8, which in turn governs the pleading standard "in all civil actions," Rule 1, the case applies to antitrust and discrimination suits alike, see 550 U.S., at 555–556, and n. 3, 127 S.Ct. 1955. Pp. 1952 – 1953.

(ii) Rule 8's pleading requirements need not be relaxed based on the Second Circuit's instruction that the District Court cabin discovery to preserve petitioners' qualified-immunity defense in anticipation of a summary judgment motion. The question presented by a motion to dismiss for insufficient pleadings does not turn on the controls placed on the discovery process. *Twombly, supra,* at 559, 127 S.Ct. 1955. And because Iqbal's *665 complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise. Pp. 1952 – 1954.

(iii) Rule 9(b)—which requires particularity when pleading "fraud or mistake" but allows "other conditions of a person's mind [to] be alleged generally"—does not require courts to credit a complaint's conclusory statements without reference to its factual context. Rule 9 merely excuses a party from

pleading discriminatory intent under an elevated pleading standard. It does not give him license to evade Rule 8's less rigid, though still operative, strictures. Pp. 1953 – 1954.

(e) The Second Circuit should decide in the first instance whether to remand to the District Court to allow Iqbal to seek leave to amend his deficient complaint. P. 1954.

490 F.3d 143, reversed and remanded.

KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C.J., and SCALIA, THOMAS, and ALITO, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post,* pp. 1954 – **1942 1961. BREYER, J., filed a dissenting opinion, *post,* pp. 1961 – 1962.

**Attorneys and Law Firms**

Gregory G. Garre, Solicitor General, Washington, DC, for Petitioners.

Alexander A. Reinert, for Respondents.

Lauren J. Resnick, Fernando A. Bohorquez, Jr., Baker & Hostetler LLP, New York, NY, Thomas D. Warren Karl Fanter, Baker & Hostetler LLP, Cleveland, OH, for Michael Rolince.

Leslie R. Caldwell, Morgan, Lewis & Bockius LLP, New York, NY, Brett M. Schuman, Morgan, Lewis & Bockius LLP, San Francisco, CA, for Kenneth Maxwell.

Michael L. Martinez, David E. Bell, Matthew F. Scarlato, Crowell & Moring LLP, Washington, DC, for Respondent Dennis Hasty.

David J. Ball, Rima J. Oken, Jennifer Brace, Etai Lahav, Weil, Gotshal & Manges LLP, New York, New York, Alexander A. Reinert, Joan M. Magoolaghan, Elizabeth L. Koob, Koob & Magoolaghan, Yonkers, New York, for Respondent Javaid Iqbal.

Gregory G. Garre, Acting Solicitor General, Gregory G. Katsas, Assistant Attorney General, Jonathan F. Cohn, Deputy Assistant Attorney General, Curtis E. Gannon, Assistant to the Solicitor General, Barbara L. Herwig, Robert M. Loeb, Sarang Vijay Damle, Washington, D.C., for Petitioners.

Ashcroft v. Iqbal, 556 U.S. 662 (2009)
_____
129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

## Opinion

Justice KENNEDY delivered the opinion of the Court.

**\*666** Javaid Iqbal (hereinafter respondent) is a citizen of Pakistan and a Muslim. In the wake of the September 11, 2001, terrorist attacks he was arrested in the United States on criminal charges and detained by federal officials. Respondent claims he was deprived of various constitutional protections while in federal custody. To redress the alleged deprivations, respondent filed a complaint against numerous federal officials, including John Ashcroft, the former Attorney General of the United States, and Robert Mueller, the Director of the Federal Bureau of Investigation (FBI). Ashcroft and Mueller are the petitioners in the case now before us. As to these two petitioners, the complaint alleges that they adopted an unconstitutional policy that subjected respondent to harsh conditions of confinement on account of his race, religion, or national origin.

In the District Court petitioners raised the defense of qualified immunity and moved to dismiss the suit, contending the complaint was not sufficient to state a claim against them. The District Court denied the motion to dismiss, concluding the complaint was sufficient to state a claim despite petitioners' official status at the times in question. Petitioners brought an interlocutory appeal in the Court of Appeals for the Second Circuit. The court, without discussion, assumed it had jurisdiction over the order denying the motion to dismiss; and it affirmed the District Court's decision.

Respondent's account of his prison ordeal could, if proved, demonstrate unconstitutional misconduct by some governmental actors. But the allegations and pleadings with respect to these actors are not before us here. This case instead turns on a narrower question: Did respondent, as the plaintiff in the District Court, **\*\*1943** plead factual matter that, if taken as true, states a claim that petitioners deprived him of his clearly established constitutional rights. We hold respondent's pleadings are insufficient.

**\*667** I

Following the 2001 attacks, the FBI and other entities within the Department of Justice began an investigation of vast reach to identify the assailants and prevent them from attacking anew. The FBI dedicated more than 4,000 special agents and 3,000 support personnel to the endeavor. By September 18 "the FBI had received more than 96,000 tips or potential leads from the public." Dept. of Justice, Office of Inspector General, The September 11 Detainees: A Review of the Treatment of Aliens Held on Immigration Charges in Connection with the Investigation of the September 11 Attacks 1, 11–12 (Apr.2003), http://www.usdoj.gov/oig/special/0306/full.pdf?bcsi_scan_61073EC0F74759AD=0 & bcsi_scan_filename =full.pdf (as visited May 14, 2009, and available in Clerk of Court's case file).

In the ensuing months the FBI questioned more than 1,000 people with suspected links to the attacks in particular or to terrorism in general. *Id.,* at 1. Of those individuals, some 762 were held on immigration charges; and a 184-member subset of that group was deemed to be "of 'high interest' " to the investigation. *Id.,* at 111. The high-interest detainees were held under restrictive conditions designed to prevent them from communicating with the general prison population or the outside world. *Id.,* at 112–113.

Respondent was one of the detainees. According to his complaint, in November 2001 agents of the FBI and Immigration and Naturalization Service arrested him on charges of fraud in relation to identification documents and conspiracy to defraud the United States. *Iqbal v. Hasty,* 490 F.3d 143, 147–148 (C.A.2 2007). Pending trial for those crimes, respondent was housed at the Metropolitan Detention Center (MDC) in Brooklyn, New York. Respondent was designated a person "of high interest" to the September 11 investigation and in January 2002 was placed in a section of the MDC known as the Administrative Maximum Special Housing Unit **\*668** ADMAX SHU). *Id.,* at 148. As the facility's name indicates, the ADMAX SHU incorporates the maximum security conditions allowable under Federal Bureau of Prisons regulations. *Ibid.* ADMAX SHU detainees were kept in lockdown 23 hours a day, spending the remaining hour outside their cells in handcuffs and leg irons accompanied by a four-officer escort. *Ibid.*

Respondent pleaded guilty to the criminal charges, served a term of imprisonment, and was removed to his native Pakistan. *Id.,* at 149. He then filed a *Bivens* action in the United States District Court for the Eastern District of New York against 34 current and former federal officials and 19 "John Doe" federal corrections officers. See *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The defendants range from the correctional officers who had day-to-day contact with respondent during the term of his confinement, to the wardens

of the MDC facility, all the way to petitioners—officials who were at the highest level of the federal law enforcement hierarchy. First Amended Complaint in No. 04–CV–1809 (JG)(JA), ¶¶ 10–11, App. to Pet. for Cert. 157a (hereinafter Complaint).

The 21–cause–of–action complaint does not challenge respondent's arrest or his confinement in the MDC's general prison population. Rather, it concentrates on his **1944 treatment while confined to the ADMAX SHU. The complaint sets forth various claims against defendants who are not before us. For instance, the complaint alleges that respondent's jailers "kicked him in the stomach, punched him in the face, and dragged him across" his cell without justification, id., ¶ 113, at 176a; subjected him to serial strip and body-cavity searches when he posed no safety risk to himself or others, id., ¶¶ 143–145, at 182a; and refused to let him and other Muslims pray because there would be "[n]o prayers for terrorists," id., ¶ 154, at 184a.

The allegations against petitioners are the only ones relevant here. The complaint contends that petitioners designated *669 respondent a person of high interest on account of his race, religion, or national origin, in contravention of the First and Fifth Amendments to the Constitution. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men ... as part of its investigation of the events of September 11." Id., ¶ 47, at 164a. It further alleges that "[t]he policy of holding post–September–11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Id., ¶ 69, at 168a. Lastly, the complaint posits that petitioners "each knew of, condoned, and willfully and maliciously agreed to subject" respondent to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Id., ¶ 96, at 172a–173a. The pleading names Ashcroft as the "principal architect" of the policy, id., ¶ 10, at 157a, and identifies Mueller as "instrumental in [its] adoption, promulgation, and implementation," id., ¶ 11, at 157a.

Petitioners moved to dismiss the complaint for failure to state sufficient allegations to show their own involvement in clearly established unconstitutional conduct. The District Court denied their motion. Accepting all of the allegations in respondent's complaint as true, the court held that "it cannot

be said that there [is] no set of facts on which [respondent] would be entitled to relief as against" petitioners. Id., at 136a–137a (relying on Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Invoking the collateral-order doctrine petitioners filed an interlocutory appeal in the United States Court of Appeals for the Second Circuit. While that appeal was pending, this Court decided Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), which discussed the standard for evaluating whether a complaint is sufficient to survive a motion to dismiss.

*670 The Court of Appeals considered Twombly's applicability to this case. Acknowledging that Twombly retired the Conley no-set-of-facts test relied upon by the District Court, the Court of Appeals' opinion discussed at length how to apply this Court's "standard for assessing the adequacy of pleadings." 490 F.3d, at 155. It concluded that Twombly called for a "flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible." Id., at 157–158. The court found that petitioners' appeal did not present one of "those contexts" requiring amplification. As a consequence, it held respondent's pleading adequate to allege petitioners' personal involvement in discriminatory decisions which, if true, violated clearly established constitutional law. Id., at 174.

**1945 Judge Cabranes concurred. He agreed that the majority's "discussion of the relevant pleading standards reflect[ed] the uneasy compromise ... between a qualified immunity privilege rooted in the need to preserve the effectiveness of government as contemplated by our constitutional structure and the pleading requirements of Rule 8(a) of the Federal Rules of Civil Procedure." Id., at 178 (internal quotation marks and citations omitted). Judge Cabranes nonetheless expressed concern at the prospect of subjecting high-ranking Government officials—entitled to assert the defense of qualified immunity and charged with responding to "a national and international security emergency unprecedented in the history of the American Republic"—to the burdens of discovery on the basis of a complaint as nonspecific as respondent's. Id., at 179. Reluctant to vindicate that concern as a member of the Court of Appeals, ibid., Judge Cabranes urged this Court to address the appropriate pleading standard "at the earliest opportunity," id., at 178. We granted certiorari, 554 U.S. 902, 128 S.Ct. 2931, 171 L.Ed.2d 863 (2008), and now reverse.

**\*671** II

[1]  We first address whether the Court of Appeals had subject-matter jurisdiction to affirm the District Court's order denying petitioners' motion to dismiss. Respondent disputed subject-matter jurisdiction in the Court of Appeals, but the court hardly discussed the issue. We are not free to pretermit the question. Subject-matter jurisdiction cannot be forfeited or waived and should be considered when fairly in doubt. *Arbaugh v. Y & H Corp.,* 546 U.S. 500, 514, 126 S.Ct. 1235, 163 L.Ed.2d 1097 (2006) (citing *United States v. Cotton,* 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002)). According to respondent, the District Court's order denying petitioners' motion to dismiss is not appealable under the collateral-order doctrine. We disagree.

A

[2]  With exceptions inapplicable here, Congress has vested the courts of appeals with "jurisdiction of appeals from all final decisions of the district courts of the United States." 28 U.S.C. § 1291. Though the statute's finality requirement ensures that "interlocutory appeals—appeals before the end of district court proceedings—are the exception, not the rule," *Johnson v. Jones,* 515 U.S. 304, 309, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995), it does not prevent "review of all prejudgment orders," *Behrens v. Pelletier,* 516 U.S. 299, 305, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996). Under the collateral-order doctrine a limited set of district-court orders are reviewable "though short of final judgment." *Ibid.* The orders within this narrow category "are immediately appealable because they 'finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.' " *Ibid.* (quoting *Cohen v. Beneficial Industrial Loan Corp.,* 337 U.S. 541, 546, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949)).

[3]  [4]  [5]  A district-court decision denying a Government officer's claim of qualified immunity can fall within the narrow class of appealable orders despite **\*672** "the absence of a final judgment." *Mitchell v. Forsyth,* 472 U.S. 511, 530, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). This is so because qualified immunity—which shields Government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights," **\*\*1946** *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)—is both a defense to liability and a limited "entitlement not to stand trial or face the other burdens of litigation." *Mitchell,* 472 U.S., at 526, 105 S.Ct. 2806. Provided it "turns on an issue of law," *id.,* at 530, 105 S.Ct. 2806, a district-court order denying qualified immunity " 'conclusively determine[s]' " that the defendant must bear the burdens of discovery; is "conceptually distinct from the merits of the plaintiff's claim"; and would prove "effectively unreviewable on appeal from a final judgment," *id.,* at 527–528 (citing *Cohen, supra,* at 546, 69 S.Ct. 1221). As a general matter, the collateral-order doctrine may have expanded beyond the limits dictated by its internal logic and the strict application of the criteria set out in *Cohen.* But the applicability of the doctrine in the context of qualified-immunity claims is well established; and this Court has been careful to say that a district court's order rejecting qualified immunity at the motion-to-dismiss stage of a proceeding is a "final decision" within the meaning of § 1291. *Behrens,* 516 U.S., at 307, 116 S.Ct. 834.

B

[6]  Applying these principles, we conclude that the Court of Appeals had jurisdiction to hear petitioners' appeal. The District Court's order denying petitioners' motion to dismiss turned on an issue of law and rejected the defense of qualified immunity. It was therefore a final decision "subject to immediate appeal." *Ibid.* Respondent says that "a qualified immunity appeal based solely on the complaint's failure to state a claim, and not on the ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction." Brief for Respondent Iqbal 15 (hereinafter Iqbal Brief). In other words, respondent **\*673** contends the Court of Appeals had jurisdiction to determine whether his complaint avers a clearly established constitutional violation but that it lacked jurisdiction to pass on the sufficiency of his pleadings. Our opinions, however, make clear that appellate jurisdiction is not so strictly confined.

In *Hartman v. Moore,* 547 U.S. 250, 126 S.Ct. 1695, 164 L.Ed.2d 441 (2006), the Court reviewed an interlocutory decision denying qualified immunity. The legal issue decided in *Hartman* concerned the elements a plaintiff "must plead and prove in order to win" a First Amendment retaliation claim. *Id.,* at 257, n. 5, 126 S.Ct. 1695. Similarly, two Terms ago in *Wilkie v. Robbins,* 551 U.S. 537, 127 S.Ct.

2588, 168 L.Ed.2d 389 (2007), the Court considered another interlocutory order denying qualified immunity. The legal issue there was whether a *Bivens* action can be employed to challenge interference with property rights. 551 U.S., at 549, n. 4, 127 S.Ct. 2588. These cases cannot be squared with respondent's argument that the collateral-order doctrine restricts appellate jurisdiction to the "ultimate issu[e]" whether the legal wrong asserted was a violation of clearly established law while excluding the question whether the facts pleaded establish such a violation. Iqbal Brief 15. Indeed, the latter question is even more clearly within the category of appealable decisions than the questions presented in *Hartman* and *Wilkie*, since whether a particular complaint sufficiently alleges a clearly established violation of law cannot be decided in isolation from the facts pleaded. In that sense the sufficiency of respondent's pleadings is both "inextricably intertwined with," *Swint v. Chambers County Comm'n,* 514 U.S. 35, 51, 115 S.Ct. 1203, 131 L.Ed.2d 60 (1995), and "directly implicated by," *Hartman,*    **1947** *supra,* at 257, n. 5, 126 S.Ct. 1695, the qualified-immunity defense.

Respondent counters that our holding in *Johnson,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238, confirms the want of subject-matter jurisdiction here. That is incorrect. The allegation in *Johnson* was that five defendants, all of them police officers, unlawfully beat the plaintiff. *Johnson* considered "the appealability of a portion of" the District Court's summary judgment order *674 that, "though entered in a 'qualified immunity' case, determine[d] only" that there was a genuine issue of material fact that three of the defendants participated in the beating. *Id.,* at 313, 115 S.Ct. 2151.

In finding that order not a "final decision" for purposes of § 1291, the *Johnson* Court cited *Mitchell* for the proposition that only decisions turning " '*on an issue of law* ' " are subject to immediate appeal. 515 U.S., at 313, 115 S.Ct. 2151. Though determining whether there is a genuine issue of material fact at summary judgment is a question of law, it is a legal question that sits near the law-fact divide. Or as we said in *Johnson,* it is a "fact-related" legal inquiry. *Id.,* at 314, 115 S.Ct. 2151. To conduct it, a court of appeals may be required to consult a "vast pretrial record, with numerous conflicting affidavits, depositions, and other discovery materials." *Id.,* at 316, 115 S.Ct. 2151. That process generally involves matters more within a district court's ken and may replicate inefficiently questions that will arise on appeal following final judgment. *Ibid.* Finding those concerns predominant, *Johnson* held that

the collateral orders that are "final" under *Mitchell* turn on "abstract," rather than "fact-based," issues of law. 515 U.S., at 317, 115 S.Ct. 2151.

The concerns that animated the decision in *Johnson* are absent when an appellate court considers the disposition of a motion to dismiss a complaint for insufficient pleadings. True, the categories of "fact-based" and "abstract" legal questions used to guide the Court's decision in *Johnson* are not well defined. Here, however, the order denying petitioners' motion to dismiss falls well within the latter class. Reviewing that order, the Court of Appeals considered only the allegations contained within the four corners of respondent's complaint; resort to a "vast pretrial record" on petitioners' motion to dismiss was unnecessary. *Id.,* at 316, 115 S.Ct. 2151. And determining whether respondent's complaint has the "heft" to state a claim is a task well within an appellate court's core competency. *Twombly,* 550 U.S., at 557, 127 S.Ct. 1955. Evaluating the sufficiency of a complaint is not a "fact-based" question of law, so the problem the Court sought to avoid in *Johnson *675 is not implicated here. The District Court's order denying petitioners' motion to dismiss is a final decision under the collateral-order doctrine over which the Court of Appeals had, and this Court has, jurisdiction. We proceed to consider the merits of petitioners' appeal.

### III

In *Twombly, supra,* at 553–554, 127 S.Ct. 1955, the Court found it necessary first to discuss the antitrust principles implicated by the complaint. Here too we begin by taking note of the elements a plaintiff must plead to state a claim of unconstitutional discrimination against officials entitled to assert the defense of qualified immunity.

[7]    In *Bivens*—proceeding on the theory that a right suggests a remedy—this Court "recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." **1948** *Correctional Services Corp. v. Malesko,* 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001). Because implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability "to any new context or new category of defendants." 534 U.S., at 68, 122 S.Ct. 515. See also *Wilkie,* 551 U.S., at 549–550, 127 S.Ct. 2588. That reluctance might well have disposed of respondent's First Amendment claim of religious discrimination. For while we have allowed a *Bivens* action to redress a violation of the equal protection component

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

of the Due Process Clause of the Fifth Amendment, see *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), we have not found an implied damages remedy under the Free Exercise Clause. Indeed, we have declined to extend *Bivens* to a claim sounding in the First Amendment. *Bush v. Lucas,* 462 U.S. 367, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983). Petitioners do not press this argument, however, so we assume, without deciding, that respondent's First Amendment claim is actionable under *Bivens.*

[8]    In the limited settings where *Bivens* does apply, the implied cause of action is the "federal analog to suits brought against state officials under Rev. Stat. § 1979, *676 42 U.S.C. § 1983." *Hartman,* 547 U.S., at 254, n. 2, 126 S.Ct. 1695. Cf. *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). Based on the rules our precedents establish, respondent correctly concedes that Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.* Iqbal Brief 46 ("[I]t is undisputed that supervisory *Bivens* liability cannot be established solely on a theory of *respondeat superior* "). See *Monell v. New York City Dept. of Social Servs.,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding no vicarious liability for a municipal "person" under 42 U.S.C. § 1983); see also *Dunlop v. Munroe,* 7 Cranch 242, 269, 3 L.Ed. 329 (1812) (a federal official's liability "will only result from his own neglect in not properly superintending the discharge" of his subordinates' duties); *Robertson v. Sichel,* 127 U.S. 507, 515–516, 8 S.Ct. 1286, 3 L.Ed. 203 (1888) ("A public officer or agent is not responsible for the misfeasances or positive wrongs, or for the nonfeasances, or negligences, or omissions of duty, of the subagents or servants or other persons properly employed by or under him, in the discharge of his official duties"). Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.

[9]    The factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue. Where the claim is invidious discrimination in contravention of the First and Fifth Amendments, our decisions make clear that the plaintiff must plead and prove that the defendant acted with discriminatory purpose. *Church of Lukumi Babalu Aye, Inc. v. Hialeah,* 508 U.S. 520, 540–541, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (opinion of KENNEDY, J.) (First Amendment); *Washington v. Davis,* 426 U.S. 229, 240, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (Fifth Amendment).

Under extant precedent purposeful discrimination requires more than "intent as volition or intent as awareness of consequences." *Personnel Administrator of Mass. v. Feeney,* 442 U.S. 256, 279, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979). It instead involves a decisionmaker's undertaking *677 a course of action " 'because of,' not merely 'in spite of,' [the action's] adverse effects upon an identifiable group." *Ibid.* It follows that, to state a claim based on a violation of a clearly established right, respondent must plead **1949 sufficient factual matter to show that petitioners adopted and implemented the detention policies at issue not for a neutral, investigative reason but for the purpose of discriminating on account of race, religion, or national origin.

Respondent disagrees. He argues that, under a theory of "supervisory liability," petitioners can be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." Iqbal Brief 45–46. That is to say, respondent believes a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution. We reject this argument. Respondent's conception of "supervisory liability" is inconsistent with his accurate stipulation that petitioners may not be held accountable for the misdeeds of their agents. In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term "supervisory liability" is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct. In the context of determining whether there is a violation of a clearly established right to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.

IV

A

[10]    [11]    We turn to respondent's complaint. Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is *678 entitled to relief." As the Court held in *Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, the pleading standard Rule 8 announces does not require "detailed factual allegations," but it demands

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

more than an unadorned, the-defendant-unlawfully-harmed-me accusation. *Id.,* at 555, 127 S.Ct. 1955 (citing *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986)). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." 550 U.S., at 555, 127 S.Ct. 1955. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Id.,* at 557, 127 S.Ct. 1955.

[12]    [13]    To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.,* at 570, 127 S.Ct. 1955. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.,* at 556, 127 S.Ct. 1955. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. *Ibid.* Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Id.,* at 557, 127 S.Ct. 1955 (brackets omitted).

Two working principles underlie our decision in *Twombly.* First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.,* at 555, 127 S.Ct. 1955 (Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we **1950** "are not bound to accept as true a legal conclusion couched as a factual allegation" (internal quotation marks omitted)). Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for *679 a plaintiff armed with nothing more than conclusions. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.,* at 556, 127 S.Ct. 1955. Determining whether a complaint states a plausible claim for relief will, as the Court of Appeals observed, be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. 490 F.3d, at 157–158. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged —but it has not "show[n]"—"that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2).

In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Our decision in *Twombly* illustrates the two-pronged approach. There, we considered the sufficiency of a complaint alleging that incumbent telecommunications providers had entered an agreement not to compete and to forestall competitive entry, in violation of the Sherman Act, 15 U.S.C. § 1. Recognizing that § 1 enjoins only anticompetitive conduct "effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), the plaintiffs in *Twombly* flatly pleaded that the defendants "ha[d] entered into a contract, combination or conspiracy to prevent competitive entry ... and ha[d] agreed not to compete with one another." 550 U.S., at 551, 127 S.Ct. 1955 (internal quotation marks omitted). The complaint also alleged that the defendants' "parallel course of conduct ... to prevent competition" and inflate prices was indicative of the *680 unlawful agreement alleged. *Ibid.* (internal quotation marks omitted).

The Court held the plaintiffs' complaint deficient under Rule 8. In doing so it first noted that the plaintiffs' assertion of an unlawful agreement was a "'legal conclusion'" and, as such, was not entitled to the assumption of truth. *Id.,* at 555, 127 S.Ct. 1955. Had the Court simply credited the allegation of a conspiracy, the plaintiffs would have stated a claim for relief and been entitled to proceed perforce. The Court next addressed the "nub" of the plaintiffs' complaint— the well-pleaded, nonconclusory factual allegation of parallel behavior—to determine whether it gave rise to a "plausible suggestion of conspiracy." *Id.,* at 565–566, 127 S.Ct. 1955. Acknowledging that parallel conduct was consistent with an unlawful agreement, the Court nevertheless concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior. *Id.,* at 567, 127 S.Ct. 1955. Because the well-pleaded fact of parallel conduct, accepted as true, did not plausibly suggest an unlawful agreement, the Court held the plaintiffs' complaint must be dismissed. *Id.,* at 570, 127 S.Ct. 1955.

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

B

[14]   Under *Twombly*'s construction of Rule 8, we conclude that respondent's complaint **1951 has not "nudged [his] claims" of invidious discrimination "across the line from conceivable to plausible." *Ibid.*

We begin our analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth. Respondent pleads that petitioners "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶ 96, App. to Pet. for Cert. 173a–174a. The complaint alleges that Ashcroft was the "principal architect" of this invidious policy, *681 *id.,* ¶ 10, at 157a, and that Mueller was "instrumental" in adopting and executing it, *id.,* ¶ 11, at 157a. These bare assertions, much like the pleading of conspiracy in *Twombly,* amount to nothing more than a "formulaic recitation of the elements" of a constitutional discrimination claim, 550 U.S., at 555, 127 S.Ct. 1955, namely, that petitioners adopted a policy " 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group," *Feeney,* 442 U.S., at 279, 99 S.Ct. 2282. As such, the allegations are conclusory and not entitled to be assumed true. *Twombly,* 550 U.S., at 554–555, 127 S.Ct. 1955. To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in *Twombly* rejected the plaintiffs' express allegation of a " 'contract, combination or conspiracy to prevent competitive entry,' " *id.,* at 551, 127 S.Ct. 1955, because it thought that claim too chimerical to be maintained. It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.

We next consider the factual allegations in respondent's complaint to determine if they plausibly suggest an entitlement to relief. The complaint alleges that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men ... as part of its investigation of the events of September 11." Complaint ¶ 47, App. to Pet. for Cert. 164a. It further claims that "[t]he policy of holding post–September–11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11,

2001." *Id.,* ¶ 69, at 168a. Taken as true, these allegations are consistent with petitioners' purposefully designating detainees "of high interest" because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose.

*682 The September 11 attacks were perpetrated by 19 Arab Muslim hijackers who counted themselves members in good standing of al Qaeda, an Islamic fundamentalist group. Al Qaeda was headed by another Arab Muslim— Osama bin Laden—and composed in large part of his Arab Muslim disciples. It should come as no surprise that a legitimate policy directing law enforcement to arrest and detain individuals because of their suspected link to the attacks would produce a disparate, incidental impact on Arab Muslims, even though the purpose of the policy was to target neither Arabs nor Muslims. On the facts respondent alleges the arrests Mueller oversaw were likely lawful and justified by his nondiscriminatory intent to detain aliens who were illegally present in the United States and who had potential connections to those who committed terrorist acts. As between that "obvious alternative explanation" for the arrests, *Twombly, supra,* at 567, 127 S.Ct. 1955, and the purposeful, invidious discrimination respondent **1952 asks us to infer, discrimination is not a plausible conclusion.

But even if the complaint's well-pleaded facts give rise to a plausible inference that respondent's arrest was the result of unconstitutional discrimination, that inference alone would not entitle respondent to relief. It is important to recall that respondent's complaint challenges neither the constitutionality of his arrest nor his initial detention in the MDC. Respondent's constitutional claims against petitioners rest solely on their ostensible "policy of holding post– September–11th detainees" in the ADMAX SHU once they were categorized as "of high interest." Complaint ¶ 69, App. to Pet. for Cert. 168a. To prevail on that theory, the complaint must contain facts plausibly showing that petitioners purposefully adopted a policy of classifying post– September–11 detainees as "of high interest" because of their race, religion, or national origin.

This the complaint fails to do. Though respondent alleges that various other defendants, who are not before us, may *683 have labeled him a person "of high interest" for impermissible reasons, his only factual allegation against petitioners accuses them of adopting a policy approving "restrictive conditions of confinement" for post–September– 11 detainees until they were " 'cleared' by the FBI." *Ibid.*

Case 7:21-cv-00247    Document 32-1    Filed on 06/29/22 in TXSD    Page 76 of 427

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

Accepting the truth of that allegation, the complaint does not show, or even intimate, that petitioners purposefully housed detainees in the ADMAX SHU due to their race, religion, or national origin. All it plausibly suggests is that the Nation's top law enforcement officers, in the aftermath of a devastating terrorist attack, sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity. Respondent does not argue, nor can he, that such a motive would violate petitioners' constitutional obligations. He would need to allege more by way of factual content to "nudg[e]" his claim of purposeful discrimination "across the line from conceivable to plausible." *Twombly,* 550 U.S., at 570, 127 S.Ct. 1955.

To be sure, respondent can attempt to draw certain contrasts between the pleadings the Court considered in *Twombly* and the pleadings at issue here. In *Twombly,* the complaint alleged general wrongdoing that extended over a period of years, *id.,* at 551, 127 S.Ct. 1955, whereas here the complaint alleges discrete wrongs—for instance, beatings—by lower level Government actors. The allegations here, if true, and if condoned by petitioners, could be the basis for some inference of wrongful intent on petitioners' part. Despite these distinctions, respondent's pleadings do not suffice to state a claim. Unlike in *Twombly,* where the doctrine of *respondeat superior* could bind the corporate defendant, here, as we have noted, petitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic. Yet respondent's complaint does not contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind. His pleadings thus do not meet the standard necessary to comply with Rule 8.

*684  It is important to note, however, that we express no opinion concerning the sufficiency of respondent's complaint against the defendants who are not before us. Respondent's account of his prison ordeal alleges serious official misconduct that we need not address here. Our decision is limited to the determination that respondent's complaint does not entitle him to relief from petitioners.

C

Respondent offers three arguments that bear on our disposition of his case, but none is persuasive.

**1953  1

Respondent first says that our decision in *Twombly* should be limited to pleadings made in the context of an antitrust dispute. Iqbal Brief 37–38. This argument is not supported by *Twombly* and is incompatible with the Federal Rules of Civil Procedure. Though *Twombly* determined the sufficiency of a complaint sounding in antitrust, the decision was based on our interpretation and application of Rule 8. 550 U.S., at 554, 127 S.Ct. 1955. That Rule in turn governs the pleading standard "in all civil actions and proceedings in the United States district courts." Fed. Rule Civ. Proc. 1. Our decision in *Twombly* expounded the pleading standard for "all civil actions," *ibid.,* and it applies to antitrust and discrimination suits alike, see 550 U.S., at 555–556, and n. 3, 127 S.Ct. 1955.

2

Respondent next implies that our construction of Rule 8 should be tempered where, as here, the Court of Appeals has "instructed the district court to cabin discovery in such a way as to preserve" petitioners' defense of qualified immunity "as much as possible in anticipation of a summary judgment motion." Iqbal Brief 27. We have held, however, that the question presented by a motion to dismiss a complaint for insufficient pleadings does not turn on the controls  *685  placed upon the discovery process. *Twombly, supra,* at 559, 127 S.Ct. 1955 ("It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side" (internal quotation marks and citation omitted)).

[15]  Our rejection of the careful-case-management approach is especially important in suits where Government-official defendants are entitled to assert the defense of qualified immunity. The basic thrust of the qualified-immunity doctrine is to free officials from the concerns of litigation, including "avoidance of disruptive discovery." *Siegert v. Gilley,* 500 U.S. 226, 236, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) (KENNEDY, J., concurring in judgment). There are serious and legitimate reasons for this. If a Government official is to devote time to his or her duties, and to the formulation of sound and responsible policies, it is counterproductive to require the substantial diversion that is attendant to

Ashcroft v. Iqbal, 556 U.S. 662 (2009)
129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

participating in litigation and making informed decisions as to how it should proceed. Litigation, though necessary to ensure that officials comply with the law, exacts heavy costs in terms of efficiency and expenditure of valuable time and resources that might otherwise be directed to the proper execution of the work of the Government. The costs of diversion are only magnified when Government officials are charged with responding to, as Judge Cabranes aptly put it, "a national and international security emergency unprecedented in the history of the American Republic." 490 F.3d, at 179.

It is no answer to these concerns to say that discovery for petitioners can be deferred while pretrial proceedings continue for other defendants. It is quite likely that, when discovery as to the other parties proceeds, it would prove necessary for petitioners and their counsel to participate in the process to ensure the case does not develop in a misleading or slanted way that causes prejudice to their position. Even *686 if petitioners are not yet themselves subject to discovery orders, then, they would not be free from the burdens of discovery.

We decline respondent's invitation to relax the pleading requirements on the **1954 ground that the Court of Appeals promises petitioners minimally intrusive discovery. That promise provides especially cold comfort in this pleading context, where we are impelled to give real content to the concept of qualified immunity for high-level officials who must be neither deterred nor detracted from the vigorous performance of their duties. Because respondent's complaint is deficient under Rule 8, he is not entitled to discovery, cabined or otherwise.

3

Respondent finally maintains that the Federal Rules expressly allow him to allege petitioners' discriminatory intent "generally," which he equates with a conclusory allegation. Iqbal Brief 32 (citing Fed. Rule Civ. Proc. 9). It follows, respondent says, that his complaint is sufficiently well pleaded because it claims that petitioners discriminated against him "on account of [his] religion, race, and/or national origin and for no legitimate penological interest." Complaint ¶ 96, App. to Pet. for Cert. 172a–173a. Were we required to accept this allegation as true, respondent's complaint would survive petitioners' motion to dismiss. But the Federal Rules do not require courts to credit a complaint's conclusory statements without reference to its factual context.

[16]  It is true that Rule 9(b) requires particularity when pleading "fraud or mistake," while allowing "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally." But "generally" is a relative term. In the context of Rule 9, it is to be compared to the particularity requirement applicable to fraud or mistake. Rule 9 merely excuses a party from pleading discriminatory intent under an elevated pleading standard. It does not give him license *687 to evade the less rigid—though still operative—strictures of Rule 8. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301, p. 291 (3d ed. 2004) ("[A] rigid rule requiring the detailed pleading of a condition of mind would be undesirable because, absent overriding considerations pressing for a specificity requirement, as in the case of averments of fraud or mistake, the general 'short and plain statement of the claim' mandate in Rule 8(a) ... should control the second sentence of Rule 9(b)"). And Rule 8 does not empower respondent to plead the bare elements of his cause of action, affix the label "general allegation," and expect his complaint to survive a motion to dismiss.

V

We hold that respondent's complaint fails to plead sufficient facts to state a claim for purposeful and unlawful discrimination against petitioners. The Court of Appeals should decide in the first instance whether to remand to the District Court so that respondent can seek leave to amend his deficient complaint.

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SOUTER, with whom Justice STEVENS, Justice GINSBURG, and Justice BREYER join, dissenting.
This case is here on the uncontested assumption that *Bivens v. Six Unknown Fed. Narcotics Agents.* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), allows personal liability based on a federal officer's violation of an individual's rights under the First and Fifth Amendments, and it comes to us with the explicit concession of petitioners Ashcroft and Mueller that an officer may be subject to *Bivens* liability as a supervisor on grounds other than *respondeat* **1955 *superior.* The

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

Court apparently rejects this concession and, although it has no bearing on the majority's **\*688** resolution of this case, does away with supervisory liability under *Bivens.* The majority then misapplies the pleading standard under *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), to conclude that the complaint fails to state a claim. I respectfully dissent from both the rejection of supervisory liability as a cognizable claim in the face of petitioners' concession, and from the holding that the complaint fails to satisfy Rule 8(a)(2) of the Federal Rules of Civil Procedure.

I

A

Respondent Iqbal was arrested in November 2001 on charges of conspiracy to defraud the United States and fraud in relation to identification documents, and was placed in pretrial detention at the Metropolitan Detention Center in Brooklyn, New York. *Iqbal v. Hasty,* 490 F.3d 143, 147–148 (C.A.2 2007). He alleges that Federal Bureau of Investigation (FBI) officials carried out a discriminatory policy by designating him as a person " 'of high interest' " in the investigation of the September 11 attacks solely because of his race, religion, or national origin. Owing to this designation he was placed in the detention center's Administrative Maximum Special Housing Unit for over six months while awaiting the fraud trial. *Id.,* at 148. As I will mention more fully below, Iqbal contends that Ashcroft and Mueller were at the very least aware of the discriminatory detention policy and condoned it (and perhaps even took part in devising it), thereby violating his First and Fifth Amendment rights.[1]

Iqbal claims that on the day he was transferred to the special unit, prison guards, without provocation, "picked him up and threw him against the wall, kicked him in the stomach, **\*689** punched him in the face, and dragged him across the room." First Amended Complaint in No. 04–CV–1809 (JG)(JA), ¶ 113, App. to Pet. for Cert. 176a (hereinafter Complaint). He says that after being attacked a second time he sought medical attention but was denied care for two weeks. *Id.,* ¶¶ 187–188, at 189a. According to Iqbal's complaint, prison staff in the special unit subjected him to unjustified strip and body cavity searches, *id.,* ¶¶ 136–140, at 181a, verbally berated him as a " 'terrorist' " and " 'Muslim killer,' " *id.,* ¶ 87, at 170a–171a,

refused to give him adequate food, *id.,* ¶ 91, at 171a–172a, and intentionally turned on air conditioning during the winter and heating during the summer, *id.,* ¶ 84, at 170a. He claims that prison staff interfered with his attempts to pray and engage in religious study, *id.,* ¶¶ 153–154, at 183a–184a, and with his access to counsel, *id.,* ¶¶ 168, 171, at 186a–187a.

The District Court denied Ashcroft and Mueller's motion to dismiss Iqbal's discrimination claim, and the Court of Appeals affirmed. Ashcroft and Mueller then asked this Court to grant certiorari on two questions:

> "1. Whether a conclusory allegation that a cabinet-level officer or other high-ranking official knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts purportedly committed by subordinate officials is sufficient to state individual-capacity claims against those officials under *Bivens.*

> **\*\*1956** "2. Whether a cabinet-level officer or other high-ranking official may be held personally liable for the allegedly unconstitutional acts of subordinate officials on the ground that, as high-level supervisors, they had constructive notice of the discrimination allegedly carried out by such subordinate officials." Pet. for Cert. I.

The Court granted certiorari on both questions. The first is about pleading; the second goes to the liability standard.

**\*690** In the first question, Ashcroft and Mueller did not ask whether "a cabinet-level officer or other high-ranking official" who "knew of, condoned, or agreed to subject a plaintiff to allegedly unconstitutional acts committed by subordinate officials" was subject to liability under *Bivens.* In fact, they conceded in their petition for certiorari that they would be liable if they had "actual knowledge" of discrimination by their subordinates and exhibited " 'deliberate indifference' " to that discrimination. Pet. for Cert. 29 (quoting *Farmer v. Brennan,* 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). Instead, they asked the Court to address whether Iqbal's allegations against them (which they call conclusory) were sufficient to satisfy Rule 8(a)(2), and in particular whether the Court of Appeals misapplied our decision in *Twombly* construing that rule. Pet. for Cert. 11–24.

In the second question, Ashcroft and Mueller asked this Court to say whether they could be held personally liable for the actions of their subordinates based on the theory that they had constructive notice of their subordinates' unconstitutional conduct. *Id.,* at 25–33. This was an odd question to pose, since Iqbal has never claimed that Ashcroft and Mueller are

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

liable on a constructive notice theory. Be that as it may, the second question challenged only one possible ground for imposing supervisory liability under *Bivens*. In sum, both questions assumed that a defendant could raise a *Bivens* claim on theories of supervisory liability other than constructive notice, and neither question asked the parties or the Court to address the elements of such liability.

The briefing at the merits stage was no different. Ashcroft and Mueller argued that the factual allegations in Iqbal's complaint were insufficient to overcome their claim of qualified immunity; they also contended that they could not be held liable on a theory of constructive notice. Again they conceded, however, that they would be subject to supervisory liability if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects as **\*691** being 'of high interest' and they were deliberately indifferent to that discrimination." Brief for Petitioners 50; see also Reply Brief for Petitioners 21–22. Iqbal argued that the allegations in his complaint were sufficient under Rule 8(a)(2) and *Twombly*, and conceded that as a matter of law he could not recover under a theory of *respondeat superior*. See Brief for Respondent Iqbal 46. Thus, the parties agreed as to a proper standard of supervisory liability, and the disputed question was whether Iqbal's complaint satisfied Rule 8(a)(2).

Without acknowledging the parties' agreement as to the standard of supervisory liability, the Court asserts that it must *sua sponte* decide the scope of supervisory liability here. *Ante,* at 1947 – 1949. I agree that, absent Ashcroft and Mueller's concession, that determination would have to be made; without knowing the elements of a supervisory liability claim, there would be no way to determine whether a plaintiff had made factual allegations amounting to grounds for relief on that claim. See *Twombly,* 550 U.S., at 557–558, 127 S.Ct. 1955. But deciding the scope of supervisory **\*\*1957** *Bivens* liability in this case is uncalled for. There are several reasons, starting with the position Ashcroft and Mueller have taken and following from it.

First, Ashcroft and Mueller have, as noted, made the critical concession that a supervisor's knowledge of a subordinate's unconstitutional conduct and deliberate indifference to that conduct are grounds for *Bivens* liability. Iqbal seeks to recover on a theory that Ashcroft and Mueller at least knowingly acquiesced (and maybe more than acquiesced) in the discriminatory acts of their subordinates; if he can show this, he will satisfy Ashcroft and Mueller's own test for supervisory liability. See *Farmer, supra,* at 842, 114 S.Ct.

1970 (explaining that a prison official acts with "deliberate indifference" if "the official acted or failed to act despite his knowledge of a substantial risk of serious harm"). We do not normally override a party's concession, see, *e.g.,* **\*692** *United States v. International Business Machines Corp.,* 517 U.S. 843, 855, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996) (holding that "[i]t would be inappropriate for us to [e]xamine in this case, without the benefit of the parties' briefing," an issue the Government had conceded), and doing so is especially inappropriate when, as here, the issue is unnecessary to decide the case, see *infra,* at 1958 – 1959. I would therefore accept Ashcroft and Mueller's concession for purposes of this case and proceed to consider whether the complaint alleges at least knowledge and deliberate indifference.

Second, because of the concession, we have received no briefing or argument on the proper scope of supervisory liability, much less the full-dress argument we normally require. *Mapp v. Ohio,* 367 U.S. 643, 676–677, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Harlan, J., dissenting). We consequently are in no position to decide the precise contours of supervisory liability here, this issue being a complicated one that has divided the Courts of Appeals. See *infra,* at 1957 – 1959. This Court recently remarked on the danger of "bad decisionmaking" when the briefing on a question is "woefully inadequate," *Pearson v. Callahan,* 555 U.S. 223, 239, 129 S.Ct. 808, 819, 172 L.Ed.2d 565 (2009), yet today the majority answers a question with no briefing at all. The attendant risk of error is palpable.

Finally, the Court's approach is most unfair to Iqbal. He was entitled to rely on Ashcroft and Mueller's concession, both in their petition for certiorari and in their merits briefs, that they could be held liable on a theory of knowledge and deliberate indifference. By overriding that concession, the Court denies Iqbal a fair chance to be heard on the question.

**B**

The majority, however, does ignore the concession. According to the majority, because Iqbal concededly cannot recover on a theory of *respondeat superior*, it follows that he cannot recover under any theory of supervisory liability. *Ante,* at 1948 – 1949. The majority says that in a *Bivens* action, "where masters do not answer for the torts of their servants," "the term 'supervisory liability' is a misnomer," and **\*693** that "[a]bsent vicarious liability, each Government official,

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

his or her title notwithstanding, is only liable for his or her own misconduct." *Ibid.* Lest there be any mistake, in these words the majority is not narrowing the scope of supervisory liability; it is eliminating *Bivens* supervisory liability entirely. The nature of a supervisory liability theory is that the supervisor may be liable, under certain conditions, for the wrongdoing of his subordinates, and it is this very principle that the majority rejects. *Ante,* at 1952 ("[P]etitioners cannot be held liable unless they themselves **1958 acted on account of a constitutionally protected characteristic").

The dangers of the majority's readiness to proceed without briefing and argument are apparent in its cursory analysis, which rests on the assumption that only two outcomes are possible here: *respondeat superior* liability, in which "[a]n employer is subject to liability for torts committed by employees while acting within the scope of their employment," Restatement (Third) of Agency § 2.04 (2005), or no supervisory liability at all. The dichotomy is false. Even if an employer is not liable for the actions of his employee solely because the employee was acting within the scope of employment, there still might be conditions to render a supervisor liable for the conduct of his subordinate. See, *e.g., Whitfield v. Melendez–Rivera,* 431 F.3d 1, 14 (C.A.1 2005) (distinguishing between *respondeat superior* liability and supervisory liability); *Bennett v. Eastpointe,* 410 F.3d 810, 818 (C.A.6 2005) (same); *Richardson v. Goord,* 347 F.3d 431, 435 (C.A.2 2003) (same); *Hall v. Lombardi,* 996 F.2d 954, 961 (C.A.8 1993) (same).

In fact, there is quite a spectrum of possible tests for supervisory liability: it could be imposed where a supervisor has actual knowledge of a subordinate's constitutional violation and acquiesces, see, *e.g., Baker v. Monroe Twp.,* 50 F.3d 1186, 1194 (C.A.3 1995); *Woodward v. Worland,* 977 F.2d 1392, 1400 (C.A.10 1992); or where supervisors " 'know about the conduct and facilitate it, approve it, condone it, or turn a *694 blind eye for fear of what they might see,' " *International Action Center v. United States,* 365 F.3d 20, 28 (C.A.D.C.2004) (Roberts, J.) (quoting *Jones v. Chicago,* 856 F.2d 985, 992 (C.A.7 1988) (Posner, J.)); or where the supervisor has no actual knowledge of the violation but was reckless in his supervision of the subordinate, see, *e.g., Hall, supra,* at 961; or where the supervisor was grossly negligent, see, *e.g., Lipsett v. University of Puerto Rico,* 864 F.2d 881, 902 (C.A.1 1988). I am unsure what the general test for supervisory liability should be, and in the absence of briefing and argument I am in no position to choose or devise one.

Neither is the majority, but what is most remarkable about its foray into supervisory liability is that its conclusion has no bearing on its resolution of the case. The majority says that all of the allegations in the complaint that Ashcroft and Mueller authorized, condoned, or even were aware of their subordinates' discriminatory conduct are "conclusory" and therefore are "not entitled to be assumed true." *Ante,* at 1951. As I explain below, this conclusion is unsound, but on the majority's understanding of Rule 8(a)(2) pleading standards, even if the majority accepted Ashcroft and Mueller's concession and asked whether the complaint sufficiently alleges knowledge and deliberate indifference, it presumably would still conclude that the complaint fails to plead sufficient facts and must be dismissed.[2]

II

Given petitioners' concession, the complaint satisfies Rule 8(a)(2). Ashcroft and Mueller admit they are liable for their subordinates' conduct if they "had actual knowledge of the assertedly discriminatory nature of the classification of suspects *695 as being 'of high interest' and they were deliberately indifferent to that discrimination." Brief for Petitioners 50. Iqbal alleges **1959 that after the September 11 attacks the FBI "arrested and detained thousands of Arab Muslim men," Complaint ¶ 47, App. to Pet. for Cert. 164a, that many of these men were designated by high-ranking FBI officials as being " 'of high interest,' " *id.,* ¶¶ 48, 50, at 164a, and that in many cases, including Iqbal's, this designation was made "because of the race, religion, and national origin of the detainees, and not because of any evidence of the detainees' involvement in supporting terrorist activity," *id.,* ¶ 49, at 164a. The complaint further alleges that Ashcroft was the "principal architect of the policies and practices challenged," *id.,* ¶ 10, at 157a, and that Mueller "was instrumental in the adoption, promulgation, and implementation of the policies and practices challenged," *id.,* ¶ 11, at 157a. According to the complaint, Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject [Iqbal] to these conditions of confinement as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest." *Id.,* ¶ 96, at 172a–173a. The complaint thus alleges, at a bare minimum, that Ashcroft and Mueller knew of and condoned the discriminatory policy their subordinates carried out. Actually, the complaint goes further in alleging that Ashcroft and Mueller affirmatively acted to create the discriminatory detention policy. If these factual allegations are true, Ashcroft and Mueller were, at

Ashcroft v. Iqbal, 556 U.S. 662 (2009)
129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

the very least, aware of the discriminatory policy being implemented and deliberately indifferent to it.

Ashcroft and Mueller argue that these allegations fail to satisfy the "plausibility standard" of *Twombly*. They contend that Iqbal's claims are implausible because such high-ranking officials "tend not to be personally involved in the specific actions of lower-level officers down the bureaucratic chain of command." Brief for Petitioners 28. But this response bespeaks a fundamental misunderstanding of the enquiry ***696** that *Twombly* demands. *Twombly* does not require a court at the motion-to-dismiss stage to consider whether the factual allegations are probably true. We made it clear, on the contrary, that a court must take the allegations as true, no matter how skeptical the court may be. See 550 U.S., at 555, 127 S.Ct. 1955 (a court must proceed "on the assumption that all the allegations in the complaint are true (even if doubtful in fact)"); *id.*, at 556, 127 S.Ct. 1955 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable"); see also *Neitzke v. Williams*, 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"). The sole exception to this rule lies with allegations that are sufficiently fantastic to defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. That is not what we have here.

Under *Twombly*, the relevant question is whether, assuming the factual allegations are true, the plaintiff has stated a ground for relief that is plausible. That is, in *Twombly* 's words, a plaintiff must "allege facts" that, taken as true, are "suggestive of illegal conduct." 550 U.S., at 564, n. 8, 127 S.Ct. 1955. In *Twombly*, we were faced with allegations of a conspiracy to violate § 1 of the Sherman Act through parallel conduct. The difficulty was that the conduct alleged was "consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market." *Id.*, at 554, 127 S.Ct. 1955. We held that in ****1960** that sort of circumstance, "[a]n allegation of parallel conduct is ... much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility of 'entitlement to relief.' " *Id.*, at 557, 127 S.Ct. 1955 (brackets omitted). Here, by contrast, the allegations in the complaint are neither confined to naked legal conclusions nor consistent ***697**

with legal conduct. The complaint alleges that FBI officials discriminated against Iqbal solely on account of his race, religion, and national origin, and it alleges the knowledge and deliberate indifference that, by Ashcroft and Mueller's own admission, are sufficient to make them liable for the illegal action. Iqbal's complaint therefore contains "enough facts to state a claim to relief that is plausible on its face." *Id.*, at 570, 127 S.Ct. 1955.

I do not understand the majority to disagree with this understanding of "plausibility" under *Twombly*. Rather, the majority discards the allegations discussed above with regard to Ashcroft and Mueller as conclusory, and is left considering only two statements in the complaint: that "the [FBI], under the direction of Defendant MUELLER, arrested and detained thousands of Arab Muslim men ... as part of its investigation of the events of September 11," Complaint ¶ 47, App. to Pet. for Cert. 164a, and that "[t]he policy of holding post–September–11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001," *id.*, ¶ 69, at 168a. See *ante*, at 1951. I think the majority is right in saying that these allegations suggest only that Ashcroft and Mueller "sought to keep suspected terrorists in the most secure conditions available until the suspects could be cleared of terrorist activity," *ante*, at 1952, and that this produced "a disparate, incidental impact on Arab Muslims," *ante*, at 1951 – 1952. And I agree that the two allegations selected by the majority, standing alone, do not state a plausible entitlement to relief for unconstitutional discrimination.

But these allegations do not stand alone as the only significant, nonconclusory statements in the complaint, for the complaint contains many allegations linking Ashcroft and Mueller to the discriminatory practices of their subordinates. See Complaint ¶ 10, App. to Pet. for Cert. 157a (Ashcroft was the "principal architect" of the discriminatory policy); ***698** *id.*, ¶ 11, at 157a (Mueller was "instrumental" in adopting and executing the discriminatory policy); *id.*, ¶ 96, at 172a–173a (Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" Iqbal to harsh conditions "as a matter of policy, solely on account of [his] religion, race, and/or national origin and for no legitimate penological interest").

The majority says that these are "bare assertions" that, "much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim" and therefore are "not

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

entitled to be assumed true." *Ante,* at 1951 (quoting *Twombly, supra,* at 555, 127 S.Ct. 1955). The fallacy of the majority's position, however, lies in looking at the relevant assertions in isolation. The complaint contains specific allegations that, in the aftermath of the September 11 attacks, the Chief of the FBI's International Terrorism Operations Section and the Assistant Special Agent in Charge for the FBI's New York Field Office implemented a policy that discriminated against Arab Muslim men, including Iqbal, solely on account of their race, religion, or national origin. See **1961 Complaint ¶¶ 47–53, *supra,* 49 164a–165a. Viewed in light of these subsidiary allegations, the allegations singled out by the majority as "conclusory" are no such thing. Iqbal's claim is not that Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed to subject" him to a discriminatory practice that is left undefined; his allegation is that "they knew of, condoned, and willfully and maliciously agreed to subject" him to a particular, discrete, discriminatory policy detailed in the complaint. Iqbal does not say merely that Ashcroft was the architect of some amorphous discrimination, or that Mueller was instrumental in an ill-defined constitutional violation; he alleges that they helped to create the discriminatory policy he has described. Taking the complaint as a whole, it gives Ashcroft and Mueller " 'fair notice of what the ... claim is and the grounds upon which it *699 rests.' " *Twombly,* 550 U.S., at 555, 127 S.Ct. 1955 (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (omission in original)).

That aside, the majority's holding that the statements it selects are conclusory cannot be squared with its treatment of certain other allegations in the complaint as nonconclusory. For example, the majority takes as true the statement that "[t]he policy of holding post–September–11th detainees in highly restrictive conditions of confinement until they were 'cleared' by the FBI was approved by Defendants ASHCROFT and MUELLER in discussions in the weeks after September 11, 2001." Complaint ¶ 69, *supra,* at 168a; see *ante,* at 1951. This statement makes two points: (1) after September 11, the FBI held certain detainees in highly restrictive conditions, and (2) Ashcroft and Mueller discussed and approved these conditions. If, as the majority says, these allegations are not conclusory, then I cannot see why the majority deems it merely conclusory when Iqbal alleges that (1) after September 11, the FBI designated Arab Muslim detainees as being of " 'high interest' " "because of the race, religion, and national origin of the detainees, and not because of any evidence of

the detainees' involvement in supporting terrorist activity," Complaint ¶¶ 48–50, App. to Pet. for Cert. 164a, and (2) Ashcroft and Mueller "knew of, condoned, and willfully and maliciously agreed" to that discrimination, *id.,* ¶ 96, at 172a. By my lights, there is no principled basis for the majority's disregard of the allegations linking Ashcroft and Mueller to their subordinates' discrimination.

I respectfully dissent.


Justice BREYER, dissenting.

I agree with Justice SOUTER and join his dissent. I write separately to point out that, like the Court, I believe it important to prevent unwarranted litigation from interfering with "the proper execution of the work of the Government." *Ante,* at 1953. But I cannot find in that need adequate justification for the Court's interpretation of *700 *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and Federal Rule of Civil Procedure 8. The law, after all, provides trial courts with other legal weapons designed to prevent unwarranted interference. As the Second Circuit explained, where a Government defendant asserts a qualified immunity defense, a trial court, responsible for managing a case and "mindful of the need to vindicate the purpose of the qualified immunity defense," can structure discovery in ways that diminish the risk of imposing unwarranted burdens upon public officials. See *Iqbal v. Hasty,* 490 F.3d 143, 158 (2007). A district court, for example, can begin discovery with lower level Government defendants before determining whether a case can be made to allow **1962 discovery related to higher level Government officials. See *ibid.* Neither the briefs nor the Court's opinion provides convincing grounds for finding these alternative case-management tools inadequate, either in general or in the case before us. For this reason, as well as for the independently sufficient reasons set forth in Justice SOUTER's opinion, I would affirm the Second Circuit.


All Citations

556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785, 73 Fed.R.Serv.3d 837, 09 Cal. Daily Op. Serv. 5961, 2009 Daily Journal D.A.R. 7005, 21 Fla. L. Weekly Fed. S 853

Ashcroft v. Iqbal, 556 U.S. 662 (2009)

129 S.Ct. 1937, 173 L.Ed.2d 868, 77 USLW 4387, 2009-2 Trade Cases P 76,785...

Footnotes

* The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1 Iqbal makes no claim against Ashcroft and Mueller based simply on his right, as a pretrial detainee, to be free from punishment prior to an adjudication of guilt on the fraud charges. See *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

2 If I am mistaken, and the majority's rejection of the concession is somehow outcome determinative, then its approach is even more unfair to Iqbal than previously explained, see *supra,* at 1957, for Iqbal had no reason to argue the (apparently dispositive) supervisory liability standard in light of the concession.

---

End of Document         © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

127 S.Ct. 1955
Supreme Court of the United States

BELL ATLANTIC
CORPORATION et al., Petitioners,

v.

William TWOMBLY et al.

No. 05–1126
|
Argued Nov. 27, 2006.
|
Decided May 21, 2007.

**Synopsis**

**Background:** Consumers brought putative class action against incumbent local exchange carriers (ILECs) alleging antitrust conspiracy, in violation of the Sherman Act, both to prevent competitive entry into local telephone and Internet service markets and to avoid competing with each other in their respective markets. The United States District Court for the Southern District of New York, Gerard Lynch, J., 313 F.Supp.2d 174, dismissed complaint for failure to state a claim upon which relief could be granted. The United States Court of Appeals for the Second Circuit, 425 F.3d 99, reversed. The Supreme Court granted certiorari.

**Holdings:** The Supreme Court, Justice Souter, held that:

[1] stating a claim under Sherman Act's restraint of trade provision requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made;

[2] an allegation of parallel business conduct and a bare assertion of conspiracy will not alone suffice to state a claim under the Sherman Act;

[3] dismissal for failure to state a claim upon which relief may be granted does not require appearance, beyond a doubt, that plaintiff can prove no set of facts in support of claim that would entitle him to relief, abrogating *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80; and

[4] consumers' allegations of parallel conduct were insufficient to state a claim.

Judgment of the Court of Appeals reversed and remanded.

Justice Stevens filed a dissenting opinion in which Justice Ginsburg joined in part.

West Headnotes (18)

[1] **Antitrust and Trade Regulation** ⇌ Cartels, Combinations, Contracts, and Conspiracies in General

Because Sherman Act's restraint of trade provision does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express. Sherman Act, § 1, 15 U.S.C.A. § 1.

187 Cases that cite this headnote

[2] **Antitrust and Trade Regulation** ⇌ Admissibility

While a showing of parallel business behavior is admissible circumstantial evidence from which the fact finder may infer agreement, it falls short of conclusively establishing agreement or itself constituting an offense under the Sherman Act's restraint of trade provision. Sherman Act, § 1, 15 U.S.C.A. § 1.

34 Cases that cite this headnote

[3] **Antitrust and Trade Regulation** ⇌ Cartels, Combinations, Contracts, and Conspiracies in General

Conscious parallelism with respect to business behavior, a common reaction of firms in a concentrated market that recognize their shared economic interests and their interdependence with respect to price and output decisions, is not in itself unlawful under Sherman Act's restraint of trade provision. Sherman Act, § 1, 15 U.S.C.A. § 1.

**[4]**  **Antitrust and Trade Regulation** ⟜ Cartels, Combinations, Contracts, and Conspiracies in General

An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct on part of defendants is not entitled to a directed verdict. Sherman Act, § 1, 15 U.S.C.A. § 1.

43 Cases that cite this headnote

**[5]**  **Antitrust and Trade Regulation** ⟜ Restraints and misconduct in general

Proof of a conspiracy under Sherman Act's restraint of trade provision must include evidence tending to exclude the possibility of independent action. Sherman Act, § 1, 15 U.S.C.A. § 1.

31 Cases that cite this headnote

**[6]**  **Federal Civil Procedure** ⟜ Antitrust and price discrimination cases

At the summary judgment stage, an offer of conspiracy evidence by a plaintiff alleging violation of Sherman Act's restraint of trade provision must tend to rule out the possibility that the defendants were acting independently. Sherman Act, § 1, 15 U.S.C.A. § 1.

111 Cases that cite this headnote

**[7]**  **Federal Civil Procedure** ⟜ Claim for relief in general

**Federal Civil Procedure** ⟜ Insufficiency in general

While a complaint attacked by a motion to dismiss for failure to state a claim upon which relief can be granted does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

167184 Cases that cite this headnote

**[8]**  **Federal Civil Procedure** ⟜ Insufficiency in general

**Federal Civil Procedure** ⟜ Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true even if doubtful in fact. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

191331 Cases that cite this headnote

**[9]**  **Federal Civil Procedure** ⟜ Claim for relief in general

While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant set out in detail the facts upon which he bases his claim, the general rule governing pleadings still requires a showing, rather than a blanket assertion, of entitlement to relief; without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only fair notice of the nature of the claim, but also grounds on which the claim rests. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

30289 Cases that cite this headnote

**[10]**  **Antitrust and Trade Regulation** ⟜ Conspiracy or combination

Stating a claim under Sherman Act's restraint of trade provision requires a complaint with enough factual matter, taken as true, to suggest that an agreement was made; asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage, but simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence

of illegal agreement. Sherman Act, § 1, 15 U.S.C.A. § 1.

20758 Cases that cite this headnote

[11]     **Federal Civil Procedure** ⟜ Clear or certain nature of insufficiency

A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.

7295 Cases that cite this headnote

[12]     **Antitrust and Trade Regulation** ⟜ Conspiracy or combination

An allegation of parallel business conduct and a bare assertion of conspiracy will not suffice to state a claim under Sherman Act's restraint of trade provision; without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Sherman Act, § 1, 15 U.S.C.A. § 1.

1396 Cases that cite this headnote

[13]     **Antitrust and Trade Regulation** ⟜ Conspiracy or combination

When allegations of parallel conduct are set out in order to make a claim under the Sherman Act's restraint of trade provision, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action. Sherman Act, § 1, 15 U.S.C.A. § 1.

552 Cases that cite this headnote

[14]     **Federal Civil Procedure** ⟜ Claim for relief in general

**Federal Civil Procedure** ⟜ Clear or certain nature of insufficiency

Dismissal for failure to state a claim upon which relief may be granted does not require appearance, beyond a doubt, that plaintiff can prove no set of facts in support of claim that

would entitle him to relief, although once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint; abrogating *Conley v. Gibson.* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

53005 Cases that cite this headnote

[15]     **Antitrust and Trade Regulation** ⟜ Conspiracy or combination

Consumers' allegations that, by virtue of parallel conduct, incumbent local exchange carriers (ILECs) entered into a contract, combination, or conspiracy to prevent competitive entry into their local telephone and Internet service markets, and agreed not to compete with one another, failed to state claim for violation of Sherman Act's restraint of trade provision, as claim essentially rested on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. Sherman Act, § 1, 15 U.S.C.A. § 1.

356 Cases that cite this headnote

[16]     **Evidence** ⟜ Newspaper articles and other published information

Where antitrust complaint quoted portion of statement of one defendant's chief executive officer (CEO) to suggest that defendants conspired together, district court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. Fed.Rules Evid.Rule 201, 28 U.S.C.A.

415 Cases that cite this headnote

[17]     **Federal Civil Procedure** ⟜ Rules of Civil Procedure

Broadening of a Federal Rule of Civil Procedure can only be accomplished by the process of amending the Federal Rules, and not by judicial interpretation.

107 Cases that cite this headnote

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

[18]    **Federal Civil Procedure** ⬅ Certainty, Definiteness and Particularity

On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than that required by general rule governing pleadings. Fed.Rules Civ.Proc.Rules 8, 9(b–c), 28 U.S.C.A.

229 Cases that cite this headnote

**1958  *544 Syllabus***

The 1984 divestiture of the American Telephone & Telegraph Company's (AT & T) local telephone business left a system of regional service monopolies, sometimes called Incumbent Local Exchange Carriers (ILECs), and a separate long-distance market from which the ILECs were excluded. The Telecommunications Act of 1996 withdrew approval of the ILECs' monopolies, "fundamentally restructur[ing] local telephone markets" and "subject[ing] [ILECs] to a host of duties intended to facilitate market entry." *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835. It also authorized them to enter the long-distance market. "Central to the [new] scheme [was each ILEC's] obligation ... to share its network with" competitive local exchange carriers (CLECs). *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823.

Respondents (hereinafter plaintiffs) represent a class of subscribers of local telephone and/or high–speed Internet services in this action against petitioner ILECs for claimed violations of § 1 of the Sherman Act, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." The complaint alleges that the ILECs conspired to restrain trade (1) by engaging in parallel conduct in their respective service areas to inhibit the growth of upstart CLECs; and (2) by agreeing to refrain from competing against one another, as indicated by their common failure to pursue attractive business opportunities in contiguous markets and by a statement by one ILEC's chief executive officer that competing in another ILEC's territory did not seem right. The District Court dismissed the complaint, concluding that parallel business conduct

allegations, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts tending to exclude independent self-interested conduct as an explanation for the parallel actions. Reversing, the Second Circuit held that plaintiffs' parallel conduct allegations were sufficient to withstand a motion to dismiss because the ILECs failed to show that there is no set of facts that would permit plaintiffs to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence.

*545 *Held:*

1. Stating a § 1 claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. An allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Pp. 1963 – 1970.

(a) Because § 1 prohibits "only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628, "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement," *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540, 74 S.Ct. 257, 98 L.Ed. 273. While a showing of parallel "business behavior is admissible circumstantial evidence from which" agreement may be inferred, it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." *Id.*, at 540–541, 74 S.Ct. 257. The inadequacy of showing parallel conduct or interdependence, without more, **1959 mirrors the behavior's ambiguity: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. Thus, this Court has hedged against false inferences from identical behavior at a number of points in the trial sequence, *e.g.*, at the summary judgment stage, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538. Pp. 1963 – 1964.

(b) This case presents the antecedent question of what a plaintiff must plead in order to state a § 1 claim. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80. While a complaint attacked by a Rule 12(b)(6)

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

motion to dismiss does not need detailed factual allegations, *ibid.*, a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true. Applying these general standards to a § 1 claim, stating a claim requires a complaint with enough factual matter to suggest an agreement. Asking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects Rule 8(a)(2)'s threshold requirement that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A parallel **\*546** conduct allegation gets the § 1 claim close to stating a claim, but without further factual enhancement it stops short of the line between possibility and plausibility. The requirement of allegations suggesting an agreement serves the practical purpose of preventing a plaintiff with " 'a largely groundless claim' " from " 'tak[ing] up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' " *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577. It is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but quite another to forget that proceeding to antitrust discovery can be expensive. That potential expense is obvious here, where plaintiffs represent a putative class of at least 90 percent of subscribers to local telephone or high-speed Internet service in an action against America's largest telecommunications firms for unspecified instances of antitrust violations that allegedly occurred over a 7-year period. It is no answer to say that a claim just shy of plausible entitlement can be weeded out early in the discovery process, given the common lament that the success of judicial supervision in checking discovery abuse has been modest. Plaintiffs' main argument against the plausibility standard at the pleading stage is its ostensible conflict with a literal reading of *Conley's* statement construing Rule 8: "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45–46, 78 S.Ct. 99. The "no set of facts" language has been questioned, criticized, and explained away long enough by courts and commentators, **\*\*1960** and is best forgotten as an incomplete, negative gloss on an accepted

pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Conley* described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival. Pp. 1964 – 1970.

2. Under the plausibility standard, plaintiffs' claim of conspiracy in restraint of trade comes up short. First, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct, not on any independent allegation of actual agreement among the ILECs. The nub of the complaint is the ILECs' parallel behavior, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience. Nothing in the complaint invests either the action or inaction alleged with a plausible conspiracy suggestion. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, the District Court correctly found that nothing in the complaint intimates that resisting the upstarts was anything more than the natural, unilateral reaction of each **\*547** ILEC intent on preserving its regional dominance. The complaint's general collusion premise fails to answer the point that there was no need for joint encouragement to resist the 1996 Act, since each ILEC had reason to try to avoid dealing with CLECs and would have tried to keep them out, regardless of the other ILECs' actions. Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act to enter into their competitors' territories, leaving the relevant market highly compartmentalized geographically, with minimal competition. This parallel conduct did not suggest conspiracy, not if history teaches anything. Monopoly was the norm in telecommunications, not the exception. Because the ILECs were born in that world, doubtless liked it, and surely knew the adage about him who lives by the sword, a natural explanation for the noncompetition is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same. Antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim. This analysis does not run counter to *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 508, 122 S.Ct. 992, 152 L.Ed.2d 1, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination." Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

claims across the line from conceivable to plausible, their complaint must be dismissed. Pp. 1970 – 1974.

425 F.3d 99, reversed and remanded.

SOUTER, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, KENNEDY, THOMAS, BREYER, and ALITO, JJ., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG, J., joined, except as to Part IV, *post*, p. 1974.

**Attorneys and Law Firms**

Stephen M. Shapiro, Kenneth S. Geller, Richard J. Favretto, Mayer, Brown, Rowe & Maw LLP, Washington, D.C., Laura J. Coleman, J. Henry Walker, Marc W.F. Galonsky, Ashley Watson, Atlanta, Georgia, for BellSouth Corporation.

Timothy Beyer, Brownstein Hyatt & Farber, P.C., Denver, Colorado, **1961 Cynthia P. Delaney, Denver, Colorado, Counsel for Qwest Communications International Inc.

Michael K. Kellogg, Mark C. Hansen, Aaron M. Panner, Kellogg, Huber, Hansen, Todd, Evans & Figel, P.L.L.C., Washington, D.C., Javier Aguilar, William M. Schur, San Antonio, Texas, for AT&T Inc. (formerly SBC Communications Inc.).

Richard G. Taranto, Farr & Taranto, Washington, D.C., Paul J. Larkin, Jr., David E. Wheeler, Robert J. Zastrow, Arlington, Virginia, Dan K. Webb, Charles B. Molster III, Winston & Strawn LLP, Chicago, Illinois, for Verizon Communications Inc. (successor-in-interest to Bell Atlantic Corporation).

Marc A. Topaz, Joseph H. Meltzer, Schiffrin & Barroway, LLP, Radnor, PA, J. Douglas Richards, Michael M. Buchman, Milberg Weiss Bershad & Schulman LLP, New York, NY, for Respondents.

**Opinion**

Justice SOUTER delivered the opinion of the Court.

**\*548** Liability under § 1 of the Sherman Act, 15 U.S.C. § 1, requires a "contract, combination ..., or conspiracy, in restraint of trade or commerce." The question in this putative class action is whether a § 1 complaint can survive a motion to dismiss when it alleges that major telecommunications providers engaged in certain parallel conduct unfavorable to **\*549** competition, absent some factual context suggesting agreement, as distinct from identical, independent action. We hold that such a complaint should be dismissed.

I

The upshot of the 1984 divestiture of the American Telephone & Telegraph Company's (AT & T) local telephone business was a system of regional service monopolies (variously called "Regional Bell Operating Companies," "Baby Bells," or "Incumbent Local Exchange Carriers" (ILECs)), and a separate, competitive market for long-distance service from which the ILECs were excluded. More than a decade later, Congress withdrew approval of the ILECs' monopolies by enacting the Telecommunications Act of 1996 (1996 Act), 110 Stat. 56, which "fundamentally restructure[d] local telephone markets" and "subject[ed] [ILECs] to a host of duties intended to facilitate market entry." *AT & T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371, 119 S.Ct. 721, 142 L.Ed.2d 835 (1999). In recompense, the 1996 Act set conditions for authorizing ILECs to enter the long-distance market. See 47 U.S.C. § 271.

"Central to the [new] scheme [was each ILEC's] obligation ... to share its network with competitors," *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004), which came to be known as "competitive local exchange carriers" (CLECs), Pet. for Cert. 6, n. 1. A CLEC could make use of an ILEC's network in any of three ways: by (1) "purchas[ing] local telephone services at wholesale rates for resale to end users," (2) "leas[ing] elements of the [ILEC's] network 'on an unbundled basis,' " or (3) "interconnect[ing] its own facilities with the [ILEC's] network." *Iowa Utilities Bd., supra,* at 371, 119 S.Ct. 721 (quoting 47 U.S.C. § 251(c)). Owing to the "considerable expense and effort" required to make unbundled network elements available to rivals at wholesale prices, *Trinko, supra,* at 410, 124 S.Ct. 872, the ILECs vigorously litigated the scope of the sharing obligation imposed by the 1996 Act, with the result that the Federal Communications Commission (FCC) three times **\*550** revised **1962** its regulations to narrow the range of network elements to be shared with the CLECs. See *Covad Communications Co. v. FCC,* 450 F.3d 528, 533–534 (C.A.D.C.2006) (summarizing the 10–year–long regulatory struggle between the ILECs and CLECs).

Respondents William Twombly and Lawrence Marcus (hereinafter plaintiffs) represent a putative class consisting

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

of all "subscribers of local telephone and/or high speed internet services ... from February 8, 1996 to present." Amended Complaint in No. 02 CIV. 10220(GEL) (SDNY) ¶ 53, App. 28 (hereinafter Complaint). In this action against petitioners, a group of ILECs,[1] plaintiffs seek treble damages and declaratory and injunctive relief for claimed violations of § 1 of the Sherman Act, ch. 647, 26 Stat. 209, as amended, 15 U.S.C. § 1, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations."

The complaint alleges that the ILECs conspired to restrain trade in two ways, each supposedly inflating charges for local telephone and high-speed Internet services. Plaintiffs say, first, that the ILECs "engaged in parallel conduct" in their respective service areas to inhibit the growth of upstart CLECs. Complaint ¶ 47, App. 23–26. Their actions allegedly included making unfair agreements with the CLECs for access to ILEC networks, providing inferior connections to the networks, overcharging, and billing in ways designed to sabotage the CLECs' relations with their own customers. *Ibid.* According to the complaint, the ILECs' *551 "compelling common motivatio[n]" to thwart the CLECs' competitive efforts naturally led them to form a conspiracy; "[h]ad any one [ILEC] not sought to prevent CLECs ... from competing effectively ..., the resulting greater competitive inroads into that [ILEC's] territory would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories in the absence of such conduct." *Id.,* ¶ 50, App. 26–27.

Second, the complaint charges agreements by the ILECs to refrain from competing against one another. These are to be inferred from the ILECs' common failure "meaningfully [to] pursu[e]" "attractive business opportunit[ies]" in contiguous markets where they possessed "substantial competitive advantages," *id.,* ¶¶ 40–41, App. 21–22, and from a statement of Richard Notebaert, chief executive officer (CEO) of the ILEC Qwest, that competing in the territory of another ILEC " 'might be a good way to turn a quick dollar but that doesn't make it right,' " *id.,* ¶ 42, App. 22.

The complaint couches its ultimate allegations this way:

"In the absence of any meaningful competition between the [ILECs] in one another's markets, and in light of the parallel course of conduct that each engaged in to prevent competition from CLECs within their respective local

telephone and/or high speed internet services markets and the other facts and market circumstances alleged above, Plaintiffs allege upon information **1963 and belief that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." *Id.,* ¶ 51, App. 27.[2]

*552 The United States District Court for the Southern District of New York dismissed the complaint for failure to state a claim upon which relief can be granted. The District Court acknowledged that "plaintiffs may allege a conspiracy by citing instances of parallel business behavior that suggest an agreement," but emphasized that "while '[c]ircumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy[, ...] "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.' " 313 F.Supp.2d 174, 179 (2003) (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); alterations in original). Thus, the District Court understood that allegations of parallel business conduct, taken alone, do not state a claim under § 1; plaintiffs must allege additional facts that "ten[d] to exclude independent self-interested conduct as an explanation for defendants' parallel behavior." 313 F.Supp.2d, at 179. The District Court found plaintiffs' allegations of parallel ILEC actions to discourage competition inadequate because "the behavior of each ILEC in resisting the incursion of CLECs is fully explained by the ILEC's own interests in defending its individual territory." *Id.,* at 183. As to the ILECs' supposed agreement against competing with each other, the District Court found that the complaint does not "alleg[e] facts ... suggesting that refraining from competing in other territories as CLECs was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs'] actions were the result of a conspiracy." *Id.,* at 188.

*553 The Court of Appeals for the Second Circuit reversed, holding that the District Court tested the complaint by the wrong standard. It held that "plus factors are not *required* to be pleaded to permit an antitrust claim based on parallel conduct to survive dismissal." 425 F.3d 99, 114 (2005) (emphasis in original). Although the Court of Appeals took the view that plaintiffs must plead facts that "include conspiracy among the realm of 'plausible' possibilities in order to survive a motion

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

to dismiss," it then said that "to rule that allegations of parallel anticompetitive conduct fail to support a plausible conspiracy claim, a court would have to conclude that there is no set of facts that would permit a plaintiff to demonstrate that the particular parallelism asserted was the product of collusion rather than coincidence." *Ibid.*

We granted certiorari to address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct, 548 U.S. 903, 126 S.Ct. 2965, 165 L.Ed.2d 949 (2006), and now reverse.

**1964 II

A

[1]  [2]  [3]  Because § 1 of the Sherman Act "does not prohibit [all] unreasonable restraints of trade ... but only restraints effected by a contract, combination, or conspiracy," *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 775, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), "[t]he crucial question" is whether the challenged anticompetitive conduct "stem[s] from independent decision or from an agreement, tacit or express," *Theatre Enterprises,* 346 U.S., at 540, 74 S.Ct. 257. While a showing of parallel "business behavior is admissible circumstantial evidence from which the fact finder may infer agreement," it falls short of "conclusively establish[ing] agreement or ... itself constitut[ing] a Sherman Act offense." *Id.,* at 540–541, 74 S.Ct. 257. Even "conscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" *554 is "not in itself unlawful." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed.2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L.Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy").

[4]  [5]  [6]  The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in

line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market. See, *e.g.,* AEI–Brookings Joint Center for Regulatory Studies, Epstein, Motions to Dismiss Antitrust Cases: Separating Fact from Fantasy, Related Publication 06–08, pp. 3–4 (2006) (discussing problem of "false positives" in § 1 suits). Accordingly, we have previously hedged against false inferences from identical behavior at a number of points in the trial sequence. An antitrust conspiracy plaintiff with evidence showing nothing beyond parallel conduct is not entitled to a directed verdict, see *Theatre Enterprises, supra;* proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, see *Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); and at the summary judgment stage a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently, see *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

B

[7]  [8]  [9]  This case presents the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the *555 Sherman Act. Federal Rule of Civil Procedure 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, *ibid.; Sanjuan v. American Bd. of Psychiatry and Neurology, Inc.,* 40 F.3d 247, 251 (C.A.7 1994), a plaintiff's obligation to provide the **1965 "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, see *Papasan v. Allain,* 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation"). Factual allegations must be enough to raise a right to relief above the speculative level, see 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235–236 (3d ed.2004) (hereinafter Wright & Miller) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action"),[3] on the assumption that all the allegations in the

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

complaint are true (even if doubtful in fact), see, *e.g.,* **\*556** *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Neitzke v. Williams,* 490 U.S. 319, 327, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989) ("Rule 12(b)(6) does not countenance ... dismissals based on a judge's disbelief of a complaint's factual allegations"); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a well-pleaded complaint may proceed even if it appears "that a recovery is very remote and unlikely").

**[10]  [11]  [12]  [13]** In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.[4] And, of course, a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and "that a recovery is very remote and unlikely." *Ibid.* In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit **\*\*1966** of the prior rulings and considered views of leading commentators, already quoted, that lawful parallel conduct fails to bespeak unlawful agreement. It makes sense to say, therefore, that an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without **\*557** more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the "plain statement" possess enough heft to "sho[w] that the pleader is entitled to relief." A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory. An allegation of parallel conduct is thus much like a naked assertion of conspiracy in a § 1 complaint: it gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the

line between possibility and plausibility of "entitle[ment] to relief." Cf. *DM Research, Inc. v. College of Am. Pathologists,* 170 F.3d 53, 56 (C.A.1 1999) ("[T]erms like 'conspiracy,' or even 'agreement,' are border-line: they might well be sufficient in conjunction with a more specific allegation—for example, identifying a written agreement or even a basis for inferring a tacit agreement, ... but a court is not required to accept such terms as a sufficient basis for a complaint").[5]

We alluded to the practical significance of the Rule 8 entitlement requirement in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), when we explained that something beyond the mere possibility of loss causation must be **\*558** alleged, lest a plaintiff with " 'a largely groundless claim' " be allowed to " 'take up the time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value.' " *Id.,* at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)). So, when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, " 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " 5 Wright & Miller § 1216, at 233–234 (quoting *Daves v. Hawaiian Dredging Co.,* 114 F.Supp. 643, 645 (D.Hawai 1953)); *see also* Dura, supra, *at 346, 125 S.Ct. 1627;* Asahi Glass Co. v. Pentech Pharmaceuticals, Inc., *289 F.Supp.2d 986, 995 (N.D.Ill.2003) (Posner, J., sitting by designation) ("[S]ome threshold of plausibility must be crossed at the outset before a patent antitrust case should be permitted to go into its inevitably costly and protracted discovery phase").*

Thus, it is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, cf. **\*\*1967** *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), but quite another to forget that proceeding to antitrust discovery can be expensive. As we indicated over 20 years ago in *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 528, n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), "a district court must retain the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." See also *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (C.A.7 1984) ("[T]he costs of modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

the events related in the complaint"); Note, *Modeling the Effect of One–Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation,* 78 N.Y. & U. L.Rev. 1887, 1898–1899 (2003) (discussing the unusually high cost of discovery in antitrust cases); **\*559** Manual for Complex Litigation, Fourth, § 30, p. 519 (2004) (describing extensive scope of discovery in antitrust cases); Memorandum from Paul V. Niemeyer, Chair, Advisory Committee on Civil Rules, to Hon. Anthony J. Scirica, Chair, Committee on Rules of Practice and Procedure (May 11, 1999), 192 F.R.D. 354, 357 (2000) (reporting that discovery accounts for as much as 90 percent of litigation costs when discovery is actively employed). That potential expense is obvious enough in the present case: plaintiffs represent a putative class of at least 90 percent of all subscribers to local telephone or high-speed Internet service in the continental United States, in an action against America's largest telecommunications firms (with many thousands of employees generating reams and gigabytes of business records) for unspecified (if any) instances of antitrust violations that allegedly occurred over a period of seven years.

It is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through "careful case management," *post,* at 1975, given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side. See, *e.g.,* Easterbrook, *Discovery as Abuse,* 69 B.U.L.Rev. 635, 638 (1989) ("Judges can do little about impositional discovery when parties control the legal claims to be presented and conduct the discovery themselves"). And it is self-evident that the problem of discovery abuse cannot be solved by "careful scrutiny of evidence at the summary judgment stage," much less "lucid instructions to juries," *post,* at 1975; the threat of discovery expense will push cost-conscious defendants to settle even anemic cases before reaching those proceedings. Probably, then, it is only by taking care to require allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no " 'reasonably founded hope that the [discovery] process will reveal relevant evidence' " to support a § 1 claim. **\*560** *Dura,* 544 U.S., at 347, 125 S.Ct. 1627, 161 L.Ed.2d 577, (quoting *Blue Chip Stamps, supra,* at 741, 95 S.Ct. 1917; alteration in *Dura* ).[6]

**\*\*1968** **[14]** Plaintiffs do not, of course, dispute the requirement of plausibility and the need for something more than merely parallel behavior explained in *Theatre*

*Enterprises, Monsanto,* and *Matsushita,* and their main argument against the plausibility standard at the pleading stage is its ostensible **\*561** conflict with an early statement of ours construing Rule 8. Justice Black's opinion for the Court in *Conley v. Gibson* spoke not only of the need for fair notice of the grounds for entitlement to relief but of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45–46, 78 S.Ct. 99. This "no set of facts" language can be read in isolation as saying that any statement revealing the theory of the claim will suffice unless its factual impossibility may be shown from the face of the pleadings; and the Court of Appeals appears to have read *Conley* in some such way when formulating its understanding of the proper pleading standard, see 425 F.3d, at 106, 114 (invoking *Conley's* "no set of facts" language in describing the standard for dismissal).[7]

On such a focused and literal reading of *Conley's* "no set of facts," a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the possibility that a plaintiff might later establish some "set of [undisclosed] facts" to support recovery. So here, the Court of Appeals specifically found the prospect of unearthing direct evidence of conspiracy sufficient to preclude dismissal, even though the complaint **\*\*1969** does not set forth a single **\*562** fact in a context that suggests an agreement. 425 F.3d, at 106, 114. It seems fair to say that this approach to pleading would dispense with any showing of a " 'reasonably founded hope' " that a plaintiff would be able to make a case, see *Dura,* 544 U.S., at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps,* 421 U.S., at 741, 95 S.Ct. 1917); Mr. Micawber's optimism would be enough.

Seeing this, a good many judges and commentators have balked at taking the literal terms of the *Conley* passage as a pleading standard. See, *e.g., Car Carriers,* 745 F.2d, at 1106 ("*Conley* has never been interpreted literally" and, "[i]n practice, a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under *some* viable legal theory" (internal quotation marks omitted; emphasis and omission in original)); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1155 (C.A.9 1989) (tension between *Conley's* "no set of facts" language and its acknowledgment that a plaintiff must provide the "grounds" on which his claim rests); *O'Brien v. DiGrazia,* 544 F.2d 543, 546, n. 3 (C.A.1 1976) ("[W]hen a plaintiff ... supplies facts to support his claim,

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

we do not think that *Conley* imposes a duty on the courts to conjure up unpleaded facts that might turn a frivolous claim of unconstitutional ... action into a substantial one"); *McGregor v. Industrial Excess Landfill, Inc.,* 856 F.2d 39, 42–43 (C.A.6 1988) (quoting *O'Brien's* analysis); Hazard, From Whom No Secrets Are Hid, 76 Tex. L.Rev. 1665, 1685 (1998) (describing *Conley* as having "turned Rule 8 on its head"); Marcus, The Revival of Fact Pleading Under the Federal Rules of Civil Procedure, 86 Colum. L.Rev. 433, 463–465 (1986) (noting tension between *Conley* and subsequent understandings of Rule 8).

We could go on, but there is no need to pile up further citations to show that *Conley's* "no set of facts" language has been questioned, criticized, and explained away long enough. To be fair to the *Conley* Court, the passage should be understood in light of the opinion's preceding summary of the complaint's **\*563** concrete allegations, which the Court quite reasonably understood as amply stating a claim for relief. But the passage so often quoted fails to mention this understanding on the part of the Court, and after puzzling the profession for 50 years, this famous observation has earned its retirement. The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. See *Sanjuan,* 40 F.3d, at 251 (once a claim for relief has been stated, a plaintiff "receives the benefit of imagination, so long as the hypotheses are consistent with the complaint"); accord, *Swierkiewicz,* 534 U.S., at 514, 122 S.Ct. 992; *National Organization for Women, Inc. v. Scheidler,* 510 U.S. 249, 256, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *H.J. Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 249–250, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival.[8]

**\*\*1970  \*564** III

[15]    When we look for plausibility in this complaint, we agree with the District Court that plaintiffs' claim of conspiracy in restraint of trade comes up short. To begin with, the complaint leaves no doubt that plaintiffs rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs. *Supra,* at 1962 – 1963. Although in form a few stray statements speak directly of agreement,[9] on fair reading these are merely legal conclusions resting on the prior allegations. Thus, the complaint **\*565** first takes account of the alleged "absence of any meaningful competition between [the ILECs] in one another's markets," "the parallel course of conduct that each [ILEC] engaged in to prevent competition from CLECs," "and the other facts and market circumstances alleged [earlier]"; "in light of" these, the complaint concludes "that [the ILECs] have entered into a contract, combination or conspiracy to prevent competitive entry into their ... markets and have agreed not to compete with one another." Complaint ¶ 51, App. 27.[10] The nub of the **\*\*1971** complaint, then, is the ILECs' parallel behavior, consisting of steps to keep the CLECs out and manifest disinterest in becoming CLECs themselves, and its sufficiency turns on the suggestions raised by this conduct when viewed in light of common economic experience.[11]

**\*566** We think that nothing contained in the complaint invests either the action or inaction alleged with a plausible suggestion of conspiracy. As to the ILECs' supposed agreement to disobey the 1996 Act and thwart the CLECs' attempts to compete, we agree with the District Court that nothing in the complaint intimates that the resistance to the upstarts was anything more than the natural, unilateral reaction of each ILEC intent on keeping its regional dominance. The 1996 Act did more than just subject the ILECs to competition; it obliged them to subsidize their competitors with their own equipment at wholesale rates. The economic incentive to resist was powerful, but resisting competition is routine market conduct, and even if the ILECs flouted the 1996 Act in all the ways the plaintiffs allege, see *id.,* ¶ 47, App. 23–24, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.

The complaint makes its closest pass at a predicate for conspiracy with the claim that collusion was necessary because success by even one CLEC in an ILEC's territory "would have revealed the degree to which competitive entry by CLECs would have been successful in the other territories." *Id.,* ¶ 50, App. 26–27. But, its logic aside, this general premise still fails to answer the point that there was just no need for joint encouragement to resist the 1996 Act; as the District Court said, "each ILEC has reason to

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

want to avoid dealing with CLECs" and "each ILEC would attempt to keep CLECs out, regardless of the actions of the other ILECs." 313 F.Supp.2d, at 184; cf. *Kramer v. Pollock–Krasner Foundation,* 890 F.Supp. 250, 256 (S.D.N.Y.1995) (while the plaintiff "may believe the defendants conspired ..., the defendants' allegedly conspiratorial actions *567 could equally have been prompted by lawful, independent goals which do not constitute a conspiracy").[12]

**1972 Plaintiffs' second conspiracy theory rests on the competitive reticence among the ILECs themselves in the wake of the 1996 Act, which was supposedly passed in the " 'hop[e] that the large incumbent local monopoly companies ... might attack their neighbors' service areas, as they are the best situated to do so.' " Complaint ¶ 38, App. 20 (quoting Consumer Federation of America, Lessons from 1996 Telecommunications Act: Deregulation Before Meaningful Competition Spells Consumer Disaster, p. 12 (Feb. 2000)). Contrary to hope, the ILECs declined " 'to enter each other's service territories in any significant way,' " Complaint ¶ 38, App. 20, and the local telephone and high–speed Internet market remains highly compartmentalized geographically, with minimal competition. Based on this state of affairs, and perceiving the ILECs to be blessed with "especially attractive business opportunities" in surrounding markets dominated by other ILECs, the plaintiffs assert that the ILECs' parallel conduct was "strongly suggestive of conspiracy." *Id.,* ¶ 40, App. 21.

But it was not suggestive of conspiracy, not if history teaches anything. In a traditionally unregulated industry with low barriers to entry, sparse competition among large firms dominating separate geographical segments of the market could very well signify illegal agreement, but here we have an obvious alternative explanation. In the decade *568 preceding the 1996 Act and well before that, monopoly was the norm in telecommunications, not the exception. *Verizon Communications Inc. v. FCC,* 535 U.S. 467, 477–478, 122 S.Ct. 1646, 152 L.Ed.2d 701 (2002) (describing telephone service providers as traditional public monopolies). The ILECs were born in that world, doubtless liked the world the way it was, and surely knew the adage about him who lives by the sword. Hence, a natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing.

[16]    [17]    [18]    In fact, the complaint itself gives reasons to believe that the ILECs would see their best interests

in keeping to their old turf. Although the complaint says generally that the ILECs passed up "especially attractive business opportunit[ies]" by declining to compete as CLECs against other ILECs, Complaint ¶ 40, App. 21, it does not allege that competition as CLECs was potentially any more lucrative than other opportunities being pursued by the ILECs during the same period,[13] and **1973 the complaint is replete with indications that any CLEC faced nearly insurmountable barriers to profitability owing to the ILECs' flagrant resistance to the network sharing requirements of the 1996 Act, *id.,* ¶ 47, App. *569 23–26. Not only that, but even without a monopolistic tradition and the peculiar difficulty of mandating shared networks, "[f]irms do not expand without limit and none of them enters every market that an outside observer might regard as profitable, or even a small portion of such markets." Areeda & Hovenkamp ¶ 307d, at 155 (Supp.2006) (commenting on the case at bar). The upshot is that Congress may have expected some ILECs to become CLECs in the legacy territories of other ILECs, but the disappointment does not make conspiracy plausible. We agree with the District Court's assessment that antitrust conspiracy was not suggested by the facts adduced under either theory of the complaint, which thus fails to state a valid § 1 claim.[14]

Plaintiffs say that our analysis runs counter to *Swierkiewicz,* 534 U.S., at 508, 122 S.Ct. 992, 152 L.Ed.2d 1, which held that "a complaint in an employment discrimination lawsuit [need] not contain specific facts establishing a prima facie case of discrimination under the framework set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792[, 93 S.Ct. 1817, 36 L.Ed.2d 668] (1973)." They argue that just as the prima facie case is a "flexible evidentiary standard" that "should not be transposed into a rigid pleading standard for discrimination cases," *Swierkiewicz, supra,* at 512, 122 S.Ct. 992, "transpos[ing] 'plus factor' summary judgment analysis woodenly into a rigid Rule 12(b)(6) pleading standard ... would be unwise," Brief for Respondents 39. As the District Court *570 correctly understood, however, "*Swierkiewicz* did not change the law of pleading, but simply re-emphasized ... that the Second Circuit's use of a heightened pleading standard for Title VII cases was contrary to the Federal Rules' structure of liberal pleading requirements." 313 F.Supp.2d, at 181 (citation and footnote omitted). Even though Swierkiewicz's pleadings "detailed the events leading to his termination, provided relevant dates, and included the ages and nationalities of at least some of the relevant persons involved with his termination," the Court of Appeals dismissed his complaint for failing to allege certain additional

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

facts that Swierkiewicz would need at the trial stage to support his claim in the absence of direct evidence of discrimination. *Swierkiewicz,* 534 U.S., at 514, 122 S.Ct. 992. We reversed on the ground that the Court of Appeals had impermissibly applied what amounted to a heightened pleading requirement by insisting that Swierkiewicz allege "specific facts" beyond those necessary to state his **1974 claim and the grounds showing entitlement to relief. *Id.,* at 508, 122 S.Ct. 992.

Here, in contrast, we do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face. Because the plaintiffs here have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed.

\* \* \*

The judgment of the Court of Appeals for the Second Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice STEVENS, with whom Justice GINSBURG joins except as to Part IV, dissenting.

In the first paragraph of its 23–page opinion the Court states that the question to be decided is whether allegations that "major telecommunications providers engaged in certain *571 parallel conduct unfavorable to competition" suffice to state a violation of § 1 of the Sherman Act. *Ante,* at 1961. The answer to that question has been settled for more than 50 years. If that were indeed the issue, a summary reversal citing *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954), would adequately resolve this case. As *Theatre Enterprises* held, parallel conduct is circumstantial evidence admissible on the issue of conspiracy, but it is not itself illegal. *Id.,* at 540–542, 74 S.Ct. 257.

Thus, this is a case in which there is no dispute about the substantive law. If the defendants acted independently, their conduct was perfectly lawful. If, however, that conduct is the product of a horizontal agreement among potential competitors, it was unlawful. The plaintiffs have alleged such an agreement and, because the complaint was dismissed in advance of answer, the allegation has not even been denied. Why, then, does the case not proceed? Does a judicial opinion

that the charge is not "plausible" provide a legally acceptable reason for dismissing the complaint? I think not.

Respondents' amended complaint describes a variety of circumstantial evidence and makes the straightforward allegation that petitioners

"entered into a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets and have agreed not to compete with one another and otherwise allocated customers and markets to one another." Amended Complaint in No. 02 CIV. 10220(GEL) (SDNY) ¶ 51, App. 27 (hereinafter Complaint).

The complaint explains that, contrary to Congress' expectation when it enacted the 1996 Telecommunications Act, and consistent with their own economic self-interests, petitioner Incumbent Local Exchange Carriers (ILECs) have assiduously avoided infringing upon each other's markets and have *572 refused to permit nonincumbent competitors to access their networks. The complaint quotes Richard Notebaert, the former chief executive officer of one such ILEC, as saying that competing in a neighboring ILEC's territory " 'might be a good way to turn a quick dollar but that doesn't make it right.' " *Id.,* ¶ 42, App. 22. Moreover, respondents allege that petitioners "communicate amongst themselves" through numerous industry associations. *Id.,* ¶ 46, App. 23. In sum, respondents allege that petitioners entered into an agreement that has long been recognized as a classic *per se* **1975 violation of the Sherman Act. See Report of the Attorney General's National Committee to Study the Antitrust Laws 26 (1955).

Under rules of procedure that have been well settled since well before our decision in *Theatre Enterprises,* a judge ruling on a defendant's motion to dismiss a complaint "must accept as true all of the factual allegations contained in the complaint." *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508, n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); see *Overstreet v. North Shore Corp.,* 318 U.S. 125, 127, 63 S.Ct. 494, 87 L.Ed. 656 (1943). But instead of requiring knowledgeable executives such as Notebaert to respond to these allegations by way of sworn depositions or other limited discovery—and indeed without so much as requiring petitioners to file an answer denying that they entered into any agreement—the majority permits immediate dismissal based on the assurances of company lawyers that nothing untoward was afoot. The Court embraces the argument of those lawyers that "there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway," *ante,* at 1971; that

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

"there was just no need for joint encouragement to resist the 1996 Act," *ibid.;* and that the "natural explanation for the noncompetition alleged is that the former Government-sanctioned monopolists were sitting tight, expecting their neighbors to do the same thing," *ante,* at 1972.

The Court and petitioners' legal team are no doubt correct that the parallel conduct alleged is consistent with the absence **\*573** of any contract, combination, or conspiracy. But that conduct is also entirely consistent with the *presence* of the illegal agreement alleged in the complaint. And the charge that petitioners "agreed not to compete with one another" is not just one of "a few stray statements," *ante,* at 1970; it is an allegation describing unlawful conduct. As such, the Federal Rules of Civil Procedure, our longstanding precedent, and sound practice mandate that the District Court at least require some sort of response from petitioners before dismissing the case.

Two practical concerns presumably explain the Court's dramatic departure from settled procedural law. Private antitrust litigation can be enormously expensive, and there is a risk that jurors may mistakenly conclude that evidence of parallel conduct has proved that the parties acted pursuant to an agreement when they in fact merely made similar independent decisions. Those concerns merit careful case management, including strict control of discovery, careful scrutiny of evidence at the summary judgment stage, and lucid instructions to juries; they do not, however, justify the dismissal of an adequately pleaded complaint without even requiring the defendants to file answers denying a charge that they in fact engaged in collective decisionmaking. More importantly, they do not justify an interpretation of Federal Rule of Civil Procedure 12(b)(6) that seems to be driven by the majority's appraisal of the plausibility of the ultimate factual allegation rather than its legal sufficiency.

I

Rule 8(a)(2) of the Federal Rules requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." The Rule did not come about by happenstance, and its language is not inadvertent. The English experience with Byzantine special pleading rules —illustrated by the hypertechnical Hilary rules of **\*574** 1834[1]—made **\*\*1976** obvious the appeal of a pleading standard that was easy for the common litigant to understand and sufficed to put the defendant on notice as to the nature

of the claim against him and the relief sought. Stateside, David Dudley Field developed the highly influential New York Code of 1848, which required "[a] statement of the facts constituting the cause of action, in ordinary and concise language, without repetition, and in such a manner as to enable a person of common understanding to know what is intended." An Act to Simplify and Abridge the Practice, Pleadings and Proceedings of the Courts of this State, ch. 379, § 120(2), 1848 N.Y. Laws pp. 497, 521. Substantially similar language appeared in the Federal Equity Rules adopted in 1912. See Fed. Equity Rule 25 (requiring "a short and simple statement of the ultimate facts upon which the plaintiff asks relief, omitting any mere statement of evidence").

A difficulty arose, however, in that the Field Code and its progeny required a plaintiff to plead "facts" rather than "conclusions," a distinction that proved far easier to say than to apply. As commentators have noted,

"it is virtually impossible logically to distinguish among 'ultimate facts,' 'evidence,' and 'conclusions.' Essentially any allegation in a pleading must be an assertion that certain occurrences took place. The pleading spectrum, passing from evidence through ultimate facts to conclusions, is largely a continuum varying only in the degree of particularity with which the occurrences are described." Weinstein & Distler, Comments on Procedural Reform: Drafting Pleading Rules, 57 Colum. L.Rev. 518, 520–521 (1957).

See also Cook, Statements of Fact in Pleading Under the Codes, 21 Colum. L.Rev. 416, 417 (1921) (hereinafter Cook) ("[T]here is no logical distinction between statements which are grouped by the courts under the phrases 'statements of **\*575** fact' and 'conclusions of law' "). Rule 8 was directly responsive to this difficulty. Its drafters intentionally avoided any reference to "facts" or "evidence" or "conclusions." See 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, p. 207 (3d ed.2004) (hereinafter Wright & Miller) ("The substitution of 'claim showing that the pleader is entitled to relief' for the code formulation of the 'facts' constituting a 'cause of action' was intended to avoid the distinctions drawn under the codes among 'evidentiary facts,' 'ultimate facts,' and 'conclusions' ...").

Under the relaxed pleading standards of the Federal Rules, the idea was not to keep litigants out of court but rather to keep them in. The merits of a claim would be sorted out during a flexible pretrial process and, as appropriate, through the crucible of trial. See *Swierkiewicz,* 534 U.S., at 514, 122 S.Ct. 992 ("The liberal notice pleading of Rule 8(a) is the starting

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

point of a simplified pleading system, which was adopted to focus litigation on the merits of a claim"). Charles E. Clark, the "principal draftsman" of the Federal Rules,[2] put it thus:

> "Experience has shown ... that we cannot expect the proof of the case to be made through the pleadings, and that such proof is really not their function. We can expect a general statement distinguishing the case from all others, so that the manner and form of trial and remedy expected are clear, and so that a permanent judgment will result." **\*\*1977** The New Federal Rules of Civil Procedure: The Last Phase —Underlying Philosophy Embodied in Some of the Basic Provisions of the New Procedure, 23 A.B.A.J. 976, 977 (1937) (hereinafter Clark, New Federal Rules).

The pleading paradigm under the new Federal Rules was well illustrated by the inclusion in the appendix of Form 9, **\*576** a complaint for negligence. As relevant, the Form 9 complaint states only: "On June 1, 1936, in a public highway called Boylston Street in Boston, Massachusetts, defendant negligently drove a motor vehicle against plaintiff who was then crossing said highway." Form 9, Complaint for Negligence, Forms App., Fed. Rules Civ. Proc., 28 U.S.C.App., p. 829 (hereinafter Form 9). The complaint then describes the plaintiff's injuries and demands judgment. The asserted ground for relief—namely, the defendant's negligent driving—would have been called a " 'conclusion of law' " under the code pleading of old. See, *e.g.*, Cook 419. But that bare allegation suffices under a system that "restrict[s] the pleadings to the task of general notice-giving and invest[s] the deposition-discovery process with a vital role in the preparation for trial."[3] *Hickman v. Taylor*, 329 U.S. 495, 501, 67 S.Ct. 385, 91 L.Ed. 451 (1947); see also *Swierkiewicz*, 534 U.S., at 513, n. 4, 122 S.Ct. 992 (citing Form 9 as an example of " 'the simplicity and brevity of statement which the rules contemplate' "); *Thomson v. Washington*, 362 F.3d 969, 970 (C.A.7 2004) (Posner, J.) ("The federal rules replaced fact pleading with notice pleading").

II

It is in the context of this history that *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), must be understood. The *Conley* plaintiffs were black railroad workers who alleged that their union local had refused to protect them against discriminatory discharges, in violation of the National Railway Labor Act. The union sought to dismiss the complaint on the ground that its general allegations of discriminatory treatment by the defendants lacked sufficient

specificity. Writing **\*577** for a unanimous Court, Justice Black rejected the union's claim as foreclosed by the language of Rule 8. *Id.*, at 47–48, 78 S.Ct. 99. In the course of doing so, he articulated the formulation the Court rejects today: "In appraising the sufficiency of the complaint we follow, of course, the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*, at 45–46, 78 S.Ct. 99.

Consistent with the design of the Federal Rules, *Conley's* "no set of facts" formulation permits outright dismissal only when proceeding to discovery or beyond would be futile. Once it is clear that a plaintiff has stated a claim that, if true, would entitle him to relief, matters of proof are appropriately relegated to other stages of the trial process. Today, however, in its explanation of a decision to dismiss a complaint that it regards as a fishing expedition, the Court scraps *Conley's* "no set of facts" language. Concluding that the phrase has been "questioned, criticized, and explained away long enough," *ante*, at 1969, the Court dismisses it as careless composition.

**\*\*1978** If *Conley's* "no set of facts" language is to be interred, let it not be without a eulogy. That exact language, which the majority says has "puzzl[ed] the profession for 50 years," *ante*, at 1969, 355 U.S. 41, 2 L.Ed.2d 80, has been cited as authority in a dozen opinions of this Court and four separate writings.[4] In not one of **\*578** those 16 opinions was the language "questioned," "criticized," or "explained away." Indeed, today's opinion is the first by any Member of this Court to express *any* doubt as to the adequacy of the *Conley* formulation. Taking their cues from the federal courts, 26 States and the District of Columbia utilize as their standard for dismissal of a complaint the very language the majority repudiates: whether it appears "beyond doubt" that "no set of facts" in support of the claim would entitle the plaintiff to relief.[5]

**\*\*1979** **\*579** Petitioners have not requested that the *Conley* formulation be retired, nor have any of the six *amici* who filed briefs in support of petitioners. I would not rewrite the Nation's civil procedure textbooks and call into doubt the pleading rules of most of its States without far more informed deliberation as to the costs of doing so. Congress has established a process—a rulemaking process—for revisions of that order. See 28 U.S.C. §§ 2072–2074 (2000 ed. and Supp. IV).

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

Today's majority calls *Conley's* " 'no set of facts' " language "an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be **\*580** supported by showing any set of facts consistent with the allegations in the complaint." *Ante,* at 1969. This is not and cannot be what the *Conley* Court meant. First, as I have explained, and as the *Conley* Court well knew, the pleading standard the Federal Rules meant to codify does not require, or even invite, the pleading of facts.[6] The "pleading standard" label the majority gives to what it reads into the *Conley* opinion—a statement of the permissible factual support for an adequately pleaded complaint—would not, therefore, have impressed the *Conley* Court itself. Rather, that Court would have understood the majority's remodeling of its language to express an *evidentiary* standard, which the *Conley* Court had neither need nor want to explicate. Second, it is pellucidly clear that the *Conley* Court was interested in what a complaint *must* contain, not what it *may* contain. In fact, the Court said without qualification that it was "appraising the *sufficiency* of **\*\*1980** the complaint." 355 U.S., at 45, 78 S.Ct. 99 (emphasis added). It was, to paraphrase today's majority, describing "the minimum standard of adequate pleading to govern a complaint's survival," *ante,* at 1969.

We can be triply sure as to *Conley's* meaning by examining the three Court of Appeals cases the *Conley* Court cited as support for the "accepted rule" that "a complaint should not **\*581** be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S., at 45–46, 78 S.Ct. 99. In the first case, *Leimer v. State Mut. Life Assurance Co. of Worcester, Mass.,* 108 F.2d 302 (C.A.8 1940), the plaintiff alleged that she was the beneficiary of a life insurance plan and that the insurance company was wrongfully withholding proceeds from her. In reversing the District Court's grant of the defendant's motion to dismiss, the Eighth Circuit noted that court's own longstanding rule that, to warrant dismissal, " 'it should appear from the allegations that a cause of action does not exist, rather than that a cause of action has been defectively stated.' " *Id.,* at 305 (quoting *Winget v. Rockwood,* 69 F.2d 326, 329 (C.A.8 1934)).

The *Leimer* court viewed the Federal Rules—specifically Rules 8(a)(2), 12(b)(6), 12(e) (motion for a more definite statement), and 56 (motion for summary judgment)—as reinforcing the notion that "there is no justification for dismissing a complaint for insufficiency of statement, except where it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could

be proved in support of the claim." 108 F.2d, at 306. The court refuted in the strongest terms any suggestion that the unlikelihood of recovery should determine the fate of a complaint: "No matter how improbable it may be that she can prove her claim, she is entitled to an opportunity to make the attempt, and is not required to accept as final a determination of her rights based upon inferences drawn in favor of the defendant from her amended complaint." *Ibid.*

The Third Circuit relied on *Leimer's* admonition in *Continental Collieries, Inc. v. Shober,* 130 F.2d 631 (1942), which the *Conley* Court also cited in support of its "no set of facts" formulation. In a diversity action the plaintiff alleged breach of contract, but the District Court dismissed the complaint on the ground that the contract appeared to be unenforceable under state law. The Court of Appeals reversed, **\*582** concluding that there were facts in dispute that went to the enforceability of the contract, and that the rule at the pleading stage was as in *Leimer:* "No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it." 130 F.3d, at 635.

The third case the *Conley* Court cited approvingly was written by Judge Clark himself. In *Dioguardi v. Durning,* 139 F.2d 774 (C.A.2 1944), the *pro se* plaintiff, an importer of "tonics," charged the customs inspector with auctioning off the plaintiff's former merchandise for less than was bid for it—and indeed for an amount equal to the plaintiff's own bid—and complained that two cases of tonics went missing three weeks before the sale. The inference, hinted at by the averments but never stated in so many words, was that the defendant fraudulently denied the plaintiff his rightful claim to the tonics, which, if true, would have violated federal law. Writing six years after the adoption of the Federal Rules he held the lead rein in drafting, Judge Clark said that the defendant

"could have disclosed the facts from his point of view, in advance of a trial if he **\*\*1981** chose, by asking for a pre-trial hearing or by moving for a summary judgment with supporting affidavits. But, as it stands, we do not see how the plaintiff may properly be deprived of his day in court to show what he obviously so firmly believes and what for present purposes defendant must be taken as admitting." *Id.,* at 775.

As any civil procedure student knows, Judge Clark's opinion disquieted the defense bar and gave rise to a movement to revise Rule 8 to require a plaintiff to plead a " 'cause of action.' " See 5 Wright & Miller § 1201, at 86–87.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

The movement failed, see *ibid.; Dioguardi* was explicitly approved in *Conley;* and "[i]n retrospect the case itself seems to be a **\*583** routine application of principles that are universally accepted," 5 Wright & Miller § 1220, at 284–285.

In light of *Leimer, Continental Collieries,* and *Dioguardi, Conley's* statement that a complaint is not to be dismissed unless "no set of facts" in support thereof would entitle the plaintiff to relief is hardly "puzzling," *ante,* at 1969. It reflects a philosophy that, unlike in the days of code pleading, separating the wheat from the chaff is a task assigned to the pretrial and trial process. *Conley's* language, in short, captures the policy choice embodied in the Federal Rules and binding on the federal courts.

We have consistently reaffirmed that basic understanding of the Federal Rules in the half century since *Conley.* For example, in *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), we reversed the Court of Appeals' dismissal on the pleadings when the respondents, the Governor and other officials of the State of Ohio, argued that the petitioners' claims were barred by sovereign immunity. In a unanimous opinion by then-Justice Rehnquist, we emphasized:

> "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence either by affidavit or admissions, its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. *Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test." Id.,* at 236, 94 S.Ct. 1683 (emphasis added).

The *Rhodes* plaintiffs had "alleged generally and in conclusory terms" that the defendants, by calling out the National Guard to suppress the Kent State University student protests, "were guilty of wanton, wilful and negligent conduct." *Krause v. Rhodes,* 471 F.2d 430, 433 (C.A.6 1972). We reversed the Court of Appeals on the ground that "[w]hatever **\*584** the plaintiffs may or may not be able to establish as to the merits of their allegations, their claims, as stated in the complaints, given the favorable reading required by the Federal Rules of Civil Procedure," were not barred by the Eleventh Amendment because they were styled as suits against the defendants in their individual capacities. 416 U.S., at 238, 94 S.Ct. 1683.

We again spoke with one voice against efforts to expand pleading requirements beyond their appointed limits in

*Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). Writing for the unanimous Court, Chief Justice Rehnquist rebuffed the Fifth Circuit's effort to craft a standard for pleading municipal liability that accounted for "the enormous expense involved today in litigation," *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 954 F.2d 1054, 1057 (1992) (internal quotation marks omitted), by requiring a plaintiff to "state with factual **\*\*1982** detail and particularity the basis for the claim which necessarily includes why the defendant-official cannot successfully maintain the defense of immunity," 507 U.S., at 167, 113 S.Ct. 1160, 122 L.Ed.2d 517, (internal quotation marks omitted). We found this language inconsistent with Rules 8(a)(2) and 9(b) and emphasized that motions to dismiss were not the place to combat discovery abuse: "In the absence of [an amendment to Rule 9(b) ], federal courts and litigants must rely on summary judgment and control of discovery to weed out unmeritorious claims sooner rather than later." *Id.,* at 168–169, 113 S.Ct. 1160.

Most recently, in *Swierkiewicz,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1, we were faced with a case more similar to the present one than the majority will allow. In discrimination cases, our precedents require a plaintiff at the summary judgment stage to produce either direct evidence of discrimination or, if the claim is based primarily on circumstantial evidence, to meet the shifting evidentiary burdens imposed under the framework articulated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See, *e.g.,* **\*585** *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985). Swierkiewicz alleged that he had been terminated on account of national origin in violation of Title VII of the Civil Rights Act of 1964. The Second Circuit dismissed the suit on the pleadings because he had not pleaded a prima facie case of discrimination under the *McDonnell Douglas* standard.

We reversed in another unanimous opinion, holding that "under a notice pleading system, it is not appropriate to require a plaintiff to plead facts establishing a prima facie case because the *McDonnell Douglas* framework does not apply in every employment discrimination case." *Swierkiewicz,* 534 U.S., at 511, 122 S.Ct. 992. We also observed that Rule 8(a)(2) does not contemplate a court's passing on the merits of a litigant's claim at the pleading stage. Rather, the "simplified notice pleading standard" of the Federal Rules "relies on liberal discovery rules and summary judgment

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.*, at 512, 122 S.Ct. 992; see Brief for United States et al. as *Amici Curiae* in *Swierkiewicz v. Sorema N. A.*, O.T.2001, No. 00–1853, p. 10 (stating that a Rule 12(b)(6) motion is not "an appropriate device for testing the truth of what is asserted or for determining whether a plaintiff has any evidence to back up what is in the complaint" (internal quotation marks omitted)).[7]

As in the discrimination context, we have developed an evidentiary framework for evaluating claims under § 1 of the Sherman Act when those claims rest on entirely circumstantial evidence of conspiracy. See ***586** *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under *Matsushita*, a plaintiff's allegations of an illegal conspiracy may not, at the summary judgment stage, rest solely on the inferences that may be drawn from the parallel conduct of the defendants. In order to survive a Rule 56 motion, a § 1 plaintiff "must present evidence 'that tends ****1983** to exclude the possibility' that the alleged conspirators acted independently.' " *Id.*, at 588, 106 S.Ct. 1348 (quoting *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984)). That is, the plaintiff "must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action." 475 U.S., at 588, 106 S.Ct. 1348.

Everything today's majority says would therefore make perfect sense if it were ruling on a Rule 56 motion for summary judgment and the evidence included nothing more than the Court has described. But it should go without saying in the wake of *Swierkiewicz* that a heightened production burden at the summary judgment stage does not translate into a heightened pleading burden at the complaint stage. The majority rejects the complaint in this case because—in light of the fact that the parallel conduct alleged is consistent with ordinary market behavior—the claimed conspiracy is "conceivable" but not "plausible," *ante*, at 1974. I have my doubts about the majority's assessment of the plausibility of this alleged conspiracy. See Part III, *infra*. But even if the majority's speculation is correct, its "plausibility" standard is irreconcilable with Rule 8 and with our governing precedents. As we made clear in *Swierkiewicz* and *Leatherman*, fear of the burdens of litigation does not justify factual conclusions supported only by lawyers' arguments rather than sworn denials or admissible evidence.

This case is a poor vehicle for the Court's new pleading rule, for we have observed that "in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' ... dismissals prior to giving the plaintiff ample ***587** opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (quoting *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962)); see also *Knuth v. Erie–Crawford Dairy Cooperative Assn.*, 395 F.2d 420, 423 (C.A.3 1968) ("The 'liberal' approach to the consideration of antitrust complaints is important because inherent in such an action is the fact that all the details and specific facts relied upon cannot properly be set forth as part of the pleadings"). Moreover, the fact that the Sherman Act authorizes the recovery of treble damages and attorney's fees for successful plaintiffs indicates that Congress intended to encourage, rather than discourage, private enforcement of the law. See *Radovich v. National Football League*, 352 U.S. 445, 454, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957) ( "Congress itself has placed the private antitrust litigant in a most favorable position .... In the face of such a policy this Court should not add requirements to burden the private litigant beyond what is specifically set forth by Congress in those laws"). It is therefore more, not less, important in antitrust cases to resist the urge to engage in armchair economics at the pleading stage.

The same year we decided *Conley*, Judge Clark wrote, presciently,

"I fear that every age must learn its lesson that special pleading cannot be made to do the service of trial and that live issues between active litigants are not to be disposed of or evaded on the paper pleadings, i.e., the formalistic claims of the parties. Experience has found no quick and easy short cut for trials in cases generally *and antitrust cases in particular*." Special Pleading in the "Big Case"? in Procedure—The Handmaid of Justice 147, 148 (C. Wright & H. Reasoner eds.1965) (hereinafter ****1984** Clark, Special Pleading in the Big Case) (emphasis added).
**588** In this "Big Case," the Court succumbs to the temptation that previous Courts have steadfastly resisted.[8] While the majority assures us that it is not applying any " 'heightened' " pleading standard, see *ante*, at 1973, n. 14, I shall now explain why I have a difficult time understanding its opinion any other way.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

III

The Court does not suggest that an agreement to do what the plaintiffs allege would be permissible under the antitrust laws, see, *e.g., Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 526–527, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). Nor does the Court hold that these plaintiffs have failed to allege an injury entitling them to sue for damages under those laws, see *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 489–490, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Rather, the theory on which the Court permits *589 dismissal is that, so far as the Federal Rules are concerned, no agreement has been alleged at all. This is a mind-boggling conclusion.

As the Court explains, prior to the enactment of the Telecommunications Act of 1996 the law prohibited the defendants from competing with each other. The new statute was enacted to replace a monopolistic market with a competitive one. The Act did not merely require the regional monopolists to take affirmative steps to facilitate entry to new competitors, see *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP,* 540 U.S. 398, 402, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004); it also permitted the existing firms to compete with each other and to expand their operations into previously forbidden territory. See 47 U.S.C. § 271. Each of the defendants decided not to take the latter step. That was obviously an extremely important business decision, and I am willing to presume that each company acted entirely independently in reaching that decision. I am even willing to entertain the majority's belief that any agreement among the companies was unlikely. But the plaintiffs allege in three places in their complaint, ¶¶ 4, 51, 64, App. 11, 27, 30, that the ILECs did in fact agree both to prevent competitors from entering into their local markets and to forgo competition with each other. And as the Court **1985 recognizes, at the motion to dismiss stage, a judge assumes "that all the allegations in the complaint are true (even if doubtful in fact)." *Ante,* at 1965.

The majority circumvents this obvious obstacle to dismissal by pretending that it does not exist. The Court admits that "in form a few stray statements in the complaint speak directly of agreement," but disregards those allegations by saying that "on fair reading these are merely legal conclusions resting on the prior allegations" of parallel conduct. *Ante,* at 1970. The Court's dichotomy between factual allegations and "legal conclusions" is the stuff of a bygone era, *supra,*

at 1976 – 1977. That distinction was a defining feature of code pleading, see generally Clark, *590 The Complaint in Code Pleading, 35 Yale L.J. 259 (1925–1926), but was conspicuously abolished when the Federal Rules were enacted in 1938. See *United States v. Employing Plasterers Assn. of Chicago,* 347 U.S. 186, 188, 74 S.Ct. 452, 98 L.Ed. 618 (1954) (holding, in an antitrust case, that the Government's allegations of effects on interstate commerce must be taken into account in deciding whether to dismiss the complaint "[w]hether these charges be called 'allegations of fact' or 'mere conclusions of the pleader' "); *Brownlee v. Conine,* 957 F.2d 353, 354 (C.A.7 1992) ("The Federal Rules of Civil Procedure establish a system of notice pleading rather than of fact pleading, ... so the happenstance that a complaint is 'conclusory,' whatever exactly that overused lawyers' cliche means, does not automatically condemn it"); *Walker Distributing Co. v. Lucky Lager Brewing Co.,* 323 F.2d 1, 3–4 (C.A.9 1963) ("[O]ne purpose of Rule 8 was to get away from the highly technical distinction between statements of fact and conclusions of law ..."); *Oil, Chemical & Atomic Workers Int'l Union v. Delta,* 277 F.2d 694, 697 (C.A.6 1960) ("Under the notice system of pleading established by the Rules of Civil Procedure, ... the ancient distinction between pleading 'facts' and 'conclusions' is no longer significant"); 5 Wright & Miller § 1218, at 267 ("[T]he federal rules do not prohibit the pleading of facts or legal conclusions as long as fair notice is given to the parties"). "Defendants entered into a contract" is no more a legal conclusion than "defendant negligently drove," see Form 9; *supra,* at 1977. Indeed it is less of one.[9]

*591 Even if I were inclined to accept the Court's anachronistic dichotomy and ignore the complaint's actual allegations, I would dispute the Court's suggestion that any inference of agreement from petitioners' parallel conduct is "implausible." Many years ago a truly great economist perceptively observed that "[p]eople of the same trade seldom meet together, even for merriment and diversion, but the conversation ends in a conspiracy against the public, or in some contrivance to raise prices." A. Smith, An Inquiry Into the Nature and Causes of the Wealth of Nations, in 39 Great Books of the Western World 55 (R. Hutchins & M. Adler eds.1952). I am not so cynical as to accept that sentiment at face value, but I need not do so here. Respondents' complaint **1986 points not only to petitioners' numerous opportunities to meet with each other, Complaint ¶ 46, App. 23,[10] but also to Notebaert's curious statement that encroaching on a fellow incumbent's territory "might be a good way to turn a quick dollar but that doesn't make it right," *id.,* ¶ 42, App. 22. What did he mean by that?

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

One possible (indeed plausible) inference is that he meant that while it would be in his company's economic self-interest to compete with its brethren, he had agreed with his competitors not to do so. According to the complaint, that is how the Illinois Coalition for Competitive Telecom construed Notebaert's statement, *id.*, ¶ 44, App. 22 (calling the statement "evidence of potential collusion among regional Bell phone monopolies to not compete  *592  against one another and kill off potential competitors in local phone service"), and that is how Members of Congress construed his company's behavior, *id.*, ¶ 45, App. 23 (describing a letter to the Justice Department requesting an investigation into the possibility that the ILECs' " 'very apparent non-competition policy' " was coordinated).

Perhaps Notebaert meant instead that competition would be sensible in the short term but not in the long run. That's what his lawyers tell us anyway. See Brief for Petitioners 36. But I would think that no one would know better what Notebaert meant than Notebaert himself. Instead of permitting respondents to ask Notebaert, however, the Court looks to other quotes from that and other articles and decides that what he meant was that entering new markets as a competitive local exchange carrier would not be a " 'sustainable economic model.' " *Ante*, at 1972 – 1973, n. 13. Never mind that—as anyone ever interviewed knows —a newspaper article is hardly a verbatim transcript; the writer selects quotes to package his story, not to record a subject's views for posterity. But more importantly the District Court was required at this stage of the proceedings to construe Notebaert's ambiguous statement in the plaintiffs' favor.[11] See *Allen v. Wright,* 468 U.S. 737, 767–768, n. 1, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (Brennan, J., dissenting). The inference the statement supports—that simultaneous decisions by ILECs not even to attempt to poach customers from one another once the law authorized them to  *593  do so were the product of an agreement—sits comfortably within the realm of possibility. That is all the Rules require.

To be clear, if I had been the trial judge in this case, I would not have permitted the plaintiffs to engage in massive discovery based solely on the allegations in this complaint. On the other hand, I surely would not have dismissed the complaint **1987  without requiring the defendants to answer the charge that they "have agreed not to compete with one another and otherwise allocated customers and markets to one another."[12] Complaint, ¶ 51, App. 27. Even a sworn denial of that charge would not justify a summary dismissal without giving the plaintiffs the opportunity to take depositions from Notebaert and at least one responsible executive representing each of the other defendants.

Respondents in this case proposed a plan of " 'phased discovery' " limited to the existence of the alleged conspiracy and class certification. Brief for Respondents 25–26. Two petitioners rejected the plan. *Ibid.* Whether or not respondents' proposed plan was sensible, it was an appropriate subject for negotiation.[13] Given the charge in the complaint  *594  buttressed by the common sense of Adam Smith—I cannot say that the possibility that joint discussions **1988  and perhaps some agreements played a role in petitioners' decisionmaking process is so implausible that dismissing the complaint before any defendant has denied the charge is preferable to granting respondents even a minimal opportunity  *595  to prove their claims. See Clark, New Federal Rules 977 ("[T]hrough the weapons of discovery and summary judgment we have developed new devices, with more appropriate penalties to aid in matters of *proof,* and do not need to force the pleadings to their less appropriate function").

I fear that the unfortunate result of the majority's new pleading rule will be to invite lawyers' debates over economic theory to conclusively resolve antitrust suits in the absence of any evidence. It is no surprise that the antitrust defense bar— among whom "lament" as to inadequate judicial supervision of discovery is most "common," see *ante,* at 1967—should lobby for this state of affairs. But "we must recall that their primary responsibility is to win cases for their clients, not to improve law administration for the public." Clark, Special Pleading in the Big Case 152. As we did in our prior decisions, we should have instructed them that their remedy was to seek to amend the Federal Rules—not our interpretation of them.[14] See *Swierkiewicz,* 534 U.S., at 515, 122 S.Ct. 992; *Crawford-El v. Britton,* 523 U.S. 574, 595, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); *Leatherman,* 507 U.S., at 168, 113 S.Ct. 1160.

IV

Just a few weeks ago some of my colleagues explained that a strict interpretation of the literal text of statutory language  *596  is essential to avoid judicial decisions that are not faithful to the intent of Congress. *Zuni Public School Dist. No. 89 v. Department of Education, ante,* p. 108, 127 S.Ct. 1534, 167 L.Ed.2d 449, (2007) (SCALIA, J., dissenting). I happen to believe that there are cases in which other tools of construction are more reliable than text, but I agree of

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

course that congressional intent should guide us in matters of statutory interpretation. *Ante,* at 106, 127 S.Ct. 1534, 167 L.Ed.2d 449, (STEVENS, J., concurring). This is a case in which the intentions of the drafters of three important sources of law—the Sherman Act, the Telecommunications Act of 1996, and the Federal Rules of Civil Procedure—all point unmistakably in the same direction, yet the Court marches resolutely the other way. Whether the Court's actions will benefit only defendants in antitrust treble-damages cases, or whether its test for the sufficiency of a complaint will inure to the benefit of all civil defendants, is a question that the future will answer. But that the Court has announced a significant new rule that does not even purport to respond to any **1989 congressional command is glaringly obvious.

The transparent policy concern that drives the decision is the interest in protecting antitrust defendants—who in this case are some of the wealthiest corporations in our economy—from the burdens of pretrial discovery. *Ante,* at 1966 – 1967. Even if it were not apparent that the legal fees petitioners have incurred in arguing the merits of their Rule 12(b) motion have far exceeded the cost of limited discovery, or that those discovery costs would burden respondents as well as petitioners,[15] that concern would not provide an adequate justification for this law-changing decision. For in the final

analysis it is only a lack of confidence in the ability of trial judges to control discovery, buttressed by appellate judges' independent appraisal of the plausibility of profoundly *597 serious factual allegations, that could account for this stark break from precedent.

If the allegation of conspiracy happens to be true, today's decision obstructs the congressional policy favoring competition that undergirds both the Telecommunications Act of 1996 and the Sherman Act itself. More importantly, even if there is abundant evidence that the allegation is untrue, directing that the case be dismissed without even looking at any of that evidence marks a fundamental—and unjustified—change in the character of pretrial practice.

Accordingly, I respectfully dissent.

**All Citations**

550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709, 68 Fed.R.Serv.3d 661, 07 Cal. Daily Op. Serv. 5550, 2007 Daily Journal D.A.R. 7097, 41 Communications Reg. (P&F) 567, 20 Fla. L. Weekly Fed. S 267

**Footnotes**

*    The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.,* 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499.

1    The 1984 divestiture of AT & T's local telephone service created seven Regional Bell Operating Companies. Through a series of mergers and acquisitions, those seven companies were consolidated into the four ILECs named in this suit: BellSouth Corporation, Qwest Communications International, Inc., SBC Communications, Inc., and Verizon Communications, Inc. (successor-in-interest to Bell Atlantic Corporation). Complaint ¶ 21, App. 16. Together, these ILECs allegedly control 90 percent or more of the market for local telephone service in the 48 contiguous States. *Id.,* ¶ 48, App. 26.

2    In setting forth the grounds for § 1 relief, the complaint repeats these allegations in substantially similar language:

      "Beginning at least as early as February 6, 1996, and continuing to the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators engaged in a contract, combination or conspiracy to prevent competitive entry in their respective local telephone and/or high speed internet services markets by, among other things, agreeing not to compete with one another and to stifle attempts by others to compete with them and otherwise allocating customers and markets to one another in violation of Section 1 of the Sherman Act." *Id.,* ¶ 64, App. 30–31.

3    The dissent greatly oversimplifies matters by suggesting that the Federal Rules somehow dispensed with the pleading of facts altogether. See *post,* at 1979 (opinion of STEVENS, J.) (pleading standard of Federal Rules "does not require, or even invite, the pleading of facts"). While, for most types of cases, the Federal Rules eliminated the cumbersome requirement that a claimant "set out *in detail* the facts upon which he bases his claim," *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (emphasis added), Rule 8(a)(2) still requires a "showing," rather than a blanket

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

assertion, of entitlement to relief. Without some factual allegation in the complaint, it is hard to see how a claimant could satisfy the requirement of providing not only "fair notice" of the nature of the claim, but also "grounds" on which the claim rests. See 5 Wright & Miller § 1202, at 94, 95 (Rule 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it").

4    Commentators have offered several examples of parallel conduct allegations that would state a § 1 claim under this standard. See, *e.g.*, 6 Areeda & Hovenkamp ¶ 1425, at 167–185 (discussing "parallel behavior that would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties"); Blechman, Conscious Parallelism, Signalling and Facilitating Devices: The Problem of Tacit Collusion Under the Antitrust Laws, 24 N.Y.L. S. L.Rev. 881, 899 (1979) (describing "conduct [that] indicates the sort of restricted freedom of action and sense of obligation that one generally associates with agreement"). The parties in this case agree that "complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason," would support a plausible inference of conspiracy. Brief for Respondents 37; see also Reply Brief for Petitioners 12.

5    The border in *DM Research* was the line between the conclusory and the factual. Here it lies between the factually neutral and the factually suggestive. Each must be crossed to enter the realm of plausible liability.

6    The dissent takes heart in the reassurances of plaintiffs' counsel that discovery would be " ' "phased" ' " and "limited to the existence of the alleged conspiracy and class certification." *Post*, at 1987. But determining whether some illegal agreement may have taken place between unspecified persons at different ILECs (each a multibillion dollar corporation with legions of management level employees) at some point over seven years is a sprawling, costly, and hugely time-consuming undertaking not easily susceptible to the kind of line drawing and case management that the dissent envisions. Perhaps the best answer to the dissent's optimism that antitrust discovery is open to effective judicial control is a more extensive quotation of the authority just cited, a judge with a background in antitrust law. Given the system that we have, the hope of effective judicial supervision is slim:

"The timing is all wrong. The plaintiff files a sketchy complaint (the Rules of Civil Procedure discourage fulsome documents), and discovery is launched. A judicial officer does not know the details of the case the parties will present and in theory *cannot* know the details. Discovery is used to find the details. The judicial officer always knows less than the parties, and the parties themselves may not know very well where they are going or what they expect to find. A magistrate supervising discovery does not—cannot—know the expected productivity of a given request, because the nature of the requester's claim and the contents of the files (or head) of the adverse party are unknown. Judicial officers cannot measure the costs and benefits to the requester and so cannot isolate impositional requests. Requesters have no reason to disclose their own estimates because they gain from imposing costs on rivals (and may lose from an improvement in accuracy). The portions of the Rules of Civil Procedure calling on judges to trim back excessive demands, therefore, have been, and are doomed to be, hollow. We cannot prevent what we cannot detect; we cannot detect what we cannot define; we cannot define 'abusive' discovery except in theory, because in practice we lack essential information." Easterbrook, Discovery as Abuse, 69 B.U.L.Rev. 635, 638–639 (1989) (footnote omitted).

7    The Court of Appeals also relied on Chief Judge Clark's suggestion in *Nagler v. Admiral Corp.*, 248 F.2d 319 (C.A.2 1957), that facts indicating parallel conduct alone suffice to state a claim under § 1. 425 F.3d, at 114 (citing *Nagler, supra*, at 325). But *Nagler* gave no explanation for citing *Theatre Enterprises* (which upheld a denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy) as authority that pleading parallel conduct sufficed to plead a Sherman Act conspiracy. Now that *Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984), and *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), have made it clear that neither parallel conduct nor conscious parallelism, taken alone, raise the necessary implication of conspiracy, it is time for a fresh look at adequacy of pleading when a claim rests on parallel action.

8    Because *Conley's* " 'no set of facts' " language was one of our earliest statements about pleading under the Federal Rules, it is no surprise that it has since been "cited as authority" by this Court and others. *Post*, at 1978. Although we have not previously explained the circumstances and rejected the literal reading of the passage embraced by the Court of Appeals, our analysis comports with this Court's statements in the years since *Conley*. See *Dura Pharmaceuticals*,

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

Inc. v. Broudo, 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577(2005) (requiring " 'reasonably founded hope that the [discovery] process will reveal relevant evidence' " to support the claim (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975));(alteration in *Dura* )); *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) ("It is not ... proper to assume that [the plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged"); *Wilson v. Schnettler*, 365 U.S. 381, 383, 81 S.Ct. 632, 5 L.Ed.2d 620 (1961) ("In the absence of ... an allegation [that the arrest was made without probable cause] the courts below could not, nor can we, assume that respondents arrested petitioner without probable cause to believe that he had committed ... a narcotics offense"). Nor are we reaching out to decide this issue in a case where the matter was not raised by the parties, see *post*, at 1979, since both the ILECs and the Government highlight the problems stemming from a literal interpretation of *Conley's* "no set of facts" language and seek clarification of the standard. Brief for Petitioners 27–28; Brief for United States as *Amicus Curiae* 22–25; see also Brief for Respondents 17 (describing "[p]etitioners and their amici" as mounting an "attack on *Conley's* 'no set of facts' standard").

The dissent finds relevance in Court of Appeals precedents from the 1940s, which allegedly gave rise to *Conley's* "no set of facts" language. See *post*, at 1979 – 1981. Even indulging this line of analysis, these cases do not challenge the understanding that, before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct. See, *e.g.*, *Leimer v. State Mut. Life Assurance Co. of Worcester, Mass.*, 108 F.2d 302, 305 (C.A.8 1940) (" '[I]f, in view of what is alleged, it can reasonably be conceived that the plaintiffs ... could, upon a trial, establish a case which would entitle them to ... relief, the motion to dismiss should not have been granted' "); *Continental Collieries, Inc. v. Shober*, 130 F.2d 631, 635 (C.A.3 1942) ("No matter how likely it may seem that the pleader will be unable to prove his case, he is entitled, upon averring a claim, to an opportunity to try to prove it"). Rather, these cases stand for the unobjectionable proposition that, when a complaint adequately states a claim, it may not be dismissed based on a district court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder. Cf. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (a district court weighing a motion to dismiss asks "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims").

9    See Complaint ¶¶ 51, 64, App. 27, 30–31 (alleging that ILECs engaged in a "contract, combination or conspiracy" and agreed not to compete with one another).

10   If the complaint had not explained that the claim of agreement rested on the parallel conduct described, we doubt that the complaint's references to an agreement among the ILECs would have given the notice required by Rule 8. Apart from identifying a 7-year span in which the § 1 violations were supposed to have occurred (*i. e.*, "[b]eginning at least as early as February 6, 1996, and continuing to the present," *id.*, ¶ 64, App. 30), the pleadings mentioned no specific time, place, or person involved in the alleged conspiracies. This lack of notice contrasts sharply with the model form for pleading negligence, Form 9, which the dissent says exemplifies the kind of "bare allegation" that survives a motion to dismiss. *Post*, at 1977. Whereas the model form alleges that the defendant struck the plaintiff with his car while plaintiff was crossing a particular highway at a specified date and time, the complaint here furnishes no clue as to which of the four ILECs (much less which of their employees) supposedly agreed, or when and where the illicit agreement took place. A defendant wishing to prepare an answer in the simple fact pattern laid out in Form 9 would know what to answer; a defendant seeking to respond to plaintiffs' conclusory allegations in the § 1 context would have little idea where to begin.

11   The dissent's quotations from the complaint leave the impression that plaintiffs directly allege illegal agreement; in fact, they proceed exclusively via allegations of parallel conduct, as both the District Court and Court of Appeals recognized. See 313 F.Supp.2d 174, 182 (S.D.N.Y.2003); 425 F.3d 99, 102–104 (C.A.2 2005).

12   From the allegation that the ILECs belong to various trade associations, see Complaint ¶ 46, App. 23, the dissent playfully suggests that they conspired to restrain trade, an inference said to be "buttressed by the common sense of Adam Smith." *Post*, at 1985 – 1986, 1987 – 1988. If Adam Smith is peering down today, he may be surprised to learn that his tongue-in-cheek remark would be authority to force his famous pinmaker to devote financial and human capital to hire lawyers, prepare for depositions, and otherwise fend off allegations of conspiracy; all this just because he belonged to the same trade guild as one of his competitors when their pins carried the same price tag.

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

13    The complaint quoted a reported statement of Qwest's CEO, Richard Notebaert, to suggest that the ILECs declined to compete against each other despite recognizing that it " 'might be a good way to turn a quick dollar.' " ¶ 42, App. 22 (quoting Chicago Tribune, Oct. 31, 2002, Business Section, p. 1). This was only part of what he reportedly said, however, and the District Court was entitled to take notice of the full contents of the published articles referenced in the complaint, from which the truncated quotations were drawn. See Fed. Rule Evid. 201.

Notebaert was also quoted as saying that entering new markets as a CLEC would not be "a sustainable economic model" because the CLEC pricing model is "just ... nuts." Chicago Tribune, Oct. 31, 2002, Business Section, p. 1 (cited at Complaint ¶ 42, App. 22). Another source cited in the complaint quotes Notebaert as saying he thought it "unwise" to "base a business plan" on the privileges accorded to CLECs under the 1996 Act because the regulatory environment was too unstable. Chicago Tribune, Dec. 19, 2002, Business Section, p. 2 (cited at Complaint ¶ 45, App. 23).

14    In reaching this conclusion, we do not apply any "heightened" pleading standard, nor do we seek to broaden the scope of Federal Rule of Civil Procedure 9, which can only be accomplished " 'by the process of amending the Federal Rules, and not by judicial interpretation.' " *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)). On certain subjects understood to raise a high risk of abusive litigation, a plaintiff must state factual allegations with greater particularity than Rule 8 requires. Fed. Rules Civ. Proc. 9(b)-(c). Here, our concern is not that the allegations in the complaint were insufficiently "particular[ized]," *ibid.;* rather, the complaint warranted dismissal because it failed *in toto* to render plaintiffs' entitlement to relief plausible.

1    See 9 W. Holdsworth, History of English Law 324–327 (1926).

2    *Gulfstream Aerospace Corp. v. Mayacamas Corp.,* 485 U.S. 271, 283, 108 S.Ct. 1133, 99 L.Ed.2d 296 (1988).

3    The Federal Rules do impose a "particularity" requirement on "all averments of fraud or mistake," Fed. Rule Civ. Proc. 9(b), neither of which has been alleged in this case. We have recognized that the canon of *expresio unius est exclusio alterius* applies to Rule 9(b). See *Leatherman v. Tarrant Cty. Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

4    *SEC v. Zandford,* 535 U.S. 813, 818, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002); *Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 654, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999); *Hartford Fire Ins. Co. v. California,* 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Brower v. County of Inyo,* 489 U.S. 593, 598, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989); *Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) *(per curiam); McLain v. Real Estate Bd. of New Orleans, Inc.,* 444 U.S. 232, 246, 100 S.Ct. 502, 62 L.Ed.2d 441 (1980); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) *(per curiam); Haines v. Kerner,* 404 U.S. 519, 521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) *(per curiam); Jenkins v. McKeithen,* 395 U.S. 411, 422, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969) (plurality opinion); see also *Cleveland Bd. of Ed. v. Loudermill,* 470 U.S. 532, 554, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (Brennan, J., concurring in part and dissenting in part); *Hoover v. Ronwin,* 466 U.S. 558, 587, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984) (STEVENS, J., dissenting); *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 561, n. 1, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977) (Marshall, J., dissenting); *Simon v. Eastern Ky. Welfare Rights Organization,* 426 U.S. 26, 55, n. 6, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (Brennan, J., concurring in judgment).

5    See, *e.g., EB Invs., LLC v. Atlantis Development, Inc.,* 930 So.2d 502, 507 (Ala.2005); *Department of Health & Social Servs. v. Native Village of Curyung,* 151 P.3d 388, 396 (Alaska 2006); *Newman v. Maricopa Cty.,* 167 Ariz. 501, 503, 808 P.2d 1253, 1255 (App.1991); *Public Serv. Co. of Colo. v. Van Wyk,* 27 P.3d 377, 385–386 (Colo.2001) (en banc); *Clawson v. St. Louis Post–Dispatch, LLC,* 906 A.2d 308, 312 (D.C.2006); *Hillman Constr. Corp. v. Wainer,* 636 So.2d 576, 578 (Fla.App.1994); *Kaplan v. Kaplan,* 266 Ga. 612, 613, 469 S.E.2d 198, 199 (1996); *Wright v. Home Depot U.S.A., Inc.,* 111 Hawai'i 401, 406, 142 P.3d 265, 270 (2006); *Taylor v. Maile,* 142 Idaho 253, 257, 127 P.3d 156, 160 (2005); *Fink v. Bryant,* 2001–CC–0987, p. 4 (La.11/28/01), 801 So.2d 346, 349; *Gagne v. Cianbro Corp.,* 431 A.2d 1313, 1318–1319 (Me.1981); *Gasior v. Massachusetts Gen. Hospital,* 446 Mass. 645, 647, 846 N.E.2d 1133, 1135 (2006); *Ralph Walker, Inc. v. Gallagher,* 926 So.2d 890, 893 (Miss.2006); *Jones v. Montana Univ. System,* 337 Mont. 1, 7, 155 P.3d 1247, 1252 (2007); *Johnston v. Nebraska Dept. of Correctional Servs.,* 270 Neb. 987, 989, 709 N.W.2d 321, 324 (2006);

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

*Blackjack Bonding v. Las Vegas Munic. Ct.,* 116 Nev. 1213, 1217, 14 P.3d 1275, 1278 (2000); *Shepard v. Ocwen Fed. Bank,* 361 N.C. 137, 139, 638 S.E.2d 197, 199 (2006); *Rose v. United Equitable Ins. Co.,* 2001 ND 154, ¶ 10, 632 N.W.2d 429, 434; *State ex rel. Turner v. Houk,* 112 Ohio St.3d 561, 562, 2007–Ohio–814, ¶ 5, 862 N.E.2d 104, 105 *(per curiam); Moneypenney v. Dawson,* 2006 OK 53, ¶ 2, 141 P.3d 549, 551; *Gagnon v. State,* 570 A.2d 656, 659 (R.I.1990); *Osloond v. Farrier,* 2003 SD 28, ¶ 4, 659 N.W.2d 20, 22 *(per curiam); Smith v. Lincoln Brass Works, Inc.,* 712 S.W.2d 470, 471 (Tenn.1986); *Association of Haystack Property Owners, Inc. v. Sprague,* 145 Vt. 443, 446, 494 A.2d 122, 124 (1985); *In re Coday,* 156 Wash.2d 485, 497, 130 P.3d 809, 815 (2006) (en banc); *Haines v. Hampshire Cty. Comm'n,* 216 W.Va. 499, 502, 607 S.E.2d 828, 831 (2004); *Warren v. Hart,* 747 P.2d 511, 512 (Wyo.1987); see also *Malpiede v. Townson,* 780 A.2d 1075, 1082–1083 (Del.2001) (permitting dismissal only "where the court determines with reasonable certainty that the plaintiff could prevail on no set of facts that may be inferred from the well-pleaded allegations in the complaint" (internal quotation marks omitted)); *Canel v. Topinka,* 212 Ill.2d 311, 318, 288 Ill.Dec. 623, 818 N.E.2d 311, 317 (2004) (replacing "appears beyond doubt" in the *Conley* formulation with "is clearly apparent"); *In re Young,* 522 N.E.2d 386, 388 (Ind.1988) *(per curiam)* (replacing "appears beyond doubt" with "appears to a certainty"); *Barkema v. Williams Pipeline Co.,* 666 N.W.2d 612, 614 (Iowa 2003) (holding that a motion to dismiss should be sustained "only when there exists no conceivable set of facts entitling the non-moving party to relief"); *Pioneer Village v. Bullitt Cty.,* 104 S.W.3d 757, 759 (Ky.2003) (holding that judgment on the pleadings should be granted "if it appears beyond doubt that the nonmoving party cannot prove any set of facts that would entitle him/her to relief"); *Corley v. Detroit Bd. of Ed.,* 470 Mich. 274, 277, 681 N.W.2d 342, 345 (2004) *(per curiam)* (holding that a motion for judgment on the pleadings should be granted only " 'if no factual development could possibly justify recovery' "); *Oberkramer v. Ellisville,* 706 S.W.2d 440, 441 (Mo.1986) (en banc) (omitting the words "beyond doubt" from the *Conley* formulation); *Colman v. Utah State Land Bd.,* 795 P.2d 622, 624 (Utah 1990) (holding that a motion to dismiss is appropriate "only if it clearly appears that [the plaintiff] can prove no set of facts in support of his claim"); *NRC Management Servs. Corp. v. First Va. Bank–Southwest,* 63 Va. Cir. 68, 70, 2003 WL 23540085 (2003) ( "The Virginia standard is identical [to the *Conley* formulation], though the Supreme Court of Virginia may not have used the same words to describe it").

6    The majority is correct to say that what the Federal Rules require is a " 'showing' " of entitlement to relief. *Ante,* at 1965, n. 3. Whether and to what extent that "showing" requires allegations of fact will depend on the particulars of the claim. For example, had the amended complaint in this case alleged *only* parallel conduct, it would not have made the required "showing." See *supra,* at 1974. Similarly, had the pleadings contained *only* an allegation of agreement, without specifying the nature or object of that agreement, they would have been susceptible to the charge that they did not provide sufficient notice that the defendants may answer intelligently. Omissions of that sort instance the type of "bareness" with which the Federal Rules are concerned. A plaintiff's inability to persuade a district court that the allegations actually included in her complaint are "plausible" is an altogether different kind of failing, and one that should not be fatal at the pleading stage.

7    See also 5 Wright & Miller § 1202, at 89–90 ("[P]leadings under the rules simply may be a general summary of the party's position that is sufficient to advise the other party of the event being sued upon, to provide some guidance in a subsequent proceeding as to what was decided for purposes of res judicata and collateral estoppel, and to indicate whether the case should be tried to the court or to a jury. No more is demanded of the pleadings than this; indeed, history shows that no more can be performed successfully by the pleadings" (footnotes omitted)).

8    Our decision in *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005), is not to the contrary. There, the plaintiffs failed adequately to allege loss causation, a required element in a private securities fraud action. Because it alleged nothing more than that the prices of the securities the plaintiffs purchased were artificially inflated, the *Dura* complaint failed to "provid[e] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." *Id.,* at 347, 125 S.Ct. 1627. Here, the failure the majority identifies is not a failure of notice—which "notice pleading" rightly condemns—but rather a failure to satisfy the Court that the agreement alleged might plausibly have occurred. That being a question not of *notice* but of *proof,* it should not be answered without first hearing from the defendants (as apart from their lawyers).

Similarly, in *Associated Gen. Contractors of Cal., Inc. v. Carpenters,* 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983), in which we also found an antitrust complaint wanting, the problem was not that the injuries the plaintiffs alleged failed to satisfy some threshold of plausibility, but rather that the injuries *as alleged* were not "the type that the antitrust statute was intended to forestall." *Id.,* at 540, 103 S.Ct. 897; see *id.,* at 526, 103 S.Ct. 897 ("As the case comes to us, we must assume that the Union can prove the facts alleged in its amended complaint. It is not, however, proper to assume that

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)

127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

the Union can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged").

9    The Court suggests that the allegation of an agreement, even if credited, might not give the notice required by Rule 8 because it lacks specificity. *Ante,* at 1970 – 1971, n. 10. The remedy for an allegation lacking sufficient specificity to provide adequate notice is, of course, a Rule 12(e) motion for a more definite statement. See *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002). Petitioners made no such motion and indeed have conceded that "[o]ur problem with the current complaint is not a lack of specificity, it's quite specific." Tr. of Oral Arg. 14. Thus, the fact that "the pleadings mentioned no specific time, place, or persons involved in the alleged conspiracies," *ante,* at 1971, n. 10, is, for our purposes, academic.

10    The Court describes my reference to the allegation that the defendants belong to various trade associations as "playfully" suggesting that the defendants conspired to restrain trade. *Ante,* at 1971 – 1972, n. 12. Quite the contrary: An allegation that competitors meet on a regular basis, like the allegations of parallel conduct, is consistent with—though not sufficient to prove—the plaintiffs' entirely serious and unequivocal allegation that the defendants entered into an unlawful agreement. Indeed, if it were true that the plaintiffs "rest their § 1 claim on descriptions of parallel conduct and not on any independent allegation of actual agreement among the ILECs," *ante,* at 1970, there would have been no purpose in including a reference to the trade association meetings in the amended complaint.

11    It is ironic that the Court seeks to justify its decision to draw factual inferences in the defendants' favor at the pleading stage by citing to a rule of evidence, *ante,* at 1972 – 1973, n. 13. Under Federal Rule of Evidence 201(b), a judicially noticed fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Whether Notebaert's statements constitute evidence of a conspiracy is hardly beyond reasonable dispute.

12    The Court worries that a defendant seeking to respond to this "conclusory" allegation "would have little idea where to begin." *Ante,* at 1971, n. 10. A defendant could, of course, begin by either denying or admitting the charge.

13    The potential for "sprawling, costly, and hugely time-consuming" discovery, *ante,* at 1967, n. 6, is no reason to throw the baby out with the bathwater. The Court vastly underestimates a district court's case-management arsenal. Before discovery even begins, the court may grant a defendant's Rule 12(e) motion; Rule 7(a) permits a trial court to order a plaintiff to reply to a defendant's answer, see *Crawford–El v. Britton,* 523 U.S. 574, 598, 118 S.Ct. 1584, 140 L.Ed.2d 759 (1998); and Rule 23 requires "rigorous analysis" to ensure that class certification is appropriate, *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); see *In re Initial Public Offering Securities Litigation,* 471 F.3d 24 (C.A.2 2006) (holding that a district court may not certify a class without ruling that each Rule 23 requirement is met, even if a requirement overlaps with a merits issue). Rule 16 invests a trial judge with the power, backed by sanctions, to regulate pretrial proceedings via conferences and scheduling orders, at which the parties may discuss, *inter alia,* "the elimination of frivolous claims or defenses," Rule 16(c)(1); "the necessity or desirability of amendments to the pleadings," Rule 16(c)(2); "the control and scheduling of discovery," Rule 16(c)(6); and "the need for adopting special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems," Rule 16(c)(12). Subsequently, Rule 26 confers broad discretion to control the combination of interrogatories, requests for admissions, production requests, and depositions permitted in a given case; the sequence in which such discovery devices may be deployed; and the limitations imposed upon them. See 523 U.S., at 598–599, 118 S.Ct. 1584. Indeed, Rule 26(c) specifically permits a court to take actions "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense" by, for example, disallowing a particular discovery request, setting appropriate terms and conditions, or limiting its scope.

In short, the Federal Rules contemplate that pretrial matters will be settled through a flexible process of give and take, of proffers, stipulations, and stonewalls, not by having trial judges screen allegations for their plausibility *vel non* without requiring an answer from the defendant. See *Societe Internationale Pour Participations Industrielles Et Commerciales, S.A. v. Rogers,* 357 U.S. 197, 206, 78 S.Ct. 1087, 2 L.Ed.2d 1255 (1958) ("Rule 34 is sufficiently flexible to be adapted to the exigencies of particular litigation"). And should it become apparent over the course of litigation that a plaintiff's filings bespeak an *in terrorem* suit, the district court has at its call its own *in terrorem* device, in the form of a wide array of Rule 11

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007)
_____
127 S.Ct. 1955, 167 L.Ed.2d 929, 75 USLW 4337, 2007-1 Trade Cases P 75,709...

sanctions. See Rules 11(b), (c) (authorizing sanctions if a suit is presented "for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation"); see *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991) (holding that Rule 11 applies to a represented party who signs a pleading, motion, or other papers, as well as to attorneys); *Atkins v. Fischer,* 232 F.R.D. 116, 126 (D.D.C.2005) ("As possible sanctions pursuant to Rule 11, the court has an arsenal of options at its disposal").

14    Given his "background in antitrust law," *ante,* at 1968, n. 6, Judge Easterbrook has recognized that the most effective solution to discovery abuse lies in the legislative and rulemaking arenas. He has suggested that the remedy for the ills he complains of requires a revolution in the rules of civil procedure:

"Perhaps a system in which judges pare away issues and focus [on] investigation is too radical to contemplate in this country—although it prevailed here before 1938, when the Federal Rules of Civil Procedure were adopted. The change could not be accomplished without abandoning notice pleading, increasing the number of judicial officers, and giving them more authority .... If we are to rule out judge-directed discovery, however, we must be prepared to pay the piper. Part of the price is the high cost of unnecessary discovery—impositional and otherwise." Discovery as Abuse, 69 B.U.L.Rev. 635, 645 (1989).

15    It would be quite wrong, of course, to assume that dismissal of an antitrust case after discovery is costless to plaintiffs. See Fed. Rule Civ. Proc. 54(d)(1) ("[C]osts other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs").

_____

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

610 F.3d 239
United States Court of Appeals,
Fifth Circuit.

Richard HERSHEY; Roberto E.
Calle Gracey, Plaintiffs–Appellants,

v.

ENERGY TRANSFER PARTNERS,
L.P.; Energy Transfer Company; ETC
Marketing, Ltd.; Houston Pipeline
Company, Defendants–Appellees.
Roberto E. Calle Gracey, Plaintiff–Appellant,

v.

Energy Transfer Partners, L.P.; Energy
Transfer Company, also known as
LA Grange Acquisition, L.P.; ETC
Marketing, Ltd.; Houston Pipeline
Company, Defendants–Appellees.

No. 09–20651.
|
June 23, 2010.

**Synopsis**

**Background:** Plaintiffs brought putative class action, purporting to represent class of natural gas futures and options contracts traders, and alleging manipulation of natural gas futures and options prices in violation of Commodities Exchange Act (CEA). The United States District Court for the Southern District of Texas, Keith P. Ellison, J., dismissed claims and denied motion to reconsider. Plaintiffs appealed.

**Holdings:** The Court of Appeals, Prado, Circuit Judge, held that:

[1] plaintiffs were required to allege that defendants specifically intended to manipulate underlying contract, and

[2] allegations that defendants knew or should have known that their manipulative actions would depress natural gas futures prices failed to state claim under CEA.

Affirmed.

West Headnotes (6)

[1]  **Federal Civil Procedure** ⮞ Insufficiency in general

Detailed factual allegations are not required to survive a motion to dismiss; however, the complaint must allege sufficient factual matter, accepted as true, to state a claim that is plausible on its face. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

105 Cases that cite this headnote

[2]  **Federal Civil Procedure** ⮞ Insufficiency in general

A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; a court should not accept threadbare recitals of a cause of action's elements, supported by mere conclusory statements, which do not permit the court to infer more than the mere possibility of misconduct. Fed.Rules Civ.Proc.Rule 8(a)(2), 28 U.S.C.A.

319 Cases that cite this headnote

[3]  **Commodity Futures Trading Regulation** ⮞ Fraud or manipulation

To be liable for commodities fraud under Commodities Exchange Act (CEA), a defendant must possess the intent to deceive, manipulate, or defraud. Commodity Exchange Act, § 22(a)(1)(D), 7 U.S.C.A. § 25(a)(1)(D).

5 Cases that cite this headnote

[4]  **Commodity Futures Trading Regulation** ⮞ Pleading

In order to state claim under Commodities Exchange Act (CEA), plaintiffs in putative class action were required to allege that defendants specifically intended to manipulate underlying natural gas futures contract, not

some hypothetical natural gas futures contract. Commodity Exchange Act, § 22(a)(1)(D), 7 U.S.C.A. § 25(a)(1)(D).

14 Cases that cite this headnote

[5]    **Commodity Futures Trading Regulation** ⬅ Fraud or manipulation

Private cause of action under the Commodities Exchange Act (CEA) requires plaintiffs to plead that (1) defendants possessed an ability to influence market prices, (2) an artificial price existed, (3) defendants caused the artificial prices, and (4) defendants specifically intended to cause the artificial price. Commodity Exchange Act, §§ 9a, 22(a), 7 U.S.C.A. §§ 13(a), 25(a).

18 Cases that cite this headnote

[6]    **Commodity Futures Trading Regulation** ⬅ Pleading

Plaintiffs' allegations in putative class action, purporting to represent class of natural gas futures and options contracts traders, that defendants knew or should have known that their manipulative actions would depress natural gas futures prices failed to state claim under Commodities Exchange Act (CEA). Commodity Exchange Act, § 9a, 7 U.S.C.A. § 13(a).

12 Cases that cite this headnote

**Attorneys and Law Firms**

***240** Bernard Persky, Labaton Sucharow, L.L.P., Christopher Lovell (argued), Lovell Stewart Halebian, L.L.P., Jared B. Stamell, Stamell & Schager, LLP, New York City, for Plaintiffs–Appellants.

Charles W. Schwartz (argued), Skadden, Arps, Slate, Meacher & Flom, L.L.P., Houston, TX, John Nowell Estes, III, William Scott Scherman, Steven C. Sunshine, Skadden, Arps, Slate, Meagher & Flom, LLP, Washington, DC, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Texas.

Before REAVLEY, PRADO and OWEN, Circuit Judges.

**Opinion**

PRADO, Circuit Judge:

This is a putative class action under the Commodities Exchange Act ("CEA"), alleging manipulation of natural gas futures and options prices. Richard Hershey and Roberto E. Gracey ("Plaintiffs") purchased and sold New York Mercantile Exchange ("NYMEX") natural gas futures contracts. Plaintiffs sued Energy Transfer Partners, L.P. and its affiliates (collectively, "Defendants") for allegedly manipulating the price of natural gas delivered at the Houston Ship Channel ("HSC") and alleged economic harm to their NYMEX natural gas futures contracts caused by that manipulation. Plaintiffs purport to represent a class of natural gas futures and options contracts traders over the period of Defendants' alleged manipulation.

The Commodities Futures Trading Commission ("CFTC") and the Federal Energy Regulatory Commission ("FERC") **\*241** alleged in previous enforcement actions that Defendants created and then exploited price differences between the HSC and the Henry Hub, a major confluence of natural gas pipelines and the settlement price for all NYMEX natural gas futures contracts. We must now decide whether Plaintiffs may bring a proper claim under the CEA for the alleged manipulation of HSC prices. Because we find that Plaintiffs failed to sufficiently allege that Defendants specifically intended to manipulate NYMEX natural gas futures contracts, we affirm the district court's dismissal.

I. FACTUAL AND PROCEDURAL BACKGROUND

*A. The Natural Gas Futures Market*

Natural gas is a commodity: a tangible good bought and sold in commerce. Black's Law Dictionary 291 (8th ed.2004). This tangible good produces a variety of intangible financial derivatives, traded on public markets by investors who have little interest in actually obtaining the natural gas. The market at issue here is NYMEX, although most of Defendants' allegedly manipulative trades occurred on the Intercontinental Exchange ("ICE"), an Internet-only competitor of NYMEX.

If the buyer purchases the commodity for cash and the seller delivers the good "on the spot," it is called a "spot sale." Thus, a spot sale reflects the current price, and therefore the actual present value, of the commodity. Arguably the most important commodities transaction is the futures contract,[1] an agreement "to buy or sell a standardized asset (such as a commodity, stock, or foreign currency) at a fixed price at a future time." Black's Law Dictionary, *supra*, at 699. The asset that is the subject of the future is called the "underlying." The modifier "underlying" has an important effect on "commodity"—the "underlying commodity" of a futures contract is a specific good, governed by the terms of the futures contract. *See Three Crown Ltd. P'ship v. Caxton Corp.*, 817 F.Supp. 1033, 1043 (S.D.N.Y.1993) (noting that, in a claim under the CEA provision at issue here, the " 'commodity underlying' ... refers to the commodity specified within the particular futures contract" and finding that particular Treasury notes were not the commodity underlying Treasury bill futures or eurodollar futures); *see also Leist v. Simplot*, 638 F.2d 283, 286 (2d Cir.1980) (noting that "the contract involved in this case, the May 1976 Maine potato futures contract, is for 50,000 pounds of Maine grown potatoes of a specified quality to be delivered at specified points in cars of the Bangor & Aroostook Railroad, between May 7 and May 25, 1976").

A future hedges, or limits, risk and allows for speculation. For example, if Party A thinks that the price for natural gas will increase, it can acquire a future for the later delivery of natural gas at a current set price to avoid paying a possibly higher price at a later date. Party B believes that the price will decrease and agrees to deliver the natural gas to Party A at the later date for the agreed price. Party B may profit from the transaction by waiting to actually acquire the natural gas for delivery until a later date, thereby benefitting from the difference between the amount received for the future and the actual cost to acquire the natural gas.

Most parties who trade in natural gas futures do not want (and simply would be unable to take physical delivery of) the natural gas. Instead, these parties trade in natural gas futures like traditional investors **\*242** trade in stocks and bonds.[2] The parties financially offset the future by further futures trading as one would sell a stock on the public market. For these parties, the difference between the contract price and the offsetting transaction represents the loss or profit.

The futures contract has two positions, a long and a short. The long party pays for the contract and is obligated to take

delivery. The short party receives payment for the future and is obligated to make delivery. If a short party holds the future until it comes due, the "prompt month," then the futures contract becomes a presently enforceable contractual obligation to deliver the natural gas. The parties on opposing sides of the future do not deal with one another; rather, they make their trades through a clearinghouse, such as NYMEX. *See In re Natural Gas Commodity Litig.*, 337 F.Supp.2d 498, 502 (S.D.N.Y.2004). The clearinghouse allows futures parties to offset their obligations easily, which introduces fluidity to the market.

The public markets for futures standardize the contracts. Everything, except for price, remains the same from one futures contract to the next.[3] The NYMEX natural gas futures contracts rules "apply to all natural gas bought and sold for future delivery on [NYMEX] with delivery at the Henry Hub." *Id.* § 220.01. Each NYMEX futures contract represents ten billion British thermal units of natural gas. *Id.* § 220.05. The price for the natural gas that is delivered at the Henry Hub is the "settlement price" of the NYMEX natural gas futures contract.[4]

The Henry Hub is a physical delivery point near Erath, Louisiana, and the confluence of many interstate and intrastate natural gas pipelines. *Amaranth*, 587 F.Supp.2d at 523. The spot price of physical delivery at the Henry Hub underpins every natural gas future on NYMEX, regardless of whether that future goes to physical delivery. *See NYMEX Rulebook*, § 220.01.[5]

The Henry Hub is not the exclusive delivery point for all natural gas in the **\*243** United States. Defendants' purchases and sales represent the bulk of the trades involving natural gas delivered through the HSC, a major conduit of natural gas to the Texas market. Because the price of delivery can vary among hubs, many large traders in natural gas commodities arbitrage—a practice of taking advantage of the price differential among markets. Black's Law Dictionary, *supra*, at 112. Defendants here used natural gas futures "basis swaps" to accomplish this arbitrage. A swap is a pure financial instrument,[6] based on the difference between two fluctuating values. In the natural gas basis swaps here, the value of the swap is the difference between the settlement price of the NYMEX natural gas futures contract for a given contract month and that of the monthly index at the HSC for that same month. Put simply, the wider the gap between prices at the

Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239 (2010)
170 Oil & Gas Rep. 393

Henry Hub and the HSC, the more money Defendants stood to make from their basis swaps.

Although prices differ between delivery hubs, those differences quickly converge because of the nature of the public market. This convergence is due, in large part, to a system of price reporting. Through Internet terminals connected to ICE or NYMEX, traders can see the flow of trades. Additionally, Platts, a reporting agency, collects certain price and volume information from trading participants, and publishes the monthly *Inside FERC's Gas Market Report* ("*IFERC*"). The public pricing information influences traders' forecasts and impacts decisions to acquire natural gas. The public pricing information will reflect any dips or spikes in prices, which in turn impacts the price at other hubs, demonstrating a high correlation between prices of natural gas at hubs nationwide.

### B. CFTC and FERC Enforcement Actions against Defendants

Plaintiffs' allegations substantially mirror the allegations in regulatory actions against Defendants by the CFTC and FERC. In July 2007, the FERC issued an Order to Show Cause and Notice of Proposed Penalties ("FERC Order to Show Cause") alleging that Defendants engaged in manipulative trading.[7] On the same day, the CFTC filed a complaint in the Northern District of Texas against Defendants, alleging market manipulation and seeking injunctive and equitable relief, along with civil penalties under the CEA.[8]

The FERC Order to Show Cause alleges, with great specificity, Defendants' use of financial constructs and coordinated trades to manipulate HSC prices:

[Energy Transfer Partners ("ETP")] dominated sales of fixed-price gas at HSC, often comprising 80 percent or more of total sales. ETP reported its fixed price sales at HSC to [IFERC] and thus was able to use its domination of the market to virtually set the IFERC HSC index. In spite of ETP's sales activity at HSC, it was consistently a net buyer of monthly gas priced at the IFERC HSC index, and thus was positioned to benefit from the lower prices it caused in the months it manipulated fixed-price sales at HSC....

**\*244** At the same time, ETP had entered into ... basis swaps to leverage its benefit from suppressing monthly physical prices at HSC.... [Thus,] ETP profited if the difference between prices at HSC and the NYMEX Contract widened, i.e., the price at HSC became lower

relative to the higher priced NYMEX Contract.... Because ETP had the power to suppress price at HSC, this was not really a bet at all, but a manipulation that was spectacularly successful in October 2005—ETP realized more than $40,000,000 in unjust profits—and highly profitable in eight other months from January 2004 through December 2005.

FERC Order to Show Cause, at 3.

The CFTC settled with Defendants for $10 million.[9] The consent letter permanently enjoined Defendants from any further manipulation of any commodity.[10] Defendants also settled with the FERC, for $30 million, and agreed to periodic independent audits.[11]

### C. Plaintiffs' Action

Plaintiffs purchased long positions in NYMEX natural gas futures, and sold those positions at a loss the same day. After the CFTC and FERC actions, Plaintiffs filed a Consolidated Class Action Complaint, alleging commodity futures market manipulation and aiding and abetting under 7 U.S.C. §§ 6(c), 13(a), and 25(a). These two traders purport to represent a class of others similarly situated, defined in their complaint as: "[a]ll persons ... (a) who sold NYMEX natural gas futures contracts, or (b) purchased or sold NYMEX natural gas options contracts between December 29, 2003 and December 31, 2006...." Plaintiffs' allegations are based on the CFTC and FERC actions. The crux of this case, however, is whether Plaintiffs can wrestle the CFTC and FERC allegations into a private cause of action.

Plaintiffs' theory of liability is as follows: Defendants had the power to suppress prices at HSC because of their dominant market position at that hub. Defendants manipulated NYMEX futures and options contracts by selling, during the bidweek, large quantities of natural gas for delivery at HSC to depress the price of the natural gas at that hub to an artificial level. Defendants provided the artificially low price information to Platts, knowing that those prices would be reflected in HSC's monthly price index. Those reported figures resulted in a published index that contained manipulated and artificial figures. Defendants engaged in this manipulation intending to drive the HSC price down against the Henry Hub price so they could profit from the difference between the two delivery hubs. The low HSC monthly index **\*245** caused the NYMEX price to fluctuate artificially, resulting in a lower price. Plaintiffs suffered damages by trading NYMEX natural

Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239 (2010)

gas futures and options contracts at artificial prices during the enumerated class period.

### D. The District Court's Dismissal

Defendants moved to dismiss Plaintiffs' Amended Complaint, arguing that Plaintiffs failed to allege that Defendants specifically intended to manipulate the price of natural gas at the Henry Hub, and thus Plaintiffs failed to allege the CEA's requirement that the manipulation be specifically directed toward the underlying commodity of the contract. It would be illogical, Defendants argued, for Defendants to intend to depress Henry Hub prices if they allegedly benefitted from the *difference* between Henry Hub and HSC prices. Plaintiffs responded that the underlying of a NYMEX futures contract is natural gas generally, rather than gas delivered at the Henry Hub, because the Henry Hub spot price merely sets national benchmark. Because the HSC and Henry Hub prices were correlated, Plaintiffs argued that Defendants' manipulation of the HSC price would necessarily drive down the cost of gas at the Henry Hub.

The district court agreed with Defendants and dismissed the case with prejudice. The district court reasoned that the private right of action under the CEA applies only to alleged manipulation of the price of the commodity underlying the contract, 7 U.S.C. § 25(a), and found that the commodity underlying Plaintiffs' NYMEX natural gas futures is the natural gas bought and sold for delivery at the Henry Hub.

The district court held that Plaintiffs failed to state a claim because they did not allege facts tending to show that Defendants had specifically intended to manipulate the cost of natural gas delivered at the Henry Hub. Plaintiffs filed a motion to reconsider, which the district court denied. Plaintiffs timely appealed.

## II. ANALYSIS

### A. Jurisdiction and Standard of Review

**[1]** We have jurisdiction under 28 U.S.C. § 1291 over the final order of the district court dismissing Plaintiffs' Amended Complaint. We review *de novo* the district court's dismissal under Federal Rule of Civil Procedure 12(b)(6). *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank, NA*, 467 F.3d 466, 469 (5th Cir.2006) (citation omitted). To survive a Rule 12(b)(6) motion to dismiss, Plaintiffs' Amended Complaint need only include "a short and plain

statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). " '[D]etailed factual allegations' are not required." *Ashcroft v. Iqbal*, —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).[12]

**[2]** However, the complaint must allege "sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.' " *Id.* at 1949 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949 (citing *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). A court should not **\*246** accept "threadbare recitals of a cause of action's elements, supported by mere conclusory statements," which "do not permit the court to infer more than the mere possibility of misconduct." *Id.* at 1949–50.

### B. The Private Right of Action under the CEA

The CEA provides a private right of action against individuals "who purchased or sold a [futures] contract" if those individuals "manipulat[ed] the price of any such contract or the price of the commodity underlying such contract." 7 U.S.C. § 25(a)(1)(D). The parties do not dispute that Plaintiffs acquired and sold NYMEX natural gas futures contracts during the period of Defendants' alleged manipulation. However, we have yet to define "manipulation" under the CEA, nor have we defined "commodity underlying."

### 1. Specific Intent for Manipulation Claims under the CEA

**[3]** To be liable for commodities fraud, a defendant must possess "the intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193–94, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) (discussing scienter requirement for securities fraud). The obligation to plead *specific* intent may be traced back to decisions establishing an agency's burden of proof. *See Grossman v. Citrus Assocs. of N.Y. Cotton Exch., Inc.,* 706 F.Supp. 221, 231 (S.D.N.Y.1989) (citing *In the Matter of Cox,* [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 23,786 at 34,060–61 (CFTC July 15, 1987)); *see also In re Soybean Futures Litig.,* 892 F.Supp. 1025, 1058–59 (N.D.Ill.1995) ("The court recognizes that a manipulation claim requires a showing of specific intent, that is, a showing that 'the accused acted (or failed to act) with the purpose or conscious object' of influencing prices.") (quoting *In re Ind. Farm Bureau Coop. Assoc., Inc.,* [1982–

1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,283 (CFTC Dec. 17, 1982)).

Although we have not had an opportunity to specifically adopt a pleading standard for commodities manipulation claims, the specific intent standard appears to have substantial support. *See Amaranth*, 587 F.Supp.2d at 530 (applying specific intent standard against private cause of action); *CFTC v. Enron Corp.*, No. H–03–909, 2004 WL 594752, at *4 (S.D.Tex. Mar. 10, 2004) (applying specific intent to claim by CFTC against firm for market manipulation); *Natural Gas Litig.*, 337 F.Supp.2d at 507 (discussing different manipulation standards, each of which includes the specific intent requirement); *Grossman*, 706 F.Supp. at 231 n. 12 (collecting cases). In *Volkart Bros., Inc. v. Freeman*, we established that manipulation is "any and every operation or transaction or practice ... calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets." 311 F.2d 52, 58 (5th Cir.1962) (citation omitted). Despite this broad standard, we noted the importance of specific intent, stating that "there must be a purpose to create prices not responsive to the forces of supply and demand." *Id.* Because the specific intent standard is grounded in sound reasoning and precedent, we adopt it for private causes of action under the CEA, 7 U.S.C. §§ 13(a) and 25(a).

*2. The Underlying Commodity of a NYMEX Natural Gas Futures Contract*

As previously discussed, all natural gas futures traded through NYMEX are governed by the *NYMEX Rulebook. See NYMEX Rulebook*, § 220.01. Only the price varies from one futures contract to the next. Each future obligates the long party **\*247** to accept delivery, and the short party to make delivery over the physical pipelines at Henry Hub over the course of the delivery month. *Id.* § 220.10. The NYMEX standard contract provides details of the delivery, including its timing and flow rate. *See, e.g., id.* §§ 220.12 & 220.13. It is exceedingly unlikely that Plaintiffs ever expected to accept delivery of natural gas through an interconnection point at Henry Hub as each named Plaintiff held his respective futures contract for a single trading day before selling it for a loss. However, this fact does not obviate the futures holder's obligation to accept delivery at the Henry Hub.

Plaintiffs argue that, contrary to the district court's finding, the underlying of a NYMEX natural gas future is natural gas generally, rather than the gas delivered at the Henry Hub. Plaintiffs contend that prices of physical natural gas, wherever

bought or sold, directly affect NYMEX natural gas futures contract prices. Plaintiffs further argue that the interconnected nature of the industry necessitates a finding that natural gas generally is the underlying commodity because the fungible commodity at any hub is "inextricably linked" with the NYMEX natural gas futures price. Plaintiffs also point out that the private cause of action provision of the CEA does not reference NYMEX prices nor any specific delivery location, but allows a claim for manipulation of the "underlying commodity" of a futures contract. 7 U.S.C. §§ 13(a), 25(a).

**[4]**    Although no circuit has squarely addressed what constitutes the underlying commodity of a NYMEX natural gas futures, *cf. Leist*, 638 F.2d at 286 (concerning a case involving May 1976 Maine potato futures and noting that those futures involve "Maine grown potatoes of a *specified* quality to be delivered at *specified points* in cars of the Bangor & Aroostook Railroad, between May 7 and May 25, 1976") (emphasis added), we cannot agree with Plaintiffs' position. Plaintiffs concede that the settlement price of a NYMEX natural gas futures contract is the price of natural gas delivered at the Henry Hub. Under the CEA, actionable manipulation must be directed at "the price of the commodity underlying *such* contract." 7 U.S.C. § 25(a)(1)(D) (emphasis added). By definition, the underlying of a futures contract depends on the *contract* itself. It is undisputed that the contract in question here is the NYMEX natural gas futures contract. Therefore, Plaintiffs must allege that Defendants specifically intended to manipulate the underlying of *that* contract, not some hypothetical natural gas futures contract.

The NYMEX natural gas futures contract is specifically tied to, and standardized against, the spot price at the Henry Hub. Although a party to a NYMEX natural gas futures contract, at an abstract level, deals generally with natural gas, that party may only accept or make delivery at the Henry Hub. This delivery restriction, standard to all NYMEX natural gas futures contracts, leads us to reason that the underlying commodity of a NYMEX natural gas futures contract is not natural gas wherever bought and sold, but the specific natural gas delivered at the Henry Hub.

*C. Plaintiffs' Amended Complaint*

**[5]**    The district court found that a private cause of action under the CEA requires Plaintiffs to plead that (1) Defendants possessed an ability to influence market prices; (2) an artificial price existed; (3) Defendants caused the artificial prices; and (4) Defendants specifically intended to cause the artificial price. *See In re Energy Transfer Partners Natural*

Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239 (2010)

170 Oil & Gas Rep. 393

*Gas Litig.,* No. 4:07–cv–3349, 2009 WL 2633781, at *3 (S.D.Tex. Aug. 26, 2009) **\*248** (citing 7 U.S.C. § 13(a); *Amaranth,* 587 F.Supp.2d at 530; *Natural Gas Litig.,* 337 F.Supp.2d at 507; *Crude Oil Litig.,* 2007 WL 1946553, at *3; *Enron Corp.,* 2004 WL 594752, at *4). We agree with the district court's finding and adopt this standard for pleading under the CEA's private cause of action, 7 U.S.C. §§ 13(a), 25(a).

[6] Plaintiffs' allege that Defendants intentionally manipulated the price of natural gas at the HSC. When Defendants reported these artificial prices to Platts, the artificial prices impacted the published index and likely influenced the price of gas at the Henry Hub, thus impacting the price of NYMEX natural gas futures contracts. The parties dispute the plausibility of Plaintiffs' allegation that Defendants specifically intended to influence either the price at the Henry Hub or the price of NYMEX natural gas, assuming the truth of Plaintiffs' other factual allegations.

Plaintiffs attempt to tie Defendants' manipulation of the HSC prices to the price of Henry Hub natural gas and NYMEX futures contracts by arguing that Defendants knew or should have known that their manipulation of natural gas prices at HSC would result in the artificial suppression of the prices of NYMEX natural gas futures contracts. In other words, Plaintiffs argue that Defendants were aware that the correlation between the natural gas hubs would cause the Henry Hub price to sink if they flooded the HSC. Directing a similar argument to the underlying commodity, Plaintiffs contend that because Defendants submitted artificially low HSC price information for publication, the depression of Henry Hub spot prices was "intentional and inevitable." Plaintiffs' argument is without merit: intentionality and inevitability are not legally equivalent.

In *Amaranth,* a class of futures traders alleged that a slew of corporate entities, collectively "Amaranth," conspired to drive up the price of NYMEX futures and benefit from advantageous swaps. 587 F.Supp.2d at 524. Amaranth allegedly accomplished its manipulation by acquiring massive long positions of NYMEX natural gas futures, thereby "signal[ing] significant demand, causing market prices to rise." *Id.* As those futures contracts went to settlement, "Amaranth would sell a significant number of futures ... artificially depress[ing] the settlement price of those futures." *Id.* Amaranth would "lose money on the futures but would profit on the swaps." *Id.* All of Amaranth's alleged manipulations were directed toward and directly impacted

the NYMEX natural gas futures market and the *Amaranth* plaintiffs alleged that Amaranth specifically intended to manipulate the market of the futures that they had purchased.

The *Amaranth* plaintiffs' allegations are different than those made by Plaintiffs here. Defendants directed every alleged manipulation toward the HSC. Indeed, Defendants benefitted from a scheme that depended on the spread between the Henry Hub and HSC. The wider the spread, the greater the return on the financial basis swaps and thus it would be counterproductive for Defendants to drive down the Henry Hub spot price.

In *Natural Gas Litigation,* a group of traders brought similar claims to those presented here, following enforcement actions after CFTC and FERC investigations. 337 F.Supp.2d at 502. The *Natural Gas Litigation* plaintiffs alleged that "a group of companies that market and trade natural gas in the physical and futures markets, acted together to unlawfully manipulate the prices of natural gas futures and option contracts *traded on the NYMEX.*" *Id.* at 502 (footnote omitted) (emphasis added). Although the alleged scheme in *Natural Gas Litigation* involved the defendants' submission of false pricing **\*249** information on spot trades at various delivery hubs, it is clear that the complaint alleged an overarching scheme to influence NYMEX natural gas futures prices. *Id.* at 502–03.

The scheme in *Natural Gas Litigation* is decidedly different from Plaintiffs' allegations here. Although the *Natural Gas Litigation* defendants reported artificial prices at hubs other than the Henry Hub in order to influence published price indices, the plaintiffs alleged that the intent behind these false reports was to drive down NYMEX natural gas futures prices. *Id.* Here, the intent of Defendants' alleged false reporting was to drive down the price of natural gas at the HSC hub. The effect on the Henry Hub, and NYMEX futures contracts, was merely an unintended consequence of the Defendants' manipulative trading.

In *Soybean Futures,* the district court granted that "[a]s a general matter ... questions of intent are inappropriate for resolution on summary judgment" but recognized that in some instances dismissal is appropriate because " 'the plaintiff presents no indication of motive and intent supportive of his position.' " 892 F.Supp. at 1058 (quoting *Powers v. Dole,* 782 F.2d 689, 696 (7th Cir.1986)). Plaintiffs here cannot tie Defendants' manipulation of the HSC price index to an intent or motive to manipulate the Henry Hub price and thus summary judgment was not premature. Under

Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239 (2010)
170 Oil & Gas Rep. 393

a specific intent standard, mere knowledge is not enough; Defendants must have specifically intended to impact the NYMEX natural gas futures market. Plaintiffs here allege only that Defendants knew or should have known that their manipulative actions would depress the NYMEX natural gas futures prices. Therefore, Plaintiffs have not stated a claim under the CEA.

III. CONCLUSION

The CFTF and FERC enforcement actions against Defendants raise the specter of manipulation; accepting Plaintiffs' allegations as true leads to the same conclusion. The alleged manipulation had only a tangential, although perhaps foreseeable, effect on the price of natural gas delivered at the Henry Hub and the price of NYMEX natural gas futures contracts. To state a claim under the CEA, however, Plaintiffs must plead facts establishing that Defendants specifically intended to influence the natural gas delivered at the Henry Hub or the price of NYMEX natural gas futures contracts. They failed to do so. We therefore AFFIRM the district court's order dismissing this case.

AFFIRMED.

**All Citations**

610 F.3d 239, 170 Oil & Gas Rep. 393

Footnotes

1    Or, simply, a "future."

2    See *In re Amaranth Natural Gas Commodities Litig.* (*Amaranth*), 587 F.Supp.2d 513, 520–24 (S.D.N.Y.2008) (providing an overview of the commodities futures market, NYMEX, and natural gas trading and stating that in the spring of 2006, "less than two percent of natural gas futures went to delivery").

3    See N.Y. Merchantile Exch., Inc., *NYMEX Rulebook*, § 220.01 (2009), *available at* http://www.cmegroup.com/rulebook/ NYMEX/2/220.pdf (last visited June 22, 2010) (hereinafter *NYMEX Rulebook*).

4    The actual calculation of the settlement price is based on a series of inputs. As detailed in Plaintiffs' Amended Complaint:

The settlement price of a NYMEX natural gas futures contract is the volume-weighted average price of trades made during the 30–minute settlement period, which is the last 30 minutes of trading on the termination day for the "prompt-month" contract. The "prompt-month" is the next calendar month. The "termination day" for NYMEX natural gas futures contracts is the third-to-last business day of the month preceding the prompt month, and the settlement period occurs from 2:00 p.m. to 2:30 p.m. EST on the termination day (except for when the NYMEX is operating on a holiday schedule). So, for example, for August 2007, the prompt-month contract was the September 2007 NYMEX natural gas futures contract. The last business day in August 2007 was Friday, August 31, so the settlement period for the September 2007 NYMEX natural gas futures contract took place from 2:00 p.m. to 2:30 p.m. on Wednesday, August 29, 2007.

5    The Henry Hub has corollaries in other commodities. For example, all NYMEX futures concerning light, sweet crude oil are tied to a hub in Cushing, Oklahoma. *See In re Crude Oil Commodity Litig.*, No. 06 Civ. 6677, 2007 WL 1946553, at *1–2 (S.D.N.Y. June 28, 2007).

6    There is no obligation of delivery or performance based on the swap.

7    See FERC, 120 F.E.R.C. ¶ 61,086, Docket No. IN06–3–002, *available at* http://www.ferc.gov/EventCalendar/ Files/20070726084254–IN06–3–002.pdf (last visited June 22, 2010).

8    See Complaint at 1–2, *CFTC v. ENERGY TRANSFER PARTNERS, L.P.*, No. 3:07–cv–01301, 2007 WL 2211178 (N.D.Tex. July 26, 2007), *available at* http://www.cftc.gov/ucm/groups/public/@lrenforceme ntactions/documents/ legalpleading/enfetpcomplaint072607.pdf.

Hershey v. Energy Transfer Partners, L.P., 610 F.3d 239 (2010)

170 Oil & Gas Rep. 393

9    *See* Press Release, CFTC, Energy Transfer Partners, L.P. and Three of Its Subsidiaries to Pay a $10 Million Penalty to Settle CFTC Action Alleging Attempted Manipulation of Natural Gas Prices (Mar. 17, 2008), *available at* http://www.cftc.gov/pressroom/pressreleases/pr5471–08. html (last visited June 22, 2010).

10   *See* Consent Order of Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendants Energy Transfer Partners, L.P., Energy Transfer Co., ERC marketing, Ltd., and Houston Pipeline Co. at 3, *CFTC v. Energy Transfer Partners, L.P.*, No. 3:07–cv–01301, 2008 WL 1971314 (N.D.Tex. Mar. 17, 2008), *available at* http://www. cftc.gov/ucm/groups/public/@lrenforceme ntactions/documents/legalpleading/enfetporder031708.pdf.

11   *See* Press Release, FERC, FERC Approves Record $30 Million Settlement in ETP Market Manipulation Case, 128 F.E.R.C. ¶ 61,269, Docket No. IN06–3–003, http://www.ferc.gov/news/news–releases/2009/2009–3/09–21–09.pdf (last visited June 22, 2010).

12   The parties dispute whether the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply to this case. Because we hold that Plaintiffs failed to state a claim under the liberal pleading standards of Rule 8, we do not reach this issue.

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

495 F.3d 191
United States Court of Appeals,
Fifth Circuit.

In re: KATRINA CANAL
BREACHES LITIGATION.

Richard Vanderbrook; Mary Jane Silva; James
Capella; Madeline Grenier, misidentified as
Sophia Granier; Jack Capella, as the Executor
of the Succession of Lilian Capella; Gregory
Jackson; Peter Ascani, III; Robert G. Harvey,
Sr., Plaintiffs–Appellees–Cross–Appellants,

v.

Unitrin Preferred Insurance Company;
Hanover Insurance Company; Standard Fire
Insurance Company, Defendants–Appellants,
State Farm Fire and Casualty
Company Defendant–Cross–Appellee.
Kelly A. Humphreys, Plaintiff–
Appellee–Cross–Appellant,

v.

Encompass Indemnity Company,
Defendant–Appellant–Cross–Appellee.
Xavier University of
Louisiana, Plaintiff–Appellee,

v.

Travelers Property Casualty Company
of America, Defendant–Appellant.
Gladys Chehardy; Daniel Fontanez; Jacquelyn
Fontanez; Larry Forster; Glendy Forster; et
al., Plaintiffs–Appellees–Cross–Appellants,

v.

Allstate Indemnity Company; Allstate
Insurance Company; American Insurance
Company; Aegis Security Insurance Company;
Lafayette Insurance Company; Liberty
Mutual Fire Insurance Company; AAA
Homeowners Auto Club Family Insurance

Company; Louisiana Citizens Property
Insurance Corporation; Lexington Insurance
Company; Encompass Insurance Company of
America; Great Northern Insurance Company;
Hanover Insurance Company; Standard Fire
Insurance Company, Defendants–Appellants,
State Farm Fire and Casualty
Company, Defendant–Cross–Appellee.

No. 07–30119.
|
Aug. 2, 2007.

**Synopsis**
**Background:** Policyholders with homeowners, renters, or
commercial-property insurance brought actions in state and
federal court, seeking recovery under their policies for
damage arising from flooding resulting from breaches or
overtopping of levees which occurred in aftermath of
Hurricane Katrina. After removal of state actions and
consolidation, the United States District Court for the
Eastern District of Louisiana, Stanwood R. Duval, Jr., J.,
466 F.Supp.2d 729, denied in part and granted in part
defendants' motions to dismiss or for summary judgment.
Parties appealed.

**Holdings:** The Court of Appeals, King, Circuit Judge, held
that:

[1] flood exclusions barred coverage, and

[2] efficient proximate cause rule did not apply.

Affirmed in part, vacated in part, and remanded.

West Headnotes (33)

[1]    **Federal Courts** ⟜ Pleading
       District court's order on motion to dismiss for
       failure to state claim is reviewed de novo.
       Fed.Rule Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

282 Cases that cite this headnote

[2]    **Federal Civil Procedure** ⟜ Construction of
pleadings

**Federal Civil Procedure** ⟜ Matters deemed
admitted; acceptance as true of allegations in
complaint

On motion to dismiss for failure to state claim,
court accepts all well-pleaded facts as true,
viewing them in light most favorable to plaintiff.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

3843 Cases that cite this headnote

[3]    **Federal Civil Procedure** ⟜ Insufficiency in
general

**Federal Civil Procedure** ⟜ Matters deemed
admitted; acceptance as true of allegations in
complaint

To survive motion to dismiss for failure to state
claim, plaintiff must plead enough facts to
state claim to relief that is plausible on its face; factual
allegations must be enough to raise right to
relief above speculative level, on assumption
that all allegations in complaint are true even if
doubtful in fact. Fed.Rule Civ.Proc.Rule 12(b)
(6), 28 U.S.C.A.

4314 Cases that cite this headnote

[4]    **Federal Civil Procedure** ⟜ Matters
considered in general

Insurance contracts which were attached to
motions to dismiss, were referred to in
complaints, and were central to plaintiffs' claims
could be considered in assessing motions to
dismiss for failure to state claim. Fed.Rules
Civ.Proc.Rule 12(b), 28 U.S.C.A.

571 Cases that cite this headnote

[5]    **Federal Courts** ⟜ Judgment on the pleadings
District court's decision on motion for judgment
on the pleadings is reviewed de novo. Fed.Rules
Civ.Proc.Rule 12(c), 28 U.S.C.A.

24 Cases that cite this headnote

[6]    **Federal Civil Procedure** ⟜ Insufficiency of
claim or defense

**Federal Civil Procedure** ⟜ Determination of
Motion

On motion for judgment on the pleadings, issue
is whether, in light most favorable to plaintiff,
complaint states valid claim for relief. Fed.Rules
Civ.Proc.Rule 12(c), 28 U.S.C.A.

1283 Cases that cite this headnote

[7]    **Federal Courts** ⟜ Summary judgment

**Federal Courts** ⟜ Summary judgment

Court of Appeals reviews grant of summary
judgment de novo, viewing all evidence in light
most favorable to nonmoving party and drawing
all reasonable inferences in that party's favor.

106 Cases that cite this headnote

[8]    **Federal Courts** ⟜ Substance or procedure;
determinativeness

In diversity cases, federal courts must apply state
substantive law.

75 Cases that cite this headnote

[9]    **Federal Courts** ⟜ Conflict of Laws; Choice
of Law

In determining which state's substantive law
controls, federal court sitting in diversity applies
choice-of-law rules of forum state.

61 Cases that cite this headnote

[10]    **Federal Courts** ⟜ Highest court

**Federal Courts** ⟜ Anticipating or predicting
state decision

**Federal Courts** ⟜ Sources of authority;
assumptions permissible

To determine Louisiana law, federal court sitting
in diversity looks to final decisions of Louisiana
Supreme Court; in absence of final decision

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

by Louisiana Supreme Court, court must make *Erie* guess and determine, in its best judgment, how that court would resolve issue if presented with same case, employing Louisiana's civilian methodology, whereby court first examines primary sources of law: the constitution, codes, and statutes.

153 Cases that cite this headnote

**[11]** **Courts** ⟜ Previous Decisions as Controlling or as Precedents

Jurisprudence, even when it rises to level of *jurisprudence constante*, is secondary law source in Louisiana.

59 Cases that cite this headnote

**[12]** **Insurance** ⟜ Policies considered as contracts
**Insurance** ⟜ Application of rules of contract construction

Under Louisiana law, insurance policy is contract between parties and should be construed by using general rules of interpretation of contracts set forth in Civil Code. LSA–C.C. art. 2045.

45 Cases that cite this headnote

**[13]** **Insurance** ⟜ Questions of law or fact

Under Louisiana law, interpretation of insurance contract generally involves question of law.

33 Cases that cite this headnote

**[14]** **Insurance** ⟜ Construction or enforcement as written

Under Louisiana insurance law, if policy wording is clear and unambiguously expresses parties' intent, insurance contract must be enforced as written.

17 Cases that cite this headnote

**[15]** **Insurance** ⟜ Reasonable expectations
**Insurance** ⟜ Reasonable persons

Under Louisiana insurance law, ambiguity in policy may be resolved through use of "reasonable-expectations doctrine," i.e., by ascertaining how reasonable insurance policy purchaser would construe clause at time insurance contract was entered.

2 Cases that cite this headnote

**[16]** **Insurance** ⟜ Reasonable expectations
**Insurance** ⟜ Usage of trade or business

Under Louisiana insurance law, court should construe policy to fulfill reasonable expectations of parties in light of customs and usages of industry.

8 Cases that cite this headnote

**[17]** **Insurance** ⟜ Ambiguity, Uncertainty or Conflict
**Insurance** ⟜ Necessity of ambiguity

Under Louisiana insurance law, rule of strict construction, whereby equivocal provisions are strictly construed against insurer, applies only if the ambiguous policy provision is susceptible to two or more reasonable interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable. LSA–C.C. art. 2056.

7 Cases that cite this headnote

**[18]** **Insurance** ⟜ Ambiguity in general

Under Louisiana insurance law, fact that term is not defined in policy itself does not alone make that term ambiguous. LSA–C.C. art. 2056.

8 Cases that cite this headnote

**[19]** **Insurance** ⟜ Reasonableness
**Insurance** ⟜ Construction to be unstrained

Under Louisiana law, insurance contract should not be interpreted in unreasonable or strained manner under guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve absurd conclusion.

18 Cases that cite this headnote

**[20]    Insurance** ⬄ Function of, and limitations on, courts, in general

Under Louisiana law, courts lack authority to alter terms of insurance contracts under guise of contractual interpretation when policy's provisions are couched in unambiguous terms.

17 Cases that cite this headnote

**[21]    Insurance** ⬄ Risks or Losses Covered and Exclusions

**Insurance** ⬄ Accident, occurrence or event

Under Louisiana law, all-risk policies create special type of coverage that extends to risks not usually covered under other insurance; recovery under all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless policy contains specific provision expressly excluding loss from coverage.

6 Cases that cite this headnote

**[22]    Insurance** ⬄ Validity and Enforceability

**Insurance** ⬄ Exclusions and limitations in general

**Insurance** ⬄ Risks or Losses Covered and Exclusions

Under Louisiana law, insurers may limit their liability under all-risk policies; absent conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon policy obligations they contractually assume.

3 Cases that cite this headnote

**[23]    Insurance** ⬄ Exclusions, exceptions or limitations

Under Louisiana law, exclusionary provisions in insurance contracts are strictly construed against insurer, and any ambiguity is construed in favor of insured.

13 Cases that cite this headnote

**[24]    Federal Courts** ⬄ Particular questions

Because rules of contract interpretation set forth in Louisiana Civil Code provided adequate basis to decide insurance coverage issue on appeal, Court of Appeals would decline request to certify question to Louisiana Supreme Court.

47 Cases that cite this headnote

**[25]    Insurance** ⬄ Surface water; flood exclusions

Under Louisiana law, as predicted by Federal Court of Appeals, flood exclusions in homeowners, renters, and commercial-property policies unambiguously precluded coverage for losses caused by flooding due to breached levees, regardless of whether levees were breached because they were negligently designed, constructed, or maintained; although term "flood" was not defined in the policies, event ensuing from breach of levees fit squarely within generally prevailing meaning of term "flood," whether its cause was regarded as natural or non-natural.

46 Cases that cite this headnote

**[26]    Insurance** ⬄ Exclusions, exceptions or limitations

Under Louisiana insurance law, fact that exclusion could have been worded more explicitly does not necessarily make it ambiguous, for purposes of strict construction rule; nor does fact that other policies have more explicitly defined scope of similar exclusions. LSA–C.C. art. 2056.

7 Cases that cite this headnote

**[27]    Insurance** ⬄ Favoring coverage or indemnity; disfavoring forfeiture

**Insurance** ⬄ Exclusions and limitations in general

Under Louisiana insurance law, even where scope of exclusion is not readily apparent, court

does not immediately construe that exclusion in favor of coverage; instead, court first applies general rules of contract construction, giving words of contract their generally prevailing meaning. LSA–C.C. art. 2047.

6 Cases that cite this headnote

[28]    **Insurance**  ⟳  Ambiguity in general

Under Louisiana insurance law, existence of more than one definition of term does not itself make term ambiguous. LSA–C.C. art. 2056.

6 Cases that cite this headnote

[29]    **Insurance**  ⟳  Rules of Construction

Under Louisiana insurance law, when word in policy has two meanings, one broad and one more restrictive included within the broader meaning, it does not follow that narrower meaning was intended.

[30]    **Contracts**  ⟳  Language of Instrument

Under canon of "noscitur a sociis," term is interpreted by considering meaning of terms associated with it.

9 Cases that cite this headnote

[31]    **Contracts**  ⟳  General and specific words and clauses

Under canon of "ejusdem generis," where general words follow enumeration of particular classes of persons or things, general words will be construed as applicable only to persons or things of same general nature or class as those enumerated.

3 Cases that cite this headnote

[32]    **Insurance**  ⟳  Reasonable expectations

Louisiana insurance law precludes use of reasonable expectations doctrine to recast policy language when such language is clear and unambiguous.

2 Cases that cite this headnote

[33]    **Insurance**  ⟳  Surface water; flood exclusions

**Insurance**  ⟳  Combined or concurrent causes

Even if Louisiana followed it, "efficient proximate cause rule," whereby loss caused by combination of covered risk and excluded risk was covered if covered risk was efficient proximate cause of the loss, did not apply to allow insureds to avoid flood exclusion by recharacterizing flood, which resulted from breaches or overtopping of levees, as negligence, since there were not two independent causes of insureds' damages at play, rather, only force that damaged their properties was flood; to extent that any negligent design, construction, or maintenance of levees contributed to the losses, it was only one factor in bringing about flood, and peril of negligence did not act, apart from flood, to bring about damage to insureds' properties.

32 Cases that cite this headnote

**Attorneys and Law Firms**

**\*195**  Joseph M. Bruno, David S. Scalia, Bruno & Bruno, New Orleans, LA, James Parkerson Roy, Domengeaux, Wright, Roy & Edwards, Lafayette, LA, Joseph J. McKernan, McKernan Law Firm, Larry Dewayne Dyess, Baton Rouge, LA, Drew A. Ranier, Norval F. Elliot, III, Ranier, Gayle & Elliot, Lake Charles, LA, David Blayne Honeycutt, Wanda Jean Edwards, Fayard & Honeycutt, Calvin Clifford Fayard, Jr., Denham Springs, LA, Matthew D. Schultz, Levin, Papantonio, Thomas, Mitchell, Echsner & Proctor, Pensacola, FL, John N. Ellison (argued), Anderspon, Kill & Olick, Philadelphia, PA, for Plaintiffs–Appellees–Cross–Appellants.

Christopher Todd Handman, Hogan & Hartson, Washington, DC, Steven W. Usdin, Barrasso, Usdin, Kupperman, Freeman & Sarver, New Orleans, LA, for Great Northern Ins. Co.

James M. Garner, Darnell Bludworth, Sher Garner Cahill Richter Klein & Hilbert, New Orleans, LA, for Xavier University of Louisiana.

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

Harry M. Reasoner, Marie Roach Yeates, Gwendolyn Johnson Samora, Vinson & Elkins, Houston, TX, Judy Y. Barrasso, Barrasso Usdin Kupperman Freeman & Sarver, New Orleans, LA, for Liberty Mutual Fire Insurance.

Alan J. Yacoubian, Neal J. Favert, Johnson, Johnson, Barrios & Yacoubian, New Orleans, LA, for AAA Homeowners Auto Club Family Insurance Co.

Laura Anne Foggan, Wiley Rein LLP, Washington, DC, for Am. Ins. Ass'n., Nat. Ass'n of Mut. Ins. Co., Property Cas. Insurers Ass'n of America and Reinsurance Ass'n of America, Amici Curiae.

Levon G. Hovnatanian, Christopher Weldon Martin, Martin R. Sadler, Martin, Disiere, Jefferson & Wisdom, Houston, TX, for United Services Auto. Ass'n, Amicus Curiae.

Alan S. Gilbert, Anne W. Mitchell, Sonnenschein, Nath & Rosenthal, Chicago, IL, for Horace Mann Ins. Co., Amicus Curiae.

Dominic J. Ovella, Sean Patrick Mount, Daniel Michael Redmann, Hailey, McNamara, Hall, Larmann & Papale, Metairie, LA, for Fidelity & Deposit Co. of Maryland, Empire Fire & Marine Ins. Co., Empire Indem Ins. Co. and Centre Ins. Co., Amici Curiae.

Marshall M. Redmon, Phelps Dunbar, Baton Rouge, LA, for Farmers Ins. Exchange, Amica Mut. Ins. Co. and Republic Fire & Cas., Amici Curiae.

Amy R. Sabrin, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, for Farmers Ins. Exchange, Amicus Curiae.

John Powers Wolff, III, Steven C. Judice, Nancy B. Gilbert, Christopher Keith Jones, Tiffany N. Thornton, Keogh, Cox & Wilson, Ltd., Baton Rouge, LA, for Amica Mut. Ins. Co., Amicus Curiae.

Christopher Raymond Pennison, Jay M. Lonero, Larzelere, Picou, Wells, Simpson & Lonero, Metairie, LA, for Republic Fire & Cas. Ins. Co., Amicus Curiae.

Appeals from the United States District Court for the Eastern District of Louisiana.

Before KING, DeMOSS and OWEN, Circuit Judges.

## Opinion

KING, Circuit Judge:

On the morning of August 29, 2005, Hurricane Katrina struck along the coast of the Gulf of Mexico, devastating portions of Louisiana and Mississippi. In the City of New Orleans, some of the most significant damage occurred when levees along three major canals—the 17th Street Canal, the Industrial Canal, and the London Avenue Canal—ruptured, permitting water from the flooded canals to inundate the city. At **196** one point in Katrina's aftermath, approximately eighty percent of the city was submerged in water.

Each plaintiff in this case is a policyholder with homeowners, renters, or commercial-property insurance whose property was damaged during the New Orleans flooding. Despite exclusions in their policies providing that damage caused by "flood" is not covered, the plaintiffs seek recovery of their losses from their insurers. Their primary contention is that the massive inundation of water into the city was the result of the negligent design, construction, and maintenance of the levees and that the policies' flood exclusions in this context are ambiguous because they do not clearly exclude coverage for an inundation of water induced by negligence. The plaintiffs maintain that because their policies are ambiguous, we must construe them in their favor to effect coverage for their losses.

We conclude, however, that even if the plaintiffs can prove that the levees were negligently designed, constructed, or maintained and that the breaches were due to this negligence, the flood exclusions in the plaintiffs' policies unambiguously preclude their recovery. Regardless of what caused the failure of the flood-control structures that were put in place to prevent such a catastrophe, their failure resulted in a widespread flood that damaged the plaintiffs' property. This event was excluded from coverage under the plaintiffs' insurance policies, and under Louisiana law, we are bound to enforce the unambiguous terms of their insurance contracts as written. Accordingly, we conclude that the plaintiffs are not entitled to recover under their policies.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The cases in this appeal are a handful of the more than forty currently pending cases related to Hurricane Katrina that have been consolidated for pretrial purposes in the Eastern District

of Louisiana. In several of the consolidated cases, property owners are suing their insurers to obtain recovery under homeowners, renters, and commercial-property policies for the damage their property sustained during the inundation of water into the city that accompanied the hurricane. This appeal involves four such cases: *Richard Vanderbrook et al. v. Unitrin Preferred Insurance Company et al.* ("the *Vanderbrook* action"), *Xavier University of Louisiana v. Travelers Property Casualty Company of America* ("the *Xavier* action"), *Gladys Chehardy et al. v. State Farm Fire & Casualty Company et al.* ("the *Chehardy* action"), and *Kelly A. Humphreys v. Encompass Indemnity Company* ("the *Humphreys* action").[1] The detailed factual and procedural background of each of these cases follows.

*A. The* Vanderbrook *Action*

In the *Vanderbrook* action, eight individuals ("the *Vanderbrook* plaintiffs") filed a petition for damages in Louisiana state court against their insurers.[2] The *Vanderbrook* plaintiffs allege that "[s]ometime between 10:00 and 11:00 a.m. on August 29, 2005, before the full force of [Hurricane Katrina] reached the City of New Orleans,  **\*197** a small section of the concrete outfall canal wall known as the 17th Street Canal, suddenly broke, causing water to enter the streets of the [c]ity," resulting in damage to their insured property. They assert that the water damage "was not the result of flood, surface water, waves, [tidal] water, tsunami, seiche, overflow of a body of water, seepage under or over the outfall canal wall or spray from any of the above but was water intrusion, caused simply from a broken levee wall."

The *Vanderbrook* plaintiffs allege that their insurers have refused to adjust or pay for their losses, despite "a sudden break in the concrete wall of the levee outfall canal" not being described in any of their policies as an excluded loss. They assert that their insurance policies are contracts of adhesion and are "unduly and unreasonably complex," resulting in their lack of understanding of the policies' provisions. And they allege that the policies' exclusions are so "oppressive" to them and "unreasonably favorable" to the insurers that the exclusions are unconscionable and void. The *Vanderbrook* plaintiffs seek compensatory damages, additional damages for the insurers' arbitrary and capricious conduct, interest, expert fees, and attorney's fees.

Plaintiffs-appellees James Capella and Madeline Grenier were insured through defendant-appellant Hanover Insurance Company ("Hanover"), plaintiffs-appellees Peter Ascani

III and Gregory Jackson were insured through defendant-appellant Standard Fire Insurance Company ("Standard Fire"), and plaintiff-appellee Richard Vanderbrook was insured through defendant-appellant Unitrin Preferred Insurance Company ("Unitrin"). The Hanover,[3] Standard Fire, and Unitrin policies provide coverage for risk of direct physical loss to structures on the property as well as for certain risks of loss to personal property, as long as the loss is not an excluded peril. The policies contain the following flood exclusion:

> We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> ....
>
> ... Water Damage, meaning:
>
> > ... Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind ....

Plaintiffs-cross-appellants Mary Jane Silva and Robert G. Harvey Sr. were insured through defendant-cross-appellee State Farm Fire and Casualty Company ("State Farm"). The State Farm policies insured against loss to the dwelling and for certain losses to personal property except as excluded by the policy. The policies contained the following flood exclusion:

> We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external  **\*198** forces, or occurs as a result of any combination of these:
>
> ....
>
> ... Water Damage, meaning:
>
> > (1) flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, all whether driven by wind or not ....

The *Vanderbrook* action was removed to federal court on the basis of diversity jurisdiction. Hanover, Standard Fire, Unitrin, and State Farm filed Rule 12(c) motions for judgment on the pleadings, contending that the *Vanderbrook* plaintiffs' losses were excluded under their respective policies. In a single eighty-five-page order issued on November 27, 2006, the district court addressed the availability of coverage under the policies at issue in all four cases in this appeal, first addressing the *Vanderbrook* action. With respect to Hanover, Standard Fire, and Unitrin, the district court denied their motions and ruled that the plaintiffs' policies insured them against loss from water damage resulting from levee breaches where the breaches were induced by negligence. The court determined that the policies' flood exclusions were ambiguous because the term "flood" was susceptible to two reasonable definitions: one that relates to floods resulting from natural causes only and one that relates to floods resulting from both natural causes and negligent or intentional acts.

The district court reached this conclusion based on several sources. First, the court discussed dictionary definitions of the term "flood" and opined that the definitions contemplated a natural event caused by rain or tide. Second, the court looked to cases interpreting "water damage" exclusions in the context of ruptured water mains, as well as "earth movement" exclusions, wherein courts have applied a distinction between naturally and non-naturally occurring events. Finally, the court considered but rejected cases that interpreted flood exclusions as extending to inundations of water caused by the rupture of a dam or dike.

Having concluded that the term "flood" as used in the exclusions was ambiguous, the district court construed the Hanover, Standard Fire, and Unitrin policies in the insureds' favor and concluded that the policies covered water damage caused by a ruptured levee where the rupture was due to the levee's inadequate design, construction, or maintenance. Because the plaintiffs alleged that the post-Katrina inundation of water into the City of New Orleans was caused by negligent design, construction, and maintenance of the levees alongside the city's canals, the court decided that if the plaintiffs could prove their allegations, they could prevail. Accordingly, the district court denied Hanover's, Standard Fire's, and Unitrin's motions.

With respect to State Farm's policies, however, the district court concluded that the flood exclusion's "lead-in" clause removed any ambiguity and clearly excluded coverage for

all floods, whether natural or not. The "lead-in" language on which the district court relied provides in part: "We do not insure for such loss [i.e., loss resulting from flood] regardless of ... the cause of the excluded event[ ] or ... whether the event ... arises from natural or external forces." The court granted State Farm's motions and dismissed the actions against it.

## B. The *Xavier* Action

Plaintiff-appellee Xavier University of Louisiana ("Xavier") filed suit against its insurer, defendant-appellant Travelers Property Casualty Company of America ("Travelers"), in federal court on the basis **\*199** of diversity jurisdiction. In its complaint, Xavier alleged that Hurricane Katrina caused in excess of $30 million in damage to insured structures on its campus. The complaint itself does not allege how the damage was caused—i.e., by water inundation from failed levees or otherwise. Xavier avers that it has filed a claim with Travelers and that despite lengthy communication, the insurer has failed to pay for the damage to Xavier's campus. Xavier brings claims for breach of contract and for violations of various provisions of Title 22 of the Louisiana Revised Statutes, seeking compensatory damages, attorney's fees, and statutory penalties.

Xavier's commercial policy with Travelers provided coverage for direct physical loss to buildings and personal property, subject to policy limitations and exclusions. The policy contained the following flood exclusion:

> We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> ....
>
> ... Water
>
> > ... Flood, surface water, waves, tides, tidal waves, overflow of any body of water, or their spray, all whether driven by wind or not ....

Xavier filed a motion for partial summary judgment, seeking a ruling that as a matter of law (1) the damage to Xavier's campus was "caused by ground water which came from the collapses of the 17th Street Canal and the London Avenue Canal levees as a result of man-made causes" and (2) such damage was covered under Xavier's policy with Travelers. The district court granted the motion in part

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

and denied it in part. For the same reasons that the court denied Hanover's, Unitrin's, and Standard Fire's motions in the *Vanderbrook* action, the court granted partial summary judgment in Xavier's favor on the second issue, determining that water damage resulting from a failed levee due to negligence would be covered under the insurance policy. But the court denied Xavier's partial-summary-judgment motion on the question whether the damage to the campus was in fact caused by the collapses of the levees, concluding that there were material questions of fact as to the cause of Xavier's water damage.

### C. The *Chehardy* Action

In the *Chehardy* action, a group of thirty individuals and one corporation ("the *Chehardy* plaintiffs")[4] allege that their real and personal property was damaged or destroyed by the inundation of water into the City of New Orleans that followed Hurricane Katrina. They bring a putative class action[5] against their insurers, asserting **\*200** that their losses were covered by their respective insurance policies.

The defendants in the *Chehardy* action are thirteen insurance companies. Among them is a group of insurers hereinafter called "the ISO Defendants," so named because these insurers used policy forms provided by Insurance Services Office, Inc. The ISO Defendants are defendants-appellants Lafayette Insurance Company ("Lafayette"), Liberty Mutual Fire Insurance Company ("Liberty Mutual"), American Insurance Company ("American"), Auto Club Family Insurance Company ("Auto Club"), Standard Fire, Lexington Insurance Company ("Lexington"), Aegis Security Insurance Company ("Aegis"), and Hanover. The remaining *Chehardy* defendants are defendants-appellants Allstate Indemnity Company and Allstate Insurance Company (collectively, "Allstate"), Louisiana Citizens Property Insurance Corporation ("Louisiana Citizens"), Encompass Insurance Company of America ("Encompass Insurance"), and Great Northern Insurance Company ("Great Northern"), as well as defendant-cross-appellee State Farm.

In their amended complaint, the *Chehardy* plaintiffs allege that after Hurricane Katrina made landfall on August 29, 2005, the New Orleans-area levee system was breached in at least eight places, causing water to be released into the city and adjoining parishes. According to the amended complaint, by 9:00 a.m. on August 29, approximately three hours after the hurricane's landfall, there was six to eight feet of water in the Lower Ninth Ward area of New Orleans, and

approximately eighty percent of Orleans Parish ultimately became submerged. The plaintiffs aver their properties sustained damage as a result of these events.

The *Chehardy* plaintiffs also allege that "any damages attributable to the levee failures are the result of improper and/or negligent design, construction, [or] maintenance of the levees by various third parties and or third party negligence." The complaint refers to engineering reports concluding that "the vast amounts of the water that entered the City of New Orleans and the surrounding parishes came about as the result of levee failures caused by negligent design, negligent maintenance and/or inadequate materials and not by topping of the levees." The complaint also summarizes the testimony of the Chief of the Army Corps of Engineers that "the Corps neglected to consider the possibility that the levee walls atop the 17th Street Canal levee would lurch away from their footings under significant water pressure and eat away at the earthen barriers below" and that "[t]he levees simply failed to work the way they were supposed to work." Additionally, the complaint alleges that "the levee breach of the Industrial Canal to the Lower Ninth Ward side was caused by an inadequately moored barge that crashed into the levee wall, rupturing the levee and compromising its ability to hold water back."

The *Chehardy* plaintiffs assert in their complaint that each was insured under an all-risk insurance policy and that their losses are covered perils under their all-risk policies. They allege that they timely filed claims with their insurers but their insurers denied coverage and have refused to indemnify them. The *Chehardy* plaintiffs acknowledge that their policies contained flood exclusions, but they assert that these exclusions should not be read so broadly as to disallow coverage for their damages because to do so "would contravene **\*201** the very purpose of [all-risk] policies." They posit that the reasonable expectations of Louisiana policyholders would be that "flood" would "encompass[ ] overflowing of the Mississippi River, accumulation of water due to heavy rainfalls, or similar phenomena, but not the failing of" the levees "due to negligent conduct beyond [their] control." Additionally, they opine in their complaint that they should not be deprived of coverage where the insurers "have drafted vague, ambiguous and unclear limitations on coverage"; they allege that although other policies on the market clearly exclude harm caused by the failure of levees, theirs do not.

The *Chehardy* plaintiffs seek a declaratory judgment that the efficient proximate causes of their damage were windstorm, acts of negligence, and storm surge, all of which were covered perils; that "[t]he breaking or failure of boundaries of lakes, reservoirs, rivers, streams, or other bodies of water was a peril not specifically excluded by any of the ... policies"; and that "[t]he damage caused by water entering the City of New Orleans ... due to the breaches in the levees ... neither falls within the regular definition of 'flood,' nor within any of the subject insurance policies' exclusions of 'flood.' " The *Chehardy* plaintiffs also bring claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and insurance bad faith under section 22:1220 of the Louisiana Revised Statutes. Additionally, the plaintiffs bring claims for breach of fiduciary duty against State Farm, Allstate, Liberty Mutual, and other insurers who sell their homeowners insurance policies directly to their customers.

The *Chehardy* plaintiffs did not include in their complaint the pertinent language from their insurance policies, nor did they attach the policies or identify which plaintiff was insured through which defendant. Instead, copies of the policies were attached to the defendants' motions seeking dismissal of the plaintiffs' claims.[6]

The policies of American, Auto Club, Hanover, Lafayette, Lexington, Liberty Mutual, Standard Fire, and Louisiana Citizens are nearly identical in every respect relevant to this appeal. All of these policies provide coverage for risk of direct physical loss to structures on the property as long as the risk is not an excluded peril. They also provide coverage for direct physical loss to personal property but only if the loss is caused by an enumerated peril and not by an excluded peril. With respect to both structures and personal property, the policies contain a list of exclusions that are not insured against—among them, flood. The flood exclusions provide:

**\*202** We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

....

... Water Damage, meaning:

... Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind ....[7]

The Aegis policy is identical in all relevant respects to the above policies, with the exception of the lead-in clause before the flood exclusion. Aegis's policy contains an endorsement deleting the clause that excludes coverage "for loss caused directly or indirectly by" water damage "regardless of any other cause" and replacing it with the following: "We do not insure for loss caused by any of the following." The effect is that Aegis's flood exclusion reads as follows:

We do not insure for loss caused by any of the following.

....

... Water Damage, meaning:

... Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind ....

The Great Northern policies provide coverage for risk of physical loss to the home and its contents except where provided otherwise or excluded by a policy exclusion. The policies contain a "Surface water" exclusion, which provides:

Surface water. We do not cover any loss caused by:

· flood, surface water, waves, tidal water, or water borne material from any of these;

· overflow of water or water borne material from a body of water;

...

from any source, even if driven by wind.

The policies also define "caused by" as "any loss that is contributed to, made worse by, or in any way results from that peril."

The Allstate policies provide coverage for losses to the dwelling and other structures on the insured property except as limited or excluded in the policies, as well as coverage for losses to personal property caused by certain enumerated causes and subject to exclusions. The policies contain the following flood exclusion:

We do not cover loss to [insured] property ... consisting of or caused by:

... Flood, including, but not limited to surface water, waves, tidal water or overflow of any body of water, or spray from any of these, whether or not driven by wind.

The State Farm policies in the *Chehardy* action are identical in every relevant respect to the State Farm policies in the *Vanderbrook* action.

Each of the defendants in the *Chehardy* action filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. (The ISO Defendants filed a consolidated motion to dismiss.) The district court addressed only the claims for breach of contract and the request for declaratory relief. With respect to all defendants except State Farm, the court denied the motions to dismiss for the same reasons it denied the motions for judgment on the pleadings in **\*203** the *Vanderbrook* action. With respect to State Farm, however, the district court granted the motion to dismiss for the same reason it granted State Farm's motion in the *Vanderbrook* action. As to the extra-contractual claims (for breach of the implied covenant of good faith and fair dealing, insurance bad faith, and breach of fiduciary duty), the district court denied the motions to dismiss without prejudice to their being re-urged at a later time, after the resolution of this appeal.

*D. The Humphreys Action*

In the *Humphreys* action, plaintiff-appellee-cross-appellant Kelly A. Humphreys filed suit against her insurer, defendant-appellant-cross-appellee Encompass Indemnity Company ("Encompass Indemnity"), in Louisiana state court.[8] Humphreys alleges that as Hurricane Katrina passed through New Orleans, the city "began pumping storm water runoff through various feeder canals into and through the 17th Street and London Avenue drainage canals into Lake Pontchartrain." "As a result of a 'sudden and accidental event' storm water drainage exerted pressure against the storm wall and levee" erected along the canals, "causing the levee and storm wall to collapse" and "result[ing] in storm waters being distributed over large portions of New Orleans." Humphreys alleges that the cause of the collapse was "inadequate maintenance" of the levee and storm wall on the part of the Orleans Levee District. She avers that as a result of these events, her residence "was inundated with approximately 12 inches of storm water causing major damage to building and contents." She asserts that the efficient proximate cause of her loss was the levee and storm-wall collapse, not flood and surface water. Humphreys states that Encompass Indemnity has failed to pay for her losses, which she asserts were covered under her policy. She brings claims for breach of contract and breach of the duty of good faith and fair dealing, and she seeks compensatory damages, attorney's fees, and treble damages

under various provisions of Title 22 of the Louisiana Revised Statutes.

Humphreys's homeowners policy with Encompass Indemnity covers direct physical loss to real property, as well as direct physical loss to personal property if caused by an enumerated peril. Both the real-property coverage and the personal-property coverage are subject to exclusions, including the following water-damage exclusion:

> We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.
>
> 1. Real Property and Tangible Personal Property. We do not insure for loss:
>
>    a. Caused by water damage, meaning:
>
>       (1) Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

The policy also contains the following "Hurricane Deductible Endorsement":

> We will pay only that part of the total of the loss for all Property Coverages that exceeds the hurricane deductible stated on the Coverage Summary. The hurricane deductible shown on the Coverage Summary applies to all covered property for direct physical loss or damage caused directly or indirectly by a hurricane as defined below. Such deductible **\*204** applies regardless of any other cause or event contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by a hurricane. In no event will the deductible applied for a hurricane loss be less than the property deductible shown on the Coverage Summary.
>
> Hurricane means wind, wind gust, hail, rain, tornado, cyclone or hurricane which results in direct physical loss or damage to property by a storm system that has been declared to be a hurricane by the National Weather Service ....
>
> ....
>
> All other provisions of this policy apply.

The *Humphreys* action was removed to federal court. On June 12, 2006, Humphreys and Encompass Indemnity settled

and agreed to dismiss with prejudice (pursuant to Rule 41) the wind-damage portion of Humphreys's claims as well as the entirety of her bad-faith claim. The parties' stipulation of partial dismissal specified that the remaining claim was the "claim to seek recovery for flood/rising water damage" under the policy.

The next day, Humphreys moved for partial summary judgment, asking the district court to rule that her policy provided coverage for flood damage to her residence pursuant to the policy's hurricane-deductible endorsement. At oral argument before the district court, according to the district court's order, Humphreys's counsel also adopted the *Chehardy, Vanderbrook,* and *Xavier* plaintiffs' arguments concerning the ambiguity of the flood exclusion, and the district court therefore construed Humphreys's partial-summary-judgment motion as also extending to the issue of the flood exclusion's applicability.[9]

The district court granted in part and denied in part Humphreys's motion. The court concluded that the hurricane-deductible endorsement did not itself create or extend coverage and denied Humphreys's partial-summary-judgment motion on this issue. But for the same reasons that the court construed most of the policies in the *Vanderbrook, Xavier,* and *Chehardy* actions as providing coverage, the court concluded that Humphreys's alleged damage was covered under her policy and granted partial summary judgment in her favor on this issue.

*E. Appeal*

The district court certified that its orders involved a controlling question of law as to which there is a substantial ground for a difference of opinion and that appeal may materially advance the ultimate termination of the litigation. All appellants and cross-appellants timely sought leave from this court to appeal from the district court's interlocutory order pursuant to 28 U.S.C. § 1292(b), and we granted their requests.

All defendants except State Farm now appeal the district court's order concluding that the water damage resulting from the levee breaches was not excluded by their policies' flood exclusions. The *Chehardy* plaintiffs and the *Vanderbrook* plaintiffs cross appeal the district court's grant of State Farm's motions to dismiss. And **\*205** Humphreys cross appeals the district court's denial of her motion for partial summary

judgment on the issue whether her policy's hurricane-deductible endorsement provides coverage for her losses.

II. STANDARD OF REVIEW

**[1]    [2]    [3]**    We review de novo the district court's order on a motion to dismiss for failure to state a claim under Rule 12(b)(6). The "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.' " *Martin K. Eby Constr. Co. v. Dallas Area Rapid Transit,* 369 F.3d 464, 467 (5th Cir.2004) (quoting *Jones v. Greninger,* 188 F.3d 322, 324 (5th Cir.1999)). To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007).[10] "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965 (quotation marks, citations, and footnote omitted).

**[4]**    Generally, in deciding a motion to dismiss for failure to state a claim, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment." Fed.R.Civ.P. 12(b). In this case, that would normally include the insurance contracts, since those documents were not attached to the complaints. But because the defendants attached the contracts to their motions to dismiss, the contracts were referred to in the complaints, and the contracts are central to the plaintiffs' claims, we may consider the terms of the contracts in assessing the motions to dismiss. *See Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir.2004) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." (citing *Collins v. Morgan Stanley Dean Witter,* 224 F.3d 496, 498–99 (5th Cir.2000))).

**[5]    [6]**    We also review de novo the district court's decision on a Rule 12(c) motion for judgment on the pleadings. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.,* 313 F.3d 305, 312 (5th Cir.2002) (citing *Hughes v. Tobacco Inst., Inc.,* 278 F.3d 417, 420 (5th Cir.2001)). The standard for deciding such a motion is the same as that for a Rule 12(b)(6) motion to dismiss for failure to state a claim. *See id.* at 313 n. 8; *see also* 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1368 (3d ed.2004). "The central issue is whether, in the light most favorable to the

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

plaintiff, the complaint states a valid claim for relief." *Great Plains Trust Co.,* 313 F.3d at 312 (citing *Hughes,* 278 F.3d at 420).

[7] We review a grant of summary judgment de novo, viewing all evidence in the light most favorable to the nonmoving ***206** party and drawing all reasonable inferences in that party's favor. *See Crawford v. Formosa Plastics Corp.,* 234 F.3d 899, 902 (5th Cir.2000). "Summary judgment is proper when the evidence reflects no genuine issues of material fact and the non-movant is entitled to judgment as a matter of law." *Id.* (citing Fed.R.Civ.P. 56(c)). "A genuine issue of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party.' " *Id.* (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

## III. DISCUSSION

### A. Controlling Law

[8] [9] In diversity cases such as these, federal courts must apply state substantive law. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Ashland Chem. Inc. v. Barco Inc.,* 123 F.3d 261, 265 (5th Cir.1997). In determining which state's substantive law controls, the court applies the choice-of-law rules of the forum state. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The parties agree that in these Louisiana actions involving the interpretation of insurance policies issued in Louisiana for property located in Louisiana, Louisiana's substantive law controls. *Cf. Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.,* 352 F.3d 254, 260 (5th Cir.2003).

[10] [11] To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court. *See id.* In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented with the same case. *See id.* In making an *Erie* guess, we must employ Louisiana's civilian methodology, whereby we first examine primary sources of law: the constitution, codes, and statutes. *Id.* (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.,* 328 F.3d 192, 197 (5th Cir.2003); *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.,* 179 F.3d 169 (5th Cir.1999). "Jurisprudence, even when it rises to the level of *jurisprudence constante,* is a secondary law source in Louisiana." *Prytania Park Hotel,* 179 F.3d at 169 (footnote

omitted); *see also Am. Int'l Specialty Lines Ins. Co.,* 352 F.3d at 261 (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.,* 953 F.2d 985, 988 (5th Cir.1992)). Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them. *Am. Int'l Specialty Lines Ins. Co.,* 352 F.3d at 261.

[12] [13] Under Louisiana law, "[a]n insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil Code." *Cadwallader v. Allstate Ins. Co.,* 848 So.2d 577, 580 (La.2003). The Louisiana Civil Code provides that "[i]nterpretation of a contract is the determination of the common intent of the parties." La. Civ.Code Ann. art. 2045 (1987); *see also Cadwallader,* 848 So.2d at 580; *La. Ins. Guar. Assoc. v. Interstate Fire & Cas. Co.,* 630 So.2d 759, 763 (La.1994). An insurance contract must be "construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any rider, endorsement, or application attached to or made a part of the policy." La.Rev.Stat. Ann. § 22:654 (2004). Interpretation of an insurance contract generally involves a question of law. *Bonin v. Westport Ins. Corp.,* 930 So.2d 906, 910 (La.2006) (citing ***207** *Robinson v. Heard,* 809 So.2d 943, 945 (La.2002)); *see also La. Ins. Guar. Assoc.,* 630 So.2d at 764.

[14] "The words of a contract must be given their generally prevailing meaning." La. Civ.Code Ann. art. 2047 (1987); *see also Cadwallader,* 848 So.2d at 580. "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La. Civ.Code Ann. art. 2046 (1987). "If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written." *Cadwallader,* 848 So.2d at 580.

Where, however, an insurance policy includes ambiguous provisions, the "[a]mbiguity ... must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions." *La. Ins. Guar. Ass'n,* 630 So.2d at 763 (citing La. Civ.Code Ann. art. 2050 (1987) ("Each provision in a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole.")). "Words susceptible of different meanings must be interpreted as having the meaning that best

*In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)*

conforms to the object of the contract." La. Civ.Code Ann. art. 2048 (1987). "A provision susceptible of different meanings must be interpreted with a meaning that renders it effective and not with one that renders it ineffective." *Id.* art. 2049 (1987).

**[15]  [16]**  Ambiguity may also be resolved through the use of the reasonable-expectations doctrine—i.e., "by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered." *La. Ins. Guar. Ass'n,* 630 So.2d at 764 (quoting *Breland v. Schilling,* 550 So.2d 609, 610–11 (La.1989)). "The court should construe the policy 'to fulfill the reasonable expectations of the parties in light of the customs and usages of the industry.' " *Id.* (quoting *Trinity Indus., Inc. v. Ins. Co. of N. Am.,* 916 F.2d 267, 269 (5th Cir.1990)). "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." La. Civ.Code Ann. art. 2053 (1987).

**[17]  [18]**  "If after applying the other general rules of construction an ambiguity remains, the ambiguous contractual provision is to be construed against the drafter, or, as originating in the insurance context, in favor of the insured." *La. Ins. Guar. Ass'n,* 630 So.2d at 764. Article 2056 of the Louisiana Civil Code provides: "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." La. Civ.Code Ann. art. 2056 (1987). "Under this rule of strict construction, equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer." *Cadwallader,* 848 So.2d at 580. "That strict construction principle applies only if the ambiguous policy provision is susceptible to two or more *reasonable* interpretations; for the rule of strict construction to apply, the insurance policy must be not only susceptible to two or more interpretations, but each of the alternative interpretations must be reasonable." *Id.* The fact that a term is not defined in the policy itself does not alone make that term ambiguous. *Am. Deposit Ins. Co. v. Myles.* 783 So.2d 1282, 1287 (La.2001).

**\*208  [19]  [20]**  "An insurance contract, however, should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably

contemplated by unambiguous terms or achieve an absurd conclusion." *Cadwallader,* 848 So.2d at 580. "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms." *Id.*

**[21]  [22]  [23]**  The policies in this case—which are homeowners, renters, and commercial-property policies— are all-risk policies. All-risk policies "create[ ] a special type of coverage that extends to risks not usually covered under other insurance; recovery under an all-risk policy will be allowed for all fortuitous losses not resulting from misconduct or fraud, unless the policy contains a specific provision expressly excluding the loss from coverage." *Alton Ochsner Med. Found. v. Allendale Mut. Ins. Co.,* 219 F.3d 501, 504 (5th Cir.2000) (applying Louisiana law) (citing *U.S. Indus., Inc. v. Aetna Cas. & Sur. Co.,* 690 F.2d 459, 461 (5th Cir.1982)). Insurers may, however, limit their liability under all-risk policies: "[A]bsent a conflict with statutory provisions or public policy, insurers, like other individuals, are entitled to limit their liability and to impose and to enforce reasonable conditions upon the policy obligations they contractually assume." *Carbon v. Allstate Ins. Co.,* 719 So.2d 437, 440 (La.1998) (citing *La. Ins. Guar. Assoc.,* 630 So.2d at 763); *see also Bonin,* 930 So.2d at 911. But "[e]xclusionary provisions in insurance contracts are strictly construed against the insurer, and any ambiguity is construed in favor of the insured." *Ledbetter v. Concord Gen. Corp.,* 665 So.2d 1166, 1169 (La.2006) (citing *Garcia v. St. Bernard Parish Sch. Bd.,* 576 So.2d 975, 976 (La.1991)).

*B. Flood Exclusions*

The plaintiffs contend that their policies' flood exclusions do not unambiguously exclude coverage for losses caused by an inundation of water resulting from a breached levee where the breach occurred in part because the levee was negligently designed, constructed, or maintained. The plaintiffs urge us to conclude that the term "flood" is ambiguous in this context and that the policies must be construed in favor of coverage. By contrast, the insurers maintain that the policies unambiguously exclude coverage for the inundation of water resulting from the breached levees.

**[24]**  The Louisiana Supreme Court has not interpreted a flood exclusion in the context of breached levees. We must therefore make an *Erie* guess and determine, in our best judgment, how that court would resolve the issue if presented

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

with this case.[11] *Am. Int'l Specialty Lines Ins. Co.,* 352 F.3d 254 at 260.

**\*209  [25]**  The plaintiffs first contend that because the term "flood" is not defined in the policies, it is ambiguous—indeed, the *Chehardy* plaintiffs say that the term's undefined status makes it per se ambiguous—requiring us to construe the term in favor of coverage. But the fact that a term used in an exclusion "is not defined in the policy itself ... alone does not make the exclusion ambiguous; instead, [the court] will give the term its generally prevailing meaning." *Am. Deposit Ins. Co.,* 783 So.2d at 1287 (citing La. Civ.Code art. 2047); *see also Hendricks v. Am. Employers Ins. Co.,* 176 So.2d 827, 830 (La.Ct.App.1965);[12] *accord Bay Cities Paving & Grading, Inc. v. Lawyers' Mut. Ins. Co.,* 5 Cal.4th 854, 21 Cal.Rptr.2d 691, 855 P.2d 1263, 1270 (1993) (rejecting rule that absence of definition makes term ambiguous even where term has generally accepted meaning and stating: "[A]ny rule that rigidly presumed ambiguity from the absence of a definition would be illogical and unworkable. To avoid the ambiguity perceived ..., an insurer would have to define every word in its policy, the defining words would themselves then have to be defined, their defining words would have to be defined, and the process would continue to replicate itself until the result became so cumbersome as to create impenetrable ambiguity.").

The plaintiffs also maintain that because the insurers could have more explicitly excluded floods that are caused in part by negligence, their failure to do so in these policies makes the flood exclusions ambiguous. Specifically, the *Chehardy* plaintiffs point to evidence that before Hurricane Katrina struck, the insurer defendants knew about the availability of policy forms that more explicitly excluded floods caused in part by man but that they elected not to amend their policies' language accordingly. Xavier, which was insured through Travelers, also points to its policy's "earth movement" exclusion, which excludes earth movements "whether natural or man made"; Xavier asserts that Travelers thus knew how to clearly exclude man-made floods but did not do so. Similarly, the district court compared the flood exclusions in most of the policies with those in the policies of State Farm and Hartford Insurance Company of the Midwest,[13] remarking **\*210** that those insurers succeeded with little effort in clearly excluding water damage resulting from negligent acts and that the other insurers could have done so as well.

**[26]**  But the fact that an exclusion could have been worded more explicitly does not necessarily make it ambiguous.

*See La. Ins. Guar. Ass'n,* 630 So.2d at 766 ("[T]hough ... the Interstate policy could have more clearly delineated its payment obligation, 'that fact does not mandate the conclusion that the policy was legally ambiguous.' " (quoting *Garmany v. Mission Ins. Co.,* 785 F.2d 941, 945–46 (11th Cir.1986))). Nor does the fact that other policies have more explicitly defined the scope of similar exclusions. As the Louisiana Supreme Court stated in *Cadwallader* when interpreting the term "relative":

> The appellate court further erred in reaching a conclusion that because some insurance policies specifically include foster children in their policy definition of "relative" or "family member," the term "relative" is somehow rendered ambiguous in the policy at issue. In making this assumption, the appellate court ignored the fundamental precept that it was required to interpret the term using its plain, ordinary and generally prevailing meaning as set forth in the policy at hand .... It is the particular insurance policy of the insured that establishes the limits of liability and it is well established that this contract of insurance is the law between the parties. When we find the contract of insurance is clear and unambiguous ... we must enforce the policy as written.

848 So.2d at 583. We therefore reject the plaintiffs' arguments that the flood exclusions in the policies before us are ambiguous in light of more specific language used in other policies.[14]

**[27]**  Furthermore, even where the scope of an exclusion is not readily apparent, we do not immediately construe that exclusion in favor of coverage. Instead, we first apply the general rules of contract construction set forth in the Civil Code. *La. Ins. Guar. Ass'n,* 630 So.2d at 764. Under those rules, we give the words of a contract their "generally prevailing meaning." La. Civ.Code Ann. art. 2047. Dictionaries, treatises, and jurisprudence are helpful resources in ascertaining a term's generally prevailing meaning. *See Gregor v. Argenot Great Cent. Ins. Co.,* 851 So.2d 959, 964 (La.2003) ( "Dictionaries are a valuable source for determining the 'common and approved usage' of words."); *Cadwallader,* 848 So.2d at 581–83 (looking to dictionaries, treatises, and jurisprudence to interpret the term "relative"). When the words of a policy provision are clear and unambiguous in the context of the facts of the case and do not lead to an absurd result, we apply the provision as written without any further interpretation. *See Cloud v. Nat'l Auto. Ins. Co.,* 875 So.2d 866, 870 (La.Ct.App.2004); La. Civ.Code Ann. art. 2046.

[28]  [29]  To ascertain the generally prevailing meaning of the term "flood," we begin by considering dictionary definitions of the term. Each of the dictionaries we **\*211** have accessed lists more than one definition of "flood," but the existence of more than one definition of a term does not itself make the term ambiguous. *Citation Ins. Co. v. Gomez,* 426 Mass. 379, 688 N.E.2d 951, 953 (1998); *see also* Webster's Third New International Dictionary Explanatory Notes at 17a n.12.4 (2002) (explaining that when a word has multiple definitions, the best definition "is the one that most aptly fits the context of an actual genuine utterance"). Likewise, when "a word has two meanings, one broad and one more restrictive included within the broader meaning, it does not follow that the narrower meaning was intended." *Comm. Union Ins. Co. v. Advance Coating Co.,* 351 So.2d 1183, 1186 (La.1977); *see also Falgout v. Walter Jester, Hampton Inc.,* 883 So.2d 515, 520 (La.Ct.App.2004).

The Oxford English Dictionary has two pertinent definitions of "flood": (1) "[a]n overflowing or irruption[15] of a great body of water over land not usually submerged; an inundation, a deluge" and (2) "[a] profuse and violent outpouring of water; a swollen stream, a torrent; a violent downpour of rain, threatening an inundation." 5 Oxford English Dictionary 1075–76 (2d ed.1989). Webster's Dictionary defines "flood" as "a rising and overflowing of a body of water that covers land not usu[ally] under water ... [;] an outpouring of considerable extent ... [;] a great downpour." Webster's Third New International Dictionary 873 (2002). The sixth edition of Black's Law Dictionary defines "flood" as follows: "An inundation of water over land not usually covered by it. Water which inundates area of surface of earth where it ordinarily would not be expected to be." Black's Law Dictionary 640 (6th ed.1990). "Flood" itself is not defined in the current (eighth) edition of Black's Law Dictionary, but "floodwater" is defined as "[w]ater that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel." Black's Law Dictionary 1622 (8th ed.2004). The most straightforward definition comes from the American Heritage Dictionary: "An overflowing of water onto land that is normally dry." American Heritage Dictionary of the English Language 674 (4th ed.2000). Finally, of particular interest is the discussion of "flood" in the Columbia Encyclopedia, which specifically includes in the definition the inundation of water resulting from the bursting of a levee:

> [I]nundation of land by the rise and overflow of a body of water. Floods occur most commonly when water from heavy rainfall, from melting ice and snow, or from a combination of these exceeds the carrying capacity of the river system, lake, or ocean into which it runs ....

> ... Less predictable are *floods resulting from ... the bursting of a natural or man-made dam or levee.*

> ....

> In the United States the Johnstown, Pa., flood of 1889, in which thousands of lives were lost, was caused by the breaking of an earth dam above the city.

Columbia Encyclopedia 1002 (6th ed.2000) (emphasis added).

We also consider the definitions of "flood" in treatises. Appleman's Insurance Law and Practice defines "flood waters" as "those waters above the highest line of the ordinary flow of a stream, and generally speaking they have overflowed a river, stream, or natural water course and have formed a continuous body with the **\*212** water flowing in the ordinary channel." 5 John Alan Appleman & Jean Appleman, Insurance Law and Practice § 3145 (1970). And Couch on Insurance defines "flood" as "the overflow of some body of water that inundates land not usually covered with water." Steven Plitt et al., Couch on Insurance § 153:54 (3d ed.2006) [hereinafter Couch]. Couch also states that the term "flood" is generally unambiguous. *Id.* § 153:49.

Additionally, we look to jurisprudence, both from Louisiana courts and from courts outside Louisiana. In *Riche v. State Farm Fire & Casualty Co.,* an intermediate Louisiana court interpreted a policy's exclusion for "flood, surface water, tidal water or tidal wave, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not." 356 So.2d 101, 103 (La.Ct.App.1978). The plaintiff in *Riche* was fishing in a boat on a lake when a windstorm caused the boat to sink, *id.* at 103, and he sought recovery under his homeowners insurance policy for the loss of his fishing gear, which was on the boat when it sank, *id.* at 102. The court held that the exclusion did not preclude the plaintiff's recovery, reasoning that the "exclusion, when read as a whole, contemplates only such damage caused by water which has risen over and covered areas not ordinarily covered by water" and does not extend to "damage caused by windstorm (or resulting waves) over a body of water, such as a lake or reservoir." *Id.* at 103–04. *Riche,* however, is of limited value in this case because its determination was simply that a

Case 7:21-cv-00247    Document 32-1    Filed on 06/29/22 in TXSD    Page 139 of 427

*In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)*

water-damage exclusion applied only to losses that occurred on areas not normally covered by water (i.e., dry land) and not to a loss occurring on a body of water. *See id.* at 103–04; *see also* Couch, *supra,* at § 153:54 (citing *Riche* for the proposition that "[b]ecause a flood is generally understood to mean the inundation of land, claims by insurers that the inundation of a boat on the water is an excluded flood are generally unsuccessful"). Unlike in *Riche,* the losses in this case occurred on land that is normally dry.

Where courts outside Louisiana have considered whether a flood exclusion similar to the ones here unambiguously precludes coverage for water damage resulting from the failure of a structure such as a dam or dike, they have uniformly declared that the inundation of water falls within the language of the exclusion. Russell G. Donaldson, Annotation, *What is "Flood" Within Exclusionary Clause of Property Damage Policy,* 78 A.L.R.4th 817 (1990 & Supp.2007) (citing *Kane v. Royal Ins. Co. of Am.,* 768 P.2d 678 (Colo.1989); *Bartlett v. Cont'l Divide Ins. Co.,* 697 P.2d 412 (Colo.Ct.App.1984); and *E.B. Metal & Rubber Indus., Inc. v. Fed. Ins. Co.,* 84 A.D.2d 662, 444 N.Y.S.2d 321 (N.Y.App.Div.1981)).[16]

The most prominent such case is *Kane,* which arose in the context of the failure of **\*213** the Lawn Lake Dam in Colorado. *See* 768 P.2d at 679. As a result of the dam failure, water swept into the Fall River and inundated the plaintiffs' insured property, causing extensive damage. *Id.* The plaintiffs argued that their all-risk policies provided coverage for the damage, even though the policies contained flood exclusions.[17] *Id.* at 680. The Colorado Supreme Court rejected this argument and construed the term "flood" as extending to the water damage resulting from the dam failure. The court relied in part on dictionary definitions and the definition of "flood" in Appleman's treatise and observed that "[t]he inundation of insureds' normally dry land falls squarely within these generally accepted definitions of the term 'flood.' " *Id.* at 681. Concluding that the term was unambiguous in light of its generally accepted meaning and in the context of the facts of the case, the court declared that "there is no doubt that this large-scale inundation of water was a 'flood.' " *Id.*[18]

In *Wallis v. Country Mutual Insurance Co.,* an Illinois intermediate court stated **\*214** that the "plain and ordinary meaning" of "flood" is "water that escapes from a watercourse in large volumes and flows over adjoining property in no regular channel ending up in an area where it would not

normally be expected." 309 Ill.App.3d 566, 243 Ill.Dec. 344, 723 N.E.2d 376, 383 (2000). The court held that it was immaterial that a particular watercourse was originally man-made as long as it had a defined bed, visible banks, and a recurrent water flow. *See id.* Indeed, the court observed that a permanent watercourse with these characteristics is considered a natural watercourse. *See id.* at 382; *see also* Black's Law Dictionary 1623 (8th ed. 2004) ("If [a man-made] watercourse is of a permanent character and has been maintained for a sufficient length of time, it may be considered a natural watercourse ...."). Accordingly, the *Wallis* court held that water that had overflowed a man-made creek's banks and damaged the plaintiff's house was a flood within the plain and ordinary meaning of the term, *id.* at 383, and that the plaintiff's loss was excluded by his insurance policy's flood exclusion, *id.* at 384.

In light of these definitions, we conclude that the flood exclusions are unambiguous in the context of this case and that what occurred here fits squarely within the generally prevailing meaning of the term "flood." When a body of water overflows[19] its normal boundaries and inundates an area of land that is normally dry, the event is a flood. This is precisely what occurred in New Orleans in the aftermath of Hurricane Katrina. Three watercourses—the 17th Street, Industrial, and London Avenue Canals—overflowed their normal channels, and the levees built alongside the canals to hold back their floodwaters failed to do so. As a result, an enormous volume of water inundated the city. In common parlance, this event is known as a flood.

Additionally, a levee is a *flood*-control structure; its very purpose is to prevent the floodwaters of a watercourse from overflowing onto certain land areas, i.e., to prevent floods from becoming more widespread. *See* 50 Am.Jur.2d *Levees and Flood Control* § 1 (2006) (defining "levee" as "an embankment constructed along the edge of a river to prevent flooding" and describing levees as one of three principal means of flood prevention and control); Webster's Third New International Dictionary 1300 (2002) (defining "levee" as "an embankment designed to prevent flooding"). By definition, whenever a levee ruptures and fails to hold back floodwaters, the result is a more widespread flood. That a levee's failure is due to its negligent design, construction, or maintenance does not change the character of the water escaping through the levee's breach; the waters are still floodwaters, and the result is a flood.

The plaintiffs, however, attempt to inject ambiguity into the term "flood" by asserting **\*215** that a reasonable interpretation of the term is that it refers only to inundations of water with "natural" causes, not those with a "non-natural" cause. The plaintiffs rely primarily on cases interpreting flood exclusions in the context of broken water mains. They also assert, applying two canons of construction, *noscitur a sociis* and *ejusdem generis*, that a flood includes only natural events because the other terms in the water-damage exclusions are natural phenomena. Additionally, they contend that a reasonable policyholder would expect that only naturally occurring floods would be excluded.

Before we address these contentions, we first question the notion that the flood in this case was non-natural. The plaintiffs focus on the alleged negligent design, construction, or maintenance of the levees as being the cause of the flood, and we accept as true (for the purpose of assessing the motions to dismiss) their allegation that the canals' floodwaters would not have reached their property had the negligence not occurred. This focus, however, ignores the sizeable natural component to the disaster: a catastrophic hurricane and the excess water associated with it. The non-natural component is simply that in certain areas, man's efforts to mitigate the effect of the natural disaster failed, with devastating consequences. But if man's failure to adequately prepare for a natural disaster could alone transform the disaster into a non-natural event outside the scope of a policy's exclusion, it is difficult to conceive how an insurer could ever exclude the resulting loss; any natural event could be recharacterized as non-natural either because man's preventative measures were inadequate or because man failed to take preventative measures at all.

Even if we accept the plaintiffs' characterization of the flood in this case as non-natural, we disagree that the term "flood" in this context is limited to natural events. The plaintiffs first maintain that dictionary definitions support their interpretation, but the dictionaries we have reviewed make no distinction between floods with natural causes and those with non-natural causes.[20] Indeed, the Columbia Encyclopedia specifically states that a flood may result from the bursting of a levee. *See* Columbia Encyclopedia 1002. Similarly, Appleman's treatise states: "A 'flood,' contemplated by the exclusion, can result from either natural or artificial causes." 5 John Alan Appleman & Jean Appleman, *supra*, at § 3145 (Supp.2007) (citing *Kane*, 768 P.2d 678).

The plaintiffs next rely heavily on a line of cases, arising in the context of broken water mains, holding that the term "flood" in a policy's exclusion was ambiguous based on a distinction between natural and non-natural events. For example, in *Ferndale Development Co. v. Great American Insurance Co.*, a Colorado intermediate court observed that "[s]everal cases have held that ['flood'] appl[ies] only in cases where 'natural' water sources are involved," **\*216** and it concluded that the term was ambiguous and thus did not extend to water from a burst water main. 34 Colo.App. 258, 527 P.2d 939, 940 (1974); *see also Ebbing v. State Farm Fire & Cas. Co.*, 67 Ark.App. 381, 1 S.W.3d 459 (1999) (following *Ferndale* and concluding that "the term 'flood' is unambiguous but that its common usage applies to water occasioned from natural events rather than a burst water main"). Similarly, a New York intermediate court held that a flood exclusion did not apply in the context of a broken water main because the term "flood" "connotes an inundation; a deluge." *Popkin v. Sec. Mut. Ins. Co. of N.Y.*, 48 A.D.2d 46, 48, 367 N.Y.S.2d 492 (N.Y.App.Div.1975). That court also opined that even if the term "flood" is to be read broadly so as to include any "great quantity" of water, the term should be construed in light of the other terms in the exclusion (surface water, waves, tidal water, tidal wave, etc.), which it stated "relate to natural phenomena." *Id.*; *see also Ender v. Nat'l Fire Ins. Co. of Hartford*, 169 A.D.2d 420, 421, 563 N.Y.S.2d 85 (N.Y.App.Div.1991) (following *Popkin* and concluding that flood exclusion did not bar recovery for damage resulting from water-main break because the exclusion "preclude[d] only recovery for damages arising from natural causes, not from artificial devices"); *cf. Mellon v. Hingham Mut. Fire Ins. Co.*, 19 Mass.App.Ct. 933, 472 N.E.2d 674, 675 (1984) (concluding that exclusion for "water below the surface of the ground" did not exclude damage from drainage pipe's rupture because the "loss was caused by an accidental break rather than a natural occurrence" and, as a fortuity, was "the kind of risk an 'all risk' policy is designed to cover").[21]

Although we do not quibble with the results reached in the water-main cases, we do not believe that a distinction between natural and non-natural causes is applicable in this context. First, unlike a canal, a water main is not a body of water or watercourse. Many (although not all) dictionary definitions define "flood" as an overflow or inundation of a body of water or watercourse.[22] Likewise, Appleman's treatise observes that flood waters generally come from a "river, stream, or natural **\*217** water course."[23] 5 John Alan Appleman & Jean Appleman, *supra*, at § 3145. So where a water-main break is involved, it is less clear that the flow of water is within the

generally prevailing meaning of "flood." *See Kane,* 768 P.2d at 681 (reasoning that in the context of a ruptured water main, the term "flood" is ambiguous in part "because a water main is not so clearly a body of water" (quotation marks omitted)); *Wallis,* 243 Ill.Dec. 344, 723 N.E.2d at 383 (distinguishing between rupture of water main and overflow of watercourse, regardless of whether the watercourse was originally man-made or forged from nature). Couch on Insurance recognizes a distinction between water-main breaks and the overflow of a body of water and opines that the body-of-water delineation is more useful than the natural/non-natural distinction in determining whether an event is a flood:

> Some jurisdictions attempt to distinguish naturally occurring floods from inundations from artificial or man-made causes such as dams or water mains. Such distinctions lead to apparent inconsistencies. For example, an inundation from the failure of a dam is considered a flood, while water pouring from a broken water main is not a flood. Therefore, distinguishing events based on whether the inundation had a natural or artificial cause may be unhelpful, especially if the policy itself does not make such a distinction. Instead, the key to reconciling these cases lies in the common definition of a flood as an overflow from a body of water. Thus, when the inundation results from the overflow of a body of water, whether natural or artificial, the event is a flood. Conversely, if the inundation does not arise from the overflow of a body of water, as when a water main breaks, the event is not a flood.

Couch, *supra,* at § 153:54 (footnotes omitted).[24]

Second, the amount of water generally released from a broken water main is not comparable to the massive inundation of water that occurred when the levees in New Orleans ruptured. *Cf. Kane,* 768 P.2d at 681 (distinguishing water-main cases on the basis that the amount of water released from a broken water main is "less clearly an inundation or deluge" (quotation marks omitted)). A broken water main or other pipe would generally be expected to produce more localized water damage and lacks the same potential to inundate large swaths of land that a breached levee or a failed dam would have. Although the plaintiffs argue that the quantity of water involved should make no difference and that the key inquiry instead should be the cause of the water damage, inherent in the definition of "flood" is the concept of inundation or deluge, and it seems apparent that the greater the inundation involved in an event, the more clearly that event is a flood. *See Popkin,* 48 A.D.2d at 48, 367 N.Y.S.2d 492 (concluding that flood exclusion does not encompass

*218 water-main break because the term "flood" "connotes an inundation; a deluge").

Third, and most important, unlike water mains, levees are flood-control structures, which by definition means that they interact with floodwaters. Because levees are man-made, one could point to man's influence nearly any time a levee fails. If a levee fails despite not being overtopped by the floodwaters, it is because the levee was not adequately designed, constructed, or maintained. If a levee fails due to the floodwaters overtopping it or loosening its footings, it is because the levee was not built high enough or the footings were not established strongly or deeply enough. Even where a levee does not fail, one could find a non-natural flood; where a properly designed and constructed levee causes floodwaters to be diverted downstream to another area of land, the resulting flood downstream occurs because the levee performs as designed. Any time a flooded watercourse encounters a man-made levee, a non-natural component is injected into the flood, but that does not cause the floodwaters to cease being floodwaters. *Cf. Smith v. Union Auto. Indem. Co.,* 323 Ill.App.3d 741, 257 Ill.Dec. 81, 752 N.E.2d 1261, 1267 (2001) (concluding that surface water does not lose its characterization as surface water simply because it is touched or affected by man-made structures). The distinction between natural and non-natural causes in this context would therefore lead to absurd results and would essentially eviscerate flood exclusions whenever a levee is involved. Consequently, we decline to follow this approach in this case. *See* La. Civ.Code Ann. art. 2049 (directing the court to interpret a term with a meaning that renders that term effective).

[30] [31] The plaintiffs additionally contend that the canons of construction known as *noscitur a sociis* and *ejusdem generis* support the proposition that the term "flood" is limited to purely natural events.[25] Although we have concluded that the distinction between natural and non-natural events in this context is unworkable and would lead to absurd results, we will nonetheless engage the plaintiffs' arguments about these canons. Under the canon of *noscitur a sociis,* a term is interpreted by considering the meaning of the terms associated with it. *See United States v. Golding,* 332 F.3d 838, 844 (5th Cir.2003) (per curiam); Black's Law Dictionary 1087 (8th ed. 2004) ("A canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it."). Under the canon of *ejusdem generis,* "where general words follow the enumeration of particular classes of persons or things, the general words will be construed as applicable only

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

to persons or things of the same general nature or class as those enumerated." *First Am. Title Ins. Co. v. First Trust Nat'l Ass'n (In re Biloxi Casino Belle Inc.),* 368 F.3d 491, 500 (5th Cir.2004); *see also* Black's Law Dictionary 556 (8th ed.2004). The plaintiffs assert that under these canons, the term "flood" includes only naturally occurring events because the other terms in the water-damage exclusions—e.g., "surface water," "waves," "tidal water," and "overflow of a body of water"— are events that occur naturally.

We disagree that the other terms in the exclusion necessarily refer to natural events. For example, a "surface water" **\*219** exclusion has been held to bar coverage where the inadequate design of a drainage system caused water to accumulate rather than drain away, resulting in water damage. *See Front Row Theatre, Inc. v. Am. Mfr.'s Ins. Cos.,* 18 F.3d 1343, 1348 (6th Cir.1994) (applying Ohio law). And the term "waves" has been held to "encompass[ ] both those waves which are motivated by natural forces and those motivated by artificial forces" such as passing motorboats. *See O'Meara v. Am. States Ins. Co.,* 148 Ind.App. 563, 268 N.E.2d 109, 111– 12 (1971). Since at least some of the terms immediately surrounding "flood" in the water-damage exclusions also relate to both natural and non-natural events, the canon of *noscitur a sociis* does not support the plaintiffs' proposed limitation of the term "flood." And *ejusdem generis* is not at all applicable in interpreting "flood" in the exclusions before us. This canon is used to interpret general terms (e.g., "and the like") following a list of specific terms. *See First Am. Title Ins. Co.,* 368 F.3d at 500. But "flood" is not a general term; it is one of the specific terms listed in the definition of "water damage." Moreover, if we were to employ these canons to justify a distinction between natural and non-natural floods in the context of the facts before us, we would be injecting ambiguity into an otherwise unambiguous term. We decline to do so. *See Tourdot v. Rockford Health Plans, Inc.,* 439 F.3d 351, 354 (7th Cir.2006) (stating that *ejusdem generis* applies only where a term is ambiguous, that it may not be used "both to create and to resolve the ambiguity," and that it "may not be used to defeat the obvious purpose or plain meaning of the text"); *Schenkel & Shultz, Inc. v. Homestead Ins. Co.,* 119 F.3d 548, 551 (7th Cir.1997) ("We cannot use the doctrine [of *noscitur a sociis*] to create uncertainty in an otherwise unambiguous term ....").

[32]    The plaintiffs finally contend that the reasonable expectations of homeowners insurance policyholders would be that damage resulting from man-made floods would be covered. "[A]scertaining how a reasonable insurance policy

purchaser would construe the clause at the time the insurance contract was entered" is one way that ambiguity in an exclusion clause may be resolved. *La. Ins. Guar. Ass'n,* 630 So.2d at 764. But "Louisiana law ... precludes use of the reasonable expectations doctrine to recast policy language when such language is clear and unambiguous." *Coleman v. Sch. Bd. of Richland Parish,* 418 F.3d 511, 522 (5th Cir.2005). As we have explained, the flood exclusions in the policies are unambiguous in the context of the specific facts of this case; thus, we need not resort to ascertaining a reasonable policyholder's expectations. For the sake of thoroughness, however, we will briefly address a few of the parties' arguments.

First, the plaintiffs assert that because their policies are all- risk policies, they have a heightened expectation of coverage and that a reasonable policyholder thus would not expect water damage resulting from third-party negligence to be excluded. Although a few courts have stated that insureds with all-risk policies have "heightened expectations" of coverage, *see, e.g., Murray v. State Farm Fire & Cas. Co.,* 203 W.Va. 477, 509 S.E.2d 1, 14 (1998), we are not aware of any Louisiana court that has so held. And although all- risk policies do generally extend to all fortuitous losses, this is true only to the extent that the policy does not expressly exclude the loss from coverage. *See Alton Ochsner Med. Found.,* 219 F.3d at 504. Each policy in this case contains a specific provision expressly excluding damage caused by flood, and none of the exclusions indicates that whether a particular flood is excluded depends on whether its cause is purely **\*220** natural. Given the generally prevailing use of the term "flood," we believe a reasonable policyholder would expect a massive inundation of water from a breached levee to be excluded, notwithstanding the all-risk nature of the policies.

Second, the plaintiffs assert that because many of the policies contained a "Hurricane Deductible Endorsement," reasonable policyholders would expect those policies to cover damage resulting from a hurricane. Many of the policies contained an endorsement materially similar to the following, from Humphreys's policy with Encompass Indemnity:

We will pay only that part of the total of the loss for all Property Coverages that exceeds the hurricane deductible stated on the Coverage Summary. The hurricane deductible shown on the Coverage Summary applies to all covered property for direct physical loss or damage caused directly or indirectly by a hurricane as defined below. Such deductible applies regardless of any other cause or event

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

contributing concurrently or in any sequence to the loss. No other deductible provision in the policy applies to direct physical loss caused by a hurricane. In no event will the deductible applied for a hurricane loss be less than the property deductible shown on the Coverage Summary.

Hurricane means wind, wind gust, hail, rain, tornado, cyclone or hurricane which results in direct physical loss or damage to property by a storm system that has been declared to be a hurricane by the National Weather Service ....

....

All other provisions of this policy apply.

The plaintiffs assert that in light of this language, a reasonable policyholder would have expected the water damage in this case to be covered. Humphreys goes a step further and argues that the hurricane-deductible endorsement in her policy actually expands coverage to extend to any property damage caused by a hurricane.

But the plain language of the hurricane-deductible endorsements indicates that they do nothing more than alter the deductible for damage caused by a hurricane. Nothing in the language of the endorsements purports to extend coverage for floods or to restrict flood exclusions; indeed they do not even include flood or water (other than rain) in the definition of "hurricane." Further, the endorsements state that all other provisions of the policies apply, indicating that the flood exclusions remain in effect. The hurricane-deductible endorsements therefore would not give a reasonable policyholder the impression that flood resulting from a breached levee would be covered.

Finally, several defendants[26] argue that in light of flood insurance available though the National Flood Insurance Program ("NFIP"), a reasonable policyholder would not expect homeowners policies to cover the flooding in this case. The defendants assert that we may consider the NFIP in interpreting "flood" because custom and industry usage is relevant under article 2053 of the Civil Code. They contend that the NFIP's existence over many years has made it clear to property owners that standard all-risk policies do not cover flood damage, regardless of whether the cause of the flood is natural or non-natural, and that property owners who want flood coverage must purchase it through the NFIP; a reasonable policyholder thus would not **\*221** expect the inundation of water in this case to be covered under

a standard homeowners, renters, or commercial-property insurance policy.

The plaintiffs, in contrast, urge us not to consider the NFIP, contending that it has no bearing on this appeal. And to the extent the NFIP may be relevant, the plaintiffs argue that a reasonable policyholder would expect the NFIP to provide coverage for naturally occurring floods but that floods induced by negligence would be covered under standard all-risk policies.

We do not rely upon the NFIP to decide this appeal. Our decision is based instead upon our determination that the flood exclusions in the policies before us unambiguously preclude the plaintiffs' recovery. But to the extent the NFIP's definition of "flood" is further evidence of the term's generally prevailing meaning, we note that it is consistent with our interpretation. Standard insurance policies issued under the NFIP define "flood" as follows:

A general and temporary condition of partial or complete inundation of two or more acres of normally dry land area or of two or more properties (one of which is [the policyholder's] property) from:

a. Overflow of inland or tidal waters;

b. Unusual and rapid accumulation or runoff of surface waters from any source;

c. Mudflow.

44 C.F.R. Pt. 61, App. A(1), App. A(2), App. A(3) (2006); *see also* Federal Emergency Management Agency, FloodSmart.gov: What is a Flood?, http://www.floodsmart.gov/floodsmart/pages/whatflood.jsp (last visited July 25, 2007). The NFIP makes no distinction between inundations of water caused by natural levee ruptures and those caused by man-made ruptures (even if such a distinction were workable). The canals' overflowing into the City of New Orleans due to the levee ruptures was certainly an overflow of inland waters as used in the NFIP's definition, and it may also have been an unusual and rapid runoff of surface waters.

In sum, we conclude that the flood exclusions in the plaintiffs' policies are unambiguous in the context of the facts of this case. In the midst of a hurricane, three canals running through the City of New Orleans overflowed their normal boundaries. The flood-control measures, i.e., levees, that man had put in place to prevent the canals' floodwaters from reaching

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

the city failed. The result was an enormous and devastating inundation of water into the city, damaging the plaintiffs' property. This event was a "flood" within that term's generally prevailing meaning as used in common parlance, and our interpretation of the exclusions ends there. The flood is unambiguously excluded from coverage under the plaintiffs' all-risk policies, and the district court's conclusion to the contrary was erroneous.[27]

C. *Efficient Proximate Cause and Anti–Concurrent–Causation Clauses*

Lastly we turn to the doctrine of efficient proximate cause. Under this doctrine, as it is applied in many jurisdictions, where a loss is caused by a combination of a covered risk and an excluded risk, the loss is covered if the covered risk was the efficient proximate cause of the loss.[28] *222 *See, e.g., Chadwick v. Fire Ins. Exch.,* 17 Cal.App.4th 1112, 21 Cal.Rptr.2d 871, 873 (1993); *Kish v. Ins. Co. of N. Am.,* 125 Wash.2d 164, 883 P.2d 308, 311 (1994); *see also* Couch, *supra,* at §§ 101:43–:45,:53–: 55. The efficient proximate cause of the loss is the dominant, fundamental cause or the cause that set the chain of events in motion. *See* Couch, *supra,* at § 101:45.

Many of the insurance policies at issue in this appeal excluded "loss caused directly or indirectly by" flood "regardless of any other cause or event contributing concurrently or in any sequence to the loss." This language, which the district court referred to as an anti-concurrent-causation clause, has been recognized as demonstrating an insurer's intent to contract around the operation of the efficient-proximate-cause rule. *See, e.g., TNT Speed & Sport Ctr., Inc. v. Am. States Ins. Co.,* 114 F.3d 731, 732–33 (8th Cir.1997).

The district court considered the anti-concurrent-causation clauses in this case and concluded that they are inapplicable here because there were not two separate causes of the plaintiffs' damage. The court remarked that this case does not present a combination of forces that caused damage and that it therefore is not analogous to cases where Hurricane Katrina may have damaged property through both wind and water. *Cf. Tuepker v. State Farm Fire & Cas. Co.,* No. 1:05-CV-599, 2006 WL 1442489, 2006 U.S. Dist. LEXIS 34710 (S.D.Miss. May 24, 2006) (unpublished opinion) (Hurricane Katrina case involving alleged damage from wind, rain, and storm surge), *appeal docketed,* Nos. 06–61075 & 06–61076 (5th Cir.). Instead, the court stated that "in this case the 'cause' conflates to the flood," meaning that the alleged

negligent design, construction, or maintenance of the levees and the resulting flood were not separate causes of the plaintiffs' losses. Consequently, the court concluded that the anti-concurrent-causation clauses needed not be addressed at that time but stated that they may need to be addressed at later stages in the litigation.

On appeal, several insurers rely in part on the language in their anti-concurrent-causation clauses to demonstrate that floods are excluded regardless of the cause. The *Chehardy* plaintiffs respond that "the District Court correctly determined that the anti-concurrent causation clauses were inapplicable," contending that the cause of their damage ("man-made inundation of water or inundation resulting from third-party negligent acts") was a covered peril.[29] Xavier responds that the district court "correctly noted that [the anti-concurrent-causation clause] is inapplicable because there is no separate or other cause of damage."

**[33]**    We agree with the district court's determination that we need not address whether insurers may contract around the *223 efficient-proximate-cause rule under Louisiana law, nor need we address the operation of the efficient-proximate-cause rule itself in this case. The efficient-proximate-cause doctrine applies only where two or more distinct actions, events, or forces combined to create the loss. *See Pieper v. Commercial Underwriters Ins. Co.,* 59 Cal.App.4th 1008, 69 Cal.Rptr.2d 551, 557 (1997) ("For the efficient proximate cause theory to apply, ... there must be two separate or distinct perils ...."); *Kish,* 883 P.2d at 311 ("The efficient proximate cause rule applies only where two or more independent forces operate to cause the loss."). But here, on these pleadings, there are not two independent causes of the plaintiffs' damages at play; the only force that damaged the plaintiffs' properties was flood. To the extent that negligent design, construction, or maintenance of the levees contributed to the plaintiffs' losses, it was only one factor in bringing about the flood; the peril of negligence did not act, apart from flood, to bring about damage to the insureds' properties. Consequently, as the plaintiffs argue and as the district court held, the efficient-proximate-cause doctrine is inapplicable. *See Chadwick,* 17 Cal.App.4th at 1117, 21 Cal.Rptr.2d 871 ("When, however, the evidence shows the loss was in fact occasioned by only a single cause, albeit one susceptible to various characterizations, the efficient proximate cause analysis has no application."); *see also Cornhusker Cas. Co. v. Farmers Mut. Ins. Co.,* 268 Neb. 168, 680 N.W.2d 595, 601–02 (2004); *Kish,* 883 P.2d at 311.

Moreover, to the extent that the plaintiffs do attempt to recharacterize the cause of their losses by focusing on negligence as the cause rather than water damage, their argument fails. "An insured may not avoid a contractual exclusion merely by affixing an additional label or separate characterization to the act or event causing the loss." *Kish,* 883 P.2d at 311; *Chadwick,* 21 Cal.Rptr.2d at 874. "If every possible characterization of an action or event were counted an additional peril, the exclusions in all-risk insurance contracts would be largely meaningless." *Chadwick,* 21 Cal.Rptr.2d at 874. Thus, in *Pieper v. Commercial Underwriters Insurance Co.,* where a policy covered loss caused by arson but excluded loss caused by brush fire, a brush fire caused by arson was excluded. 69 Cal.Rptr.2d at 557–58. The *Pieper* court determined that the cause of the brush fire was irrelevant; the plaintiffs' property was damaged by one cause alone, brush fire, and thus, the efficient-proximate-cause rule was inapplicable. *Id.* And in *Kish v. Insurance Co. of North America,* where a policy covered loss caused by rain but excluded loss caused by flood, the court held that the insured could not avoid the operation of the flood exclusion by merely recharacterizing the flood as rain. 883 P.2d at 311–13. The court held that there was one cause of the plaintiffs' loss—rain-induced flood—which was excluded, and concluded that the efficient-proximate-cause rule was inapplicable. *Id.* We similarly reject any attempt on the plaintiffs' part to avoid the operation of the flood exclusion by recharacterizing the flood as negligence; the sole cause of the losses for which they seek coverage in this litigation, flood, was excluded from coverage regardless of what factors contributed to its development.

In sum, we need not address the applicability of anti-concurrent-causation clauses or the efficient-proximate-cause rule because, as pleaded, there was not more than one separate cause of the plaintiffs' losses. As the district court recognized, there are other cases arising in the context of Hurricane Katrina where these issues may come into play, but this is not the case for their resolution.

**\*224** IV. CONCLUSION

With respect to the *Vanderbrook* action, the district court's grant of State Farm's motion for judgment on the pleadings is AFFIRMED. The denial of the motions for judgment on the pleadings filed by Hanover and Standard Fire is VACATED and REMANDED.

With respect to the *Xavier* action, the motion to certify questions to the Louisiana Supreme Court is DENIED. The district court's grant of partial summary judgment in favor of Xavier is VACATED and REMANDED.

With respect to the *Chehardy* action, the motion to certify questions to the Louisiana Supreme Court is DENIED. The district court's grant in part of State Farm's motion to dismiss is AFFIRMED. And the denial of the motions to dismiss filed by Lafayette, Liberty Mutual, American, Auto Club, Standard Fire, Lexington, Aegis, Hanover, Allstate, Louisiana Citizens, Encompass Insurance, and Great Northern pertaining to the claims for declaratory judgment and breach of contract is VACATED and REMANDED.

With respect to the *Humphreys* action, the district court's denial of Humphreys's partial-summary-judgment motion on the question of coverage under the policy's hurricane-deductible endorsement is AFFIRMED. The grant of partial summary judgment in Humphreys's favor on the question of the interpretation of the policy's flood exclusion is VACATED and REMANDED.

Motions DENIED; AFFIRMED in part, VACATED in part, and REMANDED for further proceedings consistent with this opinion. The appellees shall bear the cost of this appeal.

**All Citations**

495 F.3d 191

Footnotes

1    The *Humphreys* action was initially consolidated with the remaining cases, but on Encompass Indemnity Company's motion, the district court severed it from the consolidated case.

2    The *Vanderbrook* plaintiffs also sued the Board of Commissioners for the Orleans Levee District for the Parish of Orleans, but the claim against that defendant is not at issue in this appeal.

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

3      At oral argument before the district court, a copy of Madeline Grenier's policy with Hanover that contains only the odd-numbered pages was inserted into the record. Because the copy of the policy in the record is incomplete, we cannot adequately review it. Consequently, we leave it to the district court on remand to obtain a copy of the entire policy and to interpret it consistently with this opinion.

4      The *Chehardy* plaintiffs comprise plaintiffs-appellees-cross-appellants Gladys Chehardy; Daniel and Jacquelyn Fontanez; Larry and Glendy Forster; Kenneth and Judy Maier; Randy and Lori Gervais; Andre and Marlin Mauberret; Debbie and Dave Strawn; Stephanie and Brad Boyd; New Orleans Flooring Supply, Inc.; Shawn and Angelina Burst; Patricia Brown; Marie Fatheree; Katrina Daniels; Lionel and Edna Jones; Karen Lewis; Shane Sylvester; Austra Zapata; Sabrina Perkins; Eldridge Pollard; Michael Peterson; Wendell Glation; and Mack Barham.

5      The amended complaint defines the class of policyholders as

> all owners in the Parishes of Orleans, St. Bernard, and Jefferson, State of Louisiana, who own immovable property with improvements, principally houses or related residential structures, as well as personal property located there, which was destroyed or damaged by winds generated by Hurricane Katrina in excess of their respective policy deductibles and not reimbursed by their insurance companies, but excluding members of the judiciary, their administrative staff and any other personnel who may cause a member of the Louisiana bench to be unable to preside over this action.

6      In its order, the district court stated that it was unable to identify with certainty which *Chehardy* plaintiffs were insured through which defendants:

> The Court has attempted to ascertain this information for purposes of specificity with respect to its ensuing orders herein; however, there is some confusion which prevents the Court from doing so. In addition to which, the information provided is not in the record. However, it has been represented to the Court by counsel that all insurers herein have provided at least one policy to one plaintiff, thus the Court will enter its orders with respect to the insurers and will not be able to identify the specific plaintiff who is [a]ffected by such order.

We examined the record on appeal and identified what appear to be insurance policies corresponding with each named *Chehardy* plaintiff except Wendell Glation and Andre and Marilyn Mauberret. With respect to those plaintiffs, we granted unopposed motions to supplement the record on appeal with copies of their policies. Nevertheless, we leave it to the district court on remand to identify with certainty which plaintiff was insured under which policy (or policies) for the purposes of orders to be entered subsequent to this appeal.

7      The only variations in language between these policies are immaterial to this appeal. For example, American and Hanover substitute the words "loss or damage" for "loss," Hanover inserts "any" before "body of water," and Hanover names its exclusion "Water" rather than "Water Damage."

8      Humphreys amended her petition to add the Orleans Levee District as a defendant. Her claims against the Orleans Levee District are not at issue in this appeal.

9      Encompass Indemnity disputes that Humphreys properly asserted the issue of the flood exclusion's applicability in her motion for partial summary judgment. Encompass Indemnity characterizes the district court's grant of partial summary judgment in Humphreys's favor on this issue as sua sponte and contends that it did not receive Rule 56(c)'s requisite notice. Because we conclude that even if Encompass Indemnity did have notice, the grant of partial summary judgment was nonetheless erroneous, we need not address whether Encompass Indemnity received the required notice.

10     We have often stated that a claim should not be dismissed under Rule 12(b)(6) unless the plaintiff would not be entitled to relief under any set of facts or any possible theory he may prove consistent with the allegations in the complaint. *See, e.g., Martin K. Eby Constr.,* 369 F.3d at 467 (quoting *Jones,* 188 F.3d at 324). This standard derived from *Conley v. Gibson,* which stated that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). But recently in *Bell Atlantic,* the Supreme Court made clear that the *Conley* rule is not "the minimum standard of adequate pleading to govern a complaint's survival." 127 S.Ct. at 1968–69.

11    The motions of Xavier and the *Chehardy* plaintiffs to certify the questions raised in this appeal to the Louisiana Supreme Court pursuant to Rule XII of the Louisiana Supreme Court Rules are denied. Although we acknowledge that the Louisiana Supreme Court has not issued a definitive ruling on the interpretation of a flood exclusion in the context of the facts before us, this is not alone sufficient to warrant certification. *See Jefferson v. Lead Indus. Ass'n, Inc.,* 106 F.3d 1245, 1247 (5th Cir.1997) (per curiam) ("Alone, the absence of a definitive answer from the state supreme court on a particular question is not sufficient to warrant certification."). Because the rules of contract interpretation set forth in the Louisiana Civil Code provide us with an adequate basis to decide this appeal, we decline the certification requests. *Cf. Swearingen v. Owens–Corning Fiberglas Corp.,* 968 F.2d 559, 564 (5th Cir.1992) (refusing to certify question where "decisional analysis is relatively straightforward").

12    The *Chehardy* plaintiffs cite *Hendricks* for the proposition that if an insurance company fails to define a pertinent term of the policy or exclusionary provision, the court must adopt the meaning of that term most favorable to the policyholders. But *Hendricks* states: "Where ... a particular word or phrase is not defined [in the insurance policy], the courts will endeavor by means of generally accepted legal techniques to ascertain the common and popular meaning of such word or phrase." 176 So.2d at 830. Rather than immediately construe the undefined term in favor of the insured, the *Hendricks* court first looked to dictionary definitions and other cases to determine if the term was ambiguous. *See id.* at 830–31.

The *Chehardy* plaintiffs also cite *Arnette v. NPC Services, Inc.,* 808 So.2d 798 (La.Ct.App.2002). In that case the term being construed was "professional duty" in the context of a professional-liability exclusion. The *Arnette* court did state: "Further, because 'professional duty' is undefined in the First State policy, we conclude the professional liability exclusion is ambiguous and must be construed in favor of NUS and against First State." *Id.* at 803. But the term "professional duty," unlike "flood," lacks any generally prevailing meaning in common parlance, and it thus provided no clear indication of what coverage was being excluded. *Arnette* cannot stand for the proposition that even though a term has a generally accepted meaning outside the context of the policy, the policy's failure to define it nonetheless makes it ambiguous; otherwise *Arnette* would conflict with article 2047's command to give the words of a contract their generally prevailing meaning. *See* La. Civ.Code Ann. art. 2047.

13    Hartford Insurance Company of the Midwest ("Hartford") was a defendant in the *Vanderbrook* action. The district court granted Hartford's motion to dismiss for failure to state a claim because its policy explicitly excluded coverage for loss caused by release of water held by a levee. The *Vanderbrook* plaintiffs do not appeal this aspect of the district court's order, and Hartford is therefore not a party to this appeal.

14    To the extent that the plaintiffs also argue that the language of the other policies may be used to resolve ambiguity (not simply to demonstrate that an ambiguity exists), we need not look to other policies because the flood exclusions in the policies before us are unambiguous in the context of these facts.

15    "Irruption" is "[t]he action of bursting or breaking in; a violent entry, inroad, incursion, or invasion, esp[ecially] of a hostile force or tribe." 8 Oxford English Dictionary 104 (2d ed.1989).

16    The plaintiffs argue that *E.B. Metal,* which involved a broken dike, may be distinguished because the flood exclusion in that case included in the definition of "flood" the phrase "rising (including overflowing or *breaking of boundaries*) of lakes, reservoirs, rivers, streams, or other bodies of water." 84 A.D.2d at 662–63 (emphasis added). The plaintiffs assert that "breaking of boundaries" would include breaches of levees. We agree that *E.B. Metal's* rationale may not be fully applicable to this case on this basis. Nevertheless, the plaintiffs have not directed us to any authority contradicting the proposition that in the context of a broken dam, levee, or other similar structure, courts have reached a consensus that the term "flood" is unambiguous and that flood exclusions preclude recovery.

We also do not include in our analysis *TNT Speed & Sport Center, Inc. v. American States Insurance Co.,* 114 F.3d 731 (8th Cir.1997), or *Pakmark Corp. v. Liberty Mutual Insurance Co.,* 943 S.W.2d 256 (Mo.Ct.App.1997), because the parties in those cases did not dispute that a flood had occurred. Nor do we rely on *Florida East Coast Railway v. United States,* 519 F.2d 1184 (5th Cir.1975), or other cases interpreting the phrase "floods or flood waters" in 33 U.S.C. § 702c, which grants the United States immunity for damage resulting from floods, because the scope of the government's immunity may be broader than the exclusions in the policies before us, which we must strictly construe. *See Ledbetter,* 665 So.2d at 1169.

17    The flood exclusions in *Kane* provided:

  The Company shall not be liable for loss:

  ....

  12. caused by, resulting from, contributed to, or aggravated by any of the following:

  ....

  (b) flood, surface water, waves, tidal water or tidal waves, overflow of streams or other bodies of water, or spray from any of the foregoing, all whether driven by wind or not.

  768 P.2d at 679–80 (omissions in original).

18    The district court attempted to distinguish *Kane* in three ways, none of which withstands scrutiny. First, the district court opined that *Kane* "applied the broadest possible definition" of the term "flood," whereas Louisiana law requires exclusions to be narrowly construed. It is not clear on what basis the district court believed *Kane* applied the broadest possible definition. The *Kane* court stated that it simply determined that in the context of the facts before it, the flood exclusion was unambiguous, and it applied the exclusion as written. This is entirely consistent with Louisiana law. *See Cadwallader,* 848 So.2d at 580 ("If the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written.").

  Second, the district court erroneously inferred that the failure of the Lawn Lake Dam in *Kane* resulted from water overtopping the dam. The court opined that this factually distinguished *Kane* from the case before us, where the allegations are not that the levees were overtopped but that they collapsed when faced with conditions they should have withstood. The district court relied on the following statement in *Kane*: "Although leakage from a ruptured city water line does not fall within [Appleman's] definition [of 'flood'], the *rising and overflowing* of Fall River does .... [T]he Fall River clearly *overflowed* above the highest line of its ordinary flow." *Kane,* 768 P.2d at 682 (emphases added; brackets and quotation marks omitted). But *Kane* never stated nor implied that water overtopped the *dam*; instead, it stated that the *river,* which was downstream from the dam, overflowed its ordinary boundaries due to the large volume of water pouring in from the failed dam.

  Third, the district court observed that it was unclear from *Kane* whether Colorado follows the doctrine of efficient proximate cause, pointing to the clause: "the 'efficient moving cause' rule, if it were to be adopted by this court." *Id.* at 685. Assuming without deciding that Louisiana does follow the efficient-proximate-cause doctrine, the doctrine has no impact on how a term within a policy exclusion should be construed. The doctrine comes into play only when both a covered loss and an excluded loss are identified. *See Pieper v. Commercial Underwriters Ins. Co.,* 59 Cal.App.4th 1008, 69 Cal.Rptr.2d 551, 557 (1997). This distinction therefore is immaterial.

19    The district court noted the presence of the word "overflowing" in many of the dictionary definitions and explicitly equated "overflowing" with "overtopping" (even though the term "overtopping" was nowhere to be found in the definitions), referring to the definitions as "the 'overtopping' definitions." Since the levees' failures here are not alleged to have occurred due to water overtopping the levees, the court inferred that the breaches did not result in a flood. But the court's substitution of "overtopping" for "overflowing" was erroneous. "Overflow" means (1) "[t]o flow over; to overspread or cover with water or other liquid; to flood, inundate"; (2) "[t]o pass or spread over like a flood, so as to pervade, fill, cover, submerge, overwhelm, etc."; and (3) "[t]o flow over (the brim, banks, or sides)." 10 Oxford English Dictionary 1086. This is much broader than "overtop," which means "[t]o rise over or above the top of; to surpass in height, surmount, tower above, top." *Id.* at 1131.

20    Xavier points to the mentioning of "Act of God" in the sixth edition of Black's Law Dictionary's definition of "flood" as authority for limiting floods to natural events. Since an "Act of God" is "[a]n act occasioned exclusively by forces of nature without the interference of any human agency," Black's Law Dictionary 33 (6th ed.1990), Xavier posits that for an event to be a flood, it must be purely natural. But Black's Law Dictionary does not include "Act of God" in the definition of "flood" or indicate that they are entirely synonymous; it instead cross-references (i.e., it states, "*See also* ") "Act of God" at the end of the definition. *See id.* at 640. This singular cross-reference is not sufficient to persuade us that the dictionary definitions

of "flood" limit it to purely naturally occurring events. Furthermore, as we explained, the flood occurred here in the context of an enormous hurricane, and it thus had a significant natural component.

21    The plaintiffs also rely on cases interpreting "earth movement" exclusions in insurance policies. Such exclusions typically define "earth movement" as including earthquake, volcanic eruption, landslide, subsidence, mud flow, sink hole, erosion, sinking, shifting, and settling. *See, e.g., Murray v. State Farm Fire & Cas. Co.,* 203 W.Va. 477, 509 S.E.2d 1, 8 (1998). "A small majority of jurisdictions hold that [such] exclusions do not apply to earth movements that are non-natural in origin or source." Couch, *supra,* at § 153:65 (collecting cases); *see also id.* §§ 153:66–:67; *Fayad v. Clarendon Nat'l Ins. Co.,* 899 So.2d 1082, 1086–89 (Fla.2005); *Murray,* 509 S.E.2d at 4–5, 10; *Peach State Uniform Serv., Inc. v. Am. Ins. Co.,* 507 F.2d 996, 1000 (5th Cir.1975) (applying Georgia law).

We do not question the holdings or the rationale of the earth-movement cases. But the usefulness of a distinction between natural and non-natural causes in one context does not necessarily mean that the distinction is warranted in an unrelated context. These two contexts are unrelated in part because the term "earth movement," unlike "flood," does not have a generally prevailing meaning in common parlance. And as we explain, a distinction between natural and non-natural causes in the context of a broken levee would be unworkable and would yield absurd results.

22    The Oxford English Dictionary and Webster's Dictionary refer to "body of water." 5 Oxford English Dictionary 1075–76; Webster's Third New International Dictionary 873. Black's Law Dictionary refers to "watercourse." Black's Law Dictionary 1622 (8th ed.2004). And the Columbia Encyclopedia refers to "river system, lake, or ocean." Columbia Encyclopedia 1002.

23    A man-made watercourse may be considered natural if it is permanent and has been maintained for a sufficient length of time. Black's Law Dictionary 1623 (8th ed.2004); *see also Wallis v. Country Mut. Ins. Co.,* 309 Ill.App.3d 566, 243 Ill.Dec. 344, 723 N.E.2d 376, 382 (2000) (stating that a permanent watercourse with a defined bed, visible banks, and a recurrent water flow is considered natural, even if it was originally man-made).

24    Xavier's counsel contended at oral argument that the canals in this case were not bodies of water because they were man-made. We disagree; the canals in this case are plainly watercourses, regardless of their man-made genesis. And a flood may result from the overflow of a watercourse regardless of whether it was man-made. *See Wallis,* 243 Ill.Dec. 344, 723 N.E.2d at 383.

25    In the context of interpreting earth-movement exclusions, some courts have applied these canons of construction to support a distinction between naturally and non-naturally occurring earth movements. *See* Couch, *supra,* at § 153:66; *Murray v. State Farm Fire & Cas. Co.,* 203 W.Va. 477, 509 S.E.2d 1, 9 (1998).

26    Specifically, Standard, Hanover, Great Northern, and the ISO Defendants make this argument.

27    Because we reach this conclusion, we need not address the issue raised in the cross-appeals of the impact of the "lead-in" language in the State Farm policies.

28    To our knowledge, the Louisiana Supreme Court has not addressed the applicability of the efficient-proximate-cause doctrine in the context of an all-risk policy. But it has concluded in the context of interpreting a windstorm insurance policy (which provided coverage only for loss caused by windstorm) that "if a windstorm is the dominant and efficient cause of the loss, the insured may recover notwithstanding that another cause or causes contributed to the damage suffered." *Lorio v. Aetna Ins. Co.,* 255 La. 721, 232 So.2d 490, 493 (1970); *see also Roach–Strayhan–Holland Post No. 20, Am. Legion Club, Inc. v. Continental Ins. Co. of N.Y.,* 237 La. 973, 112 So.2d 680, 683 (1959) ("[I]t is sufficient, in order to recover upon a windstorm insurance policy not otherwise limited or defined, that the wind was the proximate or efficient cause of the loss or damage, notwithstanding other factors contributing thereto."). We express no opinion on the extent to which Louisiana follows the efficient-proximate-cause rule in the context of all-risk policies because we conclude that the rule is inapplicable to this case.

29    The *Vanderbrook* plaintiffs and Humphreys adopted the *Chehardy* plaintiffs' arguments.

In re Katrina Canal Breaches Litigation, 495 F.3d 191 (2007)

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

892 F.3d 719
United States Court of Appeals, Fifth Circuit.

INNOVA HOSPITAL SAN
ANTONIO, LIMITED
PARTNERSHIP, Plaintiff–Appellant,
v.
BLUE CROSS AND BLUE SHIELD OF
GEORGIA, INCORPORATED, doing business
as Anthem Blue Cross and Blue Shield of
Georgia; Health Care Service Corporation, a
Mutual Legal Reserve Company; Blue Cross
and Blue Shield of Alabama; Carefirst of
Maryland, Incorporated, formerly known as
Blue Cross and Blue Shield of Maryland,
Incorporated; Community Insurance Company;
Highmark, Incorporated, doing business
as HighMark Blue Cross Blue Shield of
Pennsylvania; Premera Blue Cross; BCBSM,
Incorporated, doing business as Blue Cross
Blue Shield of Minnesota; Blue Cross and Blue
Shield of Michigan; Wellmark, Incorporated,
doing business as Blue Cross and Blue
Shield of Iowa; Blue Cross; Blue Shield of
Mississippi, a Mutual Insurance Company;
Anthem Health Plans of Virginia, Incorporated,
doing business as Anthem Blue Cross and Blue
Shield of Virginia; Louisiana Health Service;
Indemnity Company, doing business as Blue
Cross Blue Shield of Louisiana; Bluecross
Blueshield of Tennessee, Incorporated; Usable
Mutual Insurance Company, doing business
as Arkansas Blue Cross and Blue Shield; Blue
Cross of California, Defendants–Appellees.

No. 14-11300
|
June 12, 2018

**Synopsis**
**Background:** Out-of-network medical services providers, as assignees, brought action under Employee Retirement Income Security Act (ERISA) and Texas common law against insurers and plan administrators, alleging underpayment or non-payment of reimbursement amounts pursuant to terms of various health benefit plans. The United States District Court for the Northern District of Texas, Reed Charles O'Connor, J., 2014 WL 10212850, dismissed the action. Providers appealed.

**Holdings:** The Court of Appeals, Jennifer Walker Elrod, Circuit Judge, held that:

[1] provider stated claim under ERISA for plan benefits without identifying specific language of every plan provision at issue;

[2] provider stated breach of contract claim against insurer without identifying specific language of every health insurance plan provision at issue;

[3] briefing on appeal was inadequate as to provider's claims under ERISA alleging failure to provide full and fair review and violations of claims procedure, and therefore it forfeited them;

[4] provider had adequate mechanism for redress, and therefore it could not recover on ERISA breach of fiduciary duty claim that requested equitable relief in form of surcharge; and

[5] provider forfeited argument that district court abused its discretion in denying its motion for leave to amend its complaint out of time.

Affirmed in part, reversed in part, and remanded.

West Headnotes (26)

[1]     **Federal Courts** ⟜ Pleading
        The Court of Appeals reviews a dismissal for
        failure to state a claim de novo. Fed. R. Civ. P.
        12(b)(6).

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

6 Cases that cite this headnote

**[2]**     **Federal Courts** ⟶ Pleading

The Court of Appeals reviews a denial of leave to amend a complaint for abuse of discretion. Fed. R. Civ. P. 15.

1 Cases that cite this headnote

**[3]**     **Federal Civil Procedure** ⟶ Construction of pleadings

**Federal Civil Procedure** ⟶ Matters deemed admitted; acceptance as true of allegations in complaint

On a motion to dismiss, a court must accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(b)(6).

14 Cases that cite this headnote

**[4]**     **Federal Civil Procedure** ⟶ Matters considered in general

Generally, a court ruling on a motion to dismiss for failure to state a claim upon which relief can be granted may rely on the complaint, its proper attachments, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. Fed. R. Civ. P. 12(b)(6).

28 Cases that cite this headnote

**[5]**     **Federal Civil Procedure** ⟶ Insufficiency in general

**Federal Civil Procedure** ⟶ Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, a complaint must contain sufficient factual matter which, when taken as true, states a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

42 Cases that cite this headnote

**[6]**     **Federal Civil Procedure** ⟶ Insufficiency in general

On a motion to dismiss for failure to state a claim upon which relief can be granted, a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged; the facts alleged must be enough to raise a right to relief above the speculative level, but the complaint may survive a motion to dismiss even if recovery seems very remote and unlikely. Fed. R. Civ. P. 12(b)(6).

26 Cases that cite this headnote

**[7]**     **Federal Civil Procedure** ⟶ Insufficiency in general

On a motion to dismiss for failure to state a claim upon which relief can be granted, the complaint must provide more than conclusions, but it need not contain detailed factual allegations. Fed. R. Civ. P. 12(b)(6).

17 Cases that cite this headnote

**[8]**     **Labor and Employment** ⟶ Amount of Benefits

**Labor and Employment** ⟶ Pleading

Out-of-network medical services provider, as assignee, stated claim under ERISA for plan benefits without identifying specific language of every plan provision at issue, on allegations, among other things, that it made numerous attempts to obtain plan documents, it provided health care services to patients insured by plan administrators, provider verified coverage before providing services, administrators uniformly failed to pay claims according to terms of plan documents or individual insurance policies, representative plan terms required reimbursement of out-of-network providers at 80% of "reasonable and customary" expenses after deductible, and administrators reimbursed provider at average rate of 11%. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(1)(B); Fed. R. Civ. P. 12(b)(6).

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

23 Cases that cite this headnote

[9]    **Labor and Employment**  ⇐ Pleading

ERISA plaintiffs should not be held to an excessively burdensome pleading standard that requires them to identify particular plan provisions in ERISA contexts when it may be extremely difficult for them to access such plan provisions. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(1)(B).

9 Cases that cite this headnote

[10]    **Federal Civil Procedure**  ⇐ Claim for relief in general

The notice pleading standard does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions. Fed. R. Civ. P. 8.

[11]    **Federal Civil Procedure**  ⇐ Depositions and Discovery

Counsel have an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith responses to legitimate discovery requests.

9 Cases that cite this headnote

[12]    **Federal Civil Procedure**  ⇐ Claim for relief in general

When discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint. Fed. R. Civ. P. 8.

20 Cases that cite this headnote

[13]    **Federal Civil Procedure**  ⇐ Insufficiency in general

While a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, a court must take account of his or her limited access to crucial information on a motion to dismiss for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).

9 Cases that cite this headnote

[14]    **Insurance**  ⇐ Amounts Payable

**Insurance**  ⇐ Pleading

**Labor and Employment**  ⇐ Amount of Benefits

**Labor and Employment**  ⇐ Pleading

Out-of-network medical services provider, as assignee, stated breach of contract claim under Texas law against insurer without identifying specific language of every health insurance plan provision at issue, on allegations, among other things, that it made numerous attempts to obtain plan documents, it provided health care services to patients insured by plan administrators, provider verified coverage before providing services, administrators uniformly failed to pay claims according to terms of plan documents or individual insurance policies, representative plan terms required reimbursement of out-of-network providers at 80% of "reasonable and customary" expenses after deductible, and administrators reimbursed provider at average rate of 11%. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(1)(B).

16 Cases that cite this headnote

[15]    **Contracts**  ⇐ Grounds of action

Under Texas law, the essential elements of a breach of contract claim are the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant, and damages sustained as a result of the breach.

18 Cases that cite this headnote

[16]    **Federal Courts**  ⇐ Failure to mention or inadequacy of treatment of error in appellate briefs

Briefing on appeal by out-of-network medical services provider, as assignee, was inadequate

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

as to its claims under ERISA alleging failure to provide full and fair review and violations of claims procedure, and therefore it forfeited them in action against plan administrator alleging underpayment or non-payment of reimbursement amounts pursuant to terms of various health benefit plans; provider devoted only few sentences to discussing those claims in its opening brief and failed even to address district court's stated basis for dismissing those claims. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(3).

[17]    **Federal Courts**   Specification of errors; points and arguments

At the very least, pressing a claim on appeal, as required to avoid forfeiture, means clearly identifying a theory as a proposed basis for deciding the case: merely intimating an argument is not the same as pressing it.

1 Cases that cite this headnote

[18]    **Labor and Employment**   Adequacy of other remedies

Out-of-network medical services provider, as assignee, had adequate mechanism for redress, and therefore it could not recover on ERISA breach of fiduciary duty claim that requested equitable relief in form of surcharge, since essence of its complaint was that administrator did not reimburse it under terms of various plans, most of which ERISA governed. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(3).

2 Cases that cite this headnote

[19]    **Equity**   Damages

Money damages typically are not available in equity.

[20]    **Labor and Employment**   Adequacy of other remedies

Under ERISA, relief on a breach of fiduciary duty claim generally is unavailable when a

plaintiff may seek monetary relief. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. §§ 1132(a)(1)(B), 1132(a)(3).

12 Cases that cite this headnote

[21]    **Labor and Employment**   Equitable relief; injunction

A surcharge, which is a type of monetary remedy against a trustee, is a potential remedy for a breach of fiduciary duty claim under ERISA. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(3).

8 Cases that cite this headnote

[22]    **Labor and Employment**   Pleading

On a breach of fiduciary duty claim under ERISA, a court must focus on the substance of the relief sought and the allegations pleaded, not on the label used. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(a)(3).

6 Cases that cite this headnote

[23]    **Labor and Employment**   Result or outcome of litigation

Under ERISA, a court in its discretion may award fees and costs to either party, as long as the fee claimant has achieved some degree of success on the merits. Employee Retirement Income Security Act of 1974 § 502, 29 U.S.C.A. § 1132(g)(1).

2 Cases that cite this headnote

[24]    **Federal Courts**   Waiver of Error in Appellate Court

Out-of-network medical services provider, as assignee, forfeited argument that district court abused its discretion in denying its motion for leave to amend its complaint out of time, in action against plan administrator under ERISA alleging underpayment or non-payment of reimbursement amounts pursuant to terms of various health benefit plans, where provider did not identify or argue relevant legal standard.

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

Employee Retirement Income Security Act of 1974, § 2 et seq., 29 U.S.C.A. § 1001 et seq.; Fed. R. Civ. P. 15, 16.

2 Cases that cite this headnote

[25]    **Federal Civil Procedure** 🔑 Time for amendment in general

**Federal Civil Procedure** 🔑 Pretrial Order

After a scheduling order deadline has expired, only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard apply to the district court's decision to grant or deny leave to amend a pleading. Fed. R. Civ. P. 15, 16.

14 Cases that cite this headnote

[26]    **Federal Courts** 🔑 Pleading

In evaluating whether a district court abused its discretion by refusing to grant an untimely motion to amend pleadings, the Court of Appeals considers four factors: (1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) the potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice. Fed. R. Civ. P. 15.

13 Cases that cite this headnote

**\*722** Appeal from the United States District Court for the Northern District of Texas, Reed Charles O'Connor, U.S. District Judge

**Attorneys and Law Firms**

Peter Michael Jung, Christine Daniels Roseveare, Clark Hill Strasburger, Dallas, TX, for Plaintiff–Appellant.

Thomas F. A. Hetherington, Blaire Bruns Johnson, McDowell Hetherington, L.L.P., Houston, TX, Amy Beth Boyea, Esq., Edison, McDowell & Hetherington, L.L.P., Arlington, TX, for Defendants–Appellees BLUE CROSS AND BLUE SHIELD OF GEORGIA, INCORPORATED, BLUE CROSS OF CALIFORNIA.

Brian Patrick Kavanaugh, Jeffrey Scott Bramson, Kirkland & Ellis, L.L.P., Chicago, IL, Dennis J. Keithly, Yung Keithly, L.L.P., Dallas, TX, Andrew Fairles MacRae, Levatino Pace, L.L.P., Austin, TX, for Defendant–Appellee HEALTH CARE SERVICE CORPORATION.

Jonathan M. Herman, Herman Law Firm, Dallas, TX, for Defendants–Appellees BLUE CROSS AND BLUE SHIELD OF ALABAMA, LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY.

Kenneth John Lambert, Shamoun & Norman, L.L.P., Farmers Branch, TX, Brian Keith Norman, Dallas, TX, Patrick Peter de Gravelles, CareFirst BlueCross BlueShield, Washington, DC, for Defendant–Appellee CAREFIRST OF MARYLAND, INCORPORATED.

Thomas F. A. Hetherington, Blaire Bruns Johnson, McDowell Hetherington, L.L.P., Houston, TX, Amy Beth Boyea, Esq., Edison, McDowell & Hetherington, L.L.P., Arlington, TX, Lawrence J. Friedman, Esq., Friedman & Feiger, L.L.P., Dallas, TX, for Defendants–Appellees COMMUNITY INSURANCE COMPANY, ANTHEM HEALTH PLANS OF VIRGINIA, INCORPORATED.

David Ronald Reneker, Attorney, James R. Ray, III, Munsch Hardt Kopf & Harr, P.C., Dallas, TX, for Defendants–Appellees HIGHMARK, INCORPORATED, PREMERA BLUE CROSS, BCBSM, INCORPORATED, WELLMARK, INCORPORATED, BLUE CROSS & BLUE SHIELD OF MISSISSIPPI.

Michael Alan Yanof, Esq., Attorney, Thompson, Coe, Cousins & Irons, L.L.P., Dallas, TX, for Defendant–Appellee BLUE CROSS AND BLUE SHIELD OF MICHIGAN.

Amy Marie Stewart, Stewart Bradbury, P.L.L.C., Dallas, TX, Susan Elizabeth Hannagan, Estes Thorne & Carr, P.L.L.C., Dallas, TX, Kevin Bernard Wiggins, White & Wiggins, L.L.P., Dallas, TX, for Defendant–Appellee BLUECROSS BLUESHIELD OF TENNESSEE, INCORPORATED.

Michael A. Naranjo, Foley & Lardner, L.L.P., San Francisco, CA, Benjamin Rodes Dryden, Foley & Lardner, L.L.P., Washington, DC, Barton L. Ridley, Touchstone, Bernays, Johnston, Beall, Smith & Stollenwerck, L.L.P., Dallas, TX, for Defendant–Appellee USABLE MUTUAL INSURANCE COMPANY.

Before WIENER, ELROD, and SOUTHWICK, Circuit Judges.

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

## Opinion

JENNIFER WALKER ELROD, Circuit Judge:

**\*723** A hospital in San Antonio brought various claims against insurance companies and third-party plan administrators for violations of ERISA. The district court dismissed all of the hospital's claims except for the claim for attorneys' fees. Because we hold that the hospital sufficiently pleaded its claims for ERISA plan benefits and state-law breach of contract (Claims I and V), we REVERSE the district court's judgment dismissing these claims and REMAND to the district court to consider these two claims, as well as the claim for attorneys' fees (Claim VIII). We AFFIRM the district court's judgment dismissing the hospital's ERISA claims under 29 U.S.C. § 1132(a)(3) (Claims II, III, and VII). We also AFFIRM the district court's judgment denying leave to amend the complaint out of time.

### I.

In 2012, Innova Hospital San Antonio[1] (hereafter, the Hospital) sued multiple insurance **\*724** companies and third-party plan administrators[2] (hereafter, the Insurers) in Texas state court. The Hospital brought the lawsuit as an assignee of the insurance benefits of the patients treated at its facility. The Hospital's original complaint alleged that the Insurers either failed to pay at all under various health-insurance claims or reduced the payment significantly. One of the Insurers timely removed the case to federal court on the basis of diversity jurisdiction and federal question jurisdiction under the Employee Retirement Income Security Act of 1974 (hereafter, ERISA).

After one of the Insurers filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, the Hospital filed an amended complaint. In the amended complaint, the Hospital alleged, among other things, that it provided medical services to patients covered by benefit plans either entered into or administered by the Insurers; (2) those patients assigned their right of payment of monies under their benefit plans to the Hospital; and (3) the Insurers either failed to reimburse the Hospital for covered claims or reimbursed the Hospital at significantly below the applicable rates. However, the amended complaint did not identify specific plans or specific plan language applicable to each claim. In response,

the Insurers moved to dismiss for failure to state a claim, arguing that the Hospital needed to identify the provisions in specific plan documents that the Insurers allegedly breached.

Prior to and during this time, the Hospital attempted—without success—to obtain the plan documents at issue from the Insurers. Two years before filing the lawsuit, the Hospital had sought to obtain relevant plan provisions from some of the Insurers. In 2012, after filing the lawsuit, the Hospital sent the Insurers requests for production seeking plan documents. Most of the Insurers objected to these requests and refused to produce the plan documents. The Insurers' reasons for objecting included arguments that: (1) current motions to dismiss for failure to state a claim were pending before the district court; (2) at least some of the documents were equally accessible to the Hospital; (3) the requests for production sought private information protected by HIPPA; (4) the requests were unduly burdensome; and (5) the requests sought information beyond what ERISA requires to be disclosed. A few Insurers provided plan documents, but apparently only after the case was administratively closed in early 2013.[3] In late 2013, after the parties were unable to reach a settlement, the case was reopened. The Hospital then sent renewed discovery requests seeking the plan documents at issue. Apparently before the Hospital received any such documents, the district court granted motions to dismiss and gave the Hospital about a month to amend its first amended complaint.

In response to the Hospital's discovery requests for plan documents, some of the Insurers argued that, pursuant to the order dismissing the first amended complaint, the Hospital had no pending **\*725** claims and therefore the Insurers were not required to respond to its discovery requests. These Insurers gave no legal reason for their refusal to produce plan documents except the dismissal order. The Hospital did not file a motion to compel or seek to obtain plan documents from patients. Instead, having been unable to obtain plan documents from the Insurers, the Hospital sent an attorney to the Department of Labor in an attempt to obtain the relevant documents. This effort proved unsuccessful. The Hospital's last effort was Internet research. This yielded two plans, which the Hospital alleged contained representative plan language. The Hospital incorporated this language into a second amended complaint.

The Hospital filed its second amended complaint against sixteen of the insurance companies and third-party plan administrators. The complaint alleged claims relating to medical services provided in 863 separate instances to

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)
2018 Employee Benefits Cas. 207,808

individual patients with benefit plans governed by either ERISA plans or non-ERISA contracts. The complaint alleged over $58 million in damages.

Among other things, the second amended complaint alleged that: (1) the Hospital provided health care services to patients insured by the Insurers; (2) the Hospital is an out-of-network provider for the purposes of the claims here; (3) the Hospital verified coverage with the Insurers before providing services; (4) the Hospital received a valid assignment of benefits; (5) the Hospital timely submitted claims to the Insurers for payment; (6) the Insurers uniformly failed to pay the claims according to the terms of the employee welfare benefit plan documents or individual insurance policies; (7) many of the same coverage and payment provisions are used across different health plans; (8) the Insurers must pay out-of-network providers some version of the "reasonable and customary" amount or the "usual, customary, and reasonable" amount; (9) representative plan terms require reimbursement of out-of-network providers at 80% of "reasonable and customary" expenses after the deductible; and (10) the Insurers reimbursed the Hospital at an average rate of 11%. Like the two prior complaints, the second amended complaint did not include the actual plan language from any ERISA plan or non-ERISA contract at issue.

The Insurers again moved to dismiss for failure to state a claim, arguing that the second amended complaint failed the plausibility pleading standard because the terms of the various benefit plans were essential allegations not included in the complaint. A month after the amended pleading deadline for filing the second amended complaint, a few of the Insurers attached some plans and portions of plans to their renewed motions to dismiss.

The district court granted the motions to dismiss on the Hospital's claims for plan benefits under ERISA and breach of contract, reasoning that the Hospital's second amended complaint was insufficient because it did not identify the specific plan provisions at issue. In all, the district court granted the Insurers' motions to dismiss on five of the eight claims but denied the motions to dismiss on Claim IV (failure to provide information upon request), Claim VI (negligent misrepresentation), and Claim VIII (attorneys' fees).

The Hospital filed a motion for leave to amend out of time, attaching to the motion a proposed third amended complaint that—now that more Insurers had produced plan documents post-dismissal—incorporated applicable plan language and

spanned 390 pages, excluding attachments. The district court denied this request. The Hospital filed voluntary motions to dismiss *726 the two claims and the part of the attorneys'-fees claim relating to Claim IV that had survived the earlier dismissal order. The district court granted this request. The Hospital then timely appealed.[4] At issue in this appeal are the following claims: Claim I: plan benefits under 29 U.S.C. § 1132(a)(1)(B); Claim II: failure to provide full and fair review under § 1132(a)(3); Claim III: violations of claims procedure under § 1132(a)(3); Claim V: state-law breach of contract; Claim VII: breach of fiduciary duty under § 1132(a)(3); and Claim VIII: attorneys' fees.[5]

## II.

[1]  [2]  [3]  [4]  We review a dismissal for failure to state a claim *de novo* and a denial of leave to amend a complaint for abuse of discretion. *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 557–58 (5th Cir. 2002). Under Federal Rule of Civil Procedure 8, a plaintiff must simply give "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss, we must "accept all well-pleaded facts as true and view those facts in the light most favorable to the plaintiff." *Richardson v. Axion Logistics, L.L.C.*, 780 F.3d 304, 306 (5th Cir. 2015) (quoting *Bustos v. Martini Club, Inc.*, 599 F.3d 458, 461 (5th Cir. 2010) ). "Generally, a court ruling on a 12(b)(6) motion may rely on the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Wolcott v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) ).

[5]  [6]  [7]  To survive a motion to dismiss, a complaint must contain sufficient factual matter which, when taken as true, states "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937. The facts alleged must "be enough to raise a right to relief above the speculative level," but the complaint may survive a motion to dismiss even if recovery seems "very remote and unlikely." *Twombly*, 550 U.S. at 555–56, 127 S.Ct. 1955 (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) ).

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)
2018 Employee Benefits Cas. 207,808

Thus, "the complaint must provide more than conclusions, but it 'need not contain detailed factual allegations.' " *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Colony Ins. Co. v. Peachtree Const., Ltd.*, 647 F.3d 248, 252 (5th Cir. 2011) ).

III.

A. ERISA Plan Benefits Under 29 U.S.C. § 1132(a)(1)(B)

Section 502(a)(1)(B) of ERISA provides: "A civil action may be brought ... by a participant or beneficiary ... to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to ***727** future benefits under the terms of the plan ...." 29 U.S.C. § 1132(a)(1)(B); *see also Aetna Health Inc. v. Davila*, 542 U.S. 200, 210, 124 S.Ct. 2488, 159 L.Ed.2d 312 (2004) (stating that under § 1132(a)(1)(B), "[i]f a participant or beneficiary believes that benefits promised to him under the terms of the plan are not provided, he can bring suit seeking provision of those benefits").

[8]  The Hospital contends that the district court erred in dismissing its second amended complaint for failure to state a claim under § 1132(a)(1)(B). First, the Hospital argues that the district court's requirement that it plead specific plan language to survive a Rule 12(b)(6) motion to dismiss conflicts with the pleading requirements set forth in *Twombly* and *Iqbal*. According to the Hospital, the district court created a "heightened pleading standard" by requiring the Hospital to plead information that it did not have and could not access without the Insurers' cooperation. The Hospital maintains that it alleged facts sufficient to state a claim under § 1132(a)(1)(B).

Second, the Hospital argues that—even if this court adopts a rule requiring a plaintiff to allege specific plan language to state a claim under ERISA—this case should be an exception to such a rule. The Hospital asserts that it "lacked meaningful access to the plan documents" because they were in the possession and control of the Insurers, and that the Insurers failed to provide access to those plans even though the Hospital made good-faith efforts to obtain them. The Insurers do not deny that they failed to produce the plan documents at first but maintain that they did not act improperly and that the Hospital had an adequate remedy that it failed to use—namely, a motion to compel production.

The Hospital cites *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d 585 (8th Cir. 2009), to support its argument that a rule "requiring the plaintiffs to plead plan language with specificity whether they have access to those documents or not ... is untenable." The Hospital emphasizes that it requested plan documents from the Insurers both before litigation and through repeated discovery requests, and that it "did the best [it] could" by obtaining representative plan provisions and then "alleg[ing] that these examples were consistent with the insurance industry standard for payment of out-of-network provider benefits." Noting that the Insurers did not begin producing plan documents until well after the deadline for re-pleading had passed, the Hospital argues that its proposed third amended complaint complies with the district court's requirement by incorporating hundreds of individual claims with specific plan language from the belatedly sent plan documents.

In ruling that the Hospital's second amended complaint was insufficient because it did not identify specific plan provisions, the district court acknowledged that the Fifth Circuit had not addressed the issue but that district courts had, including this particular district court. Thus, the district court relied on its own and other district court opinions in dismissing the Hospital's claims for breach of contract and ERISA plan benefits.

The district court lacked the benefit of the guidance in *Electrostim Medical Services, Inc. v. Health Care Service Corp.*, 614 Fed.Appx. 731 (5th Cir. 2015),[6] when it dismissed the Hospital's ERISA claim for plan benefits and breach-of-contract ***728** claim.[7] In *Electrostim*, we reversed in part the district court's judgment that granted Blue Cross Blue Shield of Texas's motion to dismiss. 614 Fed.Appx. at 745. Regarding the plaintiff Electrostim's breach-of-contract claim, the district court concluded that Electrostim had failed to provide grounds for inferring that the medical services it provided were "covered" services under a provider agreement. *Id.* at 739. Only covered services would be reimbursed. *Id.* Determining whether services were covered depended upon whether the subscribers' health plans identified them as covered. *Id.* The district court determined that Electrostim's failure to provide a basis for inferring that services were covered warranted dismissal for failure to state a breach-of-contract claim. *Id.* We disagreed. *Id.* Even though Electrostim had not identified the specific subscriber health plans indicating what services were covered (and therefore what services had to be reimbursed under the provider agreement), we concluded that Electrostim's allegations were

"sufficiently detailed to permit 'the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

Moreover, in *Electrostim*, we declined to adopt a requirement that plaintiffs must always include specific plan language in complaints alleging improper reimbursement under ERISA. In *Electrostim*, the district court dismissed the plaintiff's 29 U.S.C. § 1132(a)(1)(B) claim because it "failed to specify language in any ERISA plan entitling it to benefits." *Id.* at 741. We determined that the ERISA claim should be dismissed because the complaint "did not plausibly allege that [Electrostim] was a participant, beneficiary, or assignee entitled to assert a claim under 29 U.S.C. § 1132(a)(1)(B)." *Id.* at 742.

[9] Simply put, ERISA plaintiffs should not be held to an excessively burdensome pleading standard that requires them to identify particular plan provisions in ERISA contexts when it may be extremely difficult for them to access such plan provisions.[8] *See Braden*, 588 F.3d at 598 ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail ...."); *Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718 (2d Cir. 2013) (quoting *Braden* for the same proposition); *Garayalde–Rijos v. Municipality of Carolina*, 747 F.3d 15, 25 (1st Cir. 2014) (quoting *Braden* for the proposition that a "complaint should be read in its entirety and 'not parsed piece by piece to determine whether each allegation, in isolation, is plausible' "); *cf. Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016) (stating that "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which she has no access, as long as the facts alleged tell a plausible story"). Such a recognition is consistent with the principle that "a complaint attacked **\*729** by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ...." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. Indeed, district courts have relied on *Electrostim* in expressly rejecting overly burdensome pleading requirements in ERISA contexts. *See, e.g.*, *Infectious Disease Doctors, P.A. v. Bluecross Blueshield of Tex.*, No. 3:13-CV-2920-L, 2015 WL 4992964, at \*3–4 (N.D. Tex. Aug. 21, 2015) (denying Blue Cross Blue Shield of Michigan's motion to dismiss and, in light of our analysis in *Electrostim*, rejecting the argument that a plaintiff must identify a specific plan term to satisfy pleading standards).

[10] Therefore, in light of *Electrostim* and the reasoning of our sister circuits in analogous contexts, we hold that plaintiffs alleging claims under 29 U.S.C. § 1132(a)(1)(B) for plan benefits need not necessarily identify the specific language of every plan provision at issue to survive a motion to dismiss under Rule 12(b)(6). In so holding, we adhere to the Supreme Court's admonition that "[t]he plausibility standard is not akin to a 'probability requirement' ...." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). Alleging improper reimbursement based on representative plan provisions—as the Hospital did here—may be sufficient to show plausibility under *Twombly* and *Iqbal* when there are enough other factual allegations in the complaint to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See id.* Of course, Rule 8's pleading standard "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678–79, 129 S.Ct. 1937.

Here, the Hospital's second amended complaint contains more than mere conclusions. Besides chronicling its numerous attempts to obtain plan documents, the Hospital has credibly alleged, among other things, that: (1) it provided health care services to patients insured by the Insurers; (2) the Hospital is an out-of-network provider for the purposes of the claims here; (3) the Hospital verified coverage with the Insurers before providing services; (4) the Hospital received a valid assignment of benefits; (5) the Hospital timely submitted claims to the Insurers for payment; (6) the Insurers uniformly failed to pay the claims according to the terms of the employee welfare benefit plan documents or individual insurance policies; (7) many of the same coverage and payment provisions are used across different health plans; (8) the Insurers must pay out-of-network providers some version of the "reasonable and customary" amount or the "usual, customary, and reasonable" amount; (9) representative plan terms require reimbursement of out-of-network providers at 80% of "reasonable and customary" expenses after the deductible; and (10) the Insurers reimbursed the Hospital at an average rate of 11%. These allegations, accepted as true and viewed in the light most favorable to the Hospital, are sufficient to state a claim for plan benefits under 29 U.S.C. § 1132(a)(1)(B).

[11] It bears emphasizing that the Hospital was unable to obtain plan documents even after good-faith efforts to do so. As discussed above, the Hospital repeatedly sought to obtain from the Insurers the plan documents at issue. The Insurers did not produce most of the relevant plan

documents until the deadline to re-plead had passed—when such documents likely would be of little use.[9]  *730 Moreover, after seeking to dismiss the Hospital's claims because the complaint did not include the plan language at issue, some of these Insurers then used the dismissal order as a basis for refusing to produce plan documents during the time the district court gave the Hospital an opportunity to re-plead. As to the Insurers' suggestion that the Hospital should have requested plan documents directly from the patients, the Hospital reasonably responds that "[j]ust like employees who join ERISA-governed plans, individuals who purchase membership in non-ERISA governed group health care plans do not themselves have access to actual plan documents." At oral argument, counsel for the Insurers indicated that the Hospital probably could have sought information regarding plan provisions from plan administrators on behalf of its patients only if there was "a sufficiently written delegation of that authority from [the] patients."

[12]  On the record before us, we agree with the Hospital that it pleaded sufficient facts in its second amended complaint to survive the Insurers' motions to dismiss the claim for ERISA plan benefits. *See Vila v. Inter-Am. Inv., Corp.,* 570 F.3d 274, 285 (D.C. Cir. 2009) ("Viewed in their totality, and according [plaintiff] all favorable inferences, [plaintiff's] allegations 'plausibly give rise to an entitlement to relief' ...." (quoting *Iqbal,* 556 U.S. at 679, 129 S.Ct. 1937) ). Our holding underscores the principle that when discoverable information is in the control and possession of a defendant, it is not necessarily the plaintiff's responsibility to provide that information in her complaint. *See Lincoln Benefit Life Co. v. AEI Life, LLC,* 800 F.3d 99, 107 n.31 (3d Cir. 2015) ("Several Courts of Appeals accept allegations 'on information and belief' when the facts at issue are peculiarly within the defendant's possession."). As the Second Circuit has stated, "[t]he *Twombly* plausibility standard, which applies to all civil actions, ... does not prevent a plaintiff from 'pleading facts alleged upon information and belief' where the facts are peculiarly within the possession and control of the defendant ... or where the belief is based on factual information that makes the inference of culpability plausible ...." *Arista Records, LLC v. Doe 3,* 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted).

This is not to say that plaintiffs need not exercise due diligence in pleading factual information in ERISA contexts. Nor do we hold that a plaintiff may always plead a claim for plan benefits under 29 U.S.C. § 1132(a)(1) (B) by incorporating representative plan language into her

complaint. Our holding today is no license to fish. *See Barnes v. Tumlinson,* 597 Fed.Appx. 798, 799 (5th Cir. 2015) (unpublished) ("Discovery is not a license for the plaintiff to 'go fishing' ....") (quoting *Marshall v. Westinghouse Elec. Corp.,* 576 F.2d 588, 592 (5th Cir. 1978) ) ).

[13]  However, this is not a case in which the plaintiff has ready access to plan documents and fails to identify the specific plan language at issue. "[W]hile a plaintiff must offer sufficient factual allegations to show that he or she is not merely engaged in a fishing expedition or strike suit, we must also take account of [his or her]  *731 limited access to crucial information." *Braden,* 588 F.3d at 598 (citing *Twombly* and *Iqbal* and holding in part that the district court misapplied Rule 8's pleading standard in dismissing plaintiff's fiduciary-duty claim under ERISA. This is because "[i]f plaintiffs cannot state a claim without pleading facts which tend systemically to be in the sole possession of defendants, the remedial scheme of the statute will fail, and the crucial rights secured by ERISA will suffer." *Id.* The district court here erred in dismissing the Hospital's § 1132(a)(1)(B) claim for failure to plead specific plan language from plan documents that the Hospital made unsuccessful but good-faith efforts to obtain.

## B. Breach of Contract

[14]  For similar reasons, the district court also erred in dismissing the Hospital's breach-of-contract claim under Rule 12(b)(6). The district court determined that "to properly plead a breach of contract claim, a plaintiff must identify a specific provision of the contract that was allegedly breached." The Hospital's second amended complaint states that "[w]ith regard to the claims not governed by the terms of ERISA, the conduct of [the Insurers] described herein constitutes breach of non-ERISA contracts." 2d Amend. Compl. ¶ 89. The complaint also notes that "some of the claims remain unidentifiable as ERISA or non-ERISA at this stage of the litigation." *Id.* ¶ 29. The district court reasoned that the Hospital's allegations do not distinguish between its 29 U.S.C. § 1132(a)(1)(B) claim and its breach-of-contract claim and therefore, in keeping with its dismissal of the ERISA claim, determined that the Hospital "failed to allege enough facts about the terms of the non-ERISA plans to raise [its] right to relief above the speculative level."

On appeal, the Hospital raises the same factual allegations in support of its breach-of-contract claim that it does in support

of its § 1132(a)(1)(B) claim. The Hospital contends that it alleged sufficient facts for both claims to survive a Rule 12(b)(6) motion to dismiss—especially given the Insurers' refusal timely to produce the relevant plan documents. The Insurers respond by emphasizing that the Hospital did not request information about the contracts from its patient–assignors.

**[15]** Under Texas law, "[t]he essential elements of a breach of contract claim are the existence of a valid contract, performance or tendered performance by the plaintiff, breach of the contract by the defendant, and damages sustained as a result of the breach." *Electrostim*, 614 Fed.Appx. at 739 (quoting *City of the Colony v. N. Tex. Mun. Water Dist.*, 272 S.W.3d 699, 739 (Tex. App.—Fort Worth 2008, pet. dism'd) ). *Electrostim* directly addresses pleading requirements in an ERISA case involving a non-ERISA breach-of-contract claim, and its analysis is thus particularly instructive here. *See id.* In *Electrostim*, the plaintiff "alleged the existence and validity of the provider agreement and attached a copy." *Id.* The plaintiff alleged that Blue Cross Blue Shield of Texas breached the provision of the agreement obligating it to pay the plaintiff's claims for covered products and services. *Id.* In addition, the plaintiff alleged that the failure to pay these claims caused it to suffer damages. *Id.* As discussed above, we concluded in *Electrostim* that these allegations were sufficient to survive a Rule 12(b)(6) motion to dismiss. *Id.*

*Electrostim* 's analysis informs our holding here. While the plaintiff in *Electrostim* was able to attach to the complaint a copy of the provider agreement at issue, the plaintiff did not identify the individual subscribers' **\*732** health plans showing which services were "covered" services—the only services that had to be reimbursed under the provider agreement. *Id.* Instead of holding that Electrostim had to allege actual plan language from each of the subscribers' health plans to show that specific services allegedly covered were in fact covered, we held that Electrostim had alleged facts sufficient to state a breach-of-contract claim. *Id.*

Here, the Hospital has alleged the existence of valid contracts (non-ERISA plans), performance by the Hospital, breach of the contracts by the Insurers, and damages in the form of underpayment or non-payment sustained as a result of the breach. Therefore, in light of *Electrostim*, the Hospital's second amended complaint adequately states a claim for breach of contract under Texas law.[10] *See Rapid Tox Screen LLC v. Cigna Healthcare of Tex. Inc.*, No. 3:15-CV-3632-B, 2017 WL 3658841, at \*10 (N.D. Tex. Aug. 24, 2017) (citing *Electrostim* in rejecting defendants' motion to dismiss for

failure to state a claim when plaintiff alleged that contracts provided for reimbursement of medical expenses incurred by defendants at "usual, customary, and reasonable rates").

## C. ERISA Claims Under 29 U.S.C. § 1132(a)(3)

### 1. Claims II & III

**[16]  [17]** The Hospital's appeal also challenges the district court's dismissal of three claims brought under 29 U.S.C. § 1132(a)(3): Claim II, failure to provide full and fair review; Claim III, violations of claims procedure under ERISA; and Claim VII, breach of fiduciary duty. The Hospital has forfeited Claims II and III because of inadequate briefing on appeal. *See United States v. Scroggins*, 599 F.3d 433, 447 (5th Cir. 2010) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (quoting *Knatt v. Hosp. Serv. Dist. No. 1*, 327 Fed.Appx. 472, 483 (5th Cir. 2009) ) ). "At the very least, [pressing a claim on appeal] means clearly identifying a theory as a proposed basis for deciding the case—merely 'intimating' an argument is not the same as 'pressing' it." *Id.* (quoting *Knatt*, 327 Fed.Appx. at 483). The Hospital devotes only a few sentences to discussing Claims II and III in its opening brief and fails even to address the district court's stated basis for dismissing these claims. Thus, these claims are forfeited.

### 2. Claim VII

**[18]** The Hospital also contends that the district court erred in dismissing Claim VII, which asserts a breach of fiduciary duty under 29 U.S.C. § 1132(a)(3). The Hospital argues in its opening brief that the Supreme Court in *Varity Corp. v. Howe*, 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996), allowed plaintiffs to sue for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) when no other appropriate equitable relief is available. In addition, the Hospital cites *Hollingshead v. Aetna Health Inc.*, 589 Fed.Appx. 732 (5th Cir. 2014) (unpublished); *Tolson v. Avondale Industries, Inc.*, 141 F.3d 604 (5th Cir. 1998); and **\*733** *CIGNA Corp. v. Amara*, 563 U.S. 421, 131 S.Ct. 1866, 179 L.Ed.2d 843 (2011), and argues that under *Amara*, a plaintiff suing a fiduciary may obtain monetary damages under § 1132(a)(3) when there are no other ERISA remedies available.

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)
2018 Employee Benefits Cas. 207,808

**[19]  [20]**  The Hospital's claim for breach of fiduciary duty fails. Under § 1132(a)(3), a civil action may be brought:

> by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan ....

29 U.S.C. § 1132(a)(3). In *Varity*, the Supreme Court determined that an ERISA plaintiff may bring a claim for breach of fiduciary duty under 29 U.S.C. § 1132(a)(3) when no other remedy is available. 516 U.S. at 510–15, 116 S.Ct. 1065; *see also Tolson*, 141 F.3d at 610. "Money damages are ... the classic form of *legal* relief." *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 255, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). Thus, "[m]oney damages are not typically available in equity." *Cent. States, Se. & Sw. Areas Health & Welfare Fund ex rel. Bunte v. Health Special Risk, Inc.*, 756 F.3d 356, 363 (5th Cir. 2014). However, § 1132(a)(3) "only allows claims for the types of equitable relief typically available in equity." *Id.* It follows, then, that relief under § 1132(a)(3) generally is unavailable when a plaintiff may seek monetary relief under § 1132(a)(1)(B). *Swenson v. United of Omaha Life Ins. Co.*, 876 F.3d 809, 812 (5th Cir. 2017).

Following Supreme Court guidance, the vast majority of circuit courts have held that "if a plaintiff can pursue benefits under the plan pursuant to [§ 1132(a)(1) ], there is an adequate remedy under the plan which bars a further remedy under [§ 1132(a)(3) ]." *See LaRocca v. Borden, Inc.*, 276 F.3d 22, 28 (1st Cir. 2002) (collecting cases); *Korotynska v. Metro. Life Ins. Co.*, 474 F.3d 101, 106 (4th Cir. 2006) (stating that "the great majority of circuit courts have interpreted *Varity* to hold that a claimant whose injury creates a cause of action under § 1132(a)(1)(B) may not proceed with a claim under § 1132(a)(3)"). Simply because a plaintiff does not prevail on a § 1132(a)(1) claim does not make viable an alternative claim under § 1132(a)(3). *Tolson*, 141 F.3d at 610.

**[21]  [22]**  There is one wrinkle to note here. After the Supreme Court's decision in *Amara*, a "surcharge"—a type of monetary remedy against a trustee—is a potential § 1132(a)(3) remedy under our precedent. *Gearlds v. Entergy Servs., Inc.*, 709 F.3d 448, 452 (5th Cir. 2013); *see also Amara*, 563 U.S. at 441, 131 S.Ct. 1866 ("[T]he fact that [requiring a plan administrator to pay money owed to beneficiaries under a reformed plan] takes the form of a money payment does not remove it from the category of traditionally equitable relief."). However, "[c]ourts must focus on the substance of the relief

sought and the allegations pleaded, not on the label used." *Gearlds*, 709 F.3d at 452.

In its second amended complaint, the Hospital asserts that the Insurers' alleged breach of fiduciary duty under § 1132(a)(3) entitles the Hospital to "equitable relief by way of surcharge." 2d Amend. Compl. ¶ 101. In dismissing this claim, the district court determined that the Hospital's § 1132(a)(3) claims were indistinguishable from its § 1132(a)(1) claim. The district court concluded that the § 1132(a)(3) claims were "essentially claims for benefits denied."

We agree. While the Hospital requests equitable relief in the form of a surcharge in the alternative, the essence of its complaint **\*734** is that the Insurers failed to reimburse the Hospital under the terms of various plans, most of which ERISA governs. *Id.* ¶¶ 26, 29. The Hospital has an adequate mechanism for redress under § 1132(a)(1)(B) and thus may not simultaneously plead claims under § 1132(a)(3). *See Swenson*, 876 F.3d at 812 (reviewing motions to dismiss and holding that "[b]ecause ERISA's civil enforcement provision provides a direct mechanism to address the injury for which [plaintiff] seeks equitable relief, she cannot assert a separate ERISA claim for breach of fiduciary duty"); *Hollingshead*, 589 Fed.Appx. at 737 (agreeing on review of a dismissal under Rule 12(b)(6) that plaintiff failed to state a claim under § 1132(a)(1)(B) but nevertheless holding that plaintiff could not maintain a fiduciary-duty claim under § 1132(a)(3) ).

### D. Attorneys' Fees

The Hospital argues that it sufficiently pleaded both ERISA and non-ERISA claims for attorneys' fees in its second amended complaint. The Hospital also asserts, and the Insurers agree, that the district court dismissed its claim for attorneys' fees. However, while only mentioning the Hospital's ERISA-based claim for attorneys' fees, the district court determined that the Hospital sufficiently alleged a claim for penalties under 29 U.S.C. § 1132(c)(1) and therefore "decline[d] to dismiss [the Hospital's] claim for attorneys' fees." As discussed above, the district court dismissed all of the Hospital's claims except Claim IV (failure to provide information upon request) and Claim VI (negligent misrepresentation). The statutory provision referenced by the district court, § 1132(c)(1), deals with an administrator's failure to provide requested information under ERISA. *See* 29 U.S.C. § 1132(c)(1). The Hospital voluntarily dismissed its two remaining claims shortly after the district court's

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

dismissal order and also moved to dismiss voluntarily the part of Claim VIII (attorneys' fees) related to the Hospital's claim for failure to provide information upon request (Claim IV). Yet it was this attorneys'-fees claim that the district court appears to have explicitly allowed. Moreover, in its order regarding the Hospital's motion for leave to amend out of time, the district court stated that it had dismissed "all but two" of the Hospital's claims in its prior dismissal order. While somewhat unclear, it appears that the Hospital's claim for attorneys' fees has been dismissed in all aspects.

[23]  Regardless, under 29 U.S.C. § 1132(g)(1), "a court 'in its discretion' may award fees and costs 'to either party,' ... as long as the fee claimant has achieved 'some degree of success on the merits.' " *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245, 130 S.Ct. 2149, 176 L.Ed.2d 998 (2010) (citations omitted) (first quoting § 1132(g)(1) and then quoting *Ruckelshaus v. Sierra Club*, 463 U.S. 680, 694, 103 S.Ct. 3274, 77 L.Ed.2d 938 (1983) ). In light of our reversal of the district court's judgment as to the Hospital's claims for breach of contract and ERISA plan benefits, we remand the claim for attorneys' fees to the district court to decide after considering the merits of the other claims.

## IV.

[24]  [25]  [26]  The Hospital also appeals the district court's denial of its motion to amend its second amended complaint out of time. "Rule 16(b) [of the Federal Rules of Civil Procedure] governs amendment of pleadings after a scheduling order deadline has expired. Only upon the movant's demonstration of good cause to modify the scheduling order will the more liberal standard of Rule 15(a) apply to the district **\*735** court's decision to grant or deny leave." *S&W Enters., L.L.C. v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 536 (5th Cir. 2003). In evaluating whether a district court abused its discretion by refusing to grant an untimely motion to amend pleadings, we consider four factors: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) [the] potential prejudice in allowing the amendment; and (4)

the availability of a continuance to cure such prejudice." *Id.* (quoting *Reliance Ins. Co. v. La. Land & Exploration Co.*, 110 F.3d 253, 257 (5th Cir. 1997) ).

Here, it is undisputed that the Hospital's motion to amend its second amended complaint was filed out of time. Thus, Rule 16(b) applies, and the Hospital must show good cause to modify the scheduling order and grant leave to amend. *See id.* at 535–36. However, the Hospital fails to identify the relevant legal standard and instead only discusses Federal Rule of Civil Procedure 15. Even in its reply brief, the Hospital does not cite Rule 16. "To avoid waiver, a party must identify relevant legal standards and 'any relevant Fifth Circuit cases.' " *JTB Tools & Oilfield Servs., L.L.C. v. United States*, 831 F.3d 597, 601 (5th Cir. 2016) (quoting *United States v. Skilling*, 554 F.3d 529, 568 n.63 (5th Cir. 2009) ); *see also United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) ("[F]orfeiture is the failure to make the timely assertion of a right ...."). The Hospital fails to argue or even to identify the legal standard relevant to whether the district court abused its discretion in denying the Hospital's motion for leave to amend out of time. Therefore, the Hospital has forfeited this argument.

## V.

Accordingly, we AFFIRM the district court's judgment denying the Hospital's motion to amend its second amended complaint out of time. We also AFFIRM the district court's judgment dismissing the Hospital's 29 U.S.C. § 1132(a)(3) claims. We REVERSE the district court's judgment as to the Hospital's claims for plan benefits under 29 U.S.C. § 1132(a)(1)(B) and for breach of contract and REMAND to the district court for further proceedings consistent with this opinion. On remand, the district court also should consider the Hospital's claim for attorneys' fees under 29 U.S.C. § 1132(g)(1).

**All Citations**

892 F.3d 719, 2018 Employee Benefits Cas. 207,808

## Footnotes

1    Since this appeal was filed and briefed, Victory Medical Center Houston, L.P., the other hospital that was originally an appellant with Innova Hospital San Antonio, voluntarily moved to dismiss its appeal under Federal Rule of Appellate Procedure 42(b). Its appeal was dismissed pursuant to that motion.

Innova Hospital San Antonio, Limited Partnership v. Blue..., 892 F.3d 719 (2018)

2018 Employee Benefits Cas. 207,808

2    Appellees state that they are "sixteen independent insurers and/or claims administrators, individually doing business under Blue Cross and/or Blue Shield trademarks in various territories throughout the United States."

3    Indeed, it appears that these documents were not provided to the Hospital until after the deadline to file the second amended complaint had passed.

4    This appeal was stayed for more than two years while a related bankruptcy matter initiated by the Hospital was pending.

5    Claim IV (failure to provide information upon request) and Claim VI (negligent misrepresentation) are not at issue in this appeal, as the Hospital voluntarily dismissed these claims.

6    While *Electrostim* is unpublished, we find it to be persuasive on the issue of whether plaintiffs must identify the specific plan provisions at issue in complaints alleging improper reimbursement under ERISA.

7    The district court and the Insurers relied on the district court opinion underlying *Electrostim*, which was on appeal at the time the briefs were filed in this case. In its brief on appeal, the Hospital sought to distinguish the district court opinion underlying *Electrostim*.

8    When asked at oral argument whether the Hospital contacted its patients to obtain copies of the plans at issue, counsel for the Hospital reasoned that "many of the patients would not have been able to produce [those documents]." Moreover, counsel stated that the Hospital could not have contacted the patients' employers under HIPPA and that even if the Hospital had requested information under ERISA section 502(c), "the defendants in this case were taking the position that we were not entitled to it because we were an assignee ...."

9    While the Hospital did not file a motion to compel, this perhaps unadvised choice is not dispositive. "Counsel have an obligation, as officers of the court, to assist in the discovery process by making diligent, good-faith responses to legitimate discovery requests." *McLeod, Alexander, Powel & Apffel, P.C. v. Quarles*, 894 F.2d 1482, 1485–86 (5th Cir. 1990) (rejecting a party's contention that sanctions could not be imposed when the opposing party had not first requested an order to compel and stating that the party resisting discovery requests "must have a valid objection to each one in order to escape the production requirement").

10    Both the Hospital and the Insurers cite the elements for breach of contract under Texas law when discussing the Hospital's state-law breach-of-contract claim. However, the Insurers state in a footnote that it is "unclear which states' laws govern [the Hospital's] breach of contract claims." The Hospital admits that further discovery is needed to determine which of its reimbursement claims fall under ERISA and which fall under common-law breach of contract. Thus, we hold only that the Hospital's second amended complaint sufficiently states a breach-of-contract claim under Texas law.

---

End of Document                                                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

503 F.3d 397
United States Court of Appeals,
Fifth Circuit.

Laurene C. CUVILLIER, Plaintiff–Appellant,

v.

Donald R. TAYLOR; Hugh C. Redhead;
Johnnie Sullivan; Betty Polk; Elmira
Williams; Sherry Jackson; Richard
Harris, Defendants–Appellees.

No. 05–61186.
|
Oct. 5, 2007.

## Synopsis

**Background:** Child support obligee, proceeding *pro se*, filed § 1983 action against various employees of Mississippi Department of Human Services (MDHS) and of child support enforcement office for Mississippi county where obligor resided at time of his death, asserting deprivation of rights secured by various provisions of Title IV-D of Social Security Act and federal regulations. Defendants moved to dismiss for failure to state a claim. The United States District Court for the Southern District of Mississippi, William H. Barbour, Jr., J., dismissed action with prejudice as time-barred. Child support obligee appealed.

**[Holding:]** The Court of Appeals, Garwood, Circuit Judge, held that relied-on provisions of Title IV-D of Social Security Act and federal regulations did not give rise to federal right that was enforceable through private cause of action under § 1983.

Affirmed on other grounds.

West Headnotes (10)

**[1]** **Federal Courts** ⬌ Pleading

Court of Appeals reviews *de novo* district court's dismissal for failure to state a claim. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

23 Cases that cite this headnote

**[2]** **Federal Civil Procedure** ⬌ Insufficiency in general

**Federal Civil Procedure** ⬌ Matters deemed admitted; acceptance as true of allegations in complaint

To survive motion to dismiss for failure to state a claim, complaint does not need detailed factual allegations, but must provide plaintiff's grounds for entitlement to relief, including factual allegations that when assumed to be true raise right to relief above speculative level. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

1634 Cases that cite this headnote

**[3]** **Federal Courts** ⬌ Theory and Grounds of Decision of Lower Court

Court of Appeals may affirm district court's dismissal for failure to state a claim on any grounds raised below and supported by the record. Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

26 Cases that cite this headnote

**[4]** **Civil Rights** ⬌ Time to Sue

**Federal Courts** ⬌ Civil rights and discrimination cases

Because Congress has not specified a limitations period for § 1983 suits, in such cases federal courts borrow forum state's general personal injury limitations period. 42 U.S.C.A. § 1983.

14 Cases that cite this headnote

**[5]** **Civil Rights** ⬌ Time to Sue

**Limitation of Actions** ⬌ Civil rights

Statute of limitations in § 1983 cases in Mississippi is three-year residual period provided by Mississippi statute; this limitations period starts to run when plaintiff becomes aware or has sufficient information to know that he or she suffered an injury. 42 U.S.C.A. § 1983; West's A.M.C. § 15-1-49.

Cuvillier v. Taylor, 503 F.3d 397 (2007)

20 Cases that cite this headnote

**[6]     Civil Rights** ⟜ Rights Protected

Violation of a federal law is insufficient for redress through § 1983; plaintiff must assert violation of a federal right. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[7]     Action** ⟜ Statutory rights of action

Three factors set out in Supreme Court's 1997 *Blessing v. Freestone* decision provide guidance in determining whether a statutory provision gives rise to an individual federal right: (1) Congress must have intended that provision in question benefit plaintiff, (2) plaintiff must demonstrate that right assertedly protected by statute is not so vague and amorphous that its enforcement would strain judicial competence, and (3) statute must unambiguously impose binding obligation on states, i.e., provision giving rise to asserted right must be couched in mandatory, rather than precatory, terms.

1 Cases that cite this headnote

**[8]     Civil Rights** ⟜ Rights Protected

Once plaintiff demonstrates that a federal statutory provision creates an individual right, a rebuttable presumption exists that the right is enforceable under § 1983. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[9]     Civil Rights** ⟜ Child custody, support, and protection; parental rights

Provisions of Title IV-D of Social Security Act authorizing appropriations for purposes of enforcing support obligations owed by noncustodial parents, outlining Secretary's duty to establish standards for state programs for locating noncustodial parents and obtaining child support including standards establishing time limits for responding to requests for assistance in enforcing support orders, and setting forth enforcement obligations which must be met by state plan for child and spousal support including requirement that requests by parents who are residents of other states be treated with the same priority as requests by parents who are residents of state submitting plan, and federal regulations setting forth guidelines states must use in locating noncustodial parents and standards for monitoring compliance with support obligations, do not give rise to federal right that is enforceable through private cause of action under § 1983. Social Security Act, §§ 451, 452(a)(1), (h), 454(4)(B), (13), 42 U.S.C.A. §§ 651, 652(a)(1), (h), 654(4)(B), (13); 42 U.S.C.A. § 1983; 45 C.F.R. §§ 303.3, 303.6.

7 Cases that cite this headnote

**[10]     Civil Rights** ⟜ Other particular rights

For a particular provision of a funding statute to give rise to a federal right enforceable through § 1983, Congress must have unambiguously conferred the right on the individual. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*399** Laurene C. Cuvillier, Decatur, GA, pro se.

Royce Cole, Jackson, MS, for Defendants–Appellees.

Appeal from the United States District Court for the Southern District of Mississippi.

Before GARWOOD, BARKSDALE and GARZA, Circuit Judges.

**Opinion**

GARWOOD, Circuit Judge:

Plaintiff-appellant Laurene Cuvillier (Cuvillier) brought this action pursuant to 42 U.S.C. § 1983, asserting a deprivation of rights secured by Title IV–D of the Social Security Act, 42 U.S.C. §§ 651–669b. Because we conclude that the provisions Cuvillier relies on do not give rise to individual rights, we affirm the district court's dismissal of this suit.

Cuvillier v. Taylor, 503 F.3d 397 (2007)

## FACTS AND PROCEEDINGS BELOW

In 1983, Robert and Anne Harrison were granted a divorce by decree entered in Atlanta, Georgia. Anne Harrison subsequently changed her name to Laurene Cuvillier. As part of the divorce decree, Robert Harrison (Harrison) was required to pay $3,000.00 monthly in child support to Cuvillier. Harrison failed to do so. In 1990, Cuvillier terminated Harrison's parental rights for abandonment and failure to pay child support.

In December of 1993, Cuvillier attempted to collect the past due child support through the Georgia Department of Human Resources (GDHR). By that time, however, Harrison no longer lived in Georgia; he resided in Hazlehurst, Copiah County, Mississippi, where he owned a home and business. Accordingly, in February of 1994, GDHS forwarded a request for collection of the arrears of $261,000.00 to the Copiah County Child Support Enforcement Office (CCCSEO), a subdivision of the Mississippi Department of Human Services (MDHS).

Cuvillier alleges that she made "repeated inquiries" regarding the status of her claims, but that CCCSEO failed to pursue them. On or after June 12, 2002, however, CCCSEO filed a court action against Harrison to collect the child support.[1] Unfortunately, Harrison died on *400 November 21, 2002, before the case could be heard in court. His estate did not pay any of the arrears.

Cuvillier (proceeding *pro se,* here and below) filed this suit on Monday, June 13, 2005, under 42 U.S.C. § 1983 against various CCCSEO employees and MDHS officials: Donald Taylor, Executive Director of MDHS; Johnnie Sullivan, supervisor of CCCSEO Child Support Enforcement; Elmira Williams and Sherry Jackson, both CCCSEO caseworkers; Hugh Redhead, attorney for CCCSEO Child Support Enforcement; Richard Harris, Director of Child Support Enforcement at MDHS; and Betty Polk, the MDHS Regional Director of Child Support Enforcement MDHS. Cuvillier asserted a deprivation of rights secured by various provisions of Title IV–D of the Social Security Act, 42 U.S.C. §§ 651–669b, and 45 C.F.R. §§ 303.3, 303.6, alleging specifically that:

"Defendants' deliberate and intentional decision to take no action on collection of the child support arrears which was due to plaintiff's children; and Defendants' failure to inform

plaintiff of that decision, so that plaintiff could pursue other means of collection; resulted in plaintiff being deprived forever of her opportunity to collect support from Robert Ray Harrison."

On August 8, 2005, Defendants moved for dismissal of Cuvillier's complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, arguing that Title IV–D did not create a privately enforceable federal right, as indicated by *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). Cuvillier filed a reply to the motion on August 25, 2005. On September 23, 2005, Defendants filed "Defendants' Second Motion To Dismiss," under Rule 12(b)(6) urging as additional grounds that— even if the relevant Title IV–D provisions secure individual rights—the applicable statute of limitations and Eleventh Amendment immunity barred Cuvillier's claim. Cuvillier filed a response to the second motion on October 5, 2005.

The district court granted Defendants' second motion to dismiss in an opinion and order filed November 15, 2005.[2] The court concluded, "without considering whether plaintiff can maintain a claim under title IV," that "any such putative claim would be time barred under the applicable statute of limitations." Determining that the applicable limitations period was three years, the district court noted that, because Cuvillier filed suit on June 13, 2005, her claim "should have accrued sometime after June 13, 2002." The court found, however, that Cuvillier's claim accrued much earlier:

"Federal regulation promulgated in accordance with Title IV–D provides that state IV–D agencies must take action to enforce support obligations no later than 60 days after the agency is notified of a delinquency. 45 C.F.R. § 303.6(b)(2). Plaintiff alleges that Defendants were first apprised of Mr. Harrison's delinquency in February 1994. Therefore, Defendants allegedly violated Plaintiff's Title IV–D rights no later than May 1, 1994, when Defendants failed to act within 60 days. Further, Plaintiff alleges that she made repeated inquiries to Defendants prior to June 12, 2002, the date Defendants began legal proceedings against Mr. Harrison. Thus, the Court can reason that Plaintiff was aware of the alleged violation of her statutory right and the resulting injury prior to June 13, 2002."

*401 The district court also addressed Cuvillier's argument that the Defendants' fraudulent concealment prevented her from discovering her claims until after June 12, 2002. Observing that it was only necessary that Cuvillier knew the

Cuvillier v. Taylor, 503 F.3d 397 (2007)

facts that would support a claim, the Court concluded that because she had repeatedly made inquiries regarding what action was being taken, Cuvillier was "aware of the fact that Defendants were not pursuing her claims in a timely manner more than three years before she filed this suit."

The district court entered final judgment and dismissed the action with prejudice on November 15, 2005. Cuvillier timely filed notice of appeal on December 14, 2005.

## DISCUSSION

### I. STANDARD OF REVIEW

**[1]    [2]    [3]**    We review *de novo* a district court's dismissal under Rule 12(b)(6).[3] *Hosein v. Gonzales,* 452 F.3d 401, 403 (5th Cir.2006) (per curiam). "In doing so, we accept as true the well-pleaded factual allegations in the complaint." *Causey v. Sewell Cadillac–Chevrolet, Inc.,* 394 F.3d 285, 288 (5th Cir.2004). To survive a Rule 12(b)(6) motion to dismiss, a complaint "does not need detailed factual allegations," but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true "raise a right to relief above the speculative level."[4] *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). Conversely, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief, 'this basic deficiency should ... be exposed at the point of minimum expenditure of time and money by the parties and the court.' " *Twombly,* 127 S.Ct. at 1966 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, at 234) (quoting *Daves v. Hawaiian Dredging Co.,* 114 F.Supp. 643, 645 (D.Haw.1953) (internal quotation marks omitted)). We may affirm a district court's Rule 12(b)(6) dismissal on any grounds raised below and supported by the record. *Hosein,* 452 F.3d at 403; *see also R2 Invs. LDC v. Phillips,* 401 F.3d 638, 642 (5th Cir.2005).

### II. STATUTE OF LIMITATIONS

**[4]    [5]**    Because Congress has not specified a limitations period for section 1983 suits, in such cases "federal courts borrow the forum state's general personal injury limitations period." *Piotrowski v. City of Houston,* 51 F.3d 512, 514 n. 5 (5th Cir.1995). The relevant limitations period in Mississippi

is three years from the day the cause of action accrues. Miss.Code Ann. § 15–1–49 (2003)[5]; *see also James v. Sadler,* **\*402**    909 F.2d 834, 836 (5th Cir.1990) (in § 1983 suit, finding "the three year residual period provided by Section 15–1–49, Miss.Code Ann. applies"). The limitations period starts to run when the plaintiff becomes aware or has sufficient information to know that he or she suffered an injury. *Piotrowski,* 51 F.3d at 516. Relying on 45 C.F.R. § 303.6(c) (2),[6] the district court concluded that this three-year period ran from May 1, 1994. On appeal, Cuvillier asserts that the limitations period began to run much later: from June 12, 2002, when she "first learned from MDHS that no prior legal collection actions at all had commenced until that date."[7]

We decline to decide this case on statute of limitations grounds. First, we find it unnecessary to do so since, as we explain below, Cuvillier has not asserted a federal right enforceable under section 1983. Second, it is less than clear that the 12(b)(6) dismissal on limitations grounds was appropriate. Using the same standard as the district court, we "must look only at the pleadings and accept all allegations in them as true." *St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.,* 937 F.2d 274, 279 (5th Cir.1991) (contrasting the standard for Rule 12(b)(6) motions to dismiss with that for summary judgment motions under Federal Rule of Civil Procedure 56). Cuvillier alleges in her complaint and on appeal that when she made inquiries regarding attempts to collect the past due child support, CCCSEO officials assured her that they were taking action and fraudulently concealed from her the claims alleged in her complaint. She claims that consequently she was unable to discover her claims before June 12, 2002.[8] For purposes of the instant appeal we therefore assume *arguendo* that Cuvillier brought her suit before the limitations period expired. We proceed to consider whether the Title IV–D provisions relied on by Cuvillier give her federal rights.

### III. TITLE IV–D and 42 U.S.C. § 1983

**[6]    [7]    [8]**    Section 1983 makes liable anyone who, "under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.' " *Blessing v. Freestone,* 520 U.S. 329, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997). The Supreme Court has held that this provision protects certain *rights* conferred by federal statutes. *Id.* Violation of a federal *law* is insufficient for redress through section 1983; a plaintiff must assert **\*403**    violation of a federal *right.* *Id.* Three factors set out in *Blessing* provide

guidance in determining whether a statutory provision gives rise to an individual federal right:

> "First, Congress must have intended that the provision in question benefit the plaintiff. *Wright,* 479 U.S., at 430, 107 S.Ct., at 773–774. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. *Id.,* at 431–432, 107 S.Ct., at 774–775. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms. *Wilder, supra,* at 510–511, 110 S.Ct., at 2517–2518; see also *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1539–1540, 67 L.Ed.2d 694 (1981) (discussing whether Congress created obligations giving rise to an implied cause of action)." *Id.* at 1359–60.

Once a plaintiff demonstrates that a federal statutory provision creates an individual right, a rebuttable presumption exists that the right is enforceable under section 1983. *Id.* at 1360.

In *Blessing,* five Arizona mothers with children eligible for Title IV–D child support services claimed that the state child support "agency never took adequate steps to obtain child support payments from the fathers of their children." *Id.* at 1358. The Ninth Circuit had determined that the mothers had an enforceable individual right to have the state's child support program "achieve 'substantial compliance' with the requirements of Title IV–D." *Id.* at 1356.

The Supreme Court disagreed. *Id.* First, the Court stated that Title IV–D could not be analyzed "so generally." *Id.; see also id.* at 1360 (commenting that "the lower court's holding that Title IV–D 'creates enforceable rights' paints with too broad a brush"). The Court emphasized that the plaintiffs needed to "identify *with particularity* the rights they claimed, since it is impossible to determine whether Title IV–D, as an undifferentiated whole, gives rise to undefined 'rights.' " *Id.* at 1360 (emphasis added).

Second, the Court held that "Title IV–D does not give individuals a federal right to force a state agency to substantially comply with Title IV–D." *Id.* at 1356. In making this determination, the Court observed that the five mothers were not intended beneficiaries of the statutory provisions on which they relied: "[T]he requirement that a State operate its child support program in 'substantial compliance' with Title IV–D was not intended to benefit individual children and

custodial parents, and therefore it does not constitute a federal right." *Id.* at 1361. The Court explained that the "substantial compliance" standard is "simply a yardstick for the Secretary to measure the *systemwide* performance of a State's Title IV–D program"; that even when a state meets the substantial compliance standard, "any individual plaintiff might still be among the 10 or 25 percent of persons whose needs ultimately go unmet"; and that, assuming a state falls below the standard, the Secretary can only reduce the state's funding by up to five percent. *Id.* Title IV–D "may ultimately benefit individuals who are eligible for Title IV–D services, but only indirectly." *Id.* Further, the Court noted that regulations requiring state child support enforcement units to have "sufficient staff" espouse an "undefined standard" that would strain judicial competence if enforced through section 1983. *Id.* at 1362.

**\*404** While the Court concluded that the Arizona mothers had failed to establish that Title IV–D gave them federal rights, the Court nevertheless declined to foreclose the possibility that *some* Title IV–D provisions might give rise to individual rights. *Id.* The Court stated:

> "For example, respondent Madrid alleged that the state agency managed to collect some support payments from her ex-husband but failed to pass through the first $50 of each payment, to which she was purportedly entitled under the pre–1996 version of § 657(b)(1). Although § 657 may give her a federal right to receive a specified portion of the money collected on her behalf by Arizona, she did not explicitly request such relief in the complaint." *Id.* (citation omitted).

The Court concluded that, regardless of whether any Title IV–D provisions secure a federal right, the five Arizona mothers had not clearly alleged a violation of any such particular right. *See id.* (sending the case back to the district court to "determine exactly what rights, considered in their most concrete, specific form, respondents are asserting").

In the instant case, Cuvillier cites several specific statutory provisions that she claims support her contention that Title IV–D gives her a federal right to child support or child support collection. These are: 42 U.S.C. §§ 651–652(a)(1), (h) and 654(4)(B),(13).[9] Cuvillier asserts that **\*405** these specific provisions satisfy *Blessing* 's three factor test. We disagree and conclude that Cuvillier has not shown that these statutory sections give her a federal right.

**[9]** Although we have not addressed post-*Blessing* whether the Title IV–D provisions relied on by Cuvillier give rise to

individual federal rights, we note that the Sixth Circuit faced an appeal similar to Cuvillier's in *Clark v. Portage County, Ohio*, 281 F.3d 602 (6th Cir.2002).[10] The plaintiff in *Clark* brought suit under section 1983 claiming that county officials "failed to provide the enforcement services required to collect outstanding child support payments in violation of Title IV–D." 281 F.3d at 603. The plaintiff relied on 42 U.S.C. § 654(4)(B)—relied on by Cuvillier in this case—and 42 U.S.C. § 654(8) as statutory provisions giving her the right to sue under section 1983, and asserted that 45 C.F.R. §§ 303.3 and 303.6—also relied on by Cuvillier—evidenced this federal right. *Id.* at 604. The Sixth Circuit concluded that the cited statutory provisions did not give rise to an individual right to sue because "the Plaintiff's claimed interests, like those of the plaintiffs in *Blessing*, are so vague and amorphous as to be beyond the competence of the judiciary to enforce on behalf of individuals." *Id.* The court explained further:

> "For example, the state plan requirements in § 654(4)(B) do not make it clear whether an individual right would arise based on the alleged inadequacy of the state plan's wording or from a deficiency in the enforcement efforts of the agency. The lack of such parameters indicates that, regardless of whether the Plaintiff is an intended beneficiary of Title IV–D, Congress did not intend to give her a private right of action to challenge agency actions."
>
> *Id.* at 604–05.[11]

We agree with the Sixth Circuit in *Clark* that "the simple lack of effectiveness by a state in enforcing support obligations does not alone give rise to an individual right."[12] *Id.* at 605. Cuvillier may in some sense be a beneficiary of the Title IV–D provisions that she cites, but Congress did not intend by those provisions *\*406* to give her an individual right enforceable through a section 1983 suit. *Gonzaga University v. Doe*, 536 U.S. 273, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002), instructs this result.[13] In *Gonzaga University*, the Supreme Court made clear that courts should not read *Blessing* too broadly. That is, the Court noted that some courts had read *Blessing* "as allowing plaintiffs to enforce a statute under § 1983 so long as the plaintiff falls within the general zone of interest that the statute is intended to protect." 122 S.Ct. at 2275; *see also S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602 (5th Cir.2004). But in *Gonzaga University* the Court clarified the standard for finding a right enforceable under section 1983: "We [ ] reject the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983.... [I]t is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under

the authority of that section." 122 S.Ct. at 2275. Thus the Court made clear in *Gonzaga University* that individuals may be beneficiaries even though Congress did not confer a right on them.[14] This, we conclude, is Cuvillier's situation.

Moreover, the language of the statutory provisions cited by Cuvillier belies her assertion that Title IV–D gives her a federal right to child support or child support collection on her behalf. Specifically, the provisions' language does not focus on the individuals benefited, but rather focuses entirely on the state agency and what the agency should be doing. For example, 42 U.S.C. § 654(4) and (13) both focus on the *state agency's plan* for child and spousal support and the fact *that such a plan should provide for enforcement of support,* for compliance with other requirements necessary for an effective child support program, and for equal treatment of information requests by residents and non-residents. *The subsections do not focus on the individual beneficiaries* of the state agency's plan. This lack of focus on individuals like Cuvillier counsels against finding a federal right. *See Gonzaga Univ.,* 122 S.Ct. at 2279 (statutory provisions had an "aggregate, not individual focus"). *Compare Evergreen Presbyterian Ministries Inc. v. Hood,* 235 F.3d 908, 927 (5th Cir.2000) (finding that Medicaid recipients are intended beneficiaries of Medicaid Act provision 42 U.S.C. § 1396a(a)(30)(A), "because the provision is 'phrased in terms' benefiting recipients in that it directly focuses on their access to medical care" (citing *Wilder v. Virginia Hosp. Ass'n.* 496 U.S. 498, 110 S.Ct. 2510, 2518, 110 L.Ed.2d 455 (1990))), *with id.* at 929 (concluding that section 30(A) does not confer an individual right on health care providers "because the section does not focus directly on providers").

**[10]**    The existence of Cuvillier's asserted federal right is all the more clearly foreclosed considering that Title IV–D constitutes spending legislation. As the Court made clear in *Gonzaga University,* for a particular provision of a funding statute to *\*407* give rise to a federal right enforceable through section 1983, Congress must have *unambiguously* conferred the right on the individual. *See* 122 S.Ct. at 2273 (stating that the Court has previously "made clear that unless Congress 'speak[s] with a clear voice,' and manifests an 'unambiguous' intent to confer individual rights, federal funding provisions provide no basis for private enforcement by § 1983" (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 1540, 1545 & n. 21, 67 L.Ed.2d 694 (1981))). The FERPA provisions relied on by the *Gonzaga University* plaintiff did not give rise to the federal right he asserted in part because "they serve[d]

Cuvillier v. Taylor, 503 F.3d 397 (2007)

primarily to direct the Secretary of Education's distribution of public funds to educational institutions." *Id.* at 2271–72, 2279. Further, the relevant FERPA provisions' "reference[s] to individual consent is in the context of describing the type of 'policy or practice' that triggers a funding prohibition." *Id.* at 2278.

Cuvillier's asserted right stands in contrast to the type of situation that the Court in *Blessing* suggested might—or might not—evidence a Title IV–D based right enforceable under section 1983. *See* 117 S.Ct. at 1362 (suggesting that the pre–1996 version of 42 U.S.C. § 657(b)(1) might give the plaintiff a "federal right to receive a specified portion of the money collected on her behalf by Arizona"). In the situation referred to by the Court in *Blessing,* the plaintiff had alleged "that the state agency managed to collect some support payments from her ex-husband but failed to pass through the first $50 of each payment," to which she claimed entitlement until Title IV–D. *Id.* Thus, the plaintiff in *Blessing* alleged that the state agency had effectively taken *away* from her specific funds in its possession which the statute made her property. Here, in Cuvillier's case, the state agency simply did not do anything.

Lastly, we reject Cuvillier's reliance on 45 C.F.R. § 303.3 and § 303.6. Both of these sections are within part 303 of 45 C.F.R. Ch. III (2002). Section 303.00 ("Scope and applicability of this part") states that:

"This part prescribes:

(a) The minimum organizational and staffing requirements the State IV–D agency must meet in carrying out the IV–D program, and

(b) The standards for program operation which the IV–D agency must meet."

Thus, these regulations are focused on and directed at, and speak to, the State and its *program,* not at or to individual beneficiaries. Section 303.3 ("Location of noncustodial parents") provides that "the IV–D agency must attempt to locate all noncustodial parents," § 303.3(b), and "[w]ithin no more than 75 calendar days of determining that

[knowing the noncustodial parent's] location is necessary [to enforcement] ... ensure that location information is sufficient to take the next appropriate action in a case." Section 303.6 states that "the IV–D agency must maintain and use an effective system for: ... (c) Enforcing the obligation by: ... (2) [t]aking any appropriate enforcement action ... unless service of process is necessary ... within no more than 30 calendar days of identifying a delinquency ... or the location of the noncustodial parent, whichever occurs later. If service of process is necessary ... service must be completed (or unsuccessful attempts to serve process must be documented ...), and enforcement action taken if process is served, within no later than 60 calendar days of identifying a delinquency ... or the location of the noncustodial parent, whichever occurs later." Again, this is directed to the *state* and its focus is on the *state's* "maintenance and use" of "an effective *system*" (emphasis added). The mandate is for *the state* to maintain a **\*408** child support *system.* These regulations simply do not purport to create an individual federal *right* in beneficiaries.[15]

No doubt Congress meant for individuals like Cuvillier to fall within the sphere of Title–IV's benefits. As *Gonzaga University* indicates, however, this circumstance is insufficient to find a federal right secured by the statutory scheme. Congress did not intend the provisions Cuvillier relies on to give rise to an individual federal right to child support or child support collection.

## CONCLUSION

Because we find that Cuvillier has not asserted a violation of a federal right for which redress may be sought under 42 U.S.C. § 1983, we affirm the district court's dismissal of this suit.

AFFIRMED.

**All Citations**

503 F.3d 397

Footnotes

1    The complaint alleges that "the claims herein were fraudulently concealed by one or more of the Defendants, and Plaintiff, although exercising reasonable diligence, was not able to know or discover her claim until after June 12, 2002", and that defendants Sullivan (CCCSEO Child Support Enforcement supervisor) and Polk (Regional Director, Child Support Enforcement, MDHS) had "repeatedly assured Plaintiff that they were attempting to collect the arrears."

Cuvillier v. Taylor, 503 F.3d 397 (2007)

2    The court's November 15, 2005 order states that the case "is before the Court on" Defendants' first and second motions to dismiss.

3    Under Rule 12(b)(6), a court may dismiss an action for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).

4    In the past, this court has frequently used the expression that a case will not be dismissed " 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *E.g., Kennedy v. Tangipahoa Parish Library Bd. of Control*, 224 F.3d 359, 365 (5th Cir.2000) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Supreme Court, however, recently retired *Conley's* "no set of facts" language. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1969, 167 L.Ed.2d 929 (2007) (stating that "[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard").

5    Mississippi Code 1972 Annotated § 15–1–49, "Limitations applicable to actions not otherwise specifically provided for," states in pertinent part that "[a]ll actions for which no other period of limitation is prescribed shall be commenced within three (3) years next after the cause of such action accrued, and not after."

6    The district court cited 45 C.F.R. § 303.6(b)(2) for the proposition that "state IV–D agencies must take action to enforce support obligations no later than 60 days after the agency is notified of a delinquency." However, the correct citation appears to be § 303.6(c)(2).

7    Defendants argue that even if Cuvillier is correct that her cause of action accrued on June 12, 2002, the three-year limitations period bars her suit because she did not file her complaint until June 13, 2005, one day after three years had passed. As Cuvillier points out, however, this argument overlooks the fact that June 13, 2005 was a Monday. Therefore, the case was properly filed under *Federal Rule of Civil Procedure* 6(a), which states in pertinent part that when computing a period of time allowed "by any applicable statute," "The last day of the period so computed shall be included, unless it is a Saturday, a Sunday, or a legal holiday, ... in which event the period runs until the end of the next day which is not one of the aforementioned days."

8    Moreover, as Cuvillier points out, although the district court correctly noted that 45 C.F.R. § 303.6(c)(2) states that when service of process is necessary, enforcement action must be taken "within no later than 60 calendar days of identifying a delinquency," the district court omitted the end of that provision, which makes clear that enforcement action must be taken within 60 days of whichever occurs later—identifying a delinquency *or* identifying "the location of the noncustodial parent."

9    42 U.S.C. § 651, "Authorization of appropriations," states:

"For the purpose of enforcing the support obligations owed by noncustodial parents to their children and the spouse (or former spouse) with whom such children are living, locating noncustodial parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for assistance under a state program funded under part A of this subchapter) for whom such assistance is requested, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part." 42 U.S.C.A. § 651 (West 2003).

42 U.S.C. § 652(a)(1) states:

"*(a) Establishment of separate organizational unit; duties*

The Secretary shall establish, within the Department of Health and Human Services a separate organizational unit, under the direction of a designee of the Secretary, who shall report directly to the Secretary and who shall—

*(1)* establish such standards for State programs for locating noncustodial parents, establishing paternity, and obtaining child support and support for the spouse (or former spouse) with whom the noncustodial parent's child is living as he determines to be necessary to assure that such programs will be effective;" 42 U.S.C.A. § 652(a)(1) (West Supp.2007).

Cuvillier v. Taylor, 503 F.3d 397 (2007)

Subsection (h) of 42 U.S.C. § 652 states:

"*(h) Prompt State response to requests for child support assistance*

The standards required by subsection (a)(1) of this section shall include standards establishing time limits governing the period or periods within which a State must accept and respond to requests (from States, jurisdictions thereof, or individuals who apply for services furnished by the State agency under this part or with respect to whom an assignment pursuant to section 608(a)(3) of this title is in effect) for assistance in establishing and enforcing support orders, including requests to locate noncustodial parents, establish paternity, and initiate proceedings to establish and collect child support awards." *Id.* § 652(h).

The portions of 42 U.S.C. § 654, "State plan for child and spousal support," cited by Cuvillier state:

"A State plan for child and spousal support must—

...

(4) provide that the State will—

...

(B) enforce any support obligation established with respect to—

(i) a child with respect to whom the State provides services under the plan; or

(ii) the custodial parent of such a child;

...

(13) provide that the State will comply with such other requirements and standards as the Secretary determines to be necessary to the establishment of an effective program for locating noncustodial parents, establishing paternity, obtaining support orders, and collecting support payments and provide that information requests by parents who are residents of other States be treated with the same priority as requests by parents who are residents of the State submitting the plan." *Id.* § 654(4) & (13).

10    Post-*Blessing*, a few other sister circuits have faced issues related to child support under Title IV–D. For example, the Eighth Circuit held that 42 U.S.C. § 657 "does not create an individual right to distribution in strict compliance with its terms." *Walters v. Weiss*, 392 F.3d 306, 313 (8th Cir.2004). More recently, in *Arrington v. Helms*, 438 F.3d 1336, 1347 (11th Cir.2006), the Eleventh Circuit concluded that 42 U.S.C. § 657 "does not confer a private right to distribution of child support payments enforceable under § 1983." The circumstances presented to the Sixth Circuit in *Clark*, however, are most comparable to those currently before us, and Cuvillier does not rely on 42 U.S.C. § 657.

11    The court did not actually decide whether the plaintiff was an intended beneficiary of Title IV–D. *See* 281 F.3d at 604 (assuming the plaintiff to be an intended beneficiary—"a question we need not decide").

12    We note that, while the Sixth Circuit in *Clark* found the plaintiff's asserted rights too "vague and amorphous" and compared this deficiency to the interests of the Arizona mothers in *Blessing*, we have previously concluded that *Blessing* "never reached the vague-and-amorphous question because it found that the plaintiffs had not 'identified with particularity the rights they claimed.' " *Evergreen Presbyterian Ministries Inc. v. Hood*, 235 F.3d 908, 930 n. 28 (5th Cir.2000).

13    In *Gonzaga University*, the Court considered whether a student may sue a private university for damages under section 1983 based on provisions of the Family Educational Rights and Privacy Act of 1974 (FERPA), 88 Stat. 571, 20 U.S.C. § 1232g, that "prohibit the federal funding of educational institutions that have a policy or practice of releasing education records to unauthorized persons." 122 S.Ct. at 2271.

14    As we have previously noted, *Gonzaga University* illustrates that the Supreme Court's "approach to § 1983 enforcement of federal statutes has been increasingly restrictive; in the end, very few statutes are held to confer rights enforceable

Cuvillier v. Taylor, 503 F.3d 397 (2007)

under § 1983." *Johnson v. Hous. Auth. of Jefferson Parish,* 442 F.3d 356, 360 (2006), *cert. denied,* 549 U.S. 821, 127 S.Ct. 136, 166 L.Ed.2d 36 (2006).

15    We also note that in *Arrington v. Helms,* 438 F.3d 1336, 1340 n. 4 (11th Cir.2006), the Eleventh Circuit held that regulations under Title IV–D could not create rights enforceable under § 1983 because the statute in relation to which regulations were adopted did not create such rights. "If the statute at issue does not create rights enforceable under 42 U.S.C. § 1983, then neither do the regulations adopted under that statute." *Id.*

---

End of Document                                                © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Doe v. Columbia-Brazoria Independent School District by and..., 855 F.3d 681 (2017)

342 Ed. Law Rep. 916, 55 NDLR P 49

855 F.3d 681
United States Court of Appeals, Fifth Circuit.

John DOE, Plaintiff–Appellant

v.

COLUMBIA-BRAZORIA INDEPENDENT
SCHOOL DISTRICT, BY AND
THROUGH its BOARD OF
TRUSTEES, Defendant–Appellee

No. 16-40882
|
FILED May 3, 2017

**Synopsis**
**Background:** Former student brought action against public school district, alleging violations of § 1983, Title IX, the Rehabilitation Act, and the Americans with Disabilities Act (ADA), arising out of his alleged sexual assault by a classmate in a school bathroom. The United States District Court for the Southern District of Texas, 2016 WL 2650820, granted district's second motion to dismiss for failure to state a claim, after having first dismissed student's claims without prejudice. Student appealed.

**Holdings:** The Court of Appeals, Leslie H. Southwick, Circuit Judge, held that:

[1] district was not prohibited from bringing a second motion to dismiss for failure to state a claim;

[2] student's sexual assault by classmate, if proven, did not violate student's constitutional rights, as required to support § 1983 claim against district;

[3] student failed to sufficiently allege that district had knowledge of assault, as required to support his Title IX claim;

[4] student failed to sufficiently allege that district had actual knowledge of assault, as required to support his claim of peer-to-peer harassment, in violation of the Rehabilitation Act and the ADA; and

[5] student failed to sufficiently allege that he was excluded from an educational benefit, as required to support his claim of disability discrimination in violation of the Rehabilitation Act and the ADA.

Affirmed.

West Headnotes (19)

[1]     **Federal Courts** ⬅ Procedural Matters
        **Federal Courts** ⬅ Preliminary proceedings
        Court of Appeals reviews a district court's administrative handling of a case, including its enforcement of the local rules and its own scheduling orders, for abuse of discretion.

[2]     **Federal Courts** ⬅ Pleading
        Court of Appeals reviews de novo a district court's dismissal for failure to state a claim. Fed. R. Civ. P. 12(b)(6).

        1 Cases that cite this headnote

[3]     **Federal Civil Procedure** ⬅ Insufficiency in general
        Dismissal for failure to state a claim is appropriate when a plaintiff has failed to allege enough facts to state a claim to relief that is plausible on its face and fails to raise a right to relief above the speculative level, and a claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

        2 Cases that cite this headnote

[4]     **Federal Civil Procedure** ⬅ Matters deemed admitted; acceptance as true of allegations in complaint
        When considering a motion to dismiss for failure to state a claim, courts assume all the allegations in the complaint are true. Fed. R. Civ. P. 12(b)(6).

7 Cases that cite this headnote

**[5]**    **Federal Civil Procedure** ⬌ Motion and proceedings thereon

Public school district was not prohibited from bringing a second motion to dismiss for failure to state a claim by rule governing consolidation of motions after former student filed an amended complaint once district's first motion had been granted without prejudice, in student's action alleging violation of § 1983, Title IX, the Rehabilitation Act, and the ADA; rule governing consolidation of motions did not apply to motions to dismiss for failure to state a claim. Education Amendments of 1972 § 901 et seq., 20 U.S.C.A. § 1681 et seq.; Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; 42 U.S.C.A. § 1983; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed. R. Civ. P. 12(b)(6), 12(g), 12(h)(2).

7 Cases that cite this headnote

**[6]**    **Federal Courts** ⬌ Pleading

District court's error, if any, in permitting public school district to bring a second motion to dismiss for failure to state a claim, was harmless, in former student's action alleging violation of § 1983, Title IX, the Rehabilitation Act, and the ADA; district could have raised new arguments in its second motion to dismiss about limitations on its § 1983 liability, which could have been presented on a motion for judgment on the pleadings, which was not prohibited by rule governing raising of defenses. Education Amendments of 1972 § 901 et seq., 20 U.S.C.A. § 1681 et seq.; Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; 42 U.S.C.A. § 1983; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed. R. Civ. P. 12(b)(6), 12(c), 12(g), 12(h)(2).

4 Cases that cite this headnote

**[7]**    **Federal Civil Procedure** ⬌ Time of determination; reserving decision

District court did not abuse its discretion when it granted public school district's motion to dismiss for failure to state a claim, without granting former student's request for additional discovery or a continuance, in student's action alleging violation of § 1983, Title IX, the Rehabilitation Act, and the ADA; district opposed student's motion for continuance, student failed to show that discovery he sought actually existed, so he did not show that requested discovery would have helped him defeat district's motion even if continuance had been granted. Education Amendments of 1972 § 901 et seq., 20 U.S.C.A. § 1681 et seq.; Rehabilitation Act of 1973, § 2 et seq., 29 U.S.C.A. § 701 et seq.; 42 U.S.C.A. § 1983; Americans with Disabilities Act of 1990, § 2 et seq., 42 U.S.C.A. § 12101 et seq.; Fed. R. Civ. P. 12(b)(6).

**[8]**    **Federal Civil Procedure** ⬌ Discretion of court

A district court has exceedingly wide discretion in scheduling.

1 Cases that cite this headnote

**[9]**    **Constitutional Law** ⬌ Students
        **Constitutional Law** ⬌ Duty to protect; failure to act
        **Education** ⬌ By other students

Former student's sexual assault by classmate, if proven, did not constitute a violation of student's constitutional rights, as required to support student's § 1983 claim against public school district; district did not have a special relationship with student that required it to protect him from harm at the hands of a private actor, student presented no basis for procedural due process or equal protection claims, since limited right to be protected by state from private violence rested on substantive due process, but district's alleged shortcomings in monitoring students, training teachers, and establishing a reporting system for sexual assault did not violate due process clause. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[10]    **Civil Rights** ⬤ Nature and elements of civil
actions

A § 1983 claim requires that a plaintiff (1) allege
a violation of a right secured by the Constitution
or laws of the United States and (2) demonstrate
that the alleged deprivation was committed by
a person acting under color of state law. 42
U.S.C.A. § 1983.

5 Cases that cite this headnote

[11]    **Constitutional Law** ⬤ Duty to Protect;
Failure to Act

**States** ⬤ Torts

Right to be protected by the state from private
violence is limited and rests on substantive due
process. U.S. Const. Amend. 14.

3 Cases that cite this headnote

[12]    **Federal Courts** ⬤ Failure to mention or
inadequacy of treatment of error in appellate
briefs

Former student forfeited his argument against
public school district that he was entitled to
recover on a § 1983 claim on a theory of state-
created danger, arising out of a sexual assault by
a fellow student, where student failed to analyze
theory in a meaningful way in his opening brief
on appeal. 42 U.S.C.A. § 1983.

9 Cases that cite this headnote

[13]    **Civil Rights** ⬤ Sexual assault and abuse;
sexual activity

Former student failed to sufficiently allege that
public school district had knowledge of his
alleged sexual assault in school bathroom by
classmate, as required to support his claim that
district violated Title IX; student admitted that
no teacher or other employee was present during
attack, student alleged that his teacher should
have known about assault when he returned to
class based on his age and extent of his injuries,

though student also alleged that he asked his
mother not to reveal the fact of the assault until
he graduated, and account of student's assault in
his school record described an assault by gang in
dark alley, not an assault by one person in school
bathroom. Education Amendments of 1972 §
901, 20 U.S.C.A. § 1681(a).

1 Cases that cite this headnote

[14]    **Civil Rights** ⬤ Sexual harassment; sexually
hostile environment

A school district that receives federal funds
may be liable for student-on-student harassment
under Title IX if the district (1) had actual
knowledge of the harassment, (2) the harasser
was under the district's control, (3) the
harassment was based on the victim's sex,
(4) the harassment was so severe, pervasive,
and objectively offensive that it effectively
barred the victim's access to an educational
opportunity or benefit, and (5) the district
was deliberately indifferent to the harassment.
Education Amendments of 1972 § 901, 20
U.S.C.A. § 1681(a).

5 Cases that cite this headnote

[15]    **Civil Rights** ⬤ Discrimination by reason of
handicap, disability, or illness

Former student failed to sufficiently allege that
public school district had actual knowledge of
his alleged assault by a classmate, as required to
support his claim of peer-to-peer harassment, in
violation of the Rehabilitation Act and the ADA;
student alleged that he asked his mother not to
reveal the fact of his assault until he graduated to
avoid the "scorn and shame" that might follow if
his peers learned of the attack. Rehabilitation Act
of 1973 § 504, 29 U.S.C.A. § 794(a); Americans
with Disabilities Act of 1990 § 202, 42 U.S.C.A.
§ 12132.

[16]    **Civil Rights** ⬤ Discrimination by reason of
handicap, disability, or illness

A student claiming peer-to-peer harassment at
school in violation of the Rehabilitation Act

and the ADA must prove that (1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, (4) defendant knew about the harassment, and (5) defendant was deliberately indifferent to the harassment. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

5 Cases that cite this headnote

[17]    **Civil Rights** ⬤ Discrimination by reason of handicap, disability, or illness

Former student failed to sufficiently allege that he was excluded from an educational benefit, as required to support his claim against public school district of disability discrimination in violation of the Rehabilitation Act and the ADA, arising out of alleged sexual assault by a classmate in school bathroom; while student asserted that district acted in a discriminatory manner by allowing him to test or study in secluded locations without appropriate accommodation, student did not connect his assault with district's permitting him to test outside classroom, since assault occurred in bathroom. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

[18]    **Civil Rights** ⬤ Discrimination by reason of handicap, disability, or illness

A plaintiff claiming intentional discrimination in violation of the Rehabilitation Act and the ADA must prove (1) that he has a qualifying disability, (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity, and (3) that such discrimination is by reason of his disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

19 Cases that cite this headnote

[19]    **Civil Rights** ⬤ Discrimination by reason of handicap, disability, or illness

Intentional-discrimination liability under the Rehabilitation Act and the ADA requires proof that a school district has refused to provide reasonable accommodations for a handicapped plaintiff to receive the full benefits of the school program. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794(a); Americans with Disabilities Act of 1990 § 202, 42 U.S.C.A. § 12132.

7 Cases that cite this headnote

**\*684** Appeals from the United States District Court for the Southern District of Texas

**Attorneys and Law Firms**

Veronica L. Davis, Attorney, West Columbia, TX, for Plaintiff–Appellant.

Merri Schneider–Vogel, Frances R. Broussard, Thompson & Horton, L.L.P., Houston, TX, Holly Gene McIntush, Thompson & Horton, L.L.P., Austin, TX, for Defendant–Appellee.

Before REAVLEY, OWEN, and SOUTHWICK, Circuit Judges.

**Opinion**

LESLIE H. SOUTHWICK, Circuit Judge:

John Doe sued Columbia-Brazoria Independent School District, alleging violations of 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972, Section 504 of the Rehabilitation Act of 1973, and the Americans with Disabilities Act. The district court dismissed for the plaintiff's failure to state a claim. We AFFIRM.

FACTUAL AND PROCEDURAL BACKGROUND

John Doe is a former student of Columbia-Brazoria Independent School District. He claims he was sexually assaulted in the bathroom at Columbia Elementary School

sometime in 2002 when he was in the second or third grade. During the assault, a "male student made sexual contact with **\*685** [Doe] from the rear." The assailant allegedly threatened Doe to keep him from reporting the assault. Doe's parents recognized he was upset when he arrived home from school, but Doe initially "denied that anything was wrong." He later told his mother about the assault but "begged that she not disclose the incident until he graduated[.]"

At no time did Doe report the assault to a teacher, administrator, or other school employee. Instead, he claims his teacher should have known he was injured when he returned to the classroom, given his age and the extent of the harm. He further claims the District "knew or should have known" that the other boy had assaulted him or other students. According to Doe, the District failed in its duty to protect him by, among other things, not installing cameras in the school bathrooms. Doe claims he had an unspecified disability at the time of the incident for which "he was often sent [out] of his [class]room to test in a separate place or study in a separate area," which left him "at a greater risk of being unprotected[.]"

Doe claims he suffered in various ways following the assault. For example, he struggled with his self-esteem and "was rejected by girls he asked to school dances" when he was in seventh grade. Another student later accused Doe of "inappropriate touching." Doe claims he tried to tell the principal about his own assault when confronted, but the principal "threatened [him] with criminal action and expulsion from school." Doe's mother ultimately placed him in counseling to address the mental and physical problems that materialized after his assault.

Doe filed his initial complaint in December 2014. His second amended complaint, the live pleading here, alleges violations of 42 U.S.C. § 1983; Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681(a)); Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794); and the Americans with Disabilities Act ("ADA"). In July 2015, the District moved to dismiss the second amended complaint for failure to state a claim. The district court summarily denied the motion "without prejudice to refiling." At a later status conference, the district court offered the District an opportunity to re-urge its motion within a specified time. The District timely filed its second motion to dismiss, which the district court granted.

Doe filed for rehearing on the same day that the district court entered its final judgment. Doe argued that Federal Rule of Civil Procedure 12(g) precluded the District from filing a second motion to dismiss under Rule 12(b)(6). The district court denied the motion without explanation. Doe then filed a second motion for rehearing, which the district court treated as a Rule 59(e) motion to alter or amend the judgment. The district court denied the motion, reasoning that Rule 59(e) is not intended to give litigants a "second bite at the apple[.]" Doe timely filed a notice of appeal.

DISCUSSION

[1]   [2]   [3]   [4] "We review the district court's administrative handling of a case, including its enforcement of the local rules and its own scheduling orders for abuse of discretion." *Macklin v. City of New Orleans*, 293 F.3d 237, 240 (5th Cir. 2002). "We review de novo the district court's dismissal for failure to state a claim under [Federal Rule of Civil Procedure] 12(b)(6)." *Nationwide Bi-Weekly Admin., Inc. v. Belo Corp.*, 512 F.3d 137, 140 (5th Cir. 2007). "Dismissal under Rule 12(b)(6) is appropriate when the plaintiff has failed to allege enough facts to state a claim to relief that is plausible on its face and fails to raise a right to relief above the speculative level." *Id.* (quotation marks omitted). "A claim **\*686** has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). We assume "all the allegations in the complaint are true[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

*I. Procedural Claims*

[5] Doe makes two procedural challenges. First, he claims the district court abused its discretion by permitting the District to file a second Rule 12(b)(6) motion after the original motion was denied. Doe argues that Rule 12(g)(2) bars such filings. The District argues that Rule 12(h)(2) permits successive Rule 12(b)(6) motions and that any error in permitting the second motion was harmless.

Rule 12(g)(2) states that "[e]xcept as provided in Rule 12(h) (2) or (3), a party that makes a motion under [Rule 12] must not make another motion under [Rule 12] raising a defense or objection that was available to the party but omitted from

its earlier motion." Rule 12(h)(2) provides that "[f]ailure to state a claim upon which relief can be granted ... may be raised: (A) in any pleading allowed or ordered under Rule 7(a); (B) by a motion under Rule 12(c); or (C) at trial." We have previously held that Rule 12(g) does not require consolidation of defenses raised in a second Rule 12(b)(6) motion. *Belo*, 512 F.3d at 141. In *Belo*, the plaintiff sued the defendant in the Southern District of Ohio. *Id.* at 139. There, the defendant brought a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6). *Id.* To obviate the personal-jurisdiction issue, the plaintiff moved to transfer the case to the Northern District of Texas. *Id.* at 139–40. In that court, the defendant again moved to dismiss under Rule 12(b)(6). *Id.* at 140. This time it argued that the suit violated the Texas statute of limitations, and the district court agreed. *Id.* On appeal, the plaintiff argued that Rule 12(g)'s consolidation requirement barred the defendant's second Rule 12(b)(6) motion. *Id.* at 141. We disagreed and held that "Rule 12(h)(2) explicitly excepts from the consolidation requirement motions based on the defense of failure to state a claim upon which relief can be granted." *Id.*

There are procedural distinctions between this case and *Belo*, including that the Texas statute of limitations would not have been relevant until it was clear that Texas law applied after the transfer. Nonetheless, *Belo* does not suggest we were relying on the fact that the two Rule 12(b)(6) motions were filed in two different states' federal district courts. Instead, we said simply that Rule 12(h)(2) allows the filing of a second motion. We apply that same right to this case.

**[6]** In addition, even if Rule 12(h)(2) should not be interpreted this way, there was no harm in allowing the second motion. The District may have raised new arguments in its second motion by adding information about the special-relationship and state-created-danger exceptions to Section 1983 liability. If so, the District could have presented that same argument in a Rule 12(c) motion for judgment on the pleadings, which Rule 12(h) does not prohibit. *See, e.g., Leyse v. Bank of Am. Nat. Ass'n,* 804 F.3d 316, 321 (3d Cir. 2015); *Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty.,* 771 F.3d 697, 703 (10th Cir. 2014). The district court did not abuse its discretion in considering the District's second Rule 12(b)(6) motion.

**[7]** Second, Doe argues that the district court abused its discretion by not ***687** allowing further discovery or granting a continuance. Doe sought an extension of time

to seek records pertaining to his assault and concerning the perpetrator. Doe contends the District deliberately withheld those records. The District opposed the request, maintaining that it "did not have any records pertaining to the accused student, who had left the district more than a decade before the lawsuit was filed." In response, the district court suggested that Doe depose the District's custodian of records but made clear that any discovery beyond the deadline must be by agreement of the parties.[1] Doe also contends the district court abused its discretion by ruling on the District's motion to dismiss three days after the status conference. Despite representing to the court that he would respond to the District's motion on a certain date, Doe never responded. His failure to respond is especially conspicuous in light of the district court's strict warning on the matter during the status conference.[2]

**[8]** A district court has "exceedingly wide" discretion in scheduling. *Versai Mgmt. Corp. v. Clarendon Am. Ins. Co.,* 597 F.3d 729, 740 (5th Cir. 2010). The considerations include "not only the facts of the particular case, but also all of the demands on counsel's time and the court's time." *Id.* (quotation marks and alterations omitted). Doe can offer no support for his contention that the district court abused its discretion with respect to the discovery deadlines. His motion for a continuance was opposed, and he failed to show that the discovery he sought actually existed. That means Doe did not show that the requested discovery would have helped him defeat the District's motion to dismiss even if the continuance had been granted. *See, e.g., Six Flags, Inc. v. Westchester Surplus Lines Ins. Co.,* 565 F.3d 948, 963 (5th Cir. 2009). Also, the court indicated that extending the deadline would negatively impact the scheduling demands of other cases. Because the district court has the inherent power to control its own docket, we find no abuse of discretion here. *See Landis v. N. Am. Co.,* 299 U.S. 248, 253–54, 57 S.Ct. 163, 81 L.Ed. 153 (1936).

## II. Section 1983 Claims

**[9]** Doe alleged due-process and equal-protection violations under Section 1983. He argues the District "had an affirmative duty to protect [his] liberty interests," which include the "right to be free of unjustified intrusions of his personal security."

**[10]**    **[11]** A Section 1983 claim requires that a plaintiff "(1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of

state law." **\*688** *James v. Texas Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008) (quotation marks omitted). The right to be protected by the state from private violence is limited and rests on substantive due process. *Doe ex rel. Magee v. Covington Cnty. Sch. Dist. ex rel. Keys*, 675 F.3d 849, 853 n.2 (5th Cir. 2012) (en banc). Accordingly, Doe's case presents no basis for a procedural-due-process or an equal-protection claim.

In this case, Doe's claim does not arise from the abuse itself because no state actor committed it. *Id.* at 855 n.3. Instead, there must have been some specific and actionable deficiency on the part of the District that allowed the abuse to occur. *Id.* That requirement can be seen from *Covington*, where nine-year-old Jane attended an elementary school that required her parents to authorize any individual who was permitted to take her from school during the day. *Id.* at 852–53. On six occasions, school personnel allowed Tommy Keyes to take Jane from school, even though he was not authorized by her parents. *Id.* at 853. On those occasions, Keyes took Jane from the school premises, sexually molested her, and returned her to school. *Id.* Jane's guardians sued the school, alleging that the check-out policy "created a danger to students" and was "the direct and proximate cause of Jane's injury." *Id.*

We began our analysis by noting that Jane's constitutional claim against the school was based not on private conduct but on the school's allegedly deficient check-out policy. *Id.* at 855. As a result, her claim could only proceed if she established a special relationship between herself and the school or, potentially, if the state created the danger. *Id.* at 855–56, 863–65.

Jane could not establish a special relationship. *Id.* at 863 (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)). The case from which the special-relationship requirement was drawn stated that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." *DeShaney*, 489 U.S. at 195, 109 S.Ct. 998. A complainant and the state have that relationship only "when the State takes a person into its custody and holds him there against his will[.]" *Id.* at 199–200, 109 S.Ct. 998. The relationship exists "when the state incarcerates a prisoner," "involuntarily commits someone to an institution," or places a child in foster care. *Covington*, 675 F.3d at 856 (citations omitted). Notably, "a public school does not have a special relationship with a student that would require the school to protect the student from harm at the hands of a private actor." *Id.* Therefore, the school did not

have a constitutional duty to protect Jane from the abuse by Keyes. *Id.* at 863.

**[12]** Jane also did not satisfy what we have said would be necessary to establish a claim under the state-created-danger exception—were we to adopt such an exception. *Id.* at 866. We limit our discussion for several reasons. First, in *Covington*, we declined to adopt the exception as the law of this Circuit. *Id.* at 865. Subsequent panels have "repeatedly noted" the unavailability of the theory. *Estate of Lance v. Lewisville Indep. Sch. Dist.*, 743 F.3d 982, 1002 (5th Cir. 2014). Finally, Doe failed to analyze the theory in a meaningful way in his opening brief. The argument is thus forfeited. *See United Paperworkers Intern. Union, AFL-CIO, CLC v. Champion Intern. Corp.*, 908 F.2d 1252, 1255 (5th Cir. 1990).

In summary, Doe's claims are not based on the private conduct of his assailant but on the District's shortcomings in monitoring the students, training the teachers, and **\*689** establishing a reporting system for sexual assault. "[A] State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *DeShaney*, 489 U.S. at 197, 109 S.Ct. 998. That leaves Doe with only the special-relationship theory, having forfeited the possibility of a state-created-danger argument. There was no special relationship between the plaintiff and the state. Doe has thus failed to prove a constitutional violation.

The Section 1983 claims were properly dismissed.

*III. Title IX Claim*

**[13]** **[14]** The district court summarily dismissed Doe's claim of a violation of Title IX. Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Liability requires several factors to be satisfied:

> A school district that receives federal funds may be liable for student-on-student harassment if the district (1) had actual knowledge of the harassment, (2) the harasser was under the district's control, (3) the harassment was based on the victim's sex, (4) the harassment was so severe, pervasive, and objectively offensive that it effectively barred the victim's access to an educational opportunity or benefit, and (5) the district was deliberately indifferent to the harassment.

342 Ed. Law Rep. 916, 55 NDLR P 49

*Sanches v. Carrollton–Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) (quotation marks and alterations omitted). A plaintiff's failure to plead one of these elements is fatal to the claim. *See id.* at 166.

The district court found that Doe "fail[ed] to allege that [the District] had actual knowledge of the alleged assault" and so could not establish his Title IX claim. Doe's complaint alleges the assault took place in a restroom. There is no suggestion that a teacher or other school employee was present. Instead, he complains his teacher should have known about the assault when he returned to class based on his age and the extent of his injuries. The remainder of his complaint belies that assertion, though. Notably, Doe asked his mother not to reveal the fact of the assault until he graduated to avoid the "scorn and shame" that might follow if his peers learned of the attack. Thus, Doe not only failed to plead actual knowledge but *admitted* the District had no knowledge of his assault.

Doe acknowledges the insufficiency of his pleadings in his appellate brief. "Though not initially pled," he still "contends that the district had either actual or constructive knowledge of the incident[.]" He claims the District's "nonproduction" of certain records is indicative of actual knowledge. As noted above, though, the district court properly handled the discovery dispute, crediting the District's uncontradicted representation that the records Doe requested did not exist. Doe further claims that a "semi-autobiographical account" of his assault, allegedly available in his school record, "was maintained by the District in anticipation of litigation." Upon review, the account Doe referenced details an assault by a gang in a dark alley — not an assault by one person in the school bathroom. That record is not relevant to his claims. Doe thus failed to show the District's actual knowledge required to establish *690 liability under Title IX.[3] The district court did not err in dismissing this claim.

### IV. Section 504 and ADA Claims

[15] Finally, the district court dismissed Doe's claim of violations of Section 504 and the ADA. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]" 29 U.S.C. § 794(a). Similarly, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from

participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Cases concerning either section apply to both. *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000).

[16] To the extent Doe's claims are based on a theory of peer-to-peer harassment, he must prove each of the following:

(1) he was an individual with a disability, (2) he was harassed based on his disability, (3) the harassment was sufficiently severe or pervasive that it altered the condition of his education and created an abusive educational environment, (4) defendant knew about the harassment, and (5) defendant was deliberately indifferent to the harassment.

*Lance*, 743 F.3d at 996 (citation and alterations omitted). As noted in our discussion of Doe's Title IX claim, he did not plead sufficient facts to show the District had actual knowledge of the assault. Doe's peer-to-peer harassment claim fails on that basis.

The District also claims Doe failed to allege he was an individual with a disability or that any harassment was based on a disability. We need not discuss those additional possible defects.

[17] [18] [19] To the extent Doe's claims are based on a theory of disability-based intentional discrimination, he must allege "(1) that he has a qualifying disability; (2) that he is being denied the benefits of services, programs, or activities for which the public entity is responsible, or is otherwise discriminated against by the public entity; and (3) that such discrimination is by reason of his disability." *Hale v. King*, 642 F.3d 492, 499 (5th Cir. 2011). Intentional-discrimination liability requires proof that the "school district has *refused* to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program." *D.A. ex rel. Latasha A. v. Houston Indep. Sch. Dist.*, 629 F.3d 450, 454 (5th Cir. 2010) (citation omitted).

Doe alleges that the District acted in a discriminatory manner by allowing him to test or study in secluded locations without "appropriate accommodation." "This failure," he argues, "subjected him to isolation due to his disability which placed [him] in a position of vulnerability [and] led to [the] peer-on-peer molestation incident." The assault, though, took place in the school bathroom. Doe cannot connect the assault with the District's permitting him to test outside the classroom. Doe does not claim the District excluded him from any educational

Doe v. Columbia-Brazoria Independent School District by and..., 855 F.3d 681 (2017)
342 Ed. Law Rep. 916, 55 NDLR P 49

benefit. The district court did not err in dismissing these claims.

*691  *V. Motions Carried with the Case*

Five motions were carried with the case, most of which relate to Doe's late submission of his initial appellate brief. After his initial brief was submitted, it was twice marked insufficient. Doe thus made the requested changes, and the clerk's office accepted his brief. The District now argues that Doe made "substantive changes not necessary to correct the errors in the original brief" without notifying the court or the District. The

District moved to strike the portions of Doe's brief that were not necessary to correct the insufficiencies, and Doe moved to strike the District's motion as frivolous.

Having decided the merits of the dispute on the briefing before us, we deny each of these motions as moot.

AFFIRMED.

**All Citations**

855 F.3d 681, 342 Ed. Law Rep. 916, 55 NDLR P 49

Footnotes

1    The District also requested an extension of time for filing dispositive motions because Doe failed to appear for his deposition and was unable to reschedule before the dispositive-motions deadline. The district court granted the request so the parties would have the benefit of Doe's deposition testimony when drafting any motions for summary judgment.

2    The district court stated this during the status conference:

The deal is that there's a Motion to Dismiss for Failure to State a Claim. A response was due. There is no response on file. There needs to be a response on file before I rule. If I rule and there's not a response, then that's the end of it. So you need to be sure that this is a priority. I'm giving you the opportunity. I can't say when I'm going to rule, but I'm just telling you that the deadline has passed for filing a response. You need to make this a priority and file a response to the Motion to Dismiss.

3    The District also alleges Doe failed to show the District was deliberately indifferent to known harassment, as required by Title IX. Having resolved this issue on the actual-knowledge element, we do not reach the question of deliberate indifference.

End of Document
© 2022 Thomson Reuters. No claim to original U.S. Government Works.

866 F.3d 682
United States Court of Appeals, Fifth Circuit.

Royce Denton MCLIN, Plaintiff–Appellant

v.

Jason Gerald ARD, In his Individual and
Official Capacity as Sheriff of Livingston
Parish; Benjamin Thomas Ballard, In
his Individual and Official Capacity as a
Livingston Parish Sheriff's Office Detective;
Jack R. Alford, Jr., In his Individual and
Official Capacity as a Livingston Parish
Sheriff's Office Detective; Stan Carpenter,
In his Individual and Official Capacity as
a Livingston Parish Sheriff's Office Major;
Brian P. Smith, In his Individual and Official
Capacity as a Livingston Parish Sheriff's Office
Lieutenant Colonel; Bonita G. Sager, In his/
her Individual and Official Capacity as a
Livingston Parish Sheriff's Office Detective;
William Dorsey, In his Individual and Official
Capacity as a Livingston Parish Sheriff's
Office Deputy, also known as Willie; James
R. Norred, Jr., In his Individual and Official
Capacity as a Councilman, also known as
Jim; Cynthia G. Wale, In her Individual and
Official Capacity as a Councilwoman, also
known as Cindy; Chance McGrew Parent,
In his Individual and Official Capacity
as a Councilman, Defendants–Appellees

No. 16-30201
|
FILED August 8, 2017

**Synopsis**
**Background:** Arrestee brought § 1983 action against
Louisiana parish council members and officers from sheriff's
office, alleging a conspiracy to arrest and maliciously
prosecute arrestee for criminal defamation, in retaliation

for his criticism of council members on social networking
website. The United States District Court for the Middle
District of Louisiana, Shelly Deckert Dick, J., 2013 WL
5798989 and 2014 WL 545743, dismissed in part. Defendants
appealed. The Court of Appeals, 611 Fed.Appx. 806,
remanded. On remand, the District Court, Shelly Deckert
Dick, J., 2016 WL 482046, dismissed remaining claims.
Arrestee appealed.

**Holdings:** The Court of Appeals, Stephen A. Higginson,
Circuit Judge, held that:

[1] arrestee sufficiently alleged that arrest warrants were
tainted by false and misleading affidavits;

[2] arrestee, who voluntarily surrendered because arrest
warrants had been issued, was seized for Fourth Amendment
purposes;

[3] arrestee sufficiently alleged that probable cause did not
exist to arrest him for criminal defamation;

[4] it was not clearly established in August 2012 that a person
who voluntarily surrendered after learning that warrants had
been issued for his arrest was seized for Fourth Amendment
purposes, and thus, defendants were entitled to qualified
immunity; and

[5] arrestee's allegation that he suffered "great personal
damage" did not allow inference that his speech was actually
chilled, as would be required to state a claim for retaliation in
violation of First Amendment.

Affirmed.

West Headnotes (31)

[1]    **Federal Courts**  ⬥  Pleading
       The Court of Appeals reviews de novo the
       District Court's grant of a motion to dismiss for
       failure to state a claim. Fed. R. Civ. P. 12(b)(6).

       3 Cases that cite this headnote

[2]    **Federal Civil Procedure** ⟳ Insufficiency in general

**Federal Civil Procedure** ⟳ Matters deemed admitted; acceptance as true of allegations in complaint

To survive a motion to dismiss for failure to state a claim, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6).

7 Cases that cite this headnote

[3]    **Federal Civil Procedure** ⟳ Construction of pleadings

On a motion to dismiss for failure to state a claim, the court draws all inferences in favor of the nonmoving party, and views all facts and inferences in the light most favorable to the nonmoving party. Fed. R. Civ. P. 12(b)(6).

8 Cases that cite this headnote

[4]    **Federal Civil Procedure** ⟳ Matters deemed admitted; acceptance as true of allegations in complaint

On a motion to dismiss for failure to state a claim, legal conclusions are not entitled to an assumption of truth and must be supported by factual allegations. Fed. R. Civ. P. 12(b)(6).

[5]    **Federal Civil Procedure** ⟳ Insufficiency in general

A claim has facial plausibility, as required to survive a motion to dismiss for failure to state a claim, when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

21 Cases that cite this headnote

[6]    **Public Employment** ⟳ Privilege or immunity in general

When the motion to dismiss for failure to state a claim raises the defense of qualified immunity for a public official, the plaintiff must plead specific facts that allow the court to draw the reasonable inference that the defendant is liable for the harm alleged, and must plead with equal specificity facts that defeat a qualified immunity defense. Fed. R. Civ. P. 12(b)(6).

28 Cases that cite this headnote

[7]    **Public Employment** ⟳ Qualified immunity

The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal.

9 Cases that cite this headnote

[8]    **Civil Rights** ⟳ Government Agencies and Officers

**Civil Rights** ⟳ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

**Civil Rights** ⟳ Defenses; immunity and good faith

To defeat a claim of qualified immunity for a public official, the plaintiff has the burden to demonstrate the inapplicability of the defense by showing that: (1) the official violated a statutory or constitutional right, and (2) the right was clearly established at the time of the challenged conduct.

22 Cases that cite this headnote

[9]    **Civil Rights** ⟳ Government Agencies and Officers

Courts have discretion to decide which prong of the qualified immunity analysis for public officials to address first.

2 Cases that cite this headnote

[10]    **False Imprisonment** ⟳ Judicial process

If facts supporting an arrest are placed before an independent intermediary such as a magistrate or

grand jury, the intermediary's decision to issue an arrest warrant breaks the chain of causation for false arrest, insulating the initiating party. U.S. Const. Amend. 4.

38 Cases that cite this headnote

[11]    **False Imprisonment** ⟜ Judicial process
The initiating party for an arrest warrant may be liable for false arrest if the arrestee shows that the deliberations of the intermediary who issued the warrant were in some way tainted by the actions of the initiating party. U.S. Const. Amend. 4.

22 Cases that cite this headnote

[12]    **False Imprisonment** ⟜ Judicial process
Because the intermediary's deliberations in issuing an arrest warrant protect even police officers with malicious intent from liability for false arrest, an arrestee must show that the officer's malicious motive led the officer to withhold relevant information or otherwise misdirect the independent intermediary by omission or commission. U.S. Const. Amend. 4.

21 Cases that cite this headnote

[13]    **False Imprisonment** ⟜ Declaration, complaint, or petition
While mere allegations that an arrest warrant was tainted by the initiating party are insufficient at the summary judgment stage of an action for false arrest, such allegations may be adequate to survive a motion to dismiss for failure to state a claim, where the complaint alleges other facts supporting an inference of taint. U.S. Const. Amend. 4; Fed. R. Civ. P. 12(b)(6), 56.

22 Cases that cite this headnote

[14]    **Civil Rights** ⟜ Arrest and detention
Arrestee sufficiently alleged, as required to survive motion to dismiss for failure to state a claim, that arrest warrants were tainted by false and misleading affidavits, so that magistrate's issuance of warrants did not insulate Louisiana parish council members and

officers from sheriff's office from liability for false arrest; arrestee alleged that after he made comments on social networking website criticizing council members, members and officers, acting with knowledge that arrestee's speech was constitutionally protected, conspired to create false and misleading affidavits, which were the basis for issuance of arrest warrants. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[15]    **Arrest** ⟜ What Constitutes a Seizure or Detention
A person is "seized" for Fourth Amendment purposes when the officer, by means of physical force or show of authority, has in some way restrained the liberty of the person. U.S. Const. Amend. 4.

16 Cases that cite this headnote

[16]    **Arrest** ⟜ What Constitutes a Seizure or Detention
A seizure occurs, for Fourth Amendment purposes, only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. U.S. Const. Amend. 4.

14 Cases that cite this headnote

[17]    **Arrest** ⟜ What Constitutes a Seizure or Detention
The reasonable-person test for a seizure under the Fourth Amendment is objective and ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual claiming a violation. U.S. Const. Amend. 4.

6 Cases that cite this headnote

[18]    **Arrest** ⟜ What Constitutes a Seizure or Detention
Physical force is not required to effect a seizure under the Fourth Amendment, but absent

physical force, submission to the assertion of authority is necessary. U.S. Const. Amend. 4.

13 Cases that cite this headnote

**[19]** **Arrest** ⟿ What Constitutes a Seizure or Detention

Voluntary submissions to a show of state authority can constitute seizures for Fourth Amendment purposes. U.S. Const. Amend. 4.

1 Cases that cite this headnote

**[20]** **Arrest** ⟿ Particular cases

Arrestee, by alleging that he voluntarily surrendered to law enforcement officers after learning that three arrest warrants had been issued, sufficiently alleged that he had been seized for Fourth Amendment purposes, in § 1983 action alleging lack of probable cause for an arrest; issuance of arrest warrants would be a show of authority, and no reasonable person would believe he was free to leave after officers accepted a surrender by exercising authority consistent with warrants. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[21]** **Arrest** ⟿ What constitutes such cause in general

Probable cause for an arrest is the sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers. U.S. Const. Amend. 4.

7 Cases that cite this headnote

**[22]** **Arrest** ⟿ Authority under warrant
**Civil Rights** ⟿ Arrest and detention

Arrestee sufficiently alleged that probable cause did not exist to arrest him, pursuant to arrest warrants, for criminal defamation under Louisiana law, as required to state a Fourth Amendment claim for false arrest, in § 1983 action alleging that parish council members

and officers from sheriff's office conspired to obtain arrest warrants that were not supported by probable cause; arrestee alleged that arrest warrants were based on his conduct in criticizing council members on social networking website, and that First Amendment protection of speech did not allow the criminal defamation statute to be enforced with respect to criticizing the official conduct of public officials unless actual malice was shown. U.S. Const. Amends. 1, 4; 42 U.S.C.A. § 1983; La. Rev. Stat. Ann. § 14:47.

2 Cases that cite this headnote

**[23]** **Civil Rights** ⟿ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

When considering whether a public official's alleged conduct violated clearly established law, so that the official would not be entitled to qualified immunity from civil liability, the court must ask whether the law so clearly and unambiguously prohibited the official's conduct that every reasonable official would understand that what he is doing violates the law.

16 Cases that cite this headnote

**[24]** **Civil Rights** ⟿ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

To answer in the affirmative the question whether a public official's alleged conduct violated clearly established law, so that the official would not be entitled to qualified immunity from civil liability, the court must be able to point to controlling authority, or a robust consensus of persuasive authority, that defines the contours of the right in question with a high degree of particularity.

10 Cases that cite this headnote

**[25]** **Civil Rights** ⟿ Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general

Where no controlling authority specifically prohibits a public official's conduct, and where

McLin v. Ard, 866 F.3d 682 (2017)

the federal circuit courts are split on the issue, the law cannot be said to be clearly established, as would preclude the public official from receiving qualified immunity from civil liability.

7 Cases that cite this headnote

[26]    **Civil Rights** ⟲ Sheriffs, police, and other peace officers

It was not clearly established in August 2012 that a person who voluntarily surrendered after learning that warrants had been issued for his arrest was seized for Fourth Amendment purposes, and thus, Louisiana parish council members and officers from sheriff's office had qualified immunity from liability under § 1983 for Fourth Amendment violation arising from arrest without probable cause, based on council members' and officers' allegedly conspiring to obtain warrants for arrest under Louisiana's criminal defamation statute, which alleged conspiracy occurred despite members' and officers' knowledge that First Amendment protection of speech prohibited enforcement of statute with respect to arrestee's criticism of council members' official conduct. U.S. Const. Amends. 1, 4; 42 U.S.C.A. § 1983; La. Rev. Stat. Ann. § 14:47.

[27]    **Constitutional Law** ⟲ Freedom of Speech, Expression, and Press

**Constitutional Law** ⟲ Retaliation

The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities. U.S. Const. Amend. 1.

11 Cases that cite this headnote

[28]    **Constitutional Law** ⟲ Retaliation in general

To prevail on a § 1983 claim for First Amendment retaliation, plaintiff must show that: (1) he was engaged in constitutionally protected activity; (2) defendant's actions caused him to suffer an injury that would chill a person of ordinary firmness from continuing to engage

in that activity; and (3) defendant's adverse actions were substantially motivated by the constitutionally protected conduct. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

13 Cases that cite this headnote

[29]    **Constitutional Law** ⟲ Retaliation in general

Retaliatory criminal prosecutions in violation of First Amendment protection of speech are actionable only if a plaintiff can prove the common-law elements of malicious prosecution. U.S. Const. Amend. 1.

6 Cases that cite this headnote

[30]    **Constitutional Law** ⟲ Retaliation

Requiring a plaintiff, asserting a claim for retaliation for speech protected by First Amendment, to show actual injury, i.e., that plaintiff's speech actually has been chilled, does not necessarily mean that plaintiffs must cease criticizing government officials altogether in order to have a claim for retaliation; the effect on freedom of speech may be small. U.S. Const. Amend. 1.

14 Cases that cite this headnote

[31]    **Constitutional Law** ⟲ Website content

**Counties** ⟲ Governmental powers in general

**Public Employment** ⟲ Protected activities

**Sheriffs and Constables** ⟲ Liabilities for acts or omissions of deputies or assistants

Plaintiff's allegation that he suffered "great personal damage" from alleged conduct of Louisiana parish council members and officers from sheriff's office did not allow inference that the conduct actually chilled his speech, as would be required to state a claim for retaliation for speech protected by First Amendment, in § 1983 action alleging that after plaintiff criticized council members on social networking website, members and officers conspired to arrest him without probable cause and to prosecute him for criminal defamation. U.S. Const. Amend. 1; 42 U.S.C.A. § 1983.

McLin v. Ard, 866 F.3d 682 (2017)

4 Cases that cite this headnote

**West Codenotes**

**Limitation Recognized**

La. Rev. Stat. Ann. § 14:47

**\*686** Appeal from the United States District Court for the Middle District of Louisiana, Shelly Deckert Dick, U.S. District Judge

**Attorneys and Law Firms**

Tillman J. Breckenridge, Bailey Glasser, L.L.P., Washington, DC, John Christopher Alexander, Sr., Esq., Attorney, Alexander Law Firm, Baton Rouge, LA, for Plaintiff–Appellant.

Cullen John Dupuy, Esq., Druit George Gremillion, Jr., Esq., Attorney, Breazeale, Sachse & Wilson, L.L.P., Baton Rouge, LA, for Jason Gerald Ard, Benjamin Thomas Ballard, Jack R. Alford, Jr., Stan Carpenter, Brian P. Smith, Bonita G. Sager, and William Dorsey.

Christopher M. Moody, Moody Law Firm, Hammond, LA, for James R. Norred, Jr., Cynthia G. Wale, and Chance McGrew Parent.

Before JOLLY, SMITH, and HIGGINSON, Circuit Judges.

**Opinion**

STEPHEN A. HIGGINSON, Circuit Judge:

Royce Denton McLin alleges that members of the Livingston Parish Council and Livingston Parish Sheriff's Office maliciously conspired to prosecute him in retaliation for McLin's online comments about certain Council members. He contends that the Defendants obtained invalid arrest warrants, to which McLin surrendered, and that, as a result, he was issued a misdemeanor summons charging him with criminal defamation. After the charges were dismissed, McLin sued the Defendants under 42 U.S.C. § 1983, alleging violations of his First, Fourth, Fifth, and Fourteenth Amendment rights. The district court dismissed all claims. McLin appeals the dismissal of his First and Fourth Amendment claims. We AFFIRM.

**I.**

We recount the facts as alleged in McLin's complaint. Sometime before April 16, 2012, the Livingston Daily Times published an opinion piece titled "Sue Happy Seven Councilmen," which discussed complaints about the Livingston Parish Council's **\*687** misuse of public funds. A URL link to the piece was posted on a separate Facebook page maintained by the Livingston Daily Times. The Facebook post was open to public comment. Using a pseudonym, someone posted "critical comments" about three Council members—James R. Norred, Jr., Cynthia G. Wale, and Chance McGrew Parent (the "Council Defendants"). McLin alleges that the statements "merely constituted criticism of official conduct of public officials."

On April 20, 2012, Parent filed a report with the Livingston Parish Sheriff's Office ("LPSO") alleging that the anonymous Facebook user had "posted a comment in regards to numerous elected counsel [sic] members." In response, LPSO Detective Benjamin Thomas Ballard obtained subpoenas to Facebook and Charter Communications. The subpoena responses linked McLin's home address to the Facebook account that posted the critical comments.

Ballard obtained a search warrant for McLin's home, and he and LPSO Detective Jack R. Alford, Jr. executed the search warrant on June 11, 2012. Ballard and Alford confiscated electronic devices and equipment, and a forensic analysis purportedly linked one of the confiscated computers to the anonymous Facebook user.

Upon receiving this information, Ballard, Alford, and other officers (together with Sheriff Jason Gerald Ard, the "Officer Defendants"), and the Council Defendants (together with the Officer Defendants, the "Defendants") met on August 16, 2012, to discuss pursuing criminal charges against McLin. Some of the officers urged that criminal defamation charges under Louisiana's criminal defamation statute—Louisiana Revised Statute § 14:47—were warranted. The Council Defendants asked to pursue the charges against McLin and "swore out criminal complaints" contending that they were each subjected to criminal defamation as a result of comments McLin allegedly posted to Facebook.

McLin alleges that these "arrest warrant affidavits"[1] were "materially false." According to McLin, the "false and misleading statements" contained in the affidavits

"originated, at least in part, from a self-serving and unreliable 'review' of illegally[ ]obtained evidence" by certain officers." McLin alleges that these "materially false statements were thereafter sponsored, ratified, affirmed, supported, and relied upon" the officers. McLin further alleges that the "facially[ ]invalid arrest warrants arose from the false statements made by [the Defendants]," and that "the [Officer Defendants] conspired with the [Council Defendants] to create false and materially misleading arrest warrant affidavits as the necessary predicate to securing a formal warrant for Mr. McLin's arrest."

Based on the sworn criminal complaints, three warrants for McLin's arrest were issued on August 16, 2012. McLin learned of the charges, and later that day, voluntarily surrendered at the sheriff's office and signed a misdemeanor summons pertaining to the three purported criminal defamation violations. Four months later, an assistant district attorney dismissed the charges.

## II.

On August 16, 2013, McLin sued the Defendants for money damages under 42 U.S.C. § 1983,[2] alleging First, Fourth, **\*688** Fifth, and Fourteenth Amendment violations, and several Louisiana state law claims. Specifically, the complaint alleges that the Defendants maliciously investigated and conspired to prosecute McLin in retaliation for McLin's critical Facebook comments.

The Council Defendants moved to dismiss the complaint pursuant to Rule 12(b)(6), arguing that they were entitled to qualified immunity. The district court granted the motion and dismissed McLin's § 1983 First and Fourth Amendment claims against the Council Defendants. The Officer Defendants also moved to dismiss the complaint on the grounds of qualified immunity. The district court granted the Officer Defendants' motion as to McLin's First and Fourteenth Amendment claims and McLin's Fourth Amendment claim asserting an unconstitutional seizure. However, the district court denied the motion as to McLin's Fourth Amendment claim asserting an unconstitutional search. The Officer Defendants appealed the district court's partial denial of their motion to dismiss. We found that the complaint failed to allege the issuance of a search warrant and remanded for further proceedings, including an opportunity for McLin to amend his complaint. *McLin v. Ard*, 611 Fed.Appx. 806, 808–10 (5th Cir. 2015) (unpublished).

After remand, McLin filed an amended complaint. The Officer Defendants again moved to dismiss. On February 5, 2016, the district court granted the Officer Defendants' motion to dismiss, and entered final judgment for all the Defendants on all claims.

McLin appealed. He argues that that district court erred in dismissing his First and Fourth Amendment § 1983 claims against the Defendants.

## III.

**[1]** **[2]** **[3]** **[4]** **[5]** **[6]** We review de novo the district court's grant of a motion to dismiss. *Loupe v. O'Bannon*, 824 F.3d 534, 536 (5th Cir. 2016) (citing *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004)). To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Phillips v. City of Dallas*, 781 F.3d 772, 776 (5th Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). In reviewing the complaint, we "draw all inferences in favor of the nonmoving party, and view all facts and inferences in the light most favorable to the nonmoving party." *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009). Legal conclusions, however, are not entitled to an assumption of truth and must be supported by factual allegations. *Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937. Thus, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937). When the motion to dismiss raises the defense of qualified immunity, the plaintiff "must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm ... alleged and that defeat a qualified immunity defense with equal specificity." *Zapata v. Melson*, 750 F.3d 481, 485 (5th Cir. 2014) (quoting *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012)).

**[7]** **[8]** **[9]** "The doctrine of qualified immunity protects government officials from civil damages liability when their actions **\*689** could reasonably have been believed to be legal." *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc). To defeat a claim of qualified-immunity, the plaintiff has the burden to demonstrate the inapplicability of

the defense. *Atteberry v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005). The plaintiff must show "(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)). "Courts have discretion to decide which prong of the qualified-immunity analysis to address first." *Morgan*, 659 F.3d at 371 (citing *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)).

## IV.

McLin argues that the district court erred in dismissing his § 1983 Fourth Amendment claim. He contends that he was unreasonably "seized" when he surrendered to arrest warrants issued without probable cause. The Defendants respond that the issuance of the arrest warrants broke the causal chain, immunizing the Defendants from liability. Alternatively, the Defendants respond that McLin's voluntary surrender to the arrest warrants did not constitute a seizure, and McLin therefore failed to state a constitutional violation.

## A.

We first address whether issuance of the arrest warrants insulates the Defendants from civil liability on McLin's Fourth Amendment claim. Because McLin adequately pleads that the Defendants submitted false and misleading affidavits for the purpose of obtaining arrest warrants, we hold that issuance of the warrants does not insulate the Defendants.

**[10]** **[11]** **[12]** "It is well settled that if facts supporting an arrest are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation for false arrest, insulating the initiating party." *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009) (citing *Taylor v. Gregg*, 36 F.3d 453, 456 (5th Cir. 1994), *overruled on other grounds by Castellano v. Fragozo*, 352 F.3d 939, 949 (5th Cir. 2003) (en banc)). "[T]he initiating party may be liable for false arrest," however, "if the plaintiff shows that the 'deliberations of that intermediary were in some way tainted by the actions of the defendant.' " *Id.* (quoting *Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir. 1988)). But, "because the intermediary's deliberations protect even officers with malicious intent," a plaintiff must show

that the official's malicious motive led the official to withhold relevant information or otherwise misdirect the independent intermediary by omission or commission. *Buehler v. City of Austin/Austin Police Dep't.*, 824 F.3d 548, 555 (5th Cir. 2016) (citing *Hand*, 838 F.2d at 1427).

**[13]** We have previously held that "mere allegations of 'taint,' without more, are insufficient to overcome summary judgment." *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir. 2010); *see, e.g., id.* at 813–14 (finding no "fact issue" regarding whether appellees tainted the decision of two grand juries to return indictments); *Taylor*, 36 F.3d at 456–57 (finding that plaintiffs presented no summary judgment evidence showing that the intermediary was tainted by the actions of the defendants); *Buehler*, 824 F.3d at 555–56 (finding no error in district court summary judgment ruling that appellant "failed to show a triable issue whether the grand jury's findings of probable cause were obtained by false or misleading statements by the arresting officers"). We have not, however, addressed the "taint exception" **\*690** at the motion to dismiss stage where the standard is more permissive: a court must accept all factual allegations as true, and the complaint must state only a plausible claim. *Phillips*, 781 F.3d at 776. Thus, although our precedent demonstrates that "mere allegations of 'taint' " are insufficient at summary judgment, *Cuadra*, 626 F.3d at 813, such allegations may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference.[3]

**[14]** McLin alleges that three arrest warrants were issued[4] on the basis of the Council Defendants' affidavits, which were based on information and advice provided by the Officer Defendants. According to the complaint, the Defendants, at several "individual and collective meetings" convened "for the purposes of discussing the pursuit of criminal charges against [McLin]," "conspired ... to create false and materially misleading arrest warrant affidavits as the necessary predicate to securing" arrest warrants. Ballard purportedly drafted three "fatally flawed" arrest warrants falsely alleging "misconduct" by McLin. The Council Defendants signed "materially false" arrest warrant affidavits, which were thereafter "sponsored, ratified, affirmed, supported, and relied upon" by the Officer Defendants. More specifically, McLin alleges that the Officer Defendants knew that McLin's speech was constitutionally protected, and that none of the Council Defendants "*ever* possessed any information which would be sufficient to swear out affidavits" alleging a violation of § 14:47. Further, McLin alleges that his arrest was "effected based in whole or in part

upon the material misrepresentations, errors, omissions, and other inaccuracies" made by the Officer Defendants.

Viewing these allegations in a light most favorable to McLin and drawing all appropriate inferences, the complaint pleads facts supporting the taint exception sufficient to survive a motion to dismiss. According to McLin, the Facebook comments criticized the official conduct of public officials. McLin further alleged that, with knowledge that such speech does not constitute criminal defamation, the Defendants met for the purpose of conspiring to create false and misleading affidavits in order to obtain warrants for McLin's arrest. **\*691** Finally, McLin alleged that the arrest warrants were issued on the basis of the falsified affidavits. Accordingly, we hold that the arrest warrants do not insulate the Defendants from liability at this stage because McLin pleads that the Defendants' false and misleading affidavits tainted the magistrate's deliberations.

**B.**

We next consider whether McLin alleges an unreasonable seizure under the Fourth Amendment. McLin contends that he was "seized" when he voluntarily surrendered to the arrest warrants at the sheriff's office and signed a misdemeanor summons pertaining to the three purported criminal defamation violations. McLin further argues that his seizure was unreasonable—and therefore unconstitutional—because the Defendants lacked probable cause to arrest him.

**1.**

**[15]    [16]    [17]    [18]** A person is "seized" for Fourth Amendment purposes "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19, n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [they were] not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980)). The reasonable-person test is objective and ensures that "the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual" claiming a violation. *Id.* at 574, 108 S.Ct. 1975. Physical force is not required to effect a seizure; however, absent physical force, "*submission* to the assertion of authority" is necessary. *California v. Hodari D.*, 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

Thus, seizures have been found when an encounter is precipitated by a show of authority, such as when a siren was used to pull a motorist over; when a motorist stepped out of his camper, with his hands up, in response to an officer's knock on the camper door; or when under other circumstances it was 'apparent ... that the individual was not free to ignore the officer and proceed on his way.' *United States v. Elmore*, 595 F.2d 1036, 1041 (5th Cir. 1979) (citations omitted).

**[19]** Substantial authority from both the Supreme Court and our court establishes that *voluntary* submissions to a show of state authority can constitute seizures for Fourth Amendment purposes.[5] Consistent with this authority, the Supreme **\*692** Court's divided opinion in *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) suggests that voluntary surrender to an arrest warrant constitutes a seizure under the Fourth Amendment. In *Albright*, upon learning of an outstanding warrant for his arrest on drug charges, Albright surrendered to a city police detective. *Id.* at 268, 114 S.Ct. 807. Albright was released after posting bond. *Id.* After the court dismissed the criminal action, Albright brought a § 1983 suit against the police detective for violating his substantive due process rights under the Fourteenth Amendment. *Id.* at 269, 114 S.Ct. 807. Although the Court affirmed the district court's dismissal of the case on other grounds, seven Justices characterized Albright's voluntary surrender to the arrest warrant as a Fourth Amendment seizure. Chief Justice Rehnquist's plurality opinion (joined by Justices O'Connor, Scalia, and Ginsburg) observed that the plaintiff's "surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment." *Id.* at 271, 114 S.Ct. 807 (noting that Albright did not claim a violation of the Fourth Amendment); *see also id.* at 276, 114 S.Ct. 807 (Ginsburg, J., concurring) ("Albright's submission to arrest unquestionably constituted a seizure for purposes of the Fourth Amendment."). In a concurring opinion, Justice Souter also observed the "Fourth Amendment seizure that followed when [Albright] surrendered himself into police custody." *Id.* at 289, 114 S.Ct. 807 (Souter, J., concurring in judgment). Likewise, Justice Stevens's dissenting opinion, which was joined by Justice Blackmun, recognized Albright's "initial seizure." *Id.* at 307, 114 S.Ct. 807 (Stevens, J., dissenting).

McLin v. Ard, 866 F.3d 682 (2017)

*Albright*'s statements on the Fourth Amendment seizure issue, which were not essential to that case's outcome, are non-binding though indicative, and our court has never decided whether voluntary surrender to an arrest warrant constitutes a seizure. Several other circuit courts, however, have relied on *Albright* to hold that a state official's acceptance of a voluntary surrender to an arrest warrant constitutes a seizure. In *Whiting v. Traylor*, the plaintiff brought a § 1983 action for malicious prosecution after he voluntarily surrendered to an arrest warrant that he claimed lacked probable cause. 85 F.3d 581, 583 (11th Cir. 1996). Upon turning himself in, the plaintiff was detained overnight and then released on bond. *Id.* In vacating the district court's dismissal of the suit, the Eleventh Circuit found that the plaintiff's "initial surrender" was a seizure because "he subjected himself physically to the force of the state in response to an arrest warrant." *Id.* at 586 & n.6.

Likewise, the Tenth Circuit recently considered the § 1983 claim of a plaintiff who, after learning of his arrest warrant, turned himself into the local jail. *Goad v. Town of Meeker*, 654 Fed.Appx. 916, 921 (10th Cir. 2016) (unpublished). On review of the district court's grant of summary judgment, the court held that the plaintiff's "surrender to the State's show of authority constituted a seizure for purposes of the Fourth Amendment." *Id.* (quoting *Albright*, 510 U.S. at 271, 114 S.Ct. 807) (plurality opinion)); *see also* **\*693** *Cummisky v. Mines*, 248 Fed.Appx. 962, 964, 965 n.1 (10th Cir. 2007) (unpublished) (noting that the plaintiff was seized when, after learning about the warrant issued for his arrest, he surrendered at the police station; was photographed and fingerprinted; and then allowed to leave after posting bond).[6]

[20] Here, McLin alleges that three warrants were issued for his arrest, and that he "learned of the (false) charges and voluntarily surrendered unto the Livingston Parish Sheriff's Office ... and Defendant Ballard" later that same day. At the sheriff's office, McLin signed a misdemeanor summons for the three alleged criminal charges and then left. Issuance of the arrest warrants was a "show of authority," *see Terry*, 392 U.S. at 19 n.16, 88 S.Ct. 1868, and McLin submitted to that authority by voluntarily surrendering at the sheriff's office. *See Hodari*, 499 U.S. at 626, 111 S.Ct. 1547; *Whiting*, 85 F.3d at 585 n.6. At the moment the officer(s) accepted McLin's surrender by exercising authority consistent with those warrants, no "reasonable person would have believed that he was ... free to leave." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. 1870; *see also United States v. Jaras*, 86 F.3d 383, 390 (5th Cir. 1996) ("It is well established that a defendant's mere

acquiescence to a show of lawful authority is insufficient to establish voluntary consent."); *Albright*, 510 U.S. at 271, 114 S.Ct. 807 (plurality opinion); *Goad*, 654 Fed.Appx. at 921.

The Defendants argue that McLin fails to plead a seizure because he does not allege that his pre-trial liberty was limited. In support, they point to cases where courts have ruled that the issuance and receipt of a criminal summons or citation—without the imposition of additional, pre-trial restrictions—may not implicate the Fourth Amendment.[7] If, however, the summons **\*694** or citation is accompanied by more burdensome restrictions—such as restrictions on out-of-state travel and pre-trial reporting requirements—some courts, including this one, have recognized that a seizure may occur incident to a pre-trial release. *See Karam*, 352 F.3d at 1193–94. In *Evans v. Ball*, this court held that issuing a summons, "coupled with the requirements that [the plaintiff] obtain permission before leaving the state, report regularly to pretrial services, sign a personal recognizance bond, and provide federal officers with financial and identifying information, diminished his liberty enough to render him seized under the Fourth Amendment." 168 F.3d at 861.

The Defendants' reliance on cases concerning seizures incident to pretrial release is misplaced. McLin's Fourth Amendment claim does not stem from any conditions imposed on him once he was issued the summons. Indeed, McLin does not plead any pre-trial restrictions at all. Rather, McLin's seizure occurred when he surrendered to the arrest warrants and LPSO exercised authority consistent with the warrants—even if McLin thereafter signed his summons and was allowed to leave. The existence or non-existence of any pre-trial restrictions does not impact the analysis of this seizure.[8] The Defendants have not pointed to a case in which a court found that a person surrendering to an arrest warrant was *not* seized for Fourth Amendment purposes. Moreover, in other voluntary surrender contexts— traffic stops, for example—it makes no difference whether further restrictions follow the initial moment of seizure. *See, e.g. Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979) ("[S]topping an automobile and detaining its occupants constitute a 'seizure' ... even though the purpose of the stop is limited and the resulting detention quite brief."). We therefore hold that McLin pleads that he was seized under the Fourth Amendment.

2.

McLin v. Ard, 866 F.3d 682 (2017)

[21] Having held that McLin pleads a Fourth Amendment seizure, we must next determine whether such seizure was unreasonable and thus a constitutional violation. *See Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960) ("[W]hat the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures."). McLin's seizure occurred when he surrendered to an arrest warrant, the issuance of which required probable cause. Thus, for McLin to allege an unreasonable seizure, his allegations must make plausible that the Defendants lacked probable cause to arrest him. "[P]robable cause is the 'sum total of layers of information and the synthesis of what police have heard, what they know, and what they observed as trained officers.' " *United States v. Shaw,* 701 F.2d 367, 376 (5th Cir. 1983) (quoting *United States v. Edwards,* 577 F.2d 883, 895 (5th Cir. 1978) (en banc)).

*695 In *Garrison v. Louisiana,* the Supreme Court held that the Louisiana criminal defamation statute, La. Stat. 14:47, is unconstitutional "in the context of criticism of the official conduct of public officials." 379 U.S. 64, 77, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964). The court explained that only "false statement[s] 'made with actual malice—that is, with knowledge that it was false or with reckless disregard of whether it was false or not' "—are unprotected under the First Amendment and validly subject to criminal prosecution. *Id.* at 67, 85 S.Ct. 209 (quoting *N.Y. Times Co. v. Sullivan,* 376 U.S. 254, 279–80, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)). The Louisiana statute runs afoul of this limitation because it "punishes false statements without regard to that test if made with ill-will; even if ill-will is not established, a false statement concerning public officials can be punished if not made in the reasonable belief of its truth." *Id.* at 78, 85 S.Ct. 209. Following *Garrison,* the Louisiana Supreme Court also recognized the unconstitutionality of the statute when it circumscribes speech about public officials. *See State v. Defley,* 395 So.2d 759, 761 (La. 1981) ("LSA–R.S. 14:47 is unconstitutional insofar as it punishes public expression about public officials."); *State v. Snyder,* 277 So.2d 660, 665 (La. 1972) ("[A] charge of defamation is well founded as to these [public officials] only when the statement was made with actual malice, that is, with knowledge that it was false or with reckless disregard of whether it was false or not.").

[22] The factual allegations in McLin's complaint sufficiently plead that the Defendants lacked probable cause to prosecute McLin for violating the Louisiana criminal defamation statute. McLin alleges that the anonymous Facebook comments—posted to a news story about Council members and the Council's misuse of public funds—did not amount to criminal defamation but rather "merely constituted criticism of official conduct of public officials." Speech criticizing the official conduct of public officials is protected by the First Amendment and does not constitute criminal defamation. *See Defley,* 395 So.2d at 761; *Snyder,* 277 So.2d at 665. McLin further alleges that, upon linking the comments to him, and with knowledge that McLin's comments were protected by the First Amendment, the Defendants met and conspired to create falsified affidavits for the purpose of obtaining arrest warrants on charges of criminal defamation. *See Rykers v. Alford,* 832 F.2d 895, 898 (5th Cir. 1987) ("[A]n officer charged with enforcing Louisiana law[ ] can be presumed to know that law."). On these facts, which must be taken as true, we conclude that McLin's complaint adequately alleges an unreasonable seizure because the Defendants could not have believed they had probable cause to arrest him. *See Spiller v. City of Tex. City Police Dep't,* 130 F.3d 162, 165–66 (5th Cir. 1997) (holding that the plaintiff pleaded a Fourth Amendment claim where "the events alleged in [her] complaint did not provide [the officer] with probable cause to believe that [her speech] was likely to incite an immediate breach of the peace," and so "her arrest for disorderly conduct was not supported by probable cause").

## C.

[23] [24] [25] Although we hold that McLin pleads a Fourth Amendment violation, the Defendants are still entitled to qualified immunity unless the particular constitutional right at issue was "clearly established." "When considering a defendant's entitlement to qualified immunity, we must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].' " *Morgan,* 659 F.3d at 371 (quoting *al-Kidd,* 563 U.S. at 741, 131 S.Ct. 2074); *see also *696 Lane v. Franks,* —— U.S. ——, 134 S.Ct. 2369, 2381, 189 L.Ed.2d 312 (2014) (noting that the right must be clearly established "at the time of the challenged conduct"). "To answer that question in the affirmative, we must be able to point to controlling authority—or a robust consensus of persuasive authority—that defines the contours of the right in question with a high degree of particularity." *Morgan,* 659 F.3d at 371–72 (internal quotation marks omitted) (quoting *al-Kidd,* 563 U.S. at 742, 131 S.Ct. 2074); *see also Mullenix v. Luna,* —— U.S. ——, 136 S.Ct. 305, 308, 193 L.Ed.2d 255 (2015) ("The dispositive question is whether the violative nature of *particular* conduct is clearly established." (internal

McLin v. Ard, 866 F.3d 682 (2017)

citation and quotation omitted)). "Where no controlling authority specifically prohibits a defendant's conduct, and when the federal circuit courts are split on the issue, the law cannot be said to be clearly established." *Morgan*, 659 F.3d at 372.

[26] Here, we cannot say that *every* reasonable officer would understand that McLin was seized for purposes of the Fourth Amendment. To date, neither the Supreme Court nor the Fifth Circuit has decided that an officer's acceptance of a voluntary surrender to an arrest warrant constitutes a Fourth Amendment seizure. And there is no a "robust consensus of persuasive authority": only one circuit—the Eleventh—has found a seizure in these circumstances in a published opinion, and a majority of circuit courts have not yet weighed in. Although we now hold that McLin was seized, reasonable officers might not have understood that accepting McLin's surrender to the arrest warrants, without imposing further pre-trial restrictions, constituted a seizure.

We therefore hold that McLin fails to plead a violation of a "clearly established" constitutional right, and we affirm the district court's grant of qualified immunity to the Defendants and dismissal of McLin's Fourth Amendment claim on that basis.

## V.

McLin also argues that the district court erred in dismissing his First Amendment retaliation claim. He alleges that the Defendants violated his First Amendment rights by retaliating against him for making critical public comments about Council members. The district court determined that McLin failed to state a claim because he failed to allege an injury that would chill a person of ordinary firmness from continuing to engage in protected speech. **ROA.70–73.** We offer no opinion on the correctness of the district court's determination because we find that the complaint is deficient for another reason: McLin fails to plead that the Defendants' retaliatory conduct actually curtailed his speech.

[27]  [28]  [29]  [30] "The First Amendment prohibits not only direct limits on individual speech but also adverse governmental action against an individual in retaliation for the exercise of protected speech activities." *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002). To prevail on a § 1983 claim for First Amendment retaliation, McLin must show that "(1) [he] was engaged in constitutionally protected activity[;]

(2) the defendant's actions caused [him] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity[;] and (3) the defendant's adverse actions were substantially motivated [by] the constitutionally protected conduct." *Id.*[9] The second element "requires some showing that the plaintiff's exercise of free speech has been curtailed." *Id.* at 259 (citing *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 686 (4th Cir. 2000); **\*697** *Spear v. Town of West Hartford*, 954 F.2d 63, 67 (2d Cir. 1992); *Sullivan v. Carrick*, 888 F.2d 1, 4 (1st Cir. 1989)).[10] "A required showing of actual injury does not necessarily mean that plaintiffs must cease criticizing the government officials altogether in order to have a claim for retaliation." *Id.* at 260. "The effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Id.* at 259 (quoting *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982)).[11] In *Keenan*, the court found that the plaintiffs demonstrated curtailment when they asserted that they "backed off from direct involvement in helping expose unlawful practices in the constable's office," even though at least one plaintiff continued to investigate and file complaints about such practices. *Id.* at 260 (internal quotations omitted).

[31] Here, McLin argues that he satisfied the curtailment requirement by pleading that "he suffered 'great personal damage' from the Defendants' actions, including a violations [sic] of his First Amendment rights." From these minimal allegations, McLin urges the court to infer that he "actually suffered a curtailment of his speech."

Even drawing all appropriate inferences in favor of McLin, these allegations are insufficient to allege curtailment of McLin's speech. The assertion that McLin suffered "violations of his First Amendment rights" is a legal conclusion and is not entitled to an assumption of truth. *See Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937. McLin is left with an allegation of "great personal damage," which does not demonstrate that he reduced or changed his exercise of free speech in any way. *See Spear*, 954 F.2d at 67 (finding that a plaintiff's allegation of a chill "was conclusory and speculative" when "[t]he complaint offered nothing beyond a bare assertion that the lawsuit cause[ed] a chilling effect upon his First Amendment rights"); *Mills v. Bogalusa*, No. 13-5477, 2014 WL 2993426, at \*4 (E.D. La. Jul. 2, 2014) (dismissing retaliation claim where plaintiff failed to plead "specific facts showing actual curtailment in response to defendants' allegedly retaliatory activity"). Notably, McLin's complaint appears to be carefully drafted to avoid explicitly

McLin v. Ard, 866 F.3d 682 (2017)

admitting that he was the anonymous commentator, and accordingly, he never alleges that the Defendants' conduct stopped him from speaking further.[12] Thus, the district court did not err by dismissing McLin's First Amendment claim.

For the foregoing reasons, we AFFIRM the judgment of the district court.

**All Citations**

866 F.3d 682

*698 VI.

Footnotes

1    The complaint refers to both sworn "criminal complaints" and "arrest warrant affidavits." Reading the complaint in a light most favorable to McLin, it appears that these names refer to the same three documents that allegedly supported issuing the arrest warrants.

2    McLin sued all parties in both their individual and official capacities. He also brought § 1983 claims against the Livingston Parish Sheriff's Office.

3    District courts in this circuit have denied motions to dismiss on these grounds, finding the resolution of such factual disputes more proper for summary judgment. *See Sullivan v. Chastain*, No. Civ.A.SA04CA0803XR, 2005 WL 354032, at *3 (W.D. Tex. Jan. 4, 2005) (denying motion to dismiss on qualified immunity grounds where the plaintiff alleged that the defendant officer swore to a complaint that was without personal knowledge or probable cause); *Bustamante v. Christian*, No. 3:96-CV-2299D, 1997 WL 42530, at *5 (N.D. Tex. Jan. 29, 1997) ("Because [the plaintiff] maintains that the indictment was a product of false and misleading testimony, the court cannot say in the context of Rule 12(b)(6) that the indictment absolutely bars [plaintiff's] claim that defendants caused her false arrest."). *But see Saturn v. Barnett*, No. A–16–CA–505–LY, 2016 WL7392240, *4 (W.D. Tex. Dec. 12, 2016) (holding that the plaintiff failed to plead the taint exception because he "failed to identify any actual material false statements in [the officer's] sworn statement, only offering his own conclusory beliefs of their falsity"); *but cf. Goodarzi v. Hartzog*, No. H-12-2870, 2013 WL 3110056, at *12, 21 (S.D. Tex. June 14, 2013) (dismissing false arrest claims *without prejudice* where there was "no evidence of precisely what was said to the [independent intermediary]," but the court found "substantial questions" about whether the defendant was insulated from liability).

4    Although the complaint does not specifically allege who reviewed the affidavits and issued the warrants, Louisiana law provides that a warrant of arrest may be issued by any "magistrate," which is defined to include any judge, justice of the peace, or a mayor of a mayor's court. La. Code Crim. Proc. art. 202; *id.* art. 931(4).

5    *See, e.g., Brower v. County of Inyo*, 489 U.S. 593, 597–98, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) ("If the revenue agent had shouted, 'Stop and give us those bottles, in the name of the law!' and the defendant and his accomplice had complied ... a Fourth Amendment seizure would have occurred."); *id.* at 598–99, 109 S.Ct. 1378 ("[A] roadblock that is designed to give the oncoming driver the option of a voluntary stop" could cause a seizure because "it [is] enough for a seizure that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result."); *Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1991) (finding the plaintiff seized when he voluntarily appeared in court in response to a summons and then was released on his own recognizance subject to pre-trial restrictions), *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc); *United States v. Shabazz*, 993 F.2d 431, 433–34 (5th Cir. 1993) (finding "no question" that a seizure occurred when defendants were pulled over by officers for exceeding the speed limit); *accord United States v. Nicholas*, 448 F.2d 622, 624 (8th Cir. 1971) (finding a "clear" seizure "when the officers stationed themselves on either side of Nicholas's car and flashed their badges" "[e]ven though Nicholas may have been physically free to drive away"); *United States v. Ward*, 488 F.2d 162, 168–69 (9th Cir. 1973) (finding a "clear" seizure where agents "turned on the siren in their unmarked car and motioned the [motorist] to go around the corner and stop," and the motorist "immediately complied"); *White v. Wright*, 150 Fed.Appx. 193, 195, 197–98 (4th Cir. 2005) (unpublished) (finding the plaintiff seized where he "voluntarily turned himself in after the [criminal grand jury]

McLin v. Ard, 866 F.3d 682 (2017)

indictment was returned," and was detained briefly for fingerprinting and processing before being released subject to conditions in a bond).

6    A number of district courts have also determined that acceptance of a voluntary surrender to an arrest warrant constitutes a seizure under the Fourth Amendment. *See Garrett v. Stanton*, No. 08-0175-WS-M, 2009 WL 4258135, at *6 (S.D. Ala. Nov. 19, 2009) (observing the "considerable authority ... finding that self-surrender upon issuance of a warrant constitutes a Fourth Amendment seizure" and finding that that "[c]learly ... Garrett was seized for Fourth Amendment purposes when she surrendered to law enforcement authorities upon issuance of an arrest warrant"); *Groom v. Fickes*, 966 F.Supp. 1466, 1474–75 (S.D. Tex. 1997) (holding that the plaintiff pleaded a Fourth Amendment violation when it was "obvious that the plaintiff surrendered to the government's show of authority, *i.e.*, in response to the criminal indictment"); *see also Pomykacz v. Borough of West Wildwood*, 438 F.Supp.2d 504, 512 (D.N.J. 2006) (finding a Fourth Amendment seizure when "police officers showed their authority" by going to the plaintiff's house "to advise her that a warrant for her arrest had been issued" and the plaintiff thereafter "submitted to that authority when she appeared at the police station").

7    *See, e.g., Bielanski v. Cty. of Kane*, 550 F.3d 632, 642 (7th Cir. 2008) ("No court has held that a summons alone constitutes a seizure, and we conclude that a summons alone does not equal a seizure for Fourth Amendment purposes."); *Martinez v. Carr*, 479 F.3d 1292, 1299 (10th Cir. 2007) ("[T]he mere issuance of a citation requiring presence at future legal proceedings does not qualify as a constitutional 'seizure'...."); *DiBella v. Borough*, 407 F.3d 599, 603 (3rd Cir. 2005) (finding no seizure where plaintiffs were issued summonses, but never were arrested, never posted bail, and never were subject to any travel restrictions or pre-trial reporting requirements); *Karam v. City of Burbank*, 352 F.3d 1188, 1191, 1194 (9th Cir. 2003) (finding no seizure where no arrest warrant issued and "all [plaintiff] had to do was show up for court appearances and obtain permission from the court if she wanted to leave the state"); *Britton v. Maloney*, 196 F.3d 24, 30 (1st Cir. 1999) ("Absent any evidence that Britton was arrested, detained, restricted in his travel, or otherwise subject to a deprivation of liberty before the charges against him were dismissed, the fact that he was given a date to appear in court is insufficient to a establish a seizure within the meaning of the Fourth Amendment.").

8    *See, e.g., Whiting*, 85 F.3d at 585 n.6 (focusing on the plaintiff's "initial surrender" as the moment of seizure because "he subjected himself physically to the force of the state in response to an arrest warrant"); *Goad*, 654 Fed.Appx. at 921 (finding a seizure where the plaintiff surrendered to an arrest warrant and was immediately booked and released, with no mention of pre-trial restrictions); *Garrett*, 2009 WL 4258135 at *4, 6 (finding a seizure where the plaintiff was subject to no pre-trial restrictions after surrendering and immediately bonding out); *see also Albright*, 510 U.S. at 271, 114 S.Ct. 807 (plurality opinion) ("[Plaintiff's] surrender to the State's show of authority [the arrest warrant] constituted a seizure for purposes of the Fourth Amendment").

9    Additionally, "retaliatory criminal prosecutions in violation of the First Amendment are actionable only if a plaintiff can also prove the common-law elements of malicious prosecution...." *Keenan*, 290 F.3d at 260.

10    In *Linzy v. Cedar Hill Independent School District*, issued only a few weeks after *Keenan*, the court noted that "[o]ur precedent does not appear to expressly require a showing that a plaintiff's speech has been actually inhibited by the retaliation." No. 01-11145, 2002 WL 1021883, at *1 n.7 (5th Cir. May 9, 2002) (unpublished). The *Linzy* opinion fails to mention *Keenan*, and is unpublished and thus not binding. *See* 5th Cir. R. 47.5.

11    The requirement that a retaliation claim show some curtailment of the plaintiff's speech has been criticized by some circuit courts because it punishes the brave plaintiff. *Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999) ("[I]t would be unjust to allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity."); *Smith v. Plati*, 258 F.3d 1167, 1177 (10th Cir. 2001) (citing *Mendocino* approvingly).

12    The complaint repeatedly refers to "certain comments and statements *alleged* to have been posted ... by Mr. McLin," and states that "Defendants ... *alleged* Mr. McLin created an anonymous Facebook profile / account and used the said account to post disparaging comments...."

McLin v. Ard, 866 F.3d 682 (2017)

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

199 L.Ed.2d 606, 86 USLW 3353, 86 USLW 3356

Jan. 16, 2018.

138 S.Ct. 739
Supreme Court of the United States

Royce Denton McLIN, petitioner,

v.

Jason Geral ARD, Individually and
in His Official Capacity as Sheriff of
Livingston Parish, Louisiana, et al.

No. 17–650.
|

**Synopsis**
Case below, 866 F.3d 682.

**Opinion**
Petition for writ of certiorari to the United States Court of
Appeals for the Fifth Circuit denied.

**All Citations**

138 S.Ct. 739 (Mem), 199 L.Ed.2d 606, 86 USLW 3353, 86
USLW 3356

End of Document

© 2022 Thomson Reuters. No claim to original U.S.
Government Works.

 © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
_____
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

565 F.3d 228
United States Court of Appeals,
Fifth Circuit.

Billy LORMAND, Plaintiff–Appellant,

v.

US UNWIRED, INC.; William L.
Henning, Jr.; Robert W. Piper; Jerry
E. Vaughn, Defendants–Appellees.

No. 07–30106.
|
April 9, 2009.

**Synopsis**
**Background:** The United States District Court for the
Eastern District of Louisiana, Lance M. Africk, J., dismissed
investor's putative securities fraud class action brought
against telecommunications company and a number of its
executive officers and directors, and investor appealed.

**Holdings:** The Court of Appeals, Dennis, Circuit Judge, held
that:

[1] safe harbor provision of Private Securities Litigation
Reform Act (PSLRA) was inapplicable to alleged forward-
looking misrepresentations;

[2] defendants had duty to disclose the truth underlying their
misleading statements pertaining to no-deposit nationwide
calling programs and the company's loss of control of its
customer care, billing and cash-flow functions;

[3] investor satisfied scienter pleading requirement; and

[4] plaintiff sufficiently alleged loss causation with
respect to his claim based on defendants' omissions and
misrepresentations pertaining to company's use of no-deposit
nationwide calling programs but did not sufficiently allege
loss causation with respect to alleged misrepresentations
regarding company's conversion to affiliation or the transfer
of core functions to another company's network.

Affirmed in part, reversed in part, and remanded.

West Headnotes (14)

[1]    **Securities Regulation** ⬿ Scienter
On motion to dismiss securities fraud claim
for failure to state a claim, a court must
take into account plausible inferences opposing
as well as supporting a strong inference of
scienter; inference of scienter must ultimately be
cogent and compelling, not merely reasonable or
permissible. Private Securities Litigation Reform
Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u–4(b)
(2).

656 Cases that cite this headnote

[2]    **Securities Regulation** ⬿ Forecasts,
Estimates, Predictions or Projections
Safe harbor provision of Private Securities
Litigation Reform Act (PSLRA) was
inapplicable to alleged forward-looking
misrepresentations where plaintiff adequately
alleged that the defendants actually knew that
their statements were misleading at the time they
were made. Securities Exchange Act of 1934,
§ 21E(c)(1)(A)–(B), 15 U.S.C.A. § 78u–5(c)
(1)(A)–(B).

27 Cases that cite this headnote

[3]    **Securities Regulation** ⬿ Forecasts,
Estimates, Predictions or Projections
Safe harbor provision of Private Securities
Litigation Reform Act (PSLRA) was
inapplicable to alleged forward-looking
misrepresentations because the alleged
misrepresentations were not accompanied by
"meaningful cautionary language"; generic,
formulaic, and boilerplate disclaimers that
accompanied the forward-looking statements
in defendants' documents, which stated that
statements were "not guarantees of future
performance" and involved "known and
unknown risks and other factors that could cause
actual results to be materially different from any
future results expressed or implied by them," did
not amount to meaningful cautionary language.

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

Securities Exchange Act of 1934, § 21E(c)(1)(A)–(B), 15 U.S.C.A. § 78u–5(c)(1)(A)–(B).

36 Cases that cite this headnote

**[4]    Securities Regulation** ⬅ Nondisclosure;
Insider Trading

Disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

14 Cases that cite this headnote

**[5]    Securities Regulation** ⬅ Materiality

For purposes of securities fraud claims, omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

14 Cases that cite this headnote

**[6]    Securities Regulation** ⬅ Forecasts,
Estimates, Predictions or Projections

For securities fraud cases, an opinion or prediction is actionable if there is a gross disparity between prediction and fact. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

4 Cases that cite this headnote

**[7]    Securities Regulation** ⬅ Matters to Be
Disclosed

Telecommunications company defendants, who continually skewed the mix of information by omitting the known severe risks associated with certain business actions even as they recognized signs that those risks had already materialized, had duty to disclose the truth underlying their misleading statements pertaining to no-deposit nationwide calling programs and the company's loss of control of its customer care, billing and cash-flow functions; total mix of information was misleading because it was highly skewed toward the promised benefits of proposed affiliation with another company's network and the marketing and subscriber growth fueled by the sub-prime credit classes. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

15 Cases that cite this headnote

**[8]    Securities Regulation** ⬅ Scienter, Intent,
Knowledge, Negligence or Recklessness

In securities fraud action, required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

40 Cases that cite this headnote

**[9]    Securities Regulation** ⬅ Scienter

Investor satisfied the Private Securities Litigation Reform Act's (PSLRA) requirement that he state with particularity facts giving rise to a strong inference that the defendants acted with scienter or the required state of mind; complaint alleged that defendants knew at the time of their public statements to the contrary that company's offering of certain programs to lower income and credit risky subscribers had been forced on it by another company's network with which it affiliated itself, would not be beneficial to company, and would almost certainly lead to the company's severe economic harm or disaster, and that defendants knew at the time of their public statements to the contrary that company's affiliation conversion had been coerced, that the conversion would not be beneficial to company, that it entailed company's loss of control of its customer care, billing and cash flow functions, which had been key to company's prior business and financial success, and that it would and did severely hamper company's ability to cope with the disastrous effects of the programs that were forced on the company. Private Securities Litigation Reform Act of 1995, § 101(b)(2), 15 U.S.C.A. § 78u–4(b)(2).

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

21 Cases that cite this headnote

[10]    **Securities Regulation** ⟜ Causation;
         Existence of Injury

In order to sufficiently allege loss causation element of securities fraud claim, plaintiff must allege a facially plausible causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and plaintiff's economic loss, or the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Private Securities Litigation Reform Act of 1995, § 101(b)(4), 15 U.S.C.A. § 78u–4(b)(4).

1103 Cases that cite this headnote

[11]    **Securities Regulation** ⟜ Causation;
         Existence of Injury

Private securities fraud plaintiff sufficiently alleged loss causation with respect to his claim based on defendants' omissions and misrepresentations pertaining to telecommunications company's use of no-deposit nationwide calling programs but did not sufficiently allege loss causation with respect to alleged misrepresentations regarding company's conversion to affiliation or the transfer of core functions to another company's network; complaint contained ample discussion of how defendants' suppression of the truth caused both the artificial inflation of the stock price and its later decline when relevant truth about calling programs emerged into the marketplace. Private Securities Litigation Reform Act of 1995, § 101(b)(4), 15 U.S.C.A. § 78u–4(b)(4).

28 Cases that cite this headnote

[12]    **Securities Regulation** ⟜ Causation;
         Existence of Injury

In securities fraud actions, loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5; Private Securities Litigation Reform Act of 1995, § 101(b)(4), 15 U.S.C.A. § 78u–4(b)(4).

26 Cases that cite this headnote

[13]    **Securities Regulation** ⟜ Causation;
         Existence of Injury

Private securities fraud plaintiff is not precluded from alleging or proving loss causation by showing partial or indirect disclosures of truth about the alleged fraud disclosed to the market by persons other than the defendants. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

23 Cases that cite this headnote

[14]    **Securities Regulation** ⟜ Causation;
         Existence of Injury

Increases in stock prices after a partial disclosure that is within a series of disclosures does not preclude a final showing of loss causation in securities fraud action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

17 Cases that cite this headnote

**Attorneys and Law Firms**

**\*231** Sanford Svetcov (argued), Coughlin, Stoia, Geller, Rudman & Robbins, L.L.P., San Francisco, CA, Douglas Wilens, Coughlin, Stoia, Geller Rudman & Robbins, L.L.P., Boca Raton, FL, for Lormand.

James Richard Swanson, Lance Christian McCardle Loretta Gallaher Mince, Fishman, Haygood, Phelps, Walmsley,

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

Willis & Swanson, New Orleans, LA, for US Unwired, Inc., Henning, Piper and Vaughn.

N. Scott Fletcher, Michael C. Holmes (argued), Vinson & Elkins, Houston, TX, William Raley Alford, III, Stanley, Flanagan & Reuter, Thomas More Flanagan, Flanagan Partners, LLP, New Orleans, LA, for Henning, Piper and Vaughn.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before BARKSDALE, DENNIS and SOUTHWICK, Circuit Judges.

**Opinion**

DENNIS, Circuit Judge:

The plaintiff brings this putative class action on behalf of persons who allegedly (1) bought the common stock of US Unwired, Inc. ("US Unwired" or "the Company") between May 23, 2000 and August 13, 2002, at prices falsely inflated by the defendants' material misrepresentations that violated Sections 10(b) and 20(a) of the Securities and Exchange Act of 1934 and Rule 10b–5; and (2) suffered economic loss when the true facts about the company's operations and programs were publicly disclosed and its stock price declined as a result. The defendants are US Unwired and a number of its executive officers and directors.[1] The plaintiff alleges two main fraud claims: (a) a claim regarding defendants' implementation of subprime subscriber programs; and (b) a claim regarding defendants' drastic alteration of the **\*232** relationship between US Unwired and the Sprint network, of which US Unwired is an affiliate. They moved to dismiss the plaintiff's second amended complaint ("SAC") on grounds that (1) the alleged misleading statements are not actionable as a matter of law; (2) the facts pleaded do not give rise to a strong inference that the defendants acted with scienter; (3) the complaint fails to allege "loss causation," i.e., a causal connection between the alleged misrepresentations and the stock's subsequent depreciation; and (4) the complaint did not plead with sufficient particularity the factual basis for their allegations of misrepresentation. The district court granted the defendants' motion to dismiss under Rule 12(b)(6) after concluding that (1) some of the alleged misleading statements were not actionable because they are protected by the "safe harbor" provision of the Private Securities Litigation Reform Act ("PSLRA"), and (2) the plaintiff's SAC fails to sufficiently allege loss causation. Reviewing the defendants' motion to dismiss *de novo,* we conclude that the plaintiff's

SAC adequately pleads the subprime subscriber program claim upon which relief can be granted, but fails to adequately plead loss causation as to his other claim. The district court's decision must be reversed in part and the case remanded for further proceedings.[2]

1. Factual and Procedural Background

We review *de novo* a district court's dismissal for failure to state a claim under Rule 12(b)(6). *Cuvillier v. Taylor,* 503 F.3d 397, 401 (5th Cir.2007). Motions to dismiss under Rule 12(b)(6) "are viewed with disfavor and are rarely granted." *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 570 (5th Cir.2005). When faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2509, 168 L.Ed.2d 179 (2007) (citing *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993)). We must also draw all reasonable inferences in the plaintiff's favor. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Lovick v. Ritemoney, Ltd.,* 378 F.3d 433, 437 (5th Cir.2004). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.' " *Cuvillier,* 503 F.3d at 401 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007)).

The plaintiff's SAC alleges the following facts:[3]

In the mid–1990s, Sprint Corporation ("Sprint"), a nationwide telecommunications company, obtained licenses from the Federal Communications Commission ("FCC") to establish a wireless communications **\*233** network. Sprint established an "affiliate program" through which it contracted with third-party affiliates to construct networks in designated areas in exchange for the exclusive right to sell Sprint products and services in each area. Sprint offered three types of affiliations (Types I, II, and III) that involved varying levels of Sprint control over the third party affiliate's operations. Type III affiliation granted an affiliate the maximum amount of autonomy and control over its operations and customer base. Types I and II affiliations, in effect, gave Sprint control of an affiliate's customer care, servicing and billing.

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

In 1998, US Unwired, a Louisiana corporation, contracted with Sprint to become a Type III affiliate, rejecting Type I and II affiliations because US Unwired's management knew US Unwired's success depended on maintaining direct control of operations, billings, revenues, and customer relations. In exchange, Sprint granted US Unwired the exclusive right to provide Sprint products and services to over 500,000 customers in parts of 14 states.

As the complaint details: in 1999, Sprint began to pressure US Unwired to convert to a Type II affiliation by improperly delaying US Unwired's ability to market new services and the latest products, such as Wireless Web technology. Sprint allowed its Type I and II affiliates to market these new services first. As a result, US Unwired, as a Type III affiliate, became out-of-sync with the nationwide marketing of Sprint services and programs. Sprint then demanded that US Unwired pay some $30 million to finance its integration into the Sprint systems. But Sprint offered to waive this fee if US Unwired converted to a Type II affiliate. US Unwired initially elected to remain a Type III affiliate and attempt to negotiate more favorable terms for the cost and scope of its integration with Sprint. US Unwired was determined to retain control over its customer billings and service, which it knew was essential to its business plan. Throughout the negotiations, US Unwired's management internally voiced numerous concerns to its board about Sprint's coercive tactics aimed at forcing US Unwired into a Type II affiliation. For example, in July 2000, Henning wrote to the Board recommending that the Board put the company up for sale rather than transfer its core functions to Sprint as a Type II affiliate. However, each time US Unwired disagreed with Sprint, Sprint threatened to declare that US Unwired had breached its affiliation contract.

According to the complaint, at a March 10, 2000 meeting, Sprint conducted a presentation that effectively informed US Unwired that if US Unwired did not convert into a Type II affiliate, it would face a future of exorbitant fees, threatened contractual breach, and indefinite withholding of products. In a separate instance, US Unwired signaled its desire to operate a Type III affiliate out of Jackson, Mississippi. Sprint wanted a Type II affiliate to service the Jackson market. In an effort to force US Unwired to serve the Jackson market as a Type II affiliate, Sprint threatened to issue a public letter declaring US Unwired in breach of its contract for failing to supply Wireless Web technology to its customers even though Sprint's refusal to supply the technology to US Unwired, unless exorbitant

integration fees were paid, was the cause of the failure. Such a public letter would have devastated US Unwired's public offering plans.

On May 23, 2000, US Unwired (after filing its Securities & Exchange Commission ("SEC") registration on May 17, 2000) issued 8 million shares of its common stock at the price of $11 per share. US Unwired **234 received net proceeds of $80.6 million after an underwriting discount of $6.2 million and expenses of $1.2 million. In the prospectus for the stock offering filed with the SEC (attached as an exhibit to the complaint), US Unwired noted that it planned to use the proceeds to "accelerate the construction" of its network and "for other general corporate purposes." Throughout the class period, US Unwired subsequently conducted several stock offerings to fund its corporate acquisitions.

After protracted negotiations, Sprint and US Unwired still could not agree on the details of the integration plan. In order to force concessions, Sprint stopped all marketing activities for US Unwired. On July 22, 2000, US Unwired informed Sprint that it wanted to remain a Type III affiliate. Sprint refused to accept this decision and threatened to declare US Unwired in breach unless US Unwired fully funded the integration plan.

The complaint asserts that ultimately, in September 2000, US Unwired succumbed to Sprint's coercive economic pressure and abusive tactics, and agreed to become a Type II affiliate, thus giving Sprint control of US Unwired's customer service and billing operations. In becoming a Type II affiliate, US Unwired ceded to Sprint control of billing and the receipt of customer payments, which amounted to approximately $300 million dollars annually. Sprint thereby gained control of US Unwired's cash-flow and its relationships with its subscribers. US Unwired no longer had direct access to subscriber payments and data. With control over US Unwired's cash-flow, Sprint withheld payments or under-paid US Unwired based on Sprint's revenue estimates rather than its actual collections from US Unwired customers.

Despite fierce economic struggles and the personal acrimony between US Unwired and Sprint management, US Unwired's officers, throughout the class period in this case, disseminated positive public representations. For example, as alleged in the complaint, in a November 8, 2000 press release, US Unwired noted that integration into Sprint would "position[ ] [US Unwired] to fully capitalize on Sprint's successes ...." US Unwired publicly disclosed the transfer of billing and

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

customer services to Sprint, but never accurately disclosed the known risks involved. In fact, US Unwired stated, in an August 8, 2001 press release, that any success could be attributed to an "adherence to the sound fundamentals of our business plan over the last two years ..." even when management knew at the outset that the forced migration of customer care, billing and cash flow control to Sprint would be disastrous for the company. In a March 5, 2002 report filed with the SEC, US Unwired disclosed some of the general risks involved with the transfer of customer care and billing to Sprint, but did not disclose the potential magnitude of those risks nor the fact that some of those risks had already materialized.

The complaint notes that in May 2001, Sprint instituted a nationwide calling program for subprime credit class customers called the "no-deposit account spending limit," or the NDASL. Sprint launched this program to increase its national market share by targeting the sub-prime credit class customers. Prior to this program, Sprint required sub-prime credit class customers to pay a deposit of $125 to $250 as a condition of subscription. Under NDASL, Sprint would waive the deposit except in extraordinary circumstances. The "ClearPay" program soon replaced the NDASL program. Under "ClearPay," customers could subscribe without a deposit or a credit check. Instead, as long as *235 their accounts were current, customers would be able to use the phone within spending limits.

The complaint alleges that based on US Unwired's previous unsatisfactory experience with sub-prime credit class customers, US Unwired's management adamantly protested the decision to implement these programs in its designated areas. Piper noted that US Unwired viewed the ClearPay program as a "colossal mistake." US Unwired's management knew that it was not going to work and told Sprint that it did not want to offer the ClearPay program. Piper also noted that US Unwired told Sprint that these programs would generate bad debt and churn[4] levels beyond the levels the company could support. US Unwired was concerned about the implementation of these programs in its service areas, because those areas contained a higher percentage of potential sub-prime credit subscribers as compared to other markets and other Sprint affiliates.

The complaint alleges that US Unwired saw huge increases in deactivations and a significant rise in churn and debt levels for its sub-prime credit class customers after the programs' implementation. A former employee later testified that US Unwired, at the time, knew that many of these sub-prime credit class subscribers used their initially allotted minutes and then never paid for them, causing increased bad debt and churn, or turnover, of subscribers. However, as a recent Type II convert, US Unwired no longer had the ability to refuse implementation.

Nevertheless, its management, from the outset, sought to renegotiate for permission from Sprint to stop offering the programs. The complaint provides several examples: Piper, in an August 2, 2001 letter to Clint Slusher, Sprint's Director of Affiliate Management, noted that the no-deposit program produced "unacceptable and inconclusive results" for US Unwired in test trials. In that same letter, Piper warned that, by adding so many no-deposit subscribers, the Company expected "high churn rates and bad debt percentages" that would cause "our business plan to fail.' " Piper also stated that, if forced to take such subscribers, US Unwired "will do all [it] can to limit the appeal of [the no-deposit program]." In an internal email to US Unwired executives on August 7, 2001, Piper stated his belief that "it is critically important to stop the sale of [the no deposit program] immediately" because "[the no deposit program] ... has the potential for double-digit churn ...." In early 2002, a former Director of US Unwired had a conversation with Piper wherein they agreed that US Unwired needed to "sell to quality customers" and not just focus on the quantity of subscribers, an ongoing problem with Sprint's no-deposit initiative that was aimed at creating subscriber growth with sub-prime credit class customers. In a January 21, 2002 email to Sprint and US Unwired representatives, Piper stated, "Our position on NDASL has been clear from the beginning. We have never approved of eliminating the deposit." Despite US Unwired's protests, Sprint refused US Unwired's requests for permission to stop the program. Finally, in February 2002, Sprint permitted US Unwired to reinstate the deposit for NDASL and ClearPay customers. Nevertheless, US Unwired continued to offer by choice the no-deposit program in certain areas and US Unwired continued to face ClearPay and NDASL's ill effects.

*236 Despite the foregoing, in a March 2002 public conference call, which is referenced and quoted in the complaint, US Unwired's management continued to tout the no-deposit programs' long-term benefits. As the complaint alleges, in this call, Piper misrepresented to the public that "[w]e think these [no-deposit] customers are necessary to reach our full market penetration potential and we think you can do it profitably." In the same press conference, and in connection with the no-deposit customer market, Piper

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

also misrepresented that "we think we're still getting our market share and we think our growth opportunity is alive and well." Moreover, Piper, reinforcing his public predictions of positive growth, indicated that the churn rate "top[ped] out" at 3.5% in the first quarter. Chief Financial Officer Vaughn also indicated in the same call that the churn rate "will start to decrease" in subsequent quarters. However, soon thereafter, on July 24, 2002, Piper sent a private letter to Chuck Levine, Sprint's President, noting that US Unwired's conversion to Type II affiliation created long-term challenges and US Unwired was still "reeling from the damage" caused by ClearPay and NDASL.

At about the same time, between June 6, 2002 and August 13, 2002, several public disclosures reached the marketplace related to the no-deposit and ClearPay programs' detrimental effects upon US Unwired's financial condition, causing its stock price to decline from $4.94 to $0.90 per share.

Throughout the class period, after US Unwired began implementing the no-deposit programs in May 2001, US Unwired engaged in a series of acquisitions using its stock price revenues. On February 28, 2001, US Unwired purchased from Cameron Corporation its minority interest in Louisiana Unwired in exchange for approximately 4.63 million Class A shares of common stock for a total price of $36.5 million. On the same day, US Unwired purchased a 20% minority interest in Texas Unwired with 307,664 shares of Class A common stock for a purchase price of approximately $2.4 million. On December 20, 2001, US Unwired acquired all outstanding shares of IWO Holdings and issued a public offering of approximately 45.9 million shares with an aggregate value of $459 million based on US Unwired's December 19, 2001 stock price of $10.00 per share to cover the acquisition. On February 11, 2002, US Unwired acquired another Sprint affiliate, Georgia PCS. US Unwired issued approximately 5.5 million shares of common stock with a value of $35.7 million based on US Unwired's closing price on February 8, 2002 of $6.49. Pursuant to an October 1, 1999 agreement with its lenders, US Unwired's ability to obtain credit with those lenders was specifically tied to its ability to maintain a certain level of subscriptions. During the class period, US Unwired's ability to issue debt to fund its acquisitions and to obtain credit from lenders was directly dependent on its maintaining certain levels in both its customer subscriptions and its stock prices.

During the class period, members of US Unwired management also sold over 463,000 of their personally-

owned shares at inflated prices ranging from $5 to $13 and pocketed more than $4.94 million. Henning, Piper, and Vaughn sold 73%, 82%, and 100% respectively of their actual stock holdings at inflated prices.[5]

**\*237** In a private email in October 2002 shortly after the class period, Piper recounted management's state of mind when the no-deposit program was rolled-out and its collective foresight that the program would cause US Unwired's stock to decline. This email, sent to Tom Mateer, Sprint's Vice President of the Affiliations group, as quoted in the complaint, stated that:

> US Unwired finds itself in a precarious position today. Our growth rate has declined to almost zero, our churn and bad debt lead the industry, our free cash flow timeline has been pushed out indefinitely, and our stock and bonds are perceived to be virtually worthless. This is exactly the business environment US Unwired (USU) predicted it would be in when Sprint rolled out NDASL. USU's plea with Sprint not to offer NDASL fell on deaf ears.

On August 12, 2004, plaintiff Clodile Romero filed a securities fraud class action against US Unwired and certain directors of the company—the named individual defendants—seeking to recover for persons who purchased US Unwired securities between May 23, 2000 and August 13, 2002, i.e., the class period. Later, Billy Lormand became the lead plaintiff and amended the complaint to add claims for violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated pursuant to the Exchange Act. On August 25, 2004, Don Feyler filed a shareholder derivative action on behalf of US Unwired against the same defendants for breach of fiduciary duties, abuse of control, mismanagement, waste of corporate assets, unjust enrichment, and against Sprint for aiding and abetting a breach of fiduciary duty. On November 11, 2004, the Lormand and Feyler actions were consolidated. After the Supreme Court decision on securities pleadings in *Dura Pharmas., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005) issued, Lormand successfully moved to amend his consolidated complaint, which is now the second amended complaint ("SAC") filed on September 16, 2005.

In sum, the plaintiff's SAC alleges that US Unwired and the individual defendants misled the public by concealing material facts of which they were aware, viz., that Sprint was forcing US Unwired against its will and business judgment to enlist low income and credit risky subscribers

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

without deposits or credit checks; and that, as the defendants knew from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics of its designated network areas. The plaintiff also alleges the defendants misrepresented to the public the nature of US Unwired's relationship with Sprint and concealed the fact that Sprint had coerced US Unwired into a Type II affiliation, which enabled Sprint to force US Unwired to adopt the sub-prime credit class strategy and to take away from US Unwired its control over customer care, billing, and cash-flow. The plaintiff alleges that the defendants also continued to mislead the public regarding the financially harmful nature of these programs even as they received adverse financial information confirming their dire predictions in respect to the affiliation conversion **238** and the no-deposit programs. The plaintiff alleges that the concealment and misrepresentation of these facts caused US Unwired's stock to be falsely inflated and that the later disclosures of the truth caused a stock decline from a high of $4.94 to a low of $0.90 per share.

In response, the defendants filed motions to dismiss for failure to state a claim relying on four arguments: (1) the complaint does not plead with sufficient particularity the factual basis for their allegations of misrepresentation; (2) the alleged misleading statements are not actionable as a matter of law, because the PSLRA's safe harbor applies to their alleged misrepresentations and the defendants had no duty to disclose the alleged material omissions; (3) the facts pleaded do not give rise to a strong inference that the defendants acted with scienter; (4) the complaint fails to allege loss causation, i.e., a causal connection between the alleged misrepresentations and the stock's subsequent depreciation. On August 11, 2006, the district court "dismissed without prejudice" Lormand's complaint pursuant to Rule 12(b)(6) after ruling on three of the defendants' arguments.

The district court: (1) decided that plaintiff's SAC satisfied the particularity requirement; (2) decided that some of the alleged misrepresentations were not actionable as they were protected under the PSLRA's safe harbor provision; (3) pretermitted deciding whether, under the SAC's charges, the defendants had a duty to disclose the alleged material omissions in the misrepresentations; (4) pretermitted deciding whether plaintiff's SAC adequately alleged scienter; (5) decided that the SAC failed to sufficiently plead loss causation under Rule 12(b)(6).

Plaintiff then requested leave to amend the complaint for a third time, but the district court denied leave to amend, concluding that any further amendment would be futile. Based on its decision that further amendment would be futile, the district court dismissed the case with prejudice. The plaintiff timely appealed.

2. Discussion

Private federal securities fraud actions are based on federal securities statutes and their implementing regulations. *Dura,* 544 U.S. at 341, 125 S.Ct. 1627. Section 10(b) of the Securities Exchange Act of 1934 forbids (1) the "use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations." 15 U.S.C. § 78j(b). Commission Rule 10b–5 forbids, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b–5 (2004).

The courts have implied from these statutes and Rule 10b–5 a private damages action, which resembles, but is not identical to, common-law tort actions for deceit and misrepresentation. *Dura,* 544 U.S. at 341, 125 S.Ct. 1627 (citing *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 730, 744, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 196, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). Congress has imposed statutory requirements on that private right of action. *Id.*

In cases involving publicly traded securities and purchases or sales in public securities markets, the action's basic elements are: (1) a material misrepresentation (or omission), (2) scienter, i.e., a wrongful state of mind, (3) a connection with the purchase or sale of a security, (4) reliance, often referred to in cases involving public **239** securities markets (fraud-on-the-market cases) as "transaction causation"; (5) economic loss; and (6) "loss causation," i.e., a causal connection between the material misrepresentation and the loss. *Id.* at 341–42, 125 S.Ct. 1627.

In addition to pleading these basic elements, a plaintiff must also comply with the standards of the PSLRA, codified at 15 U.S.C. § 78u–4. Among other things, the PSLRA requires a plaintiff to identify each allegedly misleading statement with particularity and explain why it is misleading, the so-called

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

"particularity" requirement. 15 U.S.C. § 78u–4(b)(1). The PSLRA also provides that a plaintiff must allege facts "giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

[1]    Only the last requirement alters the usual contours of a Rule 12(b)(6) ruling. Usually, under Rule 12(b)(6), we must draw all reasonable inferences in the plaintiff's favor. However, for scienter only, as required by the PSLRA, "a court must take into account plausible inferences opposing as well as supporting a strong inference of scienter." *Ind. Elec. Workers' Pension Trust Fund IBEW v. Shaw Group, Inc.,* 537 F.3d 527, 533 (5th Cir.2008) (citing *Tellabs,* 127 S.Ct. at 2509). "The inference of scienter must ultimately be 'cogent and compelling,' not merely 'reasonable' or 'permissible.' " *Id.* (quoting *Tellabs,* 127 S.Ct. at 2510).

In the present case, the defendants do not contend that the plaintiff's SAC fails to allege the basic elements of: a connection with the purchase or sale of a security, reliance or transaction causation, or economic loss. The defendants challenge only the SAC's allegations of actionable material misrepresentations or omissions, scienter, and loss causation.[6]

*I. Pleading Material Misrepresentations and Omissions.*

*A.   Specific   allegations   of   misrepresentations   and omissions.*

Cognizant of the strictures of the PSLRA and Fed.R.Civ.P. 9(b), the plaintiff alleges that the defendants made twenty-four specific material misrepresentations and omissions in press releases, conference calls, interviews, and filings with the SEC,[7] as follows:

1. On April 4, 2000, US Unwired filed a registration statement with the SEC promoting an initial public offering of its common stock, which included statements emphasizing the beneficial relationship between US Unwired and Sprint. It listed the benefits of its affiliation contract with Sprint, essentially its access to Sprint's marketing, national network, handset availability, traveling services, and technology.

2. The same April 4, 2000 filing also discussed US Unwired's rights under its contract with Sprint, including the possibility of selling US Unwired's business to Sprint or of buying a license from Sprint if Sprint breached the contract.

*240  3. The same April 4, 2000 filing also discussed US Unwired's reliance on Sprint and its contract with Sprint, noting that US Unwired was dependent on Sprint and had to maintain a good relationship with Sprint or else its "business may not succeed."

The plaintiff alleges these statements were materially misleading because US Unwired was already embroiled in a bitter dispute with Sprint. Sprint had threatened to declare US Unwired in breach of its affiliation contract and had demanded that US Unwired either undertake ruinous costs to integrate its operations or become a Type II affiliate and thereby give up control of its operations. The defendants, through these factual misrepresentations and concealments, artificially inflated the stock price. Thus, On June 14, 2000, Credit Suisse First Boston initiated coverage of US Unwired with a "Buy" rating and a 2001 target price of $25, stating that "[s]imilar to other Sprint PCS affiliates, we believe US Unwired will benefit financially and strategically from its relationship with Sprint."

4. On August 9, 2000, US Unwired issued a press release announcing record second quarter revenues for the period ending June 30, 2000. Piper publicly commented: "We had a very productive second quarter. Operationally, we launched Sprint PCS service in nine new markets and added 109 cell sites to the network. Our sales team brought 11,000 new PCS subscribers onto the system. Financially, we executed a successful public offering during a very difficult market."

5. On August 11, 2000, US Unwired filed with the SEC its Form 10–Q for the period ending June 30, 2000, which repeated the financial results reported in the August 9, 2000 press release and several of the positive statements from the April 4, 2000 registration statement concerning US Unwired's beneficial relationship with Sprint PCS.

The plaintiff alleges that these statements were materially misleading because the defendants failed to disclose and otherwise omitted that Sprint had intensified its pressure on US Unwired to convert to a Type II affiliate by threatening to declare it in default of the affiliation contract and by giving it a deadline of August 31, 2000 to either convert or pay an exorbitant fee of up to $30 million to obtain access to Sprint systems. The stock price continued to be artificially inflated during this period. On September 6, 2000, First Union Securities issued a report on US Unwired, rating it as a "Strong Buy," and concluding that "US Unwired's affiliation with Sprint ... coupled with its attractive market

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

footprint, allows it to receive many of the benefits of a national wireless service provider ...." On October 2, 2000, Hibernia Southcoast Capital rated US Unwired a "Strong Buy" and concluded that "[a]s a network partner, [US Unwired] should be able to leverage its relationship with [Sprint], the fastest growing nationwide wireless provider, to grow its subscriber base faster than the industry average." On October 6, 2000, Morgan Keegan also reviewed favorably US Unwired's adoption of Sprint's "pricing strategies."

6. On November 8, 2000, US Unwired issued a press release touting the benefits of migrating customer care and billing functions to Sprint. US Unwired noted that the migration would "help [US Unwired] to more fully use [Sprint's] national sales efforts," "to capitalize on [Sprint's] successes," and "to achieve full network compatibility."

7. On November 9, 2000, US Unwired reported very good financial numbers and increased subscriptions. Piper publicly commented on the results noting that US **241** Unwired had "executed [its] business plan."

8. On November 13, 2000, US Unwired filed its Form 10–Q. It disclosed the migration of customer and billing services to Sprint only insofar as it noted that US Unwired "amended [its] management agreements with" Sprint, and that Sprint "will begin providing substantially all of [US Unwired's] billing and customer care services."

The plaintiff alleges that these statements were materially misleading, because the defendants knowingly concealed that Sprint had forced them into the new Type II relationship that fundamentally altered US Unwired's business plan and its contractual relationship with Sprint. The defendants knowingly concealed their knowledge that the transfer of control of US Unwired's billing and customer care— a consequence of the affiliation conversion—risked US Unwired's financial failure. On December 14, 2000, investor advisory company Johnson Rice said US Unwired was a buy, because it stood out among other wireless stocks due to its growth potential.

9. On January 17, 2001, US Unwired issued a press release reporting strong subscriber growth. Piper publicly commented that "US Unwired employees did a fantastic job in continuing to accelerate the expansion of [its] consumer base."

10. On February 22, 2001, US Unwired issued a press release touting its rapid growth in subscriptions. Piper commented that US Unwired "exceeded all the growth components of [US Unwired's] business model."

The plaintiff alleges that these statements were materially misleading because they ignored the known problems associated with the Type II conversion and omitted the known risks associated with conversion to its business model.

11. On March 26, 2001, US Unwired filed its Form 10– K Annual Report. It briefly reiterated without comment the fact that US Unwired had migrated billing and customer care functions to Sprint.

The plaintiff alleges that this statement was materially misleading, because it omitted the known risk associated with the forced migration of these functions to Sprint, and the magnitude of that risk, i.e., the certain or high potential for company failure.

12. On May 7, 2001, US Unwired issued a press release announcing large net subscriber additions. Piper praised the reduced churn rate in the release.

13. On May 8, 2001, US Unwired filed with the SEC its Form 10–Q stating that US Unwired had migrated billing and customer care functions to Sprint.

The plaintiff alleges that these statements were materially misleading, because they omitted disclosure of the company's forced conversion to Type II affiliation and the defendants' knowledge that US Unwired's loss of control of its customer care, billing and cash flow functions would be financially disastrous for the company.

14. On August 8, 2001, US Unwired issued a press release stating that "[o]ur outstanding operational performance and adherence to the sound fundamentals of our business plan over the last two years positioned us for the early achievement of [earnings before interest, taxes, depreciation, amortization, and non-cash compensation]."

15. Also on August 8, 2001, US Unwired filed with the SEC a Form 10–Q, which generally discussed the relationship with Sprint and the migration of billing and customer service operations, but omitted any specific discussion of risks and their magnitude.

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

**\*242** 16. On August 9, 2001, US Unwired hosted a conference call celebrating its positive earnings. Piper publicly noted that the conversion to Type II affiliation was "going quite well." First Union Securities reacted by labeling US Unwired as a "strong buy."

17. On November 8, 2001, US Unwired issued a press release that discussed the completion of the migration of customer service and billing operations to Sprint.

18. On November 8, 2001, US Unwired filed with the SEC its Form 10–Q. US Unwired noted that because Sprint was responsible for customer service and billing, it depended on Sprint for the "reporting of a significant portion" of US Unwired's "service and revenues and certain operating, selling, and administrative expenses."

The plaintiff alleges that these statements in the Form 10–Q and the press release were materially misleading, because members of US Unwired's management knew that the transfer of services was contentious, coerced, and would cause enormous problems. US Unwired would depend on Sprint for the reporting of revenue, costs, and subscriber data and thus, the transfer of these functions would be financially disastrous for US Unwired as it would lose control over its core functions. They omitted any mention of that known risk and the magnitude of that risk.

19. On March 5, 2002 US Unwired issued a press release noting significant gains in subscriptions and a churn rate of approximately 2.5%.

20. On March 5, 2002 US Unwired filed with the SEC its Form 10–K Annual Report for 2001. The report reiterated previous statements regarding the benefits associated with Sprint affiliation.

21. In the same 10–K Report, US Unwired disclosed new potential risks associated with Sprint affiliation, including possible adoption of business decisions not in US Unwired's best interests and the migration of customer service's possible effects on customer satisfaction.

22. On March 6, 2002, US Unwired hosted a conference call with investors. Piper touted the "very successful conversion to Sprint's billing and customer services." He noted that US Unwired management thought sub-prime credit class customers "are necessary to reach [US Unwired's] full market penetration potential and we think we can do it profitably."

The plaintiff alleges that these statements were materially misleading, because the US Unwired management was aware that Sprint was forcing US Unwired against its will and business judgment to enlist low income and credit risky subscribers without deposits or credit checks; that, as the defendants knew from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics within its designated network areas; that the defendants continued to mislead the public regarding the viability of this strategy even as they received adverse financial information confirming their dire predictions in respect to the no-deposit programs; that Sprint forced US Unwired to turn over control of its critical core functions of customer care, billing, and cash-flow; and that management knew relinquishing control over those core functions would lead to financial disaster. Piper's comments in the public conference call misrepresented management's view concerning the migration of billing and customer services to Sprint and the compelled marketing of these plans to sub-prime credit class customers. Piper continued to tout the past success and potential for both the forced migration of its core functions and coerced **\*243** implementation of the no-deposit programs.

23. On May 9, 2002, US Unwired reported favorable increases in subscriber growth in a press release, which Piper publicly attributed to US Unwired's "continued focus on operational excellence."

24. On May 9, 2002, US Unwired filed with the SEC its Form 10–Q. In this filing, US Unwired discussed its allowances for subscribers canceling their subscriptions and also the debt collections costs in its accounting disclosures. US Unwired also noted that these allowance estimates were consistent with "historical trends."

The plaintiff alleges that these statements were materially misleading, because these statements failed to disclose the defendants' certain knowledge from previous experience that the no-deposit programs would increase churn and bad debt because of US Unwired's subscribers' demographics; that subscriber growth figures were based on no-deposit subscribers who had a potential for high churn, and therefore were misleading; and that no-deposit programs would lead to higher costs caused by the increased churn and bad debt, and such costs would not be consistent with historical trends.

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

A reasonable person may draw the plausible inferences from the foregoing allegations that the defendants made the material misrepresentations and omissions as described above. The defendants do not dispute this conclusion; instead, the defendants contend that the alleged misrepresentations are not actionable because the representations are protected by PSLRA's safe harbor and, alternatively, the defendants were under no duty to disclose the omitted information.

*B. Safe Harbor.*
The defendants argue that certain of the misrepresentations and omissions were not actionable because they were "forward-looking" and subject to the "Safe Harbor" clause of the PSLRA; and that some of the omissions were not material because the defendants had no duty to disclose the omitted information.

Under the Safe Harbor clause, a "forward-looking" statement is not actionable if: (1) the statement is "identified as ... forward-looking ... and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially ...."; (2) it is "immaterial"; or (3) "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1)(A–B); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.,* 365 F.3d 353, 371–72 (5th Cir.2004) (applying clause to securities fraud allegations). The district court applied the safe harbor provision to alleged misrepresentations 6 through 10.[8]

As we noted earlier, the plaintiff's SAC alleges that US Unwired and the individual defendants misled the public by concealing from it material facts of which they were aware, viz., that Sprint was forcing US Unwired against its will and business judgment to enlist low income and credit risky subscribers without deposits or credit checks; and that, as the defendants knew from previous experience, this business strategy would be financially disastrous for US Unwired, given the demographics of its designated network areas. **\*244** The plaintiff also alleges the defendants misrepresented to the public the nature of US Unwired's relationship with Sprint and concealed that Sprint had coerced US Unwired into a Type II affiliation, which enabled Sprint to force US Unwired to adopt the sub-prime credit class strategy and took away US Unwired's control over customer care, billings, and cashflow. The plaintiff alleges that the defendants also continued to mislead the public regarding

the financially harmful nature of these programs and the affiliation conversion even as they received adverse financial information confirming their dire predictions.

**[2]**    Because the plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations. *See* 15 U.S.C. § 78u–5(c)(1)(A)–(B) (noting that the "safe harbor" would apply only if "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading."); *Southland Sec. Corp.,* 365 F.3d at 371–72.

The district court erroneously rejected this argument, stating that "beyond the blanket assertions by plaintiff that defendants knew that these statements had already become false when they were made, the Court can find no other suggestions of this alleged fraud." The district court did not reach the issue of scienter in its opinion and provides no basis for its determination that the defendants did not know the statements were false as the plaintiff alleges. The district court is in error, because we must accept as true the well-pleaded factual allegations in the complaint during the pleadings stage. *See Twombly,* 127 S.Ct. at 1965; *Tellabs,* 127 S.Ct. at 2509;  *Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc.,* 497 F.3d 546, 550 (5th Cir.2007). The defendants do not defend this part of the district court's reasoning on appeal; instead they contend that the plaintiff fails to sufficiently plead scienter, and, for the same reasons, would lack actual knowledge. We address and reject this argument in the scienter section below.

**[3]**    Even if the plaintiff had failed to plead actual knowledge, the safe harbor provision still would not apply here, because the alleged misrepresentations are not accompanied by "meaningful cautionary language." *See* 15 U.S.C. § 78u–5(c)(1)(A)(i) (authorizing the application the safe harbor only if forward-looking statement "is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement").

The district court concluded that US Unwired's generic disclaimer that accompanied the forward-looking statements amounted to meaningful cautionary language. The disclaimer says that US Unwired's statements in its documents are "not guarantees of future performance ... and involve known and unknown risks and other factors that could cause actual results

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

to be materially different from any future results expressed or implied by them." We disagree with the district court's conclusion, because the language urged here is boilerplate and does not qualify as meaningful cautionary language.

Congress clearly intended that boilerplate cautionary language not constitute "meaningful cautionary" language for the purpose of the safe harbor analysis. Private Securities Reform Act of 1995, Conference Report, H. Rep. No. 104–369 (1995), *reprinted in* Fed. Sec. L. Rep. (CCH) ¶ 85,710, at 87,209 (1995) and 1995 U.S.C.C.A.N. 730; *Southland Sec. Corp.,* 365 F.3d at 372 ("The requirement for **\*245** 'meaningful' cautions calls for 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances, not merely a boilerplate litany of generally applicable risk factors.").

The disclaimer language cited by the district court is very similar to language we determined to be boilerplate and not meaningfully cautionary in *Plotkin v. IP Axess, Inc.,* 407 F.3d 690 (5th Cir.2005). In *Plotkin,* we considered the following broad disclaimer found in a company's press releases to constitute boilerplate cautionary language: "These forward-looking statements involve numerous risks, uncertainties and assumptions, and actual results could differ materially from anticipated results." *Id.* at 694.

The disclaimer in this case is similarly generic and formulaic, and, likewise, is also boilerplate and not meaningful cautionary language. As further evidence that the disclaimer is mere boilerplate, the disclaimer, only with slight variations, was used in conjunction with *each* alleged misrepresentation the district court exempted from analysis under the safe harbor provision.

The district court, in effect, granted blanket safe harbor protections for the statements, because each was perfunctorily accompanied by essentially nothing more than the same boilerplate language. The district court therefore erroneously neglected to address how each excluded statement (or portions of those statements) is specifically and meaningfully protected by the safe harbor. Each statement that benefits from the safe harbor must be addressed individually. *Cf. Southland Sec. Corp.,* 365 F.3d at 379 (examining an individual statement and concluding that "[w]hile this is a forward looking statement, it cannot be ascertained from the record whether it was accompanied by meaningful cautionary language"); *Kapps v. Torch Offshore, Inc.,* 379 F.3d 207, 215 n. 11 (5th Cir.2004) ("[C]ourts must assess

the communication on a case-by-case basis.") (quoting *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 371 (3d Cir.1993)). Here, in not one instance did this generic language amount to " 'substantive' company-specific warnings based on a realistic description of the risks applicable to the particular circumstances" specifically described in any of the alleged misrepresentation so as to constitute meaningful cautionary language. *See Southland Sec. Corp.,* 365 F.3d at 372. The generic language is merely a "litany of generally applicable risk factors" applied as boilerplate to every alleged misrepresentation the district court considered to be protected under PSLRA's safe harbor. *Id.* The district court fell into legal error in its application of the safe harbor provision to misrepresentations 6–10.

Moreover, the defendants do not defend this part of the district court's analysis on appeal. Instead, the defendants point to different disclaimers in documents (attached as exhibits to the complaint) that contain the alleged misrepresentations and contend that those disclaimers meaningfully warn about or fully disclose the potential specific risks allegedly omitted in the misrepresentations. The disclaimers they rely on provide:

(1) "Our agreements with Sprint PCS are central to our business plan .... These agreements give Sprint PCS a substantial amount of control over the conduct of our business. Sprint PCS may make decisions that adversely affect our business like setting the prices for its national plans at levels that may not be economically sufficient for our business."

(2) "We will rely on Sprint PCS's internal support systems, including customer care, billings and backoffice support, in some of **\*246** our markets .... Problems with Sprint PCS's internal support systems could cause: delays or problems in our own operations or service[,] delays or difficulty in gaining access to customer and financial information[,] a loss of Sprint PCS customers[, and] an increase in the costs of customer care, billing and back-office services."

(3) "We currently have employees to handle billing, customer care, accounting, treasury and legal services in our markets where we currently offer PCS service and in most of our new markets. We believe that providing these functions ourselves is more cost-effective than having third parties provide them. In a limited number of markets, however, Sprint PCS will provide us on a contract basis with selected back office functions like billing and customer care. We anticipate that we may over time transfer control of these functions to Sprint

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

PCS if Sprint PCS can provide them more cost effectively and efficiently than we can."

(4) "Changes in technology could adversely affect us .... If Sprint PCS changes its standard, we will need to change ours as well, which will be costly and time consuming. If we cannot change our standard, we may not be able to compete with other systems."

(5) "Each Sprint management agreement requires us to follow program requirements that are used throughout the nationwide Sprint PCS network. We must continue to follow these program requirements if Sprint PCS changes them. The program requirements involve ... our participation in Sprint PCS distribution programs on a national and regional basis [and] adherence to Sprint technical program requirements .... We will comply with Sprint PCS's program requirements for technical standards, customer service standards, national and regional distribution, national accounts programs and traveling and inter-service area services. Sprint PCS can adjust the program requirements from time to time."

(6) "Our PCS business may suffer because more subscribers generally disconnect their service in the PCS industry than in the cellular industry .... We plan to keep our subscriber churn down by expanding network coverage, improving network reliability, marketing affordable plans and enhancing customer care. We cannot assure that these strategies will be successful. A high rate of PCS subscriber churn could harm our competitive position and the results of operations of our PCS services."

(7) "US Unwired is a leading proponent of prepaid products in the wireless industry. Industry experts believe that 70% of all new wireless activations will be prepay by 2002."

After surveying these warnings, and after drawing inferences in favor of the plaintiff, we conclude that the referenced precautionary language only warned the public that US Unwired's affiliation conversion may cause a limited, general, and vague risk to customer satisfaction and to US Unwired's independent discretion in business decisions in limited areas on a case-by-case basis. The cautionary language disclaimer (1) uses the phrase Sprint "may make decisions that adversely affect *our business,*" (emphasis added) which is a very vague and general warning. Disclaimer (2) stated that "[p]roblems with Sprint [ ]'s internal support systems could cause" delays and costs to customer service, and disclaimer (5) represents that Sprint's contractual authority over US Unwired was both limited in scope ("can adjust the program") and limited temporally ("from time to time"). These disclaimers also

limit the possible risk to certain areas, "delays and costs to *247 customer service," with a limited temporal scope. These warnings did not disclose that defendants knew from past experience that the sub-prime subscriber programs and US Unwired's loss of control of customer care, billings and service posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized. For example, cautionary language disclaimers (3) and (4) merely disclose the possibility of transferring functions to Sprint without disclosing any material risks.

As for the no-deposit program, US Unwired publicly stated that its management believed the program would generally succeed and was necessary. Cautionary language disclaimer (7) actually promotes an impression that the no-deposit programs, if considered to be a pre-paid program,[9] was necessary. Cautionary language disclaimer (6) states that US Unwired's business "may suffer" as a result of churn, but also noted that they "plan to keep our subscriber churn down." This warning does not disclose the specific risks and their magnitude, such as the sub-prime subscriber programs' alleged certain grave threat to US Unwired's entire business, which it was powerless to control, caused primarily by severe churn and bad debt. Moreover, warnings about the risks associated with the no-deposit programs were glossed over as a future risk of *limited* magnitude that would be averted rather than certain dangers that had already begun to materialize.

These warnings failed to correct the false impression created by the defendants' public statements or to supply the truth that they omitted, viz., that the defendants knew that the no-deposit programs and affiliation conversion threatened to severely harm the company financially by increasing churn and bad debt; that this insidious damage process had already begun; and that US Unwired was unable to contain it because its core operations had been transferred to Sprint. From the context of the alleged misrepresentations and drawing all inferences in favor of the plaintiff, these warnings, while somewhat specific, do not provide sufficiently meaningful caution about clearly present danger that was materializing. *See Rubinstein v. Collins,* 20 F.3d 160, 167–68 (5th Cir.1994) (noting that alleged misrepresentations and cautionary language must be analyzed in context and the presence of cautionary language is not *per se* dispositive) ("Under our precedent, cautionary language is not necessarily sufficient, in and of itself, to render predictive statements immaterial as a matter of law."); *see also Shaw v. Digital Equip. Corp.,* 82 F.3d 1194, 1213 (1st Cir.1996), *superseded on other grounds by statute as*

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

recognized in *Greebel v. FTP Software, Inc.,* 194 F.3d 185, 197 (1st Cir.1999) (noting how the "surrounding context" failed to caution "against such an implication with sufficient clarity to be thought to bespeak caution"). Viewing all of the statements in context, we conclude that the defendants' safe harbor argument is without merit. The misrepresentations and omissions were not accompanied by specific, concrete explanations that clearly identified and quantified the clearly present financial dangers to US Unwired, i.e., the disastrous effects of the no-deposit programs and US Unwired's loss of control of customer care, billings **\*248** and cash flow.[10]

Because "reasonable minds could ... disagree as to whether the mix of information in the [allegedly actionable] document is misleading," the statutory safe harbor provision cannot provide the basis for dismissal as matter of law. *Shaw,* 82 F.3d at 1214 (citation omitted). "[W]hen a complaint adequately states a claim, it may not be dismissed based on a district court's assessment [pursuant to Rule 12(b)(6)] that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly,* 127 S.Ct. at 1969 n. 8.[11]

### C. Materiality—Duty to Disclose.[12]

**[4]** "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.' " *Basic v. Levinson,* 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Inds., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). Accordingly, the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers. *Cf. Isquith ex rel. Isquith v. Middle S. Utils., Inc.,* 847 F.2d 186, 203 (5th Cir.1988) (noting that "emphasis and gloss can, in the right circumstances create liability" under Rule 10b–5).

**[5]** **[6]** The omission of a known risk, its probability of materialization, and its anticipated magnitude, are usually material to any disclosure discussing the prospective result from a future course of action. *See Milton v. Van Dorn Co.,* 961 F.2d 965, 969–70 (1st Cir.1992); *see generally SEC v. Merchant Capital, LLC,* 483 F.3d 747, 768–71 (11th Cir.2007); *Kowal v. MCI Commc'ns,* 16 F.3d 1271, 1277 (D.C.Cir.1994).[13] Once the defendants engaged in public discussions concerning the benefits **\*249** of Type II

affiliation and the no-deposit programs, they had a duty to disclose a "mix of information" that is not misleading.

> [W]e have long held under Rule 10b–5, a duty to speak the full truth arises when a defendant undertakes a duty to say anything. Although such a defendant is under no duty to disclose every fact or assumption underlying a prediction, he must disclose material, firm-specific adverse facts that affect the validity or plausibility of that prediction.

*Rubinstein,* 20 F.3d at 170 (internal quotations and citations omitted).

**[7]** As discussed earlier, the plaintiff sufficiently alleges that the defendants omitted serious risks inherent to the no-deposit initiatives and the company's conversion to Type II affiliation when they made statements regarding their benefits. They omitted known risks of severe magnitude, such as the known risk that long-term subscriber growth fueled by sub-prime credit class customers would almost certainly lead towards disaster. Their statements touting the benefits of US Unwired's conversion to Type II affiliation also omitted known risks of severe magnitude to their business plan as a result of the transfer of core services and customer billing to Sprint. Company officials publicly touted the migration of services and the use of no-deposit programs although they recognized signs that the dangers they privately predicted had already materialized (i.e., churn, bad debt, lack of independent control) and they had protested privately to Sprint regarding both actions; further, they continued to tout the programs and the conversion even after re-instating deposits for certain customer areas. *See Rubinstein,* 20 F.3d at 171 (" 'To warn that the untoward may occur when the event is contingent is prudent, to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.' ") (quoting *Huddleston v. Herman & MacLean,* 640 F.2d 534, 543–44 (5th Cir.1981)); *id.* at 170 n. 41 ("[A]t least facially, it appears that defendants have a duty under Rule 10b–5 to correct statements if those statements have become materially misleading in light of subsequent events."). We have also noted that:

> Perception of future events may take on a different cast as the future approaches, and, what is more important, later correspondence may act to bury facts previously disclosed. A balance once struck will not ensure a balance in the future. As new communications add a dash of recommendation, a pinch of promise, and a dusting of repetition, the scale may be tipped. To prevent an injustice to the shareholders, the elements must be weighed each

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

time that the shareholders are requested (or encouraged) to make a new decision.

*Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 605–06 (5th Cir.1974).

Here, the total mix of information was misleading, because it was highly skewed toward the promised benefits of Type II affiliation and the marketing and subscriber growth fueled by the sub-prime credit classes. The defendants continually skewed the mix of information by omitting the known severe risks associated with these business actions even as they recognized signs that those risks had already materialized. These "omitted fact[s] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic.* 485 U.S. at 231–32, 108 S.Ct. 978.[14]

**\*250** The defendants argue that their internal discussions regarding the inevitable failure of the no-deposit initiatives and Type II affiliation constituted solely their own personal (and dissenting) beliefs that need not be disclosed to the public. *See Cooperman v. Individual, Inc.,* 171 F.3d 43, 51 (1st Cir.1999) ("[D]isclosure of the business strategy supported by the majority of the Board did not obligate defendants also to disclose the fact that [the dissenter]—a distinct minority of a multi-member Board—opposed that strategy."). We disagree. Unlike the situation in *Cooperman,* the plaintiff here alleges that the entire management team of the company knew that disastrous effects would result from no-deposit initiatives and Type II affiliation. Accepting all alleged facts as true and drawing all inferences in favor of the plaintiff, a reasonable person could infer that the alleged views were neither an "isolated" nor a minority viewpoint. *See id.* at 51 & n. 12 (noting that the Cooperman complaint "makes clear that [the dissenter] was 'isolated' in his views regarding the strategic direction the Company should take."). Accordingly, we reject the defendants' arguments that they had no duty to disclose the truth underlying their misleading statements pertaining to the no-deposit programs and the company's loss of control of its customer care, billing and cash-flow functions.

*II. Pleading Scienter or Wrongful State of Mind*

At trial, a plaintiff alleging fraud in a § 10(b) action must prove her case, including the element of scienter, by a preponderance of the evidence. *Tellabs,* 127 S.Ct. at 2513. That is, "she must demonstrate that it is more likely than not that the defendant acted with scienter." *Id.* (citing *Herman & MacLean v. Huddleston,* 459 U.S. 375, 390, 103 S.Ct. 683, 74

L.Ed.2d 548 (1983)(emphasis in original)). At the pleading stage, however, a plaintiff alleging fraud in a § 10(b) action must only "plead facts rendering an inference of scienter at least as likely as any plausible opposing inference." *Id.* (emphasis in original).

Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason **\*251** or reasons why the statement is misleading," *Tellabs,* 127 S.Ct. at 2508 (quoting 15 U.S.C. § 78u–4(b)(1)); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *id.* (quoting 15 U.S.C. § 78u–4(b)(2)). In the instant case, the District Court held that the plaintiff met the first of the two requirements: the complaint sufficiently specified that the defendants alleged misleading statements or omissions and the reasons why they were misleading; and the defendants have not challenged that holding on appeal. But the district court pretermitted whether the plaintiff, as required by 15 U.S.C. § 21D(b)(2), "state[d] with particularity facts giving rise to a strong inference that [the defendants] acted with [scienter]," § 78u–4(b)(2). *See Tellabs,* 127 S.Ct. at 2508. Because the defendants presented arguments on this issue both here and below, we now address it *de novo.*

**[8]**    "The required state of mind [for scienter] is an intent to deceive, manipulate, or defraud or severe recklessness." *Ind. Elec. Workers' Pension Trust,* 537 F.3d at 533 (internal quotations omitted).[15] In addition to accepting all of the factual allegations in the complaint as true, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. *Tellabs,* 127 S.Ct. at 2509 (citing 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007)). The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Id.* (citing *Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 431 (5th Cir.2002); *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (9th Cir.2002)). "Allegations of circumstantial evidence justifying a strong inference of scienter will suffice." *Goldstein v. MCI WorldCom,* 340 F.3d 238, 246 (5th Cir.2003).

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

Further, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. In § 21D(b)(2), Congress did not merely require plaintiffs to provide a factual basis for their scienter allegations from which an inference of scienter rationally could be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong"—*i.e.*, a powerful or cogent—inference.[16] *Tellabs,* 127 S.Ct. at 2510. However, it "need not be irrefutable, i.e., of the smoking-gun genre, or even the most plausible of competing inferences." *Id.* (internal quotation marks and citations omitted). "To qualify as 'strong' **\*252** within the intendment of § 21D(b)(2), ... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 2404–05.

[9]    Reviewing the issue *de novo,* we conclude that the plaintiff satisfied the PLSRA's requirement that he state with particularity facts giving rise to a strong inference that the defendants acted with scienter or the required state of mind; that is, the plaintiff's SAC survives the Rule 12(b)(6) motion for dismissal because, when the allegations are accepted as true and taken collectively, a reasonable person would deem the plausible inference of scienter cogent and at least as strong as any opposing inference one could draw from the facts alleged. *See id.* at 2510–11.

The plaintiff's SAC alleges that the defendants acted with scienter or the required state of mind, i.e., intentionally or with severe recklessness, in respect to two principal types of misrepresentations or omissions of material facts. First, the defendants knew at the time of their public statements to the contrary that US Unwired's offering of no-deposit and ClearPay programs to lower income and credit risky subscribers had been forced on US Unwired by Sprint, would not be beneficial to US Unwired, and would almost certainly lead to the company's severe economic harm or disaster. Second, the defendants knew at the time of their public statements to the contrary that US Unwired's conversion to a Sprint Type II affiliate had been coerced by Sprint, that the conversion would not be beneficial to US Unwired, that it entailed US Unwired's loss of control of its customer care, billing and cash flow functions, which had been key to US Unwired's prior business and financial success, and that it would and did severely hamper US Unwired's ability to cope with the disastrous effects of the no-deposit and ClearPay programs that Sprint forced on the company. When these allegations are accepted as true and taken collectively, we

conclude that a reasonable person would deem the plausible inference of the defendants' scienter to be cogent and at least as strong as any opposing inference.

Contrary to their public statements applauding US Unwired's conversion from a Type III to a Type II Sprint affiliate, Piper and Henning contemporaneously but privately admitted repeatedly, as quoted and referenced in the pleadings, that US Unwired's management disapproved and strongly protested to Sprint against US Unwired's conversion to Type II affiliation. Most importantly, Henning drafted a long memo to US Unwired's Board in July of 2000 in which he predicted in detail the detrimental impact on the company should the Board decide to switch to Type II affiliation and thus cede control of billing and customer service operations to Sprint. He wrote, as quoted in the complaint, that "[t]he heart of our system is the billing system. To remove the heart from our system and make a transplant to Sprint billing would have a devastating effect on our subscribers and employees." The plaintiff also alleges that the US Unwired's corporate comptroller immediately recognized the detrimental effects on US Unwired's finances after switching to Type II affiliation—US Unwired lost control over the billing system and control over its cash-flow. In later admissions as alleged, Piper confirmed that the management recognized these clearly present dangers at the time of their alleged misrepresentations.

The SAC's allegations also give rise to a strong inference that the defendants acted with scienter in concealing their knowledge that US Unwired's use of the no-deposit programs in its demographic areas would **\*253** inevitably be severely harmful or disastrous economically for the company. The complaint alleges that the defendants predicted publicly that US Unwired's use of the no-deposit programs would bring it long-range benefits and success, even though they knew the programs were a colossal mistake and would be economically disastrous for the company. As alleged, Piper and Vaughn testified that from the beginning, and at the time US Unwired's management made the foregoing public misrepresentations and omissions, they had privately protested against Sprint's assumptions and projections regarding the no-deposit plans. As quoted in the complaint, Piper testified that Sprint "ignored our pleas not to require [US Unwired] to offer it." In a January 14, 2002 email from Piper to Sprint and US Unwired representatives, as quoted in the complaint, he stated that "we have never approved of eliminating the deposit." Plaintiff quotes from corporate documents in his complaint indicating that US Unwired's managers misrepresented or

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

concealed the truth because they knew that the no-deposit program would be harmful rather than beneficial to US Unwired. Piper noted in an August 2, 2001 letter to Clint Slusher, Sprint's Director of Affiliate Management, that the no-deposit program produced "unacceptable and inconclusive results" for US Unwired in test trials. In that same letter discussing the test trials result, "Piper warned that, by adding so many [no-deposit] subscribers, the Company expected 'high churn rates and bad debt percentages' would cause 'our business plan [to] fail[ ].' " Piper also stated in the letter that, if forced to take such subscribers, US Unwired "will do all [it] can to limit the appeal of [the no-deposit program]." In an internal email to US Unwired executives, including Vaughn, on August 7, 2001, Piper stated his belief that "it is critically important to stop the sale of [the no deposit program] immediately" because "[the no deposit program] ... has the potential for double-digit churn ...." The plaintiff also alleges that in early 2002, a former Director of US Unwired had a conversation with Piper wherein they agreed that US Unwired needed to "sell to quality customers" and not just focus on the quantity of subscribers, an ongoing problem with Sprint's no-deposit initiative that was aimed at creating subscriber growth with sub-prime credit class customers. In an email shortly after the class period, as quoted in the complaint, CEO Piper recounted the management's beliefs at the time of the roll-out of the no-deposit program. He wrote in a private October 2002 email to Tom Mateer, Sprint's Vice President of the Affiliations group, that:

> US Unwired finds itself in a precarious position today. Our growth rate has declined to almost zero, our churn and bad debt lead the industry, our free cash flow timeline has been pushed out indefinitely, and our stock and bonds are perceived to be virtually worthless. This is exactly the business environment US Unwired (USU) predicted it would be in when Sprint rolled out NDASL. USU's plea with Sprint not to offer NDASL fell on deaf ears.

The current pleadings sufficiently establish a compelling inference of scienter that the defendants knew at the outset the no-deposit initiatives and the affiliation conversion would be detrimental to the company and that they intentionally made contrary public representations and omitted this material information from their public disclosures. The defendants contend the pleadings support a competing inference that while the defendants knew about the problems with the no-deposit programs and the affiliation conversion, they did not intend to deceive the public because they believed the information was not material **\*254** or otherwise subject to public disclosure. The defendants' argument does not

accurately reflect the plaintiff's allegations because: (a) based on our materiality discussion, the alleged omissions would have "been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" and therefore was material, *Basic*, 485 U.S. at 231–32, 108 S.Ct. 978 (citation omitted); and (b) the plaintiff clearly alleges the defendants had direct knowledge and vociferously protested the affiliation conversion and no-deposit programs privately while they touted them positively in public.

In the exhibits to his complaint, the plaintiff provides numerous contemporaneous documents, such as internal emails and memos, that support a strong inference that the defendants had a wrongful state of mind at the time of their representations. The plaintiff also provides admissions from the defendants themselves regarding their state of mind at the time of their representations (as found in the defendants' post-class period deposition testimony and emails). The contemporaneous documents and post-period admissions both consistently tell the same story: the defendants privately knew, at the time of the representations, that the no-deposit programs and Type II affiliation conversion would be disastrous for the company but continued to tout their benefits publicly.

Contrary to the defendants' argument, the plaintiff's partial reliance on alleged facts dating from the post-class period does not amount to "fraud by hindsight"; that is, it does not "infer[ ] earlier knowledge based only on the situation that later came to pass." *Rodriguez–Ortiz v. Margo Caribe, Inc.*, 490 F.3d 92, 95 (1st Cir.2007).

> This is not the classic fraud by hindsight case where a plaintiff alleges that the fact that something turned out badly must mean defendant knew earlier that it would turn out badly. Nor is this a case where there is no contemporaneous evidence at all that defendants knew earlier what they chose not to disclose until later.

*Miss. Pub. Employees' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 91 (1st Cir.2008) (internal citation omitted); *see also ACA Fin. Guar. Corp. v. Advest, Inc.*, 512 F.3d 46, 62 (1st Cir.2008) (applying "fraud by hindsight" because "[t]here is nothing in the amended complaint to establish that the defendants were aware of facts, at the time they made their predictions, that would have made those predictions unreasonable, if they were unreasonable").

Here, the admissions by the individual defendants, as alleged in the complaint, directly and cogently tend to prove their

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

state-of-mind at the time of their misleading statements and omissions, *i.e.,* they are evidence that the defendants actually knew earlier that the course of action would turn out badly. Cf. *Lovelace v. Software Spectrum, Inc.,* 78 F.3d 1015, 1020 n. 4 (5th Cir.1996). Here, "[t]he plaintiff['s] claim, then, was neither one of second-guessing decisions by management nor one alleging fraud by hindsight because the plaintiffs had identified specific facts known to the defendants that had been omitted ..." *United States v. Morris,* 80 F.3d 1151, 1164 (7th Cir.1996) (internal quotations and citations omitted).

The inference of intentional deception is, at the very least, equally as compelling as any alternative inference, and a tie favors the plaintiff.[17] *Tellabs,* 127 S.Ct. at 2510  **\*255** ("A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged.") (emphasis added).

*III. Pleading Loss Causation*

*A. Legal Standards*

The PSLRA provides that a private plaintiff who claims securities fraud has the burden of proving that the defendant's fraudulent act or omission caused the loss for which the plaintiff seeks to recover.[18] The PSLRA does not, however, specifically answer the question of what must a plaintiff allege in a complaint in order to plead the "loss causation" element of such a claim for relief. The Supreme Court, in *Dura,* rejected the Ninth Circuit's answer to this question and identified the basic principles of pleading loss causation under Federal Rule of Civil Procedure 8(a)(2). 544 U.S. at 345–46, 125 S.Ct. 1627. Later, in *Twombly,* the Court, partially relying on *Dura,* decided that Rule 8(a)(2) implies a "plausibility" standard that any complaint must meet in order to state a claim for relief. 127 S.Ct. at 1965. Both *Dura's* and *Twombly's* reading of what Rule 8(a)(2) requires must be applied here to determine whether the plaintiffs pleading of loss causation is sufficient.

In *Dura,* the Ninth Circuit held that in a fraud-on-the-market case plaintiffs can satisfy the "loss causation" pleading and proof requirements simply by alleging in the complaint and subsequently proving that "the price" of the security "on the date of purchase was inflated because of the misrepresentation." *Broudo v. Dura Pharm., Inc.,* 339 F.3d 933, 938 (9th Cir.2003). The Supreme Court reversed, holding that the Ninth Circuit was wrong, both "[1] in respect to what a plaintiff must prove and [2] in respect to what the

plaintiff's complaint here must allege." 544 U.S. at 338, 125 S.Ct. 1627.

Rather, to *prove* loss causation in such a case, the Court in *Dura* held, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss." *Id.* at 342, 125 S.Ct. 1627. Based on logic, precedent and the common law roots of the securities fraud action, the Court concluded that the federal securities statutes and regulations "permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss." *Id.* at 346, 125 S.Ct. 1627. In other words, the federal laws require "that a plaintiff prove that the defendant's misrepresentations (or other fraudulent conduct) proximately caused the plaintiff's economic loss." *Id.* In order to establish this proximate causation, the plaintiff must *prove* that when the "relevant truth" about the fraud began to leak out or otherwise make its way into the marketplace it caused the price of the stock to depreciate and thereby proximately cause the plaintiff's economic loss. *Id.* at 342, 346, 125 S.Ct. 1627.

The *Dura* Court's articulation of the proof of loss causation requirement in a private securities fraud-on-the-market case  **\*256** is very similar to that adopted by this court prior to *Dura* in *Greenberg v. Crossroads Systems, Inc.,* 364 F.3d 657, 666 (5th Cir.2004).[19] The only difference, if any, is that in *Greenberg,* we required the plaintiff to prove that the truth that emerged had "related to" rather than "relevant"[20] to the defendants' fraud and that the same truth proximately caused the depreciation in price and plaintiff's economic loss.[21] Compare *Dura,* 544 U.S. at 342, 125 S.Ct. 1627 *with Greenberg,* 364 F.3d at 666.

From the requirements for the "proof" of loss causation, the *Dura* Court reasoned, for a plaintiff's complaint to adequately *allege* or *plead* these requirements, it need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," pursuant to Federal Rules of Civil Procedure 8(a)(2), and provide the defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests." 544 U.S. at 346, 125 S.Ct. 1627 (citing *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80(1957)). In *Dura,* the complaint was held to be inadequate because the plaintiffs merely alleged they "paid artificially inflated prices for Dura['s] securities and suffered damage[s]." *Id.* at 347, 125 S.Ct. 1627. On the other hand, the Court indicated that the pleadings would have been adequate if they had "claim[ed] that Dura's share price fell significantly after the

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

truth became known," *id.* or had otherwise "provid[ed] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation [.]" *Id.* The Court further indicated that ordinary pleading rules are not burdensome but call "for a plaintiff who has suffered an economic loss to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id.* The Court observed that "allowing a plaintiff to forgo giving any indication of the economic loss and proximate cause that the plaintiff has in mind would ... [permits] the routine filing of lawsuits ... with only [a] faint hope that the discovery process might lead eventually to some *plausible cause of action.* ... rather than [a lawsuit based on] a *reasonably founded hope* that the [discovery] process will reveal relevant evidence."

**\*257** *Id.* (emphasis added) (internal quotations omitted).[22]

Subsequently, in *Twombly,* the Court drew upon the "reasonably founded hope" and "plausible cause of action" requisites alluded to by *Dura* to formulate a "plausibility"[23] standard that a complaint must satisfy in order to show that the pleader is entitled to relief under Rule 8(a)(2).[24] The complaint (1) on its face[25] (2) must contain enough factual matter[26] (taken as true) (3) to raise a reasonable hope or expectation[27] (4) that discovery will reveal relevant evidence of each element of a claim.[28] "Asking for [such] plausible grounds to infer [the element of a claim] *does not impose a probability requirement* at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal [that the elements of the claim existed]." *Twombly,* 127 S.Ct. at 1965 (emphasis added).

Although *Twombly* provides new insight into Rule 8(a)(2) by reading the Rule as **\*258** implying a "plausibility" standard, it merely explicates, rather than alters, the meaning of the Rule. *See Twombly,* 127 S.Ct. at 1964–65, 1973 n. 14.[29]

**[10]**   In the present case, from *Dura's* holding about the need to allege and prove proximate causation and economic loss, as well as *Twombly's* explanation of the plausibility standard, we conclude that Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiff's economic loss, including allegations of a material misrepresentation or omission, followed by the leaking out of relevant or related truth about the fraud that caused a significant part of the depreciation of the stock and

plaintiff's economic loss, see *Dura,* 544 U.S. at 342, 125 S.Ct. 1627; or, as *Twombly* indicates, the complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of the foregoing elements of loss causation. 127 S.Ct. at 1965.

*B. Application to the Plaintiff's Second Amended Complaint*

**[11]**   Applying these principles to the plaintiff's second amended complaint, we conclude that it sufficiently alleges loss causation in respect to a certain number, but not all, of the alleged misrepresentations. The plaintiff's second amended complaint (SAC) alleges the following:

*i. Background*

Beginning on or about May 12, 2001, Sprint made a concerted nationwide effort to target lower income and credit risky subscribers as a way to fuel subscriber growth and increase its national market share. Specifically, Sprint, through its affiliates, began to offer no-deposit (service without requiring deposits) and ClearPay (service without credit checks) programs. It is reasonable to infer from the alleged facts that consumers, analysts, and investors had knowledge of the Sprint affiliates' enrollment of lower income and credit risky subscribers nationwide without the requirement of deposits or credit checks during the class period.

The defendants privately knew from previous experience that the no-deposit and ClearPay programs would prove to be a colossal mistake for Sprint and its affiliates because of their propensity to produce excessive churn and bad debt, and that the programs would be particularly devastating for US Unwired because of the high percentage of lower income and credit risky potential subscribers in its designated   **\*259** service areas. The defendants privately warned Sprint of these dangers but intentionally concealed this material information from the market. Ultimately, the negative impacts of the no-deposit and ClearPay programs were financially devastating to both Sprint and its affiliates, including US Unwired.

Because Sprint's no-deposit and ClearPay programs initially created subscriber and revenue growth, and, because the defendants concealed from the market the harmful effects they would cause to US Unwired by increased churn and bad debts, the defendants' material omissions of these facts caused US Unwired's stock prices to artificially inflate. During the class period the market for US Unwired's stock was an efficient market for the reasons set forth in detail in the SAC. As a result, the market for the stock digested information

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

regarding US Unwired from all publicly available sources and reflected this information in the stock prices. Thus, the plaintiff unknowingly bought US Unwired stock at fraudulently and artificially inflated prices.

*ii. The pertinent actionable misrepresentations.*

Throughout this period, US Unwired issued positive statements related to the no-deposit and ClearPay programs, *i.e.*, misrepresentations 12, 14, 19, 22–24 as discussed earlier. US Unwired (1) issued press releases noting significant gains in subscriptions and a low churn rate; (2) hosted a conference call with investors touting the "very successful conversion to Sprint's billing and customer services" and that sub-prime credit class customers "are necessary to reach [US Unwired's] full market penetration potential and we think we can do it profitably"; (3) issued reports of favorable increases in subscriber growth attributed to US Unwired's "continued focus on operational excellence" and praised its "adherence to the sound fundamentals of our business plan"; and (4) an SEC filing concluding that allowances for subscribers canceling their subscriptions and also the debt collections costs were consistent with "historical trends." As we noted in our discussion of materiality, these representations omitted material information that distorted the mix of information presented.

*iii. Leaking of the truth*

When the truth about the artificial inflation of US Unwired's stock leaked out or made its way into the marketplace, its revelation caused the stock price to drop significantly. As a result of the revelation of the truth, and the corresponding decline in the US Unwired stock, the investors who bought the stock during the class period were proximately caused to suffer actual economic loss. Specifically, the plaintiff's SAC alleges that the truth about the inflation of US Unwired's stock leaked out or made its way into the marketplace through a series of disclosures: On June 6, 2002, shares of US Unwired's common stock fell from an opening high of $4.94 to a low of $3.69 in response to a warning issued by AirGate PCS, another Sprint affiliate, that it would not meet its subscriber growth forecast due to the reinstatement of the deposit requirement for its ClearPay customers. On June 13, 2002, several analysts downgraded their ratings of US Unwired and industry participants. For example, Morgan Keegan & Company issued a report downgrading US Unwired "due to continued industry uncertainties surrounding growth and profitability." Similarly, J.P. Morgan Securities issued a report "downgrading US Unwired to Market Perform from

Long Term Buy after Sprint PCS drastically *260 reduced guidance for 2Q02 net adds."[30] On or about June 21, 2002, Moody's Investor Service placed the ratings for Sprint affiliates, including US Unwired, on review for possible downgrade and changed its outlook on the entire wireless industry to negative. On July 19, 2002, US Unwired issued a press release revealing that during 2Q02 it added 19,600 subscribers and 24,000 post-pay customers, and its churn for post-pay customers was up to 3.4%. On August 13, 2002, Piper in a US Unwired press release revealed that: "Historically, demand for new wireless services has been weak in our markets during the second quarter. This year, that softness was compounded as we curtailed demand by requiring a deposit from credit-challenged customers in our southern markets and experienced high involuntary disconnects in our sub-prime credit classes." On August 13, 2002, US Unwired's Form 10–Q filed with the SEC stated: "Churn was 3.4% for the three-month period ended June 30, 2002 compared to 2.2% for the three-month period ended June 30, 2001. The increase is due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated from using our service because of non-payment." At the end of the day on August 13, US Unwired's stock price fell to $0.90.

*iv. Relationship Between the Misrepresentations, the Truth, and the Loss*

These alleged disclosures of relevant truth concern only subscriber growth and the sub-prime credit marketing strategy. We therefore agree with the defendants that the plaintiff fails to allege any disclosure that relates to US Unwired's conversion to Type II affiliation or the transfer of core functions to Sprint. Although the plaintiff sufficiently alleges that the defendants made material misrepresentations and omissions about the dangers inherent in US Unwired's conversion to Type II affiliation and the transfer of its core functions to Sprint, none of the SAC's alleged disclosures plausibly suggests that a significant part of the stock price's decline and plaintiff's consequent economic loss was caused by a revelation of truth about that conversion or transfer. Accordingly, we conclude that the plaintiff's allegations are not sufficient to provide the defendants with notice of the plaintiff's loss causation theory in respect to the affiliation conversion and the transfer of core functions claims and thereby fails to plead loss causation in respect to those claims. For this reason, we have limited the "loss causation"

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

discussion to only alleged misrepresentations related to subscriber growth and the sub-price credit marketing strategy.

[12]  Combined with the allegations of the facts that the defendants knew that the no-deposit and ClearPay programs would be disastrous for US Unwired, but intentionally omitted and concealed those facts from the market, the alleged series of disclosures that revealed the suppressed truth, at first partially but ultimately in full, satisfies *Twombly's* plausibility standard by giving rise to a reasonable expectation that discovery will lead to further evidence of loss causation. As *Dura* recognizes, a plaintiff may recover under § 10(b) by pleading and proving that the relevant truth "leak[ed] out" and "ma[de] **\*261** its way into the marketplace" if all the other elements are satisfied. *See Dura*, 544 U.S. at 342, 125 S.Ct. 1627. Thus, loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation.[31]

Plausibly, the series of disclosures here began with the revelation that AirGate, a sister Sprint affiliate in substantially the same business, a company in substantially the same business as US Unwired, and having substantially the same relationship with Sprint as US Unwired, had been seriously damaged by the same sub-prime customer programs implemented by US Unwired and consequently had been forced to terminate those programs and reinstate the deposit requirement for its ClearPay or sub-prime credit class customers. The AirGate disclosure provided the initial indication to the market that the nation-wide programs aimed at the sub-prime credit-class market had failed and caused severe damage to one Sprint affiliate.

The AirGate disclosures were soon followed by partially revealed truth from disclosures regarding Sprint's drastically reduced guidance for 2Q02 net adds. Sprint's reduced guidance gives rise to a plausible inference that highly elevated churn rates caused by the nation-wide sub-prime customer programs that Sprint implemented through its affiliates had severely infected its entire network system.

Following these disclosures, expert stock analysts considered downgrading US Unwired stock and even the entire wireless industry because they viewed the previous disclosures as evidence that the sub-prime customer programs was having a severe and widespread impact on Sprint affiliates, including US Unwired, and other similar businesses. This series of disclosures culminated in the final and completing

disclosures on April 13, 2002 wherein US Unwired explicitly discussed the continuation of high churn and high involuntary disconnects as a consequence of the sub-prime credit class programs. These final disclosures squarely aligned US Unwired with previous disclosures concerning the severe negative effect of the sub-prime credit class programs on similarly situated sister Sprint affiliate companies and the entire Sprint network. The final public disclosures completed the revelation of the truth, viz., that the defendants omitted and concealed from the market that they knew **\*262** at the outset that the sub-prime programs would be particularly devastating for US Unwired and that the programs in fact wreaked havoc with the company's business and financial plans during the class period. The price of US Unwired stock dropped from $4.94 on June 6, 2002 (the date of the AirGate disclosure) to $0.90 on August 13, 2002 (the date of the final disclosures).

The disclosures regarding continued high churn rates and continued lower subscriber growth in, first, a sister affiliate, then, the Sprint network, and finally, US Unwired specifically, plausibly reveals, as a whole, the leaking out of the truth underlying US Unwired's prior misrepresentations that US Unwired's churn had topped out, churn would start to decrease, and the sub-prime credit class market still presented a great and necessary growth opportunity. The two final disclosures on August 13, 2002 completed the revelation of the truth that had been omitted and concealed by the defendants, viz., that the sub-prime subscriber programs would and did produce churn and bad debts that were financially devastating to US Unwired. The complaint also explicitly links this series of disclosures to a significant stock price drop from $4.94 to $0.90.

*C. Pleading of Loss Causation is Adequate under Dura and Twombly.*

Rather than changing the meaning of Rule 8(a)(2), both *Dura* and *Twombly* purport only to explain why the complaints in those cases failed to satisfy the rule's requirements and had to be dismissed. In *Dura*, because the complaint alleged nothing more than that the prices of the securities the plaintiff purchased were artificially inflated, the complaint failed to "provide the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the [alleged] misrepresentation." 544 U.S. at 347, 125 S.Ct. 1627. In *Twombly*, under the plausibility standard, plaintiff's complaint was insufficient because it was bare of any factual allegation that suggested an antitrust conspiracy or that raised a

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

reasonable expectation that discovery would reveal evidence of such an illegal agreement. *Twombly,* 127 S.Ct. at 1970 n. 10.

The plaintiff's SAC sufficiently pleads loss causation and is clearly distinguishable from the inadequate complaints in *Dura* and *Twombly.* The plaintiff clearly (1) provided the defendants with notice of what the relevant economic loss might be and of what the causal connection might be between that loss and the defendants' alleged misrepresentations by describing how the leaking of the relevant truth underlying those misrepresentations caused the loss, as required by *Dura;* and (2) alleged enough facts to raise a reasonable hope or expectation that discovery will reveal evidence that the elements of loss causation existed, as required by *Twombly.*

The SAC here, unlike the complaint in *Dura,* contains more than the mere allegation that the prices the plaintiff paid for his stock was artificially inflated by the defendants' omissions and misrepresentation. Rather, as required by *Dura,* the SAC provides the defendants with notice of what the relevant loss might be, viz., from a high of $4.94 on June 6, 2002 to $0.90 on August 13, 2002 (a decline of $4.04) (approximately 82%), and of what the causal connection might be between that loss and the defendants' misrepresentations. Thus, under *Dura,* the complaint has enough factual matter (taken as true) to give the defendants fair notice of the theory of loss causation that the plaintiff has in mind: a causal relationship between (1) the defendants' knowing omission and **\*263** concealment that the sub-prime credit class customer programs were bound to be disastrous for US Unwired; (2) the disclosure of relevant or related truth regarding the severe negative effects of the sub-prime credit class programs that were clearly foreseen and readily observed by the defendants; and (3) a consequent significant drop in the US Unwired stock. *Dura,* 544 U.S. at 347, 125 S.Ct. 1627. Furthermore, under *Dura* and *Greenberg,* the plaintiff alleges a plausible nexus (whether of "relatedness" or "relevance") between the revelation that the entire Sprint network, including US Unwired, had been seriously damaged by the sub-prime customer programs, and the defendants' misrepresentations that those programs would be beneficial to US Unwired and that it was necessary to continue them. Unlike the complaint in *Dura,* the plaintiff pleads all elements of loss causation—the alleged misrepresentations, the disclosures, the attendant loss, and their inter-relationships.

The complaint likewise sufficiently pleads loss causation under *Twombly,* because it clearly presents enough factual allegations (taken as true) to give rise to a reasonable hope or expectation that discovery will lead to evidence that the elements of loss causation existed. 127 S.Ct. at 1965. Unlike the complaint in *Twombly,* the plaintiff pleads enough facts (taken as true) to give rise to such a reasonable expectation, because it provides the defendant and the court with particular facts that identify the specific misrepresentations, the disclosures of the truth omitted, and the attendant loss. *Compare Twombly,* 127 S.Ct. at 1970 n. 10 (justifying the 12(b)(6) dismissal of the plaintiffs' pleadings, because "[a]part from identifying a seven-year span" they "mentioned no specific time, place, or person involved in the alleged conspiracies" and gave the defendant "little idea where to begin" his answer to the plaintiff's "conclusory allegations"). Each disclosure considered together with the others illumines the entire series or pattern of disclosures and, as a whole, alleges sufficient facts (taken as true) that raise a reasonable expectation that discovery will reveal evidence of loss causation.

### *D. The District Court's Erroneous Analysis*

The district court concluded, however, that the alleged disclosures did not constitute emerging truth sufficient to show that defendants' alleged misrepresentations proximately caused the drop in US Unwired's share price during the class period. The district court dismissed the plaintiff's complaint stating that "Lormand has failed to detail the statements made during the class period that would have revealed the truth about defendants' alleged misrepresentations and shown these misrepresentations to be the proximate cause of plaintiff's losses." *Romero v. US Unwired, Inc.,* 2006 WL 2366342, at \*8 (E.D.La. Aug. 11, 2006). Specifically, the district court reasoned: (1) The first three alleged disclosures "refer to statements that were not made by defendants"; (2) "In its next allegation, plaintiff notes that, in a press release, defendants 'failed to disclose any known information about the Company's relationship with Sprint PCS or the true state of the Company's financial condition'; there is no discussion, however, as to how defendants' failure to disclose information may have caused the truth regarding defendants' alleged misrepresentations to emerge"; and (3) "Neither of [the two April 13, 2002 disclosures] appears to suggest that any of defendants' previous statements may have been misleading" or that they "necessarily contradict [ ]" the defendants' previous representations. *Id.* at \*8–\*9 (footnotes omitted).

**\*264** **[13]** We do not agree with the district court's analysis. First, nothing in the Federal Rules, the Supreme Court's

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

decisions or our precedents bars a private securities fraud plaintiff from pleading loss causation based on alleged facts constituting circumstantial rather than direct evidence. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 390–91 & n. 30, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Accordingly, we conclude that a plaintiff in such a case may plead loss causation based on truth about the alleged fraud disclosed to the market by persons other than the defendants. We agree with the great weight of federal courts, which have held that *Dura* does not prevent a plaintiff from alleging or proving loss causation by showing partial or indirect disclosures of such truth by persons other than the defendants.[32]

Second, the district court was required to consider plaintiff's fourth alleged disclosure regarding the company's July 19, 2002 press release in its entirety, to accept all factual allegations as true, and to draw all reasonable plausible inferences from the complaint in favor of the plaintiff. But its analysis deviates from these standards in several important respects. The plaintiff's SAC alleged that:

> On July 19, 2002, U.S. Unwired issued a short press release announcing that, during the second quarter of 2002, [US Unwired] added 19,600 PCS subscribers and 24,400 post-pay customers, and its churn rate for post-pay customers was approximately 3.4%. The Company further stated that it would discuss the quarterly financial results several weeks later on August 13, 2002. Defendants *failed to disclose any known information about the Company's relationship with Sprint PCS or the true state of the Company's financial condition* resulting from Sprint PCS' imposition of the "financially disastrous" NDASL and ClearPay programs.

(emphasis added). Considering all of the foregoing allegations together with other **\*265** facts alleged in the complaint, a reasonable person could draw the plausible inferences that US Unwired's excessive churn rate was a partial emergence of the truth about defendants' alleged fraud, viz., that they had knowingly omitted and concealed from the programs' outset that the NDASL (no-deposit) and ClearPay programs would and did severely harm the company through excessive churn and bad debts; and that their prior positive assurances about the programs were intentionally false. Further, the foregoing allegations gave rise to a reasonable expectation that discovery would reveal evidence that this partial emergence of truth, combined with the others alleged, proximately caused at least a significant part of the decline in stock price as well as plaintiff's alleged economic loss. In its opinion, however, the district court

acknowledged and addressed only the statement in bold italics in the block quotation above, passing over the other relevant alleged facts in silence. Consequently, the district court erroneously failed to accept all of the facts alleged as true, to consider them in the context of all facts alleged by the complaint and to draw all plausible inferences favorable to the plaintiff. Also, the district court's opinion disregards that loss causation may be pleaded, as plaintiff does, by alleging that Defendants omitted material facts in their public statements, which falsely inflated stock values (or at least skewed the mix of information previously presented), and that the subsequent public revelation of the truth concealed or misrepresented by Defendants caused the stock price's decline and plaintiff's consequent economic loss. Contrary to the district court's conclusion, the complaint contains ample discussion of how defendants' suppression of the truth caused both the artificial inflation of the stock price and its later decline when relevant truth emerged into the marketplace.

Third, plaintiff's SAC alleges that on August 13, 2002, US Unwired's press release revealed that it had begun to withdraw from the no-deposit program by reinstating the requirement of a deposit from credit-challenged customers in its southern markets, which had caused it to experience high involuntary disconnects in its sub-prime credit classes and compound a softness in the demand for new wireless services; and that on August 13, 2002, the US Unwired's 10–Q SEC form stated: "Churn was 3.4% for the three-month period ended June 30, 2002 as compared to 2.2% for the three-month period ended June 30, 2001. The increase is due to adding a higher number of credit challenged subscribers in 2002 that elected voluntarily to not continue using our service or that were involuntarily terminated from using our service because of non-payment." In response, on August 13, 2002, the price of US Unwired stock dropped to $0.90 per share. Combined with the SAC's allegations of the four preceding partial disclosures, together with the defendants' intentional omission and concealment of material facts, viz., the disastrous effects that would result from the no-deposit and ClearPay programs, as well as the materialization of such damage during the class period, these August 13, 2002 disclosures plausibly suggest that the truth of defendants' fraud, which had gradually been leaking out, had completely emerged causing the decline of the stock price and the plaintiff's consequent economic loss.

The district court, however, disregarded the plaintiff's allegations that defendants omitted and concealed the material facts from the market that they knew the sub-prime subscriber

programs would be financially disastrous for US Unwired. Instead, it found that the August 13, 2002 disclosures did not constitute emerging *266 relevant truth because they did not "appear to suggest that any of defendants' previous statements may have been misleading" or "necessarily contradict[ory]" of defendants' previous alleged misrepresentations. *Romero*, 2006 WL 2366342, at *9. Thus, the district court overlooked that the plaintiff had alleged a claim based on the defendants' omissions of material facts that skewed the mix of information previously presented to the public thereby creating the misrepresentations. Consequently, the court either erred legally in not recognizing that a plaintiff can state a claim based on material omissions that created the misrepresentations or again failed to accept as true all factual allegations in the complaint and to attribute to the plaintiff the benefit of all plausible favorable inferences. 15 U.S.C. § 78u–4(b)(4) ("Loss causation") ("[T]he plaintiff shall have the burden of proving that the act *or omission* of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages") (emphasis added); *see also Dura*, 544 U.S. at 342, 125 S.Ct. 1627.

For these reasons, we conclude that the plaintiff has successfully pleaded loss causation with respect to his claim based on the defendants' omissions and misrepresentations pertaining to US Unwired's use of the no-deposit and ClearPay programs.

Echoing the district court's erroneous conclusions, the defendants also contend on appeal that the plaintiff does not allege a necessarily contradictory relationship between the disclosures and the defendants' material misrepresentations and omissions concealing the known threat and later materialization of financial harm to the company by the sub-prime subscriber credit programs. Their argument is without merit because the alleged disclosures considered with the entire complaint reveals the relevant truth about these misrepresentations and omissions by defendants.

[14]    The defendants also contend that other market forces and events caused all of the plaintiff's economic loss.[33] The *267 thrust of this argument is that the defendants believe that a more plausible alternate inference may be drawn as to the proximate cause of all of the plaintiff's economic loss.[34] As we have explained, however, under Rules 8(a)(2) and 12(b)(6), at the pleading stage, the plaintiff is only required to plead a plausible cause of action; we are not authorized

or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA. *See Tellabs*, 127 S.Ct. at 2510; *Twombly*, 127 S.Ct. at 1965 ("Asking for plausible grounds [for an element of a claim] does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [that element]."); *Dura*, 544 U.S. at 347–48, 125 S.Ct. 1627; *see also Scheuer*, 416 U.S. at 236, 94 S.Ct. 1683 ("When a federal court reviews the sufficiency of a complaint ... its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleadings that a recovery is very remote and unlikely but that is not the test."); *Leatherman*, 507 U.S. at 168–69, 113 S.Ct. 1160 ("[The] federal courts and litigants must rely on *summary judgment* and control of discovery to weed out unmeritorious claims ...") (emphasis added); *Swierkiewicz*, 534 U.S. at 512, 122 S.Ct. 992 (noting that the "simplified notice pleading standard" of the Federal Rules "relies on liberal *discovery* rules and *summary judgment* motions to define disputed facts and issues and to dispose of unmeritorious claims.") (emphasis added).[35]

*268  3. Conclusion

For these reasons, the district court's judgment is affirmed in part and reversed in part. Accordingly, the district court's judgment dismissing without prejudice the plaintiff's claims pertaining to US Unwired's conversion from a Type III to Type II affiliate and transfer of its core functions to Sprint is AFFIRMED.[36] The district court's judgment dismissing the plaintiff's claims pertaining to US Unwired's use of the no-deposit and ClearPay programs is REVERSED, and the case is remanded to the district court for further proceedings consistent with this opinion.[37]

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

**All Citations**

565 F.3d 228, Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

Footnotes

1    The individual defendants are: William L. Henning Jr., who was the Chairman of US Unwired's Board of Directors during
     the class period; Robert Piper, who was the Chief Executive Officer ("CEO") of US Unwired from 2000 until the end of the
     class period and Chief Operating Officer from 1995 to 2000; and Jerry E. Vaughn, who was the Chief Financial Officer
     during the class period.

2    The plaintiff also appeals the district court's denial of its motion for leave to amend before the district court dismissed the
     case with prejudice. Because we reverse the 12(b)(6) dismissal, we do not reach the subsequent denial of the motion
     for leave to amend. "Because we find a claim has been sufficiently stated to withstand 12(b)(6), we need not reach the
     question of the trial court's denial of leave to amend [the plaintiff's] complaint." *Xerox Corp. v. Genmoora Corp.,* 888 F.2d
     345, 358 n. 70 (5th Cir.1989).

3    All references to admissions, testimony, corporate documents, internal emails, and depositions are references to
     quotations from documents, prior testimony or depositions found in the complaint and its attached exhibits. *See*
     Fed.R.Civ.P. 10(c).

4    "Churn" is the "number of customers that drop service" in a given period. *See* Barbara J. Etzel, Webster's New World
     Finance and Investment Dictionary 222 (2003) ("net adds")(emphasis in the original).

5    In July 2003, US Unwired filed an action against Sprint in the United States District Court of the Western District of
     Louisiana claiming Racketeer Influenced and Corrupt Organizations ("RICO") Act violations, breach of fiduciary duty,
     breach of contract, and fraud. The SAC incorporates some of the fraud allegations from that action along with the alleged
     facts that support those allegations, such as: factual details regarding the strife between Sprint and US Unwired and
     deposition testimony discussing management's knowledge and beliefs during the affiliation conversion and the no-deposit
     programs' implementation. After extensive litigation, the parties settled; under the terms of the settlement agreement,
     Sprint acquired US Unwired for approximately $1.3 billion dollars in 2005.

6    The district court concluded that plaintiff's pleadings satisfied the PSLRA's particularity requirement. The district court
     stated: "[c]onsidering plaintiff's detailed, 81–page second amended complaint and without weighing the substance of
     plaintiff's allegations, the Court finds the plaintiff has plead[ed] his claims with sufficient particularity." The defendants
     do not contend on appeal that plaintiff's complaint pleads with insufficient particularity. Considering the detail of the
     allegations, we agree with the district court that the complaint satisfies the particularity requirement.

7    These documents are referenced and quoted in the complaint and/or attached as exhibits to the complaint.

8    The district court pretermitted the safe harbor analysis for the rest of the claims based on the other misrepresentations
     because it ultimately dismissed them for failure to plead loss causation, which is discussed below.

9    The plaintiff states in his complaint that there is some confusion as to whether the no-deposit programs are "pre-pay
     programs." The plaintiff alleges in his complaint that the no-deposit programs were sometimes erroneously characterized
     as "pre-pay programs."

10   Furthermore, many of the alleged misrepresentations, such as the statements in misrepresentations 6–10, are not
     necessarily "forward-looking," which is one requirement for safe harbor protection. 15 U.S.C. § 78u–5(1)(A). In many of
     these statements, US Unwired's management discusses past events along with future projections, such as their recent
     "execution" of their business plan, recent efforts to migrate functions to Sprint, and the current state of their relationship
     with Sprint. *See* 15 U.S.C. § 77z–2(i)(1) (defining "forward-looking" statements as statements that are projections about
     future financial status, future operations, and future economic performance).

11   This does not foreclose the safe harbor's possible applicability in latter stages of these proceedings. *See Asher v. Baxter
     Int'l, Inc.,* 377 F.3d 727, 734 (7th Cir.2004) ("Thus this complaint could not be dismissed [at the pleading stage] under the
     safe harbor, though we cannot exclude the possibility that if after discovery [the defendant] establishes that the cautions
     did reveal what were, *ex ante,* the major risks, the safe harbor may yet carry the day.").

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

12    The defendants' argument focuses on whether they had a "duty to disclose" the omitted information as alleged. The defendants' argument is, in effect, an argument that the omitted information is not "material." *See Banc One Capital Partners Corp. v. Kneipper,* 67 F.3d 1187, 1192 n. 3 (5th Cir.1995) ("The issue of whether a fact is material as a matter of law will also turn on ... whether the defendant has a duty to disclose."). The district court did not reach this argument.

13    For securities fraud cases, "[a]n opinion or prediction is actionable if there is a gross disparity between prediction and fact." *First Va. Bankshares v. Benson,* 559 F.2d 1307, 1314 (5th Cir.1977). Here, the disparity as pleaded is obvious. The plaintiff alleges the company misrepresented to the public the viability and promise of corporate actions that company officials knew would be disastrous.

14    The defendants rely on a Massachusetts district court opinion, *In re Boston Tech., Inc. Sec. Litig.,* 8 F.Supp.2d 43, 59 (D.Mass.1998) in arguing that the defendants had no duty to disclose those omitted future risks. In *Boston Tech,* the district court ruled that "[the defendant's] announcement is not alleged to have been false, and it strictly concerned the past. It is therefore not actionable .... An issuer is not obliged, when reporting past [ ] results, to inform the public that future [results] appear less rosy." *Id.* at 61. Lormand's complaint is distinguishable. Here, the alleged material omissions about future performance concern company statements that actually proffer misleading opinions regarding the promise and future performance of the no-deposit program, Type II affiliation, and the migration of company functions to Sprint. Unlike *Boston Tech,* the plaintiff alleges material omissions of known risks in future performance in relation to representations that actually concern the future and do not just describe the past.

The defendants also argue that the alleged misrepresentations are mere "puffery." Statements "are non-actionable puffery [if] they are 'of the vague and optimistic type that cannot support a securities fraud action ... and contain no concrete factual or material misrepresentation.'" *Southland Sec. Corp.,* 365 F.3d at 372 (ellipsis in original) (quoting *Lain v. Evans,* 123 F.Supp.2d 344, 348 (N.D.Tex.2002)). We reject the defendants' argument, because the plaintiff alleges concrete factual and material misrepresentations and omissions concerning statements that discuss the very specific benefits of the no-deposit programs and Type II affiliations; these alleged misrepresentations and omissions are not "vague" or "generalizations" and therefore cannot be considered mere "puffery." *See Nathenson v. Zonagen Inc.,* 267 F.3d 400, 419 (5th Cir.2001).

15    In *Tellabs,* the Supreme Court stated that "[t]o establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, 'a mental state embracing intent to deceive, manipulate, or defraud.'" 127 S.Ct. at 2507 (quoting *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193–94 & n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976)). But the Court also noted that it had previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5, *id.* at 2507 n. 3, and recognized that every Court of Appeals that has considered the issue has held a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required. *Id.* (citing *Ottmann v. Hanger Orthopedic Group, Inc.,* 353 F.3d 338, 344 (4th Cir.2003)) (collecting cases).

16    The Court elaborated that "[t]he strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative ...." *Tellabs,* 127 S.Ct. at 2510 (footnote and internal citations omitted).

17    Because the allegations of direct knowledge sufficiently support a compelling inference of scienter even in absence of insider trading, we need not address the plaintiff's allegations of insider trading and company acquisitions with stock sale revenues that may bolster this inference, *see Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.,* 497 F.3d 546, 552–53 (5th Cir.2007) ("Insider trading can be a strong indicator of scienter if the trading occurs at suspicious times or in suspicious amounts."); *Rothman v. Gregor,* 220 F.3d 81, 93–95 (2d Cir.2000).

18    15 U.S.C. § 78u–4(b)(4) provides: "Loss causation. In any private action arising under this chapter, the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages."

19    In reviewing a summary judgment, rather than a Rule 12(b)(6) dismissal, we described in detail in *Greenberg* what a plaintiff must *prove* on the merits in respect to "loss causation" to recover on a securities fraud claim. We held that:

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)
Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

> [I]n order for plaintiffs to show that a stock's price was actually affected through evidence of a significant price decrease following the revelation of the alleged "truth" of earlier false statements, plaintiffs must demonstrate: (1) that the negative "truthful" information causing the decrease in price is related to an allegedly false, non-confirmatory positive statement made earlier and (2) that it is more probable than not that it was this negative statement, and not other unrelated negative statements, that caused a significant amount of the decline.

> *Greenberg,* 364 F.3d at 666.

20      "Relevance" may require more than "relatedness," but even if it does, neither are steep or difficult standards to satisfy. At most, "relevance" here may require something similar to the evidentiary "relevance" test, i.e., that the truth disclosed must simply make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true). *Cf.* Fed.R.Evid. 401 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.").

21      Prior to *Greenberg,* we had said that the plaintiff was only required to prove that the defendant's misrepresentation "touches upon the reasons for the investment's decline in value." *Huddleston,* 640 F.2d at 549. That test was expressly overruled by *Dura. See Dura,* 544 U.S. at 343, 125 S.Ct. 1627.

22      The Court cited the following sources for the concept of weeding out claims that fail to show "reasonably founded hope" of leading to a "plausible cause of action": (1) *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 741, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975)("The potential for possible abuse of the liberal discovery provisions ... may likewise exist in this type of case to a greater extent than they do in other litigation .... [T]o the extent that it permits a plaintiff with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the process will reveal relevant evidence, it is a social cost rather than a benefit."); and (2) the PSLRA's legislative history as reflected in H.R. Conf. Rep. No. 104–369, p. 31 (1995), 1995 U.S.C.C.A.N. 730 (criticizing "abusive" practices including "the routine filing of lawsuits ... with only [a] faint hope that the discovery process might lead eventually to some plausible cause of action").

23      In discerning the "plausibility" standard from Rule 8(a)(2) and general pleadings jurisprudence, the *Twombly* Court explicitly disavowed and "retired" the oft-quoted statement in *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99: the generally " 'accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove *no set of facts* in support of his claim which would entitle him to relief.' " 127 S.Ct. at 1968–69 (quoting *Conley,* 355 U.S. at 45–46, 78 S.Ct. 99) (emphasis added).

24      Though *Twombly* is an anti-trust case, it interprets Rule 8(a)(2) and how it applies generally. *See infra* note 29.

25      *Twombly,* 127 S.Ct. at 1974.

26      The *Twombly* Court cites to 5 C. Wright & Miller, Federal Practice and Procedure § 1202, at 94, 95 (3d ed.2004), which states that Rule 8(a) "contemplate[s] the statement of circumstances, occurrences, and events in support of the claim presented" and does not authorize a pleader's "bare averment that he wants relief and is entitled to it." *See Twombly,* 127 S.Ct. at 1965 n. 3.

27      The *Twombly* Court stated "[f]actual allegations must be *enough to raise a right to relief* above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." 127 S.Ct. at 1965. (emphasis added). The *Twombly* Court quotes Wright and Miller for support. See 127 S.Ct. at 1965 (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1216, pp. 235–36 (3d ed. 2004) ("[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.") (citing some sixty-four federal court of appeals and district court cases for this proposition)).

28      The *Twombly* Court referred to *Dura* when it concluded that with its "plausibility" pleading standard, "[the Court] can hope to avoid the potentially enormous expense of discovery in cases with no 'reasonably founded hope that the [discovery] process will reveal relevant evidence.' " 127 S.Ct. at 1967 (quoting *Dura,* 544 U.S. at 347, 125 S.Ct. 1627 (quoting *Blue Chip Stamps,* 421 U.S. at 741, 95 S.Ct. 1917)).

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

29    The *Twombly* Court pointed out that its "plausibility" standard is not a heightened pleading standard beyond what the Federal Rules of Civil Procedure had always required. *Twombly,* 127 S.Ct. at 1973 n. 14. Changes to general pleading requirements "can only be accomplished 'by the process of amending the Federal Rules, and not by judicial interpretation.' " *Id.* (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 515, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). *Twombly's* merger of the "plausibility" standard with the general pleading jurisprudence and the Federal Rules indicates that it is a gloss on Rule 8(a)(2), and therefore generally applies to all complaints. *See generally Iqbal v. Hasty,* 490 F.3d 143, 157–58 (2nd Cir.2007) (describing the standard as a "flexible plausibility standard" of general applicability to all areas of law) (applying *Twombly* to a *Bivens* claim). We have applied the "plausibility" standard to many different areas of the law. *See, e.g., Lane v. Halliburton,* 529 F.3d 548, 557 (5th Cir.2008) (state law fraud and other tort claims); *Cuvillier,* 503 F.3d at 401 (§ 1983 suit). Other circuits have applied *Twombly* to securities cases. *See, e.g., N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.,* 537 F.3d 35, 44 (1st Cir.2008); *ATSI Communications, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 & n. 2 (2d Cir.2007) (applying the "plausibility" standard to securities fraud cases).

30    "Net adds" is defined as "[t]he number of new subscribers, or gross adds, minus the number of customers that drop service, which is called *churn.* Though this term can be used in many different contexts, it is frequently used in the telecom industry." Barbara J. Etzel, Webster's New World Finance and Investment Dictionary 222 (2003) (emphasis in the original).

31    The courts that have confronted this issue acknowledge the possibility that loss causation may be pleaded on a theory of partial disclosures. *See, e.g., Metzler Inv. GMBH v. Corinthian Colls., Inc.,* 540 F.3d 1049, 1063 n. 6 (9th Cir.2008); *In re Daou Sys., Inc.,* 411 F.3d 1006, 1026–27 (9th Cir.2005); *In re Bradley Pharms. Sec. Litig.,* 421 F.Supp.2d 822, 828–29 (D.N.J.2006) (citation omitted); *In re Bristol Myers Squibb Co. Sec. Litig.,* 2008 WL 3884384, at *14 (S.D.N.Y. Aug. 20, 2008) (unpublished) ("It is also clear that a corrective disclosure need not take the form of a single announcement, but rather, can occur through a series of disclosing events."); *In re Motorola Sec. Litig.,* 505 F.Supp.2d 501, 533 (N.D.Ill.2007); *Ong ex rel. Ong v. Sears, Roebuck & Co.,* 459 F.Supp.2d 729, 746 (N.D.Ill.2006); *In re Apollo Group Inc. Sec. Litig.,* 509 F.Supp.2d 837, 845, 847 (D.Ariz.2007); *Freeland v. Iridium World Commc'ns, Ltd.,* 233 F.R.D. 40, 47 & n. 9 (D.D.C.2006) (citing more cases); *Greater Penn. Carpenters Pension Fund v. Whitehall Jewellers, Inc.,* No. 04–C–1107, 2005 WL 1563206 (N.D.Ill. June 30, 2005) (crediting as "partial disclosures of prior misrepresentations and omissions" the company's issuance of a press release announcing a lawsuit, a SEC and a DOJ investigation against the defendants); *In re Vivendi Universal S.A.,* 2004 WL 876050, at *7 (S.D.N.Y. Apr.22, 2004) (unpublished) (finding loss causation adequately pleaded when a complaint alleged that a series of corrective disclosures was followed by a material price decline, and the price decline was attributable to the series of corrective disclosures).

32    To require that a plaintiff can successfully allege loss causation only by alleging the fact or evidence of a confession or statement out of the defendant's own mouth would narrow the pleading requirement for loss causation in a way not authorized by Rule 8(a)(2) or anything contained in *Dura* pertaining to pleading loss causation. *See In re Winstar Commc'ns,* No. 01–CV–3014, 2006 WL 473885 (S.D.N.Y. Feb. 27, 2006) (unpublished) (stating that in *Dura,* "[t]he Court did not address the means by which the information is imparted to the public. Specifically, *Dura* did not set forth any requirements as to who may serve as the source of the information, nor is there any requirement that the disclosure take a particular form or be of a particular quality."). *Dura* uses the term "leak out," which contemplates the release of information from third-parties outside the company's official lines of communication. *See In re Intelligroup Sec. Litig.,* 527 F.Supp.2d 262, 297 n. 18 (D.N.J.2007). The courts that have addressed this question unanimously reject the district court's approach here. *See, e.g., Hunt v. Enzo Biochem, Inc.,* 530 F.Supp.2d 580, 597 (S.D.N.Y.2008); *In re Williams Sec. Litig.,* 496 F.Supp.2d 1195, 1265 (N.D.Okla.2007); *In re eSpeed, Inc. Sec. Litig.,* 457 F.Supp.2d 266, 297 & n. 237 (S.D.N.Y.2006) ( "*Dura* imposed no requirement that corrective disclosures emanate from the company itself, so long as the truth is disclosed in some fashion."); *In re Enron Corp. Sec., Derivative and ERISA Litig.,* No. MDL–1446, 2005 WL 3504860, at *16 (S.D.Tex. Dec. 22, 2005) ("[B]esides a formal corrective disclosure by a defendant ... the market may learn of possible fraud from a number of sources [such as] whistleblowers, analysts' questioning financial results, resignations of CFOs or auditors, announcements by the company of changes in accounting treatment going forward, newspapers and journals, etc."); *In re Worldcom, Inc. Sec. Litig.,* No. 02 Civ. 3288, 2005 WL 2319118, at *23 (S.D.N.Y. Sept. 21, 2005) (to satisfy loss causation under *Dura,* plaintiff must "establish that his losses were attributable to some form of revelation to the market of the wrongfully concealed information").

*Lormand v. US Unwired, Inc.*, 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

33    The defendants also argue that the plaintiff's SAC fails to plead loss causation because one disclosure was followed immediately by a stock price increase rather than a decrease. This argument deals with the actual timing of the loss, and not whether the plaintiff pleaded a plausible causal relationship between the defendants' fraud and the plaintiff's economic loss. The market could plausibly have had a delayed reaction; a delayed reaction can still satisfy the pleading requirements for "loss causation" though *proof* of causation would be more difficult when significant time elapses before the market allegedly reacts. *See Dura*, 544 U.S. at 343, 125 S.Ct. 1627. The actual timing issue is a factual question, and is not enough to dismiss a complaint that *alleges* a specific causal link, as is the case here, under Rule 12(b)(6). *See, e.g., In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1058 (9th Cir.2008) ("A limited temporal gap between the time a misrepresentation is publicly revealed and the subsequent decline in stock value does not render a plaintiff's theory of loss causation per se implausible."); *In re Cardinal Health, Inc. Sec. Litig.*, 426 F.Supp.2d 688, 760–61 & n. 75 (S.D.Ohio 2006) ("[T]his Court is convinced that this issue of timing alone is not enough to defeat Plaintiffs' allegations of loss causation where they have clearly specified causal connections between [the defendants'] misstatements over the four-year Class Period and their resulting damages."). The plaintiff alleges that the stock dropped after the last disclosure in the series of disclosure events. This is sufficient for pleading purposes here, because increases in stock prices after a partial disclosure that is within a series of disclosures does not preclude a final showing of loss causation. *See, e.g., In re Take–Two Interactive Sec. Litig.*, 551 F.Supp.2d 247, 289–90 (S.D.N.Y.2008); *In re Seitel, Inc. Sec. Litig.*, 447 F.Supp.2d 693, 712–13 (S.D.Tex.2006); *see also In re Daou Sys., Inc.*, 411 F.3d at 1026–27; *In re Apollo Group Inc. Sec. Litig.*, 509 F.Supp.2d at 845, 847; *Ong ex rel. Ong*, 459 F.Supp.2d at 746; *In re Bristol Myers Squibb Co.*, 2008 WL 3884384, at *14; *Plumbers & Pipefitters Local 572 Pension Fund v. Cisco Systems, Inc.*, 411 F.Supp.2d 1172, 1177–78 (N.D.Cal.2005); *In re Vivendi Universal S.A.*, 2004 WL 876050, at *7 (finding loss causation adequately pleaded when a complaint alleged that a series of corrective disclosures was followed by a material price decline, and the price decline was attributable to the series of corrective disclosures); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1319 (3d Cir.2002). The plaintiff thereby alleges a plausible causal relationship between the series of disclosure events and this final loss.

34    In addition, the defendants argue that the March 2002 conference call disclosed the material omissions in full, and therefore subsequent disclosures could not have caused the loss. For similar reasons stated earlier in the safe harbor section, we disagree with the defendants' characterization of the conference call as a full disclosure of all material risks associated with the no-deposit and ClearPay programs. The conference call continued to tout the benefits of these programs and omitted the serious risk that these programs would be disastrous. Despite some limited disclosures, the defendants arguably skewed the mix of information regarding the no-deposit programs, particularly its future prospects.

35    Moreover, several circuit courts and district courts point out that it is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over "loss causation." *See In re Gilead Scis.*, 536 F.3d at 1057; *McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n. 4 (3rd Cir.2007) (citing authorities for concluding that "loss causation becomes most critical at the proof stage" (internal quotation marks omitted)); *Emergent Capital Inv. Mgmt., LLC. v. Stonepath Group, Inc.*, 343 F.3d 189, 197 (2d Cir.2003) (noting that loss causation "is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss"); *accord In re Coca–Cola Enters. Inc. Secs. Litig.*, 510 F.Supp.2d 1187, 1204 n. 5 (N.D.Ga.2007) ("Finally, several previous securities fraud cases have held that proof of loss causation is not an issue that typically should be resolved on a motion to dismiss.") (citing *In re PSS World Med., Inc. Sec. Litig.*, 250 F.Supp.2d 1335, 1351 (M.D.Fla.2002); *In re Rent–Way Sec. Litig.*, 209 F.Supp.2d 493, 513 (W.D.Pa.2002)); *see also* 3 Hazen, Securities Regulation § 12.11[3] ("Loss causation issues can be highly factual, thus frequently precluding judgment on the pleadings.").

36    Because we are reversing in part and affirming in part the Rule 12(b)(6) dismissal, we do not reach the district court's denial of leave to amend and subsequent dismissal with prejudice of the claims. *See Genmoora Corp.*, 888 F.2d at 358 n. 70. The district court's denial of leave to amend on futility grounds and subsequent dismissal with prejudice of the claims was dependent on its Rule 12(b)(6) dismissal without prejudice, which we now reverse in part. We remand with reservation of the possibility that the district court may grant leave to amend under Fed.R.Civ.P. 15 so as to cure any deficiencies in respect to other potential claims after considering our guidance from this opinion. *See, e.g., Buckey v. County of Los Angeles*, 968 F.2d 791, 794 (9th Cir.1992) (remanding to allow district court to consider if plaintiff should be able to amend complaint after claims were dismissed without prejudice).

37    *See Plotkin*, 407 F.3d at 702 (reversing in part and affirming in part a 12(b)(6) dismissal in a securities fraud action). For these reasons, we also reverse in part the dismissal of the derivative controlling person liability § 20(a) claim for the

Lormand v. US Unwired, Inc., 565 F.3d 228 (2009)

Fed. Sec. L. Rep. P 95,205, 47 Communications Reg. (P&F) 960

same reasons that we reverse in part the district court's dismissal without prejudice the § 10(b) claim. *See Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 863 (5th Cir.2003) (noting that the § 20(a) claim is a derivative claim of the § 10(b) claim).

---

End of Document     © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)

127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

127 S.Ct. 2499
Supreme Court of the United States

TELLABS, INC., et al., Petitioners,

v.

MAKOR ISSUES & RIGHTS, LTD., et al.

No. 06–484.
|
Argued March 28, 2007.
|
Decided June 21, 2007.

**Synopsis**

**Background:** Investors brought securities fraud class action against corporation and its chief executive officer (CEO). The United States District Court for the Northern District of Illinois, Amy J. St. Eve, J., dismissed action. Investors appealed. The United States Court of Appeals for the Seventh Circuit, 437 F.3d 588, reversed. Certiorari was granted.

**Holdings:** The Supreme Court, Justice Ginsburg, held that:

[1] in determining whether securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), court must consider competing inferences, and

[2] plaintiff alleging fraud in § 10(b) action must plead facts rendering inference of scienter at least as likely as any plausible opposing inference.

Vacated and remanded.

Justices Scalia and Alito filed opinions concurring in the judgment.

Justice Stevens filed dissenting opinion.

West Headnotes (7)

[1] **Securities Regulation** ⟋ Scienter, Intent, Knowledge, Negligence or Recklessness

To establish liability under § 10(b) and Rule 10b–5, private plaintiff must prove that defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); 17 C.F.R. § 240.10b–5.

516 Cases that cite this headnote

[2] **Federal Civil Procedure** ⟋ Matters deemed admitted; acceptance as true of allegations in complaint

On motion to dismiss § 10(b) action for failure to state claim on which relief can be granted, court must accept all factual allegations in complaint as true. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

3818 Cases that cite this headnote

[3] **Federal Civil Procedure** ⟋ Matters considered in general

On motion to dismiss § 10(b) action for failure to state claim on which relief can be granted, court must consider complaint in its entirety, as well as other sources courts ordinarily examine when ruling on such motions, in particular, documents incorporated into complaint by reference, and matters of which court may take judicial notice; inquiry is whether all of the facts alleged, taken collectively, give rise to strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

7237 Cases that cite this headnote

[4] **Securities Regulation** ⟋ Scienter

In determining whether securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), court must consider competing inferences; to determine whether plaintiff has alleged facts that give rise to requisite "strong inference" of scienter,

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

court must consider plausible nonculpable explanations for defendant's conduct, as well as inferences favoring plaintiff. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

2758 Cases that cite this headnote

[5]    **Securities Regulation** ⚖ Scienter

Inference of scienter in securities fraud complaint must be more than merely "reasonable" or "permissible" to satisfy Private Securities Litigation Reform Act (PSLRA); it must be cogent and compelling, thus strong in light of other explanations, and complaint will survive only if reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

2691 Cases that cite this headnote

[6]    **Securities Regulation** ⚖ Scienter

While motive can be relevant consideration, and personal financial gain may weigh heavily in favor of finding that securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), absence of motive allegation is not fatal. Private Securities Litigation Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

423 Cases that cite this headnote

[7]    **Jury** ⚖ Restriction or Invasion of Functions of Jury

In determining whether securities fraud complaint gives rise to "strong inference" of scienter, within meaning of Private Securities Litigation Reform Act (PSLRA), court's comparative assessment of plausible inferences, while constantly assuming plaintiff's allegations to be true, does not impinge upon Seventh Amendment right to jury trial. U.S.C.A. Const.Amend. 7; Private Securities Litigation

Reform Act of 1995, § 101(b), 15 U.S.C.A. § 78u–4(b)(2).

559 Cases that cite this headnote

**\*\*2501    \*308** *Syllabus*\*

As a check against abusive litigation in private securities fraud actions, the Private Securities Litigation Reform Act of 1995 (PSLRA) includes exacting pleading requirements. The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668. As set out in § 21D(b)(2), plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). Congress left the key term "strong inference" undefined.

Petitioner Tellabs, Inc., manufactures specialized equipment for fiber optic networks. Respondents (Shareholders) purchased Tellabs stock between December 11, 2000, and June 19, 2001. They filed a class action, alleging that Tellabs and petitioner Notebaert, then Tellabs' chief executive officer and president, had engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934 and Securities and Exchange Commission Rule 10b–5, and that Notebaert was a "controlling person" under the 1934 Act, and therefore derivatively liable for the company's fraudulent acts. Tellabs moved to dismiss the complaint on the ground that the Shareholders had failed to plead their case with the particularity the PSLRA requires. The District Court agreed, dismissing the complaint without prejudice. The Shareholders then amended their complaint, adding references to 27 confidential sources and making further, more specific, allegations concerning Notebaert's mental state. The District Court again dismissed, this time with prejudice. The Shareholders had sufficiently pleaded that Notebaert's statements were misleading, the court determined, but they had insufficiently alleged that he acted with scienter. The Seventh Circuit reversed in relevant part. Like the District Court, it found that the Shareholders had pleaded the misleading character of Notebaert's statements with sufficient particularity. Unlike the District Court, however, it concluded that the Shareholders had sufficiently alleged that Notebaert **\*309** acted with the requisite state of

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

mind. In evaluating whether the PSLRA's pleading standard is met, the Circuit said, courts should examine all of the complaint's allegations to decide whether collectively they establish an inference of scienter; the complaint would **2502 survive, the court stated, if a reasonable person could infer from the complaint's allegations that the defendant acted with the requisite state of mind.

*Held:* To qualify as "strong" within the intendment of § 21D(b)(2), an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent. Pp. 2506 – 2513.

(a) Setting a uniform pleading standard for § 10(b) actions was among Congress' objectives in enacting the PSLRA. Designed to curb perceived abuses of the § 10(b) private action, the PSLRA installed both substantive and procedural controls. As relevant here, § 21D(b) of the PSLRA "impose[d] heightened pleading requirements in [§ 10(b) and Rule 10b–5] actions." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503. In the instant case, the District Court and the Seventh Circuit agreed that the complaint sufficiently specified Notebaert's alleged misleading statements and the reasons why the statements were misleading. But those courts disagreed on whether the Shareholders, as required by § 21D(b)(2), "state[d] with particularity facts giving rise to a strong inference that [Notebaert] acted with [scienter]," § 78u–4(b)(2). Congress did not shed much light on what facts would create a strong inference or how courts could determine the existence of the requisite inference. With no clear guide from Congress other than its "inten[tion] to strengthen existing pleading requirements," H.R. Conf. Rep. No. 104–369, p. 41, Courts of Appeals have diverged in construing the term "strong inference." Among the uncertainties, should courts consider competing inferences in determining whether an inference of scienter is "strong"? This Court's task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims. Pp. 2506 – 2509.

(b) The Court establishes the following prescriptions: *First,* faced with a Federal Rule of Civil Procedure 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. See *Leatherman v. Tarrant County*

*Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517. *Sec ond,* *310 courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions. The inquiry is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. The Seventh Circuit expressly declined to engage in such a comparative inquiry. But in § 21D(b)(2), Congress did not merely require plaintiffs to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong"—*i.e.,* a powerful or cogent—inference. To determine whether the plaintiff has alleged facts giving rise to the requisite "strong inference," a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, but it must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A **2503 complaint will survive only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged. Pp. 2509 – 2510.

(c) Tellabs contends that when competing inferences are considered, Notebaert's evident lack of pecuniary motive will be dispositive. The Court agrees that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference. The absence of a motive allegation, however, is not fatal for allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the complaint's entirety. Tellabs also maintains that several of the Shareholders' allegations are too vague or ambiguous to contribute to a strong inference of scienter. While omissions and ambiguities count against inferring scienter, the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. Pp. 2511 – 2512.

(d) The Seventh Circuit was unduly concerned that a court's comparative assessment of plausible inferences would impinge upon the Seventh Amendment right to jury trial. Congress, as creator of federal statutory claims, has power to prescribe what must be pleaded to state the claim, just

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

as it has power to determine what must be proved to prevail on the merits. It is the federal lawmaker's prerogative, therefore, to allow, disallow, or shape the contours of— including the pleading and **\*311** proof requirements for — § 10(b) private actions. This Court has never questioned that authority in general, or suggested, in particular, that the Seventh Amendment inhibits Congress from establishing whatever pleading requirements it finds appropriate for federal statutory claims. Provided that the Shareholders have satisfied the congressionally "prescribe[d] ... means of making an issue," *Fidelity & Deposit Co. of Md. v. United States,* 187 U.S. 315, 320, 23 S.Ct. 120, 47 L.Ed. 194, the case will fall within the jury's authority to assess the credibility of witnesses, resolve genuine issues of fact, and make the ultimate determination whether Notebaert and, by imputation, Tellabs acted with scienter. Under this Court's construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud under § 10(b) must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference. At trial, she must then prove her case by a "preponderance of the evidence." Pp. 2511 – 2513.

(e) Neither the District Court nor the Court of Appeals had the opportunity to consider whether the Shareholders' allegations warrant "a strong inference that [Notebaert and Tellabs] acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2), in light of the prescriptions announced today. Thus, the case is remanded for a determination under this Court's construction of § 21D(b)(2). P. 2513.

437 F.3d 588, vacated and remanded.

GINSBURG, J., delivered the opinion of the Court, in which ROBERTS, C.J., and KENNEDY, SOUTER, THOMAS, and BREYER, JJ., joined. SCALIA, J., *post,* p. 2513, and ALITO, J., p. 2515, filed opinions concurring in the judgment. STEVENS, J., filed a dissenting opinion, *post,* p. 2516.

**Attorneys and Law Firms**

Carter G. Phillips, Washington, DC, for petitioners.

Kannon K. Shanmugam, Washington, DC, for the United States as amicus curiae, by special leave of the Court, supporting petitioners.

**\*\*2504** Arthur R. Miller, New York, NY, for respondents.

David F. Graham, Hille R. Sheppard, Robert N. Hochman, Melanie E. Walker, Sidley Austin LLP, Chicago, Illinois, Carter G. Phillips, Counsel of Record, Richard D. Bernstein, Eamon P. Joyce, Sidley Austin LLP, Washington, D.C., for Petitioners.

Arthur R. Miller, Cambridge, MA, Melvyn I. Weiss, Jerome M. Congress, Richard H. Weiss, Counsel of Record, Clifford S. Goodstein, Milberg Weiss & Bershad LLP, New York, NY, for Respondents.

Brian G. Cartwright, General Counsel, Andrew N. Vollmer, Deputy General Counsel, Jacob H. Stillman, Solicitor, Luis de la Torre, Senior Litigation Counsel, Michael L. Post, Senior Counsel, Securities and Exchange Commission, Washington, DC, Paul D. Clement, Solicitor General, Counsel of Record, Peter D. Keisler, Assistant Attorney General, Thomas G. Hungar, Deputy Solicitor General, Kannon K. Shanmugam, Assistant to the Solicitor General, Michael Jay Singer, John S. Koppel, Attorneys, Department of Justice, Washington, DC, for United States.

**Opinion**

Justice GINSBURG delivered the opinion of the Court.

**\*313** This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions brought, respectively, by the Department of Justice and the Securities and Exchange Commission (SEC). See, *e.g., Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 345, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *J.I. Case Co. v. Borak,* 377 U.S. 426, 432, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964). Private securities fraud actions, however, if not adequately contained, can be employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law. See *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,* 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006). As a check against abusive litigation by private parties, Congress enacted the Private Securities Litigation Reform Act of 1995 (PSLRA), 109 Stat. 737.

Exacting pleading requirements are among the control measures Congress included in the PSLRA. The PSLRA requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.,* the defendant's intention "to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194, and n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

(1976); see 15 U.S.C. § 78u–4(b)(1), (2). *314 This case concerns the latter requirement. As set out in § 21D(b)(2) of the PSLRA, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Congress left the key term "strong inference" undefined, and Courts of Appeals have divided on its meaning. In the case before us, the Court of Appeals for the Seventh Circuit held that the "strong inference" standard would be met if the complaint "allege[d] facts from which, if true, a reasonable person could infer that the defendant acted with the required intent." 437 F.3d 588, 602 (2006). That formulation, we conclude, does not capture the stricter demand Congress sought to convey in § 21D(b)(2). It does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by § 21D(b)(2) must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff, as the Seventh Circuit did, but also competing inferences rationally drawn from the facts alleged. An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct. To qualify as "strong" within the intendment of § 21D(b)(2), we hold, an inference of scienter must be **2505 more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.

I

Petitioner Tellabs, Inc., manufactures specialized equipment used in fiber optic networks. During the time period relevant to this case, petitioner Richard Notebaert was Tellabs' chief executive officer and president. Respondents (Shareholders) are persons who purchased Tellabs stock between December 11, 2000, and June 19, 2001. They accuse *315 Tellabs and Notebaert (as well as several other Tellabs executives) of engaging in a scheme to deceive the investing public about the true value of Tellabs' stock. See 437 F.3d, at 591; App. 94–98.[1]

Beginning on December 11, 2000, the Shareholders allege, Notebaert (and by imputation Tellabs) "falsely reassured public investors, in a series of statements ... that Tellabs was continuing to enjoy strong demand for its products and earning record revenues," when, in fact, Notebaert knew the opposite was true. Id., at 94–95, 98. From December 2000 until the spring of 2001, the Shareholders claim, Notebaert knowingly misled the public in four ways. 437 F.3d, at 596. First, he made statements indicating that demand for Tellabs' flagship networking device, the TITAN 5500, was continuing to grow, when, in fact, demand for that product was waning. Id., at 596, 597. Second, Notebaert made statements indicating that the TITAN 6500, Tellabs' next-generation networking device, was available for delivery, and that demand for that product was strong and growing, when in truth the product was not ready for delivery and demand was weak. Id., at 596, 597–598. Third, he falsely represented Tellabs' financial results for the fourth quarter of 2000 (and, in connection with those results, condoned the practice of "channel stuffing," under which Tellabs flooded its customers with unwanted products). Id., at 596, 598. Fourth, Notebaert made a series of overstated revenue projections, when demand for the TITAN 5500 was drying up and production of the TITAN 6500 was behind schedule. Id., at 596, 598–599. Based on Notebaert's sunny assessments, the *316 Shareholders contend, market analysts recommended that investors buy Tellabs' stock. See id., at 592.

The first public glimmer that business was not so healthy came in March 2001 when Tellabs modestly reduced its first quarter sales projections. Ibid. In the next months, Tellabs made progressively more cautious statements about its projected sales. On June 19, 2001, the last day of the class period, Tellabs disclosed that demand for the TITAN 5500 had significantly dropped. Id., at 593. Simultaneously, the company substantially lowered its revenue projections for the second quarter of 2001. The next day, the price of Tellabs stock, which had reached a high of $67 during the period, plunged to a low of $15.87. Ibid.

On December 3, 2002, the Shareholders filed a class action in the District Court for the Northern District of Illinois. Ibid. Their complaint stated, inter alia, that Tellabs and Notebaert had engaged in securities fraud in violation of § 10(b) of the Securities Exchange Act of 1934, 48 Stat. **2506 891, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 CFR § 240.10b–5 (2006), also that Notebaert was a "controlling person" under § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a), and therefore derivatively liable for the company's fraudulent acts. See App. 98–101, 167–171. Tellabs moved to dismiss the complaint on the ground that the Shareholders had failed to plead their case with the particularity the PSLRA requires. The District Court agreed, and therefore dismissed the complaint without

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

prejudice. App. to Pet. for Cert. 80a–117a; see *Johnson v. Tellabs, Inc.,* 303 F.Supp.2d 941, 945 (N.D.Ill.2004).

The Shareholders then amended their complaint, adding references to 27 confidential sources and making further, more specific, allegations concerning Notebaert's mental state. See 437 F.3d, at 594; App. 91–93, 152–160. The District Court again dismissed, this time with prejudice. 303 F.Supp.2d, at 971. The Shareholders had sufficiently pleaded that Notebaert's statements were misleading, the ***317** court determined, *id.,* at 955–961, but they had insufficiently alleged that he acted with scienter, *id.,* at 954–955, 961–969.

The Court of Appeals for the Seventh Circuit reversed in relevant part. 437 F.3d, at 591. Like the District Court, the Court of Appeals found that the Shareholders had pleaded the misleading character of Notebaert's statements with sufficient particularity. *Id.,* at 595–600. Unlike the District Court, however, the Seventh Circuit concluded that the Shareholders had sufficiently alleged that Notebaert acted with the requisite state of mind. *Id.,* at 603–605.

The Court of Appeals recognized that the PSLRA "unequivocally raise[d] the bar for pleading scienter" by requiring plaintiffs to "plea[d] sufficient facts to create a strong inference of scienter." *Id.,* at 601 (internal quotation marks omitted). In evaluating whether that pleading standard is met, the Seventh Circuit said, "courts [should] examine all of the allegations in the complaint and then ... decide whether collectively they establish such an inference." *Ibid.* "[W]e will allow the complaint to survive," the court next and critically stated, "if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent .... If a reasonable person could not draw such an inference from the alleged facts, the defendants are entitled to dismissal." *Id.,* at 602.

In adopting its standard for the survival of a complaint, the Seventh Circuit explicitly rejected a stiffer standard adopted by the Sixth Circuit, *i.e.,* that "plaintiffs are entitled only to the most plausible of competing inferences." *Id.,* at 601, 602 (quoting *Fidel v. Farley,* 392 F.3d 220, 227 (2004)). The Sixth Circuit's standard, the court observed, because it involved an assessment of competing inferences, "could potentially infringe upon plaintiffs' Seventh Amendment rights." 437 F.3d, at 602. We granted certiorari to resolve the disagreement among the Circuits on whether, and to what extent, a court must consider competing inferences in determining whether a securities fraud complaint ***318** gives rise to a "strong

inference" of scienter.[2] 549 U.S. 1105, 127 S.Ct. 853, 166 L.Ed.2d 681 (2007).

****2507** II

[1]  Section 10(b) of the Securities Exchange Act of 1934 forbids the "use or employ, in connection with the purchase or sale of any security ..., [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). SEC Rule 10b–5 implements § 10(b) by declaring it unlawful:

"(a) To employ any device, scheme, or artifice to defraud,

"(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made ... not misleading, or

"(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 CFR § 240.10b–5.

Section 10(b), this Court has implied from the statute's text and purpose, affords a right of action to purchasers or sellers of securities injured by its violation. See, *e.g., Dura Pharmaceuticals,* 544 U.S., at 341, 125 S.Ct. 1627. See also *id.,* at 345, 125 S.Ct. 1627 ("The securities statutes seek to maintain public confidence in the marketplace ... by deterring fraud, in part, through the availability of private securities fraud actions."); *Borak,* 377 U.S., at 432, 84 S.Ct. 1555 (private securities fraud actions provide "a most effective weapon in the enforcement" of securities laws and ***319** are "a necessary supplement to Commission action"). To establish liability under § 10(b) and Rule 10b–5, a private plaintiff must prove that the defendant acted with scienter, "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst,* 425 U.S., at 193–194, and n. 12, 96 S.Ct. 1375.[3]

In an ordinary civil action, the Federal Rules of Civil Procedure require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. Rule Civ. Proc. 8(a)(2). Although the rule encourages brevity, the complaint must say enough to give the defendant "fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharmaceuticals,* 544 U.S., at

346, 125 S.Ct. 1627 (internal quotation marks omitted). Prior to the enactment of the PSLRA, the sufficiency of a complaint for securities fraud was governed not by Rule 8, but by the heightened pleading standard set forth in Rule 9(b). See *Greenstone v. Cambex Corp.,* 975 F.2d 22, 25 (C.A.1 1992) (Breyer, J.) (collecting cases). Rule 9(b) applies to "all averments of fraud or mistake"; it requires that "the circumstances constituting fraud ... be stated with particularity" but provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally."

Courts of Appeals diverged on the character of the Rule 9(b) inquiry in § 10(b) cases: Could securities fraud plaintiffs allege the requisite mental state "simply by saying that scienter existed," **2508** *In re GlenFed, Inc. Securities Litigation,* 42 F.3d 1541, 1546–1547 (C.A.9 1994) (en banc), or were they required to allege with particularity facts giving rise to an *320 inference of scienter? Compare *id.,* at 1546 ("We are not permitted to add new requirements to Rule 9(b) simply because we like the effects of doing so."), with, *e.g., Greenstone,* 975 F.2d, at 25 (were the law to permit a securities fraud complaint simply to allege scienter without supporting facts, "a complaint could evade too easily the 'particularity' requirement in Rule 9(b)'s first sentence"). Circuits requiring plaintiffs to allege specific facts indicating scienter expressed that requirement variously. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1301.1, pp. 300–302 (3d ed.2004) (hereinafter Wright & Miller). The Second Circuit's formulation was the most stringent. Securities fraud plaintiffs in that Circuit were required to "specifically plead those [facts] which they assert give rise to a *strong inference* that the defendants had" the requisite state of mind. *Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (1979) (emphasis added). The "strong inference" formulation was appropriate, the Second Circuit said, to ward off allegations of "fraud by hindsight." See, *e.g., Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (1994) (quoting *Denny v. Barber,* 576 F.2d 465, 470 (C.A.2 1978) (Friendly, J.)).

Setting a uniform pleading standard for § 10(b) actions was among Congress' objectives when it enacted the PSLRA. Designed to curb perceived abuses of the § 10(b) private action—"nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers," *Dabit,* 547 U.S., at 81, 126 S.Ct. 1503 (quoting H.R. Conf. Rep. No. 104–369, p. 31 (1995), U.S.Code Cong. & Admin.News 1995, p. 730 (hereinafter H.R. Conf. Rep.))—the PSLRA installed both

substantive and procedural controls.[4] Notably, Congress prescribed new procedures *321 for the appointment of lead plaintiffs and lead counsel. This innovation aimed to increase the likelihood that institutional investors—parties more likely to balance the interests of the class with the long-term interests of the company—would serve as lead plaintiffs. See *id.,* at 33–34; S.Rep. No. 104–98, p. 11 (1995), U.S.Code Cong. & Admin.News 1995, pp. 679, 690. Congress also "limit[ed] recoverable damages and attorney's fees, provide[d] a 'safe harbor' for forward-looking statements, ... mandate[d] imposition of sanctions for frivolous litigation, and authorize[d] a stay of discovery pending resolution of any motion to dismiss." *Dabit,* 547 U.S., at 81, 126 S.Ct. 1503. And in § 21D(b) of the PSLRA, Congress "impose[d] heightened pleading requirements in actions brought pursuant to § 10(b) and Rule 10b–5." *Ibid.*

Under the PSLRA's heightened pleading instructions, any private securities complaint alleging that the defendant made a false or misleading statement must: (1) "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," 15 U.S.C. § 78u–4(b)(1); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," § 78u–4(b)(2). In the instant case, as earlier stated, see *supra,* at 2506, the District Court and the Seventh Circuit agreed that the Shareholders met the first of the two requirements: The complaint sufficiently **2509** specified Notebaert's alleged misleading statements and the reasons why the statements were misleading. 303 F.Supp.2d, at 955–961, 437 F.3d, at 596–600. But those courts disagreed on whether the Shareholders, as required by § 21D(b)(2), "state[d] with particularity facts giving rise to a strong inference that [Notebaert] acted with [scienter]," § 78u–4(b)(2). See *supra,* at 2506.

The "strong inference" standard "unequivocally raise[d] the bar for pleading scienter," 437 F.3d, at 601, and signaled Congress' purpose to promote greater uniformity among the Circuits, see H.R. Conf. Rep., p. 41. But "Congress did not ... throw much light on what facts ... suffice to create *322 [a strong] inference," or on what "degree of imagination courts can use in divining whether" the requisite inference exists. 437 F.3d, at 601. While adopting the Second Circuit's "strong inference" standard, Congress did not codify that Circuit's case law interpreting the standard. See § 78u–4(b)(2). See also Brief for United States as *Amicus Curiae* 18. With no clear guide from Congress other than its "inten[tion] to strengthen existing pleading requirements," H.R. Conf. Rep., p. 41,

127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

Courts of Appeals have diverged again, this time in construing the term "strong inference." Among the uncertainties, should courts consider competing inferences in determining whether an inference of scienter is "strong"? See 437 F.3d, at 601–602 (collecting cases). Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.

### III

### A

[2]  We establish the following prescriptions: *First,* faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. See *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993). On this point, the parties agree. See Reply Brief 8; Brief for Respondents 26; Brief for United States as *Amicus Curiae* 8, 20, 21.

[3]  *Second,* courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. See 5B Wright & Miller § 1357 (3d ed.2004 and Supp.2007). The inquiry, as several Courts of Appeals have recognized, is **\*323** whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. See, *e.g., Abrams v. Baker Hughes Inc.,* 292 F.3d 424, 431 (C.A.5 2002); *Gompper v. VISX, Inc.,* 298 F.3d 893, 897 (C.A.9 2002). See also Brief for United States as *Amicus Curiae* 25.

[4]  *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. The Seventh Circuit expressly declined to engage in such a comparative inquiry. A complaint could survive, that court said, as long as it "alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent"; in other words, only "[i]f a reasonable person could not draw such an inference from **\*\*2510** the alleged facts" would the

defendant prevail on a motion to dismiss. 437 F.3d, at 602. But in § 21D(b)(2), Congress did not merely require plaintiffs to "provide a factual basis for [their] scienter allegations," *ibid.* (quoting *In re Cerner Corp. Securities Litigation,* 425 F.3d 1079, 1084, 1085 (C.A.8 2005)), *i.e.,* to allege facts from which an inference of scienter rationally *could* be drawn. Instead, Congress required plaintiffs to plead with particularity facts that give rise to a "strong"—*i.e.,* a powerful or cogent—inference. See American Heritage Dictionary 1717 (4th ed.2000) (defining "strong" as "[p]ersuasive, effective, and cogent"); 16 Oxford English Dictionary 949 (2d ed.1989) (defining "strong" as "[p]owerful to demonstrate or convince" (definition 16b)); cf. 7 *id.,* at 924 (defining "inference" as "a conclusion [drawn] from known or assumed facts or statements"; "reasoning from something known or assumed to something else which follows from it").

[5]  The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff **\*324** has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences," *Fidel,* 392 F.3d, at 227 (quoting *Helwig v. Vencor, Inc.,* 251 F.3d 540, 553 (C.A.6 2001) (en banc)). Recall in this regard that § 21D(b)'s pleading requirements are but one constraint among many the PSLRA installed to screen out frivolous suits, while allowing meritorious actions to move forward. See *supra,* at 2508, and n. 4. Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.[5]

**\*\*2511** **\*325** B

[6]  Tellabs contends that when competing inferences are considered, Notebaert's evident lack of pecuniary motive will be dispositive. The Shareholders, Tellabs stresses, did not allege that Notebaert sold any shares during the class period. See Brief for Petitioners 50 ("The absence of any allegations

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

of motive color all the other allegations putatively giving rise to an inference of scienter."). While it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that the absence of a motive allegation is not fatal. See 437 F.3d, at 601. As earlier stated, *supra,* at 2509 – 2510, allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.

Tellabs also maintains that several of the Shareholders' allegations are too vague or ambiguous to contribute to a strong inference of scienter. For example, the Shareholders alleged that Tellabs flooded its customers with unwanted products, a practice known as "channel stuffing." See *supra,* at 2505. But they failed, Tellabs argues, to specify whether the channel stuffing allegedly known to Notebaert was the illegitimate kind (*e.g.,* writing orders for products customers had not requested) or the legitimate kind (*e.g.,* offering customers discounts as an incentive to buy). Brief for Petitioners 44–46; Reply Brief 8. See also *id.,* at 8–9 (complaint lacks precise dates of reports critical to distinguish legitimate conduct from culpable conduct). But see 437 F.3d, at 598, 603–604 (pointing to multiple particulars *326 alleged by the Shareholders, including specifications as to timing). We agree that omissions and ambiguities count against inferring scienter, for plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." § 78u–4(b)(2). We reiterate, however, that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. See *supra,* at 2509 – 2510; 437 F.3d, at 601. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?[6]

IV

[7]    Accounting for its construction of § 21D(b)(2), the Seventh Circuit explained that the court "th[ought] it wis[e] to adopt an approach that [could not] be misunderstood as a usurpation of the jury's role." 437 F.3d, at 602. In our view, the Seventh Circuit's concern was undue.[7] A court's **2512 comparative assessment of plausible inferences, while constantly assuming *327 the plaintiff's allegations to

be true, we think it plain, does not impinge upon the Seventh Amendment right to jury trial.[8]

Congress, as creator of federal statutory claims, has power to prescribe what must be pleaded to state the claim, just as it has power to determine what must be proved to prevail on the merits. It is the federal lawmaker's prerogative, therefore, to allow, disallow, or shape the contours of— including the pleading and proof requirements for— § 10(b) private actions. No decision of this Court questions that authority in general, or suggests, in particular, that the Seventh Amendment inhibits Congress from establishing whatever pleading requirements it finds appropriate for federal statutory claims. Cf. *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512–513, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002); *Leatherman,* 507 U.S., at 168, 113 S.Ct. 1160 (both recognizing that heightened pleading requirements can be established by Federal Rule, citing Fed. Rule Civ. Proc. 9(b), which requires that fraud or mistake be pleaded with particularity).[9]

Our decision in *Fidelity & Deposit Co. of Md. v. United States,* 187 U.S. 315, 23 S.Ct. 120, 47 L.Ed. 194 (1902), is instructive. That case concerned a rule adopted by the Supreme Court of the District of Columbia in 1879 pursuant to rulemaking power delegated by Congress. The rule required defendants, in certain contract *328 actions, to file an affidavit "specifically stating ..., in precise and distinct terms, the grounds of his defen[s]e." *Id.,* at 318, 23 S.Ct. 120 (internal quotation marks omitted). The defendant's affidavit was found insufficient, and judgment was entered for the plaintiff, whose declaration and supporting affidavit had been found satisfactory. *Ibid.* This Court upheld the District's rule against the contention that it violated the Seventh Amendment. *Id.,* at 320, 23 S.Ct. 120. Just as the purpose of § 21D(b) is to screen out frivolous complaints, the purpose of the prescription at issue in *Fidelity & Deposit Co.* was to "preserve the court from frivolous defen[s]es," *ibid.* Explaining why the Seventh Amendment was not implicated, this Court said that the heightened pleading rule simply "prescribes the means of making an issue," and that, when "[t]he issue [was] made as prescribed, the right of trial by jury accrues." *Ibid.;* accord *Ex parte Peterson,* 253 U.S. 300, 310, 40 S.Ct. 543, 64 L.Ed. 919 (1920) (Brandeis, J.) (citing *Fidelity & Deposit Co.,* and reiterating: "It does not infringe the constitutional right to a trial by jury [in a civil case], to require, with a view to formulating the issues, an oath by each party to the facts relied upon."). See also **2513 *Walker v. New Mexico & Southern Pacific R. Co.,* 165 U.S. 593, 596, 17

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

S.Ct. 421, 41 L.Ed. 837 (1897) (Seventh Amendment "does not attempt to regulate matters of pleading").

In the instant case, provided that the Shareholders have satisfied the congressionally "prescribe[d] ... means of making an issue," *Fidelity & Deposit Co.*, 187 U.S. at 320, 23 S.Ct. 120, the case will fall within the jury's authority to assess the credibility of witnesses, resolve any genuine issues of fact, and make the ultimate determination whether Notebaert and, by imputation, Tellabs acted with scienter. We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter *at least as likely as* any plausible opposing inference. At trial, she must then prove her **\*329** case by a "preponderance of the evidence." Stated otherwise, she must demonstrate that it is *more likely* than not that the defendant acted with scienter. See *Herman & MacLean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

\* \* \*

While we reject the Seventh Circuit's approach to § 21D(b) (2), we do not decide whether, under the standard we have described, see *supra*, at 2509 – 2511, the Shareholders' allegations warrant "a strong inference that [Notebaert and Tellabs] acted with the required state of mind," 15 U.S.C. § 78u–4(b)(2). Neither the District Court nor the Court of Appeals had the opportunity to consider the matter in light of the prescriptions we announce today. We therefore vacate the Seventh Circuit's judgment so that the case may be reexamined in accord with our construction of § 21D(b)(2).

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

Justice SCALIA, concurring in the judgment.
I fail to see how an inference that is merely "at least as compelling as any opposing inference," *ante*, at 2505, can conceivably be called what the statute here at issue requires: a "strong inference," 15 U.S.C. § 78u–4(b)(2). If a jade falcon were stolen from a room to which only A and B had access,

could it *possibly* be said there was a "strong inference" that B was the thief? I think not, and I therefore think that the Court's test must fail. In my view, the test should be whether the inference of scienter (if any) is *more plausible* than the inference of innocence.[\*]

**\*330** The Court's explicit rejection of this reading, *ante*, at 2510, rests on two assertions. The first (doubtless true) is that the statute does not require that "[t]he inference that the defendant acted with scienter ... be irrefutable, *i.e.*, of the 'smoking-gun' genre," *ibid.* It is up to Congress, **\*\*2514** however, and not to us, to determine what pleading standard would avoid those extremities while yet effectively deterring baseless actions. Congress has expressed its determination in the phrase "strong inference"; it is our job to give that phrase its normal meaning. And if we are to abandon text in favor of unexpressed purpose, as the Court does, it is inconceivable that Congress's enactment of stringent pleading requirements in the Private Securities Litigation Reform Act of 1995 somehow manifests the purpose of giving plaintiffs the edge in close cases.

The Court's second assertion (also true) is that "an inference at least as likely as competing inferences can, in some cases, warrant recovery." *Ante*, at 2510, n. 5 (citing *Summers v. Tice*, 33 Cal.2d 80, 84–87, 199 P.2d 1, 3–5 (1948)). *Summers* is a famous case, however, because it sticks out of the ordinary body of tort law like a sore thumb. It represented "a relaxation" of "such proof as is ordinarily required" to succeed in a negligence action. *Id.*, at 86, 199 P.2d, at 4 (internal quotation marks omitted). There is no indication that the statute at issue here was meant to relax the ordinary rule under which a tie goes to the defendant. To the contrary, it explicitly strengthens that rule by extending it to the pleading stage of a case.

**\*331** One of petitioners' *amici* suggests that my reading of the statute would transform the text from requiring a "strong" inference to requiring the "strongest" inference. See Brief for American Association for Justice as *Amicus Curiae* 27. The point might have some force if Congress could have more clearly adopted my standard by using the word "strongest" instead of the word "strong." But the use of the superlative would not have made any sense given the provision's structure: What does it mean to require a plaintiff to plead "facts giving rise to *the strongest* inference that the defendant acted with the required state of mind"? It is certainly true that, if Congress had wanted to adopt my standard with even greater clarity, it could have restructured

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

the entire provision—to require, for example, that the plaintiff plead "facts giving rise to *an inference of scienter that is more compelling than the inference that the defendant acted with a nonculpable state of mind.*" But if one is to consider the possibility of total restructuring, it is equally true that, to express the Court's standard, Congress could have demanded "*an inference of scienter that is at least as compelling as the inference that the defendant acted with a nonculpable state of mind.*" Argument from the possibility of saying it differently is clearly a draw. We must be content to give "strong inference" its normal meaning. I hasten to add that, while precision of interpretation should always be pursued for its own sake, I doubt that in this instance what I deem to be the correct test will produce results much different from the Court's. How often is it that inferences are precisely in equipoise? All the more reason, I think, to read the language for what it says.

The Court and the dissent criticize me for suggesting that there is only one reading of the text. *Ante,* at 2510 – 2511, n. 5; *post,* at 2517, n. 1 (STEVENS, J., dissenting). They are both mistaken. I assert only that mine is the natural reading of the statute (*i.e.,* the normal reading), not that it is the only **\*332** conceivable one. The Court has no standing to object to this approach, since it concludes that, in another respect, the statute admits of only one natural reading, namely, that competing inferences must be weighed because the strong-inference requirement "is inherently comparative," *ante,* at 2510. As for the dissent, it asserts that the statute cannot possibly have a natural and discernible **\*\*2515** meaning, since "Courts of Appeals" and "Members of this Court" "have divided" over the question. *Post,* at 2517, n. 1. It was just weeks ago, however, that the author of the dissent, joined by the author of today's opinion for the Court, concluded that a statute's meaning was "plain," *Rockwell Int'l Corp. v. United States,* 549 U.S. 457, 479, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007) (STEVENS, J., dissenting), even though the Courts of Appeals and Members of this Court divided over the question, *id.,* at 470, n. 5, 127 S.Ct. 1397. Was plain meaning then, as the dissent claims it is today, *post,* at 2517, n. 1, "in the eye of the beholder"?

It is unremarkable that various Justices in this case reach different conclusions about the correct interpretation of the statutory text. It is remarkable, however, that the dissent believes that Congress "implicitly delegated significant lawmaking authority to the Judiciary in determining how th[e] [strong-inference] standard should operate in practice." *Post,* at 2516 – 2517. This is language usually employed

to describe the discretion conferred upon administrative agencies, which need not adopt what courts would consider the interpretation most faithful to the text of the statute, but may choose some other interpretation, so long as it is within the bounds of the reasonable, and may later change to some *other* interpretation that is within the bounds of the reasonable. See *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Courts, by contrast, *must* give the statute its single, most plausible, reading. To describe this as an exercise of "delegated lawmaking authority" seems to me peculiar—unless one believes in lawmakers who have no discretion. Courts must apply judgment, to be sure. But judgment is not discretion.

**\*333** Even if I agreed with the Court's interpretation of "strong inference," I would not join the Court's opinion because of its frequent indulgence in the last remaining legal fiction of the West: that the report of a single committee of a single House expresses the will of Congress. The Court says, for example, that "Congress'[s] purpose" was "to promote greater uniformity among the Circuits," *ante,* at 2509, relying for that certitude upon the statement of managers accompanying a House Conference Committee Report whose text was never adopted by the House, much less by the Senate, and as far as we know was read by almost no one. The Court is sure that Congress " 'inten [ded] to strengthen existing pleading requirements,' " *ante,* at 2509, because—again—the statement of managers said so. I come to the same conclusion for the much safer reason that the law which Congress adopted (and which the Members of both Houses actually *voted* on) so indicates. And had the legislation not done so, the statement of managers assuredly could not have remedied the deficiency.

With the above exceptions, I am generally in agreement with the Court's analysis, and so concur in its judgment.

Justice ALITO, concurring in the judgment.

I agree with the Court that the Seventh Circuit used an erroneously low standard for determining whether the plaintiffs in this case satisfied their burden of pleading "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). I further agree that the case should be remanded to allow the lower courts to decide in the first instance whether the allegations survive under the correct standard. In two respects, however, I disagree with the opinion of the Court. First, the best interpretation of the statute is that

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

only those facts that are **2516 alleged "with particularity" may properly be considered in determining whether the allegations of scienter are sufficient. Second, I agree with Justice SCALIA that a "strong inference" of scienter, *334 in the present context, means an inference that is more likely than not correct.

I

On the first point, the statutory language is quite clear. Section 78u–4(b)(2) states that "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Thus, "a strong inference" of scienter must arise from those facts that are stated "with particularity." It follows that facts not stated with the requisite particularity cannot be considered in determining whether the strong-inference test is met.

In dicta, however, the Court states that "omissions and ambiguities" merely "count against" inferring scienter, and that a court should consider all allegations of scienter, even nonparticularized ones, when considering whether a complaint meets the "strong inference" requirement. *Ante,* at 2511. Not only does this interpretation contradict the clear statutory language on this point, but it undermines the particularity requirement's purpose of preventing a plaintiff from using vague or general allegations in order to get by a motion to dismiss for failure to state a claim. Allowing a plaintiff to derive benefit from such allegations would permit him to circumvent this important provision.

Furthermore, the Court's interpretation of the particularity requirement in no way distinguishes it from normal pleading review, under which a court naturally gives less weight to allegations containing "omissions and ambiguities" and more weight to allegations stating particularized facts. The particularity requirement is thus stripped of all meaning.

Questions certainly may arise as to whether certain allegations meet the statutory particularity requirement, but where that requirement is violated, the offending allegations cannot be taken into account.

*335 II

I would also hold that a "strong inference that the defendant acted with the required state of mind" is an inference that is stronger than the inference that the defendant lacked the required state of mind. Congress has provided very little guidance regarding the meaning of "strong inference," and the difference between the Court's interpretation (the inference of scienter must be at least as strong as the inference of no scienter) and Justice SCALIA's (the inference of scienter must be at least marginally stronger than the inference of no scienter) is unlikely to make any practical difference. The two approaches are similar in that they both regard the critical question as posing a binary choice (either the facts give rise to a "strong inference" of scienter or they do not). But Justice SCALIA's interpretation would align the pleading test under § 78u–4(b)(2) with the test that is used at the summary-judgment and judgment-as-a-matter-of-law stages, whereas the Court's test would introduce a test previously unknown in civil litigation. It seems more likely that Congress meant to adopt a known quantity and thus to adopt Justice SCALIA's approach.

Justice STEVENS, dissenting.
As the Court explains, when Congress enacted a heightened pleading requirement for private actions to enforce the federal securities laws, it "left the key term 'strong inference' undefined." **2517 *Ante,* at 2504 – 2505. It thus implicitly delegated significant lawmaking authority to the Judiciary in determining how that standard should operate in practice. Today the majority crafts a perfectly workable definition of the term, but I am persuaded that a different interpretation would be both easier to apply and more consistent with the statute.

The basic purpose of the heightened pleading requirement in the context of securities fraud litigation is to protect defendants from the costs of discovery and trial in unmeritorious *336 cases. Because of its intrusive nature, discovery may also invade the privacy interests of the defendants and their executives. Like citizens suspected of having engaged in criminal activity, those defendants should not be required to produce their private effects unless there is probable cause to believe them guilty of misconduct. Admittedly, the probable-cause standard is not capable of precise measurement, but it is a concept that is familiar to judges. As a matter of normal English usage, its meaning is roughly the same as "strong inference." Moreover, it is most unlikely that Congress intended us to adopt a standard

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

that makes it more difficult to commence a civil case than a criminal case.[1]

In addition to the benefit of its grounding in an already familiar legal concept, using a probable-cause standard would avoid the unnecessary conclusion that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court *must* take into account plausible opposing inferences." *Ante*, at 2509 (emphasis added). There are times when an inference can easily be deemed strong without any need to weigh competing inferences. For example, if a known drug dealer exits a building immediately after a **\*337** confirmed drug transaction, carrying a suspicious looking package, a judge could draw a strong inference that the individual was involved in the aforementioned drug transaction without debating whether the suspect might have been leaving the building at that exact time for another unrelated reason.

If, using that same methodology, we assume (as we must, see *ante*, at 2509 − 2510, 2511) the truth of the detailed factual allegations attributed to 27 different confidential informants described in the complaint, App. 91–93, and view those allegations collectively, I think it clear that they establish probable cause to believe that Tellabs' chief executive officer "acted with the required intent," as the Seventh Circuit held.[2] 437 F.3d 588, 602 (2006).

**\*\*2518** Accordingly, I would affirm the judgment of the Court of Appeals.

**All Citations**

551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335, 07 Cal. Daily Op. Serv. 7139, 2007 Daily Journal D.A.R. 9258, 20 Fla. L. Weekly Fed. S 374

**Footnotes**

| | |
|---|---|
| \* | The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U.S. 321, 337, 26 S.Ct. 282, 50 L.Ed. 499. |
| 1 | The Shareholders brought suit against Tellabs executives other than Notebaert, including Richard Birck, Tellabs' chairman and former chief executive officer. Because the claims against the other executives, many of which have been dismissed, are not before us, we focus on the allegations as they relate to Notebaert. We refer to the defendant-petitioners collectively as "Tellabs." |
| 2 | See, *e.g.*, 437 F.3d 588, 602 (C.A.7 2006) (decision below); *Brown v. Credit Suisse First Boston Corp.*, 431 F.3d 36, 49, 51 (C.A.1 2005); *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 347–349 (C.A.4 2003); *Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1187–1188 (C.A.10 2003); *Gompper v. VISX, Inc.*, 298 F.3d 893, 896–897 (C.A.9 2002); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (C.A.6 2001) (en banc). |
| 3 | We have previously reserved the question whether reckless behavior is sufficient for civil liability under § 10(b) and Rule 10b–5. See *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194, n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Every Court of Appeals that has considered the issue has held that a plaintiff may meet the scienter requirement by showing that the defendant acted intentionally or recklessly, though the Circuits differ on the degree of recklessness required. See *Ottmann*, 353 F.3d, at 343 (collecting cases). The question whether and when recklessness satisfies the scienter requirement is not presented in this case. |
| 4 | Nothing in the PSLRA, we have previously noted, casts doubt on the conclusion "that private securities litigation [i]s an indispensable tool with which defrauded investors can recover their losses"—a matter crucial to the integrity of domestic capital markets. See *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81, 126 S.Ct. 1503, 164 L.Ed.2d 179 (2006) (internal quotation marks omitted). |
| 5 | Justice SCALIA objects to this standard on the ground that "[i]f a jade falcon were stolen from a room to which only A and B had access," it could not "*possibly* be said there was a 'strong inference' that B was the thief." *Post*, at 2513 (opinion concurring in judgment) (emphasis in original). We suspect, however, that law enforcement officials as well as the owner of the precious falcon would find the inference of guilt as to B quite strong—certainly strong enough to warrant further |

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)

127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

investigation. Indeed, an inference at least as likely as competing inferences can, in some cases, warrant recovery. See *Summers v. Tice,* 33 Cal.2d 80, 84–87, 199 P.2d 1, 3–5 (1948) (plaintiff wounded by gunshot could recover from two defendants, even though he most he could prove was that each defendant was at least as likely to have injured him as the other); Restatement (Third) of Torts § 28(b), Comment *e,* p. 504 (Proposed Final Draft No. 1, Apr. 6, 2005) ("Since the publication of the Second Restatement in 1965, courts have generally accepted the alternative-liability principle of [*Summers v. Tice,* adopted in] § 433B(3), while fleshing out its limits."). In any event, we disagree with Justice SCALIA that the hardly stock term "strong inference" has only one invariably right ("natural" or "normal") reading—his. See *post,* at 2514 – 2515.

Justice ALITO agrees with Justice SCALIA, and would transpose to the pleading stage "the test that is used at the summary-judgment and judgment-as-a-matter-of-law stages." *Post,* at 2516 (opinion concurring in judgment). But the test at each stage is measured against a different backdrop. It is improbable that Congress, without so stating, intended courts to test pleadings, unaided by discovery, to determine whether there is "no genuine issue as to any material fact." See Fed. Rule Civ. Proc. 56(c). And judgment as a matter of law is a post-trial device, turning on the question whether a party has produced evidence "legally sufficient" to warrant a jury determination in that party's favor. See Rule 50(a)(1).

6    The Seventh Circuit held that allegations of scienter made against one defendant cannot be imputed to all other individual defendants. 437 F.3d, at 602–603. See also *id.,* at 603 (to proceed beyond the pleading stage, the plaintiff must allege as to each defendant facts sufficient to demonstrate a culpable state of mind regarding his or her violations (citing *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1018 (C.A.11 2004))). Though there is disagreement among the Circuits as to whether the group pleading doctrine survived the PSLRA, see, *e.g.,Southland Securities Corp. v. INSpire Ins. Solutions Inc.,* 365 F.3d 353, 364 (C.A.5 2004), the Shareholders do not contest the Seventh Circuit's determination, and we do not disturb it.

7    The Seventh Circuit raised the possibility of a Seventh Amendment problem on its own initiative. The Shareholders did not contend below that dismissal of their complaint under § 21D(b)(2) would violate their right to trial by jury. Cf. *Monroe Employees Retirement System v. Bridgestone Corp.,* 399 F.3d 651, 683, n. 25 (C.A.6 2005) (noting possible Seventh Amendment argument but declining to address it when not raised by plaintiffs).

8    In numerous contexts, gatekeeping judicial determinations prevent submission of claims to a jury's judgment without violating the Seventh Amendment. See, *e.g., Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (expert testimony can be excluded based on judicial determination of reliability); *Neely v. Martin K. Eby Constr. Co.,* 386 U.S. 317, 321, 87 S.Ct. 1072, 18 L.Ed.2d 75 (1967) (judgment as a matter of law); *Pease v. Rathbun–Jones Engineering Co.,* 243 U.S. 273, 278, 37 S.Ct. 283, 61 L.Ed. 715 (1917) (summary judgment).

9    Any heightened pleading rule, including Fed. Rule Civ. Proc. 9(b), could have the effect of preventing a plaintiff from getting discovery on a claim that might have gone to a jury, had discovery occurred and yielded substantial evidence. In recognizing Congress' or the Federal Rule makers' authority to adopt special pleading rules, we have detected no Seventh Amendment impediment.

*    The Court suggests that "the owner of the precious falcon would find the inference of guilt as to B quite strong." *Ante,* at 2510, n. 5. If he should draw such an inference, it would only prove the wisdom of the ancient maxim "*aliquis non debet esse Judex in propria causa*"—no man ought to be a judge of his own cause. *Dr. Bonham's Case,* 8 Co.Rep. 107a, 114a, 118a, 77 Eng. Rep. 638, 646, 652 (C.P. 1610). For it is quite clear (from the dispassionate perspective of one who does not own a jade falcon) that a *possibility,* even a strong possibility, that B is responsible is not a strong *inference* that B is responsible. "Inference" connotes "belief" in what is inferred, and it would be impossible to form a strong belief that it was B and not A, or A and not B.

1    The meaning of a statute can only be determined on a case-by-case basis and will, in each case, turn differently on the clarity of the statutory language, its context, and the intent of its drafters. Here, in my judgment, a probable-cause standard is more faithful to the intent of Congress, as expressed in both the specific pleading requirement and the statute as a whole, than the more defendant-friendly interpretation that Justice SCALIA prefers. He is clearly wrong in concluding that in divining the meaning of this term, we can merely "read the language for what it says," and that it is susceptible to only one reading. *Ante,* at 2514 (opinion concurring in judgment). He argues that we "must be content to give 'strong inference' its normal meaning," *ibid.,* and yet the "normal meaning" of a term such as "strong inference" is surely in the

Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007)
127 S.Ct. 2499, 168 L.Ed.2d 179, 75 USLW 4462, Fed. Sec. L. Rep. P 94,335...

eye of the beholder. As the Court's opinion points out, Courts of Appeals have divided on the meaning of the standard, see *ante,* at 2504 – 2505, 2508 – 2509, and today, the Members of this Court have done the same. Although Justice SCALIA may disagree with the Court's reading of the term, he should at least acknowledge that, in this case, the term itself is open to interpretation.

2    The "channel stuffing" allegations in ¶¶ 62–72 of the amended complaint, App. 110–113, are particularly persuasive. Contrary to petitioners' arguments that respondents' allegations of channel stuffing "are too vague or ambiguous to contribute to a strong inference of scienter," *ante,* at 2511, this portion of the complaint clearly alleges that Notebaert himself had specific knowledge of illegitimate channel stuffing during the relevant time period, see, *e.g.,* App. 111, ¶ 67 ("Defendant Notebaert worked directly with Tellabs' sales personnel to channel stuff SBC"); *id.,* at 110–112 (alleging, in describing such channel stuffing, that Tellabs took "extraordinary" steps that amounted to "an abnormal practice in the industry"; that "distributors were upset and later returned the inventory" (and, in the case of Verizon's chairman, called Tellabs to complain); that customers "did not want" products that Tellabs sent and that Tellabs employees wrote purchase orders for; that "returns were so heavy during January and February 2001 that Tellabs had to lease extra storage space to accommodate all the returns"; and that Tellabs "backdat[ed] sales" that actually took place in 2001 to appear as having occurred in 2000). If these allegations are actually taken as true and viewed in the collective, it is hard to imagine what competing inference could effectively counteract the inference that Notebaert and Tellabs " 'acted with the required state of mind.' " *Ante,* at 2513 (opinion of the Court) (quoting 15 U.S.C. § 78u–4(b)(2)).

---

End of Document    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

663 F.3d 770
United States Court of Appeals, Fifth Circuit.

Ada D. TURNER; Ronnie
Turner, Plaintiffs–Appellants,

v.

Neal E. PLEASANT; RPIA of Delaware,
Incorporated; Standard Fire Insurance
Company, Defendants–Appellees.

No. 11–30129
|
Nov. 23, 2011.
|
As Revised Dec. 16, 2011.

**Synopsis**
**Background:** Following affirmance, 127 Fed.Appx. 140, of
both the final judgment entered in a personal injury action,
2004 WL 169801, and the denial of the plaintiffs' motion
for new trial and/or to recuse, 2004 WL 612960, and the
subsequent impeachment and removal from office of the
District Judge who made those decisions, plaintiffs brought
independent action in equity seeking to reopen, alleging that
the judgment was procured by fraud involving the District
Judge. The United States District Court for the Eastern
District of Louisiana, Lance M. Africk, J., dismissed, and
plaintiffs appealed.

**[Holding:]** The Court of Appeals, Leslie H. Southwick,
Circuit Judge, held that allegations in complaint weighed in
favor of finding that the judgment should not be enforced.

Reversed and remanded.

West Headnotes (18)

**[1]** **Federal Courts** ⟜ Pleading
Court of Appeals reviews de novo a district
court's dismissal for failure to state a claim.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

15 Cases that cite this headnote

**[2]** **Federal Courts** ⟜ Dismissal for failure to
state a claim
Since a motion to dismiss for failure to state
a claim is viewed with disfavor and is rarely
granted, Court of Appeals, on appeal of a
decision to do so, construes facts in the light most
favorable to the nonmoving party. Fed.Rules
Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

489 Cases that cite this headnote

**[3]** **Federal Civil Procedure** ⟜ Insufficiency in
general
Dismissal is appropriate, pursuant to a motion
to dismiss for failure to state a claim, only if
the complaint fails to plead enough facts to state
a claim to relief that is plausible on its face.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

295 Cases that cite this headnote

**[4]** **Federal Civil Procedure** ⟜ Insufficiency in
general
A complaint must provide more than conclusions
to satisfy standards of a motion to dismiss for
failure to state a claim; although the complaint
need not contain detailed factual allegations, it
must allege enough facts to move the claim
across the line from conceivable to plausible.
Fed.Rules Civ.Proc.Rule 12(b)(6), 28 U.S.C.A.

166 Cases that cite this headnote

**[5]** **Federal Civil Procedure** ⟜ Insufficiency in
general
Determining whether the plausibility standard
for a complaint has been met within meaning of
a motion to dismiss for failure to state a claim is a
context-specific task that requires the reviewing
court to draw on its judicial experience and
common sense. Fed.Rules Civ.Proc.Rule 12(b)
(6), 28 U.S.C.A.

40 Cases that cite this headnote

Turner v. Pleasant, 663 F.3d 770 (2011)

**[6]    Res Judicata** ⟸ Claims or causes of action

**Res Judicata** ⟸ Claims or causes of action in general

Res judicata generally bars re-litigation of claims that actually were or should have been made earlier.

4 Cases that cite this headnote

**[7]    Res Judicata** ⟸ Purpose or function of doctrines

Doctrine of res judicata ensures the finality of judgments, shelters litigants from successive litigation, and conserves judicial resources.

4 Cases that cite this headnote

**[8]    Res Judicata** ⟸ Law or equity

Res judicata must at times yield to a well-pled independent action in equity.

1 Cases that cite this headnote

**[9]    Federal Civil Procedure** ⟸ Fraud; misconduct

**Federal Civil Procedure** ⟸ Time for instituting proceedings

In order to prevent an independent action in equity from making null the limitations of the related rule providing a right to relief for one year after judgment due to fraud, the injustice to be remedied must be so severe as to overcome the purposes of the doctrine of res judicata. Fed.Rules Civ.Proc.Rule 60(b)(3), 28 U.S.C.A.

1 Cases that cite this headnote

**[10]    Equity** ⟸ Nature and source of jurisdiction

Actions in equity are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs.

**[11]    Federal Civil Procedure** ⟸ Power of Court

The Federal Rules of Civil Procedure preserve a court's power to hear an independent action

to grant relief from a judgment. Fed.Rules Civ.Proc.Rule 60(d)(1), 28 U.S.C.A.

2 Cases that cite this headnote

**[12]    Federal Civil Procedure** ⟸ Fraud; misconduct

Allegations in complaint, in independent action in equity seeking to reopen final judgment in personal injury action, regarding the relationships between the District Judge and defendants' counsel, and between the Judge and defendants' expert witness, weighed in favor of finding that the judgment should not be enforced; allegations made it plausible that the defendants' attorney, their expert witness, and the Judge acted in their pecuniary self-interest at expense of the Court's integrity, and such self-dealing could have caused the Judge to enter judgment against the plaintiffs.

**[13]    Federal Civil Procedure** ⟸ Meritorious claims or defenses in general

Allegations in complaint, in independent action in equity seeking to reopen final judgment in personal injury action, that plaintiffs might have prevailed had the District Judge found the defendants' expert witness, who was the Judge's friend, less credible, made it plausible that plaintiffs' claim in the underlying case was meritorious, weighing in favor of finding that the judgment should not be enforced.

3 Cases that cite this headnote

**[14]    Federal Civil Procedure** ⟸ Fraud; misconduct

Simple fraud is insufficient to support an independent action in equity seeking to reopen a final judgment; rather, the fraud alleged must be of a greater order of magnitude.

6 Cases that cite this headnote

**[15]    Federal Civil Procedure** ⟸ Fraud; misconduct

Turner v. Pleasant, 663 F.3d 770 (2011)

Describing the degree of severity that separates simple fraud from the magnitude of fraud required in an independent action in equity seeking to reopen a final judgment will always escape precision.

3 Cases that cite this headnote

**[16]    Federal Civil Procedure** ⚖ Fraud; misconduct

Allegations of fraud raised in complaint, in independent action in equity seeking to reopen final judgment in personal injury action, were of sufficient magnitude to weigh in favor of finding that the judgment should not be enforced; complaint alleged facts that made it plausible that the defendants' attorney and their expert witness conspired with the District Judge, and that the attorney and the Judge acted in a manner calculated to prevent the Court of Appeals from undertaking meaningful appellate review.

**[17]    Federal Civil Procedure** ⚖ Fraud; misconduct

Allegations in complaint, in independent action in equity seeking to reopen final judgment in personal injury action, that plaintiffs were not at fault for failing to uncover the fraud in the case, weighed in favor of finding that the judgment should not be enforced; allegations raised a reasonable inference that the District Judge and the defendants' attorney conspired to prevent plaintiffs from ever learning the truth about the Judge's bias.

**[18]    Federal Civil Procedure** ⚖ Fraud; misconduct

Given that plaintiffs' opportunity to file a motion for relief from judgment in their underlying personal injury action had passed, they had no adequate remedy at law for alleged fraud in that case on the part of the District Judge, the defendants' attorney, and the defendants' expert witness, weighing in favor of finding, in independent action in equity seeking to reopen the underlying case, that such final judgment that

the judgment should not be enforced. Fed.Rules Civ.Proc.Rule 60(c), 28 U.S.C.A.

3 Cases that cite this headnote

**Attorneys and Law Firms**

*772 Russell Bennett Ramsey, Jr. (argued), New Orleans, LA, Ernest N. Souhlas, Souhlas Law Firm, Carter B. Wright, Law Office of Carter B. Wright, Covington, LA, for Plaintiffs–Appellants.

Elton Anthony Foster, Waller & Associates, Metairie, LA, Ralph S. Hubbard, III (argued), Reed S. Minkin, Lugenbuhl, Wheaton, Peck, Rankin & Hubbard, New Orleans, LA, for Defendants–Appellees.

Appeal from the United States District Court for the Eastern District of Louisiana.

Before JOLLY, HIGGINBOTHAM and SOUTHWICK, Circuit Judges.

**Opinion**

LESLIE H. SOUTHWICK, Circuit Judge:

Ada and Ronnie Turner seek to reopen a judgment entered in 2001. Their personal injury claims were heard in the United States District Court for the Eastern District of Louisiana. After a bench trial, Judge G. Thomas Porteous, Jr. entered judgment for the defendants. The Turners *773 moved for a new trial, or, alternatively, for Judge Porteous to recuse himself because of their claim that the judge had an overly close relationship with the defendants' attorney. Judge Porteous denied these motions. This court affirmed.

In June 2010, after Judge Porteous's impeachment, the Turners filed what they termed an independent action in equity in the same district court on the grounds that the judgment was procured by fraud involving the district judge. A new district judge dismissed the suit as barred by the doctrine of res judicata. We REVERSE and REMAND.

**FACTS**

On June 3, 2001, Ada and Ronnie Turner were on a small fishing boat on the Intracoastal Waterway in Houma,

Turner v. Pleasant, 663 F.3d 770 (2011)

Louisiana.[1] They were passed by a yacht controlled by Neal Pleasant. The Turners allege that the high speed and size of the yacht created large swells in the waterway. The swells grew so large that the Turners' boat was thrown into the air. The Turners claim that Ada Turner injured her back when she landed.

The Turners brought a personal injury lawsuit against the yacht's operator, owner, and insurance company: Neal Pleasant, RPIA of Delaware, and the Standard Fire Insurance Company, respectively. The case, filed in the Eastern District of Louisiana, was assigned to Judge G. Thomas Porteous, Jr. Originally, the defendants were represented by Mark S. Taylor, a lawyer in Metairie, Louisiana. One week before the preliminary conference, the defendants retained Richard A. Chopin as well. While Taylor still worked on the case, Chopin was designated as the trial attorney of record.

Chopin and Judge Porteous were friends. They would dine and travel together. Their relationship was such that Chopin served as an intermediary when a company unrelated to this litigation provided Judge Porteous with all-expenses-paid hunting trips. Chopin accompanied Judge Porteous on these trips, sharing a room at least twice. One of these trips occurred during the pendency of the original lawsuit, after the complaint was filed but three months before Chopin was retained by the defendants.

A central evidentiary battle at trial was between expert witnesses. The defendants' experts disputed the assertion that the yacht caused the wake and, even if it did, that Ada was injured. The defendants presented evidence that at the time of the accident, Ada suffered from a pre-existing injury to her lower back. Dr. Christopher Cenac, Sr. testified for the defendants. Chopin frequently retained Cenac to be the medical expert in personal injury cases. Like Chopin, Cenac and Judge Porteous spent time together outside of court including traveling on luxury hunts; they certainly appeared to be friends. Ultimately, Judge Porteous ruled in favor of the defendants, relying heavily on his determination that Cenac was more credible than the Turners' expert.

The Turners moved for a new trial and for the judge to recuse himself. Most of the motion concerned reasons for a new trial. Only the final paragraph presented arguments for recusal. No facts were introduced, but the motion asserted "the findings of fact and the conclusions of law reflect [partiality] and bias in favor of the defendant and/or defense counsel in this case." The defendants' response described the recusal motion

as "an act of ***774** desperation never previously witnessed" that "vituperatively attacked the Court and its integrity." The merits of the Turners' arguments were not addressed because the defendants refused to "dignify the plaintiffs' allegations by according them any additional print."

Judge Porteous denied both motions, explaining that any suggestion of partiality was "utterly unsubstantiated," "unfounded and without merit," and "not supported by any evidence." He admitted to being Chopin's friend and asserted, inaccurately according to the current pleadings, that he was friends with the Turners' counsel as well. The plaintiffs appealed.

On appeal, the judge's insistence of his impartiality and the absence of any factual support for the allegations led this court to deny the "unsupported" claims and affirm the district court's orders. *Turner v. Pleasant,* 127 Fed.Appx. 140, 141 (5th Cir.2005). For two years, the case appeared resolved.

In May 2007, the Department of Justice sent a Complaint of Misconduct against Judge Porteous to the Chief Judge of this court regarding misconduct unrelated to this case. After investigating the complaint, the Judicial Council of the Fifth Circuit determined that Judge Porteous's misconduct might be grounds for impeachment. Accordingly, it certified its determination to the Judicial Conference of the United States. The Judicial Conference unanimously decided to transmit the report to the House of Representatives, pursuant to 28 U.S.C. § 355(b)(1).

On September 17, 2008, the House of Representatives authorized the House Judiciary Committee to conduct an investigation to determine whether impeachment was warranted. This authorization was renewed at the beginning of the 111th Congress. In January 2009, the House Judiciary Committee delegated the investigation to a special sub-committee. The sub-committee concluded its report in early 2010, and recommended to the full committee that Judge Porteous be impeached. The members of the full committee agreed, introducing Articles of Impeachment on January 21, 2010. H.R. Res. 1031, 111th Cong. (2010).

On March 4, days before the House was to vote on the matter, the House Judiciary Committee printed a Report detailing its investigation into Judge Porteous's misconduct. On March 11, 2010, the House unanimously voted to impeach on four articles of impeachment. 156 Cong. Rec. H1334–1337 (daily ed. Mar. 11, 2010). On December 8, 2010, the Senate removed

Judge Porteous from office. 156 Cong. Rec. S8608–11 (daily ed. Dec. 8, 2010).

This personal injury action was one of the cases discussed in the report of the House Judiciary Committee. Placing *Turner v. Pleasant* in context of Judge Porteous's other alleged misconduct, the House Report stated that, at the time the Turners filed their motion for recusal, Judge Porteous was presiding over another trial in which Chopin was an attorney. At that trial, Chopin was representing a company that secretly provided the judge with all-expenses-paid hunting trips. Chopin served as the intermediary for these gifts. The Turners, after reviewing the House Report, filed a new complaint seeking to set aside the prior judgment.

The new cause of action repeated the argument concerning Judge Porteous's relationship with Chopin. But it also made new allegations. The complaint alleged that the defendants and Chopin improperly used Cenac as a witness in an attempt to gain favorable treatment. It also gathered facts and details from the House Report. The complaint claimed Chopin frequently bought meals for Judge Porteous, **\*775** that the judge and the defendants' expert witness were friends who hunted together, that Chopin and the judge shared a hotel room while the underlying case was on appeal to this court, and that Judge Porteous made deceptive statements in his order denying recusal in an attempt to hide his relationship with Chopin and cloud the record on appeal.

The defendants filed a motion to dismiss on the basis that the complaint was barred by res judicata. The district court granted the motion. The court held that the complaint, as a collateral attack on a prior judgment, was barred by res judicata. It also discussed in a footnote the claim of fraud, finding it unsupported by any facts. The Turners timely appealed.

## DISCUSSION

**[1]    [2]    [3]    [4]    [5]**   We review *de novo* a district court's dismissal for failure to state a claim. *Colony Ins. Co. v. Peachtree Constr., Ltd.,* 647 F.3d 248, 252 (5th Cir.2011). We construe facts in the light most favorable to the nonmoving party, as a motion to dismiss under 12(b)(6) "is viewed with disfavor and is rarely granted." *Harrington v. State Farm Fire & Cas. Co.,* 563 F.3d 141, 147 (5th Cir.2009) (quotation marks and citation omitted). Dismissal is appropriate only if the complaint fails to plead "enough facts to state a claim

to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).[2] To satisfy this standard, the complaint must provide more than conclusions, but it "need not contain detailed factual allegations." *Colony Ins. Co.,* 647 F.3d at 252. Yet, it must allege enough facts to move the claim "across the line from conceivable to plausible." *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955. Determining whether the plausibility standard has been met is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1950, 173 L.Ed.2d 868 (2009).

**[6]    [7]**   The Turners filed an independent action in equity.[3] A significant hurdle for them, one the district court found had not been cleared, was that a few years earlier they had made the same general assertions in the district court and on the appeal from the final judgment. Res judicata generally bars re-litigation of claims that actually were or should have been made earlier. *Test Masters Educ. Servs., Inc. v. Singh,* 428 F.3d 559, 571 (5th Cir.2005). The doctrine ensures the finality of judgments, shelters litigants from successive litigation, and conserves judicial resources. *Procter & Gamble Co. v. Amway Corp.,* 376 F.3d 496, 499 (5th Cir.2004).

**[8]    [9]    [10]    [11]**   Res judicata must at times yield to a well-pled independent action in equity. *See United States v. Beggerly,* 524 U.S. 38, 45–46, 118 S.Ct. 1862, 141 L.Ed.2d 32 (1998). In order to prevent an independent action in equity from making null the limitations of the related Rule 60(b)(3) right to relief for one year after judgment due to fraud, the injustice to be remedied must be so severe as to overcome the purposes for the doctrine of res judicata. *Id.* at 47, 118 S.Ct. 1862. The actions are "governed not by rule or statute but by **\*776** the control necessarily vested in courts to manage their own affairs." *See Chambers v. NASCO, Inc.,* 501 U.S. 32, 43, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991) (quotation marks and citation omitted). The Federal Rules preserved a court's power to hear an independent action to grant relief from a judgment. *See* Fed.R.Civ.P. 60(d)(1).

The defendants argue one of our precedents controls and should cause us to affirm. *See Addington v. Farmer's Elevator Mut. Ins. Co.,* 650 F.2d 663 (5th Cir.1981). In that case, a litigant sought to reopen a judgment by claiming the judge was biased and that a witness committed perjury. *Id.* at 668. On appeal, we discussed that the plaintiff presented both an independent action for relief from judgment, which would be under Rule 60(d)(1), and a claim of fraud on the court—a Rule

Turner v. Pleasant, 663 F.3d 770 (2011)

60(d)(3) claim. *Id.* at 667 n. 6. We held the independent action failed because "the plaintiff has alleged no facts indicating that the issues raised were not open to litigation in the former action or that he was denied a fair opportunity to make his claim or defense" in the original lawsuit. *Id.* at 668. The case did not limit this court's historic power to set aside past judgments when necessary to preserve the integrity of the courts, but it did require a proper pleading to invoke that power.

In our analysis, we identified five elements of an independent action in equity: (1) a prior judgment which "in equity and good conscience" should not be enforced; (2) a meritorious claim in the underlying case; (3) fraud, accident, or mistake which prevented the party from obtaining the benefit of their claim; (4) the absence of fault or negligence on the part of the party; and (5) the absence of an adequate remedy at law. *Addington,* 650 F.2d at 667–68.

The Turners allege that the defendants or their agents improperly exploited the relationships between Judge Porteous and Chopin as well as between the judge and Cenac. The House Report, excerpted in the complaint, details the claim that Chopin served as a middleman for improper gifts and payments to Judge Porteous from a company that appeared before him in another case. H.R.Rep. No. 111–427, at 127 (2010). Allegedly, the Turners' recusal motion threatened to disclose this fact. Moreover, the Report claims that Judge Porteous ruled in a manner which prevented a fair assessment of the recusal motion on appeal. This tactic allegedly was also employed by Chopin, who refused to refute the merits of the motion, instead simply labeling the allegations "unsubstantiated."

The Turners also alleged that Judge Porteous inhibited any investigation of his relationships. "He disclosed no pertinent material facts about his relationship with Chopin, failed to address the discrete allegations known and raised by the moving counsel and made deceptive statements that distorted the factual record as to his relationship with the attorney at issue." *Id.* at 135. As alleged in the Report, his conduct "assured affirmance on appeal of his denial of the recusal motion, and a victory below for Chopin." *Id.* Allegedly, Chopin and Porteous engaged in a "sustained effort to keep Judge Porteous's hunting trips a secret from litigants who would have reason to believe their interests before the court might be affected." *Id.* at 136 n. 643. This is far more than an allegation of friendship by the judge for an attorney and a witness.

**[12]** These allegations make it plausible that Chopin, Cenac, and Porteous acted in their pecuniary self-interest at the expense of the court's integrity. Such self-dealing could have caused Judge Porteous to enter judgment against the Turners. If this proves to be true, the judgment should not be enforced **\*777** because equity will not enforce judgments procured by fraud or bribery. *See* Restatement (Second) of Judgments § 70 (1982).

**[13]** Next, the Turners allege that their personal injury claim is meritorious. They claim the outcome of the trial hinged on credibility determinations made by the trier of fact. If Judge Porteous had found Cenac to be less credible, it is plausible that the Turners would have prevailed. Because it is plausible that the Turners may present a winning claim, we cannot say it is without merit.

**[14]** **[15]** We also require a plausible allegation of fraud. Simple fraud is insufficient. If that is the case, a motion under Rule 60(b)(3) is the proper vehicle to reopen judgment. *See Beggerly,* 524 U.S. at 46, 118 S.Ct. 1862. Rather, the fraud alleged must be of a greater order of magnitude. Describing the degree of severity that separates the two types of fraud will always escape precision. *Cf. In re Levander,* 180 F.3d 1114, 1119–20 (9th Cir.1999); *Wilkin v. Sunbeam Corp.,* 466 F.2d 714, 717 (10th Cir.1972); 11 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2870 (2d ed. 1987).

**[16]** The Turners' complaint alleges facts that make it plausible that Chopin and Cenac conspired with the district judge, and that Chopin and the judge—both officers of the court—acted in a manner calculated to prevent this court from undertaking meaningful appellate review. This court, like the public at large, relies on the integrity and honesty of the district judges. We presume judges to be honest. *See Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). When confronted with such unusual facts, it is at least plausible that the district court did not perform its task in the manner expected.

This case's historic context amplifies this concern. Judge Porteous is only the eighth judge ever impeached and removed from office by the United States Congress. When viewing the complaint in its proper context, assuming all the facts alleged are true, and construing it in the light most favorable to the Turners, we conclude that it is plausible that there was fraud of a sufficient magnitude that the procedural requirements of Rule 60(b)(3) do not control.

[17]    Our inquiry does not end there. The Turners must also allege that they were not at fault for failing to uncover the fraud. The Turners argue that they used every tool at their disposal during the original trial. The defendants contend that this is not true, as the Turners could have sought to depose Judge Porteous or Chopin in order to develop a more detailed factual record. Yet the Turners' counsel did diligently bring a motion for recusal upon learning of Judge Porteous's trip with Chopin. The House Report asserts that Chopin and Porteous attacked the complaint in tandem to "seal off further inquiry into" the relationship. H.R.Rep. No. 111–427, at 135.

We disagree that the alleged scheme was discoverable by the Turners simply because it was eventually uncovered by the House of Representatives. The House of Representatives is part of a co-equal branch of government. It has the power to compel testimony. *See Watkins v. United States,* 354 U.S. 178, 200–01, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957). It has the power to hold those who refuse to testify in contempt. *Id.* at 207 n. 45, 77 S.Ct. 1173. By comparison, the Turners would have been forced to seek Judge Porteous's permission to conduct depositions. Regardless of any suggestions of additional efforts they might have undertaken, the Turners'

ability to **\*778** uncover immediately after trial what the House Report later claimed was occurring was virtually nonexistent.

Assuming the allegations contained in the complaint are true, there is a reasonable inference that Porteous and Chopin conspired to prevent the Turners from ever learning the truth about Porteous's bias. With the presiding judge and opposing counsel both actively attempting to hide facts from the Turners, the Turners have put forward sufficient facts to plausibly allege that they were not at fault for failing to uncover the fraud.

[18]    We are left with the last element. The Turners must allege they have no adequate remedy at law. They do not. The opportunity to file a Rule 60(b) motion passed long ago. *See* Fed.R.Civ.P. 60(c).

We REVERSE the district court's dismissal and REMAND.

**All Citations**

663 F.3d 770

### Footnotes

1    These facts are drawn from the Turners' complaint and, given the posture of the case, are accepted as true. *Hale v. King,* 642 F.3d 492, 498–99 (5th Cir.2011).

2    The complaint includes Plaintiffs' Exhibit A, which is a collection of excerpts from the House Report. *See* Fed.R.Civ.P. 10(c).

3    Such an action is distinct from a motion to set aside a judgment for fraud on the court. *Compare* Fed.R.Civ.P. 60(d)(1) *with* Fed.R.Civ.P. 60(d)(3). Even so, the fraud alleged in an independent action may be of the kind that could accurately be described as fraud on the court. *See George P. Reintjes Co. v. Riley Stoker Corp.,* 71 F.3d 44, 48–49 (1st Cir.1995).

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

396 F.Supp.3d 720
United States District Court, S.D. Texas, Houston Division.

Robert HACK, Plaintiff,

v.

Theodore M. WRIGHT, et al, Defendants.

Civil Action No. 4:14-CV-3442
|
Signed 07/05/2019

## Synopsis

**Background:** Shareholder filed derivative action on behalf of corporation against members of corporation's board of directors and executive officers for breach of fiduciary duty, unjust enrichment, gross mismanagement, and insider trading, alleging defendants knew that corporation lowered its underwriting standards and offered credit lines to customers who lacked creditworthiness, which led to financial problems of which defendants were aware, that board of directors knowingly approved false and misleading public statements, that the false and misleading information presented to the public artificially inflated stock prices, and that individual defendants sold shares on the basis of material non-public information about corporation's true financial condition. Defendants filed motion to dismiss for failure to plead demand futility and motion to dismiss for failure to state a claim.

**Holdings:** The District Court, adopted report and recommendation of Dena Hanovice Palermo, United States Magistrate Judge, which held that:

[1] corporation's certificate of incorporation exculpated board of directors from liability to the extent authorized by statute;

[2] chief executive officer (CEO) and board member lacked independence, and thus pre-suit demand that CEO and board member pursue breach of fiduciary duty claim was excused;

[3] directors who were members of audit committee and who were placed on board by third-party company did not lack independence, and thus demand would not have been futile on such basis;

[4] shareholder sufficiently pled fraud in regards to statements made by inside director and corporate officers, as required in derivative suits alleging breach of fiduciary duties based on dissemination of false information;

[5] shareholder failed to allege that defendants used material, nonpublic information improperly, as required to state a claim for insider trading;

[6] allowing shareholder to amend complaint to obtain books and records through inspection demand would not be futile; and

[7] leave to amend would not be denied on basis that shareholder was dilatory.

Motions granted.

West Headnotes (67)

**[1]    Corporations and Business Organizations** ⮞ Derivative actions

Because rule governing shareholder derivative actions, requiring shareholder derivative complaint to state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members and the reasons for not obtaining the action or not making the effort, does not identify substantive standards, the particularity of a plaintiff's pleadings is governed by the standards of the state of incorporation. Fed. R. Civ. P. 23.1.

**[2]    Corporations and Business Organizations** ⮞ Authority of directors

When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved.

[3]    **Corporations and Business Organizations** ⟜ Evidence

Under Delaware law, directors on corporation's board of directors are entitled to the presumption that they were faithful to their fiduciary duties.

[4]    **Corporations and Business Organizations** ⟜ Nature and Form of Remedy

Under Delaware law, in a stockholder derivative suit, a stockholder pursues a cause of action that belongs to the corporation.

[5]    **Corporations and Business Organizations** ⟜ Necessity of demand

**Corporations and Business Organizations** ⟜ Interest of director or officer in lawsuit or lack of independence

Under Delaware law, a stockholder may not pursue a stockholder derivative suit to assert a claim of the corporation unless the stockholder: (1) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so, or (2) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of litigation. Fed. R. Civ. P. 23.1.

[6]    **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under Delaware law, where plaintiff in stockholder derivative suit does not make a pre-suit demand on the board of directors, the complaint must plead with particularity facts showing that a demand on the board would have been futile in order to overcome the business judgment presumption. Fed. R. Civ. P. 23.1.

[7]    **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under Delaware law, just as under its federal counterparts, the standard for pleading demand futility in shareholder derivative suit is more stringent than on a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6), 23.1.

[8]    **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under Delaware law, plaintiff must plead particularized factual statements that are essential to the claim to satisfy standard for pleading demand futility in shareholder derivative suit. Fed. R. Civ. P. 23.1.

[9]    **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under Delaware law, plaintiff need not plead evidence to satisfy standard for pleading demand futility in shareholder derivative suit. Fed. R. Civ. P. 23.1.

[10]    **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under standard of pleading demand futility in shareholder derivative suit, plaintiff is entitled to all reasonable inferences that logically flow from particularized facts under Delaware law. Fed. R. Civ. P. 23.1.

[11]    **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under Delaware law, to satisfy standard for pleading demand futility in shareholder derivative suit, plaintiffs must show that a majority, or in a case where there are an even number of directors, exactly half, of the board

was incapable of considering demand. Fed. R. Civ. P. 23.1.

[12]    **Corporations and Business Organizations** ⬅ Excuse for Failure to Demand; Futility

Under Delaware law, demand futility of a derivative action must be determined on a claim-by-claim basis. Fed. R. Civ. P. 23.1.

[13]    **Corporations and Business Organizations** ⬅ Allegations of excuse for failure to demand; futility

Under Delaware law, to determine demand futility under the *Aronson* test, 473 A.2d 805, to determine whether allegations of complaint sufficiently plead demand futility, which applies when plaintiff challenges a board transaction or decision in shareholder derivative suit, the court must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent, or (2) the challenged transaction was otherwise the product of a valid exercise of business judgment; the prongs are disjunctive, so if either prong is satisfied, demand is excused. Fed. R. Civ. P. 23.1.

1 Cases that cite this headnote

[14]    **Corporations and Business Organizations** ⬅ Interest of director or officer in lawsuit or lack of independence

Directorial interest exists under Delaware law, as would excuse demand under *Aronson* test, 473 A.2d 805, to determine whether allegations of complaint in stockholder derivative suit sufficiently plead demand futility, whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the shareholders. Fed. R. Civ. P. 23.1.

1 Cases that cite this headnote

[15]    **Corporations and Business Organizations** ⬅ Interest of director or officer in lawsuit or lack of independence

Under Delaware law, "directorial independence," as term is used in *Aronson* test, 473 A.2d 805, to determine whether allegations of complaint in stockholder derivative suit sufficiently plead demand futility, under which demand is excused if reasonable doubt is raised as to directorial interest and independence, means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences. Fed. R. Civ. P. 23.1.

[16]    **Corporations and Business Organizations** ⬅ Allegations of excuse for failure to demand; futility

Under Delaware law, where the plaintiff does not challenge a decision of a corporate board of directors in stockholder derivative suit, courts apply the *Rales* test, 634 A.2d 927, to determine demand futility, under which court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand. Fed. R. Civ. P. 23.1.

[17]    **Corporations and Business Organizations** ⬅ Allegations of excuse for failure to demand; futility

Under Delaware law, plaintiff in stockholder derivative suit can satisfy the *Rales* test, 634 A.2d 927, to determine demand futility, under which court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand, by showing that the directors would

face a substantial likelihood of personal liability by complying with a shareholder's demand to pursue litigation. Fed. R. Civ. P. 23.1.

[18]     **Corporations and Business Organizations** ☞ Interest of director or officer in lawsuit or lack of independence

Under Delaware law, likelihood of corporate directors' personal liability if they complied with shareholder's demand to pursue litigation must be substantial to satisfy *Rales* test, 634 A.2d 927, to determine demand futility in shareholder derivative suit, a mere threat is insufficient. Fed. R. Civ. P. 23.1.

[19]     **Corporations and Business Organizations** ☞ Excuse for Failure to Demand; Futility

Under Delaware law, stockholder derivative cases in which the plaintiff complains of inaction by corporate board of directors or a violation of the board's oversight duties are analyzed under the *Rales* test, 634 A.2d 927, to determine demand futility because the plaintiff does not challenge a conscious board decision; these are commonly referred to as *Caremark* claims, 698 A.2d 959. Fed. R. Civ. P. 23.1.

[20]     **Corporations and Business Organizations** ☞ Oversight

Under Delaware law, standard for corporate director oversight liability under *In re Caremark International Inc. Derivative Litigation*, 698 A.2d 959, applicable in stockholder derivate suits in which plaintiff complains of inaction by board of directors or violation of board's oversight duties, is that: (1) directors utterly failed to implement any reporting or information system or controls, or (2) having implemented such a system or controls, consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention.

[21]     **Corporations and Business Organizations** ☞ Exculpatory provisions in charter, articles of incorporation or bylaws

**Corporations and Business Organizations** ☞ Allegations of excuse for failure to demand; futility

Corporation's certificate of incorporation exculpated board of directors from liability to the extent authorized by statute, which heightened shareholder's burden in pleading demand futility and lessened directors' likelihood of personal liability in stockholder derivative suit under Delaware law; certificate stated that no director would be liable to corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director. 8 Del. Code § 102(b)(7); Fed. R. Civ. P. 23.1.

[22]     **Corporations and Business Organizations** ☞ Allegations of excuse for failure to demand; futility

Under Delaware law, where a corporation's certificate of incorporation includes an exculpatory provision, a serious threat of liability may only be found to exist if the plaintiff in stockholder derivative suit pleads a non-exculpated claim against the directors based on particularized facts.

[23]     **Corporations and Business Organizations** ☞ Allegations of excuse for failure to demand; futility

Under Delaware law, where corporate directors are exculpated under exculpatory provision in certificate of incorporation, plaintiff in stockholder derivative suit must also plead particularized facts that demonstrate that the directors acted with scienter, that is, that they had actual or constructive knowledge that their conduct was legally improper.

[24]     **Federal Civil Procedure** ☞ Matters considered in general

**Federal Civil Procedure** ☞ Motion

In securities cases, while the district court must ordinarily limit its review on a motion to dismiss to the complaint, court may consider public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission (SEC) without, pursuant to rule governing motions to dismiss, converting the motion into one for summary judgment. Fed. R. Civ. P. 12(b).

**[25]    Evidence** ⬩ Corporations and Associations

District court may take judicial notice of the certificate of incorporation in deciding a motion to dismiss on basis of demand futility in stockholder derivative suit. Fed. R. Civ. P. 12(b), 23.1.

**[26]    Corporations and Business Organizations** ⬩ Interest of director or officer in lawsuit or lack of independence

Corporation's chief executive officer (CEO) lacked independence, and thus demand that CEO pursue shareholder's breach of fiduciary duty claim prior to filing stockholder derivative action was excused under Delaware law; CEO was not listed as independent on proxy statement under NASDAQ rules. Fed. R. Civ. P. 23.1.

**[27]    Corporations and Business Organizations** ⬩ Allegations of excuse for failure to demand; futility

Under Delaware law, demand futility cannot be pleaded in stockholder derivative suit merely on the basis of allegations that inside directors would act to preserve their employment positions; if this were the case, every inside director would be disabled from considering a pre-suit demand. Fed. R. Civ. P. 23.1.

**[28]    Federal Civil Procedure** ⬩ Amendments by briefs or motion papers

Complaint cannot be amended by briefs in opposition to a motion to dismiss. Fed. R. Civ. P. 12(b).

**[29]    Corporations and Business Organizations** ⬩ Interest of director or officer in lawsuit or lack of independence

Corporate board member lacked independence, and thus demand that board member pursue shareholder's breach of fiduciary duty claim prior to filing stockholder derivative action was excused under Delaware law; board member was not listed as independent on proxy statement under NASDAQ rules. Fed. R. Civ. P. 23.1.

**[30]    Corporations and Business Organizations** ⬩ Interest of director or officer in lawsuit or lack of independence

Corporate directors who were members of audit committee did not lack independence or face a substantial likelihood of personal liability based on their membership on committee, and thus demand that directors pursue shareholder's breach of fiduciary duty claim prior to filing stockholder derivative action was not excused under Delaware law; mere membership on audit committee was not sufficient to excuse demand, and allegations were insufficient to create reasonable inference that directors knew that financial statements approved for dissemination were false or misleading. Fed. R. Civ. P. 23.1.

**[31]    Corporations and Business Organizations** ⬩ Allegations of excuse for failure to demand; futility

Under Delaware law, plaintiff in stockholder derivative suit may not excuse demand by merely making conclusory allegations that a director disseminated financial statements he knew to be false. Fed. R. Civ. P. 23.1.

**[32]    Corporations and Business Organizations** ⬩ Interest of director or officer in lawsuit or lack of independence

Corporate directors who were placed on board of directors by third-party company and its affiliates, which were significant longtime

shareholders of corporation, did not lack independence, and thus demand that directors pursue shareholder's breach of fiduciary duty claim prior to filing stockholder derivative action was not excused under Delaware law; there was no showing as to how third-party company or its affiliates had any interest in, or could have influenced in any way, board's challenged actions, and mere fact that board approved some transactions that might have benefited third-party company or its affiliates was not enough to show that company so controlled the directors' decisionmaking as to mean they lacked independence to consider a demand. Fed. R. Civ. P. 23.1.

[33]    **Corporations and Business Organizations** ⬮ Interest of director or officer in lawsuit or lack of independence

When arguing demand futility under Delaware law in stockholder derivative suit, it is not enough to charge that a corporate director was nominated by or elected at the behest of those controlling the outcome of a corporate election; that is the usual way a person becomes a corporate director. Fed. R. Civ. P. 23.1.

[34]    **Corporations and Business Organizations** ⬮ Interest of director or officer in lawsuit or lack of independence

Stock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control that would support assertion that corporate director lacked independence, as required for demand to be excused in stockholder derivative action under Delaware law. Fed. R. Civ. P. 23.1.

[35]    **Corporations and Business Organizations** ⬮ Interest of director or officer in lawsuit or lack of independence

To demonstrate lack of independence by corporate director, as would excuse pre-suit demand that director pursue the corporate claim in stockholder derivative suit, based

on allegation that director is dominated and controlled by a third-party business relationship, there must be some alleged nexus between the domination and the resulting personal benefit to the controlling party under Delaware law. Fed. R. Civ. P. 23.1.

[36]    **Corporations and Business Organizations** ⬮ Allegations of excuse for failure to demand; futility

Plaintiff in stockholder derivative suit charging domination or control of one or more corporate directors must allege particularized facts manifesting a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation or persons doing the controlling to demonstrate a lack of independence, as would excuse pre-suit demand that directors pursue the corporate claim under Delaware law. Fed. R. Civ. P. 23.1.

[37]    **Corporations and Business Organizations** ⬮ Interest of director or officer in lawsuit or lack of independence

Insured versus insured clause exclusion argument, based on allegation that there would be no corporate directors or officers liability insurance protection if individual directors or officers brought suit against themselves, but that there would be coverage if claim was asserted in a stockholder derivative action, does not support demand futility determination under Delaware law. Fed. R. Civ. P. 23.1.

[38]    **Corporations and Business Organizations** ⬮ Allegations of excuse for failure to demand; futility

Under Delaware law, "group allegations" against members of corporation's board of directors in stockholder derivative action that members breached their fiduciary duties by approving and disseminating false and misleading public disclosures were insufficient to excuse pre-suit demand that members pursue claim; specific facts were not alleged about what each member

knew, when and how board knew such facts, and that board, knowing such facts, nevertheless affirmatively authorized issuance of statements to the contrary, and how the board was actually involved in creating or approving the statements was not described with particularity. Fed. R. Civ. P. 23.1.

[39]     **Corporations and Business Organizations** ⟜ Excuse for Failure to Demand; Futility

Group allegations against corporate directors are insufficient to excuse demand in shareholder derivative suits under Delaware law, since plaintiff must plead with particularity the reasons for excusing demand as to each director individually. Fed. R. Civ. P. 23.1.

2 Cases that cite this headnote

[40]     **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Allegation that a majority of corporate directors approved, participated, or acquiesced in a challenged transaction will not, in and of itself, establish demand futility in stockholder derivative action under Delaware law. Fed. R. Civ. P. 23.1.

[41]     **Corporations and Business Organizations** ⟜ Oversight

**Corporations and Business Organizations** ⟜ Exculpatory provisions in charter, articles of incorporation or bylaws

Under Delaware law, corporate board of directors' breach of oversight responsibilities is a breach of the duty of loyalty, and thus not exculpated under statute providing for provision in certificate of incorporation eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director. 8 Del. Code § 102(b)(7).

[42]     **Corporations and Business Organizations** ⟜ Disclosure of information to corporation and shareholders or members

To plead a disclosure claim under Delaware law, alleging directors breached duty not to knowingly disseminate false information to stockholders, where there is no request for stockholder action, plaintiff must allege that the directors deliberately misinformed shareholder about the business of the corporation, either directly or by a public statement.

[43]     **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Under Delaware law, failure to plead particularized facts beyond conclusory allegations that demonstrated scienter, including how, when, and from whom corporate directors obtained knowledge upon which they knowingly violated duties of good faith and loyalty by disseminating false information to stockholders, precluded demand futility determination based on claim in shareholder derivative action that directors violated duty of loyalty by disseminating false information. Fed. R. Civ. P. 23.1.

[44]     **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Having found each of plaintiff's allegations of demand futility in stockholder derivative suit insufficient when considered in isolation, court must decide whether the totality of plaintiff's allegations demonstrate reasonable doubt about the board of directors' impartiality, as would support determination that demand was excused under Delaware law. Fed. R. Civ. P. 23.1.

[45]     **Corporations and Business Organizations** ⟜ Allegations of excuse for failure to demand; futility

Allegations of demand futility pertaining to breach of fiduciary duty claim in stockholder derivative action, considered cumulatively, failed to plead demand futility with particularity for at least half of the directors on the board, as would excuse pre-suit demand that directors pursue claim under Delaware law; having failed to make a demand to obtain books and records before filing complaint, shareholder submitted complaint that lacked particularized facts compromising the impartiality of board that would have acted on a demand, and shareholder sufficiently pled demand futility only for two members of the eight-member board. 8 Del. Code § 220; Fed. R. Civ. P. 23.1.

2 Cases that cite this headnote

[46]     **Corporations and Business Organizations** ⬥ Fiduciary Duties as to Management of Corporate Affairs in General

**Corporations and Business Organizations** ⬥ Degree of care required and negligence

**Implied and Constructive Contracts** ⬥ Unjust enrichment

Under Delaware law, claims for unjust enrichment and gross mismanagement are considered duplicative of claims for breach of fiduciary duty in stockholder derivative actions.

1 Cases that cite this headnote

[47]     **Corporations and Business Organizations** ⬥ Allegations of excuse for failure to demand; futility

Shareholder's allegations in derivative suit regarding insider trading were not pled with sufficient particularity to excuse demand for at least half of the board of directors under Delaware law; other than making conclusory allegations that directors possessed material non-public information when they sold their shares, shareholder did not allege specific facts as to what particular material information any individual director knew, or when and how he or she knew it, shareholder failed to explain why timing of each sale raised inference of

insider trading, and mere fact that directors sold substantial amounts of stock was insufficient to support inference of insider trading. Fed. R. Civ. P. 23.1.

[48]     **Corporations and Business Organizations** ⬥ Interest of director or officer in lawsuit or lack of independence

Under Delaware law, to determine if a director faces a substantial likelihood of liability for insider trading, as would excuse pre-suit demand that board of directors pursue the claim, it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information. Fed. R. Civ. P. 23.1.

[49]     **Corporations and Business Organizations** ⬥ Allegations of excuse for failure to demand; futility

Under Delaware law, conclusory allegations that defendants sold stock at a time when they knew material, non-public information are insufficient to excuse demand that directors pursue the corporate claim prior to filing stockholder derivative suit. Fed. R. Civ. P. 23.1.

[50]     **Federal Civil Procedure** ⬥ Pleading, Defects In, in General

Motions to dismiss for failure to state a claim are viewed with disfavor and are rarely granted. Fed. R. Civ. P. 12(b)(6).

[51]     **Federal Civil Procedure** ⬥ Insufficiency in general

A claim is "plausible," as would preclude dismissal of a complaint for failure to state a claim, when the pleaded factual contents allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Fed. R. Civ. P. 12(b)(6).

Hack v. Wright, 396 F.Supp.3d 720 (2019)

**[52]**    **Federal Civil Procedure** ⬅ Insufficiency in general

**Federal Civil Procedure** ⬅ Construction of pleadings

When ruling on motion to dismiss for failure to state a claim, ultimate question is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff. Fed. R. Civ. P. 12(b)(6).

**[53]**    **Federal Civil Procedure** ⬅ Construction of pleadings

**Federal Civil Procedure** ⬅ Matters deemed admitted; acceptance as true of allegations in complaint

In considering a motion to dismiss for failure to state a claim, a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true. Fed. R. Civ. P. 12(b)(6).

**[54]**    **Federal Civil Procedure** ⬅ Insufficiency in general

Courts are required to dismiss, pursuant to rule governing motions to dismiss for failure to state a claim, claims based on invalid legal theories, even though they may be otherwise well-pleaded. Fed. R. Civ. P. 12(b)(6).

**[55]**    **Corporations and Business Organizations** ⬅ Allegations as to corporate right of action

Shareholder failed to plead existence of facts suggesting board of directors knew of corporation's financial problems and that board chose to do nothing, as required to show bad faith and scienter under *Caremark* claim, 698 A.2d 959, for corporate director oversight liability, applicable in stockholder derivate suits in which plaintiff complains of inaction by board of directors or violation of board's oversight duties under Delaware law; shareholder's allegations were conclusory.

**[56]**    **Federal Civil Procedure** ⬅ Fraud, mistake and condition of mind

Under Delaware law, particularity requirement under rule governing pleading requirements for fraud applies in stockholder derivative cases where the plaintiff alleges the corporate defendants breached their fiduciary duties of care, loyalty, and good faith by causing or allowing the corporation to disseminate to the market materially misleading and inaccurate information through public statements, including, but not limited to press releases and Securities and Exchange Commission (SEC) filings. Fed. R. Civ. P. 9(b).

**[57]**    **Federal Civil Procedure** ⬅ Fraud, mistake and condition of mind

Rule governing pleading requirements for fraud requires the who, what, when, where, and how of the alleged fraud to be laid out. Fed. R. Civ. P. 9(b).

**[58]**    **Federal Civil Procedure** ⬅ Fraud, mistake and condition of mind

Shareholder pled fraud with requisite particularity, as required in stockholder derivative action brought under Delaware law in which shareholder alleged that members of corporation's board of directors breached their fiduciary duties of care, loyalty, and good faith by causing or allowing corporation to disseminate to the market materially misleading and inaccurate information through public statements, in regards to statements made by inside director and corporate officers; shareholder identified specific purportedly false and misleading statements and reports made or signed by director and officers, and shareholder generally alleged that director and officers knowingly made false and misleading statements. Fed. R. Civ. P. 9(b).

Hack v. Wright, 396 F.Supp.3d 720 (2019)

[59]     **Federal Civil Procedure** 👈 Fraud, mistake and condition of mind

Shareholder failed to satisfy particularity requirement under rule governing pleading requirements for fraud with regard to outside corporate directors, precluding relief under Delaware law on claim in stockholder derivative action that directors breached their fiduciary duties of care, loyalty, and good faith by causing or allowing corporation to disseminate to the market materially misleading and inaccurate information through public statements; shareholder averred in conclusory fashion that all directors reviewed, approved, or signed false and misleading statements and reports and that corporation issued false and misleading press releases without explanation as to how each outside directors was personally involved. Fed. R. Civ. P. 9(b).

[60]     **Corporations and Business Organizations** 👈 Purchase or Sale of Stock to or from Director, Officer, or Agent

Under Delaware law, to state a claim for insider trading, plaintiff must plead that: (1) the corporate fiduciary possessed material, nonpublic company information, and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information.

[61]     **Corporations and Business Organizations** 👈 Bill, petition, or complaint

Shareholder failed to allege that members of corporation's board of directors used material, nonpublic information improperly by making trades motivated by the substance of that information, as required to state a claim for insider trading under Delaware law; shareholder's allegations in support of insider trading claim that, because of board's issuance of false and misleading public statements, corporation's stock traded at artificially-inflated prices, and that during that time board members sold shares using material non-public

information regarding corporation's financial condition were conclusory, and shareholder did not allege facts indicating culpable conduct or that timing of the sales was suspicious.

[62]     **Corporations and Business Organizations** 👈 Purchase or Sale of Stock to or from Director, Officer, or Agent

Under Delaware law, in alleging a claim of breach of fiduciary duty for insider trading, plaintiff must assert some causal relationship between the alleged confidential information and the profit that the defendant is said to have derived from the unlawful purchase or sale of stock.

[63]     **Federal Civil Procedure** 👈 Pleading over

When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint before dismissing the action with prejudice, unless it is clear the defects are incurable. Fed. R. Civ. P. 12(b)(6), 15.

[64]     **Federal Civil Procedure** 👈 Amendments

Court has discretion to grant leave to amend and may consider undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment. Fed. R. Civ. P. 15.

[65]     **Federal Civil Procedure** 👈 Pleading over

Allowing shareholder to amend complaint in stockholder derivative action, asserting claims against members of corporation's board of directors and executive officers for breach of fiduciary duty, unjust enrichment, gross mismanagement, and insider trading, to obtain books and records through an inspection demand would not be futile under Delaware law, and thus shareholder's claims would be dismissed, following motions to dismiss for failure to state a claim and failure to plead demand futility, with

leave to amend; inspection demand would likely not be denied, and shareholder might be able to cure deficiencies after making books and records demand. 8 Del. Code § 220; Fed. R. Civ. P. 12(b)(6), 15; Fed. R. Civ. P. 23.1.

[66]    **Corporations and Business Organizations** ⇐ Right to Inspection

Under Delaware law, shareholder may only obtain inspection relief by making a books and records demand after filing a derivative lawsuit, provided that suit was dismissed without prejudice and shareholder was granted leave to amend, if shareholder has a proper purpose for making such a demand. 8 Del. Code § 220; Fed. R. Civ. P. 15.

[67]    **Federal Civil Procedure** ⇐ Time for amendment

Under Delaware law, leave to amend complaint in stockholder derivative action, asserting claims against members of corporation's board of directors and executive officers for breach of fiduciary duty, unjust enrichment, gross mismanagement, and insider trading, to allow shareholder to obtain books and records through an inspection demand would not be denied on grounds that shareholder was dilatory; even though shareholder waited more than four years to request such relief, case was stayed for about four years pending outcome of related securities class action, shareholder timely requested appropriate relief in his brief in opposition to motion to dismiss for failure to state a claim and failure to plead demand futility, and operative complaint was the original complaint. 8 Del. Code § 220; Fed. R. Civ. P. 12(b)(6), 15, 23.1.

**Attorneys and Law Firms**

**\*730** Francis A. Bottini, Jr., Albert Y. Chang, Bottini Bottini Inc., La Jolla, CA, Kip B. Shuman, The Shuman Law Firm,

Boulder, CO, Roger B. Greenberg, Thane Tyler Sponsel, III, Sponsel Miller Greenberg PLLC, Houston, TX, for Plaintiff.

Michael C. Holmes, Megan Marie Coker, Meriwether Tull Evans, Stephen Sullivan Gilstrap, Vinson & Elkins LLP, Dallas, TX, Jennifer Barrett Poppe, Vinson & Elkins, Austin, TX, for Defendants.

**ORDER ADOPTING REPORT AND RECOMMENDATION**

KEITH P. ELLISON, UNITED STATES DISTRICT JUDGE

Pending before the Court is Defendants' Motion to Dismiss (Doc. No. 29), which had been referred to Magistrate Judge Dena Hanovice Palermo for a report and recommendation. On May 29, 2019, Judge Palermo issued the Report and Recommendation on Plaintiffs Motion to Remand (Doc. No. 40), recommending that the Motion to Dismiss be granted. The time for filing objections has passed, and no objections were filed.

Pursuant to Federal Rule of Civil Procedure 72(b), the Court has reviewed the Report and Recommendation for clear error. Finding no clear error, the Court adopts the Report and Recommendation in its entirety. Accordingly, Defendants' Motion to Dismiss (Doc. No. 29) is hereby granted. Plaintiff is granted leave to amend by July 19, 2019. Plaintiff is ordered to notify the Court, no later than July 1, 2019:

   a. Whether he will amend the complaint based on documents Defendants recently produced, or

   b. Whether he intends to make a Section 220 demand, and

   c. Whether he needs a stay for the company to respond to his demand.

**IT IS SO ORDERED.**

**REPORT AND RECOMMENDATION ON DEFENDANTS' MOTION TO DISMISS**

Dena Hanovice Palermo, United States Magistrate Judge

Plaintiff Robert Hack ("Plaintiff") filed this shareholder derivative action against Defendants Theodore Wright, Bob Martin, Jon Jacoby, Kelly Malson, Douglas Martin, David Schofman, Scott Thompson, Brian Taylor, and Michael Poppe

Hack v. Wright, 396 F.Supp.3d 720 (2019)

(collectively "Defendants"), as well as against Conn's, Inc. as a nominal Defendant ("Conn's" or "Corporation").[1] Compl., ECF No. 1. Before the Court is Defendants' motion to dismiss for failure to plead demand futility under Rule 23.1 and failure to state a claim under Rule 12(b)(6).[2] ECF No. 29. Having considered the record and authorities, the Court recommends that Defendants' motion should be granted without prejudice and Plaintiff should be granted leave to amend.

# I.

## BACKGROUND

### A. The Parties.

Plaintiff—a shareholder of Conn's—filed this derivative action on behalf of Conn's. **\*731** ECF No. 1 at ¶¶ 1, 16. This case shares a common factual background with the securities class action against Conn's, which sells household appliances in retail stores across the country and also has a credit arm of its business, providing in-house credit options, third-party financing programs, and third-party rent-to-own payment plans to its customers. *Id.* at ¶¶ 29, 55; *see In re Conn's, Inc. Sec. Litig.*, No. 14-CV-548 (S.D. Tex.). Beginning in February 2014, Conn's made public announcements that its fourth quarter fiscal year 2014 bad debts in its credit segment exceeded its previously issued full-year fiscal 2014 guidance and it expected earnings per share dilution in the fourth quarter in 2014 and in 2015. ECF No. 1 at ¶¶ 118-23. Plaintiff alleges in his complaint that the Individual Defendants engaged in wrongdoing between April 3, 2013 through the date the complaint was filed, on December 1, 2014 (the "Relevant Period"). *Id.* at ¶ 1.

Plaintiff brings this claim against seven members of the Corporation's eight-member Board of Directors ("Board")—Theodore Wright,[3] Douglas Martin, Bob Martin, Jon Jacoby, Kelly Malson, David Schofman, and Scott Thompson.[4] Plaintiff also brings this suit against two executive officers who are not on the Board—Brian Taylor, the Corporation's Chief Financial Officer ("CFO"), and Michael Poppe, the Corporation's Chief Operating Officer ("COO"). *Id.* at ¶¶ 1, 6, 17-28. The complaint alleges they each held these positions during the Relevant Period.[5] *Id.* at ¶¶ 17-28.

### B. Plaintiff's Complaint.

In his 89-page complaint, Plaintiff alleges that, during the Relevant Period, "all members of the Board knew that Conn's lowered its underwriting standards and offered credit lines to customers who lacked creditworthiness, as a strategy to generate revenue." *Id.* at ¶ 2; *see also id.* at ¶¶ 7, 60-65. Plaintiff alleges this led to financial problems, of which the Defendants were aware. *Id.* at ¶¶ 2, 71, 83. Plaintiff alleges that the Board of Directors knowingly approved false and misleading public statements (including press releases, annual and quarterly reports, statements during conference calls and conferences, and statements to analysts) that misrepresented the underwriting policy changes, overstated the financial condition of the Corporation, and falsely attributed financial problems to reasons other than the lower underwriting standards, thereby violating their fiduciary duties and federal securities laws. *Id.* at ¶¶ 2, 7, 48, 50, 53, 58-123.

Plaintiff also alleges that the false and misleading information presented to the public artificially inflated Conn's stock prices during the Relevant Period. *Id.* at ¶¶ 3, 66, 81, 114. Plaintiff alleges that five of the Individual Defendants—Mr. Wright, Mr. Jacoby, Mr. D. Martin, Mr. Thompson, and Mr. Poppe —sold over 1.3 million Conn's shares for over $66 million on the basis of material non-public information about Conn's true financial condition. *Id.* at ¶¶ 4, 124-126. Plaintiff brings claims for breach of fiduciary duty, unjust enrichment, gross mismanagement, and insider trading. *Id.* at ¶¶ 168-190.

### **\*732** C. Defendants' Motion To Dismiss.

Defendants seek to dismiss Plaintiff's complaint on two grounds: (1) Plaintiff failed to adequately plead that demanding the Board to bring this suit would be futile under Federal Rule of Civil Procedure 23.1, and (2) Plaintiff failed to state a claim on which relief can be granted under Federal Rule of Civil Procedure 12(b)(6) for each of his four claims. ECF No. 29 at 6. Plaintiff concedes he did not demand the Board to bring this action but contends demand would be futile because the seven Director Defendants are interested, lack independence, and would face a substantial likelihood of personal liability. ECF No. 30 at 11.

# II.

## RULE 23.1

Hack v. Wright, 396 F.Supp.3d 720 (2019)

**A. Legal Standard For Demand Futility Under Rule 23.1.**

**[1]** Federal Rule of Civil Procedure 23.1 requires a shareholder derivative complaint to state with particularity "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Because Rule 23.1 does not identify substantive standards, "the particularity of a plaintiff's pleadings is governed by the standards of the state of incorporation." *Freuler v. Parker*, 803 F. Supp. 2d 630, 636 (S.D. Tex. 2011), *aff'd*, 517 F. App'x 227 (5th Cir. 2013) (applying Delaware law). The parties agree that since Conn's is incorporated in Delaware, Delaware law applies. ECF No. 29 at 8; ECF No. 30 at 12.

**[2]    [3]** "When a corporation suffers harm, the board of directors is the institutional actor legally empowered under Delaware law to determine what, if any, remedial action the corporation should take, including pursuing litigation against the individuals involved." *Van der Gracht de Rommerswael on Behalf of Rent-A-Center, Inc. v Speese*, No. 4:17-CV-227, 2017 WL 9280071, at *6 (E.D. Tex. Aug. 11, 2017) (quoting *In re China Agritech, Inc. S'holder Deriv. Litig.*, No. 7163-VCL, 2013 WL 2181514, at *13 (Del. Ch. May 21, 2013)) (applying Delaware law), *report and recommendation adopted*, 2017 WL 4545929 (E.D. Tex. Oct. 12, 2017). "Under Delaware law, directors are entitled to the presumption that they were faithful to their fiduciary duties." *Freuler*, 803 F. Supp. 2d at 637 (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v Stewart*, 845 A.2d 1040, 1048 (Del. 2004)).

**[4]    [5]    [6]** "In a stockholder derivative suit, a stockholder pursues a cause of action that belongs to the corporation." *Id.* at 636 (citing *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984)). "A stockholder may not pursue a derivative suit to assert a claim of the corporation unless the stockholder: (a) has first demanded that the directors pursue the corporate claim and the directors have wrongfully refused to do so; or (b) establishes that pre-suit demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of litigation." *Van der Gracht*, 2017 WL 9280071, at *7 (quoting *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008)). "Where, as here, a plaintiff does not make a pre-suit demand on the board of directors, the complaint must plead 'with particularity facts showing that a demand on the board would have been futile' " in order to

overcome the business judgment presumption. *Id.* (quoting *In re Citigroup, Inc. S'holder Deriv. Litig.*, 964 A.2d 106, 121 (Del. Ch. 2009)).

*\*733* **[7]    [8]    [9]    [10]** Under Delaware law, just as under its federal counterparts, the standard for pleading demand futility is more stringent than on a 12(b)(6) motion to dismiss for failure to state a claim. See *Grobow v. Perot*, 526 A.2d 914, 920 (Del. Ch. 1987), *aff'd*, 539 A.2d 180 (Del. 1988). The plaintiff must plead "particularized factual statements that are essential to the claim...." *Freuler*, 803 F. Supp. 2d at 638 (quoting *Brehm v. Eisner*, 746 A.2d 244, 254 (Del. 2000)). However, he "need not plead evidence." *Van der Gracht*, 2017 WL 9280071, at *7 (quoting *Aronson*, 473 A.2d at 816). "[T]he plaintiff is entitled to all 'reasonable inferences [that] logically flow from particularized facts....' " *Id.* (quoting *Beam*, 845 A.2d at 1048).

**[11]    [12]** "Plaintiffs must show that a majority—or in a case where there are an even number of directors, exactly half—of the board was incapable of considering demand." *In re INFOUSA, Inc. S'holder Litig.*, 953 A.2d 963, 989-90 (Del. Ch. 2007) (citation omitted). "[D]emand futility must be determined on a claim-by-claim basis." *Taylor v. Kissner*, 893 F. Supp. 2d 659, 666 (D. Del. 2012) (citing *MCG Capital Corp. v. Maginn*, No. 4521-CC, 2010 WL 1782271, at *18 (Del. Ch. 2010)) (applying Delaware law).

**1. The *Aronson* test.**

**[13]    [14]    [15]** "The Delaware Supreme Court has established two similar, but not identical, tests for determining whether the allegations of a complaint sufficiently plead demand futility." *Van der Gracht*, 2017 WL 9280071, at *14 (citing *Wood*, 953 A.2d at 140). The *Aronson* test applies when a plaintiff challenges a board decision or transaction. To determine demand futility under *Aronson*, the court "must decide whether, under the particularized facts alleged, a reasonable doubt is created that: (1) the directors are disinterested and independent[6] [or] (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Goldfarb*, 2012 WL 13028298, at *2 (quoting *Aronson*, 473 A.2d at 814). The prongs are disjunctive, so "if either prong is satisfied, demand is excused." *Freuler*, 803 F. Supp. 2d at 637 (quoting *Brehm*, 746 A.2d at 256).

**2. The *Rales* test.**

[16]   Where the plaintiff does not challenge a decision of the Board, courts apply the *Rales* test to determine demand futility. *Goldfarb*, 2012 WL 13028298, at *3 (quoting *Rales*, 634 A.2d at 933-34). Under the *Rales* test, "a court must determine whether or not the particularized factual allegations of a derivative stockholder complaint create a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Id.* at *4 (quoting *Rales*, 634 A.2d at 934). This essentially eliminates the second prong of the *Aronson* test. *Freuler*, 803 F. Supp. 2d at 638 (quoting *Rales*, 634 A.2d at 933).

[17]   [18]   A plaintiff can satisfy the *Rales* test "by showing that the directors would face a 'substantial likelihood' of personal ***734** liability by complying with a shareholder's demand to pursue litigation." *Taylor*, 893 F. Supp. at 666 (citing *Rales*, 634 A.2d at 936). "[D]efendant directors who face a substantial likelihood of personal liability are deemed interested in the transaction and thus cannot make an impartial decision." *In re Goldman Sachs Group, Inc. S'holder Litig.*, No. 5215-VCG, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011). "[T]he likelihood of liability must be substantial—a 'mere threat' is insufficient." *In re Gen. Mot. Co. Deriv. Litig.*, No. 9627-VCG, 2015 WL 3958724, at *13 (Del. Ch. June 26, 2015), *aff'd*, 133 A.3d 971 (Del. 2016).

**3. *Caremark* claims.**

[19]   Cases in which the plaintiff complains of Board inaction or a violation of the Board's oversight duties are analyzed under the *Rales* test because the plaintiff does not challenge a conscious board decision. *In re Goldman Sachs*, 2011 WL 4826104, at *6, 18. These are commonly referred to as *Caremark* claims. *Id.* at *18; *see In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996). "A *Caremark* claim has been recognized as 'possibly the most difficult theory in corporation law on which a plaintiff might hope to win a judgment.' " *In re Gen. Mot.*, 2015 WL 3958724, at *16 (quoting *Caremark*, 698 A.2d at 967).

[20]   "[T]he standard for director oversight liability under *Caremark* is that: '(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations, thus disabling themselves from being informed of risks or problems requiring their attention. The second basis for liability—a conscious failure to monitor—has been held to require pleading with particularity that there were so-called 'red flags' that put the directors on notice of problems with their systems, but which were consciously disregarded.' " *In re Gen. Mot.*, 2015 WL 3958724, at *16 (citations omitted).

**4. The Parties disagree which standard applies.**

The Parties disagree about which standard applies. Plaintiff alleges, as an initial matter, that he challenges a conscious decision of the Board, so *Aronson* applies. ECF No. 30 at 12. Plaintiff also alleges demand is excused under both *Rales* and the first prong of *Aronson* because the Directors face a substantial likelihood of personal liability *and* are interested or lack independence. *Id.* at 11, 13-24. On the other hand, Defendants contend that Plaintiff pled a *Caremark* claim, and must show the Defendants face a substantial likelihood of personal liability. ECF No. 29 at 16.

Plaintiff argues that he is not bringing a *Caremark* claim because the complaint alleges that the Directors *consciously* engaged in misconduct.[7] ECF No. 30 at 25-26. However, some of the allegations in the complaint do appear to allege a *Caremark* claim based on the lack of oversight, implicating a heightened standard under *Rales*. For example, specifically with regard to the Audit Committee members, Plaintiff alleges that the Audit Committee had "oversight responsibilit[ies][,]" "either ***735** failed to conduct the requisite reviews or conduct a cursory, defective review[,]" "failed to implement adequate internal controls over the Company's financial reporting[,]" and "failed to properly oversee Conn's business[.]" ECF No. 1 at ¶¶ 43, 144, 146, 172.

The Court finds the particular test is not determinative in this case because Plaintiff's arguments for demand futility implicate both *Rales* and the first prong of *Aronson*, which many courts have recognized target the same core inquiry.[8] Plaintiff's allegations in the complaint also implicate both tests. Resolving all factual inferences in favor of the Plaintiff, the allegations that the Board approved false and misleading statements can be construed as Board decisions, implicating *Aronson*. *See, e.g.*, *In re Goldman Sachs*, 2011 WL 4826104, at *7 (applying *Aronson* to board's approval of compensation scheme); *In re Cendant Corp. Deriv. Action Litig.*, 189 F.R.D. 117, 129 (D.N.J. 1999) (applying Delaware law) (applying

*Aronson* to board's dissemination of false and misleading statements).[9] On the other hand, Plaintiff's insider trading allegations implicate *Rales* because they do not challenge a Board decision. Furthermore, the Court determines that Plaintiff failed to plead demand futility under either *Rales* or the first prong of *Aronson*.[10] Assuming that Plaintiff is required to meet the **\*736** heightened pleading standard for a *Caremark* claim, Plaintiff failed to meet this standard as well.

### 5. Conn's certificate of incorporation contains an exculpatory clause.

[21] Plaintiff's pleading burden in this case is further heightened, and the Directors' likelihood of personal liability is lessened, by the fact that Conn's certificate of incorporation exculpates the Directors from liability to the extent authorized by 8 Del. Code § 102(b)(7). *Taylor*, 893 F. Supp. 2d at 669; *Van der Gracht*, 2017 WL 9280071, at \*16. Conn's certificate of incorporation states:

> No director of the Corporation shall be liable to the Corporation or any of its stockholders for monetary damages for breach of fiduciary duty as a director, provided, however that this Article EIGHT does not eliminate the liability of the director (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; ... or (iv) for any transaction from which the director derived an improper personal benefit.

Ex. 4 at 4-5 (Article Eight), ECF No. 29-5.

[22] [23] [24] [25] Where a corporation's certificate of incorporation includes an exculpatory provision, "a serious threat of liability may only be found to exist if the plaintiff pleads a non-exculpated claim against the directors based on particularized facts." *In re Gen. Mot.*, 2015 WL 3958724, at \*13 (quoting *DiRienzo v. Lichtenstein*, No. 7094-VCP, 2013 WL 5503034, at \*28 (Del. Ch. Sept. 30, 2013)). "[W]here directors are exculpated, 'a plaintiff must also plead particularized facts that demonstrate that the directors acted with scienter, i.e., that they had 'actual or constructive knowledge' that their conduct was legally improper." *Van der Gracht*, 2017 WL 9280071, at \*17 (quoting *In re Citigroup*, 964 A.2d at 125). Other than disputing that the Court should consider Defendants' attachments,[11] the Plaintiff does not dispute the existence or authenticity of the certificate of

incorporation, or that its exculpatory clause implicates a heightened pleading standard.

### B. Demand Is Not Excused For Plaintiff's Breach Of Fiduciary Duty Claim.

Plaintiff alleges that demand would be futile as to seven of the eight Directors regarding his claim for breach of fiduciary duty based on allegations that the Directors knowingly issued false and misleading statements about the Corporation's **\*737** financial condition.[12]

### 1. Theodore Wright.

[26] Plaintiff alleges that Mr. Wright is interested and lacks independence because (1) according to Conn's own April 15, 2014 proxy statement, Mr. Wright is not independent under NASDAQ rules; and (2) as CEO, his livelihood depends on his continued employment with Conn's and his substantial compensation. ECF No. 1 at ¶¶ 136-37. Plaintiff also alleges that Mr. Wright faces a substantial likelihood of liability for (1) approving false and misleading statements and (2) insider trading during the Relevant Period. *Id.* at ¶¶ 138-39.

Defendants concede that Mr. Wright is not listed as independent on its proxy statement under NASDAQ rules. ECF No. 29 at 12. Drawing all factual inferences in favor of the Plaintiff, the Court determines that Mr. Wright is interested or lacks independence. If Conn's does not find him independent under NASDAQ requirements, the Court cannot assume he is independent for the demand inquiry here. "[T]o have a derivative suit dismissed on demand excusal grounds because of the presumptive independence of directors whose own colleagues will not accord them the appellation of independence creates cognitive dissonance that our jurisprudence should not ignore." *Sandys v. Pincus*, 152 A.3d 124, 131 (Del. 2016) (finding directors not independent for purposes of the demand futility analysis where their own company did not list them as independent in its public disclosures under NASDAQ listing rules).

[27] [28] While Mr. Wright lacks independence under Plaintiff's first argument, Plaintiff's other arguments have been repeatedly rejected by courts. Regarding Plaintiff's argument that Mr. Wright is interested because of his position as CEO, "[d]emand futility cannot be pleaded merely on the basis of allegations that inside directors would act to preserve their employment positions. If this were the case, every

Hack v. Wright, 396 F.Supp.3d 720 (2019)

inside director would be disabled from considering a pre-suit demand." *Guitierrez v. Logan,* No. H-02-1812, 2005 WL 2121554, at *11 (S.D. Tex. Aug. 31, 2005) (internal citations omitted) (applying Delaware law). As to Plaintiff's two other arguments that Mr. Wright faces a substantial likelihood of liability for making false and misleading statements and insider trading, these arguments fail to establish demand futility as discussed *infra* with regard to the other Directors.[13]

**\*738  2. Douglas Martin.**

[29]  Plaintiff alleges Mr. D. Martin is interested and lacks independence for the same reason as Mr. Wright – Conn's own April 15, 2014 proxy statement allegedly did not list Mr. D. Martin as independent under NASDAQ rules.[14] ECF No. 1 at ¶ 136 n.4. Accordingly, the Court does not consider Mr. D. Martin independent or disinterested for the purpose of demand under Rule 23.1.[15]

While Plaintiff adequately pled demand would be futile as to Mr. Wright and Mr. D. Martin, Plaintiff failed to do so for any other Director.

**3. Audit Committee Defendants: Kelly Malson, David Schofman, and Scott Thompson.**

[30]  Plaintiff alleges three other Director Defendants—Ms. Malson, Mr. Schofman, and Mr. Thompson—are interested, lack independence, and face a substantial likelihood of personal liability based on their membership on the Audit Committee. ECF No. 1 at ¶¶ 140-149. In the complaint, Plaintiff explains at length the Audit Committee's role and duties in reviewing financial statements; reviewing disclosures made to the Committee by the Corporation's CEO and CFO; preparing reports required by the Securities Exchange Commission ("SEC"); reviewing and discussing the adequacy and effectiveness of the Corporation's internal controls; responsibility for the integrity of the Corporation's financial statements; responsibility for the Corporation's auditing, accounting, and financial reporting processes; and oversight responsibilities. *Id.* at ¶¶ 43-44, 141, 142, 145, 148.

Plaintiff further alleges that each member of the Audit Committee knew about the problems with the Corporation's consumer credit programs because they received "daily reports from Conn's credit and collection department" and

had "regular discussions with management in the process of reviewing and approving the dissemination of the false and misleading statements set forth in this complaint." *Id.* at ¶ 143. Plaintiff alleges the Audit Committee "either failed to conduct the requisite reviews or conduct a cursory, defective review" and because of this failure, "approved the issuance of the false and misleading financial statements ... and press releases...." *Id.* at ¶ 144. Plaintiff alleges the Audit Committee "failed to implement adequate internal controls over the Company's financial reporting" and "failed to correct the materially false and misleading information[,]" and therefore its members "face a sufficiently substantial likelihood of liability for breaches of their fiduciary  \*739  duties of loyalty and good faith." *Id.* at ¶¶ 146, 147, 149.

[31]  However, mere membership on the Audit Committee, without more, is not sufficient to excuse demand. *Ellis,* 2018 WL 3360816, at *11 (citations omitted); *accord Wood,* 953 A.2d at 142 (not excusing demand because plaintiff's allegations that directors executed financial disclosures, authorized certain transactions, and served on the audit committee fail to establish the directors knowingly participated in illegal conduct). In addition, Plaintiff's allegations are conclusory. "A plaintiff may not excuse demand 'by merely making conclusory allegations that a director disseminated financial statements he knew to be false.' " *Jones,* 503 F. Supp.2d at 1335 (quoting *In re Computer Sci. Corp. Deriv. Litig.,* No. CV-06-5288 MRP, 2007 WL 1321715, at *9 (C.D. Cal. 2007)).

Plaintiff must explain with particularity how the Audit Committee learned that the statements it approved were false, "who presented it with the information, when, or how the committee members' response or lack thereof rendered them active participants" in the alleged wrongdoing. *Id.* at 1334-35. Vague allegations that the Audit Committee members received "daily reports from Conn's credit and collection department" and had "regular discussions with management in the process of reviewing and approving the dissemination of the false and misleading statements" do not contain sufficient particularity about the content of those reports and discussions to create a reasonable inference that the Audit Committee members knew any statements were false or misleading.[16] These allegations fail to show demand futility under either *Rales* or the first prong of *Aronson.* In addition, to the extent Plaintiff's allegations that the Audit Committee failed to discharge its oversight responsibilities qualify as a *Caremark* claim, Plaintiff's allegations also fail to satisfy the heightened standard under *Caremark.*

**4. Defendants affiliated with Stephens, Inc.: Jon Jacoby, Bob Martin, and Douglas Martin.**

[32] Plaintiff alleges that three of the Board members—Mr. Jacoby, Mr. B. Martin, and Mr. D. Martin—are interested and lack independence because they were placed on the Board by a third-party company, Stephens, Inc. and its affiliates, who are significant longtime shareholders of Conn's. ECF No. 1 at ¶¶ 156, 157, 162. Plaintiff alleges that between 2010 and 2014, Stephens, Inc. and its affiliates held between 22.3% and 24.9% of Conn's stock, and prior to Conn's initial public offering ("IPO") in 2003, held at least 70% of Conn's stock. *Id.* at ¶ 158. Plaintiff further alleges that the rest of the Board is beholden to, dominated, and controlled by Mr. Jacoby, Mr. B. Martin, and Mr. D. Martin. *Id.* at ¶ 155. Plaintiff alleges that:

> Jacoby is currently the vice chairman and senior managing director of The *740 Stephens Group, LLC, and has been employed at Stephens, Inc. and its affiliates since 1963. D. Martin is currently an executive vice president of Stephens, Inc., where he has been employed since 1981. B. Martin, a Conn's director since 2003, is currently an operating partner of The Stephens Group, LLC and has held that position since at least 2012. Before his employment at The Stephens Group, LLC, B. Martin established decades-long careers at two Arkansas-based retailers, Walmart International, Inc. and Dillards, Inc., both of which had close historical ties with Stephens, Inc. and its affiliates.

*Id.* at ¶ 157. Plaintiff alleges that Stephens, Inc. and its affiliates have long exercised domination and control over the Board. *Id.* at ¶ 159.

Plaintiff alleges the domination and control is evidenced by the fact that the Board has approved multimillion-dollar transactions to engage the services of Direct Marketing Solutions, Inc. ("DMS"), and that Stephens, Inc. and its affiliates own DMS or its parent companies. *Id.* at ¶ 159. Plaintiff also alleges that the Board engaged the brokerage and financial-advisory services of Stephens, Inc. and its affiliates several times over a span of five years. *Id.* at ¶ 160. Plaintiff alleges these transactions were entered into for the benefit of Stephens, Inc. and its affiliates, and Conn's admitted to such domination and control in its March 27, 2014 Form 10-K:

> Our corporate actions may be substantially controlled by our principal shareholders and affiliated entities. As of January 31, 2014, Stephens, Inc., The Stephens Group,

LLC, and their respective affiliates beneficially owned a significant portion of our common stock ... Stephens Inc. and the beneficial owners of the shares that were previously held in the voting trust and The Stephens Group, LLC could exert substantial influence over determining the outcome of any corporate transaction or other matter submitted to the stockholders for approval, including election of directors .... The interests of Stephens Inc. and The Stephens Group, LLC, and their respective affiliates, may differ from or be adverse to the interest of our other stockholders....

*Id.* at ¶ 161.

[33] [34] However, the mere fact that some of the Directors have business relationships with Stephens, Inc. and its affiliates is an insufficient basis to excuse demand.

> The basic hurdle for plaintiffs stems from the fact that the kind of relationships alleged in the complaint exist at many companies. Directors tend to be experienced and accomplished business persons; those individuals also tend to ... have a wide range of professional and charitable affiliations and relationships. It is usually considered in the interests of corporations and their shareholders to attract experienced and accomplished business leaders as directors.... Only professional or personal friendships that "border on or even exceed familial loyalty and closeness[ ] may raise a reasonable doubt whether a director can appropriately consider demand." ... The commonplace business, professional, and personal relationships alleged in this case are not remotely sufficient under Delaware law to disqualify the challenged directors from evaluating demand in an independent manner.

*Pirelli Armstrong Tire Corp. Retiree Medical Benefits Trust ex rel. Fed. Nat. Mortg. Ass'n v. Raines,* 534 F.3d 779, 793-94 (D.C. Cir. 2008) (applying Delaware law) (internal citations omitted). "[I]t is not enough to charge that a director was nominated *741 by or elected at the behest of those controlling the outcome of a corporate election. That is the usual way a person becomes a corporate director." *Aronson,* 473 A.2d at 816. In addition, "stock ownership alone, at least when it amounts to less than a majority, is not sufficient proof of domination or control." *Id.* at 815.

[35] [36] Here, Plaintiff's allegations fail to plead how Stephens, Inc. or its affiliates had any interest in, or could have influenced in any way, the Board's actions challenged by this lawsuit. The 10-K statement likewise fails to include sufficient detail indicating the Board could not consider a demand due to the influence of Stephens, Inc. in

this context. "There must be some alleged nexus between the domination and the resulting personal benefit to the controlling party.' " *Strong*, 877 F. Supp. 2d at 452 (quoting *Highland Legacy Ltd. v. Singer*, No. Civ-A-1566-N, 2006 WL 741939, at *8 (Del. Ch. Mar. 17, 2006)). "[A] plaintiff charging domination or control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.' *Grobow*, 526 A.2d at 924 (quoting *Aronson*, 473 A.2d at 816). The mere fact that the Board approved some transactions that may have benefited Stephens, Inc. or its affiliates, and which are completely unrelated to the conduct challenged here, is not enough to show that Stephens, Inc. "so controlled the directors' decisionmaking as to mean they lacked independence to consider a demand." *Pirelli*, 534 F.3d at 794.

### 5. Insured vs. insured exclusion.

[37]   Plaintiff further alleges in the complaint that demand would be futile under what is referred to as the "insured verses insured exclusion." ECF No. 1 at ¶ 165. Specifically, Plaintiff alleges there would be no directors and officers liability insurance ("D & O Insurance") protection if the Individual Defendants brought suit against themselves, but there would be D & O coverage if the claims were asserted in a derivative action. *Id.* However, the "insured v. insured clause exclusion argument has been regularly rejected by courts" as a basis for demand futility under Delaware law. *Freuler*, 803 F. Supp. 2d at 651-52 (citations omitted).

### 6. Group allegations.

[38]   Plaintiff makes additional group allegations against all the Individual Defendants that "[t]he consumer credit business is the core product of Conn's[,]" therefore "all Director Defendants are charged with the knowledge of the true facts regarding the consumer credit program," and "[d]espite their knowledge of the true facts regarding the consumer credit programs and the financial condition of Conn's, the Director Defendants approved the dissemination of false and misleading information in the public disclosures made by Conn's." ECF No. 1 at ¶¶ 150-53. Therefore, Plaintiff alleges the Director Defendants "face a substantial likelihood of liability" for breaching their fiduciary duties and demand is futile. *Id.* at ¶ 154, 163.

[39]   First, group allegations are insufficient to excuse demand. Under Delaware law, a plaintiff must plead with particularity the reasons for excusing demand as to each director individually. *In re Rocket Fuel*, 2016 WL 4492582, at *6 (rejecting allegations about "insider selling defendants" as an undifferentiated group and requiring plaintiff to "allege specific facts as to what particular material information any individual defendant knew, or when and how he or she knew it") (emphasis in original); *In re Citigroup*, 964 A.2d at 121 n.36 (rejecting plaintiffs' " 'group' accusation **\*742** mode of pleading demand futility" and noting that "[h]ad plaintiffs provided individual allegations as to each of the director defendants, the outcome of his case may have been different."); *DeSimone v. Barrows*, 924 A.2d 908, 935, 940 (Del. Ch. 2007) ("a derivative complaint must plead facts *specific to each director*") (emphasis in original).

Second, the core business theory has been rejected as a basis for excusing demand. *In re Rocket Fuel*, 2016 WL 4492582, at *6 (rejecting "core operations" argument in assessing demand futility); *accord Jones*, 503 F. Supp.2d at 1337.

[40]   Third, it is "well-settled that an allegation that a majority of directors approved, participated, or acquiesced in a challenged transaction will not, in and of itself, establish demand futility."[17] *Grobow*, 526 A.2d at 924 (citations omitted); *accord In re Yahoo!*, 153 F. Supp. 3d at 1120 (conclusory allegations that directors "signed" or were involved in "reviewing" disclosures do not excuse demand); *Jones*, 503 F. Supp. 2d at 1333 (group allegations that directors participated in the issuance of false or misleading statements and would have to sue themselves do not excuse demand); *Pedroli ex rel. Microtune, Inc. v. Bartek*, 564 F. Supp. 2d 683, 695 (E.D. Tex. 2008) (applying Delaware law) ("[A] plaintiff may not 'bootstrap allegations of futility' by pleading merely that 'the directors participated in the challenged transaction or that they would be reluctant to sue themselves.' ") (citations omitted); *Ellis*, 2018 WL 3360816, at *10 (allegations that the defendants "reviewed and approved" disclosures or "caused or allowed" the corporation to issue misleading statements do not excuse demand); *Goldfarb*, 2012 WL 13028298, at *6-7 (allegations that the board " 'caused' the issuance of misrepresentations" or "participated in the challenged action" do not excuse demand); *Aronson*, 473 A.2d at 814 (rejecting the notion that "any board approval of a challenged transaction automatically connotes 'hostile interest' and 'guilty participation' .... Were that so, the demand requirements of our law would be

meaningless...."); *see also Vitellone v. Evans*, No. H-13-1887, 2013 WL 6806179, at *9 (S.D. Tex. Dec. 20, 2013) (applying Delaware law) (not excusing demand as to allegations that defendants disseminated misleading statements because they lacked particularity).

Plaintiff did not allege specific facts about what each Director knew, "when and how the board knew that fact; [ ] and that the board, knowing this fact, nevertheless **\*743** affirmatively authorized the issuance of statements to the contrary[.]" *Goldfarb*, 2012 WL 13028298, at *7. Plaintiff also failed to describe with particularity "how the board was actually involved in creating or approving the statements...."[18] *Ellis*, 2018 WL 3360816, at *10. Plaintiff's allegations fail to demonstrate demand futility under either *Rales* or the first prong of *Aronson*.

### 7. Non-exculpated claims.

[41]    [42]    To the extent Plaintiff is required to plead non-exculpated claims in light of the certificate of incorporation's exculpatory clause, Plaintiff alleged that the Defendants breached their duties of loyalty and good faith. ECF No. 1 at ¶¶ 53, 135, 147, 170, 188, 189. The Delaware Supreme Court has recognized that the dissemination of false information could violate fiduciary duties of care, loyalty, *or* good faith. *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998) (emphasis added);[19] *accord In re TASER Int'l S'holder Deriv. Litig.*, No. CV-05-123, 2006 WL 687033, at *12 (D. Ariz. Mar. 17, 2006) (applying Delaware law) (exculpatory provision in certificate of incorporation does not bar claims based on disseminating misleading and inaccurate information and insider trading); *In re Cendant Corp.*, 189 F.R.D. at 133 (exculpatory provision in certificate of incorporation does not bar claims based on allegations that defendants *knowingly* issued public false and misleading statements). In addition, to the extent Plaintiff's allegations against the Audit Committee can be construed as oversight violations, "[a] breach of oversight responsibilities is a breach of the duty of loyalty, and thus not exculpated under section 102(b)(7)." *In re Goldman Sachs*, 2011 WL 4826104, at *18.

[43]    Plaintiff also alleged the Directors acted knowingly. ECF No. 1 at ¶¶ 7, 88, 101, 106, 117, 126, 143, 148, 173, 186, 188. However, he must plead particularized facts beyond conclusory allegations that demonstrate scienter, including how, when, and from whom the Defendants obtained the knowledge upon which they *knowingly* violated duties of loyalty and good faith. Plaintiff failed to do this.

### 8. Cumulative allegations of demand futility.

[44]    [45]    "Having found each of Plaintiff's allegations insufficient when considered in isolation, the Court must decide whether the totality of Plaintiff's allegations demonstrate reasonable doubt about **\*744** the Board's impartiality." *Jones*, 503 F. Supp. 2d at 1341 (citing *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990)). The Court finds that Plaintiff's allegations, even considered cumulatively, fail to plead demand futility with particularity for at least half of the Directors on the Board.

Notably, the Plaintiff did not make a demand to obtain books and records under 8 Del. Code § 220 before filing his complaint. "Having failed to heed the numerous admonitions by our judiciary for derivative plaintiffs to obtain books and records before filing a complaint, the [plaintiff] [has] unsurprisingly submitted [a complaint] that lacks particularized facts compromising the impartiality of the [Conn's] board that would have acted on a demand[,]" and instead appears to merely have copied most of the complaint that was filed in the related securities class action. *Guttman*, 823 A.2d at 493 (not excusing demand where plaintiff failed to plead particularized facts, failed to make a books and records request, and merely based their complaint on the related securities action complaint);[20] *accord Wood*, 953 A.2d at 143-44 (not excusing demand where plaintiff failed to plead particularized facts and failed to make a books and records request). "These books and records could have provided the basis for the pleading of particularized facts...." *Guttman*, 823 A.2d at 504.

This complaint stands in contrast to other cases in which demand was excused because the plaintiffs pled particularized facts about specific information that was given to directors and which they disregarded. *See, e.g.*, *Rosenbloom v. Pyott*, 765 F.3d 1137, 1141, 1153 (9th Cir. 2014) (applying Delaware law) (excusing demand where the plaintiff, relying on a demand for books and records, pled detailed information the board received but consciously ignored, such as repeated FDA warnings); *In re Pfizer*, 722 F. Supp. 2d at 460 ("the Complaint details at great length a large number of reports made to members of the board from which it may reasonably be inferred that they all knew of Pfizer's continued misconduct and chose to disregard it"); *In re*

*China Agritech*, 2013 WL 2181514, at *17, 27 (excusing demand where plaintiff pled particularized facts, in reliance on books and records it obtained under Section 220). Thus, although Plaintiff sufficiently pled demand futility for two Directors, he failed to do so for at least four members of the Board. Plaintiff's claim for breach of fiduciary duty should be dismissed.

## C. Demand Is Not Excused For Plaintiff's Unjust Enrichment And Gross Mismanagement Claims.

[46] Defendants cited cases indicating that under Delaware law, claims for unjust enrichment and gross mismanagement are considered duplicative of claims for breach of fiduciary duty. *See Friedman v. Khosrowshahi*, No. 9161-CB, 2014 WL 3519188, at *13 (Del. Ch. July 16, 2014) (not excusing demand for unjust enrichment claim *745 based on the same reasons for not excusing demand as to breach of fiduciary duty claim because unjust enrichment claim "is derivative of the fiduciary duty claim"), *aff'd*, No. 442, 2015 WL 1001009 (Del. Mar. 6, 2015); *accord Seinfeld v. Slager*, No. 6462-VCG, 2012 WL 2501105, at *16 (Del. Ch. June 29, 2012) (same); *see also In re Citigroup*, 964 A.2d at 114 n.6 (dismissing gross mismanagement claim under Rule 23.1 based on the same reasons for dismissing breach of fiduciary duty claim because a claim for gross mismanagement is the same as a claim for breach of fiduciary duty). Plaintiff did not provide contrary authority. Thus, for the same reasons that Plaintiff's fiduciary duty claim should be dismissed, his unjust enrichment and gross mismanagement claims should also be dismissed.

## D. Demand Is Not Excused For Plaintiff's Insider Trading Claim.

[47] Plaintiff contends demand would be futile because Mr. Wright (and implicitly Mr. Jacoby, Mr. D. Martin, and Mr. Thompson) faces a substantial likelihood of liability for insider trading.[21] ECF No. 1 at ¶ 139.

Plaintiff alleges that because of the Board's issuance of false and misleading public statements, "Conn's stock traded at artificially-inflated prices during the Relevant Period." *Id.* at ¶ 3. Plaintiff alleges that while the stock prices were inflated, four Directors—Mr. Wright, Mr. Jacoby, Mr. D. Martin, and Mr. Thompson—"sold at least 1,313,964 shares of Conn's stock, receiving approximately $66,886,993.49 in proceeds[,]" using insider information regarding Conn's true financial condition. *Id.* at ¶¶ 4, 124-25, 139. The Plaintiff lists the challenged stock sales and their dates, and makes

the following group allegations collectively against the four Directors regarding insider trading:

[A]ll the Individual Defendants had knowledge of the falsity of the statements they caused Conn's to make in that all individual Defendants knew, or were reckless in not knowing, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.... [T]he Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Conn's, their control over, and/or receipt or modification of the allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Conn's participated in the unlawful scheme....

*Id.* at ¶ 126.

Between April 3, 2013 and February 19, 2014, Defendants Wright, Jacoby, D. *746 Martin, Thompson, and Poppe knew the information described above, and sold Conn's stock on the basis of such information.

The information described above was proprietary non-public information concerning the financial condition and future business prospects of Conn's. It was a proprietary asset belonging to Conn's, which Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe used for their own benefit when they sold the stock.

At the time of their stock sales, Defendants Wright, Jacoby, D. Martin, Thompson, and Poppe knew that the Company's financial results were overstated.... Their sales of Conn's stock while in the possession and control of this material adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

*Id.* at ¶¶ 186-188.

[48] [49] To determine if a director faces a substantial likelihood of liability for insider trading, "it must be shown that each sale by each individual defendant was entered into and completed on the basis of, and because of, adverse material non-public information." *Rattner v. Bidzos*, No. Civ-A-19700, 2003 WL 22284323, at *11 (Del. Ch. Sept. 3, 2003) (citations omitted); *accord Guitierrez*, 2005 WL 2121554, at

*8. Conclusory allegations that defendants "sold stock at a time when they knew material, non-public information" are insufficient to excuse demand. *In re Rocket Fuel*, 2016 WL 4492582, at *6. "[I]t is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that [a director] made sales of company stock in the market at a time when he possessed material, non-public information." *Id.* (quoting *Guttman*, 823 A.2d at 502).

Other than making conclusory allegations that the Directors possessed material, non-public information when they sold their shares, Plaintiff "does not allege specific facts as to what particular material information any individual defendant knew, or when and how he or she knew it." *Id.*; *accord Rattner*, 2003 WL 22284323, at *10; *Guttman*, 823 A.2d at 503.[22]

Nor does Plaintiff explain why the timing of each sale raises an inference of insider trading. The only common pattern is that the sales were made during the Relevant Period over a span of almost one year.[23] Other than for Mr. Wright,[24] the **\*747** complaint also fails to specify what trades the Directors previously made, if any; whether the Directors may have made their sales for other reasons; and what percentage of each Director's stock was sold. *See Rattner*, 2003 WL 22284323, at *10-12 (not excusing demand for insider trading claim); *Guttman*, 823 A.2d at 504 (same). The mere fact that they sold substantial amounts of stock is likewise insufficient to support an inference of insider trading. *Guttman*, 823 A.2d at 504.

Though the Court already determined that Mr. Wright and Mr. D. Martin are interested or lacking independence on other grounds as discussed above, Plaintiff's allegations regarding insider trading (even in combination with other allegations) are not pled with sufficient particularity to excuse demand for at least half of the Board. Therefore, Plaintiff's insider trading claim should be dismissed.

## III.

### RULE 12(b)(6)

#### A. Legal Standard For Failure To State A Claim Under Rule 12(b)(6).

**[50]** A court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009) (citation omitted). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**[51]** The complaint must include more than mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citations omitted). A complaint must "contain sufficient factual matter ... to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). A claim is plausible "when the pleaded factual contents allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 219 (5th Cir. 2012). "[A] complaint 'does not need detailed factual allegations,' but must provide the plaintiff's grounds for entitlement to relief—including factual allegations that when assumed to be true 'raise a right to relief above the speculative level.'" *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

**[52]    [53]    [54]** The ultimate question "is whether the complaint states a valid claim when viewed in the light most favorable to the plaintiff." *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.*, 871 F. Supp. 2d 581, 590 (S.D. Tex. 2012). "[I]n considering a motion to dismiss under Rule 12(b)(6), a complaint must be liberally construed in favor of the plaintiff and all well-pleaded facts taken as true." *Duke Energy Int'l*, 748 F. Supp. at 665. "[C]ourts are required to dismiss, pursuant to [Rule 12(b)(6)], claims based on invalid legal theories, even though they may be otherwise well-pleaded." *Farshchi v. Wells Fargo Bank, N.A.*, No. H-15-1692, 2016 WL 2858903, at *2 (S.D. Tex. May 13, 2016) (citing *Flynn v. State Farm Fire and Cas. Ins. Co.*, 605 F. Supp. 2d 811, 820 (W.D. Tex. 2009)).

### B. Breach Of Fiduciary Duty.

Hack v. Wright, 396 F.Supp.3d 720 (2019)

**1. Defendants contend Plaintiff failed to state a *Caremark* claim.**

[55] Defendants argue that Plaintiff failed to state a *Caremark* claim for breach **\*748** of fiduciary duty because Plaintiff failed to plead "red flags" that would have put the Defendants on notice of Conn's financial problems, but which they consciously disregarded, as required to show bad faith and scienter under a *Caremark* claim. ECF No. 29 at 27-28.

In support, Defendants rely on *Taylor v. Kissner* and *DeSimone v. Barrows* to argue that Plaintiff must plead bad faith. However, in *Taylor*, the relevant section that Defendants rely on discusses the standard for pleading a *Caremark* claim under Rule 23.1, not 12(b)(6). *See Taylor*, 893 F. Supp. 2d at 670. Even though Plaintiff's complaint may fail the heightened pleading standard under Rule 23.1, that does not mean Plaintiff otherwise fails to meet the 12(b)(6) standard.

In *DeSimone*, the court explained that, "to state a viable *Caremark* claim ... a plaintiff must plead the existence of facts suggesting that the board knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed[,]" and that the Board must have acted with scienter. 924 A.2d at 935, 940. To the extent the Plaintiff attempted to allege a *Caremark* claim, the Court agrees that those allegations should be dismissed as conclusory.[25] *See supra* Section II.A.4.

However, Plaintiff alleges in his opposition he is not bringing a *Caremark* claim. Indeed, most of the allegations regarding the Board's conscious approval of allegedly false and misleading statements and insider trading can be construed as non-*Caremark* claims. *See, e.g., Vitellone*, 2013 WL 6806179, at \*5-10 (analyzing plaintiffs' allegations of dissemination of false and misleading statements separately from *Caremark* allegations); *In re Citigroup*, 964 A.2d at 123-35 (same). Defendants' arguments do not show that Plaintiff failed to state a claim for the non-*Caremark* claims. Nevertheless, that does not end the inquiry as to those claims.

**2. Defendants contend Plaintiff must satisfy the pleading requirements for fraud under Rule 9(b).**

Defendants also argue that because the complaint brings claims based on "alleged misrepresentations or omissions that

sound in fraud, Federal Rule of Civil Procedure 9(b) also requires him to 'state with particularity the circumstances constituting fraud or mistake.' " ECF No. 29 at 15. Plaintiff contends his allegations do not sound in fraud and that he is not required to meet the Rule 9(b) standard. ECF No. 30 at 27. In the alternative, Plaintiff argues that if he is required to satisfy Rule 9(b), the complaint does so. *Id.* (citing *In re TASER*, 2006 WL 687033, at \*13)).

[56] *In re TASER* clearly indicates that Rule 9(b)'s particularity requirement applies in cases such as this where the plaintiff alleges the defendants "breached their fiduciary duties of care, loyalty, and good faith by 'causing or allowing the Company to disseminate to the Market materially misleading and inaccurate information through public statements, including, but not limited to press releases and **\*749** SEC filings.' " 2006 WL 687033, at \*14 (applying Rule 9(b) pleading standard).

[57] Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "Rule 9(b) requires 'the who, what, when, where, and how' [of the alleged fraud] to be laid out." *In re BP p.l.c. Sec. Litig.*, 109 F. Supp. 3d 946, 954 (S.D. Tex. 2014) (quoting *Benchmark Elecs., Inc. v. J.M. Huber Corp.*, 343 F.3d 719, 724 (5th Cir. 2003)).

[58] The Court finds that Plaintiff sufficiently pled " 'the who, what, when, where, and how' [of the alleged fraud]" as required under Rule 9(b) regarding false and misleading statements made by Mr. Wright, Mr. Poppe, and Mr. Taylor. The Plaintiff identified specific purportedly false and misleading statements and reports made or signed by each of them. ECF No. 1 at ¶¶ 58-123. *In re TASER* found that similar allegations satisfied the Rule 9(b) standard. 2006 WL 687033, at \*16. To the extent Plaintiff contends these Defendants "knowingly" made false and misleading statements—even though this may lack the level of particularity required to excuse demand under Rule 23.1—this likely satisfies Rule 9(b) under which "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[26] Fed. R. Civ. P. 9(b).

[59] In contrast, Plaintiff failed to satisfy Rule 9(b)'s particularity requirement with regard to the outside Directors. Plaintiff only averred in conclusory fashion that all Director Defendants "reviewed," "approved," or "signed" false and misleading statements and reports, or that Conn's as a company issued false and misleading press releases, without

explanation as to how each outside Director was personally involved. Accordingly, had Plaintiff adequately alleged demand futility, his claim for breach of fiduciary duty as to Mr. Wright, Mr. Poppe, and Mr. Taylor would have survived under Rules 8 and 9(b). Plaintiff's claim for breach of fiduciary duty as to Mr. B. Martin, Mr. Jacoby, Ms. Malson, Mr. D. Martin, Mr. Schofman, and Mr. Thompson fail under Rule 9(b).

### C. Gross Mismanagement And Unjust Enrichment.

As discussed above, claims for unjust enrichment and gross mismanagement are duplicative of claims for breach of fiduciary duty and should be disposed of in the same manner. *See Friedman*, 2014 WL 3519188, at *13; *Seinfeld*, 2012 WL 2501105, at *16; *In re Citigroup*, 964 A.2d at 114 n.6; *see also Frank v. Elgamal*, No. 6120-VCN, 2014 WL 957550, at *31 (Del. Ch. Mar. 10, 2014) ("The Court frequently treats duplicative fiduciary duty and unjust enrichment claims in the same manner when **\*750** resolving a motion to dismiss. For example, if the Court dismisses a fiduciary duty claim for failure to state a claim, then it very likely also dismisses a duplicative unjust enrichment claim. Conversely, where the Court does not dismiss a breach of fiduciary duty claim, it likely does not dismiss a duplicative unjust enrichment claim.").[27]

### D. Insider Trading.

**[60]** Defendants contend that Plaintiff's claim for insider trading should be dismissed for failure to state a claim under Rule 12(b)(6). ECF No. 29 at 29-30. Both parties agree that under Delaware law, to state a claim for insider trading—commonly known as a *Brophy* claim—the Plaintiff must plead that "(1) the corporate fiduciary possessed material, nonpublic company information; and (2) the corporate fiduciary used that information improperly by making trades because she was motivated, in whole or in part, by the substance of that information." *See In re Primedia, Inc., S'holders Litig.*, No. 6511, 2013 WL 6797114, at *13 (Del. Ch. Dec. 20, 2013) (quoting *In re Oracle Corp.*, 867 A.2d 904, 934 (Del. Ch. 2004), *aff'd*, 872 A.2d 960 (Del. 2005)).

### 1. Possession of material, nonpublic company information.

Regarding the first element, Plaintiff generally alleged that each Defendant knew the true poor financial condition of

Conn's.[28] Plaintiff also alleged that each Defendant caused the Corporation to make false and misleading statements and knowingly failed to disclose that "(a) the Company's revenue and financial results were overstated; (b) the Company lacked adequate internal and financial controls; and (c) as a result of the foregoing, the Company's financial statements were materially false or misleading...." ECF No. 1 at ¶ 53.

Defendants contend Plaintiff failed to "allege what specific material, non-public information each director possessed at the time of each stock sale," thereby failing to plead the first element. ECF No. 29 at 29. Defendants did not, however, cite any authority for how specifically these allegations for the first element must be pled under the liberal 12(b)(6) standard. While Plaintiff did not allege with a high degree of detail what information each Defendant possessed at the time of each sale, requiring this level of detail would likely have the effect of displacing the more liberal 12(b)(6) standard with the particularity requirements of Rule 23.1. Indeed, with regard to whether Plaintiff stated a *Brophy* claim, Defendants largely reiterate their arguments for why Plaintiff failed to plead demand futility. But even assuming Plaintiff sufficiently alleged the first element, Plaintiff failed to adequately allege the second element for a *Brophy* claim.

### \*751 2. Making trades that are motivated by the insider information.

**[61]** Regarding the second element, Plaintiff alleged that because of the Board's issuance of false and misleading public statements, "Conn's stock traded at artificially-inflated prices during the Relevant Period" and during that time, "five of the Individual Defendants—Mr. Wright, Mr. Jacoby, Mr. D. Martin, Mr. Thompson, and Mr. Poppe—sold over 1.3 million shares of their Conn's stock for over $66 million using material non-public information regarding Conn's financial condition." ECF No. 1 at ¶¶ 3-4, 124.

**[62]** Defendants contend that Plaintiff lacks "individualized allegations linking any defendant to specific insider knowledge motivating particular trades," failing to satisfy the second element. While Defendants again do not cite authority explaining how detailed these allegations must be under 12(b)(6), and only rely on *Guttman* which analyzed insider trading allegations under Rule 23.1, the Court finds that these allegations are conclusory. "[A] plaintiff must assert some causal relationship between the alleged confidential information and the profit that the defendant is said to have

derived from the unlawful purchase or sale." *In re Sagent Tech., Inc., Deriv. Litig.*, 278 F. Supp. 2d 1079, 1092 (N.D. Cal. 2003) (applying Delaware law) (finding complaint failed to state a claim where it did "not allege facts showing that the defendants who sold stock during the approximately 28-month period at issue in the complaint possessed any specific material, nonpublic information at the time of each of those transactions, nor that they traded on the basis of such information.").

For example, Plaintiff relies on *In re Primedia* to argue it pled a *Brophy* claim. While *In re Primedia* was deciding a motion for judgment on the pleadings under Rule 12(c), the Court surmised that where an insider purchased stock on the same day as, and two weeks after, Primedia's board approved a sale of assets, and Primedia publicly announced the sale more than a month later, such a complaint would likely survive a 12(b)(6) motion to dismiss. 2013 WL 6797114, at *12, 14.

However, such facts are absent here. Plaintiff did not allege facts indicating culpable conduct or that the timing of the sales was suspicious. *Cf. id.* at *14 (the purchase of stock "[was] timed conveniently to occur just before the public announcement of the [sale]"). The second element requires culpable conduct, not mere knowledge.[29] Having failed to make more than conclusory allegations as to the second element for a *Brophy* claim, Plaintiff's insider trading claim should be dismissed for the reason that it fails to state a claim.

*752 **IV.**

**LEAVE TO AMEND**

Plaintiff requests that, if the Court dismisses any of his claims, he be granted leave to amend. ECF No. 30 at 33. Plaintiff argues that if his demand futility allegations are found to be inadequate, he can obtain books and records through an inspection demand under 8 Del. Code § 220. *Id.*

**A. Legal Standard For Leave To Amend.**

[63]  [64]  "When a plaintiff's complaint fails to state a claim, the court should generally give the plaintiff at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice" unless it is clear that defects are incurable. *Freuler*, 803 F. Supp. 2d at 635 (citing *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002)); *see also King v.*

*Terwilliger*, No. H-12-2182, 2013 WL 708495, at *7 (S.D. Tex. Feb. 26, 2013) (granting leave to amend in shareholder derivative suit). A court has discretion to grant leave to amend and may consider "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of amendment." *Id.* (quoting *Wimm v. Jack Eckerd Corp.*, 3 F.3d 137, 139 (5th Cir. 1993)).

**B. Defendants Contend Amendment Would Be Futile.**

[65]  Defendants allege that Plaintiff should be denied any opportunity to amend the complaint based on two grounds. First, Defendants contend any Section 220 demand for books and records would be denied due to being filed long after Plaintiff filed this lawsuit. ECF No. 31 at 14 (citing *La. Mun. Police Emps.' Ret. Sys. v. Pyott*, 46 A.3d 313, 342-44 n.23 (Del. Ch. 2012) (noting derivative claims are routinely denied "where the plaintiffs have not first used Section 220 to obtain books and records")). However, the case cited by Defendants does not go so far as to say dismissal with prejudice is mandatory or that derivative suits can never be filed before a books and records demand is made.

[66]  To the contrary, the Delaware Supreme Court has recognized that while grossly inefficient, derivative plaintiffs may make a books and records demand after filing a derivative lawsuit, provided that the suit was dismissed without prejudice and the plaintiff was granted leave to amend. *See King v. VeriFone Holdings, Inc.*, 12 A.3d 1140, 1145 (Del. 2011) (A "bright line rule barring stockholder-plaintiffs from pursuing inspection relief under 8 Del. C. § 220 solely because they filed a derivative action first, does not comport with existing Delaware law or sound policy.") (collecting cases where stockholder-plaintiffs filed derivative suits first and were later permitted to make books and records demands to replead their derivative complaints). Shareholders may only obtain inspection relief if they have a proper purpose for making such a demand. *Id.* at 1145. The Delaware Supreme Court recognized "it is a proper purpose under Section 220 to inspect books and records that would aid the plaintiff in pleading demand futility in a to-be-amended complaint in a plenary derivative action, where the earlier-filed plenary complaint was dismissed on demand futility-related grounds without prejudice and with leave to amend." *Id.* at 1150. Thus, a Section 220 demand would likely not be denied.

While Plaintiff's decision to file a derivative suit before making a demand for books and records to ensure the

complaint **753** would withstand Rule 23.1 scrutiny was ill-advised and expended a substantial amount of judicial resources, he may be able to cure the deficiencies after making a books and records demand. *See, e.g., In re Verifone Holdings, Inc. S'holder Deriv. Litig.,* No. C-07-6347, 2009 WL 1458233, at *13 (N.D. Cal. May 26, 2009) (granting leave to amend in shareholder derivative suit because plaintiffs could make a Section 220 demand under Delaware law to assert additional particularized facts). Therefore, amendment would not be futile.

### C. Defendants Contend Plaintiff Was Dilatory.

[67] Defendants also argue that leave to amend should be denied because Plaintiff waited more than four years to request such relief. ECF No. 31 at 14. However, this case was stayed for about four years pending the outcome of the related securities class action so this argument lacks merit.[30] Plaintiff timely requested the appropriate relief in his brief in opposition to Defendants' motion to dismiss after the stay was lifted. Furthermore, the operative complaint is still the original complaint.

Plaintiff should be granted at least one opportunity to amend the complaint after making a Section 220 demand for books and records, to the extent Plaintiff still needs other documents he has not already received through discovery.[31] The Court recommends that Plaintiff be granted leave to amend until July 19, 2019, providing Plaintiff with the agreed amount of time to review documents relevant to amending the complaint. Plaintiff should be ordered to notify the Court if he can satisfactorily amend the complaint based on documents Defendants recently produced or still needs to make a Section 220 demand, in which case Plaintiff may request that the action be stayed.

In the latter case, the action should be stayed so that, if the Corporation "refuses to permit an inspection sought by a stockholder ... or does not reply to the demand within 5 business days after the demand has been made, the stockholder may apply to the Court of Chancery for an order to compel such inspection" as authorized by 8 Del. Code § 220. *See, e.g., Oswald v. Humphreys,* No. C16-241, 2016 WL 6582025, at *4 (N.D. Cal. Nov. 7, 2016) (granting motion to dismiss shareholder derivative complaint without prejudice and with leave to amend and staying case so plaintiff can make a Section 220 demand). If the case is stayed, Plaintiff should be required to file a status report every 30 days updating the Court on the status of a Section 220 demand and his intent to

file an amended complaint. *See, e.g., In re Johnson & Johnson Deriv. Litig.,* 865 F. Supp. 2d 545, 581 (D.N.J. 2011) (granting motion to dismiss shareholder derivative complaint without prejudice and with leave to amend so plaintiff can make a Section 220 demand); Order, *In re Johnson & Johnson Deriv. Litig.,* No. 2:11-CV-2919 (D.N.J. Nov. 29, 2011), ECF No. 27 (ordering plaintiff to file a status report every 30 days on status **754** of Section 220 process and intent to file amended complaint).

## V.

## CONCLUSION

The Court recommends the following:

1. Defendants' motion to dismiss should be granted.

2. Plaintiff's complaint should be dismissed without prejudice and Plaintiff should be granted leave to amend by July 19, 2019.

3. Plaintiff should be ordered to notify the Court, no later than July 1, 2019:

   a. whether he will amend the complaint based on documents Defendants recently produced, or

   b. whether he intends to make a Section 220 demand, and

   c. whether he needs a stay for the company to respond to his demand.

4. If Plaintiff intends to make a Section 220 demand and requests a stay,

   a. this action should be stayed, and

   b. Plaintiff should be required to file a status report with the Court every 30 days after the stay is entered.

**The Parties have fourteen days from service of this Report and Recommendation to file written objections. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Failure to file timely objections will preclude review of factual findings or legal conclusions, except for plain error.** *Quinn v. Guerrero,* 863 F.3d 353, 358 (5th Cir. 2017).

Signed at Houston, Texas, on May 29, 2019.

**All Citations**

396 F.Supp.3d 720

**Footnotes**

1    On March 29, 2019, the District Judge referred this motion for a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B), ECF No. 35.

2    Plaintiff filed an opposition, ECF No. 30, and Defendants filed a reply, ECF No. 31.

3    Mr. Wright is the only inside Director, serving as the Chair of the Board and also as the Corporation's Chief Executive Officer ("CEO"). ECF No. 1 at ¶ 17.

4    The Board's eighth Director, William Saunders, is not named as a Defendant in this suit. ECF No. 1 at ¶ 6.

5    Defendants allege that Mr. Wright, Mr. Jacoby, and Mr. Thompson are no longer members of the Board. ECF No. 29 at 12 n.5.

6    "Directorial interest exists whenever divided loyalties are present, or a director either has received, or is entitled to receive, a personal financial benefit from the challenged transaction which is not equally shared by the shareholders." *Goldfarb on behalf of Pain Therapeutics, Inc. v. Barbier*, No. 11-CA-1102, 2012 WL 13028298, at *6 (W.D. Tex. Apr. 26, 2012) (quoting *Pogostin v. Rice*, 480 A.2d 619, 624 (Del. 1984)) (applying Delaware law). "Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Id.* (quoting *Aronson*, 473 A.2d at 816).

7    *See, e.g., Abbott Labs. Deriv. S'holders Litig.*, 325 F.3d 795, 805-06 (7th Cir. 2003) (applying Delaware law) (distinguishing plaintiffs' claims alleging the that directors knowingly breached their fiduciary duties from *Caremark* claims where directors are charged with " 'unconsidered' failure to act" or conduct "predicated upon ignorance of liability creating activities"); *accord In re Pfizer Inc. S'holder Deriv. Litig.*, 722 F. Supp. 2d 453, 459-60 (S.D.N.Y. 2010) (applying Delaware law) (same).

8    *See, e.g., In re Yahoo! Inc. S'holder Litig.*, 153 F. Supp. 3d 1107, 1119 (N.D. Cal. 2015) (applying Delaware law) ("The *Rales* test simply requires the plaintiff to offer particularized allegations to create a reasonable doubt as to the first prong of the *Aronson* test....") (citing *Rales*, 634 A.2d at 934); *Ellis v. Gonzalez*, No. 2017-342-SG, 2018 WL 3360816, at *5-6 (Del. Ch. July 10, 2018) ("The tests articulated in *Aronson* and *Rales* are 'complementary versions of the same inquiry.' ... [U]nder either *Aronson* or *Rales*, the question here is the same: Does the Complaint adequately allege that a majority of [the corporation's] board face[ ] a substantial likelihood of liability for breaching the duty of loyalty?"), *aff'd*, No. 412, 2019 WL 654609 (Del. Feb. 18, 2019); *Park Employees' and Retirement Board Employees' Annuity & Benefit Fund of Chicago v. Smith*, No. 11000-VCG, 2017 WL 1382597, at *5 (Del. Ch. Apr. 18, 2017) ("The analysis in both *Rales* and *Aronson* drive at the same point; they seek to assess whether the individual directors of the board are capable of exercising their business judgment on behalf of the corporation."); *Guttman v. Huang*, 823 A.2d 492, 500-01 (Del. Ch. 2003) ("[T]he differences between the *Rales* and the *Aronson* tests in the circumstances of this case are only subtly different, because the policy justification for each test points the court toward a similar analysis.... [The *Rales*] inquiry makes germane all of the concerns relevant to both the first and second prongs of *Aronson*."); *see also Strong v. Taylor*, 877 F. Supp. 2d 433, 444 (E.D. La. 2012) (applying Delaware law) (analyzing demand futility under both *Rales* and the first prong of *Aronson* collectively); *Khanna v. McMinn*, No. 20545, 2006 WL 1388744, at *12 (Del. Ch. May 9, 2006) (same). The difference between the tests is particularly less relevant where, as here, Plaintiff makes no allegation that he satisfies the second prong of *Aronson*.

9    *But see also In re Rocket Fuel Inc. Deriv. Litig.*, No. 15-CV-4625, 2016 WL 4492582, at *4-5 (N.D. Cal. Aug. 26, 2016) (applying Delaware law) (applying *Rales* test to board's issuance of misleading statements where parties agreed that *Rales* applied); *In re Hecla Min. Co. Deriv. S'holder Litig.*, Nos. 2:12-CV-98, 2:12-CV-119, 2014 WL 689036, at *15 (D. Id. Feb. 20, 2014) (applying Delaware law) (applying *Rales* to board's dissemination of misleading statements, but noting the inherent overlap between the two tests); *Jones ex rel. CSK Auto Corp. v. Jenkins*, 503 F. Supp. 2d 1325, 1332, 1334-35

(D. Ariz. 2007) (applying Delaware law) (citing *Rales* for demand futility standard as to board's dissemination of false and misleading statements but analyzing whether directors were interested or lacked independence).

10    *See, e.g., In re Rocket Fuel*, 2016 WL 4492582, at *6 (finding that which test applies is irrelevant because the plaintiff's demand futility allegations are insufficient under either test); *accord Goldfarb*, 2012 WL 13028298, at *5 (same).

11    Defendants attached the certificate of incorporation and three other documents to their motion to dismiss. *See* Ex. 1-4, ECF Nos. 29-1, 29-2, 29-3, 29-4, 29-5. Plaintiff objects to Defendants' attachment of these exhibits. ECF No. 30 at 26 n.12. While the court must ordinarily limit its review on a motion to dismiss to the complaint, "[t]he Court may consider 'public disclosure documents required by law to be, and that have been, filed with the SEC ... without, pursuant to Rule 12(b), converting the motion into one for summary judgment.'" *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 747 n.4 (N.D. Tex. 2018) (quoting *Fin. Acquisition Partners v. Blackwell*, 440 F.3d 278, 286 (5th Cir. 2006)). "The court may take judicial notice of the certificate in deciding a motion to dismiss." *Van der Gracht*, 2017 WL 9280071, at *16 (quoting *In re Baxter Int'l Inc. S'holders Deriv. Litig.*, 654 A.2d 1268, 1270 (Del. Ch. 1995)) (taking judicial notice of certificate of incorporation on motion to dismiss for demand futility analysis under Rule 23.1); *accord Jones*, 503 F. Supp. 2d at 1340, n.6 (same); *Knox v. Rosenberg*, No. H-99-123, 1999 WL 35233291, at *6-7 (S.D. Tex. Sept. 28, 1999) (same). The Court declines to rely on Defendants' other three attachments, as they are not critical to resolving the motion and Defendants only rely on them to establish background facts.

12    Some of Plaintiff's demand futility arguments could also apply to Plaintiff's claim for breach of fiduciary duty based on allegations of insider trading, to the extent this violates the Directors' fiduciary duties. *See In re China Automotive Sys. Inc. Deriv. Litig.*, No. 7145-VCN, 2013 WL 4672059, at *10 (Del. Ch. Aug. 30, 2013) (recognizing insider trading as a breach of fiduciary duty) (citing *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7-8 (Del. Ch. 1949)). For clarity, and because demand futility must be alleged on a "claim-by-claim basis," *Taylor*, 893 F. Supp. 2d at 666, the Court discusses those demand futility allegations that pertain specifically to Plaintiff's insider trading claim separately. *See infra* Section II.D.

13    Plaintiff also alleges in his brief that Mr. Wright faces a substantial likelihood of liability because he was a named Defendant in a related securities class action. ECF No. 30 at 14 (citing *In re Conn's*, No. 14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125). However, Plaintiff did not discuss this in his complaint and "it is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss." *In re Enron Corp. Sec., Deriv., & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011) (citing *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 646 (S.D. Tex. 2001)). Furthermore, that action settled. *See, e.g., In re Rocket Fuel*, 2016 WL 4492582, at *5 (finding directors who were dismissed in securities action "face almost no risk of liability—let alone a substantial likelihood—from that case."). The Court notes that Mr. Wright is a named Defendant in another securities fraud action pending before the same District Judge for similar violations, but Plaintiff made no allegation that it also serves as a basis on which to excuse demand as to Mr. Wright. *See* Compl., *Microcapital Fund LP et al. v. Conn's, Inc. et al.*, No. 4:18-CV-1020 (S.D. Tex. Apr. 2, 2018), ECF No. 1. Even if relevant, the Court already determined that Mr. Wright is interested or lacking independence on other grounds.

14    Defendants concede that Mr. D. Martin is not listed as independent on the Corporation's proxy statement under NASDAQ listing standards. ECF No. 29 at 12. Defendants contend Mr. Martin was not listed as such because of his connection with Stephens, Inc., which the Court otherwise finds meritless as discussed *infra. Id.* However, despite other Board members also having alleged affiliations with Stephens, Inc., the Corporation found only Mr. Martin was not independent on this basis and the Court will presume, resolving all inferences in favor of the Plaintiff, that he lacks sufficient independence for demand futility purposes.

15    Plaintiff's other allegations as to Mr. D. Martin lack merit as further discussed *infra* with regard to other Directors.

16    Plaintiff also emphasizes a reference in a July 2014 New York Times article stating that Mr. Schofman allegedly typed a message to Mr. Wright about consumer credit while on the phone with the reporter. ECF No. 1 at ¶ 85. Plaintiff alleges the "spontaneity of Schofman's communication with Wright exemplifies the Audit Committee Defendants' direct and regular involvement in, and their knowledge of, the issues regarding the Company's consumer credit programs." ECF No. 30 at 18-19. However, the mere allegation that a Director typed a message to the CEO does not include any other factual information about what specifically Mr. Schofman wrote to Mr. Wright about, whether Mr. Wright responded, whether this

was typical, or what information Mr. Schofman (or other Audit Committee Defendants) specifically had that indicated their knowledge of the falsity of Conn's public statements.

17    In addition, Plaintiff challenges many of the same statements that were at issue in the related securities class action before the same District Judge presiding over this case. *See* ECF No. 1 at ¶¶ 59, 60, 64, 65, 70, 72, 74, 76, 77, 78, 86, 87, 91, 108, 109, 111, 120. Applying the relevant pleading standards under the Private Securities Litigation Reform Act, the District Judge struck many of those statements from the Fourth Amended Complaint in the securities class action because they were not materially misleading. *See* Mot. Hr'g Tr. at 71:17-72:25, 89:11-111:13, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Mar. 25, 2016), ECF No. 117 (striking statements in paragraphs 64, 65, 68, 69, 74, 79-83, 90, and 91); Mot. Hr'g Tr. at 29:21-31:11, 40:4-42:18, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. Mar. 29, 2016), ECF No. 118 (striking statements in paragraphs 98, 112, 113, 123, and part of paragraph 111); *see also* Order, *In re Conn's*, No. 4:14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125. Thus, those statements cannot be used to excuse demand here. *See In re Yahoo!*, 153 F. Supp. 3d at 1120 (not excusing demand where plaintiffs challenged same statements at issue in the class action, and which were deemed not materially misleading). The fact that many of those statements were already found not to be materially misleading reduces the Directors' likelihood of personal liability for issuing those statements here.

18    *accord Strong*, 877 F. Supp. 2d at 448 ("When a Plaintiff does not allege facts suggesting that the Individual Defendants prepared the financial statements or that they were directly responsible for the misstatements or omissions then this Court cannot reasonably conclude that the Individual Defendants face a substantial likelihood of liability" for mere execution of financial reports.); *In re Citigroup*, 964 A.2d at 134 (not excusing demand where plaintiff failed to plead particularized facts showing directors' involvement in the preparation of allegedly misleading disclosures other than reviewing them, or that they knew any disclosures or omissions were false).

19    "*Malone* established that directors owe a duty not to knowingly disseminate false information to stockholders, even when the directors are not seeking stockholder action. To plead a disclosure claim where there is no request for stockholder action, a plaintiff must allege that the directors 'deliberately misinform[ed] shareholder about the business of the corporation, either directly or by a public statement.' ... Because [the corporation's] charter contains a Section 102(b)(7) exculpatory provision, the Plaintiff here cannot establish demand futility based on his disclosure claims unless he 'plead[s] particularized factual allegations that 'support the inference that the disclosure violation[s] w[ere] made in *bad faith, knowingly or intentionally.*' ' " *Ellis*, 2018 WL 3360816, at *5 (emphasis in original).

20    At the time this complaint was filed on December 1, 2014, plaintiffs in the related securities class action had filed a second amended complaint. *Compare* ECF No. 1 *with* Second Am. Compl., *In re Conn's*, No. 14-CV-548 (S.D. Tex. Oct. 29, 2014), ECF No. 56. After this action was stayed on January 30, 2015, ECF No. 18, plaintiffs in the related class action amended their complaint twice more. *See* Third Am. Compl., *In re Conn's*, No. 14-CV-548 (S.D. Tex. Apr. 10, 2015), ECF No. 86; Fourth Am. Compl., *In re Conn's*, No. 14-CV-548 (S.D. Tex. July 21, 2015), ECF No. 104. The District Judge granted the defendants' motion to dismiss the Fourth Amended Complaint in part, striking substantial portions of the complaint. Order, *In re Conn's*, No. 14-CV-548 (S.D. Tex. May 5, 2016), ECF No. 125.

21    Plaintiff includes his insider trading allegations as to Mr. Jacoby, Mr. D. Martin, and Mr. Thompson as part of his complaint's "substantive allegations" of misconduct, but not in the section addressing "derivative and demand futility allegations" for any Director other than Mr. Wright. Therefore, it is not entirely clear on the face of the complaint that Plaintiff alleges this is a basis for excusing demand as to Mr. Jacoby, Mr. D. Martin, and Mr. Thompson. However, Plaintiff alleges in his opposition brief that "the Director Defendants' violations of the Company's insider trading policy ... cast[s] doubt on the Board's independence," ECF No. 30 at 24, and Defendants likewise assume that Plaintiff makes this argument, ECF No. 29 at 25. While Plaintiff must explicitly make such allegations as to each Director in the complaint, the Court will assume he did so, construing the complaint liberally in his favor.

22    *see also In re Hecla*, 2014 WL 689036, at *15 (not excusing demand based on insider trading allegations where plaintiff made conclusory allegations and no particularized facts exist to indicate the defendants improperly used material, non-public information); *Jones*, 503 F. Supp.2d at 1338 (not excusing demand based on insider trading allegations where Plaintiff alleged defendants had access to material non-public information because of their "access to and review of internal corporate documents; conversations and connections with other corporate officers, employees, and directors....", but "did not provide any particularized information about the internal corporate documents that [defendants] allegedly

reviewed, details of the conversations they had with other corporate officers, or what information was discussed at the Board meetings....").

23    *See also In re Pfizer, Inc. Deriv. Sec. Litig.*, 307 F. App'x 590, 594 (2d Cir. 2009) (applying Delaware law) (finding plaintiffs' allegations regarding insider trading fail to excuse demand because they "give no reason why their timing suggest trading on the basis of inside information."); *Guttman*, 823 A.2d at 503 (not excusing demand based on insider trading allegations because "the timing of the defendants' trades is quite disparate, having only the common pattern of coming after the filing of a certified financial statement.").

24    Plaintiff alleges Mr. Wright had not sold any Conn's shares since 2007. ECF No. 1 at ¶ 139.

25    As Defendants argued, some of Plaintiff's allegations undermine the plausibility of a *Caremark* claim. ECF No. 29 at 28 (citing ECF No. 1 at ¶¶ 31-45, 61). For example, the complaint describes policies that were in place to ensure the integrity of financial reporting and that Audit Committee members received "daily reports from Conn's credit and collection department" and had "regular discussions with management in the process of reviewing and approving the dissemination of the false and misleading statements set forth in this complaint." ECF No. 1 at ¶¶ 35-45, 143.

26    Plaintiff generally alleges that each Defendant knew "(a) Conn's was growing its sales revenues and financial results by utilizing underwriting and collections practices that, despite the statements to the contrary, weakened its portfolio quality and left it susceptible to substantial increases in its delinquency rates and bad debt; (b) Conn's faced increased delinquency and charge-off rates in its credit segment; (c) Conn's financial performance was substantially and materially threatened due to the Company's practices in its credit segment; (d) rather than approving just 'some' customers in new stores that would otherwise not have been approved 'for a brief period of time,' all new store customers were approved for credit in order to meet sales quotas, including customers with abysmal FICO scores and customers who previously had been denied credit at other Conn's stores; and (e) ... the statements regarding the Company's financial performance were false and misleading and lacked a reasonable basis when made." ECF No. 1 at ¶¶ 2, 71, 83. Plaintiff also alleges "Wright was informed of the Company's collections problems through daily reports from the credit and collections department." *Id.* at ¶ 152.

27    As to Plaintiff's unjust enrichment claim, Defendants also argue that "one Texas court has suggested that an unjust enrichment claim does not relate to the 'rights, powers, and duties of [the Board's] governing authority, governing persons, officers, owners, and members,' ... and thus that Texas substantive law should govern such claims ... [and] if Texas law were applied, Plaintiff's unjust enrichment claim would require dismissal for the additional reason that Texas does not recognize an independent tort for unjust enrichment." ECF No. 29 at 29 n.13 (citing *Madison P'ship Liquidity Inv'rs 31, LLC*, No. SA98CA324, 1998 WL 1782544, at *2 (W.D. Tex. Sept. 28, 1998)). Plaintiff objects that Defendants' reliance on Texas law is irrelevant. ECF No. 30 at 30 n.17. In *Madison*, the Court relied in part on a choice of law analysis to determine that Texas state law applied in that context. Such briefing is absent here, so the Court does not rely on this argument to dispose of Plaintiff's claim.

28    *See supra* n.26.

29    Defendants also contend that Plaintiff's insider trading claim as to Mr. Poppe is particularly weak because his sale was purportedly made under a SEC Rule 10b5-1 plan. ECF No. 29 at 30 (citing ECF No. 1 at ¶ 125 n.3). Defendants explain that "[t]hese plans allow officers, directors, or other insiders who regularly possess material, non-public information to buy or sell stock according to preset prices, dates, or other non-discretionary means." *Id.* (citing 17 C.F.R. § 240.10b5-1). Defendants also cite cases that indicate sales made under such plans do not raise a strong inference of scienter, although these were not analyzing whether an insider trading claim survives a Rule 12(b)(6) motion. *Id.* (citing *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 n.11 (9th Cir. 2008); *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 604 (S.D.N.Y. 2007)). Despite acknowledging Mr. Poppe's sale was made under such a plan, Plaintiff only makes conclusory allegations that "his sales are highly suspicious in terms of volume and timing especially in light of the fact that he did not sell any Conn's shares at any time before the Relevant Period." ECF No. 1 at ¶ 125 n.3.

30    The complaint was first filed on December 1, 2014. ECF No. 1. The case was stayed soon thereafter on January 30, 2015. ECF No. 18. Despite the stay being in place, Defendants were ordered to file any motion to dismiss by November 1, 2018. The Court held a scheduling conference on February 6, 2019, after which the stay was lifted.

31    While this motion was pending, the parties jointly filed an agreed motion to extend Plaintiff's deadline to amend the pleadings from May 3, 2019 to July 19, 2019 on the basis that the parties began engaging in discovery and exchanged documents. ECF No. 39. The Defendants produced approximately 837,750 pages of documents to the Plaintiff. *Id.* at ¶¶ 18-19.

End of Document                                              © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Stokes v. Southwest Airlines, 887 F.3d 199 (2018)

57 NDLR P 33

887 F.3d 199
United States Court of Appeals, Fifth Circuit.

Kellie STOKES, Mom and Friend
of B.S., Plaintiff-Appellant

v.

SOUTHWEST AIRLINES,
Defendant-Appellee

No. 17-10760
|
April 5, 2018

**Synopsis**
**Background:** Mother of young airline passenger with autism brought action against airline for violation of state law and federal Air Carrier Access Act (ACAA), alleging that airline's gate agents prevented her family from boarding their flight because they considered her child's behavior disruptive. The United States District Court for the Northern District of Texas, A. Joe Fish, Senior District Judge, 2017 WL 1354099, granted airline's motion to dismiss in part and, on rehearing, dismissed remaining claims. Passenger's mother appealed.

**[Holding:]** The Court of Appeals, Stephen A. Higginson, Circuit Judge, held that ACAA did not provide private cause of action against airline.

Affirmed.

West Headnotes (12)

**[1]** **Federal Courts** 🔗 Questions of Law in General
Court of Appeals reviews issue of law de novo.

**[2]** **Action** 🔗 Statutory rights of action
Whether a given statute should be enforceable through private civil lawsuits is, like any aspect of statutory design, fundamentally up to Congress.

**[3]** **Action** 🔗 Statutory rights of action
**Constitutional Law** 🔗 Creation of rights of action
Courts are bound to follow Congress's choices as to whether statutes should be enforceable through private civil lawsuits, and courts are bound to ascertain those choices through the tools of statutory interpretation.

**[4]** **Action** 🔗 Statutory rights of action
If statute does not itself provide for its enforcement through private civil lawsuits, a private cause of action will not be created through judicial mandate.

5 Cases that cite this headnote

**[5]** **Action** 🔗 Statutory rights of action
In ascertaining whether statute confers private right of action, judicial task is to interpret the statute Congress has passed and to do so by consulting statutory structure and text, while legal context, such as prevailing law at the time of the statute's enactment, matters only to the extent it clarifies text.

3 Cases that cite this headnote

**[6]** **Action** 🔗 Statutory rights of action
Absent affirmative evidence of Congressional intent to allow private civil suits to enforce a statute, there can be no private right of action— no matter how desirable that might be as a policy matter, or how compatible with the statute.

1 Cases that cite this headnote

**[7]** **Action** 🔗 Statutory rights of action
**Carriers** 🔗 Accommodations for disabilities
Air Carrier Access Act (ACAA) did not provide private cause of action against airline for mother of young passenger with autism who alleged airline violated ACAA when its gate agents prevented her family from boarding their flight

because they considered her child's behavior disruptive; ACAA did not expressly provide a right to sue air carrier, to the contrary, ACAA combined with other federal aviation statutes to form comprehensive administrative scheme designed to vindicate fully the rights of disabled persons, and this detailed statutory structure evinced none of the requisite affirmative Congressional intent to allow private right of action. 49 U.S.C.A. §§ 41110(a)(2)(B), 41705, 46101(a), 46106, 46107(b)(1)(A), 46301(a)(1)(A), (c)(1)(A).

5 Cases that cite this headnote

[8]    **Action** ⟜ Statutory rights of action

**Carriers** ⟜ Accommodations for disabilities

Air Carrier Access Act (ACAA) confers no private right to sue in federal district court. 49 U.S.C.A. §§ 41110(a)(2)(B), 41705, 46101(a), 46106, 46107(b)(1)(A), 46301(a)(1)(A), (c)(1)(A).

5 Cases that cite this headnote

[9]    **Courts** ⟜ Number of judges concurring in opinion, and opinion by divided court

Court of Appeals abides by the "rule of orderliness," under which a panel of the court cannot overturn a prior panel decision absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court or by an en banc court.

6 Cases that cite this headnote

[10]    **Courts** ⟜ Supreme Court decisions

When the Supreme Court expressly or implicitly overrules a precedent set by the Court of Appeals, a subsequent panel of the Court of Appeals has the authority and obligation to declare and implement this change in the law, but a mere hint of how the Supreme Court might rule in the future will not suffice; the intervening change must be unequivocal.

6 Cases that cite this headnote

[11]    **Courts** ⟜ Number of judges concurring in opinion, and opinion by divided court

Determination whether a given precedent set by Court of Appeals has been abrogated is itself a determination subject to the rule of orderliness, under which a panel of the court cannot overturn a prior panel decision absent an intervening change in the law.

5 Cases that cite this headnote

[12]    **Carriers** ⟜ Accommodations for disabilities

With limited exceptions, Air Carrier Access Act (ACAA) is enforceable only by the agency charged with administering it. 49 U.S.C.A. §§ 41110(a)(2)(B), 41705, 46101(a), 46106, 46107(b)(1)(A), 46301(a)(1)(A), (c)(1)(A).

1 Cases that cite this headnote

**\*200** Appeal from the United States District Court for the Northern District of Texas

**Attorneys and Law Firms**

Dennis Dean McCarty, Esq., Carrollton, TX, Jonathan Forrest Raburn, McCarty & Raburn, L.L.C., Cedar Hill, Plaintiff-Appellant.

Katherine Ann Staton, Robert M. Cohan, Jackson Walker, L.L.P., Dallas, TX, Sean Daniel Jordan, Jackson Walker, L.L.P., Austin, TX, for Defendant-Appellee.

Before KING, HAYNES, and HIGGINSON, Circuit Judges.

**Opinion**

STEPHEN A. HIGGINSON, Circuit Judge:

We must decide whether private persons can sue in federal district court to enforce the Air Carrier Access Act of 1986 ("ACAA"), Pub. L. No. 99-435, 100 Stat. 1080 (codified as amended at 49 U.S.C. § 41705). Although we answered that question affirmatively in *Shinault v. American Airlines, Inc.*, 936 F.2d 796, 800 (5th Cir. 1991), the Supreme Court's intervening decision in *Alexander v. Sandoval*, 532 U.S. 275, 286–91, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), now mandates a different **\*201** result. We therefore join every

Stokes v. Southwest Airlines, 887 F.3d 199 (2018)

57 NDLR P 33

post-*Sandoval* federal court to consider the issue and hold that the ACAA confers no such private right of action.

I

Kellie Stokes sues Southwest Airlines on behalf of her young son with autism. She alleges that Southwest gate agents prevented her family from boarding their flight, allegedly because the agents considered her son's behavior disruptive. A Southwest pilot had also allegedly been rude to them the previous day. According to Stokes, her son suffered "great physical emotional and mental pain and anguish" as a result of these experiences.

Stokes originally asserted claims under state law and under the Americans with Disabilities Act ("ADA"). In response to Southwest's motion to dismiss, however, Stokes withdrew the ADA claim and substituted a new claim under a different disability-discrimination statute: the ACAA. *See* 49 U.S.C. § 41705(a). Southwest again moved to dismiss, arguing that the state-law claims were preempted and that only the federal government may sue to enforce the ACAA in district court. The district court initially granted the motion to dismiss only in part. But on Southwest's motion to reconsider, the district court held that the ACAA confers no right of action to private litigants; declined to exercise supplemental jurisdiction over the remaining state-law claims, *see* 28 U.S.C. 1367(c)(3); and accordingly dismissed the case.

[1] On appeal, Stokes challenges only the district court's conclusion that the ACAA supplies no private right of action. "We review this issue of law *de novo.*" *Casas v. Am. Airlines, Inc.*, 304 F.3d 517, 520 (5th Cir. 2002).

II

A

[2]   [3]   [4] Whether a given statute should be enforceable through private civil lawsuits is, like any aspect of statutory design, fundamentally up to Congress. *E.g., Sandoval*, 532 U.S. at 286, 121 S.Ct. 1511; *Johnson v. Interstate Mgmt. Co., LLC*, 849 F.3d 1093, 1097 (D.C. Cir. 2017); *Delancey v. City of Austin*, 570 F.3d 590, 592–93 (5th Cir. 2009). Often, Congress expressly provides for private civil-suit enforcement. Other times, however, Congress specifies only

criminal-law enforcement, or leaves civil enforcement in the hands of administrative agencies. Courts are bound to follow Congress's choices in this arena, and bound to ascertain those choices through the tools of statutory interpretation. *Sandoval*, 532 U.S. at 286–87, 121 S.Ct. 1511. "If the statute does not itself so provide, a private cause of action will not be created through judicial mandate." *Ziglar v. Abbasi*, —— U.S. ——, 137 S.Ct. 1843, 1856, 198 L.Ed.2d 290 (2017).

This was not always the case. During the mid-twentieth century, the Supreme Court viewed the fashioning of statutory remedies as within the proper judicial role. *Id.* at 1855. Under the now-abandoned maxim that "a statutory right implies the existence of all necessary and appropriate remedies," *id.* (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 239, 90 S.Ct. 400, 24 L.Ed.2d 386 (1969) ), this *"ancien regime"* routinely inferred private rights of action from silent statutory text, *id.* The Supreme Court's approach has since evolved. Starting in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), affirmative congressional intent became one of four relevant factors (though not always a necessary one), *see id.* at 78, 82, 95 S.Ct. 2080, and the next two decades of cases increasingly focused on congressional intent alone, *see, e.g.,* *202 *Love v. Delta Air Lines*, 310 F.3d 1347, 1351–52 & n.2 (11th Cir. 2002) (collecting cases). *See generally* Richard H. Fallon, Jr., *et al.*, *The Federal Courts and the Federal System* 705–07 (6th ed. 2009).

[5]   [6] That trend culminated in *Alexander v. Sandoval*, 532 U.S. 275, 286–93, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), which today defines the method for identifying private rights of action. *Sandoval* 's command is clear: "[t]he judicial task is to interpret *the statute Congress has passed*," *id.* at 286, 121 S.Ct. 1511 (emphasis added), and to do so by consulting statutory structure and text, *id.* at 288 & n.7, 121 S.Ct. 1511. "Legal context," such as prevailing law at the time of the statute's enactment, matters "only to the extent it clarifies text." *Id.* at 288, 121 S.Ct. 1511. And absent "affirmative" evidence of intent to allow private civil suits, there can be no private right of action—"no matter how desirable that might be as a policy matter, or how compatible with the statute." *Id.* at 286–87, 293 n.8, 121 S.Ct. 1511.

B

[7] Since *Sandoval*, every federal court to reach the issue has held that the ACAA's text and structure preclude a private right of action. *See Lopez v. Jet Blue Airways*, 662 F.3d 593,

Stokes v. Southwest Airlines, 887 F.3d 199 (2018)

57 NDLR P 33

597–98 (2d Cir. 2011); *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1269–70 (10th Cir. 2004); *Love*, 310 F.3d at 1354–59.[1] We agree that *Sandoval* compels this result.

As other circuits have explained, although the ACAA prohibits airlines from discriminating on the basis of disability, it "does not expressly provide a right to sue the air carrier." *Lopez*, 662 F.3d at 597 (construing 49 U.S.C. § 41705). To the contrary, the ACAA combines with other federal aviation statutes to form a comprehensive **\*203** *administrative* scheme "designed to vindicate fully the rights of disabled persons." *Id. See generally* 49 U.S.C. subtit. VII, pt. A (§§ 40101–46507). Those statutes likewise instruct that ACAA enforcement lies primarily with the Department of Transportation ("DOT"), leaving private litigants only carefully circumscribed roles. To wit:

- Rather than suing airlines directly, aggrieved passengers are to notify the DOT, 49 U.S.C. § 46101(a), which "shall investigate each [ACAA] complaint," *id.* § 41705(c)(1).[2]

- If, after an investigation and hearing, the DOT finds an ACAA violation, it *must* issue an order compelling compliance, *id.* § 46101(a)(4), and may further revoke the airline's air carrier certificate, *id.* § 41110(a)(2)(B), or impose civil penalties of up to $25,000 for each act of discrimination, *id.* §§ 41705(b), 46301(a)(1)(A) & (c)(1)(A).

- The DOT may then enforce these orders by filing *its own* civil action in district court, *id.* § 46106, or by requesting that the Department of Justice do the same, *id.* § 46107(b)(1)(A).

- The DOT must also "publish disability-related complaint data" and "report annually to Congress" on "all complaints received." *Id.* § 41705(c)(2)–(3).

- Finally, persons with a "substantial interest" in a DOT enforcement order may seek judicial review by petitioning a federal *court of appeals, see id.* § 46110, arguably allowing aggrieved passengers to compel DOT investigations, *see Love*, 310 F.3d at 1356 n.11.

"Notably absent from th[is] scheme," however, "is a private right to sue in a federal district court." *Id.* at 1354; *accord Boswell*, 361 F.3d at 1265 ("[The] ACAA establishes certain administrative remedies but not a private right of action.").

[8] This detailed statutory structure evinces none of the requisite "affirmative" intent. *See Sandoval*, 532 U.S. at 289–91, 293 n.8, 121 S.Ct. 1511. Quite the opposite: "Congress's creation of specific means of enforcing the statute indicates that it did *not* intend to allow an additional remedy—a private right of action—that it did not expressly mention at all." *Boswell*, 361 F.3d at 1270 (emphasis added); *see also Sandoval*, 532 U.S. at 290, 121 S.Ct. 1511 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others."); *Lopez*, 662 F.3d at 598 ("[T]he text and structure of the [ACAA] show that Congress chose to accomplish [its] goal through means other than private enforcement actions in the district courts."); *Love*, 310 F.3d at 1354 ("[T]he text of the ACAA ... and the surrounding statutory structure ... belie[ ] any congressional intent to create a private remedy."); *cf. Casas*, 304 F.3d at 522–23 (holding that this same administrative scheme precludes a private right to enforce a similar aviation statute). The ACAA confers no private right to sue in federal district court.

C

[9] The difficulty, of course, is that our circuit previously has held otherwise. *See* **\*204** *Shinault v. Am. Airlines, Inc.*, 936 F.2d 796, 800 (5th Cir. 1991). Our analysis would usually stop there. "This circuit abides by the rule of orderliness, under which a panel of the court cannot overturn a prior panel decision 'absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court or by our *en banc* court.' " *United States v. Boche-Perez*, 755 F.3d 327, 334 (5th Cir. 2014) (quoting *Tech. Automation Servs. Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 405 (5th Cir. 2012) ).

[10] But when the Supreme Court " 'expressly or implicitly' overrules one of our precedents, we have the authority *and obligation* to declare and implement this change in the law." *United States v. Tanksley*, 848 F.3d 347, 350 (5th Cir.) (emphasis added) (quoting *United States v. Kirk*, 528 F.2d 1057, 1063 (5th Cir. 1976) ), *as supplemented*, 854 F.3d 284 (5th Cir. 2017). Such a change occurs, for example, when the Supreme Court disavows the mode of analysis on which our precedent relied. *See, e.g., id.* at 350–52 (finding precedent abrogated where a recent Supreme Court opinion "instructed courts on how to" perform the relevant analysis in a way that "unequivocally resolve[d]" the case); *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 775–76 (5th Cir. 2003) (finding precedent abrogated where an intervening Supreme Court

Stokes v. Southwest Airlines, 887 F.3d 199 (2018)

57 NDLR P 33

case "shift[ed] [the] focus" of the applicable test). "[A] mere 'hint' of how the [Supreme] Court might rule in the future," however, will not suffice; the intervening change "must be unequivocal." *United States v. Alcantar*, 733 F.3d 143, 146 (5th Cir. 2013).

To say that *Sandoval* "unequivocally" abrogated *Shinault* is, if anything, an understatement. In *Shinault*, our court inferred a private right of action from the ACAA notwithstanding that "[t]he [statute] does not provide for [one]." 936 F.2d at 800. Instead, we justified our holding by citing legislative history, historical congressional practice, and the fact that the ACAA's language does not expressly *prohibit* courts from creating a private right. *See id.* Then, acknowledging the dearth of guidance from Congress and relying on cases from the "*ancien regime*," we determined what remedies were "necessary and appropriate," ultimately settling on compensatory and emotional damages but not injunctions. *Id.* at 804 (quoting *Little Hunting Park*, 396 U.S. at 239, 90 S.Ct. 400, *abrogation recognized in Ziglar*, 137 S.Ct. at 1855). *Sandoval* could hardly be clearer that courts cannot take this approach. *See, e.g.*, 532 U.S. at 286–87, 121 S.Ct. 1511 ("Statutory intent [to create a private remedy] is determinative. Without it, a cause of action does not exist and courts may not create one, no matter ... how compatible with the statute [it might be]. Raising up causes of action where a statute has not created them may be a proper function for common-law courts, but not for federal tribunals." (citations omitted) ); *id.* at 288, 121 S.Ct. 1511 ("In determining whether statutes create private rights of action, ... legal context matters only to the extent it clarifies text."); *id.* at 293 n.8, 121 S.Ct. 1511 (" '[A]ffirmative' evidence of congressional intent must be provided *for* an implied remedy, not against it...."). We cannot adhere to *Shinault* without disregarding *Sandoval*.[3]

**\*205** Other circuits agree that *Sandoval* contradicts *Shinault*. *See, e.g.*, *Lopez*, 662 F.3d at 597; *Boswell*, 361 F.3d at 1269 (declining to follow *Shinault* because it "issued before the Supreme Court's shift" in *Sandoval*); *Love*, 310 F.3d at 1358–59 (declining to follow *Shinault* because "[after] *Sandoval*, we may not engage in a similarly wide-ranging interpretive inquiry"); *see also* DOT Amicus Brief, *supra* note 1, at 9 n.4 ("[*Shinault*] applied an analysis that the Supreme

Court has since rejected."). And just last year, when a district court rejected an argument based on *Shinault* because *Shinault* "relie[d] on pre-*Sandoval* reasoning," *Conservation Force v. Delta Air Lines, Inc.*, 190 F.Supp.3d 606, 616 (N.D. Tex. 2016) (addressing 49 U.S.C. § 41310), our response was to summarily affirm, "[e]ssentially for the reasons stated in the district court's comprehensive and well-reasoned opinion," 682 Fed.Appx. 310, 311 (5th Cir. 2017). There is no serious dispute that *Shinault* no longer states the law.[4]

**[11]** In response, Stokes contends that our caselaw has reaffirmed *Shinault* even after *Sandoval* issued. If that were true, that would control: the determination whether a given precedent has been abrogated is itself a determination subject to the rule of orderliness. *See United States v. Reyes-Contreras*, 882 F.3d 113, 123 (5th Cir. 2018). But the case on which Stokes relies—*Bynum v. American Airlines, Inc.*, 166 Fed.Appx. 730 (5th Cir. 2006)—held no such thing: it held, without reference to or discussion of *Sandoval*, that attempting to sue under the ACAA was not *sanctionably frivolous* with *Shinault* on the books. *See id.* at 733 (applying Fed. R. Civ. P. 11(b)(2) ). And in any event, *Bynum* is an unpublished decision that does not bind us here. *See* 5th Cir. R. 47.5.4. *Sandoval*, by contrast, is a command we cannot ignore.

III

**[12]** In light of "the unambiguous teachings of *Sandoval*," *Love*, 310 F.3d at 1358, we join the Second, Tenth, and Eleventh Circuits and hold that, with the limited exceptions described above, the ACAA "is enforceable only by the agency charged with administering it," *Horne v. Flores*, 557 U.S. 433, 456 n.6, 129 S.Ct. 2579, 174 L.Ed.2d 406 (2009). No private right of action exists to enforce the ACAA in district court. *Shinault* 's contrary holding did not survive *Sandoval*. The district court's judgment is AFFIRMED.

**All Citations**

887 F.3d 199, 57 NDLR P 33

Footnotes

1    Representative district court opinions include *Segalman v. Sw. Airlines Co.*, No. 2:11-cv-01800, 2016 WL 146196, at \*3 (E.D. Cal. Jan. 13, 2016); *O'Brien v. City of Phoenix*, No. 12-cv-1334, 2012 WL 4762465, at \*1 (D. Ariz. Oct. 5, 2012); *Gill v. JetBlue Airways Corp.*, 836 F.Supp.2d 33, 47–48 (D. Mass. 2011); *Brown v. Alaska Air Grp., Inc.*, No. 11-cv-0091,

2011 WL 2746251, at *2 (E.D. Wash. July 14, 2011); *Hill v. United Air Lines, Inc.*, No. 2:10-cv-3243, 2011 WL 1113499, at *1–2 (D.S.C. Mar. 24, 2011); *Seymour v. Cont'l Airlines, Inc.*, No. 09-526, 2010 WL 3894023, at *1–2 (D.R.I. Oct. 4, 2010); *Johnson v. Nw. Airlines, Inc.*, No. 08-cv-2272, 2010 WL 5564629, at *5 (N.D. Cal. May 5, 2010); *Jackson v. United Airlines, Inc.*, No. 3:08-cv-182, 2009 WL 1036068, at *10 (E.D. Va. Apr. 17, 2009); *Thomas v. Nw. Airlines Corp.*, No. 08-11580, 2008 WL 4104505, at *2–5 (E.D. Mich. Sept. 2, 2008); *Wright ex rel. D.W. v. Am. Airlines, Inc.*, 249 F.R.D. 572, 575 (E.D. Mo. 2008); *Shqeirat v. U.S. Airways Grp., Inc.*, 515 F.Supp.2d 984, 1000–02 (D. Minn. 2007); *Chipps v. Cont'l Airlines, Inc.*, No. 3:05-cv-2024, 2006 WL 463160, at *3–5 (M.D. Pa. Feb. 24, 2006); *Bynum v. Am. Airlines*, No. 03-cv-518, 2004 WL 5568868, at *2 (S.D. Tex. Sept. 1, 2004); *Ruta v. Delta Airlines, Inc.*, 322 F.Supp.2d 391, 402–03 (S.D.N.Y. 2004); and *Fox v. Am. Airlines, Inc.*, No. 02-cv-2069, 2003 WL 21854800, at *4 (D.D.C. Aug. 5, 2003), *aff'd on other grounds*, 389 F.3d 1291 (D.C. Cir. 2004). *But see Waters v. Port Auth. of N.Y. & N.J.*, 158 F.Supp.2d 415, 432–33 (D.N.J. 2001) (rendering a decision immediately after *Sandoval*, but without acknowledging *Sandoval* or otherwise addressing the ACAA's text and structure); *Bower v. Fed. Exp. Corp.*, 156 F.Supp.2d 678, 688 n.17 (W.D. Tenn. 2001) (same). We also note that the agency charged with administering the ACAA has taken the position that no private right of action exists. *See* Brief of U.S. Dep't of Transp. as Amicus Curiae at 9–14, *Boswell v. Skywest Airlines, Inc.*, No. 02-4188 (10th Cir. Dec. 3, 2003) [hereinafter DOT Amicus Brief], *available at* http://bit.ly/2pbWIT4.

The Third and Ninth Circuits have reserved on whether *Sandoval* permits an ACAA private right of action, *see Gilstrap v. United Air Lines, Inc.*, 709 F.3d 995, 1002 (9th Cir. 2013); *Elassaad v. Indep. Air, Inc.*, 613 F.3d 119, 132 n.18 (3d Cir. 2010), but the Ninth Circuit is set to decide the issue soon, *see Segalman v. Sw. Airlines Co.*, No. 17-15196 (9th Cir. argued Mar. 14, 2018).

2    In addition, under DOT regulations, domestic airlines using planes with 19 or more passenger seats must retain one or more "Complaints Resolution Officials" at each airport they serve, who must take steps to resolve ACAA complaints. *See* 14 C.F.R. §§ 382.151, 382.153. The airline itself must also respond to written complaints and inform complainants of their right to invoke the DOT administrative process. *See id.* § 382.155.

3    Congress also amended the ACAA after we decided *Shinault*. *See Love*, 310 F.3d at 1350 n.1. But the DOT has represented that these changes were "non-substantive," DOT Amicus Brief, *supra* note 1, at 4, and Southwest does not advance them as a reason not to follow *Shinault*. Given that *Sandoval* clearly "changed the legal landscape," *e.g.*, *Bonano v. E. Caribbean Airline Corp.*, 365 F.3d 81, 86 n.4 (1st Cir. 2004), we need not similarly address the effect of the statutory amendments on our rule of orderliness.

4    Like our circuit, the Eighth Circuit held a decade before *Sandoval* that the ACAA is privately enforceable. *See Tallarico v. Trans World Airlines, Inc.*, 881 F.2d 566, 569–70 (8th Cir. 1989). The Eight Circuit has yet to revisit that holding, but district courts in that circuit have already declined to follow it in light of *Sandoval*. *See, e.g.*, *Wright*, 249 F.R.D. at 575; *Shqeirat*, 515 F.Supp.2d at 1000–02.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S.
                                                   Government Works.

Smith v. Merritt, 940 S.W.2d 602 (1997)

40 Tex. Sup. Ct. J. 377

940 S.W.2d 602
Supreme Court of Texas.

Colin A. SMITH and Al Smith, Petitioners,

v.

Margaret MERRITT, et al., Respondents.

No. 95–1286.
|
Argued April 17, 1996.
|
Decided Feb. 28, 1997.

**Synopsis**

Passenger who was injured in automobile accident sued social hosts of party at which 19–year-old driver consumed alcoholic beverages, alleging that hosts were negligent and negligent per se in providing alcohol to driver. The 4th Judicial District Court, Rusk County, Donald R. Ross, J., granted summary judgment for defendants and the Court of Appeals, Ramey, C.J., 929 S.W.2d 456, affirmed in part and reversed in part. Passenger appealed. The Supreme Court, Abbott, J., held that: (1) hosts had no common-law duty to passenger to refrain from providing alcohol to driver; (2) provision of alcohol code defining minor as person under 21 did not alter adult status of driver for purposes of determining hosts' civil liability; and (3) provision of alcohol code prohibiting furnishing of alcohol to persons under 21 did not create negligence per se cause of action against hosts.

Judgment of Court of Appeals affirmed in part and reversed in part, and take-nothing judgment rendered.

Hecht, J., filed a concurring opinion in which Owen, J., joined.

West Headnotes (8)

**[1]** **Negligence** ⟜ Necessity and Existence of Duty

In determining whether cause of action in negligence exists, threshold inquiry is whether defendants owed plaintiffs a legal duty.

17 Cases that cite this headnote

**[2]** **Negligence** ⟜ Public policy concerns

When significant and diverse public policy concerns are implicated in determining whether to impose common-law duty, careful consideration should be given to legislative pronouncements reflecting adoption of particular public policy.

4 Cases that cite this headnote

**[3]** **Alcoholic Beverages** ⟜ Underage consumers

**Automobiles** ⟜ Non-commercial providers; social hosts

Social hosts who provided alcohol to 19–year-old driver did not owe common-law tort duty to driver's passenger to refrain from providing alcohol to driver.

9 Cases that cite this headnote

**[4]** **Alcoholic Beverages** ⟜ Underage consumers

Provision of Texas alcoholic beverage code (TABC) defining minor as person under 21 years of age did not alter adult status of 19–year-old driver for purposes of determining civil liability of social hosts who provided driver with alcohol. V.T.C.A., Alcoholic Beverage Code § 106.01.

15 Cases that cite this headnote

**[5]** **Alcoholic Beverages** ⟜ Liability premised on regulatory or criminal violations; negligence per se

Provision of Texas alcoholic beverage code (TABC) prohibiting furnishing alcohol to persons under 21 did not create negligence per se cause of action for passenger in car driven by 19–year-old against social host for providing alcohol to driver. V.T.C.A., Alcoholic Beverage Code § 106.06.

22 Cases that cite this headnote

**[6]** **Negligence** ⟜ Standard established by statute or regulation

Smith v. Merritt, 940 S.W.2d 602 (1997)

40 Tex. Sup. Ct. J. 377

Negligence per se is common-law doctrine in which duty is imposed based on standard of conduct created by penal statute rather than on reasonably prudent person test used in pure negligence claims.

64 Cases that cite this headnote

[7]    **Negligence** ⇐ Standard established by statute or regulation

Not every penal statute creates appropriate standard of care for civil liability purposes, and thus, court is not required to adopt penal statute's standard.

19 Cases that cite this headnote

[8]    **Negligence** ⇐ Standard established by statute or regulation

In determining whether penal statute creates appropriate standard of care for civil liability, court may consider whether adoption of such standard would be inconsistent with legislative intent.

13 Cases that cite this headnote

**Attorneys and Law Firms**

**\*603** David B. Griffith, Robert D. Bennett, Gilmer, for petitioners.

Edward L. Merritt, Frank M. Mason, Gregory P. Grajczyk, Longview, for respondents.

**Opinion**

ABBOTT, Justice, delivered the opinion of the Court, in which PHILLIPS, Chief Justice, and GONZALEZ, CORNYN, ENOCH, SPECTOR and BAKER, Justices, join.

The issue in this case is whether a social host can be liable in negligence or negligence per se for injuries resulting from the host's provision of alcohol to a nineteen-year-old guest.[1] Because the Legislature has established **\*604** a policy against such causes of action, we decline to expand the common law to include those claims. Accordingly, the court

of appeals' judgment is affirmed in part and reversed in part, and we render judgment that the Smiths take nothing.

I

Nineteen-year-old Robert Barbee hosted a party at a lake house owned by his parents, Marita and Bob Barbee, and his grandparents, Margaret and A.P. Merritt. There is no indication that the owners were present or even aware that Barbee hosted this party; however, there is evidence that the owners were aware that Barbee had previously hosted parties at the lake house.

Barbee brought two kegs of beer to the lake house and provided them to the party guests.[2] Nineteen-year-old Robert Hale and eighteen-year-old Colin Smith were two of the guests. After drinking two or three cups of beer, Hale left the party in his car with Smith as a passenger. Soon thereafter, Hale collided head-on with a truck, seriously injuring Smith. Summary judgment evidence showed that Hale may have been driving too fast on the narrow, winding, poorly lit road. A medical report revealed that Hale's blood alcohol concentration was .069 grams per deciliter.

Colin Smith and his father Al Smith sued Robert Barbee and the lake house owners for Colin's injuries. The Smiths alleged that the defendants were negligent and negligent per se for providing Hale with alcohol in violation of liquor control laws and with knowledge that Hale would be driving. The trial court granted the owners' and Robert Barbee's collective motion for summary judgment. The court of appeals affirmed in part, holding that neither Robert Barbee nor the owners owed any common-law duty to the Smiths to prevent Hale from drinking and driving. 929 S.W.2d 456. However, the appellate court reversed in part, holding that a fact question existed concerning whether Robert Barbee was negligent per se for violating section 106.06 of the Texas Alcoholic Beverage Code (TABC), which generally prohibits the provision of alcohol to persons under twenty-one. 929 S.W.2d at 459–60; Tex. Alco. Bev.CodeE § 106.06.

The Smiths filed an application for writ of error with this Court, reasserting their claims that the lake house owners and Robert Barbee were liable in negligence and negligence per se. Robert Barbee also filed an application, asserting that the negligence per se cause of action against him under section 106.06 is precluded by Chapter 2 of the TABC, the "Dram

Shop Act," which provides the exclusive cause of action for serving alcohol to a person eighteen years of age or older.

## II

**[1]** **[2]** In determining whether a cause of action in negligence exists, the threshold inquiry is whether the defendants owed the plaintiffs a legal duty. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). Deciding whether to impose a common-law duty involves complex social and economic policy considerations. *Graff v. Beard,* 858 S.W.2d 918, 920 (Tex.1993). This is especially true in deciding whether to impose a duty on a social host because of the competing societal concerns and public policy issues inherent in such a decision.[3] When significant and diverse **\*605** public policy concerns are implicated, careful consideration should be given to legislative pronouncements reflecting the adoption of a particular public policy. *See Graff,* 858 S.W.2d at 919.

Historically, an alcohol provider owed no tort duty to third persons for injuries caused by the provision of alcohol. *El Chico,* 732 S.W.2d at 309. The consumption of alcohol, rather than the provision of it, was considered to be the sole proximate cause of injury to the third person. *Id.* In 1987, this Court created a common-law duty owed by commercial providers of alcohol to injured third parties in *El Chico.* During the week that opinion was issued, the Texas Legislature superceded the newly recognized common-law duty by amending the TABC to create the Dram Shop Act. *See* Tex. Alco. Bev.CodeE §§ 2.01–2.03; *Graff,* 858 S.W.2d at 919.

The purpose of the legislative enactment is clear. Chapter 2 of the TABC is entitled "Civil Liabilities for Serving Beverages." That chapter "provides *the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older.*" Tex. Alco. Bev.CodeE § 2.03 (emphasis added). Only "a person who sells or serves an alcoholic beverage under authority of a license or permit issued under the terms of [the TABC] or who otherwise sells an alcoholic beverage to an individual" can be liable under Chapter 2. *Id.* § 2.01.

When enacting Chapter 2, the Legislature specifically considered and rejected the inclusion of civil liability for social hosts. *See* Conf. Comm. Rep. on H.BB. 1652, 70th Leg. (1987); *Graff,* 858 S.W.2d at 919. Early versions of the

bill created civil causes of action against both commercial establishments and social hosts. *Graff,* 858 S.W.2d at 919. However, the final version of the bill, and what is currently Chapter 2, creates a statutory cause of action against *commercial* providers only. *Id.;* Tex. Alco. Bev.Code § 2.02. The Legislature demonstrated its intent against the creation of common-law social host liability for serving persons eighteen years of age or older by including language in section 2.03 that liability under Chapter 2 "is in lieu of common law or other statutory law warranties and duties." Tex. Alco. Bev.Code § 2.03.

This Court has previously deferred to the Legislature on social host liability. In *Graff,* we relied heavily on Chapter 2 of the TABC and its legislative history in declining to create a common-law tort duty for a social host who makes alcohol available to an intoxicated adult guest who will be driving. We decided that, as between social hosts and adult guests, the focus of liability to third parties should remain on the drinker. *Graff,* 858 S.W.2d at 921–22. Absent a special relationship between the social host and the adult guest, the host has neither superior knowledge with which to foresee harm nor a legal right to control the guest. See *id.* at 920; *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983).

**[3]** Applying our holding in *Graff* and the dictates of TABC Chapter 2, we conclude that the defendants in this case did not owe a common-law tort duty to the Smiths to refrain from providing alcohol to Hale. Our holding does not leave the Smiths without a remedy, however. Nothing in the TABC or the common law prevents the Smiths from asserting a claim against Hale, the individual who made the choice to drink and drive.

## III

**[4]** The Smiths argue that *Graff* is distinguishable from this case because the *Graff* holding concerned *adult* guests of a social host, and the guest in this case, Robert Hale, was a statutory minor according to TABC section 106.01. Section 106.01 provides: "In this code [the TABC], 'minor' means a person under 21 years of age." Section 106.06 establishes a misdemeanor offense (with certain exceptions not applicable here) for anyone who "purchases an alcoholic beverage for or gives or with criminal negligence makes available an alcoholic beverage to a minor." Tex. Alco. Bev.CodeE § 106.06(a) (as amended by Acts 1993, 73rd Leg., ch. 934, § 79).[4]

Smith v. Merritt, 940 S.W.2d 602 (1997)

40 Tex. Sup. Ct. J. 377

**\*606** Because the guest in this case, Robert Hale, was nineteen and a minor under the TABC, the Smiths urge that two theoretical underpinnings of *Graff*—the inability of social hosts to know the extent of alcohol consumed by their guests and their inability to control their guests' conduct—do not apply. The Smiths contend that social hosts have no need to monitor the alcohol consumption and control the behavior of intoxicated minors because alcohol cannot be legally provided to minors. Because Hale was classified as a "minor" under the Code, the Smiths urge that the reasoning supporting non-liability for a social host who serves alcohol to an intoxicated adult driver is inapplicable.

Robert Hale was an adult at the time of the accident. The fact that he was defined as a minor solely for purposes of TABC section 106.01 is not significant in our negligence analysis.

Since 1973, the age of majority in Texas has been eighteen, except to the extent that there is a conflict with the minimum age provisions of the TABC. Tex. Civ. Prac. & Rem.Code §§ 129.001, 129.003. For purposes other than determining criminal liability under TABC Chapter 106, persons eighteen years of age or older are adults and have the right and corresponding responsibility to make their own choices. *See* Tex. Civ. Prac. & Rem.Code § 129.001 (age of majority is eighteen); Tex. Fam.Code § 1.51 (ability to marry at age eighteen); U.S. Const. amend. XXVI (right to vote at age eighteen); Tex. Elec.Code § 11.002(1) (same); *Kargar v. Sorrentino,* 788 S.W.2d 189, 191 (Tex.App.—Houston [14th Dist.] 1990, no writ) (power to contract at age eighteen); *see also* Tex. Fam.Code § 41.001(2) (parents no longer liable for torts of children when they reach age eighteen); Tex. Penal Code § 8.07(d) (may be put to death for penal violation at age seventeen); 50 U.S.C. app. §§ 453, 454 (must register with Selective Service at age eighteen and can enlist at age eighteen and six months). *See generally Fuller v. Maxus Energy Corp.,* 841 S.W.2d 881, 885 (Tex.App.—Waco 1992, no writ) (stating that an eighteen-year-old has the right to marry, vote, contract, and go to war). Thus, Hale was an adult for virtually all purposes at the time of this accident. Most importantly, he was an adult for the purpose of being responsible for his own behavior and any civil liability resulting therefrom. *See* Tex. Civ. Prac. & Rem.Code § 129.001; Tex. Fam.Code § 41.001(2); *Fuller,* 841 S.W.2d at 885. Nineteen-year-old Barbee could not control nineteen-year-old Robert Hale's decision to drive in an inebriated condition. As an adult subject to being sued in his own capacity, Hale's tort duty should not be shifted to the social hosts in this case.

We recognize that section 106.01 does statutorily return persons aged eighteen to twenty to minority status for the purpose of the penal provisions in section 106.06. Nevertheless, the legislative history of Chapter 106 makes clear that the Legislature did not intend for minor status under section 106.01 to alter adult status elsewhere in the TABC or at common law. The Legislature raised the drinking age to twenty-one only for the express purpose of avoiding "the imposition of sanctions against the state and loss of federal highway funds" for failure to comply with a federal highway funding statute. Tex. Alco. Bev.CodeE § 106.01 historical note (Vernon 1995) [Act of June 6, 1985, 69th Leg., R.S., ch. 285, §§ 1, 14, 15, Tex. Gen. Laws 1323, 1328–29; Act of June 11, 1985, 69th Leg., R.S., ch. 462, §§ 2, 15, 16, Tex. Gen. Laws 1625, 1629–30]; *see also Boyd v. Fuel Distribs., Inc.,* 795 S.W.2d 266, 275 (Tex.App.—Austin 1990, writ denied). Moreover, the Legislature expressed a policy preference for lowering the age of majority for alcohol consumption to nineteen by enacting legislation that will cause the age of majority to revert automatically to nineteen if the Attorney General ever certifies that the federal highway funding law is repealed or otherwise unenforceable. Act of June 17, 1987, 70th Leg., R.S., ch. 495, § 5, 1987, Tex. Gen. Laws 2110 (amending 1985 Tex. Gen. Laws, ch. 285, § 16, at 1328). Absent the federal statute related to highway funds, persons aged nineteen and twenty, including Robert Hale, would not be minors under **\*607** section 106.01. *Boyd,* 795 S.W.2d at 276. It cannot be fairly reasoned, then, that the Legislature intended persons aged eighteen to twenty to be considered minors for purposes of determining civil liability outside of the Chapter 2 framework.

Moreover, allowing social host liability for merely serving alcohol to a person eighteen or over—as urged by the Smiths —would create the anomalous situation where social hosts could incur civil liability for conduct that the Legislature has expressly stated is insufficient to justify civil liability for commercial providers. Under Chapter 2, commercial providers who serve alcohol to persons aged eighteen to twenty may incur civil liability only if "at the time the provision occurred it was apparent to the provider that the individual being sold, served, or provided with an alcoholic beverage was obviously intoxicated to the extent that he presented a clear danger to himself and others." Tex. Alco. Bev.CodeE § 2.02(b)(1). Under the Smiths' contention, social hosts may be civilly liable for injuries to third parties merely for the act of furnishing alcohol to a person at least eighteen years of age but under the age of twenty-one, regardless of

Smith v. Merritt, 940 S.W.2d 602 (1997)

40 Tex. Sup. Ct. J. 377

whether the recipient was "obviously intoxicated." Because commercial providers are much better equipped to determine how much alcohol guests have consumed and when they have approached their limit, it would be odd, indeed, to hold that a statute limiting commercial vendor liability simultaneously allows this Court to create social host liability at a lower standard of culpability.

Considered together, Chapter 2 and Chapter 106 of the TABC reflect the Legislature's deliberate decision not to create a cause of action against social hosts for serving alcohol to persons eighteen years of age and older. We will not circumvent the Legislature's intentions by imposing a duty upon social hosts that the Legislature itself has rejected.

IV

[5] The Smiths also argue that the defendants were negligent per se because they violated section 106.06 of the TABC by providing beer to the nineteen-year-old Robert Hale. The court of appeals allowed the Smiths' cause of action for negligence per se against Barbee, finding that Smith was within both the specific class of persons protected by section 106.06 ("minors" under age twenty-one) and the general class of persons protected by the TABC as a whole (the general public).[5] 929 S.W.2d at 459 (citing *El Chico*, 732 S.W.2d at 312–13). We disagree with the court of appeals and hold that section 106.06 of the TABC does not create a negligence per se cause of action when a social host provides alcohol to a person eighteen years of age or older.

[6]  [7]  [8]  Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims. *See El Chico*, 732 S.W.2d at 312; *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex.1979); *Rudes v. Gottschalk*, 159 Tex. 552, 324 S.W.2d 201, 204 (1959). However, not every penal statute creates an appropriate standard of care for civil liability purposes; therefore, a court is not required to adopt the penal statute's standard. *Carter*, 584 S.W.2d at 278; *Rudes*, 324 S.W.2d at 205 ("As the power of adopting or rejecting standards rests with the civil courts, we may accept or reject the criminal statute or use such part thereof as may be deemed appropriate for our purposes."). In determining whether a penal statute creates an appropriate standard of care, we may consider whether the adoption of such a standard would be inconsistent with legislative intent.

Section 106.06 is located in Title 4 of the TABC, entitled "Regulatory and Penal Provisions," and provides criminal penalties[6] for providing an alcoholic beverage to a person **\*608** under the age of twenty-one. Tex. Alco. Bev.CodeE § 106.06. In contrast, Chapter 2 establishes civil liability for serving alcohol. By enacting Chapter 2 separately from Chapter 106, and thereby establishing a bifurcated civil and criminal liability scheme, the Legislature manifested its intent that Chapter 2 should serve as the sole basis of civil liability for serving alcohol to persons aged eighteen to twenty.

We also find significant the Legislature's expressed intention to preclude Chapter 106 from serving as a basis for negligence per se. Section 2.03 clearly states that Chapter 2 "provides the exclusive cause of action for providing an alcoholic beverage to a person 18 years of age or older." Tex. Alco. Bev.CodeE § 2.03. That section further mandates that liability under Chapter 2 "is in lieu of common law or other statutory law warranties and duties of providers of alcoholic beverages." *Id.* Thus, under Chapter 2, civil liability for alcohol providers, as defined in section 2.01, is in lieu of any negligence per se cause of action, even when the provider serves alcohol to a person aged eighteen to twenty.

Nevertheless, the Smiths contend, and the court of appeals reasoned, that because Chapter 2 applies only to commercial providers, it does not preclude a negligence per se cause of action against a social host. 929 S.W.2d at 460 n. 3. We disagree for several reasons. First, the exclusivity provision in section 2.03 and the legislative history of Chapter 2 make clear that the Legislature has already considered and declined to create a social host duty for serving alcohol to a person eighteen years of age or older. *See Graff*, 858 S.W.2d at 919. Second, the legislative history of section 106.01 demonstrates that the express reason for elevating the age of majority status to age twenty-one was not to prevent injury to the class of persons such as the Smiths, but rather to "avoid the imposition of sanctions against the state and loss of federal highway funds." Act of June 6, 1985, 69th Leg., R.S., ch. 285, §§ 1, 14, 15, Tex. Gen. Laws 1323, 1328–29; Act of June 11, 1985, 69th Leg., R.S., ch. 462, §§ 2, 15, 16, Tex. Gen. Laws 1625, 1629–30; *Boyd*, 795 S.W.2d at 275. Third, it is inconceivable that the Legislature would desire that the combination of Chapter 106 and Chapter 2 would result in negligence per se for social hosts but not for commercial providers for serving alcohol to persons aged eighteen to twenty.

We hold that providing alcohol to a person aged eighteen to twenty, in violation of section 106.06 of the TABC, is not sufficient to establish a negligence per se cause of action against a social host.[7] To hold otherwise would ignore the intent and policies of the Legislature.


**V**

The Smiths urge two other points of error. First, they assert that the court of appeals erred by considering the issues of ownership and control of the lake house and whether the owners knew of the party because these two issues were not raised in the defendants' motion for summary judgment. Second, the Smiths urge that the owners of the lake house had a duty under sections 318 and 877 of the *Restatement (Second) of Torts*. These provisions of the *Restatement* concern the duties of the possessor of land upon which tortious conduct is committed. We need not reach these issues because we conclude that the defendants owed no tort duty to the Smiths.


**VI**

We affirm the court of appeals' judgment for the defendants on the negligence issue. We reverse in part the judgment of the court of appeals and render judgment that the Smiths take nothing on their negligence per se cause of action.


HECHT, Justice, joined by OWEN, Justice, concurring.

I join in the Court's opinion and would add only that in several other states the judiciary has deferred to the legislature to determine social host liability. *See, e.g., Bankston v. Brennan*, 507 So.2d 1385, 1387 (Fla.1987)( "[W]hen the legislature has actively entered **\*609** a particular field and has clearly indicated its ability to deal with such a policy question, the more prudent course is for this Court to defer to the legislative branch."); *Gariup Constr. Co., Inc. v. Foster*, 519 N.E.2d 1224, 1228 (Ind.1988) ( "Cognizant of our legislature's active and ongoing interest and participation in the development of public policy in this area, this Court is unwilling to depart from the general rule followed in most jurisdictions, and we hold that common law liquor liability shall not be extended to the purely social host". (footnote omitted)); *Burkhart v. Harrod*, 110 Wash.2d 381, 755 P.2d 759, 762 (1988)(en banc)(observing that the legislature was disinclined to impose social host liability, and noting that its judicial deference to

the legislature on the issue of social host liability "is fully supported by precedent both within and without th[e] state"); *Olsen v. Copeland*, 90 Wis.2d 483, 280 N.W.2d 178, 182 (1979) ("The problem ... of controlling drinking and driving ... is a legislative problem ... and the issue [of whether or not to impose liability upon alcohol providers] is one best dealt with by the legislature.").

This is true for some courts even in the absence of legislative pronouncements on issues related to social host liability. *See, e.g., Boutwell v. Sullivan*, 469 So.2d 526, 529 (Miss.1985)("We are of the opinion that this question, which involves strong public policy and change of the law, should be studied comprehensively and addressed by the [legislature]."); *D'Amico v. Christie*, 71 N.Y.2d 76, 524 N.Y.S.2d 1, 4, 518 N.E.2d 896, 899 (1987) ("[I]f there is to be a change in [imposing liability on non-seller alcohol providers] it should come from the legislature."); *Manning v. Andy*, 454 Pa. 237, 310 A.2d 75, 76 (1973)("[W]e feel that a decision of this monumental nature is best left to the legislature."); *Ferreira v. Strack*, 652 A.2d 965, 968 (R.I.1995) ("[T]he creation of new causes of action [regarding social host liability] should be left to the Legislature." (citations omitted)).

Some courts have gone so far as to hold that a legislature's activity in this area preempts a common-law cause of action. *E.g., Charles v. Seigfried*, 165 Ill.2d 482, 209 Ill.Dec. 226, 231, 651 N.E.2d 154, 159 (1995); *Holmquist v. Miller*, 367 N.W.2d 468, 471 (Minn.1985); *Cole v. City of Spring Lake Park*, 314 N.W.2d 836, 840 (Minn.1982).

In circumstances similar to those in this case, other jurisdictions have refused to recognize a cause of action for negligence per se. The Nevada Supreme Court has reasoned:

> In other contexts we have recognized that a violation of a penal statute is negligence per se. We decline to so rule in this case since to do so would subvert the apparent legislative intention. The statute before us is but one of many in the statutory scheme regulating the sale of tobacco and intoxicating liquor to minors and drunkards. The section immediately preceding [the statute in question] does impose a limited civil liability upon the proprietor of a saloon who sells liquor to a minor. By providing for civil liability in one section and failing to do so in the section immediately following, the legislature has made its intention clear. Accordingly, we must conclude that a violation [of the statute in question] does not impose civil liability ..., nor is such a violation negligence per se.

Smith v. Merritt, 940 S.W.2d 602 (1997)

40 Tex. Sup. Ct. J. 377

*Hamm v. Carson City Nugget, Inc.,* 85 Nev. 99, 450 P.2d 358, 360 (1969) (citations omitted); *see also Holmes v. Circo,* 196 Neb. 496, 244 N.W.2d 65, 70 (1976) (agreeing with the court's conclusions in *Hamm* ); *cf. Kube v. Kube,* 193 Neb. 559, 227 N.W.2d 860 (1975) (no cause of action for violation of a federal statute that provided no civil remedy).

**All Citations**

940 S.W.2d 602, 40 Tex. Sup. Ct. J. 377

## Footnotes

1    In *Ryan v. Friesenhahn,* 911 S.W.2d 113 (Tex.App.—San Antonio 1995, writ granted), the court of appeals concluded that social hosts can be liable in negligence and negligence per se for injuries sustained by an intoxicated guest under eighteen years of age. We granted Friesenhahn's application for writ of error to determine whether the appellate court correctly imposed a social host duty under the circumstances of that case. Our holding in today's opinion is limited to social hosts providing alcohol to guests eighteen years of age or older. Accordingly, this opinion is not dispositive of the *Friesenhahn* case.

2    The record does not reflect where or how Barbee obtained the beer. The person or entity who provided the beer to Barbee is not a party in this lawsuit.

3    *See Burkhart v. Harrod,* 110 Wash.2d 381, 755 P.2d 759, 761 (1988)(en banc) (listing the range of issues involved in social host liability, including "the amount of damage caused by drunk drivers, the percentage of that damage for which a social host was at some point involved, the extent to which automobile insurance of all types already provides a remedy to victims, the effect that the added liability would have on homeowners' and renters' insurance rates, the possibilities of alternative remedies ..., the possibilities of limiting the host's liability, and proscribing standards of conduct for social hosts.").

4    Section 106.06 actually contains two subsections labeled "(a)." In addition to the subsection quoted in the text of this opinion, a different version of Section 106.06(a) establishes a misdemeanor offense for anyone who "purchases an alcoholic beverage for or gives or makes available an alcoholic beverage to a minor with criminal negligence." The existence of two subsections labeled "(a)" and the difference between the two are immaterial to this opinion.

5    The court of appeals relied on the general purpose of the TABC, which is to "protect[ ] ... the welfare, health, peace, temperance, and safety of the people of the state." Tex. Alco. Bev.CodeE § 1.03.

6    A violation of Section 106.06 is a misdemeanor punishable by a fine of not less than $100 nor more than $500. Tex. Alco. Bev.CodeE § 106.06(c).

7    Of course, hosts who provide alcohol to a person eighteen years of age or older, but under twenty-one, in violation of section 106.06 are still subject to criminal sanctions.

---

End of Document                                            © 2022 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 4391247
Only the Westlaw citation is currently available.
United States District Court, N.D. Texas, Dallas Division.

Toliver ARMSTRONG, Plaintiff,

v.

SOUTHWEST AIRLINES CO., Defendant.

Case No. 3:20-cv-3610-BT
|
Signed 09/24/2021

**Attorneys and Law Firms**

Aaron Herbert, Marissa Ann Maggio, The Law Firm of Aaron A. Herbert, Dallas, TX, for Plaintiff.

Katherine A. Staton, Elizabeth Walsh Pittman, Jackson Walker LLP, Dallas, TX, for Defendant.

**MEMORANDUM OPINION AND ORDER**

REBECCA RUTHERFORD, U.S. MAGISTRATE JUDGE

**\*1** Defendant Southwest Airlines Co. (Southwest) has filed a Motion for Judgment on the Pleadings (ECF No. 13) under Federal Rule of Civil Procedure 12(c). For the reasons stated, the Court GRANTS Southwest's Motion and DISMISSES with prejudice Plaintiff Toliver Armstrong's negligence per se claim.

**Background**

Armstrong brings this civil action against Southwest asserting claims for negligence and negligence per se based on the Air Carrier Access Act (ACAA), arising out of injuries he sustained on or about April 29, 2019.[1] Pl.'s Pet. ¶¶ 9, 11-13 (ECF No. 1-3). Armstrong alleges he was injured when a Southwest employee pushing him in a wheelchair through Dallas Love Field Airport "made a sudden turn and ran the wheelchair into the suitcase of an individual who [was] walking through the airport." *Id.* ¶ 9. The collision caused Armstrong "to fall out of the wheelchair onto the floor" and caused another person to fall on top of him. *Id.* According to Armstrong, he suffered "severe bodily injuries," and by this lawsuit he seeks damages for his medical costs, physical pain

and suffering, mental anguish, and disfigurement. *Id.* at ¶¶ 9, 14.

Southwest filed an answer (ECF No. 4) generally denying Armstrong's allegations of negligence and asserting several affirmative defenses, including the defense that Armstrong failed to state a claim upon which relief can be granted as to negligence per se because the ACAA does not provide a private cause of action. Def.'s Answer 5. Southwest also filed the pending Motion for Judgment on the Pleadings, arguing that Armstrong's negligence per se claim fails because the ACAA does not provide a private cause of action. Def.'s Mot. 3-4. Armstrong objects that he is not asserting a private cause of action under the ACAA but "a common law negligence per se claim, with certain regulations under the ACAA forming the basis for the negligence standard of care." Pl.'s Resp. ¶ 5 (ECF No. 14). Southwest responds that the ACAA's comprehensive regulatory scheme is an inappropriate basis for a negligence per se claim. Def.'s Mot. 4-7; Def.'s Reply 2-3 (ECF No. 15). The Motion is fully briefed and ripe for determination.

.

**Legal Standard**

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is designed to dispose of cases where the material facts are not in dispute and a judgment on the merits can be rendered by looking to the substance of the pleadings and any judicially noticed facts." *Hebert Abstract v. Touchstone Props., Ltd.*, 914 F.2d 74, 76 (5th Cir. 1990) (per curiam) (internal citations omitted). The standard for deciding a motion under Rule 12(c) is the same as the one for deciding a motion to dismiss under Rule 12(b)(6). *Gentilello v. Rege*, 627 F.3d 540, 543-44 (5th Cir. 2010).

**\*2** When deciding a 12(b)(6) motion for failure to state a claim, the court "accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (internal quotation marks and citations omitted). To survive a Rule 12(c) motion for judgment on the pleadings, therefore, a plaintiff's complaint must contain sufficient factual matter to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "To be plausible, the complaint's '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d 201, 210 (5th Cir. 2010) (quoting *Twombly*, 550 U.S. at 555).

Armstrong v. Southwest Airlines Co., Slip Copy (2021)
2021 WL 4391247

This pleading standard does not require " 'detailed factual allegations,' " but it does demand more than an unadorned accusation devoid of factual support. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).

**Analysis**

I. <u>Southwest is entitled to dismissal of Armstrong's negligence per se claim because Armstrong abandoned his claim based on § 382.95 and failed to plead sufficient facts to support a claim based on § 382.141.</u>

Armstrong asserts a state law negligence per se claim alleging that Southwest failed to "provide free and safe assistance to passengers with disabilities," in violation of 14 C.F.R. § 382.95, and neglected to "properly train its employees on the use of assistance equipment such as wheelchairs," in violation of 14 C.F.R. § 382.141. Pl.'s Pet. ¶ 13. However, Armstrong abandoned his claim based on § 382.95 in his Response to Southwest's Rule 12(c) Motion. Pl.'s Resp. ¶ 12 ("After carefully reviewing and considering 14 C.F.R. § 382.95 again, ... Plaintiff believes that Defendant may be correct in their argument that a violation of this particular regulation cannot be negligence per se under Texas law. Plaintiff will replead to take this out of his complaint as a basis for negligence per se."). Armstrong further fails to plead any facts to support a claim that Southwest failed to properly train its employees on the use of wheelchairs, as required by § 382.141. Armstrong has thus failed to plead a claim that is plausible on its face. Southwest is entitled to dismissal of Armstrong's negligence per se claim.

Generally, the Court would permit Armstrong an opportunity to replead his negligence per se claim based on § 382.141. But "leave to amend need not be granted when it would be futile to do so." *See, e.g.*, *F.D.I.C. v. Conner*, 20 F.3d 1376, 1385 (5th Cir. 1994) (internal citations omitted). As explained below, Texas law prohibits negligence per se claims that conflict with the legislative intent behind the underlying statute. And here, the ACAA evinces Congress's intent to bar private causes of action, including negligence per se. Therefore, any negligence per se claim based on the regulations promulgated under the ACAA would be futile.

II. <u>Armstrong's negligence per se claim must be dismissed with prejudice.</u>

The ACAA and its implementing regulations prohibit airlines from discriminating against disabled passengers. 49 U.S.C. § 41705; *see also* 14 C.F.R. § 382.1 ("The purpose of this Part is to carry out the [ACAA]. This rule prohibits both U.S. and foreign carriers from discriminating against passengers on the basis of disability; requires carriers to make aircraft, other facilities, and services accessible; and requires carriers to take steps to accommodate passengers with a disability."). But the ACAA provides no private right of action. Indeed, the Fifth Circuit recently held: "No private right of action exists to enforce the ACAA in district court." *Stokes v. Southwest Airlines*, 887 F.3d 199, 205 (5th Cir. 2018). And "every federal court to reach the issue has held that the ACAA's text and structure preclude a private right of action." *Id.* at 202 (citing *Lopez v. Jet Blue Airways*, 662 F.3d 593, 597-98 (2d Cir. 2011); *Boswell v. Skywest Airlines, Inc.*, 361 F.3d 1263, 1269-70 (10th Cir. 2004); *Love v. Delta Air Lines*, 310 F.3d 1347, 1354-59 (11th Cir. 2002)). Each of these courts have held that because the ACAA fails to "expressly provide a right to sue [an] air carrier," no private right of action exists under the statute. *Stokes*, 887 F.3d at 202. (internal quotation marks and citations omitted).

**\*3** Rather, the ACAA "combines with other federal aviation statutes to form a comprehensive administrative scheme designed to vindicate fully the rights of disabled persons." *Id.* at 202-03 (internal quotation marks and citations omitted). This regulatory scheme's enforcement "lies primarily with the Department of Transportation." *Id.* The ACAA only leaves private litigants "carefully circumscribed roles." *Id.* at 203. The ACAA's remedial process is specifically limited to an aggrieved passenger notifying the Department of Transportation (DOT) of an alleged violation (with a limited right of judicial review if the DOT declines to investigate); the DOT investigating the allegation; the DOT issuing an order of compliance; and the DOT itself enforcing that order by filing a civil action in district court. *Id.*

Under Texas law, when a legislative body declines to provide for an individual private right of action in a statute and instead provides a comprehensive regulatory scheme with limited private remedies, that statute will not be an appropriate basis for a negligence per se claim. *See Smith v. Merritt*, 940 S.W.2d 602, 607-08 (Tex. 1997); *Reeder v. Daniel*, 61 S.W.3d 359, 362-63 (Tex. 2001). In Texas, "[n]egligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute

Armstrong v. Southwest Airlines Co., Slip Copy (2021)

2021 WL 4391247

rather than on the reasonably prudent person test used in pure negligence claims." *Smith*, 940 S.W.2d at 607 (internal citations omitted). To determine whether a given statute may be the basis for a negligence per se claim, Texas courts must "consider whether recognizing such an accompanying civil action would be inconsistent with legislative intent." *Reeder*, 61 S.W.3d at 362. In other words, Texas courts "will not disturb the Legislature's regulatory scheme by judicially recognizing a cause of action" not contemplated in the statute. *Id.* at 364; *see also Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856 (2017) ("If the statute does not itself so provide, a private cause of action will not be created through judicial mandate.") (internal citations omitted).

In *Baker v. Smith & Nephew Richards, Inc.*, a Texas state district court considered whether the federal Food, Drug, and Cosmetic Act (FDCA) and its Medical Device Amendments (MDA) could form the basis for a state law negligence per se claim. 1999 WL 811334, at *1 (Tex. Dist. Ct. June 7, 1999), *aff'd sub nom.*, *McMahon v. Smith & Nephew Richards. Inc.*, 2000 WL 991697 (Tex. App.— Houston [14th Dist.] July 20, 2000, no pet.). The court held that using these federal statutes to form the statutory standard of care for a negligence per se claim "would be inconsistent with ... legislative intent." *Id.* at *18. In so doing, the court specifically noted that these statutes contained a "prohibition on private causes of action," and were governed by "broad prosecutorial authority given to the FDA." *Id.* The court reasoned that such provisions indicated that the statutes included a policy against private actions like negligence per se, and thus declined "to expand the law to include such claims." *Id.* (internal citations omitted).

The Texas Supreme Court used similar reasoning to hold that the Texas Dram Shop Act could not serve as the basis for a negligence per se claim. *See Smith*, 940 S.W.2d at 607-08; *Reeder*, 61 S.W.3d at 362-63. In both *Smith* and *Reeder*, the Texas Supreme Court pointed to the agency-enforced comprehensive regulatory scheme and explicit limitation of remedies in the Dram Shop Act as evidence that allowing a negligence per se claim based on the Act would contravene legislative intent. *Smith*, 940 S.W.2d at 608; *Reeder*, 61 S.W.3d at 363-64. The Texas Supreme Court thus held that the Dram Shop Act's limited remedies were provided "in lieu of any negligence per se cause of action." *Smith*, 940 S.W.2d at 608; *see also Reeder*, 61 S.W.3d at 362 (citing *Smith*).

 *4 Federal courts interpreting Texas law have also refused to allow negligence per se claims that conflict with legislative

intent. For instance, the court in *Bell v. American Traffic Solutions, Inc.* held that a Texas licensing statute could not be the basis for a negligence per se claim. 633 F. Supp. 2d 305, 315 (N.D. Tex. 2009) (Fish, J.), *aff'd in part, vacated in part*, 371 F. App'x 488 (5th Cir. 2010). Citing the statute's "detailed complaint-filing scheme," the court found that the Texas Legislature "did not intend for individuals to redress alleged violations ... through private suit." *Id.* This fact "counsel[ed] against allowing a negligence per se claim to attach to a violation" of the statute. *Id.* Similarly, the Fifth Circuit held in *Martino v. Kiewit New Mexico Corp* that a plaintiff could not base a negligence per se claim on an OSHA regulation that did "not provide [the plaintiff] with a cause of action." 600 F. App'x 908, 912 (5th Cir. 2015). Even though an employee of the defendant would have had a right of action under the statute, the fact that the plaintiff himself did not have a right of action under OSHA was enough to "preclude" him from using it as a basis for negligence per se. *Id.*

In view of these precedents and the ACAA's complex regulatory scheme that precludes a private right of action, the Court finds that the ACAA is not a proper basis for a negligence per se claim under Texas law. Like the statutes at issue in *Baker*, *Bell*, and *Martino*, the ACAA contains no private right of action. And, like the statutes at issue in *Smith*, *Reeder*, and *Baker*, the ACAA forms a comprehensive regulatory scheme, enforced by a governmental agency, that explicitly limits the actions of private litigants to a few exclusive remedies. Accordingly, like the statutes considered in those cases, the ACAA evinces a Congressional intent to disallow private rights of action not included in the statute —including negligence per se. Thus, allowing a negligence per se claim based on the ACAA would violate the Texas law requirement that a negligence per se claim respect the legislative intent of the underlying statute. If the Court were to allow Armstrong to bring a negligence per se claim based on the ACAA, it would "disturb the Legislature's regulatory scheme by judicially recognizing a [private] cause of action" not contemplated in the statute. *Reeder*, 61 S.W.3d at 364. Because the ACAA cannot serve as the basis for a negligence per se claim, Armstrong's negligence per se claim is dismissed with prejudice.

## Conclusion

For the foregoing reasons, the Court GRANTS Southwest's Motion for Judgment on the Pleadings (ECF No. 13) and

Armstrong v. Southwest Airlines Co., Slip Copy (2021)
2021 WL 4391247

DISMISSES with prejudice Armstrong's negligence per se claim under the ACAA.

**SO ORDERED.**

**All Citations**

Slip Copy, 2021 WL 4391247

Footnotes

1        Armstrong originally filed this suit in the 68th Judicial District Court of Dallas County, Texas, but Southwest, invoking federal diversity jurisdiction, removed the suit to this Court. Def.'s Not. Rem. (ECF No. 1). The Court recently denied Armstrong's motion to remand. Mem. Op. & Order (ECF No. 18).

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1740075
Only the Westlaw citation is currently available.
United States District Court, S.D. Texas, Houston Division.

Stanley J. BRYANT, Plaintiff,

v.

The CIT GROUP/CONSUMER
FINANCE, et al., Defendants.

Civil Action H–16–1840
|
Signed 04/11/2018

**Attorneys and Law Firms**

Jeffrey Craig Jackson, Jeffrey Jackson & Associates, PLLC, John Phillip Fretz, The Law Office of John Fretz, Houston, TX, for Plaintiff.

Randall Burton Clark, McGuireWoods, Houston, TX, for Defendants.

**Amended[1] Memorandum Opinion and Order**

Gray H. Miller, United States District Judge

**\*1** Pending before the court is a motion to dismiss filed by defendants Ditech Financial, LLC ("Ditech") and The Bank of New York Mellon f/k/a The Bank of New York, as Trustee for the benefit of the Certificateholders of the CWABS, Inc. Asset–Backed Certificates, Series 2006–BC4 ("BONYM") (collectively, "Defendants").[2] Dkt. 22. After considering the motion, response, and applicable law, the court is of the opinion that Defendants' motion to dismiss should be GRANTED.

**I. Background**

This case relates to the foreclosure sale of real property located at 2234 Dawn Shadow Way, Fresno, Texas 77545 (the "Property"). Dkt. 20 (first am. compl.). Plaintiff Stanley J. Bryant executed a mortgage note on the Property secured by a deed of trust on December 20, 2005 (collectively, the "Loan"). Dkt. 20, Ex. 1. CIT Group/Consumer Finance, Inc. ("CIT") was the lender, and the Mortgage Electronic Registration

System ("MERS") was listed as the beneficiary of the deed of trust. Id. MERS assigned the deed of trust to BONYM on August 23, 2011. Dkt. 20, Ex. 10. Bryant claims that at some point in 2011 he had medical problems and struggled to pay his mortgage and medical bills, which resulted in his falling into default on his home loan. Dkt. 20. He attaches six different notices of sale to his complaint, the earliest of which is dated November 2011 and the most recent of which is dated April 2016. Id. & Exs. 2–7. Defendant Bank of America, N.A. ("BOA") is listed as the acting mortgage servicer on some of the notices, which were served by a substitute trustee or trustees. See, e.g., Dkt. 20, Ex. 2. The final attached notice of sale lists the sale date as April 5, 2016. Dkt. 20, Ex. 7. On April 5, 2016, the house was sold to BONYM via a credit bid. Dkt. 20, Ex. 8. Bryant contends, however, that he holds legal title to the house. Id.

According to Bryant's amended complaint, the only recorded assignment of the Loan is a fraud and forgery and, even if it were not, there is no complete and unbroken chain of assignments from CIT to BONYM. Dkt. 20. Bryant argues that Chester Levings, an Assistant Secretary of MERS, "purportedly signed" an assignment of the Loan to BONYM on August 23, 2011, but the assignment does not state that MERS was acting as nominee for any entity. Dkt. 20. Bryant asserts that this and other documents related to the chain of assignments are void *ab initio* because they are forgeries. Id. He also asserts that if the loan was securitized into the 2006–BC4 Trust as BONYM claims, it was not properly and validly transferred according to the Trust's Pooling and Servicing Agreement ("PSA") and the law of the state in which the Trust was created—New York. Id. He contends the note was not legally or validly assigned and/or transferred as required by Texas and New York law and that BONYM thus had no standing to foreclose as a real party in interest. Id. Bryant raises eleven causes of action: (1) violation of section 12.002 of the Texas Civil Practices and Remedies Code against BOA, MERS, and BONYM; (2) negligence per se against BOA, MERS, and BONYM; (3) gross negligence and gross negligence per se against BOA, MERS, and BONYM; (4) money had and received against BONYM, BOA, and Ditech Financial LLC ("Ditech"); (5) unjust enrichment against BONYM, BOA, and Ditech; (6) declaratory judgment of lack of standing to foreclose against BONYM and Ditech; (7) declaratory judgment against all defendants; (8) quiet title against all defendants; (9) declaratory relief under the statute of limitations against all defendants; (10) fraud against the CWABS, Inc. Asset–Backed Certificates, Series 2006–BC4 Trust (the "CWABS Trust"), BONYM, and Ditech; and (11)

Bryant v. CIT Group/Consumer Finance, Not Reported in Fed. Supp. (2018)

violation of the Texas Debt Collection Act ("TDCA") against BONYM, BOA, and Ditech. *Id.*

**\*2** Ditech and BONYM removed the case to this court on June 27, 2016, alleging diversity jurisdiction. Dkt. 1. They noted that defendants BOA and MERS consented to the removal, and they asserted that no consent was required from the CWABS Trust or CIT because they are nominal parties that had been fraudulently joined. *Id.* They additionally contended that the consent of the CWABS Trust, CIT, and CWABS, Inc., was not required because these parties have not been served and no citations have been issued to them. *Id.* Bryant filed a motion to remand, arguing that the case should be remanded because the notice of removal failed to state the citizenship of the CWABS Trust. Dkt. 16. Ditech and BONYM argued that the trustee's citizenship, not the trust's, is what matters in this case. Dkt. 21. The court held that the trustee was the real party in interest whose citizenship counted for diversity purposes and denied the motion to remand. Dkt. 43.

Defendants filed a motion to dismiss. Dkt. 22. They argue that (1) Bryant lacks standing to assert any violations of the PSA and challenge any assignment that purportedly violates the PSA; (2) Bryant's conclusory forgery allegations do not meet the pleading standards, which require allegations as to who, what, when, where, and how of the alleged fraud; (3) the Fifth Circuit and Texas court have repeatedly held that MERS has the authority to assign deeds as a beneficiary, foreclosing Bryant's argument that MERS did not have the authority to execute the assignments; (4) Bryant's quiet title claim fails because it is based on inadequate allegations of forgery rather than the strength of Bryant's title; (5) Bryant's statutory fraudulent lien claims relating to the filings of the assignment and substitute trustees in the real property records of Fort Bend County are time-barred; (6) even if the statutory fraudulent lien claims were not time-barred, a document assigning a deed of trust does not qualify as a "lien or claim" under the statute; (7) moreover, Bryant's statutory fraudulent lien claims fail because Bryant did not adequately plead that the defendants intended to cause physical or financial injury or mental anguish; (8) the negligence-based claims are time-barred; (9) the negligence-based claims also fail because there is no private right of action under the relevant statute and, regardless, the defendants did not violate the statute because the statute does not require recording of an assignment of a deed of trust; (9) the unjust enrichment and money had and received claims fail because there is a valid contract covering the subject matter of this dispute; (10) the fraud claims fail under the economic loss rule and were not pled with particularity; and (11) the TDCA claim fails because it is based on the deficient lack of standing to foreclose and forgery allegations and also because it is conclusory, lacks specific facts, and is insufficient to plead plausible harm. Dkt. 22. Defendants argue that because all of these claims fail, Bryant's requests for declaratory relief also necessarily fail. *Id.*

In response, Bryant contends that he has alleged sufficient facts for all claims that require a heightened pleading standard, that all of his claims are properly pled, and that the statute-of-limitations defense is a red herring. Dkt. 29.

## II. Legal Standard

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964–65 (2007). In considering a Rule 12(b)(6) motion to dismiss a complaint, courts generally must accept the factual allegations contained in the complaint as true. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1050 (5th Cir. 1982). The court does not look beyond the face of the pleadings, and attachments thereto, in determining whether the plaintiff has stated a claim under Rule 12(b)(6). *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000); *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, [but] a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (citations omitted). The "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* The supporting facts must be plausible—enough to raise a reasonable expectation that discovery will reveal further supporting evidence. *Id.* at 556.

**\*3** In addition to meeting the plausibility standard, under Federal Rule of Civil Procedure 9(b), if a party is alleging fraud or mistake, the pleading must "state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 185 (5th Cir. 2009) (noting that Rule 9(b) does not "supplant" Rule 8(a)). However, this particularity requirement "does not 'reflect a subscription to fact pleading.'

" *Id.* (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 178 (5th Cir. 1997)). Instead, pleadings alleging fraud must contain "simple, concise, and direct allegations of the circumstances constituting the fraud, which ...must make relief plausible, not merely conceivable, when taken as true." *Id.* (internal quotations omitted) (referring to the standard enunciated in *Twombly*).

The Fifth Circuit interprets Rule 9(b) strictly, "requiring a plaintiff pleading fraud to specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Id.* (quoting *Herrmann Holdings Ltd. v. Lucent Techs. Inc.*, 302 F.3d 552, 564–65 (5th Cir. 2002)). Thus, Rule 9(b) generally requires the complaint to "set forth 'the who, what, when, where, and how' of the events at issue." *Id.* (quoting *ABC Arbitrage Plaintiffs Grp. v. Tchuruk*, 291 F.3d 336, 350 (5th Cir. 2002)). However, "Rule 9(b)'s ultimate meaning is context-specific." *Grubbs*, 565 F.3d at 185. Thus, "[d]epending on the claim, a plaintiff may sufficiently 'state with particularity the circumstances constituting fraud or mistake' without including all the details of any single court-articulated standard—it depends on the elements of the claim at hand." *Id.*

## III. Analysis

Bryant has asserted eleven causes of action plus a request for exemplary damages and attorneys' fees. Dkt. 20. The court will first address two overarching themes in Bryant's amended complaint—that the Loan was not properly transferred according to the PSA and that various signatures are forgeries. It will then discuss each claim in the order Bryant asserts them in his complaint and determine whether Bryant has stated any claims for which relief can be granted.

### A. Securitization Challenges

Bryant contends that the Loan was not properly and validly transferred into the 2006–BC4 Trust according to the Trust's PSA. *Id.* Defendants argue that Bryant does not have standing to assert violations of the PSA or challenge the assignment for purportedly violating the PSA because Bryant is not a party to the PSA. Dkt. 22. In his response, Bryant makes various arguments relating to standing, but he does not address Defendants' contention that Bryant does not have standing to challenge violations of the PSA. *See* Dkt. 29. Under Fifth Circuit law, Bryant has no right to challenge the assignments

as being in violation of the PSA unless he is a party to the PSA or an intended third–party beneficiary of the PSA. *Reinagel v. Deutsche Bank Nat'l Trust Co.*, 735 F.3d 220, 228 (5th Cir. 2013) (applying Texas law). Since Bryant did not plead any facts indicating that he is an intended third-party beneficiary of the PSA, his claims relating to violations of the PSA cannot stand. *See id.* (noting that the plaintiffs had failed to "state any facts indicating that the parties to the PSA *intended* that" the plaintiffs are third-party beneficiaries and that, regardless, "the fact that the assignments violated the PSA—a separate contract—would not render the assignment void, buy merely entitle [the plaintiffs] to sue for breach of the PSA"). Thus, any claims based on the invalidity of the assignments due to violations of the PSA fail.

### B. Forgery Allegations

**\*4** Bryant also contends that he "is informed and believes, and thereon alleges, and alleges upon information reasonably likely to be discovered, that Chester Levings did not personally sign the Assignment, nor did a person with authority from the real Chester Levings sign the Assignment...or affix Chester Levings's electronic signature to the Assignment,...[which causes] the Assignment to be void *ab initio* as a forgery." Dkt. 20 (italics corrected). According to the amended complaint, Bryant based this belief on "out-of-state mortgage assignments in which the signature for Chester Levings is markedly different from the signature on the Assignment in this case." *Id.* He attached assignments of properties located in Florida and South Carolina that were purportedly signed by Levings, and in each of these assignments, Levings' signature is an illegible right-slanted signature. *See* Dkt. 20, Exs. 11–14. The signature in this case is also an illegible right-slanted signature. *See* Dkt. 20, Ex. 10. The signatures on these assignments are similar but not identical. *Compare*, Dkt. 20, Exs. 10–14.

Bryant similarly contends in his complaint that he "is informed and believes, and thereon alleges, or alleges upon information reasonably likely to be discovered, for each of the recorded substitution documents referenced [in the amended complaint], the signatures of each signer [of the substitution of trustee filings] were not signed or affixed by the named signer, nor were the signatures signed or affixed with someone else with the knowledge or authority of the named signers with regard to the Plaintiff's specific loan. Thus, all substitution documents are forgeries and void *ab initio*." Dkt. 20. Bryant attached the following to his complaint: an appointment of substitute trustee purportedly signed by Melanie D. Cowan, Vice President of BONYM,

Bryant v. CIT Group/Consumer Finance, Not Reported in Fed. Supp. (2018)

relating to the Property, and three appointment of substitute trustee forms or assignments of other properties that are purportedly signed by Cowan. *See* Dkt. 20, Exs. 16, 18–20. The signatures, like the Levings's signatures, are similar but not identical. Bryant contends the Cowan signatures are "markedly different." Dkt. 20. Bryant also attaches two additional appointment of substitute trustee forms appointing substitute trustees for the Property, one purportedly signed by Tanyia Hill, assistant vice president of BONYM, and one purportedly signed by Brandon Schildts, a BONYM foreclosure supervisor. Dkt. 20, Exs. 15, 17.

Defendants assert that Bryant must plead the who, what, where, when, and how of the alleged forgeries and that his conclusory assertions of forgery do not meet this heightened pleading standard. Dkt. 22. The court agrees that Federal Rule of Civil Procedure 9(b) provides the appropriate pleading standard for Bryant's forgery allegations. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Lopez v. Sovereign Bank, N.A.*, No. H–13–1429, 2014 WL 7446746, at *8 (S.D. Tex. Dec. 31, 2014) (Rosenthal, J.) (explaining that Rule 9(b) applies to claims in which fraud is alleged, even if fraud is not an element of that claim, and applying Rule 9(b) to similar forgery allegations).

Bryant argues, however, that his forgery allegations are based on information that is peculiarly within the opposing party's knowledge and that, as such, he should be permitted to discovery information about the alleged forgery. Dkt. 29. He also asserts that pleading fraud with particularity does not necessarily mean pleading the date, time, or place of the fraud if the party has "alternative means of injecting precision and some measure of substantiation into its allegations of fraud." *Id.* Bryant contends that allegations of fraud may be based on information and belief when the facts in question are peculiarly within the opposing party's knowledge and the complaint sets forth a factual basis for the plaintiff's belief. *Id.*

The court agrees that the requirements of Rule 9(b) may be relaxed where the facts relating to the alleged fraud are peculiarly within the opposing party's knowledge; however, this exception "must not be mistaken for license to base claims of fraud on speculation and conclusory allegations." *U.S. ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 903 (5th Cir. 1997) (quoting *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1068 (5th Cir. 1994)); *see also id.* ("[E]ven where allegations are based on information and belief, the complaint must set forth a factual basis for such

belief."). Bryant has provided only conclusory statements that the signature on the assignment was forged. *See* Dkt. 20; *see also Reed v. Bank of Am, N.A.*, No. h–15–2005, 2016 WL 3058303, at *3 (S.D. Tex. May 3, 2016) (Miller, J.) (dismissing almost identical forgery allegations). While he attaches documents that he claims have "markedly different signatures," Bryant has provided no information regarding who executed these alleged forgeries, how the forgery scheme was carried out, or why the alleged forged signatures were made. *See Tuchman*, 14 F.3d at 1068 ("Rule 9(b) requires the plaintiff to allege the particulars of time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what [that person] obtained thereby." (quoting *Tel–Phonic Servs., Inc. v. TBS Int'l, Inc.*, 975 F.2d 1134, 1139 (5th Cir. 1992) ). Courts have found allegations similar to Bryant's insufficient in many cases. *See, e.g., Jemison v. Citimortgage, Inc.*, No. H–14–2475, 2015 WL 251754, at *2 (S.D. Tex. Jan. 20, 2015) (Rosenthal, J.) (finding bare allegations that signatures on assignments were forged to be insufficient under Rule 9(b)); *Lopez*, 2014 WL 7446746, at *8 (same); *see also Kreway v. Countrywide Bank, FSB*, 647 Fed.Appx. 437, 438 (5th Cir. 2016) (unpublished). In fact, in *Kreway*, the Fifth Circuit addressed a forgery argument almost identical to Bryant's, and it did not relax the pleading standard to the extent Bryant advocates. The *Kreway* plaintiff alleged:

> **\*5** "Upon information and belief, and/or information reasonably expected to be discovered during this litigation, the 2011 assignment purportedly signed by [MERS Assistant Secretary] Bud Kamyabi is also void because it was signed or affixed by a person not Bud Kamyabi, and signed or affixed by a person without any authority or knowledge whatsoever from the real Bud Kamyabi."

The plaintiff in *Kreway*, like Bryant, attached an exhibit to his pleading containing signature comparisons. The Fifth Circuit found that the plaintiff "did not plead any facts relating to who perpetrated the alleged forgery or how, when, and where the alleged forgery was executed. The allegation therefore [fell] short of the pleading requirements of Rule 9(b)." 647 Fed.Appx. at 438.

All of Bryant's claims based on his forgery allegations necessarily fail because Bryant has not met the pleading standard for forgery.

**C. First Cause of Action: Texas Civil Practices and Remedies Code § 12.002**

Bryant contends that the defendants made, presented, or used the assignment and substitution of trustee documents with knowledge that they were fraudulent court records or a fraudulent lien or claim against real property or an interest in real property of the Texas Civil Practices and Remedies Code section 12.002. Dkt. 20. Defendants assert that this fraudulent lien claim fails as a matter of law because (1) it is time-barred; (2) a document assigning a deed of trust does not qualify as a "lien or claim" under the statute; and (3) Bryant fails to sufficiently plead that the defendants intended to cause injury. Dkt. 22. Bryant counters that several courts have held that an assignment of a deed of trust can constitute a lien or claim against an *interest* in property. Dkt. 29. And he argues that the statute of limitations argument is a red herring because he has properly pled the discovery rule. *Id.*

To state a claim under Section 12.002(a), a plaintiff must plead facts showing the defendant

"(1) made, presented, or used a document with knowledge that it was a 'fraudulent lien or claim against real or personal property or an interest in real or personal property,' (2) intended that the document be given legal effect, and (3) intended to cause the plaintiff physical injury, financial injury, or mental anguish." *Ferguson v. Bank of N.Y. Mellon Corp.*, 802 F.3d 777, 783 (5th Cir. 2015) (quoting *Henning v. OneWest Bank FSB*, 405 S.W.3d 950, 964 (Tex. App.—Dallas 2013, no pet.) (quoting Tex. Civ. Prac. and Rem. Code § 12.002(a)) ). The court chooses to address only the intent argument, which is dispositive. In pleading the third element, intent to cause injury, Bryant essentially recites the statute: "Defendants made, presented, or used a document or other record with intent to cause Plaintiff to suffer financial injury, mental anguish, or emotional distress." Dkt. 20. This is insufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 678 ("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' " (quoting *Twombly*, 550 U.S. at 555) ). Defendants' motion to dismiss the statutory claims under section 12.002, which is Bryant's first cause of action, is GRANTED. Bryant's claim for a violation of section 12.002 is DISMISSED WITH PREJUDICE.

### D. Second and Third Causes of Action: Negligence Per Se, Gross Negligence, and Gross Negligence Per Se Claims

*6 Bryant contends that the defendants were "negligent per se in the misconduct alleged herein" and grossly negligent per se because they violated section 12.002, the section 192.007

of the Texas Local Government Code, and section 41.008(c)(8) and (c)(12) of the Texas Civil Practices and Remedies Code. Dkt. 20. Defendants argue that the statute of limitations bars these claims and, regardless, Bryant does not sufficiently state a claim for violations of these statutes. Dkt. 22. In the court's original memorandum opinion and order, it granted Defendants' motion with regard to the negligence per se, gross negligence, and gross negligence per se claims pursuant to the statute of limitations. The court, however, overlooked the holding in *Vanderbilt Mortgage & Finance, Inc. v. Flores*, 692 F.3d 358 (5th Cir. 2012). Applying *Vanderbilt*, the court now concludes that, taking the claims plead in the complaint as true, it cannot dismiss the negligence-based claim due to the statute of limitations. Defendants' motion to dismiss on this ground is DENIED.

The court therefore turns to whether Bryant has otherwise stated plausible claims for negligence per se, gross negligence, and gross negligence per se. "Negligence per se is a tort concept whereby a legislatively imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonably prudent person." *Carter v. William Sommerville & Son, Inc.*, 584 S.W.2d 274, 278 (Tex. 1979). "Negligence *per se* is not a separate cause of action that exists independently of a common-law negligence cause of action....Rather, negligence *per se* is merely one *method* of proving a breach of duty, a requisite element of any negligence cause of action." *Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. App.—Houston [14th Dist.] 2009, pet. denied); *See Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997) ("Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims."). "The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent." *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998).

Here, because Bryant did not state a claim for a violation of section 12.002, he has not stated a negligence per se or gross negligence per se claim associated with violating that statute.

With regard to section 192.007, Defendants assert that the statute does not require the recordation of an assignment of a deed of trust. Dkt. 22. The court agrees. Section 192.007 relates to "records of releases and other actions." It states:

(a) To release, transfer, assign, or take another action relating to an instrument that is filed, registered, or

Bryant v. CIT Group/Consumer Finance, Not Reported in Fed. Supp. (2018)

recorded in the office of the county clerk, a person must file, register, or record another instrument relating to the action in the same manner as the original instrument was required to be filed, registered, or recorded.

(b) An entry, including a marginal entry, may not be made on a previously made record or index to indicate the new action.

Tex. Loc. Gov't Code Ann. § 192.007. Bryant fails to state a claim for negligence per se or gross negligence per se with regard to Defendants' alleged violation of this statute because the statute does not require recordation of an assignment for the assignment to be valid. See Dall. Cty., Tex. v. MERSCORP, Inc., 2 F. Supp. 3d 938, 494 (N.D. Tex. 2014) (agreeing with its sister court's *Erie* guess that section 192.007 " 'does not require recordation of an assignment for that assignment to be effective as to the parties to an assignment' " (quoting *Green v. JPMorgan Chase Bank, N.A.*, 937 F. Supp. 2d 849, 858 (N.D. Tex. 2014); *see also Reinagel v. Deutsche Bank Nat'l Tr. Co.*, 735 F.3d 220, 227 n.27 (5th Cir. 2013) (discussing how section 192.007, an "obscure provision," "has never been cited in a state court decision and is best read as a procedural directive to county clerks, not as a prerequisite to the validity of assignments"). Moreover, Bryant has not shown that he is in the class of people this statute, which relates to how counties record certain instruments, was designed to protect. *Cf. Dall. Cty., Tex.*, 2 F. Supp. 3d at 949 ("Section 192.007 'was never intended to be wielded as a weapon in litigation' " (quoting the district court opinion in *Hudson v. JP Morgan Chase, N.A.*, 541 Fed.Appx. 380, 384 (5th Cir. 2013)). Accordingly, Bryant fails to state a negligence per se or gross negligence per se claim for violation of this statute.

**\*7**  Bryant's claims under section 41.008 also fail. Texas Civil Practices and Remedies Code section 41.008 sets limits with regard to economic damages versus compensatory damages in certain types of cases. *See* Tex. Civ. Prac. & Rem. Code Ann. § 41.008. The subsections of this statute cited by Bryant in his negligence per se and gross negligence per se claims exclude the limitation of liability for knowing and intentional violations of certain Texas Penal Code sections, including a section prohibiting forgery (§ 32.21) and a section prohibiting fraudulent destruction, removal, or concealment in writing (§ 32.47).[3] *See id.* § 41.008(c)(8), 41.008(c)(12); Tex. Penal Code Ann. §§ 32.21, 32.47. Defendants argue that these claims fail as a matter of law because the Texas Penal Code does not create a private cause of action. Dkt. 22. Bryant correctly notes that a **negligence per se** claim cannot be defeated solely because a statute does not provide a **private**

right of **action**, but he does not cite any authority, in his complaint or response, for the proposition that a violation of these sections of the Texas Penal Code constitutes **negligence per se**, and he does not provide any argument that he is in the class of individuals the statutes were intended to protect or that his injury is the type that the statutes were designed to prevent. *See* Dkts. 20 (amended complaint), 29 (response to motion to dismiss); *see also Allison v. J.P. Morgan Chase Bank, N.A.*, No. 1:11–CV0342, 2012 WL 4633177, at *14 (E.D. Tex. Oct. 2, 2012) (noting that the plaintiffs did not assert a plausible **negligence per se** claim because "the pleading does not factually allege the violation of a specific statute, much less state how courts have determined that statute to establish **negligence per se**"); *cf., e.g., Rabon v. Auto Fasteners, Inc.*, 672 F.2d 1231, 1238 (5th Cir. Unit B 1982) ("Although OSHA creates no **private** right of **action**, violation of an OSHA regulation is evidence of negligence, or, in appropriate circumstances, **negligence per se**.").

"[T]he mere fact that the Legislature adopts a criminal statute does not mean [the Texas Supreme Court] must accept it as a standard for civil liability." *Carter*, 584 S.W.2d at 278. While all "persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so,...this is not equivalent to a duty in tort." *Perry*, 973 S.W.2d at 304. "[R]ecognizing a new, purely statutory duty 'can have an extreme effect on the common law of negligence' when it allows a cause of action where the common law would not." *Id.* at 306 (quoting Leonard, *The Application of Criminal Legislation to Negligence Cases: A Reexamination*, 23 Santa Clara L. Rev. 427, 449 n.92 (1983)). To determine whether such a duty should be created, Texas courts consider the following factors:

(1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and

(5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

*Id.* at 309.

"In the mortgage context, there is no special relationship between a mortgagor and a mortgagee, or between a servicer and a borrower, that would impose an independent common law duty on [Defendants]." *Miller v. CitiMortgage, Inc.*, No. 3:11–CV–2786–L, 970 F. Supp. 2d 568, 585 (N.D. Tex. 2013) (collecting cases); *see also Levels v. Merlino*, 969 F. Supp. 2d 704, 717 (N.D. Tex. 2013) ("Many Texas courts have addressed whether the relationship between a mortgagor and a mortgagee constitutes a 'special relationship' and have consistently concluded that it does not." (collecting cases) ). Thus, since there is no independent common-law duty, the first factor weighs against imposing a duty for violations of sections 32.21 and 32.47. With regard to the second and third factors, these statutes at least arguably clearly define the prohibited conduct, and both require intent to defraud or harm. Thus, the second and third factors at least arguably weigh in favor of imposing a duty. With regard to the fourth factor, it is unlikely that imposing a duty would cause ruinous damages disproportionate to the seriousness of the statutory violation in most circumstances; thus, this factor likely weighs in favor of imposing a duty. The fifth factor, however, weighs against imposing a duty. The direct cause of Bryant's harm—losing the real property at issue—is Bryant's admitted failure to make payments. Defendants did not cause Bryant to not make payments and there is no allegation that his failure to do so had anything to do with the alleged forgeries. The court finds that the first factor and fifth factor weigh sufficiently against imposing a duty to outweigh the middle factors, even if they the second, third, and fourth factors weigh in favor of a duty. Because the factors enunciated by the Texas Supreme Court weigh against imposing a duty, the court makes an *Erie* guess that the Texas Supreme Court would not find it appropriate to impose a negligence duty on its citizens for breach of these statutes. *See Seahawk Liquidating Tr. v. Certain Underwriters at Lloyds London*, 810 F.3d 986, 991 (5th Cir. 2016) ("When an issue of state law is unclear, a federal court must make an 'Erie guess' as to what the state's highest court would decide."); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938). Accordingly, the negligence per se and gross negligence per se claims must fail.

**\*8** Bryant also attempts to assert a gross negligence claim outside of the context of negligence per se. This claim, however, fails because in order to assert a negligence claim, one must assert a duty. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004) ("The elements of a negligence cause of action are the existence of a legal duty, a breach of that duty, and damages

proximately caused by the breach."); *Nowzaradan v. Ryans*, 347 S.W.3d 734, 739 (Tex. App.—Houston [14th Dist.] 2011, no pet.) ("[E]xcepting certain worker's compensation cases, it is well established that a finding of ordinary negligence is a prerequisite to a finding of gross negligence."). Bryant has not alleged such a duty and, as noted above, there is no "special relationship" here that would give rise to a duty. *See Miller*, 970 F. Supp. 2d at 585.

Defendants' motion to dismiss the negligence per se, gross negligence, and gross negligence per se claims is GRANTED. Bryant's negligence per se, gross negligence, and gross negligence per se claims are DISMISSED WITH PREJUDICE.

**E. Fourth and Fifth Causes of Action: Equitable Tort Claims**

Bryant's claims of money had and received and unjust enrichment stem from his claim that the assignments were forged. *See* Dkt. 29 (arguing that the equitable and tort claims are properly pled because "the assignment of the deed of trust is void and do[es] not transfer the contractual rights from one Defendant to another"). Specifically, Bryant contends that Defendants were unjustly enriched by receiving mortgage payments from Bryant when they were not the legal owners of the mortgage lien, loan, note, or deed of trust. Dkt. 20. Bryant additionally argues that Defendants made mortgage assignments with knowledge that the documents or records were fraudulent court records or lines. *Id.* He contends that BONYM, BOA, and Ditech hold the monthly payments they received from Bryant as well as the Property when in equity and good conscience the money and Property belong to Bryant. *Id.*

Defendants argue that the unjust enrichment and money had and received claims fail because Bryant cannot recover under both tort and contract claims, and that the claims are based on the flawed assignment challenges, anyway, and therefore must be dismissed. Dkt. 22.

A money had and received claim is " 'equitable in nature' " and " 'belongs conceptually to the doctrine of unjust enrichment.' " *Fowler v. U.S. Bank Nat'l Ass'n*, 2 F. Supp. 3d 965, 983 (S.D. Tex. 2014) (Lake, J.) (quoting *Best Buy Co. v. Barrera*, 248 S.W.3d 160, 162 (Tex. 2007), and *Edwards v. Mid-Continent Office Distribs., L.P.*, 252 S.W.3d 833, 837 (Tex. App.—Dallas 2008, pet. denied)). To establish a claim for money had and received, Bryant must show that the

"defendants hold money which in equity and good conscience belongs to him." *Id.* at 983.

Under Texas law, unjust enrichment "characterizes the result of failing to make restitution or benefits received under circumstances giving rise to an implied or quasi-contract." *TransAmerica Natural Gas Corp. v. Finkelstein*, 933 S.W.2d 591, 600 (Tex. App.—San Antonio 1996, writ denied). The purpose for the claim is to prevent unconscionable loss to the payor and unjust enrichment to the payee. *Bryan v. Citizens Nat'l Bank in Abilene*, 628 S.W.2d 761, 763 (Tex. 1982). An unjust enrichment claim "is based on quasi-contract and is unavailable when a valid, express contract governing the subject matter of the dispute exists." *Coghlan v. Wellcraft Marine Corp.*, 240 F.3d 449, 454 (5th Cir. 2001) (applying Texas law); *see also Finkelstein*, 933 S.W.2d at 600.

Bryant does not sufficiently state a claim for either of these claims because he bases these claims on his allegations of forgery, which the court has ruled do not meet the pleading standard. Therefore, Defendants' motion to dismiss the money had and received and unjust enrichment claims, which are Bryant's third and fourth causes of action, is GRANTED. The money had and received and unjust enrichment claims are DISMISSED WITH PREJUDICE.

## F. Sixth Cause of Action: Lack of Standing to Foreclose

**\*9** Bryant contends that BONYM did not have standing to conduct the foreclosure sale due to the allegedly forged assignment. Dkt. 20. Bryant also asserts that the assignment to BONYM is invalid and demonstrates a break in the chain of assignments of the Deed of Trust and Note because MERS failed to state for whom it was acting as nominee on the face of the Assignment. *Id.* Defendants argue that the conclusory forgery allegations cannot support the lack of standing to foreclose claim and that the chain of title argument is invalid because MERS had the right to assign the Deed of Trust to BONYM. Dkt. 29.

The court agrees with Defendants on both counts. First, all claims stemming from the alleged forgery fail because Bryant has not adequately pled that the assignment was forged. Second, Bryant's chain of title argument fails because MERS assigned only the Deed of Trust and had authority to do so as the beneficiary of the Deed of Trust. *See Reece v. U.S. Bank Nat'l Ass'n*, 762 F.3d 422, 425 (5th Cir. 2014) ("Our Court has expressly recognized that MERS may assign a deed of trust to a third party and that such assignments confer the new assignee standing to non-judicially foreclose on property

associated with that particular deed of trust." (citing *Martins v. BAC Home Loan Servicing, L.P.*, 722 F.3d 249, 253–55 (5th Cir. 2013)). Accordingly, Defendants' motion to dismiss Bryant's sixth cause of action, lack of standing to foreclose, is GRANTED. Bryant's lack of standing to foreclose claim is DISMISSED WITH PREJUDICE.

## G. Seventh Cause of Action: Declaratory Judgment

Bryant contends that BONYM and its agents do not have authority to foreclose because BONYM is not a real party in interest to the Note or Deed of Trust and requests judicial determination of the rights and obligations of the parties with regard to the Property. Dkt. 20. He requests, specifically, a determination whether any defendant has an ownership interest in the Note, a decree declaring that he is entitled to the exclusive possession of the Property and that Defendants have no monetary interest in the Note, and a decree declaring that he owns a fee simple and is entitled to the quiet and peaceful possession of the Property. *Id.* Defendants argue that since the request for declaratory judgment is dependent on the underlying causes of action and because Bryant has not asserted any claims that are viable, the request for declaratory relief must also be denied. Dkt. 22. The court agrees. "The Declaratory Judgment Act is remedial only." *Collin Cnty., Tex. v. Homeowners Ass'n for Values Essential to Neighborhoods*, 915 F.2d 167, 170 (5th Cir. 1990). "A party's legal interest must relate to an actual 'claim arising under federal law that another asserts against him....' " *Id.* (quoting *Loew v. Ingalls Shipbuilding*, 723 F.2d 1173, 1179 (5th Cir. 1984)); *see also Mbache v. Wilmington Trust, Nat'l Ass'n*, No. 4:15–CV–1846, 2016 WL 1162200, at \*4 n.5 (S.D. Tex. Mar. 24, 2016) (Hoyt, J.) ("Claims for injunctive relief and declaratory relief are remedial in nature, and are therefore dependent on the plaintiff's assertion of a viable cause of action."). As Bryant has pled no viable causes of action, Defendants' motion to dismiss Bryant's seventh cause of action seeking declaratory relief is GRANTED. Bryant's request for declaratory relief is DENIED.

## H. Eighth Cause of Action: Quiet Title

Bryant contends that "[u]nder the lien theory of mortgages, which is followed in Texas, the homeowner retains legal ownership of the mortgaged property while the trustee named in the deed of trust retains equitable ownership in favor of the original lender or their successors and assigns." Dkt. 20. Bryant argues that he has currently "lost legal ownership of the Property he had pursuant to that warranty deed he received from the previous owners" but that he has "an equitable

Bryant v. CIT Group/Consumer Finance, Not Reported in Fed. Supp. (2018)

interest in the Property...which he is enforcing *via* this lawsuit." *Id.* He argues that this equitable interest is superior to BONYM's legal title resulting from the foreclosure sale because BONYM "wrongly claimed a secured monetary interest and estate in the Property that was adverse to Plaintiff's legal title at the time of sale." *Id.*

*10 Defendants assert that the quiet title claim fails as a matter of law because it is not based on the strength of Bryant's title "but rather on the fatally flawed forgery allegations." Dkt. 22. Defendants argue that Bryant cannot demonstrate that he has superior title because any ownership interest he claims he had was "wiped away by the foreclosure of the Property, thereby giving BONYM superior title to the Property as a matter of law." *Id.* Defendants also argue that the quiet title claim fails because Bryant admitted he was in default in his amended complaint and the amended complaint does not state that Bryant tendered the amount owed on the Note. *Id.*

Bryant argues that Defendants "are wrong on the quiet title" and that the cases cited by Defendants "mangled Texas law on quiet title."[4] Dkt. 29. Bryant cites various cases in an attempt to explain to the court and Defendants "what Texas law really is." *Id.* Bryant also contends that he does not have to tender equity "at any moment during the litigation to set aside the sale" and that, instead, he must tender equity to regain title only if he is successful on the merits of setting aside a foreclosure sale. Dkt. 29.

### 1. Removing the Cloud

Bryant next points out that in a suit to quiet title, the equitable relief requested is to remove a cloud on the title.[5] Dkt. 29 (citing *MERS v. Groves*, No. 14–10–00090–CV, 2011 WL 1364070, at *5 (Tex. App.—Houston [14th Dist.] Apr. 12, 2011, pet. denied)). Indeed, a "suit to quiet title—also known as a suit to remove cloud from title—relies on the invalidity of the defendant's claim to the property." *Gordon v. W. Hous. Trees, Ltd.*, 352 S.W.3d 32, 42 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "A cloud on title exists when an outstanding claim or encumbrance is shown, which on its face, if valid, would affect or impair the title of the owner of the property." *Id.* To establish that he "has a right of ownership and that the adverse claim is a cloud on the title that equity will remove," Bryant must show "(1) an interest in a specific property, (2) title to the property is affected by a claim by the defendant, and (3) the claim, although facially valid, is invalid

or unenforceable." *Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied).

The court finds that Bryant has not sufficiently allegedly that BONYM "wrongly claimed a secured monetary interest and estate in the Property that was adverse to Plaintiff's legal title at the time of sale" (Dkt. 20). This assertion depends on the forgery allegations, which are not adequately pled. Bryant has thus not adequately pled that BONYM's claim was invalid or unenforceable, which is necessary to establish the third element. Accordingly, Defendants' motion to dismiss the quiet title claim, which is Bryant's eighth cause of action, is GRANTED. Bryant's quiet title claim is DISMISSED WITH PREJUDICE.

### 2. Tendering Equity

*11 Defendants assert that a purchaser at a foreclosure sale has superior title as a matter of law to the prior owner's because "the prior owner's chain of title is cut off by the trustee's deed that is executed in favor of the purchaser at the foreclosure sale." Dkt. 22 (citing *Cook–Bell v. MERS*, 868 F. Supp. 2d 585, 591 (N.D. Tex. 2012)). Defendants argue that Bryant's interest in the title was "wiped away by the foreclosure" and mention that Bryant failed to allege he tendered the amount owed as an additional reason why the quiet title claim should fail. *Id.* Bryant contends that he does not have to tender equity "at any moment during the litigation to set aside the sale" and that, instead, he must tender equity to regain title only if he is successful on the merits of setting aside the sale. Dkt. 29.

Bryant's arguments about when he must tender equity are not on point. He clearly did not pay the amount he owed before the foreclosure sale, so the foreclosure sale proceeded. Bryant has alleged no facts to support the claim that his interest in the title is superior to BONYM's.

### I. Bryant's Ninth Cause of Action: Declaratory Relief Under the Statute of Limitations

Bryant contends that the limitations period began to run more than four years before the April 2016 foreclosure sale and that there were no actions taken by the parties or their agents during the limitations period that could be construed as a waiver or abandonment of acceleration. Dkt. 20. He therefore requests a judicial declaration of the rights and interests of the parties and a determination of the validity of the defendants' real property liens. *Id.* Defendants argue that Bryant "fails to allege when the Loan was accelerated and merely states in a

conclusory fashion that no actions were taken to abandon the acceleration of the Loan." Dkt. 22. Defendants contend this does not raise a right to relief above a speculative level. *Id.* Bryant argues that he lays out the timing in paragraphs 11 and 12 of his amended complaint, which indicate that Defendants first began foreclosure activity in 2011 and did not complete the foreclosure sale until 2016. Dkt. 29.

The court agrees with Bryant that he sets forth some timing information related to the foreclosure in his amended complaint. He indicates that he received notices of sale in November 2011, November 2012, December 2012, August 2015, January 2016, and April 2016. *See* Dkt. 20 ¶ 11. He attaches all of these notices to his complaint. *See* Dkt. 20, Exs. 2–7. He also states that the Property did was sold on April 5, 2016. Dkt. 20 ¶ 12. He does not, however, state when the note was accelerated. The court thus agrees with Defendants that Bryant's request for a declaratory judgment on the limitations issue is conclusory and Bryant has not provided sufficient information to state a claim for relief beyond a speculative level. Defendants' motion to dismiss this claim for declaratory relief under the statute of limitations, which is Bryant's ninth cause of action, is GRANTED. Bryant's request for declaratory relief is DENIED.

**J. Tenth Cause of Action: Fraud**
Bryant's fraud claim also stems from his allegations that the deed of trust was forged. *See* Dkt. 20. Defendants assert that the fraud claim is (1) barred by the economic loss rule; and (2) should be dismissed regardless because Bryant has not sufficiently pled the specific speaker, the misrepresentations, or when the misrepresentations were made, which are all necessary to establish a fraud claim. Dkt. 22. Bryant contends that he alleges "a continuing and systematic series of statements that Defendants owned the power of sale when in fact they did not." Dkt. 29. He attaches documents that he alleges demonstrate six instances in which Defendants claimed to have the power of sale when they did not. Dkt. 29 & Exs. 2–7.

**\*12** If Bryant had pled the forgery claims with sufficient particularity, then these documents may have been sufficient evidence of who, what, when, where, and how to state a claim, but since the forgery claim fails, the fraud claim based on the defendants not having the power of sale due to the alleged forgeries also fails. Defendants' motion to dismiss the fraud claim, which is Bryant's tenth cause of action, is GRANTED. Bryant's fraud claim is DISMISSED WITH PREJUDICE.

**K. Eleventh Cause of Action: Texas Debt Collection Act**
Bryant contends that BONYM, BOA, and Ditech are "debt collectors" who engaged in the collection of consumer debt with regard to Bryant's mortgage loan. Dkt. 20. Bryant alleges that BONYM, BOA, and Ditech violated the TDCA "by threatening foreclosure and engaging in foreclosure activity against [Bryant], attempting to collect the mortgage Note debt from [Bryant] without legal standing to do so, and when [BONYM] threatened to sell [Bryant's] home pursuant to a foreclosure order based on such wrongful charges." Dkt. 20. Bryant also alleges that the defendants' actions in processing the foreclosure, including filing the allegedly forged assignments and the attempts to collect past the limitations period constituted false, deceptive, or misleading practices. *Id.*

Defendants argue that Bryant's TDCA claim fails because it is based on the fatally flawed forgery allegations. Dkt. 22. Defendants additionally assert that his allegations are conclusory, lack specific facts, and are thus insufficient to state a plausible claim. *Id.* Defendants further point out that foreclosure is not an action prevented by law and thus cannot constitute a violation of the TDCA, particularly since Bryant admits he defaulted on his loan. *Id.*

Bryant alleges violations of Texas Finance Code sections 392.301(a)(8), 392.304(a)(14), and 392.304(a)(19). Under Texas Finance Code section 392.301(a)(8), a debt collector "may not use threats, coercion, or attempts to coerce that employ...threatening to take an action prohibited by law." Tex. Fin. Code Ann. § 392.301(a)(8). Under section 392.304(a)(14), a debt collector "may not use a fraudulent, deceptive, or misleading representation that employs...representing falsely the status or nature of the services rendered by the debt collector or the debt collector's business." Tex. Fin. Code Ann. § 392.304(a)(14). Under section 392.304(a)(19), the catch-all provision, a debt collector "may not use a fraudulent, deceptive, or misleading representation that employs...using any other false representation or deceptive means to collect a debt or obtain information concerning a consumer." Tex. Fin. Code Ann. § 392.304(a)(19).

The court agrees with the defendants that Bryant fails to state a claim for violations of these statutes because they are all based on the forgery allegations. Defendants' motion to dismiss the TDCA claims is GRANTED. All of Bryant's TDCA claims, which are asserted in his eleventh cause of action, are DISMISSED WITH PREJUDICE.

Bryant v. CIT Group/Consumer Finance, Not Reported in Fed. Supp. (2018)

**L. Requests for Attorneys' Fees and Exemplary Damages**
Since none of Bryant's claims survive the motion to dismiss, his requests for attorneys' fees and exemplary damages are also DENIED.

**IV. Conclusion**

Defendants' motion to dismiss is GRANTED. All of Bryant's claims against Ditech and BONYM are DISMISSED WITH PREJUDICE. The claims against the remaining defendants remain pending.

**All Citations**

Not Reported in Fed. Supp., 2018 WL 1740075

Footnotes

1    The court *sua sponte* amends its original memorandum opinion and order to correct its analysis in section III.D. This is the only section that is amended, and the amendment does not impact the outcome.

2    Defendants The CIT Group/Consumer Finance, Inc. and CWABS, Inc. have not been served. Dkt. 1. Defendants Countrywide Home Loans, Inc., now know as Bank of America NA, and Mortgage Electronic Registration Systems, Inc. have appeared but did not join in the motion to dismiss. *See* Dkts. 1–4, 22.

3    Texas Penal Code section 32.21(b) states: "A person commits an offense if he forges a writing with intent to defraud or harm another." Tex. Penal Code Ann. § 32.21(b). Subsection 32.21(d) makes it a state jail felony "if the writing purports to be a will, codicil, deed, deed of trust, mortgage, security instrument, security agreement, credit card, check, authorization to debit an account at a financial institution, or similar sight order for payment of money, contract, release, or other commercial instrument." *Id.* § 32.21(d).

     Texas Penal Code section 32.47(a) states: "A person commits an offense if, with intent to defraud or harm another, he destroys, removes, conceals, alters, substitutes, or otherwise impairs the verity, legibility, or availability of a writing, other than a governmental record." Tex. Penal Code Ann. § 32.47(a). Subsection (d) makes the offense a state jail felony if the writing "is a deed, mortgage, deed of trust, security instrument, security agreement, or other writing for which the law provides public recording or filing, whether or not the writing has been acknowledged." *Id.* § 32.47(d).

4    Bryant first explains "lien theory" by referring to a federal bankruptcy court opinion and a Tyler Court of Appeals decision. *See* Dkt. 29. The court will instead refer to an opinion by the Texas Supreme Court. In *Taylor v. Brennan*, 621 S.W.2d 592 (Tex. 1981), the Texas Supreme Court explained, "Texas follows the lien theory of mortgages. Under this theory the mortgagee is not the owner of the property and is not entitled to its possession, rentals or profits."

5    Bryant also contends in his response that BONYM is not the *bona fide* purchaser of the Property and asserts in his response to the motion to dismiss that "[i]n the instant case, there has not been a foreclosure sale, yet." Dkt. 29. This is contrary to the complaint, which states that the Property sold on April 5, 2016, and expressly indicates that it was a "foreclosure sale." *See* Dkt. 20 at 4 ("Before the foreclosure sale, Plaintiff was the legal title-holder to the Property."). Additionally, the substitute trustee's deed attached to the complaint indicates the Property was sold at a foreclosure sale in Fort Bend County on April 5, 2016. Dkt. 20, Ex. 8. It appears this argument was erroneously left in the response, and the court therefore does not address it.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

973 S.W.2d 301
Supreme Court of Texas.

Douglas Wayne PERRY, Janise
White, and Raul Quintero, Petitioners,
v.
S.N. and S.N., individually and a/n/f of B.N., a
minor, and a/n/f of K.N., a minor, Respondents.

No. 97–0573.
|
Argued Jan. 7, 1998.
|
Decided July 3, 1998.

**Synopsis**

Parents, individually and as next friends of their children, brought negligence action against friends of day care providers for failing to report child abuse they allegedly witnessed at day-care center. The 53rd Judicial District Court, Travis County, Paul R. Davis, Jr., J., granted friends' motion for summary judgment, and parents appealed. The Austin Court of Appeals, 944 S.W.2d 728, reversed and remanded, and friends petitioned for writ of error. The Supreme Court, Phillips, C.J., held that violation of child abuse reporting statute was not negligence per se.

Reversed and rendered.

West Headnotes (12)

**[1]**    **Appeal and Error** ⟜ Briefs
Supreme Court may not consider factual assertions that appear solely in the appellate briefs and not before the trial court.

10 Cases that cite this headnote

**[2]**    **Judgment** ⟜ Sufficiency of pleading
Trial court may not grant summary judgment for failure to state a cause of action without first giving the plaintiff an opportunity to amend the pleadings.

14 Cases that cite this headnote

**[3]**    **Judgment** ⟜ Sufficiency of pleading
Plaintiffs had a fair opportunity to correct any deficiency in their pleadings before summary judgment was entered against them for failure to state claim, where one defendant previously filed special exceptions arguing that plaintiffs had not stated a cause of action, and plaintiffs subsequently amended their petition.

8 Cases that cite this headnote

**[4]**    **Appeal and Error** ⟜ Summary judgment
Because defendants' motions for summary judgment argued only that plaintiffs failed to state a cognizable claim, the trial court's judgment could be upheld, if at all, only on that ground.

3 Cases that cite this headnote

**[5]**    **Appeal and Error** ⟜ Summary Judgment
When the ground for the trial court's decision granting summary judgment is that plaintiffs failed to state a cause of action, reviewing court must take the allegations in the pleadings as true in determining whether a cause of action exists.

12 Cases that cite this headnote

**[6]**    **Negligence** ⟜ Necessity and Existence of Duty
Existence of a legally cognizable duty is a prerequisite to all tort liability.

3 Cases that cite this headnote

**[7]**    **Negligence** ⟜ Violations of statutes and other regulations
Mere fact that legislature adopts criminal statute does not mean that courts must accept it as standard for civil liability; considerations which warrant imposing tort liability are not identical to those that warrant criminal conviction, and courts will not apply the doctrine of negligence

Perry v. S.N., 973 S.W.2d 301 (1998)
41 Tex. Sup. Ct. J. 1162

per se if criminal statute does not provide appropriate basis for civil liability.

*36 Cases that cite this headnote*

[8]    **Negligence** ⟜ Violations of statutes and other regulations

In determining whether criminal statute is an appropriate basis for tort liability, court must look beyond the facts of the particular case to consider the full reach of the statute.

*2 Cases that cite this headnote*

[9]    **Negligence** ⟜ Violations of statutes and other regulations

Threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. Restatement (Second) of Torts §§ 286, 288.

*51 Cases that cite this headnote*

[10]   **Infants** ⟜ Persons obligated to report in general

Child abuse reporting statute, which imposed reporting requirement on any person having "cause to believe" child was being abused, was not appropriate standard for negligence per se liability, though statute criminalized only knowing failure to report abuse, considering that there was no relevant common law duty, statutory standard was not clearly defined, liability could be significantly disproportionate to underlying conduct, statute applied to broad class of people, and connection between statutory violation and relevant injury was attenuated.

*68 Cases that cite this headnote*

[11]   **Negligence** ⟜ Protection against acts of third persons

**Negligence** ⟜ Duty in general

At common law there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress.

*1 Cases that cite this headnote*

[12]   **Negligence** ⟜ Violations of statutes and other regulations

Defendant in most negligence per se cases already owes the plaintiff a preexisting common law duty to act as a reasonably prudent person, so that the statute's role is merely to define more precisely what conduct breaches that duty.

*28 Cases that cite this headnote*

**Attorneys and Law Firms**

**\*302** Gary E. Zausmer, Jeffrey Jury, Tom Tourtellotte, Austin, for Petitioners.

Greg Reed, Lionel J. Roach, Austin, for Respondents.

**Opinion**

PHILLIPS, Chief Justice, delivered the opinion of the Court.

Respondents' motion for rehearing is overruled. Our opinion of May 8, 1998, is withdrawn and the following is substituted in its place.

This is a suit for injuries arising out of the abuse of children at a day care center. Plaintiffs filed suit individually and as next friends of their two children, alleging that defendants witnessed the abuse and failed to report it to the police or child welfare officials. The sole issue before us is whether plaintiffs may maintain a cause of action for negligence per se based on the Family Code, which requires any person having cause to believe a child is being abused to report the abuse to state authorities and makes the knowing failure to do so a misdemeanor. *See* Tex. Fam.Code §§ 261.101(a), 261.109 (formerly Tex. Fam.Code §§ 34.01, 34.07). The trial court granted summary judgment for defendants, but the court of appeals reversed and remanded plaintiffs' negligence per se and gross negligence claims for trial. *Nash v. Perry*, 944 S.W.2d 728 (Tex.App.—Austin 1997). We reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing. Because plaintiffs did not preserve

their common law negligence claims, we do not decide whether there should be a common law duty to report child abuse in some circumstances.

B.N. and K.N. attended a day care center operated by Francis Keller and her husband Daniel Keller from March 25, 1991, to August 28, 1991. Their parents, S.N. and S.N., allege that during that period, Daniel Keller regularly abused B.N. and K.N. and other children at the center both physically and sexually. Mr. and Mrs. N. brought suit against the Kellers and three of the Kellers' friends, Douglas Perry, Janise White, and Raul Quintero. Plaintiffs claim that Francis Keller confided in White at an unspecified time that Daniel Keller had "abusive habits toward children." They further allege that on one occasion in August 1991, while visiting the Kellers, defendants Perry, White, and Quintero all saw Daniel Keller bring a number of children out of the day care center into the Kellers' adjoining home and sexually **\*303** abuse them. The record does not indicate whether B.N. and K.N. were among these children. According to plaintiffs, Perry, White, and Quintero did not attempt to stop Daniel Keller from abusing the children or report his crimes to the police or child welfare authorities.

[1]  Plaintiffs' brief filed in this Court alleges additional facts that were not contained in their trial court pleadings. They now assert that Perry pleaded guilty to indecency with a child by contact and that White and Quintero were indicted but not prosecuted for sex offenses involving the children at the day care center. Plaintiffs' trial court petition, however, did not allege that Perry, White, or Quintero participated in abusing B.N. and K.N. or other children. We may not consider factual assertions that appear solely in the appellate briefs and not before the trial court. *See Estate of Arrington v. Fields,* 578 S.W.2d 173, 183 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.).

Instead, Mr. and Mrs. N. alleged only that Perry, White, and Quintero were negligent per se because they violated a statute requiring any person who "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse" to file a report with the police or the Department of Protective and Regulatory Services. Tex. Fam.Code § 261.109(a). Plaintiffs also asserted gross negligence and common law negligence claims. They claimed that Perry, White, and Quintero's failure to report the abuse proximately caused them harm by permitting the day care center to remain open, thus enabling Daniel Keller to continue abusing the children at the center. They sought damages for pain, mental anguish, and medical expenses, as well as loss of

income when they could not work outside the home because of B.N. and K.N.'s injuries.

[2]   [3]   Perry, White, and Quintero moved for summary judgment on the sole ground that plaintiffs failed to state a cause of action. None of the parties presented any summary judgment evidence. A court may not grant summary judgment for failure to state a cause of action without first giving the plaintiff an opportunity to amend the pleadings. *See Pietila v. Crites,* 851 S.W.2d 185, 186 n. 2 (Tex.1993). Before any defendant moved for summary judgment, however, White filed special exceptions arguing that plaintiffs had not stated a cause of action, and plaintiffs subsequently amended their petition. Although it appears from the record that Perry and Quintero did not file special exceptions, their motions for summary judgment were based solely on the grounds argued in White's special exceptions. Thus, Mr. and Mrs. N. had a fair opportunity to correct any deficiency in their pleadings.

[4]   [5]   The trial court granted Perry, White, and Quintero's motions for summary judgment and severed plaintiffs' claims against those three defendants from their suit against the Kellers, which is not before us. Because defendants' motions for summary judgment argued only that plaintiffs failed to state a cognizable claim, the trial court's judgment can be upheld, if at all, only on that ground. *See McConnell v. Southside Indep. Sch. Dist.,* 858 S.W.2d 337, 341 (Tex.1993). When the ground for the trial court's decision is that plaintiffs failed to state a cause of action, we must take the allegations in the pleadings as true in determining whether a cause of action exists. *See El Chico Corp. v. Poole,* 732 S.W.2d 306, 309 (Tex.1987).

The court of appeals affirmed the summary judgment on plaintiffs' common law negligence claims but reversed and remanded for trial on the issues of negligence per se and gross negligence, holding that a violation of the Family Code's child abuse reporting requirement is negligence per se. 944 S.W.2d 728. Mr. and Mrs. N. have not appealed the court of appeals' judgment affirming the summary judgment against them on common law negligence. Therefore, the question of whether Texas should impose a new common law duty to report child abuse on the facts of this case is not before us. *See generally Golden Spread Council, Inc. v. Akins,* 926 S.W.2d 287, 291–92 (Tex.1996); *Butcher v. Scott,* 906 S.W.2d 14, 15–16 (Tex.1995) (both refusing to recognize a common law duty to report abuse under the circumstances of those cases); *Greater Houston* **\*304** *Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990) (setting out factors for deciding whether

Perry v. S.N., 973 S.W.2d 301 (1998)

41 Tex. Sup. Ct. J. 1162

a common law duty should exist). We granted defendants' application for writ of error to resolve the conflict between the court of appeals' decision remanding the negligence per se claims for trial and the decisions of three other courts of appeals declining to permit tort liability for violation of the statutory child abuse reporting requirement. *See Marshall v. First Baptist Church,* 949 S.W.2d 504, 508 (Tex.App.—Houston [14th Dist.] 1997, no writ); *Childers v. A.S.,* 909 S.W.2d 282, 289–90 (Tex.App.—Fort Worth 1995, no writ); *Scott v. Butcher,* 906 S.W.2d 16, 20–21 (Tex.App.—Tyler 1994), *rev'd on other grounds,* 906 S.W.2d 14 (Tex.1995).[1]

[6]   "It is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability." *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex.1993). The court of appeals found a duty in the following mandatory child abuse reporting provisions of the Texas Family Code:

A person having cause to believe that a child's physical or mental health or welfare has been adversely affected by abuse or neglect by any person shall immediately make a report as provided by this subchapter.

Tex. Fam.Code § 261.101(a).[2]

(a) A person commits an offense if the person has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report as provided in this chapter.

(b) An offense under this section is a Class B misdemeanor.

*Id.* § 261.109.[3] The court concluded that these provisions create a "statutory duty" to report child abuse, and that a violation of this duty is negligence per se. *See* 944 S.W.2d at 730.

[7]   All persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so, but this is not equivalent to a duty in tort. *See, e.g., Smith v. Merritt,* 940 S.W.2d 602, 607–08 (Tex.1997) (statute making it a crime to furnish alcohol to persons under age 21 did not impose a tort duty on social hosts). "It is well-established that the mere fact that the Legislature adopts a criminal statute does not mean that this court must accept it as a standard for civil liability." *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d 274, 278 (Tex.1979). "The considerations which warrant imposing tort liability are not identical with those which warrant criminal conviction," Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 Colum. L.Rev..

21, 22–23 (1949), and we will not apply the doctrine of negligence per se if the criminal statute does not provide an appropriate basis for civil liability.[4] *See* **\*305** *Smith,* 940 S.W.2d at 607; *Rudes v. Gottschalk,* 159 Tex. 552, 324 S.W.2d 201, 204–05 (1959); *Phoenix Refining Co. v. Powell,* 251 S.W.2d 892, 896 (Tex.Civ.App.—San Antonio 1952, writ ref'd n.r.e.).

[8]   Before we begin our analysis of whether section 261.109 of the Family Code is an appropriate basis for tort liability, we emphasize that we must look beyond the facts of this particular case to consider the full reach of the statute. We do not decide today whether a statute criminalizing only the type of egregious behavior with which these defendants are charged—the failure of eyewitnesses to report the sexual molestation of preschool children—would be an appropriate basis for a tort action. That is not the statute the Legislature passed. Rather, the issue before us is whether it is appropriate to impose tort liability on any and every person who "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect and knowingly fails to report." Tex. Fam.Code § 261.109(a). *Cf.* Leonard, *The Application of Criminal Legislation to Negligence Cases: A Reexamination,* 23 Santa Clara L.Rev. 427, 457–66 (1983) (contrasting the rigidity of statutory standards with the flexibility of case-by-case common law determinations of duty and breach).

[9]   The threshold questions in every negligence per se case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *See Moughon v. Wolf,* 576 S.W.2d 603, 604 (Tex.1978); *East Tex. Motor Freight Lines v. Loftis,* 148 Tex. 242, 223 S.W.2d 613, 615 (1949); *Missouri, K & T. Ry. v. Saunders,* 101 Tex. 255, 106 S.W. 321, 321–23 (1908); Restatement (Second) of Torts §§ 286, 288. Texas's first mandatory child abuse reporting statute, from which Family Code section 261.101(a) is derived, stated that "[t]he purpose of this Act is to protect children who [ ] ... are adversely affected by abuse or neglect." Act of May 24, 1971, 62d Leg., R.S., ch. 902, § 1, 1971 Tex. Gen. Laws 2790. Similarly, the current Family Code provision governing the investigation of reports of child abuse states that "[t]he primary purpose of the investigation shall be the protection of the child." Tex. Fam.Code § 261.301(d).

[10]   B.N. and K.N. are within the class of persons whom the child abuse reporting statute was meant to protect, and they suffered the kind of injury that the Legislature intended

Perry v. S.N., 973 S.W.2d 301 (1998)
41 Tex. Sup. Ct. J. 1162

the statute to prevent.[5] But this does not end our inquiry. *See Praesel v. Johnson,* 967 S.W.2d 391, 395 (Tex.1998). The Court must still determine whether it is appropriate to impose tort liability for violations of the statute. *See Smith,* 940 S.W.2d at 607–08. This determination is informed by a number of factors, some discussed by the court of appeals in this case and others derived from past negligence per se decisions of Texas courts and from scholarly analyses. *306 These factors are not necessarily exclusive, nor is the issue properly resolved by merely counting how many factors lean each way. Rather, we set out these considerations as guides to assist a court in answering the ultimate question of whether imposing tort liability for violations of a criminal statute is fair, workable, and wise.

[11]    We first consider the fact that, absent a change in the common law, a negligence per se cause of action against these defendants would derive the element of duty solely from the Family Code. At common law there is generally no duty to protect another from the criminal acts of a third party or to come to the aid of another in distress. *See Butcher,* 906 S.W.2d at 15; *Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983). Although there are exceptions to this no-duty rule, *see, e.g., Lefmark Management Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997) (noting that under some circumstances, person in control of premises has duty to protect invitees from crime), this case does not fall within any of the established exceptions, and Mr. and Mrs. N. have not asked this Court to impose on persons who are aware of child abuse a new common law duty to report it or take other protective action.

[12]    In contrast, the defendant in most negligence per se cases already owes the plaintiff a pre-existing common law duty to act as a reasonably prudent person, so that the statute's role is merely to define more precisely what conduct breaches that duty. *See Rudes,* 324 S.W.2d at 204 ("We adopt the statutory test rather than that of the ordinarily prudent man as the more accurate one to determine negligence ...."); *see also Moughon,* 576 S.W.2d at 604; Restatement (Second) of Torts § 286 (1965) (both defining negligence per se as the judicial adoption of a statute to define the standard of conduct of a reasonable person). For example, the overwhelming majority of this Court's negligence per se cases have involved violations of traffic statutes by drivers and train operators —actors who already owed a common law duty to exercise reasonable care toward others on the road or track. *See, e.g., Murray v. O & A Express, Inc.,* 630 S.W.2d 633 (Tex.1982); *Impson v. Structural Metals, Inc.,* 487 S.W.2d 694 (Tex.1972); *Missouri–Kansas–Texas R.R. Co. v. McFerrin,* 156 Tex. 69,

291 S.W.2d 931 (1956); *Liberty Film Lines v. Porter,* 136 Tex. 49, 146 S.W.2d 982 (1941); *Texas Co. v. Betterton,* 126 Tex. 359, 88 S.W.2d 1039 (1936); *Lancaster & Wight v. Allen,* 110 Tex. 213, 217 S.W. 1032 (1920); *Missouri, K & T. Ry. Co. v. Saunders,* 101 Tex. 255, 106 S.W. 321 (1908); *San Antonio & A.P. Ry. Co. v. Bowles,* 88 Tex. 634, 32 S.W. 880 (1895).

When a statute criminalizes conduct that is also governed by a common law duty, as in the case of a traffic regulation, applying negligence per se causes no great change in the law because violating the statutory standard of conduct would usually also be negligence under a common law reasonableness standard. *See Praesel,* 967 S.W.2d at 395; *Parrott v. Garcia,* 436 S.W.2d 897, 900 (Tex.1969); *Rudes,* 324 S.W.2d at 204; Morris, *The Role of Criminal Statutes in Negligence Actions,* 49 Colum. L.Rev.. 21, 34 (1949). But recognizing a new, purely statutory duty "can have an extreme effect upon the common law of negligence" when it allows a cause of action where the common law would not. *See* Leonard, 23 Santa Clara L.Rev. at 449 n. 92. In such a situation, applying negligence per se "bring[s] into existence a new type of tort liability." *Burnette v. Wahl,* 284 Or. 705, 588 P.2d 1105, 1109 (1978). The change tends to be especially great when, as here, the statute criminalizes inaction rather than action. *See generally Otis Eng'g,* 668 S.W.2d at 309; 3 Harper et al., The Law of Torts § 18.6 (2d ed.1986); Keeton et al., Prosser & Keeton on the Law of Torts § 56, at 373–77 (5th ed.1984); Thayer, *Public Wrong and Private Action,* 27 Harv. L.Rev.. 317 (1914) (all discussing traditional tort law distinction between misfeasance and nonfeasance).

Some commentators contend that the term "negligence per se" does not even apply when the statute on which civil liability is based corresponds to no common law duty. *See* Keeton et al. § 36, at 221 n. 9; Forell, *The Statutory Duty Action in Tort: A Statutory/Common Law Hybrid,* 23 Ind. L.Rev. 781, 782 (1990). While our definition has never been so restrictive, this Court in fact *307 has created a new duty by applying negligence per se on only one occasion. In *Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 549 (Tex.1985), a third party dragged the plaintiff into an unlocked vacant apartment owned by the defendant and raped her. Because the plaintiff was a trespasser according to traditional premises liability categories, the defendant landowner owed her no common law duty. *See id.* at 548. Although two members of this Court would have recognized a new common law duty of reasonable care toward trespassers, at least in certain cases, *see id.* at 551–54 (Kilgarlin, J., concurring); *id.* at 554 (Spears, J., concurring), a plurality instead found a duty only in a

Perry v. S.N., 973 S.W.2d 301 (1998)
41 Tex. Sup. Ct. J. 1162

city ordinance requiring landowners to keep vacant buildings locked. *See id.* at 549. But in our next major negligence per se case, *El Chico Corp. v. Poole,* we returned to the norm of deriving duty from the common law and looking to the statute only for the standard of conduct. Only after we created a new common law duty not to sell alcohol to intoxicated persons, *see El Chico,* 732 S.W.2d at 309–12, did we adopt a relevant section of the Alcoholic Beverage Code as "the attendant standard of conduct." *Id.* at 312–13. Thus, based on both this Court's past practice and the observations of noted scholars, we conclude that the absence of a relevant common law duty should be considered in deciding whether to apply negligence per se to the Family Code's reporting provision.

The court of appeals in this case listed several factors to consider in deciding whether to apply negligence per se. *See* 944 S.W.2d at 730 (citing Ratliff, Comment, *Negligence Per Se in Texas,* 41 Tex. L.Rev. 104, 106 (1962)). According to the court of appeals, the principal factors favoring negligence per se are that the Legislature has determined that compliance with criminal statutes is practicable and desirable and that criminal statutes give citizens notice of what conduct is required of them. *See id.* As considerations against negligence per se, the court of appeals cautioned that some penal statutes may be too obscure to put the public on notice, may impose liability without fault, or may lead to ruinous monetary liability for relatively minor offenses. *See id.* The first of these factors is not helpful because it points the same way in every case: the very existence of a criminal statute implies a legislative judgment that its requirements are practicable and desirable. The court of appeals' remaining factors, however, are pertinent to our analysis.

On the question of notice, this Court has held that one consideration bearing on whether to apply negligence per se is whether the statute clearly defines the prohibited or required conduct. *See Praesel,* 967 S.W.2d at 395; *Carter,* 584 S.W.2d at 278; Restatement (Second) of Torts § 874A cmt. h(1). The Family Code's reporting requirement is triggered when a person "has cause to believe that a child's physical or mental health or welfare has been or may be adversely affected by abuse or neglect." Tex. Fam.Code § 261.109(a). In this case, defendants allegedly were eyewitnesses to sexual abuse. Under these facts, there is no question that they had cause to believe abuse was occurring, and thus that the statute required them to make a report. In many other cases, however, a person may become aware of a possible case of child abuse only through second-hand reports or ambiguous physical symptoms, and it is unclear whether these circumstances are

"cause to believe" that such conduct "may be" taking place.[6] *See Scott,* 906 S.W.2d at 20. A statute that conditions the requirement to report on these difficult judgment calls does not clearly define  **\*308**  what conduct is required in many conceivable situations.[7]

The next factor the court of appeals considered was whether applying negligence per se to the reporting statute would create liability without fault. *See* 944 S.W.2d at 730. We agree with the court of appeals that it would not, because the statute criminalizes only the "knowing[ ]" failure to report.[8] *See id.; see also El Chico,* 732 S.W.2d at 313 (holding under a similarly worded statute that "a liquor licensee is negligent as a matter of law under the statute when he *knowingly* sells an alcoholic beverage to an intoxicated person" (emphasis added)). This characteristic of the statute weighs in favor of imposing civil liability.

Our next consideration is whether negligence per se would impose ruinous liability disproportionate to the seriousness of the defendant's conduct. In analyzing this factor, the court of appeals treated child abuse as the relevant conduct. *See* 944 S.W.2d at 730 ("[T]he abuse of children has become notorious."). The conduct criminalized by section 261.109, however, is not child abuse but the failure to report child abuse. Through its penal laws, the Legislature has expressed a judgment that abuse and nonreporting deserve very different legal consequences. The abuser in this case committed the offense of aggravated sexual assault on a child under the age of fourteen, a first degree felony carrying a penalty of five to ninety-nine years in prison and a fine of up to $10,000. *See* Tex. Pen.Code §§ 22.021, 12.32. Almost all of the other acts of abuse and neglect covered by the reporting requirement, *see* Tex. Fam.Code § 261.001(1), (4) (defining "abuse" and "neglect"), are also felonies. *See* Tex. Pen.Code § 22.04 (injury to a child); *id.* § 22.041 (abandoning or endangering child); *id.* § 22.011(a)(2), (f) (statutory rape). Even the lowest level of felony is punishable by 180 days to two years in jail and a $10,000 fine, *see id.* § 12.35, and automatically deprives the offender of certain civil rights such as the franchise, *see* Tex. Elec.Code § 13.001(a)(4), eligibility for public office, *see id.* § 141.001(a)(4), and the right to own a firearm, *see* Tex. Pen.Code § 46.04(a). By contrast, failure to report abuse or neglect, no matter how serious the underlying crime, is a class B misdemeanor punishable by no more than six months in jail and a $2,000 fine. *See* Tex. Fam.Code § 261.109(b); Tex. Pen.Code § 12.22. This evidence of legislative intent to penalize nonreporters far less severely than abusers weighs against holding a person

who fails to report suspected abuse civilly liable for the enormous damages that the abuser subsequently inflicts. The specter of disproportionate liability is particularly troubling when, as in the case of the reporting statute, it is combined with the likelihood of "broad and wide-ranging liability" by collateral wrongdoers that we condemned in *Carter v. William Sommerville & Son, Inc.,* 584 S.W.2d at 279.

Finally, in addition to the factors discussed by the court of appeals, we have also looked to whether the injury resulted directly or indirectly from the violation of the statute. *See Praesel,* 967 S.W.2d at 395. In *Carter v. William Sommerville & Son, Inc.,* we refused to apply negligence per se liability to a provision of the Texas Motor Carrier Act making it a misdemeanor to aid and abet any violation of the Act. *See Carter,* 584 S.W.2d at 278–79. We concluded that the aiding and abetting section was "too far removed to be adopted as a standard" for civil liability, in part because "[i]t is only by first finding a violation of some other section of the Act that the court may then find a violation" of that *309 provision. *Carter,* 584 S.W.2d at 279. Like the aiding and abetting provision in *Carter,* Family Code section 261.109 defines the misdemeanor of failure to report child abuse in terms of the wrongful act of a third party. Under *Carter*'s reasoning, the indirect relationship between violation of such a statute and the plaintiff's ultimate injury is a factor against imposing tort liability.

The lack of direct causation is not in itself dispositive; we have imposed civil liability for some statutory violations that caused the plaintiff's injury by facilitating the tort of a third party. *See El Chico,* 732 S.W.2d at 312–13 (statute prohibiting sale of alcohol to intoxicated person); *Nixon,* 690 S.W.2d at 548–49 (building ordinance requiring security measures). But a reporting statute by definition places a *fourth* party between the defendant and the plaintiff: the person or agency to whom the defendant is required to make the report. Thus, the connection between the defendant's conduct and the plaintiff's injury is significantly more attenuated in a case based on failure to report than in *Nixon* or *El Chico.* We are not aware of any Texas case applying negligence per se to a statute that, like the child abuse reporting provision, interposes not one but two independent actors between the plaintiff and the defendant.

We conclude by noting that for a variety of reasons, including many of those we have discussed, most other states with mandatory reporting statutes similar to Texas's have concluded that the failure to report child abuse is

not negligence per se. *See C.B. v. Bobo,* 659 So.2d 98, 102 (Ala.1995); *Fischer v. Metcalf,* 543 So.2d 785, 790–91 (Fla.Dist.Ct.App.1989); *Cechman v. Travis,* 202 Ga.App. 255, 414 S.E.2d 282, 284 (1991); *Borne v. Northwest Allen County Sch. Corp.,* 532 N.E.2d 1196, 1202–03 (Ind.Ct.App.1989); *Kansas State Bank & Trust Co. v. Specialized Transp. Servs., Inc.,* 249 Kan. 348, 819 P.2d 587, 604 (1991); *Valtakis v. Putnam,* 504 N.W.2d 264, 266 (Minn.Ct.App.1993); *Bradley v. Ray,* 904 S.W.2d 302, 312–14 (Mo.Ct.App.1995); *Marquay v. Eno,* 139 N.H. 708, 662 A.2d 272, 276–78 (1995). *But see Landeros v. Flood,* 17 Cal.3d 399, 131 Cal.Rptr. 69, 551 P.2d 389, 396–97 (1976); *Curran v. Walsh Jesuit High Sch.,* 99 Ohio App.3d 696, 651 N.E.2d 1028, 1030 (1995); *Doe v. Coffee County Bd. of Educ.,* 852 S.W.2d 899, 909 (Tenn.Ct.App.1992).

In summary, we have considered the following factors regarding the application of negligence per se to the Family Code's child abuse reporting provision: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute. Because a decision to impose negligence per se could not be limited to cases charging serious misconduct like the one at bar, but rather would impose immense potential liability under an ill-defined standard on a broad class of individuals whose relationship to the abuse was extremely indirect, we hold that it is not appropriate to adopt Family Code section 261.109(a) as establishing a duty and standard of conduct in tort. Therefore, Mr. and Mrs. N. and their children may not maintain a claim for negligence per se or gross negligence based on defendants' violation of the child abuse reporting statute. Because plaintiffs did not appeal the court of appeals' adverse decision on their common law negligence claims, we do not consider whether Texas should impose a common law duty to report or prevent child abuse.

For the foregoing reasons, we reverse the judgment of the court of appeals and render judgment that plaintiffs take nothing.

Perry v. S.N., 973 S.W.2d 301 (1998)

41 Tex. Sup. Ct. J. 1162

**All Citations**

973 S.W.2d 301, 41 Tex. Sup. Ct. J. 1162

Footnotes

1     This Court was unable to address the negligence per se issue in *Butcher* for jurisdictional reasons. *See Butcher v. Scott,* 906 S.W.2d 14, 16 (Tex.1995). This case thus presents our first opportunity to consider this question.

2     This mandatory reporting statute was enacted in 1971. *See* Act of May 24, 1971, 62d Leg., R.S., ch. 902, § 1, 1971 Tex. Gen. Laws 2790, 2791. Prior to that time, Texas did not require the reporting of child abuse, although there were statutes granting immunity from suit to doctors and other professionals who chose to report cases of suspected abuse. *See* Act of April 26, 1965, 59th Leg., R.S., ch. 117, 1965 Tex. Gen. Laws 277 (physicians); Act of May 5, 1969, 61st Leg., R.S., ch. 219, 1969 Tex. Gen. Laws 637 (other professionals).

      The version of this provision in force at the time of the events in this case read "has been *or may be* adversely affected." *See* 944 S.W.2d at 729 (quoting former Tex. Fam.Code § 34.01(a)) (emphasis added). The Legislature deleted the italicized language in 1997. *See* Act of Sept. 1, 1997, 75th Leg., R.S., ch. 1022, § 65, 1997 Tex. Gen. Laws 3733, 3760. However, the phrase "or may be" remains in the current version of § 261.109(a).

3     This provision criminalizing the failure to report was added in 1973. *See* Act of May 17, 1973, 63d Leg., R.S., ch. 398, § 1, 1973 Tex. Gen. Laws 881.

4     At times, our opinions have included language suggesting that any statutory violation is automatically negligence per se. *See, e.g., Southern Pac. Co. v. Castro,* 493 S.W.2d 491, 497 (Tex.1973) (stating that to prove negligence per se, one must prove the unexcused violation of a penal standard). Yet these same opinions recognize the Restatement of Torts as the law of Texas on negligence per se, and the Restatement expressly states that the adoption of criminal statutes into tort law is a matter of judicial discretion: "The correct rule is ...: 'The unexcused violation of a legislative enactment or an administrative regulation *which is adopted by the court as defining the standard of conduct of the reasonable man,* is negligence in itself.' " *Southern Pac.,* 493 S.W.2d at 497 (emphasis added)(quoting Restatement (Second) of Torts § 288B (1965)); *see also* Restatement (Second) of Torts § 286 (1965) ("The court *may* adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment ....") (emphasis added); *id.* cmt. d ("Since the legislation has not so provided, the court is under no compulsion to accept it as defining any standard of conduct for purposes of a tort action.").

5     A few courts in other jurisdictions have interpreted mandatory reporting statutes as intended to protect only the specific child the defendant suspects is being abused, not other potential victims of the same abuser. *See Curran v. Walsh Jesuit High School,* 99 Ohio App.3d 696, 651 N.E.2d 1028, 1030–31 (1995); *Marcelletti v. Bathani,* 198 Mich.App. 655, 500 N.W.2d 124, 127 (1993). It is unclear from the pleadings whether B.N. and K.N. were among the children whom defendants saw being abused. But whether or not *Curran* and *Marcelletti*'s analysis applies to the Texas reporting statute, B.N. and K.N. are within the protected class on the facts of this case. According to the pleadings, defendants saw Daniel Keller take some of the children enrolled in the day care center out of the center into an adjoining room of the Kellers' home and sexually abuse them. This gave defendants "cause to believe" that the "physical or mental health or welfare" of all the children attending the day care center—not only the particular children they saw being abused on that occasion—"may be adversely affected by abuse or neglect." *See* Tex. Fam.Code § 261.109(a). Thus, the statute required defendants to make a report concerning all the children at the center.

6     Determining whether abuse is or may be occurring in a particular case is likely to be especially difficult for untrained laypersons. Texas is one of a minority of states that require any person who suspects child abuse to report it. *See* O'Brien & Flannery, *The Pending Gauntlet to Free Exercise: Mandating that Clergy Report Child Abuse,* 25 Loy. L.A. L.Rev. . 1, 24–25 & n. 127 (1991) (collecting statutes). Most states place such a requirement only on professionals who may be expected to know more than the average person about recognizing child abuse and who have a professional relationship with and responsibility for children. *See id.* at 19 n. 106 (collecting statutes); *id.* at 24. The Texas Family Code contains a

Perry v. S.N., 973 S.W.2d 301 (1998)

41 Tex. Sup. Ct. J. 1162

separate mandatory reporting provision, not relevant here, specifically directed to members of certain professions. *See* Tex. Fam.Code § 261.101(b).

7 We do not mean to suggest that section 261.109 is unconstitutionally vague. In fact, one court of appeals has already rejected an as-applied vagueness challenge to this provision. *See Morris v. State,* 833 S.W.2d 624, 627 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). A statute's lack of clarity need not rise to a constitutionally suspect level in order to be a factor in our determination of whether imposing negligence per se is appropriate.

8 Although the issue of strict liability is related to the problem of notice, *see Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 499, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982), a statute may require scienter and yet fail to define clearly the prohibited conduct. *Cf. Long v. State,* 931 S.W.2d 285, 289 (Tex.Crim.App.1996).

End of Document   © 2022 Thomson Reuters. No claim to original U.S. Government Works.

443 S.W.3d 221
Court of Appeals of Texas,
Corpus Christi–Edinburg.

Jerilyn Ann CERDA, as Next
Friend of Noel Doe, Appellant,
v.
RJL ENTERTAINMENT, INC.
d/b/a Club Cheetah, Appellee.

No. 13–12–00356–CV.
|
Dec. 12, 2013.

**Synopsis**
**Background:** Minor, a 14-year-old girl, brought action against sexually-oriented nightclub for negligence, negligence per se, and grossly negligent infliction of emotional distress, after she was kidnapped, allowed to enter the club by an employee who knew the kidnapper, and forced by her kidnappers to perform adult oriented dancing. The nightclub moved to dismiss based on special exceptions. The 319th District Court, Nueces County, Thomas F. Greenwell, J., granted the motion. Minor appealed.

**Holdings:** The Court of Appeals, Corpus Christi–Edinburg, Benavides, J., held that:

[1] employee did not owe duty of care to minor;

[2] minor was within class of persons that criminal statutes were designed to protect;

[3] minor's harms were the type that criminal statutes were designed to prevent;

[4] criminal statutes could be used to impose negligence per se liability; and

[5] grossly negligent infliction of emotional distress was not a recognized cause of action.

Affirmed in part, reversed in part, and remanded.

**West Headnotes (14)**

[1]    **Pleading** ⬥ Special exceptions
Although special exceptions are generally filed to force clarification of vague pleadings, they may also be used to determine whether a plaintiff has stated a cause of action permitted by law. Vernon's Ann.Texas Rules Civ.Proc., Rule 91.

1 Cases that cite this headnote

[2]    **Appeal and Error** ⬥ Defenses, objections, and exceptions in general
**Appeal and Error** ⬥ Dismissal and Nonsuit in General
When reviewing a trial court's dismissal of a cause based on the grant of special exceptions, the court of appeals examines two distinct rulings: (1) the decision to sustain the special exceptions; and (2) the decision to dismiss the cause of action. Vernon's Ann.Texas Rules Civ.Proc., Rule 91.

1 Cases that cite this headnote

[3]    **Negligence** ⬥ Elements in general
To establish negligence, a party must establish a duty, breach of that duty, and damages proximately caused by the breach.

[4]    **Negligence** ⬥ Necessity and Existence of Duty
**Negligence** ⬥ Relationship between parties
Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances.

[5]    **Public Amusement and Entertainment** ⬥ Concerts, performances, theaters and shows in general
Employee of sexually-oriented nightclub that permitted a 14-year-old girl who had been kidnapped to enter after she was forced by her

kidnappers to present a false identification and then perform adult oriented dancing did not owe a duty of care to the minor to prevent her from being corrupted, and thus was not liable to minor under theory of negligence.

[6]    **Torts** ⫸ Duty and breach thereof in general

All persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so, but this is not equivalent to a duty in tort.

[7]    **Negligence** ⫸ Duty based upon statute or other regulation

The threshold question in negligence per se cases is whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent.

1 Cases that cite this headnote

[8]    **Public Amusement and Entertainment** ⫸ Concerts, performances, theaters and shows in general

A 14-year-old girl who was forced by her kidnappers to perform adult-oriented dancing at a sexually-oriented nightclub belonged to the class of persons that statutes prohibiting the employment, authorization or inducement of a child to engage in sexual conduct or sexual performance, were designed to protect, as required to bring negligence per se action against nightclub that accepted a false identification presented by kidnapper and allowed 14-year-old to perform. V.T.C.A., Penal Code §§ 43.25(b), 43.251.

[9]    **Damages** ⫸ Particular Cases

The mental anguish and emotional distress a 14-year-old girl experienced after being forced by her kidnappers to perform adult-oriented dancing at a sexually-oriented nightclub were the types of injuries that the statutes prohibiting the employment, authorization or inducement

of a child to engage in sexual conduct or sexual performance, were designed to protect against, as required to bring negligence per se action against nightclub that accepted a false identification presented by kidnappers and allowed 14-year-old to perform. V.T.C.A., Penal Code §§ 43.25(b), 43.251.

[10]   **Negligence** ⫸ Violations of statutes and other regulations

To consider whether imposing tort liability for violations of a criminal statute is fair, workable, and wise, court looks to a number of non-exclusive factors; the court will not apply the doctrine of negligence per se if the criminal statute does not provide an appropriate basis for civil liability.

3 Cases that cite this headnote

[11]   **Negligence** ⫸ Duty based upon statute or other regulation

**Negligence** ⫸ Violations of statutes and other regulations

The non-exclusive factors for determining if civil liability may be imposed for violation of a criminal statute under a theory of negligence per se are: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; (5) and whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

3 Cases that cite this headnote

[12]   **Public Amusement and Entertainment** ⫸ Concerts, performances, theaters and shows in general

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

Imposing civil liability on businesses for violations of criminal statutes prohibiting exploitation of children under the age of 18 years in the adult-entertainment industry would be fair, workable, and wise, as required for civil liability under a negligence per se theory; liability would affect the affirmative actions of only a small number of businesses, statutes clearly put public on notice of required conduct, statutes did not impose liability without fault, imposition of such liability would not affect a wide range of collateral wrongdoers such as business patrons, and a potential plaintiff's injuries would stem directly from a violation of the statutes. V.T.C.A., Penal Code §§ 43.25(b), 43.251.

2 Cases that cite this headnote

[13]    **Damages** ⬿ Negligent Infliction of Emotional Distress

There is no general duty not to negligently inflict emotional distress.

[14]    **Damages** ⬿ Particular cases

A 14-year-old girl failed to state a claim for grossly negligent infliction of emotional distress in her action against sexually-oriented nightclub after she was allowed to enter the club after being forced by her kidnappers to present a false identification and then forced to perform adult-oriented dancing; there was no indication that Texas recognized claims for grossly negligent infliction of emotional distress, and minor did not ask the court to recognize such a theory of liability.

1 Cases that cite this headnote

## Attorneys and Law Firms

*223 Travis C. Headley, Watts, Guerra & Craft, LLP, San Antonio, for Appellant.

Carlos Villarreal, McKibben & Villarreal, Corpus Christi, for Appellee.

Before Chief Justice VALDEZ and Justices BENAVIDES and LONGORIA.

## OPINION

Opinion by Justice BENAVIDES.

This appeal arises out of the trial court's granting of special exceptions and subsequent dismissal with prejudice of certain causes of action asserted by appellant Jerilyn Ann Cerda ("Cerda"), as next friend of Noel Doe ("Noel"), against RJL Entertainment, Inc. d/b/a Club Cheetah ("Club Cheetah"). By one issue, Cerda asserts that the trial court erred in granting Club Cheetah's motion to dismiss and sever based on special exceptions. We affirm, in part, and reverse and remand, in part.

## I. Background

Cerda alleged the following facts in her second-amended original petition to the trial court: kidnappers, Leslie Campbell and an unknown driver, abducted fourteen-year-old Noel outside of a San Antonio, Texas homeless shelter on March 23, 2009. Noel lived at the shelter with her family due to her parents' recent unemployment. Later, Campbell and the unknown driver drove Noel to a home in San Antonio, where Campbell assaulted her. The next day, Noel was taken to an apartment in San Antonio where she met a couple, Raquel McIntosh and Alvin Robertson. McIntosh gave Noel "provocative clothes to wear" and thereafter charged various men to sexually assault Noel. During her kidnapping, Noel was taken to "multiple locations" throughout San Antonio and Corpus Christi, Texas.

At some point during the ordeal, Campbell took Noel to Club Cheetah, a sexually-oriented business in Corpus Christi, Texas. At the club, Noel presented a false identification card to Club Cheetah's manager, Jeffrey Shawn Martinez, which belonged to another woman who was approximately eight years older than Noel. Cerda asserts *224 in her petition that "[l]ikely due to [Martinez's] and [Campbell's] personal relationship, [Martinez] failed to properly scrutinize [Noel's] false identification." As a result, Noel stripped for money. Cerda states that patrons of Club Cheetah touched Noel while she performed topless lap dances on them and that Noel was encouraged by Club Cheetah's DJ to remove her bra and expose her breasts to the patrons. Stated another way, Cerda

contended that by dancing topless for the "entertainment and sexual gratification" of Club Cheetah's patrons, she was the subject of sexual exploitation for profit by the club.

On March 30, 2009, Noel escaped from her captivity while Campbell showered. Cerda alleges that as a result of Club Cheetah's actions, Noel suffered "bodily injury and sickness including ... lost peace of mind, depression, neurosis, nervousness, weight fluctuations, nightmares, irritability, upset stomach, pains in her stomach, sleep loss, and/or anxiety." Cerda asserted various causes of action in her lawsuit against all of the defendants. As to Club Cheetah, Cerda alleged negligence, negligence per se, and grossly negligent infliction of emotional distress. Cerda invoked the doctrine of respondeat superior as to Martinez's actions as an employee or vice principal of Club Cheetah.

Specifically, Cerda alleged that Martinez had a duty to exercise ordinary care and breached that duty in one or more of the following ways:

> (1) Failing to ensure the age of adult oriented dancers;
>
> (2) Allowing the exploitation of Noel while acting in the course and scope of his employment with the Club; and
>
> (3) Failing to ascertain the accuracy of Noel's age;

With regard to Club Cheetah, Cerda asserted various acts of negligence, including:

> (1) Failing to properly train employees regarding the appropriate methods and procedures for ensuring that topless dancers are of the age of majority; and
>
> (2) Failing to properly train employees to monitor the adult oriented business for underage patrons and dancers.

Cerda also asserted that Club Cheetah and Martinez's conduct constituted negligence per se under penal code sections 43.25 (Sexual Performance by a Child) and 43.251 (Employment Harmful to Children), as well as Corpus Christi Municipal Code section 48–10. See Tex. Penal Code Ann. §§ 43.25(c) (West 2011), 43.251 (West Supp.2013); Corpus Christi, Tex., Gen. Ordinances ch. 48, art. II, § 48–10 (1996) ("Ordinance 48–10"). Alternatively, Cerda alleged a cause of action for gross negligence that proximately caused Noel's "highly foreseeable injuries," including mental anguish. Under these theories of recovery, Noel sought damages for personal injury, pain and suffering, and mental anguish in the past, as well as damages for personal injury, pain and suffering, and mental

anguish that in reasonable probability will be suffered in the future. Noel also sought punitive damages.

On October 31, 2011, the trial court sustained the first set of special exceptions filed by Club Cheetah for Cerda's failure to plead a recognizable cause of action, but allowed Cerda to cure its purportedly defective pleading. Cerda repleaded and filed, with leave of the trial court, her second amended original petition. Club Cheetah filed a motion to dismiss and sever based on special exceptions, again asserting that Cerda failed to plead a recognizable cause of action. On February 28, **\*225** 2012, the trial court granted Club Cheetah's Motion to Dismiss and Sever based on Special Exceptions.[1] This appeal followed.

## II. Standard of Review

**[1]** **[2]** Although special exceptions are generally filed to force clarification of vague pleadings, they may also be used to determine whether a plaintiff has stated a cause of action permitted by law. *Mowbray v. Avery,* 76 S.W.3d 663, 677 (Tex.App.-Corpus Christi 2002, pet. denied); *see also* Tex.R. Civ. P. 91. When reviewing a trial court's dismissal of a cause based on the grant of special exceptions, we examine two distinct rulings: (1) the decision to sustain the special exceptions; and (2) the decision to dismiss the cause of action. See *Mowbray,* 76 S.W.3d at 678.

We review a trial court's order sustaining special exceptions for abuse of discretion. *Id.; see Holt v. Reproductive Servs., Inc.,* 946 S.W.2d 602, 604 (Tex.App.-Corpus Christi 1997, writ denied). The test for abuse of discretion is whether the court acted without reference to any guiding rules and principles or whether the act was arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). If the decision to sustain the special exceptions was proper, we then review whether the decision to dismiss was appropriate. See *Mowbray,* 76 S.W.3d at 678.

The issue of whether a petition states a claim is a question of law. *Id.* In our review, we consider the issue *de novo* and take all allegations, facts, and interferences in the pleadings as true and view them in a light most favorable to the pleader. *Id.* If the pleading does not state a cause of action, the trial court does not err in dismissing the entire case. See *Holt,* 946 S.W.2d at 605. With this framework in mind, we now turn to the issue raised before us in this appeal.

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

## III. Discussion

Because Cerda's claims against Club Cheetah were dismissed for failure to state a cause of action, our review of the trial court's order sustaining the special exceptions turns on whether the pleadings state a cause of action. *See Mowbray,* 76 S.W.3d at 680 (holding that a trial court does not err in granting special exceptions and dismissing a cause of action for incurable pleading defects based on claims not recognized by law). Accordingly, we begin our analysis by determining whether Cerda's pleadings state a cause of action recognized by law.

### A. Negligence

**[3]    [4]    [5]**    To establish negligence, a party must establish a duty, breach of that duty, and damages proximately caused by the breach. *Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex.2006). As such, it is fundamental that the existence of a legally cognizable duty is a prerequisite to all tort liability. *Graff v. Beard,* 858 S.W.2d 918, 919 (Tex.1993). Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances. *Torrington Co. v. Stutzman,* 46 S.W.3d 829, 837 (Tex.2000).

Cerda's pleadings allege claims of common law negligence and negligence per se against Club Cheetah. On appeal, Cerda argues that its negligence claims are based upon a "general duty to avoid corrupting a minor," as well as several "specific duties" **\*226** under the Texas Penal Code and the City of Corpus Christi Code of Ordinances.

Cerda does not direct this Court to any authority that imposes a general duty to "avoid corrupting a minor." Tex.R.App. P. 38.1(i). Moreover, the Court's independent research has revealed no authority that addresses such a proposition. As a result, we conclude that the trial court did not err by dismissing Cerda's cause of action that was based on a general law duty to avoid corrupting a minor.[2]

### B. Negligence Per Se

**[6]    [7]    [8]**    We turn next to Cerda's argument that Club Cheetah breached three separate statutory duties amounting to negligence per se. Negligence per se is a tort concept whereby the civil courts adopt a legislatively imposed standard of conduct as defining the conduct of a reasonably prudent person. *Moughon v. Wolf,* 576 S.W.2d 603, 604 (Tex.1978).

All persons have a duty to obey the criminal law in the sense that they may be prosecuted for not doing so, but this is not equivalent to a duty in tort. *Perry v. S.N.,* 973 S.W.2d 301, 304 (Tex.1998). Thus, the threshold question in negligence per se cases is whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Id.* at 305; *see also* Moughon, 576 S.W.2d at 604.

**[9]    [10]    [11]    [12]**    Texas Penal Code section 43.25(b) (prohibiting the employment, authorization or inducement of a child to engage in sexual conduct or sexual performance), section 43.251 (prohibiting the employment, authorization, or inducement of a child to work in a sexually oriented commercial activity or a place of business which permits, requests, or requires a child to work nude or topless), and Corpus Christi municipal ordinance 48–10 (prohibiting anyone under the age of eighteen to enter or be on the premises of a sexually oriented business) deal with the prohibition of allowing, employing, or inducing children to engage, view, or be within a certain proximity of businesses or activities that are sexual in nature. Noel, age fourteen at the time of these alleged activities, is within the class of persons whom these statutes and ordinance seek to protect. *See Coutta v. State,* 385 S.W.3d 641, 656 (Tex.App.-El Paso 2012, no pet.) (holding that the intent of section 43.251 is "to prevent the exploitation of children under the age of 18 years in the adult-entertainment industry"); *see also* House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B. 1269, 65th Leg., R.S. (1977) (explaining that section 43.25(b) "protects minors from those who would exploit them for obscene purposes"); House Comm. on Criminal Jurisprudence, Bill Analysis, Tex. H.B.1904, 70th Leg., R.S. (1987) (explaining that this bill's purpose was to proscribe the employment of children in sexually-oriented businesses because such a provision is not provided anywhere in the other child labor laws); Corpus Christi, Tex., Gen. Ordinances ch. 48, art. II, § 48–1 (1996) ("The purpose of this chapter is to regulate sexually oriented businesses to promote the public health, safety and welfare of the citizens of Corpus Christi, and to establish reasonable and uniform regulations to prevent the concentration of sexually oriented businesses in the city."). Furthermore, Noel alleged at least some injuries that the Legislature and the City of Corpus Christi intended to prevent by prohibiting such activities, including mental anguish and emotional distress that **\*227** minors can experience in these situations. However, despite answering these threshold questions in the affirmative, we must still determine whether it is appropriate to impose tort liability for violations of a

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

statute. *See Perry*, 973 S.W.2d at 305; *Praesel v. Johnson*, 967 S.W.2d 391, 395 (Tex.1998). To consider whether imposing tort liability for violations of a criminal statute is "fair, workable, and wise," we look to a number of non-exclusive factors. *Perry*, 973 S.W.2d at 306. Stated another way, we will not apply the doctrine of negligence per se if the criminal statute does not provide an appropriate basis for civil liability. *Id.* at 304 (internal citations omitted). The Texas Supreme Court set forth the following factors for courts to consider in deciding whether to apply the doctrine of negligence per se:

(1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty;

(2) whether the statute puts the public on notice by clearly defining the required conduct;

(3) whether the statute would impose liability without fault;

(4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and

(5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.

*Id.* at 309.

[13]   First, we consider the fact that absent a change in the common law, a negligence per se cause of action against Club Cheetah would derive the element of duty solely from the penal code and the Corpus Christi code of municipal ordinances. In Texas, there is no general duty not to negligently inflict emotional distress. *See Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex.1993). The *Boyles* court made clear, however, that its decision does not affect a claimant's right to recover mental anguish damages caused by a defendant's breach of some other legal duty—i.e., negligent infliction of direct physical injury, wrongful death, battery, failure of a telegraph company to timely deliver death message, invasion of privacy, defamation, or negligent handling of a corpse. *Id.* Additionally, we are not directed to any other recognized common law duties that would apply to the facts of this case. Accordingly, the criminal statutes and ordinance invoked by Cerda does not supply the standard for an existing duty, but would create a new one. *See Reeder v. Daniel*, 61 S.W.3d 359, 367 (Tex.2001) (analyzing whether to impose negligence per se liability for one minor providing alcohol to another minor).[3] This consideration could arguably weigh

against imposing civil liability because recognizing a "purely statutory duty" can have "an extreme effect upon the common law of negligence" when it allows a cause of action where the common law would not. *See Perry*, 973 S.W.2d at 306. However, such "an extreme effect" would not occur in this case because the concern over the criminalization of inaction rather than action that the *Perry* Court warned about is not present here. *See id.* Instead, the provisions criminalize affirmative action by individuals and, by extension, a very specific class  ***228** of businesses. *See id.* (citing Ezra Ripley Thayer, *Public Wrong and Private Action*, 27 Harv. L.Rev.. 317, 327–28 (1914)).[4]

Second, we consider whether the statutes and ordinance put the public on notice by clearly defining the required conduct. Club Cheetah argues that the question of notice in this case poses more questions than answers and reveals "a truly dysfunctional standard for tort liability." We disagree. Section 43.25 clearly states that a person commits the offense of sexual performance of a child if "knowing the character and content thereof, he employs, authorizes, or induces a child younger than 18 years of age to engage in sexual conduct or a sexual performance." *See* Tex. Penal Code Ann. § 43.25(b). In other words, the public is put on notice by section 43.25 to not employ, authorize, or induce a child younger than 18 years of age to engage in sexual conduct[5] or a sexual performance.[6] Likewise, section 43.251 prohibits a person from employing, authorizing, or inducing "a child to work" in "a sexually oriented commercial activity" or "any place of business permitting, requesting, or requiring a child to work nude or topless."[7] Corpus Christi municipal ordinance 48–10 goes further than the penal code sections in putting the public on notice by creating a statutory presumption on sexually-oriented businesses. *See* Corpus Christi, Tex., Gen. Ordinances ch. 48, art. II, § 48–10. Ordinance 48–10 states that "an owner, manager, or an employee" of a sexually oriented business "[knows] a person was under the age of eighteen" unless such an employee asked for and was furnished a proper identification. Further, the ordinance states that it is a defense to any charge under the ordinance that the identification provided "upon reasonable  ***229** examination, appeared to be valid on its face reflecting that such person is more than seventeen years old."

In examining whether the statute would impose liability without fault, the *Perry* Court relied on *El Chico v. Poole*, 732 S.W.2d 306, 313 (Tex.1987), *superseded by statute as stated in, F.F.P. Operating Partners, L.P. v. Duenez*, 237 S.W.3d 680,

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

684–85 (Tex.2007), which found a liquor licensee negligent as a matter of law when he *knowingly* sells an alcoholic beverage to an intoxicated person. *See Perry,* 973 S.W.2d at 308. With regard to the pertinent penal code provisions, Club Cheetah argues that such statutes "on their face impose liability without an element of fault." Again, we disagree.

Section 43.25(b) legislatively imposes a standard of conduct which we adopt to define as the conduct of a reasonably prudent person. *See Nixon v. Mr. Property Mgmt. Co., Inc.,* 690 S.W.2d 546, 549 (Tex.1985) (citing *Moughon,* 576 S.W.2d at 604); *see also Mo. Pac. R. Co. v. Am. Statesman,* 552 S.W.2d 99, 103 (Tex.1977) ("Where the Legislature has declared that a particular act shall not be done, it fixes a standard of reasonable care, and an unexcused violation of the statute constitutes negligence or contributory negligence as a matter of law."). Similarly, section 43.251 legislatively imposes a standard of conduct upon businesses which we adopt to define the conduct of a reasonably prudent business engaging in "sexually oriented commercial activity" or a business that permits, requests, or requires one to work nude or topless. *See Nixon,* 690 S.W.2d at 549. Furthermore, Ordinance 48–10 explicitly discusses fault by stating that an owner, manager, or employee of a sexually oriented business violates the ordinance by "*knowingly, recklessly,* or *with criminal negligence* " allowing a person, who is under the age of eighteen to remain on the premises. Corpus Christi, Tex., Gen. Ordinances ch. 48, art. II, § 48–10 (1996) (emphasis added); *see also id.* ch. 48, art. II, § 48–2 (defining "sexually oriented business"). Additionally, Ordinance 48–10 imposes a "reasonable examination" standard on a sexually-oriented business that chooses to utilize the defense that the child presented a purportedly valid identification. Accordingly, these characteristics weigh in favor of imposing civil liability.[8]

Our next consideration is whether negligence per se would impose ruinous liability disproportionate to the seriousness of the defendant's conduct, particularly if the liability would fall on a broad and wide range of collateral wrongdoers. By enacting sections 43.25 and 43.251, the Texas Legislature has chosen to specifically criminalize the exploitation of children, by individuals and businesses that employ, authorize, or induce them to work in sexual performances, sexually-oriented businesses, or any place of business permitting, requesting, or requiring an individual to work nude or topless. Under section 43.25, the offense is a third-degree felony or a second-degree felony if the child is under fourteen years old. *See* Tex. Penal Code Ann. § 43.25(c). Third-degree felonies

carry the fourth most serious punishment of Texas crimes with a punishment range of two to ten **\*230** years' imprisonment and a fine of up to $10,000. *See id.* § 12.34 (West 2011). A violation of section 43.251, at the time that the crime in this case was allegedly committed, was a Class A misdemeanor. Class A misdemeanors are the most serious misdemeanors and are punishable by up to one-year imprisonment and a fine of up to $4,000. *But see id.* § 43.251(c) (amended in 2011 to make the offense a second-degree felony, or a first-degree felony if the child is under fourteen years old). A violation of ordinance 48–10 constitutes a Class C misdemeanor. *See* Corpus Christi, Tex., Gen. Ordinances ch. 48, art. II, § 48–3(c) (1996). Class C misdemeanors are punishable by fines not to exceed $500. *See* Tex. Penal Code Ann. § 12.23 (West 2011). Additionally, ordinance 48–3 gives the City of Corpus Christi the authority to "bring a civil action for the enforcement" of its ordinances regulating sexually-oriented businesses. *See id.* § 48–3(g).

We recognize Club Cheetah's meritorious argument that such civil liability would be "potentially ruinous" to Club Cheetah when compared to the criminal punishments of the relevant statutes. However, we disagree with such an assessment of the potential punishments involved. The Legislature intended for violations of both penal sections involved in this case to carry the possibility of imprisonment in addition to potential fines. Potential jail time deals with important liberty interests which could far outweigh any potential liability that could be imposed under the civil justice system. Additionally, while a violation of ordinance 48–10 carries a minimal criminal punishment of only a fine of up to $500; ordinance 48–3 also gives the City of Corpus Christi authority to bring civil actions.

Further, even though these provisions have no "ruinous liability disproportionate to the seriousness of the defendant's conduct," this liability would not particularly fall on a "broad and wide range" of collateral wrongdoers, as addressed by the Texas Supreme Court in *Carter v. William Sommerville and Son, Inc. See* 584 S.W.2d 274, 278–79 (Tex.1979); *see also Perry,* 973 S.W.2d at 308. Here, exposure of liability is directed toward a limited segment of specific individuals[9] and entities, which allow, employ, or induce children to engage, view, or be within certain proximity of businesses or activities that are sexual in nature. *See* Tex. Penal Code Ann. §§ 43.25(c), 43.251; Corpus Christi, Tex., Gen. Ordinances ch. 48, art. II, § 48–10. Club Cheetah argues, however, that use of the word "induce" in the penal code statutes would broaden the scope of collateral offenders to include patrons

of Club Cheetah, who "drive the very existence of the club." We, again, disagree. "Induce" is not defined by the penal code, so we adopt the word's meaning in common usage. *See* Tex. Gov't Code Ann. § 311.011 (West 2013). Thus, "induce" means to "move by persuasion or influence" or "to bring about by influence." *Dornbusch v. State*, 156 S.W.3d 859, 866 (Tex.App.-Corpus Christi 2005, pet ref'd) (internal citations omitted). Based on this definition, patrons, who merely act as such, could not be held liable without more evidence to show that they moved Noel by persuasion or influence to dance at Club Cheetah. *See generally id.* No such allegation is made in Cerda's pleadings. Therefore, the limited scope of potential offenders, also weighs in favor of imposing civil liability.

**\*231** Next, we consider whether Noel's injuries are a direct or indirect result of the violation of the statute. As a starting point, Club Cheetah correctly points out that other defendants known and unknown, who are not parties to this appeal, have culpability in some of Noel's alleged injuries. We disagree, however, that Noel's alleged injuries were not a direct result of Club Cheetah's actions. After reading Cerda's pleadings as true and viewing them in a light most favorable to her, direct causation can be imputed to Club Cheetah under the facts of this case because Cerda alleges that because Club Cheetah allowed her to dance topless for the "entertainment and sexual gratification" of Club Cheetah's patrons, she suffered damages. Cerda's pleadings specifically name Club Cheetah as a first-party tortfeasor for actions unrelated to any other torts which may lie with any other third-party defendants. Therefore, this factor also weighs in favor of imposing civil liability.

Finally, we also consider the prevailing public policies of this state regarding children. *See Perry*, 973 S.W.2d at 306 (noting that the preceding factors are not necessarily exclusive). Texas has a "strong, long-standing policy to protect the interest of children," *Williams v. Patton*, 821 S.W.2d 141, 145 (Tex.1991), and a number of statutory schemes promote this interest. *See, e.g.,* Texas Family Code Chapter 161 (Involuntary Termination of Parent–Child Relationship); Texas Family Code Chapter 154 (Child Support); Texas Labor Code Chapter 51 (Restrictions on Employment of Children). In addition to these statutes, the Legislature intended to further its public policy of protecting the safety, welfare, and best interests of children by enacting statutes like sections 43.25 and 43.251 and Ordinance 48–10. Thus, these public policy considerations also support imposing civil liability.

In summary, we have considered various factors including: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute; and (6) the prevailing public policies of this state regarding the protection of children. Because a decision to impose negligence per se under penal code sections 43.25 and 43.251, as well as City of Corpus Christi Ordinance 48–10, could be limited to cases alleging serious misconduct like the present case, would impose an easily-defined standard of liability on a limited class of individuals and businesses whose relationship to the allegations of damages was direct, and would further this state's long-standing policy of protecting the interest of children, we hold that it would be appropriate to adopt penal code sections 43.25 and 43.251, as well as Ordinance 48–10 as establishing duties and standards of conduct in tort. Such imposition would also be "fair, workable, and wise." *See Perry*, 973 S.W.2d at 306. Accordingly, we conclude that Cerda may plead a claim for negligence per se pursuant to these three legislative enactments. As a result, the trial court's dismissal of Cerda's negligence per se claims was erroneous.

### C. Gross Negligence

**[14]** Lastly, Cerda argues that her cause of action for grossly negligent infliction **\*232** of emotional distress is viable in post-*Boyles* Texas jurisprudence. Club Cheetah takes the opposite position, relying on *Boyles* and other cases to support its argument. We will examine each case below.

As stated earlier in this opinion, *Boyles* holds that there is no general duty not to negligently inflict emotional distress. *See* 855 S.W.2d at 597. The *Boyles* holding does not, however, address whether Texas recognizes a cause of action for grossly negligent infliction of emotional distress. *See id.* at 600–01. Cerda interprets this holding, however, as an implicit recognition of the cause of action, while Club Cheetah, relying on language in the opinion's dissent, argues that the court outright rejected such a theory. We find neither argument persuasive. We read *Boyles* as a side-step of the issue which holds that even if a cause of action were recognized in Texas, Kerr, the plaintiff, could not recover

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

on it because she did not properly plead or preserve it as a theory of recovery. In other words, the Texas Supreme Court neither rejected nor recognized such a theory of recovery in its ruling because it was not pleaded and not properly before the court. However, unlike Kerr, Cerda properly pleaded grossly negligent infliction of emotional distress under the auspices that such a cause of action "already exist[s]" under Texas law. However, without further guidance from the Texas Supreme Court, we cannot make such a determination as to whether grossly negligent infliction of emotional distress is recognized in Texas.[10]

Club Cheetah further asserts, however, that since *Boyles,* the Texas Supreme Court has been "faced with multiple opportunities to recognize a cause of action for grossly negligent inflicted mental anguish or emotional distress and has rejected such theory." *See Standard Fruit and Vegetable Co., Inc. v. Johnson,* 985 S.W.2d 62 (Tex.1998); *Temple–Inland Forest Products Corp. v. Carter,* 993 S.W.2d 88 (Tex.1999); *Perry,* 973 S.W.2d at 301. We disagree.

In *Standard Fruit and Vegetable,* the plaintiff asserted various claims at the trial court, including grossly negligent infliction of emotional distress, after witnessing a fatal accident that occurred in his proximity. The plaintiff alleged only mental anguish damages. The trial court granted summary judgment on all of plaintiff's claims, including the claim for egregious or grossly negligent infliction of emotional distress as an unrecognized cause of action under Texas law. The plaintiff appealed only two claims: (1) intentional infliction of emotional distress; and (2) negligent infliction of emotional distress based upon the breach of the defendant driver's duty allegedly owed to highway users under state and federal traffic laws. *See Standard Fruit,* 985 S.W.2d at 64. In its ruling, the Texas Supreme Court held only that the plaintiff could not maintain a claim for intentional infliction of emotional distress because the risk that emotional distress would result was incidental to the commission of some other tort. As such, the plaintiff could not recover under that particular theory; however, the issue of whether egregious or grossly negligent infliction of emotional distress was not properly before the court to address.

In *Temple–Inland,* the Texas Supreme Court held that fear of an increased risk of **233** developing an asbestos-related

disease when no disease is presently manifest, regardless of any individual plaintiff's circumstances, is not a recognized cause of action. 993 S.W.2d at 93. Like in *Standard Fruit and Vegetable,* the opinion does not specifically address whether grossly negligent infliction of emotional distress is a recognized cause of action in Texas. *Perry* also does not address whether such a cause of action exists in Texas, as Club Cheetah argues. *See* 973 S.W.2d at 302 ("The sole issue before us is whether plaintiffs may maintain a cause of action for negligence per se based on the Family Code, which requires any person having cause to believe a child is being abused to report the abuse to state authorities and makes the knowing failure to do so a misdemeanor.").[11]

Therefore, because we hold that case law is unclear as to whether such a cause of action for grossly negligent infliction of emotional distress is recognized in Texas and Cerda has not asked us to recognize such a theory, we conclude that Cerda has not pled a recognized cause of action to survive dismissal on that particular cause of action. *See Mowbray,* 76 S.W.3d at 680.

### D. Summary

We overrule Cerda's issue on appeal regarding her causes of action under common-law negligence for breach of a duty to not corrupt a minor and grossly negligent infliction of emotional distress. We sustain Cerda's argument that the trial court erred by dismissing her negligence per se causes of action against Club Cheetah under Texas Penal Code sections 43.25 and 43.251, as well as under City of Corpus Christi Ordinance 48–10.

### IV. Conclusion

The trial court's judgment is affirmed, in part, and reversed and remanded, in part, for further proceedings consistent with this opinion.

### All Citations

443 S.W.3d 221

Footnotes

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

1    After the severance, the trial court's ruling became a final and appealable judgment for purposes of our jurisdiction. *See Lehmann v. Har–Con Corp.,* 39 S.W.3d 191, 195 (Tex.2001) ("[A]n appeal may be taken only from a final judgment.").

2    Additionally, we note that Cerda does not ask this Court to recognize a new common-law duty to avoid corrupting a minor under the circumstances of this case. Absent such an invitation, we decline to do so *sua sponte. See* Tex.R.App. P. 47.1.

3    Cerda concedes in her brief that "had there been physical injury associated with [Noel's] entry into Club Cheetah, Club Cheetah would have breached a general duty of ordinary care and would be civilly liable for those injuries."

4    Additionally, in support of this contention, Thayer notes that:

> As society develops, new dangers to the public welfare are constantly perceived, and new prohibitions are enacted by the legislature. They may be regulations of highway traffic,—the position of vehicles on the highway, the speed at which they may run, the conduct of railways at crossings; or building laws passed to lessen fire risks; or restrictions on the use of dangerous articles, such as the carrying of firearms by children, or the sale of poisons unlabeled, or handling explosives without specified precautions. Whatever form the prohibition may take, and the varieties are infinite, a danger has been deemed by the legislature so great as to justify making its creation or continuance a public wrong. A new statutory "nuisance" has thus been created in every sense in which that word has legal significance; and the proposition that he who violates the statute or ordinance does so at his peril is only an application of the principle that an action lies in favor of one who has suffered a private injury from a public nuisance.

Ezra Ripley Thayer, *Public Wrong and Private Action,* 27 Harv. L.Rev.. 317, 327–28 (1914) (footnotes omitted).

5    "Sexual conduct" is statutorily defined as:

> sexual contact, actual or simulated sexual intercourse, deviate sexual intercourse, sexual bestiality, masturbation, sado-masochistic abuse, or lewd exhibition of the genitals, the anus, or any portion of the female breast below the top of the areola.

tex. Penal Code Ann. § 43.25(a)(2).

6    "Sexual performance" means any performance or part thereof that includes sexual conduct by a child younger than 18 years of age. *Id.* § 43.25(a)(1).

7    "Nude" means a child who is:

> (A) entirely unclothed; or

> (B) clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breasts below the top of the areola of the breasts, if the child is female, or any portion of the genitals or buttocks.

*Id.* § 43.251(a)(4). "Topless" means a female child clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of her breasts below the top of the areola. *Id.* § 43.251(a)(6).

8    Club Cheetah requests this Court to take judicial notice of the 2011 Texas Human Trafficking Prevention Task Force Report. While we take judicial notice of the report, we find Club Cheetah's utilization of its contents as a basis for its arguments at this stage of the proceedings premature. Club Cheetah references the Task Force's report to argue that "if the biggest problem for state authorities is identifying victims like [Noel], then it is reasonable to conclude that [Martinez] and [Club Cheetah] will have difficulty making the same determination." These arguments deal more with questions of fact, not law, and do not aid in our de novo review of whether Cerda stated a recognized cause of action.

9    In addition to punishing direct actors of the crime, penal code section 43.25 also punishes parents and legal guardians of children who "consent[ ] to the participation by the child in a sexual performance." *See* Tex. Penal Code Ann. § 43.25(b).

10    We further note that Cerda expressly states that she does not ask this Court to create or recognize a new cause of action for grossly negligent infliction of emotional distress. Absent such an invitation, we decline to do so *sua sponte.*

Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (2013)

*See* Tex.R.App. P. 47.1. We further believe that such a question of clarification would be better suited for our state's highest court or the Legislature to answer.

11   We also decline to adopt the expanded interpretation of *Boyles* made by a federal district court in *Hagen v. BeautiControl Cosmetics, Inc.,* No. CIV.A.398-CV-1199, 1998 WL 355479, at *1 (N.D.Tex.1998) (mem. op.) that grossly negligent infliction of emotional distress is not a recognized cause of action in Texas because such an opinion is not binding on this Court.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

2015 WL 12768697
Only the Westlaw citation is currently available.
United States District Court, S.D.
Texas, Brownsville Division.

DANIEL E. DAVIS & DAVIS
HEAVY HAUL TRANSPORTATION,
INC. Plaintiffs/Counter Defendants,

v.

UNION PACIFIC RAILROAD
CO., Defendant/Counter Plaintiff,

Civil Action No. B: 12–212
|
Signed 10/1/2015.
|
Filed 10/02/2015

**Attorneys and Law Firms**

Dennis M. Sanchez, Sanchez Whittington & Wood, LLC, Brownsville, TX, Jesse Robert Buttery, Hodge & James, Harlingen, TX, Robert M. Tramuto, Jones Granger et al, Houston, TX, for Plaintiffs/Counter Defendants.

Norton A. Colvin, III, Colvin Chaney et al, Joseph Anthony Rodriguez, Rodriguez Colvin et al, Marjory Colvin Batsell, Attorney at Law, Brownsville, TX, Christina Fontenot Crozier, Haynes and Boone, LLP, Houston, TX, for Defendant/Counter Plaintiff.

**MEMORANDUM OPINION AND ORDER**

Ronald G. Morgan, United States Magistrate Judge

***1** On October 22, 2012, Plaintiffs Daniel Davis ("Davis") and Davis Heavy Haul Transportation, Inc. filed a complaint against Defendant Union Pacific Railroad Company ("Union Pacific"). Dkt. No. 1. The complaint alleges that Union Pacific's negligence caused a collision between Davis's vehicle and a Union Pacific train. The parties have consented to have the case decided by the Magistrate Judge, pursuant to 28 U.S.C. § 636(c). Dkt. No. 28.

On June 21, 2013, Union Pacific filed an answer and counterclaims against Davis. Dkt. No. 12. Union Pacific

asserts that it was Davis's negligence that caused the accident, for which reason damages should be assessed against Davis. Id. On October 1, 2015, Union Pacific filed an amended answer and counterclaims. Dkt. No. 62.

On August 31, 2015, Union Pacific filed a motion for summary judgment, asserting that Davis was negligent per se for failing to contact the railroad prior to crossing the tracks, in violation of state law. Dkt. No. 53. On that same day, Union Pacific filed a partial motion for summary judgment as to Davis's claim that Union Pacific was negligent for having inadequate warning signs at the railroad crossing. Dkt. No. 52.

On September 21, 2015, Davis filed responses to both motions for summary judgment. Dkt. No. 54, 55. On October 1, 2015, Union Pacific filed replies to the responses. Dkt. Nos. 59, 60.

After reviewing the record—and for the reasons set forth more fully below—Union Pacific's motions for summary judgment are decided as follows: (1) as to the assertion that Davis was negligent per se, the motion is denied; (2) as to the assertion that the warning signs were adequate, as a matter of law, the motion is granted.

**I. Background**

**A. Factual Background**[1]

On November 12, 2011, Davis was driving a "heavy haul" truck—i.e. one that moves various oversized loads and machinery—from El Paso, Texas, to Hidalgo, Texas. Dkt. No. 29–3, p. 14. On this occasion, the truck was hauling a crane. Id. The truck became stuck on the train tracks in Encinal, Texas—north of Laredo—and was involved in a collision with a Union Pacific train. Id, p. 5.

Davis testified at his deposition that, when he left El Paso, he set the deck height of his trailer—the clearance "between the underside of the [trailer] and the ground"—at nine inches. Dkt. No. 29–3, p. 31. According to Davis, he measured the clearance by physically measuring the distance between the trailer and the ground; he did these measurements at the front and back of the trailer. Id, p. 32. Kelley Adamson, an expert witness retained by Davis, testified that large load trailers are designed with an upward curve in the center, "so that when the load sits on it, it deflects down flat." Dkt. No. 29–3, p. 19.

Texas law requires certain types of equipment to contact the railroad before crossing the tracks. Tex. Transp. Code §

Case 7:21-cv-00247    Document 32-1    Filed on 06/29/22 in TXSD    Page 347 of 427

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

545.255(b). As relevant here, any "equipment or structure" that has "a vertical body or load clearance of less than one-half inch per foot of the distance between two adjacent axles or less than nine inches measured above the level surface of a roadway"[2] must give "notice to a station agent of the railroad" before moving "on or across a track." Tex. Transp. Code § 545.255(a)(2)(B) (emphasis added).

**\*2** Brian Jarrett, who is the director of the Response Management Communications Center for Union Pacific, stated in an affidavit that Union Pacific has specific protocols if a vehicle operator contacts Union Pacific for safe crossing. Dkt. No. 53–2, p. 2. When such contact is made, Union Pacific "personnel have the responsibility to immediately identify the grade crossing involved and then immediately notify the respective train dispatcher on an emergency radio to stop train traffic in or near the location involved." Id. Further, "train traffic is monitored and/or stopped by train management until the vehicle clears the crossing." Id, p. 1.

The parties agree that Davis's truck became high-centered on the track (i.e., the underside of the trailer failed to clear the track and became wedged against the track, which resulted in the truck and trailer being stuck on the tracks). Dkt. No. 53, p. 6. As a result of becoming stuck, Davis was unable to move the truck and the train collided with the stationary truck. Id. There is a specific railroad sign which indicates that the tracks may require a higher road clearance for crossing trucks ("W10–5 sign")[3]; the police officer who investigated this collision testified at his deposition that he did not "recall seeing" a W10–5 sign at that location. Dkt. No. 29–2, p. 13.

In 2001, the Texas Department of Public Safety installed "flashing light signals and gates" at that particular railroad crossing. Dkt. No. 52–1, p. 7. The Federal government funded 90 percent of the project; the State of Texas funded the remaining 10 percent. Id.

**B. Procedural History**

On October 22, 2012, Davis filed a complaint against Union Pacific. Dkt. No. 1. In the complaint, Davis listed 21 different and non-exclusive reasons that Union Pacific was negligent. Id. Davis also alleged that Union Pacific was guilty of perse negligence and gross negligence. Id.

On November 26, 2012, Union Pacific filed an answer, generally denying Davis's claims; Union Pacific also pled —as an affirmative defense—that Davis's negligence was

the cause of the accident. Dkt. No. 4. On June 21, 2013, Union Pacific filed an amended answer, which maintained all of the previously pled affirmative defenses, but also included a counterclaim against Davis and Davis Heavy Haul Transportation, Inc. Dkt. No. 12, p. 16. In its counterclaim, Union Pacific alleged that Davis's negligence was the cause of the accident and sought damages for its losses. Id.

On March 6, 2015, the parties filed a notice that they consented to have a magistrate judge hear the case and issue all orders, including final judgment. Dkt. No. 27. On March 9, 2015, United States District Judge Andrew S. Hanen referred the case to the undersigned to "conduct all further proceedings, including final judgment." Dkt. No. 28.

On August 31, 2015, Union Pacific filed a partial motion for summary judgment. Dkt. No. 52. Union Pacific asserts that it is entitled to summary judgment as to any claim that it was responsible for inadequately warning Davis about any possible low ground clearance at that crossing. Id. Union Pacific asserts that (1) it has no authority to unilaterally place permanent warning signs; and, (2) federal funding of warning signs at the crossing preempts any state law tort claims.

**\*3** On that same day, Union Pacific filed another motion for summary judgment, asserting that there is no genuine dispute of material fact that Davis was perse negligent. Dkt. No. 53. The motion asserts that Davis violated Tex. Transp. Code § 545.255 by not contacting the railroad before crossing the tracks and that Davis's failure was the proximate cause of the collision. Id.

On September 21, 2015, Davis filed responses to the motions for summary judgment. Dkt. Nos. 54, 55. As to the claims regarding the warning signs, Davis asserts that the claims are not preempted by Federal law because Union Pacific had a state law duty to warn Davis of any "ultra-hazardous" condition – namely, the high slope of the tracks. Dkt. No. 55. As to the claims regarding negligence perse, Davis asserts that the statute in question does not apply to him and that the statute is impermissibly ambiguous. Dkt. No. 54.

On October 1, 2015, Union Pacific filed reply briefs. Dkt. Nos. 59, 60.

**II. Applicable Law**

**A. Diversity Jurisdiction**

As relevant here, federal courts have jurisdiction over civil actions where (1) "the matter in controversy exceeds the sum or value of $75,000;" and, (2) the action is between citizens of different States. 28 U.S.C. § 1332(a)(1). In his complaint, Davis asked for damages of $900,000. Dkt. No. 1, p. 8. Furthermore, Davis is a citizen of Texas and Union Pacific is not a citizen of Texas. Dkt. No. 1. No party disputes these facts; diversity jurisdiction is present in this case.

"Because federal jurisdiction in this case is based on diversity of citizenship, the court must apply Texas law when determining substantive issues." Finnicum v. Wyeth, Inc., 708 F. Supp. 2d 616, 619 (E.D. Tex. 2010) (referencing Foradori v. Harris, 523 F.3d 477, 486 (5th Cir. 2008)). "If no state court decisions control, [a federal court] must make an 'Erie[4] guess' as to how the Texas Supreme Court would apply state law." Beavers v. Metro. Life Ins. Co., 566 F.3d 436, 439 (5th Cir. 2009) (footnote added).

While the Court applies Texas substantive law to most issues in this case, the motion for summary judgment is judged by the standard of FED. R. CIV. P. 56. Barrett Computer Services, Inc. v. PDA, Inc., 884 F.2d 214, 217 n.3 (5th Cir. 1989); C.R. v. American Institute for Foreign Study, Inc., 2013 WL 5157699, *3 (W.D. Tex. 2013) (unpubl.).

**B. Summary Judgment**

Summary judgment is appropriate when the moving party has established that the pleadings, depositions, answers to interrogatories, admissions, and affidavits—if any—demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A material fact is one that might influence the outcome of the suit. Bazan v. Hidalgo Cnty., 246 F.3d 481, 489 (5th Cir. 2001). A genuine issue is "real and substantial, as opposed to merely formal, pretended, or a sham." Id. Accordingly, a "genuine issue of material fact exists where evidence is such that a reasonable jury could return a verdict for the non-movant." Piazza's Seafood World, L.L.C. v. Odom, 448 F.3d 744, 752 (5th Cir. 2006).

Union Pacific, in its role as counterclaimant, has the burden of proof at trial for its counterclaims. Robbins Hardwood Flooring, Inc. v. Bolick Distributors Corp., 79 Fed.Appx. 81, 83 (5th Cir. 2003) (unpubl.) (citing Co–Efficient Foundation v. Woods, 171 F.2d 691, 694 (5th Cir. 1949)). Because Union Pacific has moved for summary judgment, it "must establish beyond peradventure all of the essential elements of the claim

or defense to warrant judgment in [its] favor." Mudrick v. Cross Equipment Ltd., 250 Fed.Appx. 54, 56–57 (5th Cir. 2007) (unpubl.) (quoting Fontenot v. Upjohn Co., 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis original)).

**\*4** In Fontenot, the Court of Appeals noted that, in a typical summary judgment motion, the movant does not bear the burden at trial and can prove it is entitled to summary judgment by simply showing that the party with the burden cannot meet at least one essential element of its claim. Id. When the party moving for summary judgment also bears the burden of proving the claim, it must establish that there is no genuine dispute of material fact as to every element of its claim, so that the evidence is so overwhelming that it is entitled to judgment in its favor. Id.

Additionally, the Court must review all evidence in the light most favorable to the non-moving party. Piazza's Seafood World, 448 F.3d at 752. Factual controversies are resolved in favor of the non-moving party, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Murungi v. Xavier Univ. of La., 313 Fed.Appx. 686, 688 (5th Cir. 2008) (unpubl.) (citing Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)). "[I]n the absence of proof," the court cannot "assume that the nonmoving party could or would prove the necessary facts." Little, 37 F. 3d at 1075. Finally, "a court should not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment." Chacon v. Copeland, 577 Fed.Appx. 355, 360 (5th Cir. 2014) (unpubl.) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000)) (internal quotations omitted).

**C. Negligence**

Under Texas law, to prove negligence, the plaintiff must establish "a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach." Nabors Drilling, U.S.A., Inc. v. Escoto, 288 S.W.3d 401, 404 (Tex. 2009).

The question of whether a duty exists is a question of law for the Court to decide. Allen Keller Co. v. Foreman, 343 S.W.3d 420, 425 (Tex. 2011). In certain instances, however, the existence of a duty can be based upon duties imposed legislatively, via statutes, pursuant to the doctrine of "negligence perse." Cerdav. RJLEntertainment, Inc., 443S.W.3d221, 226 (Tex. App.–CorpusChristi2013). "Negligence perse is a tort concept whereby the civil courts

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

adopt a legislatively imposed standard of conduct as defining the conduct of a reasonably prudent person." Id.

Negligence perse is not a cause of action independent from negligence; rather, it is one method of proving a breach of duty. Zavala v. Trujillo, 883 S.W.2d 242, 246 (Tex. App.–El Paso 1994, writ denied). "Accordingly, a plaintiff asserting negligence perse is not required to prove that the defendant failed to act as a reasonably prudent person would have acted under the same or similar circumstances," because the law in question created a duty that the defendant had an obligation to follow. Johnson v. Enriquez, —— S.W.3d ——, ——, 2015 WL 799461, *3 (Tex. App.–El Paso 2015) (citing Carter v. William Sommerville and Son, Inc., 584 S.W.2d 274, 278 (Tex. 1979)).

Violations of criminal statutes can establish a violation of the reasonable person standard. Perry v. S.N., 973 S.W.2d 301, 305 (Tex. 1998). Having said that, not every violation of a criminal statute gives rise to negligence perse. Cerda, 443 S.W.3d at 226–227 ("[W]e will not apply the doctrine of negligence perse if the criminal statute does not provide an appropriate basis for civil liability"). Instead, "the adoption of criminal statutes into tort law is a matter of judicial discretion." Perry, 973 S.W.2d at 305 n.4.

The Texas Supreme Court has identified a number of "factors for courts to consider in deciding whether" the doctrine of negligence perse applies:

    *5 (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty;

    (2) whether the statute puts the public on notice by clearly defining the required conduct;

    (3) whether the statute would impose liability without fault;

    (4) whether negligence perse would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and

    (5) whether the plaintiff's injury is a direct or indirect result of the violation of the statute.
Cerda, 443 S.W.3d at 227 (citing Perry, 973 S.W.2d at 309).

Even where a statute provides a basis for negligence perse, the plaintiff is still required to prove that "(1) the defendant violated a statute or ordinance setting an applicable standard

of care; (2) the breach was the proximate cause of the plaintiff's damages; and (3) the statute was designed to prevent an injury to that class of persons to which the plaintiff belongs." Johnson, —— S.W.3d at ——; 2015 WL 799461 at *3–4.

### III. Analysis

Union Pacific has filed motions for summary judgment on two distinct and unrelated issues: (1) whether Davis was negligent perse for failing to notify the railroad before crossing the tracks; and, (2) whether Davis's claims regarding the inadequacy of the warning signs are preempted by Federal law.

As to the first issue, the Court concludes that the statute in question—Tex. Transp. Code § 545.255—is not applicable to Davis's heavy haul truck. The Court further concludes that the statute is not properly a foundation upon which to base tort liability. As such, Union Pacific is not entitled to summary judgment on this issue.

As to the second issue, Federal law preempts any claims regarding the adequacy of the warning signs at the railroad crossing. Accordingly, Union Pacific is entitled to summary judgment on that issue as a matter of law.

The analysis for each of these conclusions is set out below.

### A. Negligence PerSe

Union Pacific asserts that Davis was negligent perse when he failed to notify the railroad before crossing the tracks. According to Union Pacific, this duty was imposed by Tex. Trans. Code § 545.255. It is undisputed that Davis did not contact the railroad.

The Court must first examine the statute to determine if it applies to Davis's tractor-trailer.[5] If the statute does apply to Davis's vehicle, the Court must then determine whether violations of Tex. Trans. Code § 545.255 amount to negligence perse.

### I. Application

    *6 The Court notes that there are no Texas cases—in either state or federal court—interpreting this statute. Thus, the Court must make an Erie guess as to how the Texas Supreme

Court would interpret this statute. When interpreting this statute, the Court must give plain meaning to the words used, unless such an interpretation leads to an absurd result. Valdez v. Hollenbeck, 465 S.W.3d 217, 227 (Tex. 2015).

Texas law requires operators of certain equipment to contact the railroad before crossing the tracks; such notice must give "the railroad reasonable time to provide proper protection at the crossing." Tex. Trans. Code § 545.255(b). This statute is applicable to a "crawler-type tractor, steam shovel, derrick, roller, or any other equipment or structure with a normal operating speed of 10 miles per hour or less." Tex. Trans. Code § 545.255(a)(1)–(2). The words "equipment" or "structure" are not defined in the statute.

By its terms, the statute also applies to "any equipment or structure" which has "a vertical body or load clearance of less than one-half inch per foot of the distance between two adjacent axles or less than nine inches measured above the level surface of a roadway." Tex. Trans. Code § 545.255(a)(2)(B) (emphasis added). The Texas Supreme Court has said that, generally, the use of the word "or" signifies "a separation between two distinct ideas." Spradlin v. Jim Walter Homes. Inc., 34 S.W.3d 578, 581 (Tex. 2000).

Given this disjunctive use, an operator of any "equipment or structure" which has "a vertical body or load clearance of less than one-half inch per foot of the distance between two adjacent axles" or any "equipment or structure," which has "a vertical body or load clearance " of "less than nine inches measured above the level surface of a roadway," must contact the railroad.

A plain reading of this statute requires an operator of any "equipment or structure," that has less than nine inches of clearance from the bottom of equipment/structure to the level surface of the roadway must contact the railroad before crossing the railroad. The question is what constitutes "equipment" or "structure."

Union Pacific has urged a reading of "equipment" which includes "automobiles." Dkt. No. 60, p. 4 (citing Tex. Transp. Code § 201.106(g)). The Court first notes that the definitions for chapter five, which includes § 545.255, are found in Texas Trans. Code § 541.001, et. seq. SeeUnited Parcel Service, Inc. v. Rankin, —— S.W.3d ——, 2015 WL 3503814, *7 (Tex. App.–San Antonio June 3, 2015) (applying the definitions found in § 541 to regulations found in § 545); Heard v. State, 2008 WL 659833, *2 (Tex. App.–Beaumont 2008)

(same). Thus, Union Pacific's reliance upon an inapplicable definitional section, lends no support to its argument that the term "equipment," in § 545.255, applies to vehicles, such as Davis's trailer.

Moreover, if the definition of "equipment" found elsewhere in the statutes was applicable to § 545.255, it would lead to absurd results. Using Union Pacific's interpretation and the criterion of road clearance set forth in § 545.255(a)(2)(B), nearly every non-truck/SUV on the road could be required to contact the railroad.

For example, the Toyota Camry was the top selling car in America in May 2015. Chris Woodyard, Top 20 top selling vehicles in May: Cars still matter, USA Today (June 4, 2015), (http://www.usatoday.com/story/money/cars/2015/06/03/cars-trucks-top-20-bestselling-in-may/28425871/). A 2015 Toyota Camry has 6.1 inches of ground clearance. Toyota 2015 Camry Product Information (http://toyota.us/1Lj1IfV). Under Union Pacific's apparent application of the statute, every Camry owner is operating an "automobile," which is considered "equipment;" because the Camry has less than nine inches of ground clearance, its operator would be required to contact the railroad before crossing any railroad tracks. Under that application, Union Pacific would be inundated with calls from across Texas. This would be an absurd result and, surely, cannot be what the legislature intended when it wrote the statute.[6]

**\*7** In contrast to Union Pacific's arguments, the meaning and applicability of the statute can be derived from examining what it expressly regulates. The first few pieces of equipment mentioned in the statute are construction-type equipment: crawler-type tractors, steam shovels, derricks, rollers. Tex. Trans. Code § 545.255(a)(1). Under the ejusdemgeneris canon of construction, "if general words follow an enumeration of specific persons or things, the general words apply only to persons or things of the same kind or class as those specifically mentioned." BP Oil Pipeline Company v. Plains Pipeline. L.P., —— S.W.3d. ——, 2015 WL 3988574, *6 (Tex. App.–Houston [14 Dist.] 2015). Under this reading of the statute, it would apply to "equipment" or "structure[s]" that are of the "same kind or class" as crawler-type tractors, steam shovels, derricks, rollers. This interpretation makes sense.

None of the listed equipment is a street-legal vehicle. Instead, all are heavy-duty construction equipment. Davis's tractor-trailer would not appear to be of the same kind or class

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

as construction equipment, even if it was hauling such equipment.

Furthermore, Texas law defines a vehicle as "a device that can be used to transport or draw persons or property on a highway." Texas Trans. Code § 541.201(23). Davis's tractor-trailer clearly fits this definition.

The statute in question here—§ 545.255—does not speak of vehicles, but rather uses the terms "equipment" and "structure[s]." § 545.255(a)(2). The principle of exclusio unius recognizes that when the Legislature uses specific terms to define conduct, it necessarily excludes the terms that were not used. Laidlaw Waste Systems (Dallas), Inc. v. City of Wilmer, 904 S.W.2d 656, 659 (Tex. 1995) ("When the Legislature employs a term in one section of a statute and excludes it in another section, the term should not be implied where excluded."). The Texas legislature repeatedly used the word vehicle throughout the Transportation Code. It did not, however, include the term vehicle in § 545.255 and this Court will not read it into the statute.

This conclusion is further buttressed by the fact that the type of equipment identified in § 545.255—crawler-type tractor, steam shovel, derrick, or roller—does not conform with the definition of a vehicle found in § 541.201(23). That section defines "special mobile equipment" as "a vehicle that is not designed or used primarily to transport persons or property and that is only incidentally operated on a highway." Texas Trans. Code § 541.201(18) (emphasis added). In other words, "special mobile equipment" is not used for the same purpose that a vehicle is used for, despite the fact that it may meet the literal definition of vehicle. This section lists several examples: "road construction and maintenance machinery, including an asphalt spreader, bituminous mixer, bucket loader, tractor other than a truck tractor, ditcher, levelling grader, finishing machine, motor grader, road roller, scarifier, earth-moving carryall and scraper, power shovel or dragline, or self-propelled crane and earth-moving equipment." Texas Trans. Code § 541.201(18)(A). The equipment listed in § 545.255 appears to fall clearly within the category of mobile special equipment listed in § 541.201(18)(A), rather than as a vehicle under § 541.201(23). Thus, § 545.255 applies to equipment that would generally fit the listed definition of "special mobile equipment."

Given that Davis's tractor-trailer is a vehicle and this statute applies to "equipment" or "structures"—not vehicles—the

motion for summary judgment asserting negligence perse for violating this statute is denied.

## 2. Appropriate for Negligence PerSe

Even assuming, for purposes of discussion, that § 545.255 applied to Davis's vehicle, violation of the statute does not amount to negligence perse. This conclusion follows from the Court's determination that the statute is not an appropriate foundation for implying negligence perse.

**\*8** As an initial matter, the Court notes that when conducting this analysis, it "must look beyond the facts of this particular case to consider the full reach of the statute." Perry, 973 S.W.2d at 305. To put it another way, the Court is not to consider Davis's specific actions when deciding if a criminal statute should be imported into the tort liability standards via negligence perse. Id. (noting that the Court was not considering "whether a statute criminalizing only the type of egregious behavior with which these defendants are charged ... would be an appropriate basis for a tort action."). Rather, the Court must consider "whether it is appropriate to impose tort liability on any and every person" who violates the statute by failing to call ahead. Id.

Furthermore, "[j]ust] [b]ecause the legislature has adopted a standard of criminal culpability does not necessarily mean that the supreme court must adopt that as a standard of civil liability." Goode v. Bauer, 109 S.W.3d 788, 792 (Tex.App.– Corpus Christi 2003) (citing Carter v. William Sommerville and Son, Inc., 584 S.W.2d 274, 278 (Tex. 1979)). Rather, the Court must answer "the ultimate question of whether imposing tort liability for violations of a criminal statute is fair, workable, and wise." Perry, 973 S.W.2d at 306.

With this foundation in mind, the Court must determine whether this statute should be imported into tort law via a theory of negligence perse. In deciding the matter, the Court must consider the non-exhaustive factors set forth in Cerda, 443S.W3dat227. As set forth earlier, those factors include: (1) whether the statute is the sole source of a tort duty; (2) whether the statute provides sufficient notice; (3) whether the liability resulting from the violation of the statute would impose liability without fault; (4) whether the damages imposed would be disproportionate to the seriousness of the statutory violation; and, (5) whether the plaintiff's injury is a direct or indirect result of the violation. Id. In evaluating these factors, the Court is not to apply them mechanically.

Perry, 973 S.W.2d at 306 ("nor is the issue properly resolved by merely counting how many factors lean each way."). Each factor is addressed, in turn.

The first factor—whether the statute is the sole source of the tort duty—weighs in favor of finding negligence perse. The driver of a vehicle owes "a common law duty to exercise reasonable care toward others on the road or track." Perry, 973 S.W.2d at 307. The statute in question—§ 545.255—appears to merely define what is reasonable care when operating heavy equipment at a railroad crossing. Indeed, traffic statutes are routinely used for negligence perse for this very reason. Id (collecting cases).

The second factor—clear definition of required conduct—weighs heavily against finding negligence perse. As previously discussed, ejusdemgeneris requires the Court to define "equipment" or "structure" as being of the "same kind or class" as the listed equipment: steam shovels, derricks, rollers, crawler-type tractors. BP Oil Pipeline Company, 2015 WL 3988574, *6. This leaves a wide range of vehicles open for interpretation.

While some equipment may clearly fit within the statute (e.g. cranes, backhoes, skid steers), there is some equipment that is border-line. It is not immediately apparent to which vehicles/equipment this statute applies. While a good faith argument could be made either way, it is this largely equal plausibility that leads to the conclusion that the applicability of the statute is not clearly defined. Omega Contracting, Inc. v. Torres, 191 S.W.3d 828, 840–41 (Tex. App.—Fort Worth 2006) (finding negligence per se inappropriate when the underlying criminal statute was "not susceptible of precise meaning").

*9 Furthermore, the statute requires that the operator's notice give "the railroad reasonable time to provide proper protection at the crossing." Tex. Trans. Code § 545.255(b) (emphasis added). The "reasonable" standard is not defined anywhere in the statute and is not capable of precise meaning. Indeed, reasonableness is a "fact-intensive" inquiry. Wong v. Tenet Hospitals, Ltd., 181 S.W.3d 532, 539 (Tex.App.—El Paso 2005, no pet.). Giving the railroad 10 minutes notice may be reasonable in one situation, but unreasonable under different circumstances. If it is "difficult ... to know exactly when" to act, the statute is a poor basis for negligence perse. Baker v. Smith & Nephew Richards, Inc., 1999 WL 811334, *10 (152nd Judicial Dist. Texas 1999) (unpubl.).

The fact that the duty is couched in terms of "reasonableness," is significant in the Court's analysis. "[A] statute which defines a violation in conditional terms is less likely to support the application of negligence perse than one which provides an absolute, and thus more definite, standard of care." Ordonez v. M.W. McCurdy & Co., Inc., 984 S.W.2d 264, 268–69 (Tex.App.–Houston [1 Dist.] 1998). When the duty is qualified by terms such as "safely" or "prudently," then the "reasonable person" standard found in tort law is " is read into the [criminal] statute, thus requiring the jury to determine, as a matter of fact, whether the motorist acted as a reasonably prudent person would have under the same or similar circumstances." Id. Because such criminal statutes employ a "reasonable person" standard—a finding that largely requires a jury determination—they are not appropriate for negligence perse. Id.

As set forth above, this statute requires notice to be given to allow the railroad a "reasonable" time to provide protection at the crossing. Tex. Trans. Code § 545.255(b). Thus, by its express terms, the statute employs the "reasonable" standard of tort law, which clearly seems to be an improper basis upon which to impose negligence perse.

The third element—whether the statute would impose liability without fault—weighs slightly against negligence perse. In this factor, the Court is concerned with whether it creates unfairly strict liability or has some element of scienter. This statute lacks a mensrea requirement. SeePerry, 973 S.W.2d at 308 (noting that the criminal statute in question required the defendant to "knowingly" act); El Chico Corp. v. Poole, 732 S.W.2d 306, 309 (Tex. 1987) (same). Given the lack of a mensrea element, it would be unfair to hold violators of this statute strictly liable for every collision, no matter the underlying facts of the case.

The fourth element—whether negligence perse would impose ruinous liability, disproportionate to the seriousness of the defendant's conduct—weighs heavily against negligence perse. The Texas legislature has deemed violations of 545.255 to be a minor offense; the maximum fine is $200. Tex. Trans. Code § 545.255(e). Indeed, violating § 545.255 is a Class C misdemeanor, the least serious offense type under Texas law. Texas Penal Code § 12.03; 12.23.

If § 545.255 were used for negligence perse, a defendant who committed a minor Class C misdemeanor could be held strictly liable—possibly in amounts reaching the millions of dollars—for a railroad collision. Indeed, it is difficult to

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

imagine a more disproportionate comparison between the underlying criminal conduct and the civil liability. The Texas Supreme Court warned against using negligence perse if it would "lead to ruinous monetary liability for relatively minor offenses." Perry, 973 S.W.2d at 307. This is such a case.

*10 The fifth factor—whether the plaintiff's injury is a direct or indirect result of the violation of the statute—is neutral. In some cases, the failure to notify may directly cause the injury. In other cases, it might indirectly cause injuries or even be a non-factor. It is not clear that it would be the direct cause of injuries in every case.

In reviewing the factors, the Court concludes that if faced with the same question, the Texas Supreme Court would conclude that § 545.255 is not an appropriate foundation for negligence perse claims. In sum, the proscribed conduct and the actors whose conduct is proscribed is not clearly defined. Further, using the statute as a basis for negligence perse would lead to ruinous monetary liability for an incredibly minor offense.

Union Pacific, with minimal analysis of § 545.255, has asserted that the statute is a proper basis for negligence perse because it is a traffic regulation. Dkt. No. 53, p. 12 (stating that "[s]tatutes governing traffic at railroad tracks are especially well-suited for negligence perse claims"). Texas courts have recognized that traffic regulations are the most common type of statutes to be applied to negligence perse claims. Perry, 973 S.W.2d at 306. This judicial history, however, is not a finding that all traffic regulations are appropriate for negligence perse claims. Texas courts have refused to apply various traffic regulations to negligence perse claims. Ordonez, 984 S.W.2d at 269 (collecting cases). Based upon the Court's analysis of this specific statute, it should not be used to establish negligence perse.

Given that § 545.255 is not a proper vehicle to establish negligence perse, Union Pacific is not entitled to summary judgment on this issue.[7]

### B. Warning Signs
Union Pacific also seeks summary judgment denying Davis's "negligence claims for failure to provide adequate warning signs." Dkt. No. 52. Because the choice of signage is preempted by Federal law, summary judgment is appropriate.

The Federal Railroad Safety Act of 1970 ("FRSA") was enacted "to promote safety in all areas of railroad operations

and to reduce railroad-related accidents and injuries to persons." Missouri Pacific R. Co. v. Limmer. 299 S.W.3d 78, 81 (Tex. 2009). The FSRA affords states the ability to adopt laws and regulations related to railroad safety unless "the Secretary of Transportation ... prescribes a regulation or issues an order covering the subject matter of the State requirement. ..." 49 U.S.C. § 20106(a)(2).

Federal regulations mandate "adequate warning devices" for railroad crossings when "Federal-aid funds participate in the installation of the devices." 23 C.F.R. § 646.214(b)(3)(I)–(b)(4). The U.S. Supreme Court has concluded that, when such devices are installed, "the federal standard for adequacy applies to the crossing improvement and substantially subsume[s] the subject matter of the relevant state law." Norfolk Southern Ry. Co. v. Shanklin, 529 U.S. 344, 356 (2000) (internal quotations omitted).

*11 To put it another way, when federal funds are used to install warning devices at a railroad crossing, the federal government defines what warning devices are adequate and completely preempts state law in this matter. Shanklin, 529 U.S. at 357 ("What States cannot do—once they have installed federally funded devices at a particular crossing— is hold the railroad responsible for the adequacy of those devices.").

The Supreme Court noted that States are free to "revisit[ ] the adequacy of devices installed using federal funds" and can use their own funds "to install more protective devices." Shanklin, 529 U.S. at 357–58. States and railroads, however, cannot be held liable for failing to act of their own accord to revisit the signs; by approving the installation of the current warning devices, the Federal government has deemed the devices to be minimally adequate. Id.

In this case, federal funds were used in 2001 to install "flashing light signals and gates" at the railroad crossing at which the collision occurred in this case. Dkt. No. 52–1, p. 7. These warning devices are expressly noted in the federal regulations. See 23 C.F.R. § 646.214(b)(3)(I) (noting the installation of "automatic gates with flashing light signals."). Under the existing case law, any claim regarding the adequacy of the warning devices is clearly preempted by federal law. Shanklin, 529 U.S. at 357; Limmer, 299 S.W.3d at 81.

There are two exceptions to this preemptive effect. The first is statutory: there is no preemption for what is considered "an essentially local safety or security hazard." 49 U.S.C. §

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

20106(a)(2)(A). The other is noted by the Supreme Court: there is no preemption if the train has a "duty to slow or stop ... to avoid a specific, individual hazard" found on the railroad tracks. Easterwood, 507 U.S. at 675 n.15. Neither of these exceptions apply in this case.

The statutory preemption found in § 20106(a)(2)(A) "allows states to adopt additional or more stringent state regulation related to railroad safety to prevent a local hazard, but only if the state law is not incompatible with federal regulation and does not burden interstate commerce." Hesling v. CSX Transp., Inc., 396 F.3d 632, 640 (5th Cir. 2005). Thus, the exception is intended to permit states to issue additional regulations for railroad safety under specific circumstances. Common law duties resulting from civil lawsuits are not regulations to which this exception applies. Wiggins v. Union Pacific R. Co., 2003 WL 25720982, *2 (E.D. Tex. 2003) (unpubl.) (citing CSX Transportation, Inc. v. Easterwood, 507 U.S. 658, 675 (1993)). Thus, this exemption is inapplicable.

The second exemption generally applies to claims of excessive speed, where the train was traveling at, or slower than, federal speed limits. Hesling, 396 F.3d at 640. In those circumstances, excessive speed claims are generally preempted. Claims of excessive speed, however, are not pre-empted when the train has a "duty to slow or stop ... to avoid a specific, individual hazard." Easterwood, 507 U.S. at 675, n. 15.

This exception almost always relates to the "avoidance of a specific collision," such as issues of poor weather, a malfunctioning signal apparatus or poor visibility. Hesling v. CSX Transp., Inc., 396 F.3d 632, 640, n. 4 (5th Cir. 2005). In other words, it can be thought of as an exemption that applies when a train travels too fast for conditions that are specific to that individual moment at that individual track. "A condition that can be or is present at many, or most sites cannot be a specific, individual hazard." Id. This exception is to be "narrowly construed." Easterwood v. CSX Transp., Inc., 933 F.2d 1548, 1553 n. 3 (11th Cir. 1991).

*12 The hazard "must be the sort of aberration that the Secretary could not have practically considered when determining train speed limits and warning device regulations

under the FRSA." Ludwig v. Norfolk Southern Ry. Co., 50 Fed.Appx. 743, 750 (6th Cir. 2002) (unpubl.) (citing O'Bannon v. Union Pac. R.R. Co., 960 F.Supp. 1411, 1420 (W.D. Mo. 1977)).

The exemption is inapplicable to the condition in this case. This collision was not the result of a specific one-time occurrence, such as a fallen tree or poor visibility caused by the weather. Rather, Davis is alleging that the collision occurred because of a structural problem with how the track and its slope were constructed and Union Pacific's failure to warn him about that problem. Assuming that this problem exists, it is always present at that particular crossing and can be present at many railroad crossings. Thus, it is not the type of aberration that the Secretary of Transportation could not have considered when deciding which warning devices were adequate for that crossing.

Were the Court to hold otherwise, "the exception would swallow the clear intent of the FRSA to preempt state law." Wright By and Through Wright v. Illinois Central R. Co., 868 F.Supp. 183, 187 (S.D. Miss. 1994). Given this exemption's narrow construction, it is also is inapplicable to the facts of this case.

Because Davis's claims regarding signage are preempted—and do not fit into either exemption—Union Pacific is entitled to summary judgment as to any claim that they were negligent for failing to erect adequate warning signs.

### IV. Order
The motion for summary judgment filed by Union Pacific, Dkt. No. 52, regarding warning signs is **granted**.

The motion for summary judgment filed by Union Pacific, Dkt. No. 53, regarding negligence per se is **denied**.

The case remains set for trial.

### All Citations

Not Reported in Fed. Supp., 2015 WL 12768697

Footnotes

1    The Court will not go into great detail as to the specific circumstances of the accident. To the extent reference is necessary, those circumstances are discussed at length in the Court's previous memorandum and decision. Dkt. No. 32.

Daniel E. Davis & Davis Heavy Haul Transportation, Inc...., Not Reported in Fed....

2    The distance between the fourth and fifth axle of Davis's tractor-trailer was 36.5 feet. Dkt. No. 53–3, p. 2.

3    The W10–5 sign is a sign that is sanctioned by the U.S. Department of Transportation. U.S. Department of Transportation, Federal Highway Administration, Manual on Uniform Traffic Control Devices (2009), Ch. 8B, Signs and Markings. Its use is guided by the Manual on Uniform Traffic Control Devices ("MUTCD"), but it is not mandated. "[T]he purpose and intent of the [MUTCD] is to provide standards of guidance for states and municipalities to follow, rather than mandatory, binding rules." Peruta v. City of Hartford, 2012 WL 3656366, *14 (D. Conn. 2012) (unpubl.).

4    Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938).

5    In their prior summary judgment motions, the parties assumed that § 545.255 applied to Davis's tractor-trailer and disputed whether Davis's trailer's clearance was sufficient. Dkt. No. 26, pp. 8–9, Dkt. No. 29, pp. 13–14. In resolving that summary judgment motion, the Court noted that the sufficiency of Davis's trailer's clearance was a factual issue and denied summary judgment. Dkt. No. 32, p. 18. Given the absence of challenge as to the applicability of the statute, the Court's prior summary judgment denial did not address the issue of applicability of the statute to Davis's vehicle. In contrast, in the pending motion for summary judgment, the parties dispute whether § 545.255 applied to Davis's tractor–trailer. Dkt. No. 53, pp. 8–10; Dkt. No. 54, pp. 7–9; Dkt. No. 60, pp. 3–4. Given this clear dispute, the Court must squarely address the issue of the statute's applicability to Davis's vehicle. Resolution of this dispute does not change the ultimate result in the earlier summary judgment motion.

6    The Court notes that there is a different provision, in section 545, which applies to "vehicles." Vehicles are required to have "sufficient undercarriage clearance" to cross a railroad grade crossing; the necessary amount of clearance is not defined. Tex. Trans. Code § 545.427(a).

7    Given the resolution of this motion, the Court will not, presently, address the remaining issues of whether Union Pacific is in the class of persons that the statute was meant to protect or whether Davis's purported violation of § 545.255 proximately caused the collision. Trujillo v. Carrasco, 318 S.W.3d 455, 458 (Tex.App.–El Paso 2010, no pet.). The larger issue of proximate cause will be left for the jury to decide.

---

End of Document                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Trimble v. Millwood Hospital, 420 F.Supp.3d 550 (2016)

420 F.Supp.3d 550
United States District Court,
N.D. Texas, Fort Worth Division.

Samantha TRIMBLE, Plaintiff,

v.

MILLWOOD HOSPITAL, Defendant.

Civil Action No. 4:14-cv-00868-O
|
Signed September 12, 2016

**Synopsis**
**Background:** Patient brought action against hospital, alleging claims including negligence, false imprisonment, and violation of Rehabilitation Act. Hospital moved for summary judgment.

**Holdings:** The District Court, Reed O'Connor, J., held that:

[1] Texas statute setting out types of representations that a hospital could not make to a patient was not a penal statute, and thus any violation of statute by hospital did not provide basis for a negligence per se claim under Texas law;

[2] expert testimony was not required to support patient's false imprisonment claim; and

[3] expert testimony was not required to establish that patient's admission to hospital was cause of her alleged damages, in Rehabilitation Act claim.

Motion granted in part and denied in part.

West Headnotes (24)

[1]    **Federal Civil Procedure**  Ascertaining existence of fact issue
       On a motion for summary judgment, the court cannot make a credibility determination in light of conflicting evidence or competing inferences.

[2]    **Federal Civil Procedure**  Weight and sufficiency
       Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment.

[3]    **Federal Civil Procedure**  Weight and sufficiency
       Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.

[4]    **Health**  Elements of malpractice or negligence in general
       To prevail on medical negligence claim under Texas law, plaintiff must show: (1) defendant owed her a duty to meet the relevant standard of care; (2) defendant breached that standard of care; (3) she suffered an injury; and (4) defendant's breach caused that injury.

       1 Cases that cite this headnote

[5]    **Health**  Standard of Care
       Under Texas law, the standard of care for a hospital is what an ordinary hospital would have done under the same or similar circumstances.

[6]    **Health**  Standard of practice and departure therefrom
       In a medical negligence claim under Texas law, expert testimony is generally required to establish the standard of care, particularly when the underlying issue involves the performance of medical procedures.

       1 Cases that cite this headnote

[7]    **Health**  Gross or obvious negligence and matters of common knowledge
       In a medical negligence claim under Texas law, when the underlying negligence involves

the standard of non-medical, administrative, ministerial, or routine care at a hospital, expert testimony is not needed because the jury is competent from its own experience to determine and apply such a reasonable care standard.

*1 Cases that cite this headnote*

**[8]    Health**  ⟜  Negligent hiring or supervision
In a medical negligence claim against a hospital under Texas law, establishing the standard of care for admitting an individual for inpatient care requires evidence on the proper training, supervision, and protocols necessary to ensure the proper admission of patients.

**[9]    Negligence**  ⟜  Standard established by statute or regulation
Under Texas law, negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims; however, not every penal statute creates an appropriate standard of care for civil liability purposes.

**[10]    Negligence**  ⟜  Violations of statutes and other regulations
**Torts**  ⟜  Torts
Under Texas law, in determining whether to impose tort liability for violations of a criminal statute, ultimate question is whether it is fair, workable, and wise.

**[11]    Health**  ⟜  Mental Health
Texas statute setting out types of representations that a hospital could not make to a patient was not a penal statute, and thus any violation of statute by hospital did not provide basis for a negligence per se claim under Texas law against hospital by patient arising out of patient having been committed to inpatient mental health treatment, where statute was not enforced by criminal

penalties. Tex. Health & Safety Code Ann. § 164.009.

**[12]    Health**  ⟜  Mental Health
Texas regulation setting out rights of persons receiving mental health services was not a penal statute, and thus any violation of regulation by hospital did not provide basis for a negligence per se claim under Texas law against hospital by patient arising out of patient having been committed to inpatient mental health treatment, where regulation was not enforced by criminal penalties. 25 Tex. Admin. Code § 404.154.

**[13]    Health**  ⟜  Mental Health
Section of Texas Health and Safety Code providing for criminal penalties for knowing violations of particular statutory subtitle, which included statutes relating to provision of mental health services, did not transform that subtitle into a penal statute, as could render any violation of subtitle's provisions by hospital a basis for mental health patient's Texas law negligence per se claim; separate provision specifically provided for civil liability, and that provision was incorporated into a title and subtitle focused on the regulation of mental health facilities. Tex. Health & Safety Code Ann. §§ 321.003, 571.020.

**[14]    False Imprisonment**  ⟜  Nature and Elements of False Imprisonment
Under Texas law, in order for plaintiff to succeed on false imprisonment claim, she must prove defendant willfully detained her, without her consent, and without authority of law.

**[15]    False Imprisonment**  ⟜  Weight and sufficiency
In a false imprisonment claim under Texas law relating to a mental hospital's failure to discharge patient, whether there is sufficient reason to believe a patient may need court-ordered mental health services, as would provide

Trimble v. Millwood Hospital, 420 F.Supp.3d 550 (2016)

lawful authority for detention, is a medical question that requires expert testimony.

[16]    **False Imprisonment** ⬅ Weight and sufficiency

Expert testimony was not required to support determination of whether lawful authority existed for detention, in patient's false imprisonment claim under Texas law against hospital, a mental health facility, as it related to patient's initial admission to hospital rather than to continued detention after requesting discharge, where patient alleged that there was no preliminary examination and that she was not provided her patient rights, as required by statute. Tex. Health & Safety Code Ann. § 572.002.

[17]    **Health** ⬅ Particular procedures

Patient, who received mental health treatment from hospital, was not required to provide expert testimony to maintain claim against hospital under Texas statute providing private cause of action against a mental health facility for harm from violation of certain mental health provisions. Tex. Health & Safety Code Ann. § 321.003.

[18]    **Health** ⬅ Affidavits of merit or meritorious defense; expert affidavits

Texas statute governing pleading requirements with regard to expert report in a health care liability claim do not apply in federal court. Tex. Civ. Prac. & Rem. Code Ann. § 74.351.

[19]    **Civil Rights** ⬅ Publicly assisted programs

To make a prima facie case under the Rehabilitation Act, a plaintiff must show: (1) that she was a qualified individual with a disability; (2) the program or facility received federal funding; and (3) she was adversely treated solely as a result of the disability. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794.

[20]    **Civil Rights** ⬅ Grounds and subjects; compensatory damages

In order to recover compensatory damages for a claim under the Rehabilitation Act, the plaintiff must show that the adverse acts or omissions were intentional. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794.

[21]    **Civil Rights** ⬅ Grounds and subjects; compensatory damages

Patient was not required to provide expert testimony in order to establish that patient's admission to hospital, a mental health facility, was the cause of her alleged damages, in patient's Rehabilitation Act claim against hospital arising out of conduct including alleged detention of patient against her will, where patient asserted that stigma related to her admission caused her diminished job opportunities and that admission caused out-of-pocket expenses. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794.

[22]    **Civil Rights** ⬅ Grounds and subjects; compensatory damages

In a claim for violation of Rehabilitation Act, compensatory damages may not be presumed; however corroborating testimony and medical evidence is not required in every case involving compensatory damages. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794.

[23]    **Civil Rights** ⬅ Grounds and subjects; compensatory damages

A claimant's testimony alone may be sufficient to support a finding of compensatory damages in an action for violation of Rehabilitation Act. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794.

[24]    **Civil Rights** ⬅ Mental suffering, emotional distress, humiliation, or embarrassment

Plaintiff's testimony alone can be sufficient to establish emotional distress damages and

Trimble v. Millwood Hospital, 420 F.Supp.3d 550 (2016)

causation in an action for violation of Rehabilitation Act, but the plaintiff must offer specific facts as to the nature of his claimed emotional distress and the causal connection to alleged violations. Rehabilitation Act of 1973 § 504, 29 U.S.C.A. § 794.

**Attorneys and Law Firms**

*553 Martin J. Cirkiel, Cirkiel & Associates, Round Rock, TX, Kenneth D. Carden, The Carden Law Office, Dallas, TX, for Plaintiff.

Glynis Lori Zavarelli, Wentz & Zavarelli LLP, Irving, TX, Mary Leslie Davis, Hermes Law, PC, Dallas, TX, for Defendant.

**ORDER**

Reed O'Connor, UNITED STATES DISTRICT JUDGE

Before the Court are Defendant's ("Millwood") Motion for Summary Judgment and Brief and Appendix in Support (ECF Nos. 37–39), Trimble's Response (ECF No. 60), Millwood's Reply (ECF No. 68), Trimble's Sur-Reply (ECF No. 78), and the parties' supplemental briefs. Def.'s Br. Supp., ECF No. 95; Pl.'s Resp., ECF No. 98; Def.'s Reply, ECF No. 100. On June 6, 2016, the Court granted in part Plaintiff's ("Trimble") Motion for Reconsideration. Order, June 6, 2016, ECF No. 88. The Court ordered the parties to file supplemental briefs addressing which, if any, of Trimble's claims require expert testimony to establish causation. *Id.* at 5. The Court held a hearing on Defendant's Summary Judgment Motion on August 3, 2016. Having considered the briefing, the applicable law, and the arguments at the hearing, the Court concludes that Defendant's Motion for Summary Judgment should be **GRANTED in part** and **DENIED in part**.

**I. BACKGROUND**

The facts of this case are contested. The following factual recitation is taken largely from Plaintiff's Amended Complaint. Am. Compl., ECF No. 21. On Friday, October 26, 2012, Samantha Trimble, a teacher, was placed on administrative leave after one of her students allegedly fabricated a story that Trimble had played a humiliating joke on the student. Am. Compl. ¶ 20, ECF No. 21. Trimble

became upset and called her pastor for emotional support. *Id.* ¶ 21. Sometime later, Trimble decided to visit a physician to receive a sleeping aid and address her anxiety. *Id.* ¶ 22. Trimble went to her doctor's office and answered the physician assistant's questions regarding her feelings of panic and anxiety, sleep issues, and eating problems. *Id.* ¶ 23. Trimble expressed her desire for a free consultation for psychological help that same evening and her primary care physician referred her to Millwood Hospital ("Millwood"). *Id.*; Sur-Reply ¶ 22, ECF No. 78.

Trimble went to Millwood and spoke with a licensed professional counselor. Am. Compl. ¶ 24. She signed a consent form for inpatient care. *Id.* ¶ 25. Trimble alleges that during the intake process, she was not provided information about the hospital's daily charges and she was not informed that she was being admitted. Pl.'s Am. Br. Mot. Summ. J. ¶¶ 56–57, ECF No. 63. She further alleges that she was not seen by a physician and the "Physician's Admission Order," on which her admission was based, was fraudulent. *Id.* ¶ 58.

Trimble was then taken down a long hallway and brought into a locked facility. Am. Compl. ¶ 26. She asked when she would see the psychiatrist but she alleges her request was ignored. *Id.* Trimble received medications for anxiety from the nurse and within minutes she was extremely drowsy. *Id.* ¶¶ 28–29. When she awoke the next day, Trimble stated that it was a mistake to have come to Millwood and that she wanted to leave the facility. *554 Id.* ¶ 30. After a nurse provided Trimble an "Against Medical Advice" form, Trimble filled out the form and asked to call her mother. *Id.* ¶¶ 31–32. Her request to leave was denied. *Id.* at ¶ 32.

Trimble alleges that while detained at Millwood, the staff refused to accommodate her religious beliefs, threatened her, repeatedly ignored her, and held her at the facility against her will. *Id.* ¶¶ 34–42. Trimble also alleges that she encountered severely disturbed and violent individuals that put her in fear of her life. *Id.* ¶ 81. Trimble eventually contacted the Arlington Police Department and asked them to intervene. *Id.* ¶ 65. The Police Department was not able to intervene, Trimble alleges, because Millwood refused to show the officer her admission documentation, despite Trimble approving showing the officer her records. *Id.* ¶ 66. After two additional days Trimble was discharged. *Id.* ¶¶ 71, 73.

Trimble brings the following claims against Millwood: (1) negligence; (2) gross negligence; (3) false imprisonment; and (4) violations of her civil rights under § 504 of the

Rehabilitation Act, the Americans with Disabilities Act, and 18 U.S.C. § 1983. She also brought state law claims pursuant to various provisions of the Texas Health & Safety Code and related provisions.[1] Am. Compl., ECF No. 21. Based on these claims, Trimble seeks damages for emotional distress, past medical expenses, out-of-pocket costs, loss of opportunity, and exemplary damages. Am. Compl. ¶¶ 120–28. Trimble subsequently waived her claims under the Americans with Disabilities Act and 18 U.S.C. § 1983. Pl.'s Sur-Reply Mot. Summ. J. 1 n.1, ECF No. 78. The other claims remain.

Millwood filed a Motion to Dismiss for Failure to Comply with § 74.351 of the Texas Civil Practice & Remedies Code and Motion for Summary Judgment on each of Trimble's claims. *See* Br. Supp. Mot. Summ. J., ECF No. 39; Mot. Dismiss, ECF No. 36. The Court granted Millwood's Motion to Dismiss based on Trimble's failure to file an expert report in accordance with § 74.351, an order the Court reconsidered after the Fifth Circuit issued an opinion holding that the expert report requirement does not apply in federal court. Order, June 6, 2016, ECF No. 88; *Passmore v. Baylor Health Care System*, 823 F.3d 292, 299 (5th Cir. 2016). The Court also reconsidered its grant of summary judgment on Trimble's Rehabilitation Act claim. Order, June 6, 2016, ECF No. 88. Because the Court originally disposed of Trimble's health care liability claims with Millwood's Motion to Dismiss, the Court did not consider those claims with Millwood's Motion for Summary Judgment. In granting Trimble's Motion to Reconsider in part, the Court ordered additional briefing on which of Trimble's dismissed claims require expert testimony to establish liability or causation, as she designated no expert witness to testify in this case. *Id.* The Court also held a hearing on the Motion for Summary Judgment. Minute Entry, Aug. 8, 2016, ECF No. 109. The parties filed their supplemental briefs, and the Court now addresses Millwood's Motion for Summary Judgment anew.

## II. LEGAL STANDARD

Summary judgment is proper when the pleadings and evidence on file show "that there is no genuine dispute as to any material fact and the movant is entitled to **\*555** judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rule 56(c) places the initial burden on the moving party to identify those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S.

317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The movant makes a showing that there is no genuine issue of material fact by informing the court of the basis of its motion and by identifying the portions of the record that reveal there are no genuine material fact issues. *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. 2548; Fed. R. Civ. P. 56(c).

**[1]    [2]    [3]**  When the moving party has carried its burden of demonstrating the absence of a genuine dispute of material fact, the nonmoving party bears the burden of coming forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). When reviewing the evidence on a motion for summary judgment, the court must decide all reasonable doubts and inferences in the light most favorable to the non-movant. *See Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir. 1988). The court cannot make a credibility determination in light of conflicting evidence or competing inferences. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994), *cert. denied*, 513 U.S. 871, 115 S.Ct. 195, 130 L.Ed.2d 127 (1994).

## III. ANALYSIS

### A. Medical Negligence and Gross Negligence

Trimble alleges that Millwood was negligent by committing her to inpatient care "when it was not necessary," and Millwood "violated the duty of care it owed [her] to exercise that degree of care ... ordinarily possessed and used by other mental health treatment centers." Am. Compl. ¶¶ 111–12. Based on Millwood's alleged negligence and gross negligence, Trimble seeks damages for emotional distress, past medical expenses, out-of-pocket costs, loss of opportunity, and exemplary damages. Am. Compl. ¶¶ 120–28.

Millwood moves for summary judgment of Trimble's negligence claims, arguing that Trimble's negligence claims require expert testimony to establish standard of care, breach,

and causation. Def.'s Suppl. Br. Mot. Summ. J. 3, ECF No. 95. In support of its Motion for Summary Judgment, Millwood attaches the affidavit of Dr. Michael Arambula. Def.'s App. Br. Mot. Summ. J., Ex. A ("Arambula Aff."), ECF No. 38-1. Dr. Arambula states that "Millwood Hospital was not negligent nor grossly negligent in its care, treatment and services provided to Samantha Trimble," and that Millwood "met or exceeded the applicable standards of care, and [acted] consistent with all applicable statutory or regulatory requirements." Arambula Aff. ¶ 3, ECF No. 38-1. Trimble offers no expert testimony to counter Dr. Arambula. She argues that expert testimony is not necessary because "[the] applicable standards of care are set in Chapter [sic] 164, 321, 572, 576 and 611 of the Texas Health & Safety Code, as well as the Patient Bill *556 of Rights, found at 40 T.A.C. § 404.154 ...." Pl.'s Am. Resp. Mot. Summ. J. ¶ 54, ECF No. 60.

[4]  [5]  [6]  [7]  To prevail on her medical negligence claim under Texas law, Trimble must show: (1) Millwood owed her a duty to meet the relevant standard of care; (2) Millwood breached that standard of care; (3) she suffered an injury; and (4) Millwood's breach caused that injury. *Mills v. Angel*, 995 S.W.2d 262, 267 (Tex. App.—Texarkana 1999, no pet.). The standard of care for a hospital like Millwood "is what an ordinary hospital would have done under the same or similar circumstances." *Id.* at 268 (citing *Denton Reg'l Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950–51 (Tex. App.—Fort Worth 1997, writ dism'd by agr.)). Expert testimony is generally required to establish the standard of care, particularly "when the underlying issue involves the performance of medical procedures." *Denton*, 947 S.W.2d at 950–51 (citing *St. Paul Med. Ctr. v. Cecil*, 842 S.W.2d 808, 814 (Tex. App.—Dallas 1992, no writ)). "But when the underlying negligence involves the standard of non-medical, administrative, ministerial, or routine care at a hospital, expert testimony is not needed because the jury is competent from its own experience to determine and apply such a reasonable care standard." *Mills*, 995 S.W.2d at 268 (citing *Cecil*, 842 S.W.2d at 812).

[8]  At the hearing on the Motion for Summary Judgment, Trimble conceded that the treatment decisions once she was admitted to Millwood would "arguably" require expert testimony. Draft Hr. Trans. 3:5–7. As a result, Trimble focuses her negligence claim on the process of her admission to Millwood in order to cast the negligence question as purely administrative and not requiring expert testimony. Pl.'s Resp. Suppl. Br. Mot. Summ. J. ¶ 16, ECF No. 98. However, the process for admitting a patient for inpatient care at a mental hospital is as much a medical treatment decision as any decision made after admission. Establishing the standard of care for admitting an individual for inpatient care "require[s] evidence on the proper training, supervision, and protocols" necessary to ensure the proper admission of patients. *Texas W. Oaks Hosp., LP v. Williams*, 371 S.W.3d 171, 182 (Tex. 2012) (holding that expert testimony was necessary to establish a mental hospital's standard of care for preventing aggressive behavior between patients and employees); *see also Denton*, 947 S.W.2d at 951 (requiring expert testimony on "whether the standard of care required the hospital to require [Certified Registered Nurse Anesthetists] supervision by an anesthesiologist"). Such information is not within a jury's common knowledge or experience. *Mills*, 995 S.W.2d at 268.

Trimble's references to Texas's statutory and regulatory code do not alter this analysis. It is unclear from Trimble's briefing whether she offers it these provisions as proof of negligence per se or as the basis for res ipsa loquitur, but her argument fails on both accounts. Trimble describes her argument as an application of the common law doctrine of res ipsa loquitur. Pl.'s Am. Resp. Summ. J. ¶ 51, ECF No. 60. However, the term does not accurately describe Trimble's argument. Res ipsa loquitur provides that "in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence that establishes a prima facie case." Res Ipsa Loquitur, *Black's Law Dict.* (10th ed. 2014). Trimble does not argue that any injury or accident raises an inference of negligence, but rather that the violation of a statute establishes negligence. This is negligence per se. Negligence, *Black's Law Dict.* (10th Ed. 2014) ("negligence per se usu. arises from a statutory violation").

*557  Millwood asserts that Trimble's negligence per se arguments were not timely pleaded. Reply Mot. Summ. J. 7, ECF No. 68. While "negligence per se" was not explicitly stated in Trimble's Amended Complaint, the Court finds that Trimble's citation to the relevant provisions in her "Statement of Facts" and in the section entitled "Violations of the Mental Health Code" was sufficient to put Millwood on notice that these provisions were incorporated into Trimble's negligence claim. Pl.'s Am. Compl. ¶¶ 13–16, 102–04, ECF No. 21. In subsequent briefing, Trimble cited ever-changing provisions and chapters of the Texas code as a basis for her negligence per se claim, but the Court analyzes only those provisions relevant and specifically cited in her First Amended Complaint as a basis for negligence per se. *See Bell Atlantic v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167

L.Ed.2d 929 (2007) (noting the purpose of Federal Rule of Civil Procedure 8(a)(2) is to "give the defendant fair notice of what the ... claim is") (citing *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The only relevant provisions specifically referenced in the Amended Complaint are: (1) Texas Health & Safety Code § 164.009; (2) various provisions of title 7 subtitle C chapters 571, 572, 574, and 576 of the Texas Health & Safety Code; and (3) Chapter 404 of Title 25 of the Texas Administrative Code ("T.A.C."). None of these provisions provide a basis for negligence per se.

[9]  [10]  "Negligence per se is a common-law doctrine in which a duty is imposed based on a standard of conduct created by a penal statute rather than on the reasonably prudent person test used in pure negligence claims." *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997). "However, not every penal statute creates an appropriate standard of care for civil liability purposes ...." *Id.* In determining whether to impose tort liability for violations of a criminal statute, "the ultimate question" is whether it is "fair, workable, and wise." *Perry v. S.N.*, 973 S.W.2d 301, 306 (Tex. 1998).

[11]  [12]  Section 164.009 of the Texas Health & Safety Code and chapter 404 of the T.A.C. cannot provide a basis for negligence per se because they are not penal statutes. "A 'penal statute' is one that defines a criminal offense and specifies a corresponding fine, penalty, or punishment." *Pack v. Crossroads, Inc.*, 53 S.W.3d 492, 509 (Tex. App.—Fort Worth 2001, pet. denied) (citing 1421 *Black Law's Dict.* (7th ed. 1999)). Neither § 164.009 nor 25 T.A.C. § 404.154 are enforced by criminal penalties and are, therefore, not penal. *See Watkins v. Cornell Companies, Inc.*, No. 3:11-CV-260-M-BN, 2013 WL 1914713, at *4–5 (N.D. Tex. 2013) (Horan, M.J.), *adopted by*, 2013 WL 1926375 (N.D. Tex. May 8, 2013) (Lynn, J.).

[13]  Section 571.020 of the Texas Health & Safety Code does provide criminal penalties for knowingly violating any provision of title 7 subtitle C of the Texas Health & Safety Code, which encompasses the remaining chapters on which Trimble relies. However, the Court declines to find that § 571.020 is sufficient to transform subtitle C into a penal statute, and relies on legislative intent in rejecting these provisions as a basis for negligence per se.

In *Smith v. Merritt*, the Texas Supreme Court considered whether tort liability should be imposed for violation of a

statute imposing criminal penalties for serving alcohol to someone under the age of twenty-one. 940 S.W.2d 602, 607 (Tex. 1997). The court found it dispositive that the legislature had enacted a chapter separate from the relevant criminal chapter to establish civil liability for serving alcohol. *Id.* The court held that "the Legislature manifested its intent that the [civil liability chapter]  *558 should serve as the sole basis of civil liability for serving alcohol to persons aged eighteen to twenty." *Id.* at 608.

Here, the Court reaches a similar conclusion. The Court finds that the Texas legislature has manifested a similar intent with title 7 subtitle C of the Texas Health & Safety Code. While § 571.020 is codified within subtitle C, the provision providing civil liability is § 321.003 of the Texas Health & Safety Code, which is found title 4 subtitle G. Tex. Health & Safety Code § 321.003. Significantly, Title 4 is entitled "Health Facilities," and subtitle G is entitled "Mental Health, Chemical Dependency, and Rehabilitation Services." By incorporating civil liability in a title and subtitle focused specifically on the regulation of mental health facilities, the Texas legislature manifested its intent for § 321.003 to provide "the sole basis of civil liability" for violations of subtitle C by mental health facilities such as Millwood. *See Smith*, 940 S.W.2d at 607 (Tex. 1997).

Because the provisions on which Trimble relies cannot form a basis for a negligence per se claim and Trimble has failed to provide expert testimony to establish the standard of care for her negligence claim, summary judgment on Trimble's negligence and gross negligence claims is **GRANTED**.

**B. False Imprisonment**

[14]  Trimble also alleges a false imprisonment claim based on her admission to and subsequent detention at Millwood. Millwood moves for summary judgment on the grounds that Trimble's false imprisonment claim requires expert testimony. In order for Trimble to succeed on her false imprisonment claim she must prove Millwood willfully detained her, without her consent, and without authority of law. *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995) (citing *Sears, Roebuck & Co. v. Castillo*, 693 S.W.2d 374, 375 (Tex. 1985)). The Court finds that Trimble's false imprisonment claim is really two separate claims: (1) the first related to Dr. Mehta's decision to detain Trimble after she requested discharge; and (2) the second related to the alleged statutory violations Trimble contends resulted in her fraudulent admission. The Court will analyze these in turn.

[15]  Defendant argues that Trimble must provide expert testimony to establish that she was detained without lawful authority when Millwood detained her after her request for discharge. The Court agrees. Texas law clearly authorizes a physician to detain a patient if the physician "has reasonable cause to believe that the patient might meet the criteria for court-ordered mental health services." Tex. Health & Safety Code § 572.004(c); *Groomes v. USH of Timberlawn, Inc.*, 170 S.W.3d 802, 806 (Tex. App.—Dallas 2005, pet. denied). In order to prove that Millwood acted without authority of law in detaining her, Trimble "will necessarily have to offer evidence that the doctor departed from an accepted standard of medical care by not authorizing [her] discharge." *Groomes*, 170 S.W.3d at 806 (court found expert testimony necessary to establish standard of care for false imprisonment claim related to mental hospital's failure to discharge patient). Whether there is sufficient reason to believe a patient may need court-ordered mental health services is a medical question that requires expert testimony. *Id.*

Millwood provided the expert testimony of Dr. Arambula to show that Dr. Mehta acted under statutory authority when he issued the order to hold Trimble afer she requested discharge. Arambula Aff. ¶¶ 8, 13, App. 4, 6, ECF No. 38-1. Dr. Arambula also found that Millwood acted appropriately in following Dr. Mehta's order. *Id.* Trimble has not offered expert evidence **\*559** controverting Dr. Mehta's testimony and therefore cannot establish that her detention after requesting discharge was without authority of law. *Randall's Food Markets*, 891 S.W.2d at 644. As a result, Trimble has failed to offer sufficient summary judgment evidence to create a material issue of fact for her false imprisonment claim as it relates to Dr. Mehta's decision not to discharge her from Millwood.

To avoid this expert report requirement, Trimble shifted her false imprisonment claim in later briefing to focus on the alleged statutory violations surrounding her initial admission. Trimble contends that her admission to Millwood was without her consent because "she never received necessary information about the hospital's daily charges, ... was never told she was being admitted," and the physician's order supporting admission "was based on a physical examination that never occurred." Pl.'s Am. Resp. Mot. Summ. J. ¶ 70, ECF No. 60; Pl.'s App. Am. Resp. Mot. Summ. J. Ex. D (Trimble Deposition) 243:7–13, App. 59, ECF No. 59-5. Millwood argues that Trimble must still provide expert testimony to controvert Dr. Arambula's testimony that the care and services provided by Millwood at the admission stage and

throughout "were appropriate, met the applicable standards of care and were in compliance with applicable statutory guidelines ...." Def.'s Suppl. Br. Mot. Summ. J. 6–7, ECF No. 95.

[16]  The Court finds that expert testimony is not required for Trimble's false imprisonment claim as it relates to her initial admission. Section 572.002 of the Texas Health & Safety Code provides that a mental health facility may admit a patient for voluntary inpatient services if the facility performs a preliminary examination and informs the patient of his or her patient rights. Tex. Health & Safety Code § 572.002. Trimble alleges that there was no preliminary examination and she was not provided her patient rights. Am. Compl. ¶¶ 25–27, ECF No. 21. A jury could find that failure to meet these statutory requirements invalidated Millwood's legal authority to have admitted Trimble to inpatient care. Further, a detention is "without consent" "if [ ] induced by deception or coercion." *Smith v. State*, 2016 WL 3611546, at *2 (Tex. App.—Dallas 2016, no pet.) (citing Tex. Penal Code Ann. §§ 1.07(a)(19)(A), 31.03(3)(A)). Whether Millwood's alleged failure to meet the statutory requirements amounted to deception nullifying Trimble's consent is also a fact question for the jury.

Millwood's contention that Trimble's false imprisonment claims are merely recast healthcare liability claims does not affect this analysis. Reply Suppl. Br. Mot. Summ. J. 3, ECF No. 100. Texas courts have found that false imprisonment claims related to the provision of medical services are healthcare liability claims under the Medical Liability and Insurance Improvement Act and therefore subject to § 74.351 of the Texas Civil Practice & Remedies Code, which imposes an expert report pleading requirement. *See Groomes*, 170 S.W.3d at 806. However, the Fifth Circuit recently concluded that § 74.351 does not apply in federal court. *Passmore*, 823 F.3d at 292. Millwood provides no other legal basis for imposing a blanket expert testimony requirement on all healthcare liability claims; therefore, it is irrelevant whether Trimble's false imprisonment claim is a recast healthcare liability claim when § 74.351 no longer applies.

As the Court finds that expert testimony is not necessary to establish whether or not Millwood complied with the dictates of statute and material issues of fact remain for the jury, Millwood's motion for summary judgment as to Trimble's false imprisonment claim prior to Dr. Mehta's refusal to discharge her is **DENIED**.

Trimble v. Millwood Hospital, 420 F.Supp.3d 550 (2016)

**\*560  C. Mental Health Code Statutes**

[17]  Texas Health & Safety Code § 321.003 provides a private cause of action against a treatment or mental health facility for anyone harmed by a violation of certain mental health provisions. Tex. Health & Safety Code § 321.003. Trimble pleads a claim under this provision for Millwood's alleged violations of "Plaintiff's general patient rights under the Texas Mental Health Code." Am. Compl. ¶ 102. Millwood argues that Trimble was required to provide expert testimony to prove this claim as well, but failed to do so. Suppl. Br. Mot. Summ. J. 8, ECF No. 95.

[18]  Millwood cites several cases in support of its expert testimony argument. *Id.* at 7–8 (citing *Tex. Laurel Ridge Hosp., L.P. v. Almazan*, 374 S.W.3d 601 (Tex. App.—San Antonio 2012, no pet.); *Broxterman v. Carson*, 309 S.W.3d 154 (Tex. App.—Dallas 2010, pet. denied); *Tex. Cypress Creek Hosp. L.P. v. Hickman*, 329 S.W.3d 209 (Tex. App.—Houston [14th Dist.] 2010, pet. denied); *Groomes*, 170 S.W.3d at 802; *Parker v. CCS/Meadow Pines, Inc.*, 166 S.W.3d 509 (Tex. App.—Texarkana 2005, no pet.)). Yet each of these cases relies on § 74.351 of the Texas Civil Practice and Remedies Code in holding that claims under § 321.003 require expert testimony. As noted above, the pleading requirements of section § 74.351 do not apply in federal court, making the cases Millwood cites inapposite. *Passmore*, 823 S.W.3d at 292.

Millwood points to no other case or statute to support its contention that Trimble must provide expert testimony to maintain a claim under § 321.003 of the Texas Health & Safety Code. Trimble has provided sufficient summary evidence without expert testimony to create a fact issue as to whether Millwood complied with the provisions of the Texas Health & Safety Code enforced by § 321.003. Accordingly, the motion for summary judgment as to Trimble's claim under § 321.003 of the Texas Health & Safety Code is **DENIED**.

**D. Rehabilitation Act**

[19]  [20]  [21]  Trimble also claims that Millwood's alleged statutory violations amount to a violation of § 504 of the Rehabilitation Act. Pl.'s Sur-Reply Suppl. Br. Mot. Summ. J. ¶¶ 27–31, ECF No. 78; 29 U.S.C. § 794. To make a prima facie case under the Rehabilitation Act, a plaintiff must show: (1) that she was a qualified individual with a disability; (2) the program or facility received federal funding; and (3) she was adversely treated solely as a result of the disability. *Chandler v. City of Dall.*, 2 F.3d 1385, 1390 (5th Cir. 1993). In order

to recover compensatory damages, the plaintiff must show that the adverse acts or omissions were intentional. *Delano-Pyle v. Victoria Cty.*, 302 F.3d 567, 574 (5th Cir. 2002) (citing *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir. 1984)).

In its initial Order on Summary Judgment, the Court granted summary judgment on Trimble's Rehabilitation Act claim. Order, March 4, 2016, ECF No. 80. The Court found that while there was a question of fact as to Trimble's alleged qualifying disability and the intentionality of Millwood's actions, Trimble had not provided sufficient summary judgment evidence to create a factual dispute as to whether the adverse actions were "solely as a result of" her disability or whether she was denied reasonable accommodation. *Id.* at 18–23. The Court found on reconsideration that it had impermissibly drawn an inference in the movant's favor when considering whether the alleged statutory violations occurred *because* of her qualifying disability and denied summary judgment.[2]  **\*561**  Order Reconsid. 4, June 6, 2016, ECF No. 88.

[22]  [23]  On reconsideration, Millwood challenges Trimble's Rehabilitation Act claim again, arguing that Trimble must offer expert testimony causally connecting Trimble's alleged damages to Millwood's alleged violations rather than the medical conditions that caused Trimble to seek help from Millwood initially. Reply Suppl. Br. Mot. Summ. J. 5, ECF No. 100; Suppl. Br. Mot. Summ. J. 11, ECF No. 95. Millwood provides no legal support for this assertion and the Court declines to impose a blanket expert testimony requirement at the summary judgment phase. The standard of proof for compensatory damages in discrimination cases is not so exacting. Compensatory damages may not be presumed; however "corroborating testimony and medical evidence is *not* required in *every* case involving compensatory damages." *DeCorte v. Jordan*, 497 F.3d 433, 442 (5th Cir. 2007) (citing *Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1046–47 (5th Cir. 1998)). A claimant's testimony alone may even be sufficient to support a finding of compensatory damages. *DeCorte*, 497 F.3d at 442.

While Trimble may struggle to convince a jury that her alleged damages were caused by Millwood's alleged violations without expert testimony, a jury is equipped to make this determination on its own. It is not a medical question whether the stigma related to being admitted to a mental institution is the cause of Trimble's diminished

job opportunities. Nor is it a medical question whether her admission to Millwood caused her out-of-pocket expenses.

Millwood's argument that Trimble would need expert testimony to establish that her emotional distress was caused by her admission to Millwood, not by her pre-existing medical conditions, is more persuasive. Expert medical testimony would be enlightening in distinguishing between the two potential causes; however, the law does not mandate expert testimony.

[24] While the Fifth Circuit has not specifically addressed the causation element of emotional distress damages, the Eighth Circuit has touched upon this issue a number of times. *See Webner v. Titan Distrib., Inc.*, 267 F.3d 828, 836 (8th Cir. 2001) (finding emotional distress damages award appropriate based on plaintiff's own testimony of distress in combination with the surrounding circumstances); *Christensen v. Titan Distrib., Inc.*, 481 F.3d 1085, 1096–97 (8th Cir. 2007) (finding emotional distress damages award appropriate based on testimony of husband and wife showing temporal relationship between discriminatory act and emotional distress); *Heaton v. Weitz Co.*, 534 F.3d 882, 891 (8th Cir. 2008) (finding denial of judgment as a matter of law for jury award of emotional distress damages not improper based on plaintiff's personal testimony of emotional distress and subsequent medical treatment). The Eighth Circuit has held that "[a] plaintiff is entitled to damages for emotional distress when there is evidence of actual emotional distress caused by [a defendant's] discriminatory acts ...." *Christensen*, 481 F.3d at 1096–97 (citing *Webner*, 267 F.3d at 836). Plaintiff's testimony alone can be sufficient to establish damages and causation, but the plaintiff must "offer specific facts as to the nature of his claimed emotional distress and the causal connection to [the] alleged violations." *Id.* The Eight Circuit reasons that this flexible standard is necessary because "[a]wards for pain and suffering are highly subjective and the

assessment of damages is within the sound **\*562** discretion of the jury, especially when the jury must determine how to compensate an individual for an injury not easily calculable in economic terms." *Id.*

Under this standard, expert testimony is not required. Trimble's emotional distress claims are subjective and within the discretion of the jury. At trial, Trimble may be unable to provide sufficient testimony to prove to the jury that her emotional distress was caused by Millwood's alleged violation, rather than her pre-existing conditions. But Trimble has provided sufficient summary judgment evidence without expert testimony to create a material issue of fact as to whether her admission to Millwood was the cause of her alleged damages.

As there is a fact issue for the jury regarding Trimble's alleged damages, Millwood's motion for summary judgment as to Trimble's Rehabilitation Act claim is **DENIED**.

## IV. CONCLUSION

Based on the foregoing, the Court finds that Defendant's Motion for Summary Judgment should be and is hereby **GRANTED in part** and **DENIED in part**. The motion is granted as to Plaintiff's claims for medical negligence, gross negligence, and a portion of the false imprisonment claim and is denied as to Plaintiff's claims under § 321.003 of the Texas Health & Safety Code, § 504 of the Rehabilitation Act, and the false imprisonment claim related to her initial admission.

**SO ORDERED** on this **12th day** of **September, 2016.**

## All Citations

420 F.Supp.3d 550

## Footnotes

1    Specifically, the Amended Complaint lists "Tex. Health & Safety Code, Title 7, Subtitle C"; "25 Tex. Admin. Code, Chapter 404"; "Title 2, Article 3, Subchapter L, of the Tex. Health & Safety Code"; "Texas Health & Safety Code § 576.021(5)"; "25 TAC 404.154(3) and 404.154(24); and finally "Title 4, Subtitle G, Chapter 321, § 321.003 of the Tex. Health & Safety Code." Am. Compl. ¶¶ 102–04.

2    The Court declined to reconsider its conclusion that Trimble had failed to provide sufficient summary judgment evidence to support her claim that she was denied reasonable accommodation. Order Reconsid. 4, Junder 6, 2016, ECF No. 88.

Trimble v. Millwood Hospital, 420 F.Supp.3d 550 (2016)

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

McMahon v. Smith & Nephew Richards, Inc., Not Reported in S.W.3d (2000)

2000 WL 991697

2000 WL 991697
Only the Westlaw citation is currently available.

Notice: Not designated for Publication. Under Tex.R.App.P.
47.7 unpublished opinions may not be cited as authority.

Court of Appeals of Texas, Houston (14th Dist.).

John McMAHON, Appellant,

v.

SMITH & NEPHEW
RICHARDS, INC., Appellee.

No. 14–99–00616–CV.
|
July 20, 2000.

On Appeal from the 152nd District Court, Harris County,
Texas, Trial Court Cause No. 95–58737–A.

Panel consists of Chief Justice MURPHY and Justices
HUDSON and WITTIG.

OPINION

WITTIG

**\*1** Appellant, John McMahon, experienced multiple back
surgeries including the implantation of an experimental or off
label pedicle screw fixation device. He brought as many as
fifteen different theories of recovery against appellee, Smith
& Nephew, Inc. Prior to the hearing on appellee's summary
judgment motion, these myriad claims were deferred in
favor of appellant's central negligence per se claim, so far
unaddressed by Texas appellate courts. Appellant maintained
the failure of Smith & Nephew Richards, Inc. to obtain
appropriate Food and Drug Administration approval of the
Rogozinski device gave rise to his per se claims. This
appeal is from both the trial court's striking the testimony
of McMahon's expert witness on causation and the court's
subsequent grant of summary judgment under the senior
summary judgment rule of McMahon's claim of negligence
per se. Because appellant does not prevail on the causation
issue, we do not reach appellant's arguments under the Food,
Drug and Cosmetic Act or the Medical Device Amendments.
We affirm.

Facts

In 1991, appellant suffered injuries to his head, neck and
back when he collided with a loading dock in his eighteen-
wheeler. His initial treatment was conservative, utilizing
muscle relaxers, physical therapy, and traction. However,
his symptoms worsened. He was evaluated by Dr. Clark,
who diagnosed a disc herniation. Appellant underwent two
surgeries but continued to experience persistent back and leg
pain.

More than three years after the accident, appellant saw
Dr. Dan Eidman, a board certified orthopedic surgeon,
complaining of increasing neck, back, and leg pain and
intermittent numbness and tingling in both legs. Dr. Eidman
recommended a surgical decompression and fusion with the
use of an internal spinal fixation device. Spinal fusion surgery
attempts to fuse adjacent vertebrae and thereby prevent the
abnormal motion of the joint between them. The specific
implant chosen was the Rogozinski Spinal Rod System
but it was attached to the pedicles via screws[1] vis a vis
the attachment to the sacrum with hooks. Dr. Eidman thus
attached the splint to appellant's spine by anchoring bone
screws in the pedicles and fastened the Rogozinski "splint"
device to these screws. This method was argued by appellee
to be "off-label," which is a use not described in the label
permitted by the FDA, but unregulated. Appellant argues the
method is not off-label but experimental, thus precipitating
FDA involvement and regulation.

Appellant continued under Dr. Eidman's care over the next
year and a half. During this time, Appellant continued to
complain of persistent low back and leg pain. Conservative
measures again failed to relieve his symptoms. Dr. Eidman
recommended additional surgery to decompress the disk just
above the fused area.

Appellant filed suit in 1995. Having abandoned other claims,
his only extant liability claim is negligence per se. This, he
avers, appellee committed when it allegedly violated FDA
regulations by unlawfully marketing of the Rogozinski device
for pedicle screw use. He complains that the unapproved use
of the Rogozinski device itself, as opposed to the spinal fusion
surgery in general, caused nerve damage or the formation of
scar tissue. He asserts that the device is responsible for his
disabilities, which continue to date.

McMahon v. Smith & Nephew Richards, Inc., Not Reported in S.W.3d (2000)

2000 WL 991697

**\*2**  Appellee moved for summary judgment under Tex.R.Civ.P. 166a(c) claiming that the pedicle implant did not cause appellant's ailments. In support of the motion, appellee offered the affidavit of Dr. Eidman, who implanted the device. Dr. Eidman states that the pedicle implant did not cause appellant any personal injury.

In response, appellant filed an affidavit and deposition excerpts from Dr. Kevin Gorin, a rehabilitation and pain management specialist. Dr. Gorin asserts that appellant's current complaints were caused by appellee's internal spinal fixation device, rather than any pre-existing or progressive disease.

Appellee then challenged the qualifications of Dr. Gorin to testify as to the cause of appellant's complaints. After a *Daubert* hearing, the district court, Judge Harvey Brown presiding, granted the challenge to the experts qualifications and testimony and issued a well-reasoned opinion, explaining his analysis in detail. *Baker v. Smith & Nephew Richards, Inc.,* No. 95–58737, 1999 WL 811334 (152nd Dist.Ct., Harris County, Tex., June 7, 1999).

Appellant's Expert

Appellant argues that it was error for the trial court to strike the testimony of Dr. Gorin, who was his sole causation witness. We review a trial court's decision not to admit expert testimony for an abuse of discretion. *See E.I. du Pont de Nemours and Co. v. Robinson,* 923 S.W.2d 549, 558 (Tex.1995).

The trial court found that appellant failed to met his burden of proving that Dr. Gorin is qualified to testify as an expert in this case. Dr. Gorin is board-certified in both rehabilitation and pain medicine, and it is undisputed that he is an expert in those areas. Appellee, however, argued that, despite these qualifications, Dr. Gorin was not qualified to testify as to the *cause* of appellant's complaints. According to the affidavit of Dr. George William Wharton, an orthopedic surgeon, a pain management doctor (such as Dr. Gorin) lacks the necessary experience to determine whether or not a spinal implant is the cause of a patient's post-surgical pain.

The trial court noted that Dr. Gorin was not a surgeon and, therefore, had never performed or assisted in spinal surgery or the surgical explanation of any instrumentation. Additionally, the trial court correctly found no evidence that

Dr. Gorin claimed expertise in biomechanics, biomedicine, or metallurgy. Dr. Gorin conceded that he could not offer an expert opinion regarding whether the instrumentation was appropriate in appellant's case. Nor could he describe the Rogozinski device or tell the difference between a Rogozinski System and similar systems. Finally, Dr. Gorin did not rebut or otherwise address Dr. Wharton's statement that a pain management specialist was unqualified to testify as to causation in this case. This omission was significant because appellant, as the offering party, bore the burden of proving his expert's qualifications.

The trial court concluded that, "despite Dr. Gorin's extensive training and experience in pain management and rehabilitation, there is no indication that he has been trained or attained adequate experience in actually diagnosing the *causes* of back ailment injuries in general, or more specifically, complaints of continuing pain after fusion surgery for patients with implants." (Emphasis added.) We are in accord with this finding.

**\*3**  The possession of a medical degree does not qualify a physician to offer expert testimony on every medical question. *See Broders v. Heise,* 924 S.W.2d 148, 152 (Tex.1995) (upholding trial court's exclusion of testimony of emergency physician regarding cause of death from brain injury). Given the increasingly specialized and technical nature of medicine, such a rule would ignore the modern realities of medical specialization and eliminate the trial court's role of ensuring that those who purport to be experts truly have expertise concerning the actual subject about which they are offering an opinion. *Id.* at 152–53. The proponent of the testimony has the burden to show that the expert "possess[es] special knowledge as to the very matter on which he proposes to give an opinion." *Id.* [Citations omitted.]; *see also Gammill v. Jack Williams Chevrolet, Inc.,* 972 S.W.2d 713, 719 (Tex.1998).

Though Dr. Gorin is qualified to testify as to the type of pain appellant was suffering and what kind of treatment will work, such expertise does not qualify him to testify as to causal factors which actually precipitated the pain or condition. As such, the trial court did not abuse its discretion in concluding that Dr. Gorin has not adequately shown his qualifications to state whether a Rogozinski Spinal Rod System affixed by pedicle screws, did, in fact, cause post-surgical spinal pain or untoward result

McMahon v. Smith & Nephew Richards, Inc., Not Reported in S.W.3d (2000)

2000 WL 991697

We note that the trial court also struck Dr. Gorin because it found his methodology unreliable. Because the trial court's analysis of Dr. Gorin's qualifications is correct and thus dispositive, we need not additionally review the court's analysis of Dr. Gorin's methodology. *See* Tex.R.App.P. 47.1.

## Negligence Per Se

Summary judgment is proper when a movant establishes that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Tex.R.Civ.P. 166a(c); *Randall's Food Mkts., Inc. v. Johnson,* 891 S.W.2d 640, 644 (Tex.1995). Defendants are entitled to summary judgment if they conclusively negate at least one essential element of each of the plaintiff's causes of action. *See American Tobacco Co., Inc. v. Grinnell,* 951 S.W.2d 420, 425 (Tex.1997). However, we make every reasonable inference in favor of the nonmovant and resolve any doubts in their favor. *Randall's Food Mkts., Inc.,* 891 S.W.2d at 644. If the movant establishes a right to summary judgment, the non-movant must produce summary judgment proof showing the existence of an issue of material fact to preclude summary judgement. *See Westland Oil Dev. Corp. v. Gulf Oil Corp.,* 637 S.W.2d 903, 907 (Tex.1982); *Cummings v. HCA Health Servs. of Texas,* 799 S.W.2d 403, 405 (Tex.App.—Houston [14th Dist.] 1990, no writ).

We need not address the FDA regulations and intricacies of Appellant's claim for negligence per se. Even if we were to assume, arguendo, that appellee's actions constituted negligence per se,[2] the plaintiff still must show the violation was the proximate cause of the injury. *See Missouri Pac. R. Co. v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977); *Taco Cabana, Inc. v. Exxon Corp.,* 5 S.W.3d 773, 779 (Tex.App.—San Antonio 1999, pet. denied).

**\*4** Dr. Eidman explicitly states that, in his expert opinion, "[N]one of the signs or symptoms which were present after the surgery were caused or contributed to by any component of the instrumentation used to stabilize the spine including the screws in the vertebral pedicles." Appellee's expert has thus conclusively negated the causation element of Appellant's claim. Left without an expert, appellant could not and did not raise a genuine issue of material fact on the material issue. We therefore overrule appellant's issues.

The judgment of the trial court is affirmed.

## All Citations

Not Reported in S.W.3d, 2000 WL 991697

## Footnotes

1    Considerable national mass tort litigation evolved on the use of pedicle screws. The Rogozinski System was FDA approved at the time for some spinal applications e.g. sacral attachment, but not for certain other uses including pedicle fixation. The FDA in 1998 apparently "downclassifed" pedicle screw systems. *See* 63 Fed.Reg. 40025, 40035–36, (July 27, 1998.) The pedicles are two short pieces of bone on each side of the spinal vertebrae body which extend back from the top of the vertebrae.

2    We specifically reserve and do not rule on merits of the negligence per se allegations. Much law has developed since the first pedicle screw cases were tried. For example, *see Talley v. Danek Medical, Inc.,* 179 F.3rd 154, 161 (4th Cir.1999) rejecting appellant's theory.

---

End of Document                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

672 F.2d 1231
United States Court of Appeals,
Fifth Circuit.

Unit B[*]

David A. RABON, Plaintiff-Appellee,

v.

AUTOMATIC FASTENERS,
INC., et al., Defendants,

AUTOMATIC FASTENERS, INC., and

Omark Industries, Inc., Defendants-Appellees,

v.

HARDAWAY CONSTRUCTION
COMPANY, INC., Third
Party Defendant-Appellant.

No. 79-2994.
|
April 12, 1982.

**Synopsis**

Plaintiff, who was struck by nail shot from powder actuated stud gun, brought suit against manufacturer and distributor, which brought third-party indemnity action against plaintiff's employer. The United States District Court for the Middle District of Florida, George C. Carr, J., found that manufacturer and distributor were liable but that they were entitled to complete indemnification from employer, and employer appealed. The Court of Appeals, Tjoflat, Circuit Judge, held that: (1) employer could be required to indemnify manufacturer and distributor on theory that employer accepted responsibility for cooperating with manufacturer and distributor in discharging their nondelegable duty to warn of dangers of stud gun and then breached its duty; (2) under agreement between employee and manufacturer and distributor, manufacturer and distributor were liable to employee to full extent of judgment since judgment exceeded $40,000 and employer unsuccessfully defended indemnity claim; (3) Occupational Safety and Health Act regulations were properly admitted in evidence; (4) error, if any, in admission of portion of deposition of safety engineer was harmless; and (5) District Court ruled correctly that question of attorney fees was not for the jury.

Affirmed.

West Headnotes (14)

[1]    **Indemnity** ⬚ Relative culpability

**Indemnity** ⬚ Secondary liability

**Indemnity** ⬚ Pleading

Under Florida law, if plaintiff's recovery is necessarily based on culpable conduct of the defendant, then no cause of action for indemnity will lie; furthermore, third-party indemnity action will survive motion to dismiss only if third-party complaint alleges that there existed special duty running from indemnitor to indemnitee, that indemnitor breached that duty, that plaintiff's injuries resulted from the breach, and that indemnitee can be held liable for injuries resulting to the plaintiff from the indemnitor's acts.

4 Cases that cite this headnote

[2]    **Indemnity** ⬚ Secondary liability

Florida law regards one who is strictly liable as being at fault, that is, not merely vicariously liable, and for that reason one who is strictly liable cannot recover indemnity.

1 Cases that cite this headnote

[3]    **Indemnity** ⬚ Pleading

Where employee alleged that stud gun was dangerous instrumentality, that manufacturer and distributor had nondelegable duty to warn those who might use it of its dangerous potentialities, and that they negligently performed their duty to warn all employees who used stud guns of their danger and where third-party complaint filed against employer alleged that employer had accepted responsibility for cooperating with manufacturer and distributor in discharging their nondelegable duty to warn of dangers of stud gun and then breached its duty, district court properly denied motion to dismiss third-party complaint against employer under Florida law.

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)
10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

1 Cases that cite this headnote

**[4]**    **Federal Courts**  ⬤ Inferior courts

In diversity action Court of Appeals was bound by decision of Florida District Court of Appeal as it would have been by decision of Florida Supreme Court.

2 Cases that cite this headnote

**[5]**    **Indemnity**  ⬤ Scope and Extent of Liability

Where, before trial, plaintiff and defendants entered into "Mary Carter" agreement, whereby the two defendants agreed to pay plaintiff $20,000 each regardless of final outcome in the event the judgment was less than $40,000 or whether defendants failed to recover judgment for indemnity against third-party defendant, and where plaintiff recovered judgment against defendants in the amount of $200,000 and defendants were successful in their indemnity claim against third-party defendant, defendants were liable to plaintiff for the full amount of the judgment and agreement therefore did not limit third-party defendant's liability to the defendants.

1 Cases that cite this headnote

**[6]**    **Evidence**  ⬤ Safety standards

In employee's suit against manufacturer and distributor of stud gun, Occupational Safety and Health Act regulations, which were introduced as evidence of negligence and not as a basis for an independent cause of action, were properly admitted in evidence over objection that Act prohibited their introduction. Occupational Safety and Health Act of 1970, §§ 2 et seq., 4(b) (4), 29 U.S.C.A. §§ 651 et seq., 653(b)(4).

1 Cases that cite this headnote

**[7]**    **Action**  ⬤ Statutory rights of action
**Negligence**  ⬤ Violations of statutes and other regulations

Although Occupational Safety and Health Act creates no **private right of action**, violation of

OSHA regulation is evidence of negligence or, in appropriate circumstances, **negligence per se**. Occupational Safety and Health Act of 1970, §§ 2 et seq., 4(b)(4), 29 U.S.C.A. §§ 651 et seq., 653(b)(4).

22 Cases that cite this headnote

**[8]**    **Negligence**  ⬤ Violations of statutes and other regulations
**Negligence**  ⬤ Violations of statutes or other regulations

To establish that violation of a statute or regulation, including Occupational Safety and Health Act, is negligence per se, plaintiff must prove violation of statute which is intended to protect class of persons to which plaintiff belongs against risk of type of harm which has in fact occurred; if plaintiff does establish his negligence, he must then prove that violation was proximate cause of his injury. Occupational Safety and Health Act of 1970, §§ 2 et seq., 4(b) (4), 29 U.S.C.A. §§ 651 et seq., 653(b)(4).

6 Cases that cite this headnote

**[9]**    **Federal Courts**  ⬤ Substance or procedure; determinativeness
**Federal Courts**  ⬤ Admissibility

In diversity action, federal law governs procedural matters, including admissibility of evidence.

4 Cases that cite this headnote

**[10]**    **Federal Courts**  ⬤ Effect of Failure to Preserve Error

Where third-party defendant did not object to admission of Occupational Safety and Health Act regulations at trial on grounds of relevance, but objected on grounds that regulations did not imply federal cause of action and that Act itself prohibited introduction of regulations as evidence of negligence, there was no need to determine on appeal whether the regulations were relevant to any issue in the case. Occupational Safety and Health Act of 1970, §§

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

2 et seq., 4(b)(4), 29 U.S.C.A. §§ 651 et seq., 653(b)(4).

1 Cases that cite this headnote

[11]    **Federal Courts** ⮬ Admission of Evidence

In suit brought by employee against manufacturer and distributor of stud gun, error, if any, in admission of portions of deposition of safety engineer who had occasionally inspected construction site did not warrant reversal, in light of abundant evidence that employees were operating stud guns without certification and in view of fact that references to unsatisfactory job site housekeeping and failure to wear safety goggles while chipping concrete constituted mere shred of totality of the evidence presented in the five-day trial.

2 Cases that cite this headnote

[12]    **Federal Courts** ⮬ Cumulative evidence; facts otherwise established

Improper admission of evidence which is merely cumulative of matters shown by other admissible evidence is harmless error.

1 Cases that cite this headnote

[13]    **Indemnity** ⮬ Questions for jury

District court properly ruled that whether defendants were entitled to attorney fees for successfully seeking indemnity from third-party defendant was not for the jury, where third-party defendant stipulated to reasonableness of amounts awarded, for, under Florida law, prevailing party in indemnity action is entitled as a matter of law to reasonable attorney fees incurred in defense of the principal claim.

2 Cases that cite this headnote

[14]    **Indemnity** ⮬ Attorney fees

Under Florida law, prevailing party in indemnity action is entitled as a matter of law to reasonable attorney fees incurred in defense of the principal claim.

1 Cases that cite this headnote

**Attorneys and Law Firms**

*1233 John E. Houser, Jacksonville, Fla., for third party defendant-appellant.

Marks, Gray, Conroy & Gibb, John R. Saalfield, Jacksonville, Fla., for Automatic Fasteners, Inc.

Charles Cook Howell, III, Jacksonville, Fla., for Omark Industries, Inc.

W. C. Gentry, Jacksonville, Fla., for David A. Rabon.

Appeal from the United States District Court for the Middle District of Florida.

Before TUTTLE, TJOFLAT and KRAVITCH, Circuit Judges.

**Opinion**

TJOFLAT, Circuit Judge:

In the course of his employment for Hardaway Construction Company (Hardaway), David Rabon was struck above the left eye by a 2 1/2 inch nail which was shot from a powder actuated stud gun by a co-employee. Rabon brought a diversity action against Omark Industries, Inc. (Omark), the manufacturer of the stud gun, and Automatic Fasteners, Inc. (Automatic), the distributor of the stud gun.[1] Omark and Automatic brought a third party indemnity action against Hardaway. The jury found that Omark and Automatic were liable to Rabon for $200,000 and that Omark and Automatic were entitled to complete indemnification from Hardaway. The district court entered judgment accordingly. Hardaway appeals the judgment for indemnity on several grounds. We affirm.

I.

Hardaway argues first that under Florida law[2] it cannot be required to indemnify Omark and Automatic and that the district court therefore should have granted its motion to dismiss the third party complaint.[3] We disagree. On the facts as the jury was authorized to find them, Florida indemnity law would permit a judgment against Hardaway.

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

Rabon was employed as a carpenter's helper by Hardaway, the general contractor for a portion of Amelia Island Plantation near Jacksonville, Florida. Hardaway purchased Omark powder actuated stud guns from Omark's distributor, Automatic. A stud gun is used to drive nails into concrete and other hard surfaces, and operates on the order of a .22 pistol, using a .22 cartridge to propel the fastener through the barrel and into the desired surface.

Through Automatic, Omark undertook to train and instruct users of its powder actuated tools by making a company representative available on the job site to train personnel who might use them. Thus, when Automatic's salesman, Wiggins, first sold stud guns to Hardaway, he informed Hardaway that only trained operators should use them and that he would be available to instruct Hardaway's employees in their use. Hardaway agreed to make its employees available to Wiggins for training, and assumed responsibility to identify, locate, and organize the workers Wiggins was to train. *1234 Wiggins subsequently visited the construction site regularly and was available to instruct employees as they were hired. Included in the training was the warning that nails should not be fired into concrete less than three inches from its edge.

Carl Jackson went to work for Hardaway in February of 1974 as a carpenter's helper. He had never before used a stud gun and was not asked by Hardaway about his prior experience with the tool. Jackson was issued a stud gun on his first day on the job and at no time received instruction in its use.

On April 15, 1974, Jackson and Rabon were working on a roof at the Amelia Island construction site. Jackson, attempting to secure a board to the edge of the underlying concrete, fired his stud gun into the concrete less than three inches from the edge. The nail went through the board, ricocheted out of the concrete, and traveled upward into Rabon's eye.

Rabon alleged in his complaint that Omark and Automatic were strictly liable because the stud gun was defective by reason of insufficient warning and training in its use, and, alternatively, that Omark and Automatic negligently performed their duty to warn or train users of the stud gun, an inherently dangerous instrumentality. Omark and Automatic denied liability and further answered that if they were liable, it was due not to their independent conduct but to Hardaway's breach of its agreement to make its employees available for instruction in use of the stud gun. Alleging derivative liability for Hardaway's active fault, Omark and Automatic

sued Hardaway for indemnity. Hardaway contends that on the stated facts it cannot be liable to the defendants under Florida law.

In Houdaille Industries, Inc. v. Edwards, 374 So.2d 490 (Fla.1979), the Supreme Court of Florida faced the question whether a manufacturer sued for breach of warranty may bring a third party action for indemnity against the plaintiff's employer. Edwards, an employee of Houdaille Industries, was killed when a steel cable used in the manufacture of concrete beams broke while being stretched through a beam mold. Edwards' personal representative sued the manufacturer of the steel cable, Florida Wire, for wrongful death, alleging that Florida Wire had breached an implied warranty of fitness by providing a defective cable. Florida Wire filed a third party indemnity action against Houdaille, alleging that if Florida Wire were negligent, its negligence was merely passive, while that of Houdaille was active. Under the traditional Florida test for implied indemnity, Florida Wire's passive negligence would have provided a valid basis for its recovery over.

The trial court granted Houdaille's motion for summary judgment on the third party complaint, concluding that if Florida Wire was liable to Edwards, it was necessarily for breach of warranty or some other wrongdoing which could only be characterized as active negligence. The district court of appeal reversed, holding that a manufacturer of a product is entitled to bring an action in implied indemnity against an employer who has, through active misuse of the product, caused injuries to its employee. On certiorari, the Supreme Court of Florida quashed the decision of the court of appeal and ordered the summary judgment for Houdaille reinstated.

The supreme court held that, "absent a special relationship between the manufacturer and the employer which would make the manufacturer only vicariously, constructively, derivatively, or technically liable for the wrongful acts of the employer, there is no right of indemnification on the part of the manufacturer against the employer." 374 So.2d at 492. The court suggested that the court of appeal had improperly used the traditional indemnity concepts of active and passive negligence by weighing the fault of the manufacturer against the fault of the employer; in the context of implied indemnity, those terms meant nothing more than fault or no fault. Id. at 493. In applying this test, the court held, it is improper to weigh the relative fault of the parties.

*1235 [1] Under Houdaille, if the plaintiff's recovery is necessarily based on the culpable conduct of the defendant,

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

then no cause of action for indemnity will lie.[4] Furthermore, a third party indemnity action will survive a motion to dismiss only if the third party complaint alleges: (1) that there existed a special duty running from the indemnitor to the indemnitee; (2) that the indemnitor breached that duty; (3) that the plaintiff's injuries resulted from the breach; and (4) that the indemnitee can be held liable for the injuries resulting to the plaintiff from the indemnitor's acts.[5]

Defendants Omark and Automatic reason that they were held liable to Rabon on one of two theories: either they were strictly liable as the manufacturer and the distributor of a product defective by reason of insufficient warning and instruction, or else they were liable for their breach of the nondelegable duty to warn prospective users of the hazards of the stud gun, a dangerous instrumentality under Florida law. In either case, Omark and Automatic argue, their liability was merely vicarious and was occasioned solely by Hardaway's negligent breach of its special duty to them to make its employees available for training, thus entitling them to indemnity.

[2]  If Rabon's sole claim had been in strict liability, the defendants' theory would fail. Florida law regards one who is strictly liable as being at fault, that is, not merely vicariously liable. West v. Caterpillar Tractor Company, Inc., 336 So.2d 80 (Fla.1976); see Chesrow, Howard, and Howard, Fault and Equity: Implied Indemnity after Houdaille, 34 U.Miami L.Rev. 727, 734 (1980). For that reason, one who is strictly liable cannot recover indemnity under Houdaille. Ford Motor Co. v. Hill, 381 So.2d 249 (Fla. 4th Dist.Ct.App.1979).

[3]  However, Rabon stated a cause of action not only in strict liability, but also in negligence. The negligence theory was that the stud gun is a dangerous instrumentality, that the manufacturer and the distributor of a dangerous instrumentality have a nondelegable duty to warn those who might use it of its dangerous potentialities,[6] and that the defendants negligently performed their duty to warn all the Hardaway employees who used stud guns of their dangers. The defendants urge that if they were liable to Rabon on the negligence theory, their liability was only vicarious and was the product of Hardaway's failure to discharge its obligation to make the workers available for instruction. Thus, they argue, they are entitled to indemnity under Houdaille.

[4]  In light of Houdaille, the determinative inquiry is whether a party liable in negligence for its nonperformance of a nondelegable duty may be without fault and merely

vicariously liable for a third party's breach of its obligation to discharge or help discharge the first party's duty. Phrasing the question more elegantly, "whether one may delegate a nondelegable duty," a Florida court of appeal has answered the question in the affirmative in a decision which controls our disposition of this issue. Atlantic Coast Development Corp. v. Napoleon Steel Contractors, Inc., 385 So.2d 676 (Fla. 3d Dist.Ct.App.1980).[7]

In that case, Napoleon Steel was engaged in a crane operation on a construction site.  **1236**  Under Florida law, such activity is inherently dangerous and imposes a nondelegable duty upon those involved to use care in its performance. Atlantic, a subcontractor on the site, employed men who worked several stories below the crane. Since Napoleon's crane operator could not watch the deck below and the load on the crane simultaneously, Napoleon asked Atlantic to warn its employees when the crane was in operation. Atlantic "agreed to assume the duty, which was otherwise owed by Napoleon, of keeping (its) men safely away from the proximity of the crane while it was in operation." 385 So.2d at 679. However, Atlantic failed to warn plaintiff's decedent, and he was killed when a load of blocks fell from the crane. The court held that Napoleon was entitled to indemnity from Atlantic because it was only "technically" liable due to Atlantic's negligent performance of Napoleon's "nondelegable duty."

> Holding a particular undertaking to be nondelegable means that responsibility, i.e., ultimate liability, for the proper performance of that undertaking may not be delegated. The term nondelegable does not preclude delegation of the actual performance of the task. "Nondelegable" applies to the liabilities arising from the delegated duties if breached.

> Napoleon, involved in an inherently dangerous activity, may delegate the duty to look out for the safety of the workers to Atlantic. Napoleon would remain liable for injuries to third persons such as Atlantic's employee ... for a breach by Atlantic of the duty delegated to it. Napoleon, in turn, if found to be without fault, would be allowed to seek indemnity from Atlantic who failed to properly carry out the duty that was delegated to it.

Id. at 679-680 (citations omitted).

Napoleon's application of Houdaille is directly on point: just as Florida law permitted Napoleon to recover indemnity from Atlantic when Atlantic accepted responsibility for discharging Napoleon's nondelegable duty to warn its workers and then breached its duty, so Florida law would permit the defendants in this case to recover indemnity

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

from Hardaway when Hardaway accepted responsibility for cooperating with Omark and Automatic in discharging their nondelegable duty to warn of the dangers of the stud gun and then breached its duty.

The defendants' third party complaint thus advanced one valid theory, premised on the defendants' liability for negligent performance of their nondelegable duty to warn, and one invalid theory, premised on the defendants' strict liability. Since the third party complaint stated one claim permitting recovery, the district court properly denied Hardaway's motion to dismiss it.[8]

II.

[5]    Before trial, Rabon and the defendants entered into a Mary Carter agreement, whereby the defendants sought to limit their exposure in the event they were found solely liable and Rabon sought to assure himself at least some recovery in the event the jury should find against him on his claim against the defendants. The agreement provided that Omark and Automatic would each pay Rabon $20,000 regardless of the final outcome of Rabon's suit against them or the amount of the verdict, and regardless of the outcome of their third party claim against Hardaway. The agreement further provided:

> (Rabon) will satisfy any judgment herein against Omark and/or Automatic which is greater than $40,000 only to the extent that such judgment is indemnified by Hardaway; in the event the judgment is less than $40,000 or Omark and Automatic *1237 do not recover a judgment for indemnity against Hardaway, then (Rabon) will recover $20,000 from Automatic and $20,000 from Omark.

On the first day of trial, Hardaway, having learned that Rabon and the defendants had entered into the Mary Carter agreement, moved orally to dismiss Rabon's complaint and to limit the trial to the issue of the defendants' entitlement to indemnity for $40,000 or, alternatively, to limit the amount of any recovery to $40,000. The theory behind Hardaway's motion was that since the Mary Carter agreement limited the defendants' exposure to $40,000, and since an indemnitor is liable only to make the indemnitee whole, Hardaway's liability was also limited to $40,000. The motion was in effect an attempt to plead the agreement as an affirmative defense partially barring the defendants' recovery and to secure from the district court a ruling limiting Hardaway's

liability to $40,000 as a matter of law. Although Hardaway did not move to amend its third party answer to add the stated defense as it should have, we will treat Hardaway's motion as having presented to the court the defense that the Mary Carter agreement limited its liability to $40,000.

The district court[9] found that the Mary Carter agreement was clear and unambiguous. The court found further that while the agreement limited the defendants' minimum liability to Rabon to $40,000, the only limitation on the defendants' maximum liability was the extent to which defendants might recover a "judgment for indemnity against Hardaway." Since the agreement did not condition the defendants' maximum liability on their being able to satisfy a judgment against Hardaway, the agreement did not fix or limit the defendants' exposure. The court found further that:

> (I)n the event the judgment from which appeal has been taken is affirmed, Defendants will be liable to Plaintiff for the full amount of the judgment against them, and, as clearly spelled out in the Agreement, Plaintiff will satisfy said judgment against Defendants in full; Defendants' payments to Plaintiff in such event will be made under, pursuant to, and in satisfaction of the Final Judgment, rather than the Mary Carter agreement; and it will then be up to Defendants to attempt to satisfy their judgment for indemnity against Hardaway.

> Additionally, in the event the judgment for indemnity is affirmed, the Mary Carter agreement will then become inapplicable, as it only applies, according to its clear terms, if the Plaintiff recovers a judgment against Defendants of less than $40,000 (which he did not), or if Defendants are unsuccessful in seeking a judgment for indemnity against Hardaway.

> Should the Defendants for any reason be unable to satisfy their judgment or indemnity against Hardaway in whole or in part, said inability will have no effect whatsoever on Defendants' obligation to satisfy the judgment against them in full.

Based on these findings, the court concluded that, given the defendants' recovery of judgment against Hardaway, the Mary Carter agreement did not limit the defendants' liability, since the defendants are required to satisfy in full Rabon's judgment against them, regardless whether they are later able to collect their judgment against Hardaway. The court therefore denied Hardaway's motion to limit its liability to the defendants to $40,000.

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

We affirm the ruling of the district court. The Mary Carter agreement limited Omark's and Automatic's liability to Rabon to $40,000 only if (1) Rabon did not recover a judgment against them of at least $40,000 or (2) Omark and Automatic were unsuccessful in their indemnity claim against Hardaway. Neither of those conditions occurred. Under the agreement, Omark and Automatic are liable to Rabon to the full **\*1238** extent of the judgment. The agreement therefore does not limit Hardaway's liability to the defendants.

III.

A.

The court admitted in evidence over Hardaway's objection two Occupational Safety & Health Act (OSHA) regulations offered by Automatic. The regulations required (1) that fasteners not be driven into concrete closer than three inches from the edge[10] and (2) that only trained operators use powder actuated tools.[11] The court instructed the jury that it might consider the regulations and their possible violation in connection with the defendants' indemnity claims against Hardaway and that violation of either regulation was negligence.

[6]    Hardaway urges that the admission of the OSHA regulations in evidence was error. Hardaway's principal contention, that OSHA regulations do not imply a federal cause of action, is inapposite; the record shows clearly that the regulations were introduced as evidence of negligence and not as a basis for an independent cause of action.

[7]    [8]    [9]    [10]    Hardaway's second argument, that OSHA itself prohibits the introduction of OSHA regulations as evidence of their violators' negligence, is unavailing. Although OSHA creates no **private** right of action,[12] violation of an OSHA regulation is evidence of negligence or, in appropriate circumstances, **negligence per se**.[13] Melerine v. Avondale Shipyards, Inc., 659 F.2d 706 (5th Cir. 1981); see also, National Marine Services, Inc. v. Gulf Oil Co., 433 F.Supp. 913, 919-920 (E.D.La.1977), aff'd 608 F.2d 522 (5th Cir. 1979); Buhler v. Marriott Hotels, Inc., 390 F.Supp. 999 (E.D.La.1974).[14] The district court did not err in admitting the regulations in evidence over the objection that OSHA prohibited their introduction.[15]

**\*1239** B.

The court admitted into evidence over Hardaway's objection a portion of the deposition of a safety engineer who had occasionally inspected the Amelia Island construction site. The deposition indicated that on one inspection "there might have been some floor and wall openings that needed guarding," that "job site housekeeping should be improved," and that the engineer had seen an employee without safety goggles chipping concrete and another employee using a stud gun without certification. Hardaway contends that the admission of these portions of the deposition was error because the evidence was irrelevant to the accident in issue and was prejudicial and inflammatory.

[11]    [12]    Even if the admission of portions of the deposition was error, we hold that the error was harmless. Errors in evidentiary rulings are not reversible unless prejudice results. Fed.R.Civ.P. 61; Fed.R.Evid. 103; King v. Gulf Oil Co., 581 F.2d 1184 (5th Cir. 1978). The improper admission of evidence which is merely cumulative of matters shown by other admissible evidence is harmless error. Coughlin v. Capitol Cement Co., 571 F.2d 290, 307 (5th Cir. 1978); American Motorists Ins. Co. v. Landes, 252 F.2d 751 (5th Cir. 1958). The admission of the reference in the deposition to a Hardaway employee who was using a stud gun without certification may have been error because of the possible lack of connection between that incident and the injury to Rabon. But in light of the abundant evidence that Jackson was using a stud gun without certification on the occasion of Rabon's injury, and that other uncertified employees, including Rabon, were also using stud guns at that time, all of which evidence was introduced without objection, any error in this regard was harmless.

The admission of references to unsatisfactory job site housekeeping and to one failure to wear safety goggles while chipping concrete was, even if error, harmless. Those references constituted twelve lines out of approximately 550 lines of the portion of the safety engineer's deposition that was introduced in evidence; the deposition was one of thirteen that was read to the jury. The references objected to were a mere shred of the totality of the evidence which was presented in the five day trial, and can hardly be said to be dramatic or inflammatory. Moreover, while Hardaway asserts that this evidence inflamed the jury and diverted it from its consideration of the facts of this case, Hardaway does

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

not suggest that any reference to this evidence was made in argument to the jury. Thus, we have no reason to suspect that the evidence had any potential for prejudice or that any attempt was made to put the evidence to prejudicial use.

IV.

In its final decree, the district court retained jurisdiction of the action for the purpose of awarding attorneys' fees in connection with the defendants' indemnity claims against Hardaway. The court held a hearing on the defendants' motions for fees and costs. Though contesting the defendants' entitlement to fees, Hardaway stipulated that if it were liable for fees, reasonable attorneys' fees would be $20,481.00 for Omark and $13,354.80 for Automatic. The court subsequently granted the defendants' motions for fees in the stated amounts, rejecting Hardaway's contention that the defendants' entitlement to fees should have been tried to the jury. Hardaway now urges that the district court erred by

awarding fees without having submitted the question to the jury.

[13]   [14]   The district court ruled correctly that the question of attorneys' fees was not for the jury. In Florida, the prevailing party in an indemnity action is entitled as a matter of law to reasonable attorneys' fees incurred in defense of the principal claim. Borg-Warner Acceptance Corp. v. Philco Finance Corp., 356 So.2d 830 (Fla. 1st Dist.Ct.App.1978); *1240 Pender v. Skillcraft Industries, Inc., 358 So.2d 45 (Fla. 4th Dist.Ct.App.1978). Although the amount of a reasonable fee is a jury question, Hardaway's stipulation to the reasonableness of the amounts awarded removed that question from dispute.

AFFIRMED.

All Citations

672 F.2d 1231, 10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

Footnotes

*     Former Fifth Circuit Case, Section 9(1) of Public Law 96-452 October 14, 1980.

1     Automatic is a wholly owned subsidiary of Allied Products Corporation, which was also named as a defendant. Allied Products Corporation was jointly liable with Automatic. We refer to the two collectively as Automatic. This opinion will refer to Automatic and Omark together as defendants.

2     All agree that Florida substantive law governs this case.

3     In fact, Hardaway does not advance its argument in terms of an asserted error by the district court, and intimates nowhere in its discussion of the Florida law of indemnity in what way the district court's purported misapplication of that law led to error. Although probably not obliged to do so in the face of such a defect, see, e.g., Spellacy v. Southern Pacific Co., 428 F.2d 619 (9th Cir. 1970), we nonetheless reach the merits of Hardaway's argument. If Hardaway's view of the Florida law of indemnity were correct, then the district court's denial of Hardaway's motion to dismiss the third party complaint was reversible error. We therefore treat this appeal as assigning error to that ruling.

4     See Chesrow, Howard, and Howard, Fault and Equity: Implied Indemnity after Houdaille, 34 U.Miami L.Rev. 727, 749 (1980).

5     See Chesrow, Howard, and Howard, supra note 5, at 748. The authors also assert that the complaint against the indemnitee must allege a cause of action based at least in part on imputed liability. Subsequent developments in Florida law have proven this apparently sound reading of Houdaille inaccurate. See Atlantic Coast Development Corp. v. Napoleon Steel Contractors, Inc., 385 So.2d 676 (Fla. 3d Dist.Ct.App.1980), discussed at p. 1236 infra.

6     See Dayton Tire and Rubber Co. v. Davis, 348 So.2d 575, 581 (Fla. 1st Dist.Ct.App.1977), rev'd on other grounds sub nom. Goodyear Tire & Rubber Co. v. Hughes Supply, Inc., 358 So.2d 1339 (Fla.1978); Walker v. National Gun Traders, Inc., 116 So.2d 792 (Fla. 3d Dist.Ct.App.1960).

Rabon v. Automatic Fasteners, Inc., 672 F.2d 1231 (1982)

10 Fed. R. Evid. Serv. 851, 1982 O.S.H.D. (CCH) P 26,018

7    We are bound by the decision of the district court of appeal as we would be by a decision of the Florida Supreme Court. See Mott v. Mitsubishi International Corp., 636 F.2d 1073 (5th Cir. 1981).

8    Hardaway did not assert at trial or on appeal that the third party complaint should be dismissed or struck in part. Nor did Hardaway contend at trial or on appeal that the third party claim should have been submitted to the jury on the failure to warn theory but not on the strict liability theory. Finally, Hardaway does not contend that the jury's general verdict is impeachable because it was based on the wrong theory.

9    At trial, the district court initially reserved ruling on Hardaway's motion and then failed to rule on it altogether. We therefore remanded the case so that the court could make its ruling. The findings of fact and conclusions of law reported in the text comprised the district court's order on remand.

10   "Fasteners shall not be driven directly into materials such as brick or concrete closer than 3 inches from the unsupported edge or corner, or into steel surfaces closer than one-half inch from the unsupported edge or corner, unless a special guard, fixture, or jig is used...." 29 C.F.R. s 1910.243(d) (4)(ix)(a) (1974).

11   "Only employees who have been trained in the operation of the particular tool in use shall be allowed to operate a powder-actuated tool." 29 C.F.R. s 1926.302(e)(1) (1974).

12   OSHA, 29 U.S.C. s 653(b)(4) (1976), provides:

   Nothing in this chapter shall be construed to supersede or in any manner affect any workmen's compensation law or to enlarge or diminish or affect in any other manner the common law or statutory rights, duties, or liabilities of employers and employees under any law with respect to injuries, diseases, or death of employees arising out of, or in the course of, employment.

   We have read s 653(b)(4) and the legislative history of OSHA to say that OSHA did not create a new private cause of action. Jeter v. St. Regis Paper Co., 507 F.2d 973 (5th Cir. 1975) (dictum).

13   To establish that the violation of a statute or regulation, including OSHA, is negligence per se, a plaintiff must prove "th(e) violation of a statute which is intended to protect the class of persons to which the plaintiff belongs against the risk of the type of harm which has in fact occurred." Melerine v. Avondale Shipyards, Inc., 659 F.2d 706, 709 (5th Cir. 1981), quoting Marshall v. Isthmian Line, Inc., 334 F.2d 131, 134 (5th Cir. 1964). If the plaintiff thus establishes negligence, he must then prove that the violation was the proximate cause of his injury. Melerine, 659 F.2d at 710. Since Hardaway does not challenge the jury instruction that violation of either OSHA regulation constituted negligence, we need not decide whether any such violation was negligence per se.

14   In this diversity case, federal law governs procedural matters, Southern Pac. Transp. Co. v. Smith Material Co., 616 F.2d 111 (5th Cir. 1980), including the admissibility of evidence. Johnson v. William C. Ellis & Sons Iron Works, Inc., 604 F.2d 950 (5th Cir. 1980).

15   We question whether the OSHA regulations were relevant to any issue in this case; they were not relevant to Rabon's claim against Omark and Automatic, since they were not his employer; they were probably not relevant to Omark's and Automatic's indemnity claim against Hardaway, since that action was grounded in Hardaway's obligation to make its workers available for training in the proper use of the stud gun. However, since Hardaway did not object to the admission of the OSHA regulations on such grounds at trial, (or, for that matter, on appeal), we need not decide this question. See Fed.R.Civ.P. 46; Colonial Refrigerated Transportation, Inc. v. Mitchell, 403 F.2d 541, 552 (5th Cir. 1968).

---

End of Document                                          © 2022 Thomson Reuters. No claim to original U.S. Government Works.

Sinegal v. Ryan Marine Services, 712 F.Supp.2d 597 (2008)

712 F.Supp.2d 597
United States District Court, S.D. Texas, Houston Division.

Forest SINEGAL, Plaintiff,
v.
RYAN MARINE SERVICES,
et al., Defendants.

Civ. No. 3:07–cv–0141.
|
Sept. 8, 2008.

**Synopsis**
**Background:** Worker brought action under Outer Continental Shelf Lands Act (OCSLA) against off-shore platform owner and operator, boat operator, boat, crane operator, and others to recover for injuries he sustained while being transferred from platform to boat. Platform owner and operator moved for summary judgment.

**Holdings:** The District Court, Keith P. Ellison, J., held that:

[1] statutes governing liability of property owners for injuries arising from failure to provide safe workplace were applicable to protect platform owner;

[2] owner was not liable for employee's injuries; and

[3] owner did not have non-delegable duty to ensure employee's safety.

Motion granted.

West Headnotes (8)

[1]     **Negligence** ⇐ Duty to warn
        **Negligence** ⇐ Safe Workplace Laws
        Under Texas law, property owner is not liable for injuries to independent contractor unless it has actual knowledge of dangerous activity resulting in injury and fails to adequately warn of danger.

V.T.C.A., Civil Practice & Remedies Code § 95.003.

2 Cases that cite this headnote

[2]     **Shipping** ⇐ Dangerous or Defective Condition of Vessel, Appliances, or Places for Work
        Under Texas law, as predicted by the district court, injuries sustained by independent contractor's employee when he fell from personnel basket during transfer from off-shore platform to boat arose from contractor's work on improvement to real property, and thus statutes governing liability of property owners for injuries arising from failure to provide safe workplace were applicable to protect platform owner, even though contractor had ceased work and was not on platform, where transportation to and from platform was required for him to perform his work. V.T.C.A., Civil Practice & Remedies Code §§ 95.002, 95.003.

1 Cases that cite this headnote

[3]     **Negligence** ⇐ Necessity and Existence of Duty
        **Negligence** ⇐ Ownership, custody and control
        **Negligence** ⇐ Safe Workplace Laws
        Under Texas law, property owner can retain right to control aspect of independent contractor's work so as to give rise to duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control. V.T.C.A., Civil Practice & Remedies Code § 95.003.

2 Cases that cite this headnote

[4]     **Negligence** ⇐ Ownership, custody and control
        **Negligence** ⇐ Safe Workplace Laws
        Under Texas law, in order for property owner's duty of care to independent contractor to arise, property owner's right of control must not merely be general or supervisory but must extend to

Sinegal v. Ryan Marine Services, 712 F.Supp.2d 597 (2008)

operative detail of contractor's work so that contractor is not free to do work in its own way, and to injury-producing activity itself. V.T.C.A., Civil Practice & Remedies Code § 95.003.

7 Cases that cite this headnote

[5]    **Labor and Employment** ⬅ Extent of Control

Under Texas law, for general contractor to be liable for its independent contractor's acts, it must have right to control means, methods, or details of independent contractor's work, control must relate to injury that negligence causes, and contract must grant contractor at least power to direct order in which work is to be done.

3 Cases that cite this headnote

[6]    **Shipping** ⬅ Dangerous or Defective Condition of Vessel, Appliances, or Places for Work

Under Texas law, off-shore platform owner did not control its independent contractors' work, and thus was not liable for injuries sustained by independent contractor's employee during transfer from platform to boat, even though owner required all contractors to abide by its safety rules and regulations, and owner was aware of other accidents involving crane and personnel basket transfers, where crane used for transfer was operated by employee of another independent contractor, contracts in question did not give owner right to control work, none of owner's employees were on platform at time of accident, employees did not take their directions and instructions from owner, and none of owner's safety procedures specifically proscribed manner in which personnel basket transfers were to be made. V.T.C.A., Civil Practice & Remedies Code § 95.003.

[7]    **Negligence** ⬅ Ownership, custody and control

**Negligence** ⬅ Safe Workplace Laws

Under Texas law, merely exercising or retaining general right to recommend safe manner for

independent contractor's employees to perform their work is not enough to subject premises owner to liability. V.T.C.A., Civil Practice & Remedies Code § 95.003.

[8]    **Shipping** ⬅ Degree of care required and duty to give warning

Off-shore platform owner did not have non-delegable duty under Occupational Safety and Health Administration (OSHA) and Mineral Management Services (MMS) regulations to ensure safety of independent contractors' employees working on platform.

**Attorneys and Law Firms**

*598 Pamela Brookey Lolan, River Ridge, LA, Russell Scott Briggs, Fibich Hampton et al., Houston, TX, for Plaintiff.

James J. Sullivan, Austin, TX, Frank Anthony Piccolo, Preis Roy, Houston, TX, for Defendants.

*599 *MEMORANDUM AND ORDER*

KEITH P. ELLISON, District Judge.

Pending before the Court is Defendant Maritech Resources, Inc.'s Motion for Summary Judgment. For the following reasons, Defendant's Motion, Doc. No. 61, is **GRANTED.**

**I. BACKGROUND**

**A. Factual Background**[1]

Plaintiff was employed by Dynamic Industries, Inc. ("Dynamic") as a welder/rigger/fitter to perform work on the Maritech High Island A 560 stationary platform off the coast of Galveston in the Gulf of Mexico. Two members of the Dynamic crew, Plaintiff and his brother Jonathan, worked on the platform, but at night slept on a boat, the RMS Atlantis, operated by Ryan Marine Services, Inc. ("Ryan Marine"). On March 22, 2006, Plaintiff was changing out grating and handrails on the platform. Around 10:30 p.m., Plaintiff's supervisor told him it was time to leave the

Sinegal v. Ryan Marine Services, 712 F.Supp.2d 597 (2008)

platform, and advised Plaintiff he was going to get the crane operator to transfer Plaintiff and his brother to a work boat, the RMS Atlantis, via Billy Pugh basket.[2] Gregg Williams, an employee of Baker/MO Services, Inc. ("Baker/MO") was operating the crane that transfers the basket from the platform to the boat. Plaintiff alleges that during the basket transfer from the platform to the boat, high winds and rough conditions prevented Williams from controlling the basket, and caused the basket to strike the crew boat port stacks and hit the railing of the boat. Plaintiff claims that, as a result, he lost his footing and fell to the deck of the boat, suffering severe injuries to his neck, back, wrist, and knee.[3]

Plaintiff subsequently brought suit against Maritech, Ryan Marine, Baker/MO, Williams, and others. (Pl.'s Fourth Am. Compl., Doc. No. 56.) This Court has jurisdiction over the lawsuit in admiralty pursuant to 28 U.S.C. § 1333.

### B. Relationship Between the Parties

Maritech was the owner and operator of the platform. Maritech has a mineral lease with the federal government for production of petroleum at the platform.

Plaintiff's employer, Dynamic, contracted with Maritech to repair damage to the platform caused by Hurricane Rita. A Master Service Agreement between Dynamic and Maritech states that Dynamic was an independent contractor. (Doc. No. 61, Dynamic Master Serv. Agree., Sec. 6 ("Contractor shall be an independent contractor as to all Work. Company shall have no control or direction over Contractor or Contractor's employees ... Company being only interested in the results obtained.").) Section 8 of the Dynamic Master Service Agreement, entitled "Safety," also provides:

It is understood by the parties that Contractor is an independent contractor and Company has no responsibility or duty to supervise Contractor's safety and health programs relative to the work. Contractor covenants, warrants and represents that all work performed by it hereunder shall be performed in the safest manner possible, consistent within industry standards and in strict compliance with all applicable rules, regulations, statutes, policies, and procedures of each governmental authority having *600 jurisdiction over the Work performed. Contractor and its employees, agents, and subcontractors shall abide fully with all applicable Company safety rules and regulations

(Doc. No. 61, Dynamic Master Serv. Agree., Sec. 8.)

Maritech also contracted with Defendant Baker/MO to provide operating services, including the provision of a crane operator. Baker/MO and Maritech also had a Master Service Agreement stating that Baker/MO was an independent contractor. (*See, e.g.*, Doc. No. 61, Ex. A, p. 19–23; Depo. Ex. 3; Baker/MO Master Serv. Agree, Sec. 6 ("Contractor shall be an independent contractor as to all work. Company shall have no control or direction over Contractor or Contractor's employees and its subcontractors and their employees. Company being only interested in the results obtained.").) Section 8 of the Agreement, entitled "Safety," provides:

It is understood by the parties that Contractor is an independent contractor and Company has no responsibility or duty to supervise Contractor's safety and health programs relative to the work. Contractor covenants, warrants and represents that all work performed by it hereunder shall be performed in the safest manner possible, consistent within industry standards and in strict compliance with all applicable rules, regulations, statutes, policies, and procedures of each governmental authority having jurisdiction over the Work performed. Contractor and its employees, agents, and subcontractors shall abide fully with all applicable Company safety rules and regulations

(Doc. No. 61, Baker/MO Master Serv. Agree, Sec. 8.)[4] Gregg Williams, who was operating the crane at the time of the accident, was an employee of Baker/MO. Williams held the title of "lead operator." (Doc. No. 61, Ex. E at 16.)

Maritech also contracted with Offshore Oil Services (OOS) to subcharter the RMS Atlantis. Defendant Ryan Marine operated the crew boat that Plaintiff was attempting to board at the time of the accident.

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. Fed. R. Civ. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett,* 247 F.3d 206, 210 (5th Cir.2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics*

Sinegal v. Ryan Marine Services, 712 F.Supp.2d 597 (2008)

*Corp.,* 234 F.3d 899, 902 (5th Cir.2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. *See, e.g., Eason v. Thaler,* 73 F.3d 1322, 1325 (5th Cir.1996); *see also Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (noting that a **\*601** non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

### III. ANALYSIS

Defendant Maritech contends that it cannot be held liable as a property owner for personal injury to an independent contractor under Section 95 of the Texas Civil Practice and Remedies Code. Plaintiff contends that Section 95 does not apply to this case because Plaintiff was off premises when injured and completed work, and that even if Section 95 does apply, Maritech may be held liable for his injuries. Plaintiff also argues that Maritech is liable for Gregg William's actions based on a theory of non-delegable duty.

### A. Outer Continental Shelf Lands Act

Parties agree that the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1331, applies to this case. Under OCSLA the law of the adjacent state—in this case, Texas —applies unless state law is inconsistent with federal law or regulations. 43 U.S.C. § 1333. The Southern District of Texas has clarified that for adjacent state law to apply under OCSLA: "(1) the controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto); (2) federal maritime law must not apply of its own force; and (3) the state law must not be inconsistent with federal law." *Franks v. Chevron Corp.,* No. 3:06–cv–506, 2007 WL 2330296, at \*1 (S.D.Tex. Aug. 13, 2007) (citing *Union Tex. Petroleum Corp. v. PLT Eng'g,* 895 F.2d 1043, 1047 (5th Cir.1990)).

Here, parties do not dispute that the platform constitutes a situs covered by OCSLA. *See also Franks,* 2007 WL 2330296 at \*3 ("[T]he situs rule will be satisfied if, at the time of the injury, the worker was in physical contact with the platform or some appurtenance thereto.") (citing *Hodgen v. Forest Oil Corp.,* 87 F.3d 1512, 1527 (5th Cir.1996).) Nor does either party contend that federal maritime law applies of its own force. Although Plaintiff discusses Occupational Safety

and Health Standards (OSHA) and the Mineral Management Services (MMS) regulations at length in support of his non-delegable duty theory, he does not argue that Chapter 95 of the Texas Civil Remedies and Procedure Act is inconsistent with federal law. *See also Franks,* 2007 WL 2330296 at \*4 (finding that Chapter 95 was not inconsistent with federal law).

### B. Chapter 95 of the Texas Civil Practice and Remedies Code

Prior to the passage of Chapter 95, Texas common law controlled premises liability claims brought by an injured independent contractor who was performing work for a premises owner or contractor. *See Arsement v. Spinnaker Exploration Co., LLC,* 400 F.3d 238, 244 (5th Cir.2005). Under Texas common law, "[t]he general rule is that an owner ... does not have a duty to see that an independent contractor performs work in a safe manner." *Redinger v. Living, Inc.,* 689 S.W.2d 415, 418 (Tex.1985). A property owner or contractor "was liable [under Texas common law] for negligent activity only if it controlled the independent contractor's methods of work *and* failed to take reasonable care for such control." *Id.* (emphasis in original) (citing *Redinger,* 689 S.W.2d at 418).

**[1]** In 1996, the Texas legislature passed Chapter 95 of the Texas Civil Practice and Remedies Code as part of a broader "tort reform" effort. *See, e.g., Arsement,* 400 F.3d at 245; **\*602** *Spears v. Crown Central Petroleum Corp.,* 133 Fed.Appx. 129, 130 (5th Cir.2005) (unpublished). Chapter 95 "provide[s] greater protection for property owners" against negligent activity claims by independent contractors. *Arsement,* 400 F.3d at 245. Where Chapter 95 applies, a property owner is not liable for injuries to an independent contractor "who constructs, repairs, renovates, or modifies an improvement to real property, including personal injury, death, or property damage arising from the failure to provide a safe workplace," unless:

> (1) the property owner exercises or retains some control over the manner in which the work is performed, other than the right to order the work to start or stop or to inspect progress or receive reports; and

> (2) the property owner had actual knowledge of the danger or condition resulting in the personal injury, death, or property damage and failed to adequately warn.

Tex. Civ. Prac. & Rem.Code § 95.003. Chapter 95 therefore codifies the holding in *Redinger* regarding control, but modifies the common law approach by protecting the

property owner from liability unless it has *actual* knowledge of the dangerous activity resulting in the injury and fails to adequately warn of the danger. *Arsement,* 400 F.3d at 245; *see also Phillips v. The Dow Chemical Co.,* 186 S.W.3d 121, 132 (Tex.App.-Houston [1 Dist.] 2005).

### 1. Chapter 95 Applies to Plaintiff's Claims

Plaintiff argues that Chapter 95 does not apply to his claim because he was injured when he was off the clock and off the Maritech premises.

Chapter 95 applies only to a claim:

> (1) against a property owner, contractor, or subcontractor for personal injury, death, or property damage to an owner, a contractor, or a subcontractor or an employee of a contractor or subcontractor; and

> (2) that arises from the condition or use of an improvement to real property where the contractor or subcontractor constructs, repairs, renovates, or modifies the improvement.

Tex. Civ. Prac. & Rem.Code § 95.002. The defendant bears the burden of showing that Chapter 95 applies to a plaintiff's claim. *See Jones v. Apache Corp.,* No. G–05–499, 2007 WL 656268, at *2 (S.D.Tex. Feb. 27, 2007). Chapter 95 applies to both premises defect claims and to negligent activity claims. *Arsement,* 400 F.3d at 249 (citing *Francis v. Coastal Oil & Gas Corp.,* 130 S.W.3d 76, 84 (Tex.App.-Houston [1st Dist.] 2003, no pet.)). Although the Texas Supreme Court has not yet considered a Chapter 95 case, Texas Courts of Appeal have construed Chapter 95 broadly. *See Spears,* 133 Fed.Appx. at 131.

Despite the language of Section 95.002 requiring that the claim "arise [ ] from the condition or use of an improvement to real property," Texas courts have applied Chapter 95 even where the defective condition or activity leading to the injury was not the direct object of the independent contractor's work. In *Fisher v. Lee and Chang Partnership,* the Appeals Court noted that "[t]he statute does not require that the defective condition be the object of the contractor's work," and applied Chapter 95 where the appellant was injured while using a "ladder to reach the roof to perform his job, the repair of air conditioning units." 16 S.W.3d 198, 201 (Tex.App.-Houston [1 Dist.] 2000). The *Fisher* court additionally noted that the ladder "provided appellant a means to reach his work site. It was not the object of his work. Nevertheless, appellant's injuries arose from 'the failure to provide a safe

workplace.' " 16 S.W.3d at 202 (citing Tex. Civ. Prac. & Rem.Code § 95.003). **\*603** The *Fisher* court discussed the legislative history of Chapter 95, and concluded that the injury-producing defect must only "relate to" the contractor's work. *Id.* at 202. Likewise, in *Clark v. Ron Bassinger,* a Texas Court of Appeals applied Chapter 95 where an independent contractor who was working on the room of a home fell through a skylight opening and was injured. No. 07–03–0291–CV, 2006 WL 229901, at *1 (Tex.App.-Amarillo Jan. 31. 2006). The *Clark* court, citing *Fisher,* rejected the argument that Chapter 95 did not apply because Clark's injury was unrelated to his plumbing work:

> Clark was engaged in the construction of an improvement to real property. His duties required him to work on the roof. As in *Fisher,* although the covered skylight opening was not the object of Clark's work, it was an unsafe part of his workplace and his injury arose from the failure to provide him a safe workplace.

*Id.* at *2. Unlike the case before the Court, in both *Clark* and *Fisher,* however, the injured party was engaged in the performance of his work and was on the property owner's premises.

At least one federal District Court has held that Chapter 95 applies to a claim, even though the plaintiff was not on the property owner's premises at the time he was injured. In *Franks v. Chevron,* the plaintiff was providing maintenance on a platform. No. 3:06–cv–506, 2007 WL 2330296, at *1 (S.D.Tex. Aug. 13, 2007). The plaintiff was ordered to transfer to a vessel located alongside the platform to "rig up a container on the vessel in order to offload it to the platform." While on the adjacent vessel, plaintiff slipped while climbing off the container, and fell onto the deck, sustaining injuries. *Id.* The Southern District of Texas rejected plaintiff's argument that Chapter 95 did not apply to his claims against the platform owner because his injury was not sustained on the platform itself, and instead found that the vessel was "merely an extension of the premises." *Id.* at *6. The court explained:

> Accepting Plaintiff's argument that his claim is not a premises liability claim because he was injured on the Seacor vessel would require a hyper-technical application of the statute and would undermine the legislative intent of providing greater protection for property owners against independent contractor's negligence claims. Although the Plaintiff was "fortuitously positioned" on the vessel at the time of his accident, he was similar to all the other plaintiffs in cases applying Chapter 95 in that he was injured while in the course of modifying the improvement, that is adding

a storage container to the platform. The nature of offshore drilling platforms, because of their size and location, make them ill-equipped for having on premises all the necessary equipment. Therefore, transportation vessels are necessary for transporting people and equipment back and forth from offshore platforms. For purposes of premises liability, the vessel was merely an extension of the premises. A premises which the Plaintiff was required, as a part of job duties, to perform work on.

*Id.* (internal citations omitted). Notably, however, the *Franks* court emphasized that the plaintiff was injured while he was actually performing work related to modification of the improvement. *Id.*

The Court is unaware of any Texas case applying Chapter 95 to an injury sustained where the plaintiff was no longer performing any work nor was located on the premises. *Spears v. Crown Central Petroleum,* an unpublished Fifth Circuit case, comes the closest to reaching such a conclusion. In *Spears,* the court found that Chapter 95 applied where an independent contractor tripped on steel-braided hoses lying across *604 his path. *Spears,* 133 Fed.Appx. at 129, 131 (emphasizing that "the Texas intermediate courts of appeals have unanimously construed chapter 95 broadly"). The plaintiff tripped on the hoses after he had finished performing his work and was headed to a tool shed. *Id.* at 129. The tool shed presumably was located on the property owner's premises, however.

[2]    Although there is no precedential case directly on point, the Court finds that the application of Chapter 95 is appropriate in this case. Both the Southern District of Texas and the Fifth Circuit, albeit in non-precedential opinions, have emphasized the broad reading of Chapter 95 by the Texas appellate courts. Although Plaintiff was not working on the improvement at the time of his injury, the crane and Billy Pugh basket provided him with a "means to reach his worksite," as did the ladder in *Fisher.*[5] Such transportation, particularly in the context of offshore platform work, can be considered "related to" Plaintiff's work. *See Franks,* 2007 WL 2330296 at *6 (finding transportation vessel to be an extension of an offshore platform and discussing the special nature of offshore platform work). The *Spears* court found that Chapter 95 may apply to an injury sustained shortly after a contractor concluded his work, and this Court likewise finds that Chapter 95 applies in this case even though Plaintiff was no longer on the clock. As the Court explains below, however, even if Chapter 95 did not apply, Plaintiff's claims would be barred under the common-law outlined under *Redinger.*

**2. Plaintiffs Claims Are Barred by Chapter 95 and *Redinger***

In order for a property owner to be liable to an independent contractor, the property owner must: 1) exercise "some control over the manner in which the work is performed;" 2) have "actual knowledge of the danger or condition" resulting in the injury; and 3) fail to adequately warn. Tex. Civ. Prac. & Rem.Code § 95.003.

Maritech argues that it may not be held liable under Chapter 95 because it had no contractual right to control nor did it exercise actual control over the operation of the crane and personnel basket. Plaintiff argues that there is at least a genuine issue of material fact as to whether Maritech controlled the personnel basket transfer.[6]

In *Redinger,* the Texas Supreme Court adopted the Second Restatement approach to determining whether a property owner owes a duty to an independent contractor. 689 S.W.2d at 418. Several Texas appellate courts have acknowledged that Section 95.003(1), regarding control, is simply a codification of this holding in *Redinger. See, e.g., Phillips v. The Dow Chemical Co.,* 186 S.W.3d 121, 132 (Tex.App.-Houston [1 Dist.] 2005).

[3]    A property owner "can retain the right to control an aspect of an independent contractor's work so as to give rise to a duty of care to that independent contractor's employees in two ways: by contract or by actual exercise of control." *605 *Lee Lewis Const., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex.2001). The question of whether a contract gives a right of control is generally a question for the court, while the question of actual control is "generally a question of fact for the jury." *Id.*

[4]    [5]    In order for such a duty to arise, the property owner's "right of control must not merely be general or supervisory but must extend to the 'operative detail' of the contractor's work so that the contractor is not free to do the work in its own way, and to the injury-producing activity itself." *Id.* at 792. "The right to control must be more than a general right to order work to stop and start, or to inspect progress." *Coastal Marine Service of Texas, Inc. v. Lawrence,* 988 S.W.2d 223 (Tex.1999); *see also* Tex. Civ. Prac. & Rem.Code § 95.003(1); *Redinger,* 689 S.W.2d at 418 (citing Restatement (Second) of Torts § 414, cmt. c). The Texas Supreme Court further clarified in *Dow Chemical v. Bright:*

For a general contractor to be liable for its independent contractor's acts, it must have the right to control the means, methods, or details of the independent contractor's work. Further, the control must relate to the injury the negligence causes, and the contract must grant the contractor at least the power to direct the order in which work is to be done. 89 S.W.3d 602, 607 (Tex.2002); *see also Arsement,* 400 F.3d at 252.

[6]    In this case, the relevant contracts provide Maritech with no right to control its independent contractors' work. The Court's inquiry is therefore specifically directed to whether Maritech actually controlled the injury-producing activity, i.e., the transfer of Plaintiff via Billy Pugh basket to the RMS Atlantis.

Defendant argues that Maritech exercised no actual control over the basket transfer. It is undisputed that Gregg Williams, a Baker/MO employee, was operating the crane that transferred Plaintiff from the platform to the *RMS Atlantis.* The parties also concede there were no Maritech personnel on the platform at the time of the accident. Nor is there any argument that Maritech in any other way controlled Plaintiff's entry and exit from the platform, or that Maritech controlled the manner in which Plaintiff himself conducted his work. Plaintiff admits that he took his job directions and instructions from Dynamic supervisors or occasionally the Baker/MO lead operator. Plaintiff's own supervisor instructed him it was time to leave for the day and went to get the Baker/MO crane operator to make the crane transfer.[7]

Williams testified that, as lead operator, he was "responsible for the production, maintaining the maintenance, and the compliance, the logistics" and "everything that goes on on the platform." (Doc. No. 61, Ex. E.) Williams had been trained on how to operate the crane during a personnel basket transfer, but there is no allegation that this training was provided by Maritech. (*Id.*) Williams was paid by Baker/MO and Baker/MO provided him with a written job description setting forth his duties and responsibilities as lead operator. (*Id.*)

According to Plaintiff, Maritech is required to designate a "person in charge" at each facility under the relevant MMS regulations. As "lead operator," Williams was the "person in charge" of the Platform. Russell Steiner, the Maritech safety and compliance superintendent, testified that Maritech delegated safety of the workplace **\*606** to Baker/MO through Williams, the lead operator. (Doc. No. 62, Ex. 18,

at 56–57.) Williams was responsible for providing a Maritech safety orientation to all new employees and subcontractors before entering a work area. (*Id.* at 86–87.) David Boudreaux, Maritech's production manager and corporate representative, testified that Maritech requires all contractors to abide by Maritech safety rules and regulations. (Doc. No. 62, Ex. 12, at 22–23; *see also* Herron Depo, Doc. No. 62, Ex. 13 at 18, 20 (testifying that Baker/MO's safety program on the platform was in accordance with Maritech policies and adding that he and his crew were the "eyes and ears of Maritech" on the platform.) Plaintiff also notes that Maritech safety rules and regulations were present on the platform along with a platform orientation sheet informing contractors what they may and may not do and alerting them to any hazards. (Doc. No. 62, Ex. 18, at 80–81; *see also* Doc. No. 62, Ex. 12, at 35.) The contractors initial and sign the orientation sheet. (*Id.*) Williams also filled out an accident investigation on a Maritech form. (*Id.* at 75–76; Doc. No. 62, Ex. 19; *see also* Williams Depo., Doc. No. 62, Ex. 14, at 28–29.)

None of Maritech's safety procedures specifically proscribe the manner in which personnel basket transfers are to be made or the weather conditions that would warrant cancellation of a transfer. (See Doc. No. 61, Ex. A, 44–45.) Plaintiff emphasizes, however, that Maritech was aware of several accidents involving crane and personnel basket transfers, and had issued a Maritech Safety Alert to persons in the offshore field about this problem. (Doc. No. 62, Ex. 18, at 105–06; 112–14; Doc. No. 62, Ex. 21.)

Plaintiff additionally provides some evidence as to Maritech's control over Williams' activities in areas unrelated to safety. Plaintiff points out, for example, that Williams did production reports on Maritech forms. (Doc. No. 62, Ex. 14, 17–18.) Plaintiff additionally points out that Williams approved and signed time tickets of subcontractor Dynamic. (*Id.* at 58–60; Doc. No. 62, Ex. 24.) Williams did testify that he had daily, weekly, and monthly assignments that came from Baker/MO and Maritech. (Doc. No. 61, Ex. E, 114.) Williams also testified that Maritech did not ever direct him on the method and manner of doing personnel basket transfers. (*Id.* at 117.)

[7]    Plaintiff's evidence that Maritech required its independent contractors to comply with Maritech safety regulations is not sufficient to establish the kind of control required by Section 95.003. "Merely exercising or retaining a general right to recommend a safe manner for the independent contractor's employees to perform their work is not enough to subject a premises owner to liability." *Koch Ref. Co.*

*v. Chapa,* 11 S.W.3d 153, 155 (Tex.1999); *Arsement,* 400 F.3d at 252 (citing *Dow,* 89 S.W.3d at 607). If a premises owner's control is limited to requiring a subcontractor to comply with the owner's safety regulations, the owner owes the subcontractor's employees only a "narrow duty of care that its safety requirements and procedures do not unreasonably increase the probability and severity of injury." *Dow,* 89 S.W.3d at 607 (citing *Hoechst–Celanese Corp. v. Mendez,* 967 S.W.2d 354, 358 (Tex.1998)). The narrow duty that arises from requiring a subcontractor to follow an owner's safety regulations has been interpreted to encompass only "a duty that any safety requirements and procedures [the owner] promulgated did not unreasonably increase, rather than decrease, the probability and severity of injury." *Hoechst–Celanese Corp.,* 967 S.W.2d at 358; *see also Koch,* 11 S.W.3d at 156 (finding that the presence of an owner's **\*607** safety representative and the owner's prior instructions to a contractor's employees to perform their work in a safe manner did not constitute the kind of control needed to create a duty); *Dow,* 89 S.W.3d at 608. There is absolutely no evidence in this case that Maritech's general safety requirements and procedures increased the probability and severity of Plaintiff's injury. While Maritech did not have specific safety regulations regarding personnel basket transfers, the Maritech Safety Alert issued February 20, 2006 did outline measures to prevent problems with personnel basket transfers. (Doc. No. 62, Ex. 21.) Plaintiff does not argue, however, that these measures increased the probability or severity of Plaintiff's injury. Indeed, nothing in the measures would appear to do so.

Any other control that Maritech may have exercised over Williams' in terms of production reports or time records appears entirely unrelated to the work that produced plaintiff's injury. Thus, this kind of control would not impose a duty on Maritech under Section 95.003.

Plaintiff relies on the Southern District of Texas' holding in *Franks v. Chevron Corp.* in support of its argument that these facts are sufficient to create a genuine issue of material fact as to whether Maritech exercised the requisite control over the work that produced the alleged injury. No. 3:06–cv–506, 2007 WL 2330296 (S.D.Tex. Aug. 13, 2007). In *Franks,* however, there was evidence that the premises owner had directly, and allegedly negligently, instructed the plaintiff to perform the activity that led to his injury. *Id.* at *1, *7. No such evidence is present in this case.

The Court finds, therefore, that there is no genuine issue of material fact as to Maritech's control over the relevant work.

As a result, Plaintiff's claim against Defendant is barred under Section 95.003. Because Plaintiff has failed to establish that Maritech exercised the requisite control over this work, the Court need not reach the question of whether Maritech had actual knowledge of the danger or failed to adequately warn Plaintiff.[8]

Furthermore, because the "control" section of 95.003 codifies the common law requirement set forth in *Redinger,* Plaintiff's claims against Maritech would fail even if Chapter 95 did not apply in this case.

### C. Non–Delegable Duty and Vice–Principal

**[8]**    Plaintiff also argues that Maritech is liable for the actions of Williams because Maritech's duties under the Occupational Safety and Health Standards (OSHA) and the Mineral Management Services (MMS) regulations are non-delegable and because Williams was Maritech's vice-principal.[9]

The Fifth Circuit has already rejected the argument that MMS regulations impose an independent duty on a platform owner to maintain a safe workplace. *See, e.g.,* **\*608** *Fruge Ex. Rel Fruge v. Parker Drilling Co.,* 337 F.3d 558, 561–64 (5th Cir.2003) (noting that the MMS regulations "govern the parties" joint and several liabilities vis-à-vis the Government, not amongst themselves); *Dupre v. Chevron U.S.A., Inc.,* 109 F.3d 230, 231 (5th Cir.1997). The Fifth Circuit and other courts have further determined that OSHA does not create a private right of action, and thus does not impose any duty on an employer. *See, e.g., Jeter v. St. Regis Paper Co.,* 507 F.2d 973, 976–77 (5th Cir.1975) ("[N]o cause of action for such violations can be implied under OSHA to run in favor of a person who was not an employee of the violator against whom recovery is sought."). The Texas Courts of Appeals have also rejected the argument that OSHA regulations impose such a non-delegable duty on a premises owner, and have held that common law duties are not expanded by OSHA. *See, e.g., McClure v. Denham,* 162 S.W.3d 346, 352–54 (Tex.App.-Fort Worth 2005).

Plaintiff's reliance on *Denson v. Diamond Offshore Co.* is unavailing. 955 So.2d 730, 735, (La.App. 4 Cir.2007). In *Denson,* the Court noted that although *Fruge* held that no cause of action existed under MMS regulations, it "recognized the operational control exception based on Louisiana negligence law as espoused in *Coulter*" *Id.* The *Denson* court then concluded that a fact issue existed as to

Sinegal v. Ryan Marine Services, 712 F.Supp.2d 597 (2008)

whether a lease operator maintained operational control over an independent contractor's relevant acts. *Id.* The *Denson* court was clearly analyzing the relevant question of control, and not a question of non-delegable duty. To the extent that *Denson* reached a different conclusion than this Court on the question of control, the Court finds that the facts in *Denson* differed from those in the present case. The Court further observes that the *Denson* court was applying Louisiana law regarding any duty that might arises from a property owner or general contractor's requirement that an independent contractor comply with its safety regulations.

The Court finds, therefore, that Maritech did not owe Plaintiff a non-delegable duty to ensure his safety pursuant to the relevant MMR or OSHA regulations, and thus does not reach the question of whether Williams can be considered Maritech's Vice–Principal.

## IV. CONCLUSION

Defendant Maritech's Motion for Summary Judgment, Docket No. 61, is **GRANTED.** Plaintiff's claims against Defendant Maritech are **DISMISSED WITH PREJUDICE.** The Court does not, of course, wish to be understood as expressing any opinion as to Plaintiff's claims against other Defendants.

**IT IS SO ORDERED.**

**All Citations**

712 F.Supp.2d 597

## Footnotes

1    The relationships between and among the different parties are set forth in the following subsection.

2    A Billy Pugh basket is a rope basket hooked to a crane.

3    Parties dispute exactly how the accident occurred. Plaintiff also contends that Williams failed to warn him of any wind conditions and wave height and their potential effect on the crane operations. (Doc. No. 62, Ex. 2.)

4    The Court will not consider the Baker–Maritech "Work Agreement" submitted by Defendant as Exhibit B to its Motion for Summary Judgment. As Plaintiff correctly points out, the Work Agreement was executed in July 2006, four months after the accident at issue in this case.

5    Although the basket was being used in this instance to transport Sinegal from the worksite to his sleeping quarters, it was also used to transport him from the boat to the platform in the mornings.

6    This case involves two independent contractors—Dynamic (and its employee Sinegal) and Baker (and its employee Williams). Texas courts have clarified that the question of control must focus on the owner's control over the injury-producing activity itself. In this case, the injury producing activity was the transfer, by Billy Pugh basket, from the platform to the boat. Defendant's control over that activity, therefore, appears to be the relevant inquiry.

7    Defendant argues that the decision to make the personnel basket transfer was a joint decision between Williams, the *RMS Atlantis* captain, and Plaintiff. Plaintiff has made no argument that Maritech controlled the captain's work.

8    The parties do not appear to dispute that Plaintiff was not adequately warned about the danger or that there is at least a genuine issue of material fact as to this question.

9    Plaintiff does not clarify whether he believes that the alleged non-delegable nature of this duty renders Chapter 95 inapplicable or whether he believes that such liability can be imposed even if Chapter 95 would prevent such liability. The Court presumes that Plaintiff intends to argue that the non-delegable duty renders Chapter 95 inapplicable, given that the Texas courts have found Chapter 95 to be an exclusive remedy. *See Francis v. Coastal Oil & Gas Corp.,* 130 S.W.3d 76, 88 (Tex.App.-Houston [1 Dist.] 2003) (finding that Chapter 95 is an exclusive remedy and precludes common law negligence liability).

Sinegal v. Ryan Marine Services, 712 F.Supp.2d 597 (2008)

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

**53 Tex. Jur. 3d Negligence § 16**

Texas Jurisprudence, Third Edition    April 2022 Update

Negligence
Russell J. Davis, J.D., M.A.

**II. Elements of Actionable Negligence**

**B. Duty of Care**

**2. Statute or Ordinance as Basis of Duty; Negligence Per Se**

## § 16. Violation of criminal statute as negligence per se

Topic Summary    References    Correlation Table

---

West's Key Number Digest

West's Key Number Digest, Negligence⬤⇌222, 259

---

The violation of a penal statute or ordinance may constitute negligence per se, not merely evidence of negligence.[1] Moreover, a criminal statute that is ineffective, as, for example, one unenforceable as a penal statute because it is vague and indefinite,[2] may, if suitable for the purpose, be taken as a standard for civil liability.[3] Standards set forth in criminal statutes may even be applied to persons who are expressly excepted from criminal responsibility under the statutes; however, civil courts retain the test of foreseeability of harm before liability is imposed under the doctrine of negligence per se.[4]

The nonexclusive factors for determining if civil liability may be imposed for violation of a criminal statute under a theory of negligence per se are: (1) whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty; (2) whether the statute puts the public on notice by clearly defining the required conduct; (3) whether the statute would impose liability without fault; (4) whether negligence per se would result in ruinous damages disproportionate to the seriousness of the statutory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; (5) and whether the plaintiff's injury is a direct or indirect result of the violation of the statute.[5]

In the absence of express statutory provision in a criminal statute for the fixing of civil liability in a negligence action, the violation of the statute may be made the basis of civil liability only where one of the purposes of the statute is to set up a standard of conduct calculated to protect the interests of the class of persons to which the injured party belongs,[6] and the injury is of the nature the statute is intended to prevent.[7] Moreover, even in such a case, the power of adopting or rejecting standards rests with the civil courts, which may therefore decline to accept the statute as a test of negligence.[8] Although courts will generally adopt

§ 16. Violation of criminal statute as negligence per se, 53 Tex. Jur. 3d Negligence § 16

the statutory test, rather than that of the ordinarily prudent person, as being more accurate for a determination of negligence, civil courts may accept or reject a criminal statute or use any part of it deemed to be appropriate.[9]

---

**Observation:**

Not every penal statute creates an appropriate standard of care for civil liability purposes; thus, the court is not required to adopt the penal statute's standard,[10] and in determining whether a penal statute creates an appropriate standard of care for civil liability, the court may consider whether the adoption of such standard would be inconsistent with legislative intent.[11]

---

For an act forbidden by penal law to be negligence per se, all of the essential elements of the crime must appear from the evidence.[12] The mere failure to file a criminal complaint, however, is not an exoneration of a charge of civil fault and its consequent liability.[13]

---

**Illustration:**

Imposing civil liability on businesses for violations of criminal statutes prohibiting the exploitation of children under the age of 18 years in the adult-entertainment industry would be fair, workable, and wise, as required for civil liability under a negligence per se theory; liability would affect the affirmative actions of only a small number of businesses, the statutes clearly put the public on notice of the required conduct, the statutes did not impose liability without fault, the imposition of such liability would not affect a wide range of collateral wrongdoers such as business patrons, and a potential plaintiff's injuries would stem directly from a violation of the statutes.[14]

---

Footnotes

1          Smith v. Merritt, 940 S.W.2d 602 (Tex. 1997).

2          Herrin v. Falcon, 198 S.W.2d 117 (Tex. Civ. App. Beaumont 1946) (abrogated on other grounds by, In re Bridgestone Americas Tire Operations, LLC, 459 S.W.3d 565 (Tex. 2015)) and writ refused n.r.e.

3          Phoenix Refining Co. v. Powell, 251 S.W.2d 892 (Tex. Civ. App. San Antonio 1952), writ refused n.r.e.

4          Rudes v. Gottschalk, 159 Tex. 552, 324 S.W.2d 201 (1959).

§ 16. Violation of criminal statute as negligence per se, 53 Tex. Jur. 3d Negligence § 16

| 5 | Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (Tex. App. Corpus Christi 2013), review denied, (Apr. 25, 2014). |
| 6 | Murray v. O & A Exp., Inc., 630 S.W.2d 633 (Tex. 1982). |
| 7 | Brownstone Park Ltd. v. Southern Union Gas Co., 537 S.W.2d 270 (Tex. Civ. App. Austin 1976), writ refused n.r.e., (Sept. 29, 1976). |
| 8 | Rudes v. Gottschalk, 159 Tex. 552, 324 S.W.2d 201 (1959); Boyd v. Fuel Distributors, Inc., 795 S.W.2d 266 (Tex. App. Austin 1990), writ denied, (Feb. 27, 1991). |
| 9 | Rudes v. Gottschalk, 159 Tex. 552, 324 S.W.2d 201 (1959); Boyd v. Fuel Distributors, Inc., 795 S.W.2d 266 (Tex. App. Austin 1990), writ denied, (Feb. 27, 1991). |
| 10 | Smith v. Merritt, 940 S.W.2d 602 (Tex. 1997); Goode v. Bauer, 109 S.W.3d 788 (Tex. App. Corpus Christi 2003); Freudiger v. Keller, 104 S.W.3d 294 (Tex. App. Texarkana 2003). |
| 11 | Smith v. Merritt, 940 S.W.2d 602 (Tex. 1997). |
| 12 | McCall v. Alpine Tel. Corp., 183 S.W.2d 205 (Tex. Civ. App. El Paso 1944), judgment aff'd, 143 Tex. 335, 184 S.W.2d 830 (1944) (overruled in part on other grounds by, Texas Emp. Ins. Ass'n v. Collins, 156 Tex. 376, 295 S.W.2d 902 (1956)). |
| 13 | Younger Bros., Inc. v. Myers, 159 Tex. 585, 324 S.W.2d 546 (1959). |
| 14 | Cerda v. RJL Entertainment, Inc., 443 S.W.3d 221 (Tex. App. Corpus Christi 2013), review denied, (Apr. 25, 2014). |

---

**End of Document**                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.

LII > Federal Rules of Civil Procedure
> **Rule 12. Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing**

# Rule 12. Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing

(a) TIME TO SERVE A RESPONSIVE PLEADING.

(1) *In General.* Unless another time is specified by this rule or a federal statute, the time for serving a responsive pleading is as follows:

(A) A defendant must serve an answer:

(i) within 21 days after being served with the summons and complaint; or

(ii) if it has timely waived service under Rule 4(d), within 60 days after the request for a waiver was sent, or within 90 days after it was sent to the defendant outside any judicial district of the United States.

(B) A party must serve an answer to a counterclaim or crossclaim within 21 days after being served with the pleading that states the counterclaim or crossclaim.

(C) A party must serve a reply to an answer within 21 days after being served with an order to reply, unless the order specifies a different time.

(2) *United States and Its Agencies, Officers, or Employees Sued in an Official Capacity.* The United States, a United States agency, or a United States officer or employee sued only in an official capacity must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the United States attorney.

(3) *United States Officers or Employees Sued in an Individual Capacity.* A United States officer or employee sued in an individual capacity for an act or omission occurring in connection with duties performed on the United States' behalf must serve an answer to a complaint, counterclaim, or crossclaim within 60 days after service on the officer or employee or service on the United States attorney, whichever is later.

(4) *Effect of a Motion.* Unless the court sets a different time, serving a motion under this rule alters these periods as follows:

(A) if the court denies the motion or postpones its disposition until trial, the responsive pleading must be served within 14 days after notice of the court's action; or

(B) if the court grants a motion for a more definite statement, the responsive pleading must be served within 14 days after the more definite statement is served.

(b) How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

(1) lack of subject-matter jurisdiction;

(2) lack of personal jurisdiction;

(3) improper venue;

(4) insufficient process;

(5) insufficient service of process;

(6) failure to state a claim upon which relief can be granted; and

(7) failure to join a party under Rule 19.

A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed. If a pleading sets out a claim for relief that does not require a responsive pleading, an opposing party may assert at trial any defense to that claim. No defense or objection is waived by joining it with one or more other defenses or objections in a responsive pleading or in a motion.

(c) Motion for Judgment on the Pleadings. After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings.

(d) Result of Presenting Matters Outside the Pleadings. If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All

parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

(e) MOTION FOR A MORE DEFINITE STATEMENT. A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response. The motion must be made before filing a responsive pleading and must point out the defects complained of and the details desired. If the court orders a more definite statement and the order is not obeyed within 14 days after notice of the order or within the time the court sets, the court may strike the pleading or issue any other appropriate order.

(f) MOTION TO STRIKE. The court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter. The court may act:

   (1) on its own; or

   (2) on motion made by a party either before responding to the pleading or, if a response is not allowed, within 21 days after being served with the pleading.

(g) JOINING MOTIONS.

   (1) *Right to Join.* A motion under this rule may be joined with any other motion allowed by this rule.

   (2) *Limitation on Further Motions.* Except as provided in Rule 12(h)(2) or (3), a party that makes a motion under this rule must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion.

(h) WAIVING AND PRESERVING CERTAIN DEFENSES.

   (1) *When Some Are Waived.* A party waives any defense listed in Rule 12(b)(2)–(5) by:

      (A) omitting it from a motion in the circumstances described in Rule 12(g)(2); or

      (B) failing to either:

         (i) make it by motion under this rule; or

         (ii) include it in a responsive pleading or in an amendment allowed by Rule 15(a)(1) as a matter of course.

   (2) *When to Raise Others.* Failure to state a claim upon which relief can be granted, to join a person required by Rule 19(b), or to state a legal defense to a claim may be raised:

(A) in any pleading allowed or ordered under Rule 7(a);

(B) by a motion under Rule 12(c); or

(C) at trial.

(3) *Lack of Subject-Matter Jurisdiction.* If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.

(i) Hearing Before Trial. If a party so moves, any defense listed in Rule 12(b)(1)–(7)—whether made in a pleading or by motion—and a motion under Rule 12(c) must be heard and decided before trial unless the court orders a deferral until trial.

### Notes

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Feb. 28, 1966, eff. July 1, 1966; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009.)

### Notes of Advisory Committee on Rules—1937

*Note to Subdivision (a).* 1. Compare [former] Equity Rules 12 (Issue of Subpoena—Time for Answer) and 31 (Reply—When Required—When Cause at Issue); 4 Mont.Rev.Codes Ann. (1935) §§9107, 9158; N.Y.C.P.A. (1937) §263; N.Y.R.C.P. (1937) Rules 109–111.

2. U.S.C., Title 28, §763 [now 547] (Petition in action against United States; service; appearance by district attorney) provides that the United States as a defendant shall have 60 days within which to answer or otherwise defend. This and other statutes which provide 60 days for the United States or an officer or agency thereof to answer or otherwise defend are continued by this rule. Insofar as any statutes not excepted in Rule 81 provide a different time for a defendant to defend, such statutes are modified. See U.S.C., Title 28, [former] §45 (District courts; practice and procedure in certain cases under the interstate commerce laws) (30 days).

3. Compare the last sentence of [former] Equity Rule 29 (Defenses—How Presented) and N.Y.C.P.A. (1937) §283. See Rule 15(a) for time within which to plead to an amended pleading.

*Note to Subdivisions (b) and (d).* 1. See generally [former] Equity Rules 29 (Defenses—How Presented), 33 (Testing Sufficiency of Defense), 43 (Defect of Parties—Resisting Objection), and 44 (Defect of Parties—Tardy Objection); N.Y.C.P.A. (1937) §§277–280; N.Y.R.C.P. (1937) Rules 106–112; *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 25, r.r. 1–4; Clark, *Code Pleading* (1928) pp. 371–381.

2. For provisions authorizing defenses to be made in the answer or reply see *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 25, r.r. 1–4; 1 Miss.Code Ann. (1930) §§378, 379. Compare [former] Equity Rule 29 (Defenses— How Presented); U.S.C., Title 28, [former] §45 (District Courts; practice and procedure in certain cases under the interstate commerce laws). U.S.C., Title 28, [former] §45, substantially continued by this rule, provides: "No replication need be filed to the answer, and objections to the sufficiency of the petition or answer as not setting forth a cause of action or defense must be taken at the final hearing or by motion to dismiss the petition based on said grounds, which motion may be made at any time before answer is filed." Compare Calif.Code Civ.Proc. (Deering, 1937) §433; 4 Nev.Comp.Laws (Hillyer, 1929) §8600. For provisions that the defendant may demur and answer at the same time, see Calif.Code Civ.Proc. (Deering, 1937) §431; 4 Nev.Comp.Laws (Hillyer, 1929) §8598.

3. [Former] Equity Rule 29 (Defenses—How Presented) abolished demurrers and provided that defenses in point of law arising on the face of the bill should be made by motion to dismiss or in the answer, with further provision that every such point of law going to the whole or material part of the cause or causes stated might be called up and disposed of before final hearing "at the discretion of the court." Likewise many state practices have abolished the demurrer, or retain it only to attack substantial and not formal defects. See 6 Tenn.Code Ann. (Williams, 1934) §8784; Ala.Code Ann. (Michie, 1928) §9479; 2 Mass.Gen.Laws (Ter.Ed., 1932) ch. 231, §§15–18; Kansas Gen.Stat.Ann. (1935) §§60–705, 60–706.

*Note to Subdivision (c)*. Compare [former] Equity Rule 33 (Testing Sufficiency of Defense); N.Y.R.C.P. (1937) Rules 111 and 112.

*Note to Subdivisions (e)* and (f). Compare [former] Equity Rules 20 (Further and Particular Statement in Pleading May Be Required) and 21 (Scandal and Impertinence); *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 19, r.r. 7, 7a, 7b, 8; 4 Mont.Rev.Codes Ann. (1935) §§9166, 9167; N.Y.C.P.A. (1937) §247; N.Y.R.C.P. (1937) Rules 103, 115, 116, 117; Wyo.Rev.Stat.Ann. (Courtright, 1931) §§89–1033, 89–1034.

*Note to Subdivision (g)*. Compare Rules of the District Court of the United States for the District of Columbia (1937), Equity Rule 11; N.M. Rules of Pleading, Practice and Procedure, 38 N.M.Rep. vii [105–408] (1934); Wash.Gen.Rules of the Superior Courts, 1 Wash.Rev.Stat.Ann. (Remington, 1932) p. 160, Rule VI (e) and (f).

*Note to Subdivision (h)*. Compare Calif.Code Civ.Proc. (Deering, 1937) §434; 2 Minn.Stat. (Mason, 1927) §9252; N.Y.C.P.A. (1937) §§278 and 279; Wash.Gen.Rules of the Superior Courts, 1 Wash.Rev.Stat.Ann. (Remington, 1932) p. 160, Rule VI (e).

This rule continues U.S.C., Title 28, §80 [now 1359, 1447, 1919] (Dismissal or remand) (of action over which district court lacks jurisdiction), while U.S.C., Title 28, §399 [now 1653] (Amendments to show diverse citizenship) is continued by Rule 15.

### NOTES OF ADVISORY COMMITTEE ON RULES—1946 AMENDMENT

*Subdivision (a)*. Various minor alterations in language have been made to improve the statement of the rule. All references to bills of particulars have been stricken in accordance with changes made in subdivision (e).

*Subdivision (b)*. The addition of defense (7), "failure to join an indispensable party", cures an omission in the rules, which are silent as to the mode of raising such failure. See Commentary, *Manner of Raising Objection of Non-Joinder of Indispensable Party* (1940) 2 Fed.Rules Serv. 658 and (1942) 5 Fed.Rules Serv. 820. In one case, *United States v. Metropolitan Life Ins. Co*. (E.D.Pa. 1941) 36 F.Supp. 399, the failure to join an indispensable party was raised under Rule 12(c).

Rule 12(b)(6), permitting a motion to dismiss for failure of the complaint to state a claim on which relief can be granted, is substantially the same as the old demurrer for failure of a pleading to state a cause of action. Some courts have held that as the rule by its terms refers to statements in the complaint, extraneous matter on affidavits, depositions or otherwise, may not be introduced in support of the motion, or to resist it. On the other hand, in many cases the district courts have permitted the introduction of such material. When these cases have reached circuit courts of appeals in situations where the extraneous material so received shows that there is no genuine issue as to any material question of fact and that on the undisputed facts as disclosed by the affidavits or depositions, one party or the other is entitled to judgment as a matter of law, the circuit courts, properly enough, have been reluctant to dispose of the case merely on the face of the pleading, and in the interest of prompt disposition of the action have made a final disposition of it. In dealing with such situations the Second Circuit has made the sound suggestion that whatever its label or original basis, the motion may be treated as a motion for summary judgment and disposed of as such. *Samara v. United States* (C.C.A.2d, 1942) 129 F.(2d) 594, cert. den. (1942) 317 U.S. 686; *Boro Hall Corp. v. General Motors Corp*. (C.C.A.2d, 1942) 124 F.(2d) 822, cert. den. (1943) 317 U.S. 695. See also *Kithcart v. Metropolitan Life Ins. Co*. (C.C.A.8th, 1945) 150 F.(2d) 997, aff'g 62 F.Supp. 93.

It has also been suggested that this practice could be justified on the ground that the federal rules permit "speaking" motions. The Committee entertains the view that on motion under Rule 12(b)(6) to dismiss for failure of the complaint to state a good claim, the trial court should have authority to permit the introduction of extraneous matter, such as may be offered on a motion for summary judgment, and if it does not exclude such matter the motion should then be treated as a motion for summary

judgment and disposed of in the manner and on the conditions stated in Rule 56 relating to summary judgments, and, of course, in such a situation, when the case reaches the circuit court of appeals, that court should treat the motion in the same way. The Committee believes that such practice, however, should be tied to the summary judgment rule. The term "speaking motion" is not mentioned in the rules, and if there is such a thing its limitations are undefined. Where extraneous matter is received, by tying further proceedings to the summary judgment rule the courts have a definite basis in the rules for disposing of the motion.

The Committee emphasizes particularly the fact that the summary judgment rule does not permit a case to be disposed of by judgment on the merits on affidavits, which disclose a conflict on a material issue of fact, and unless this practice is tied to the summary judgment rule, the extent to which a court, on the introduction of such extraneous matter, may resolve questions of fact on conflicting proof would be left uncertain.

The decisions dealing with this general situation may be generally grouped as follows: (1) cases dealing with the use of affidavits and other extraneous material on motions; (2) cases reversing judgments to prevent final determination on mere pleading allegations alone.

Under group (1) are: *Boro Hall Corp. v. General Motors Corp*. (C.C.A.2d, 1942) 124 F.(2d) 822, cert. den. (1943) 317 U.S. 695; *Gallup v. Caldwell* (C.C.A.3d, 1941) 120 F.(2d) 90; *Central Mexico Light & Power Co. v. Munch* (C.C.A.2d, 1940) 116 F.(2d) 85; *National Labor Relations Board v. Montgomery Ward & Co*. (App.D.C. 1944) 144 F.(2d) 528, cert. den. (1944) 65 S.Ct. 134; *Urquhart v. American-La France Foamite Corp*. (App.D.C. 1944) 144 F.(2d) 542; *Samara v. United States* (C.C.A.2d, 1942) 129 F.(2d) 594; *Cohen v. American Window Glass Co*. (C.C.A.2d, 1942) 126 F.(2d) 111; *Sperry Products Inc. v. Association of American Railroads* (C.C.A.2d, 1942) 132 F.(2d) 408; *Joint Council Dining Car Employees Local 370 v. Delaware, Lackawanna and Western R. Co*. (C.C.A.2d, 1946) 157 F.(2d) 417; *Weeks v. Bareco Oil Co*. (C.C.A.7th, 1941) 125 F.(2d) 84; *Carroll v. Morrison Hotel Corp*. (C.C.A.7th, 1945) 149 F.(2d) 404; *Victory v. Manning* (C.C.A.3rd, 1942) 128 F.(2d) 415; *Locals No. 1470, No. 1469, and 1512 of International Longshoremen's Association v. Southern Pacific Co*. (C.C.A.5th, 1942) 131 F.(2d) 605; *Lucking v. Delano* (C.C.A.6th, 1942) 129 F.(2d) 283; *San Francisco Lodge No. 68 of International Association of Machinists v. Forrestal* (N.D.Cal. 1944) 58 F.Supp. 466; *Benson v. Export Equipment Corp*. (N. Mex. 1945) 164 P.(2d) 380 (construing New Mexico rule identical with Rule 12(b)(6); *F. E. Myers & Bros. Co. v. Gould Pumps, Inc*. (W.D.N.Y. 1946) 9 Fed.Rules Serv. 12b.33, Case 2, 5 F.R.D. 132. Cf. *Kohler v. Jacobs* (C.C.A.5th, 1943) 138 F.(2d) 440; *Cohen v. United States* (C.C.A.8th, 1942) 129 F.(2d) 733.

Under group (2) are: *Sparks v. England* (C.C.A.8th, 1940) 113 F.(2d) 579; *Continental Collieries, Inc. v. Shober* (C.C.A.3d, 1942) 130 F.(2d) 631; *Downey v. Palmer* (C.C.A.2d 1940) 114 F.(2d) 116; *DeLoach v. Crowley's Inc*. (C.C.A.5th, 1942) 128 F.(2d) 378; *Leimer v. State Mutual Life Assurance Co. of Worcester, Mass*. (C.C.A.8th, 1940) 108 F.(2d) 302; *Rossiter v. Vogel* (C.C.A.2d, 1943) 134 F.(2d) 908, compare s. c. (C.C.A.2d, 1945) 148 F.(2d) 292; *Karl Kiefer Machine Co. v. United States Bottlers Machinery Co*. (C.C.A.7th, 1940) 113 F.(2d) 356; *Chicago Metallic Mfg. Co. v. Edward Katzinger Co*. (C.C.A.7th, 1941) 123 F.(2d) 518; *Louisiana Farmers' Protective Union, Inc. v. Great Atlantic & Pacific Tea Co. of America, Inc*. (C.C.A.8th, 1942) 131 F.(2d) 419; *Publicity Bldg. Realty Corp. v. Hannegan* (C.C.A.8th, 1943) 139 F.(2d) 583; *Dioguardi v. Durning* (C.C.A.2d, 1944) 139 F.(2d) 774; *Package Closure Corp. v. Sealright Co., Inc*. (C.C.A.2d, 1944) 141 F.(2d) 972; *Tahir Erk v. Glenn L. Martin Co*. (C.C.A.4th, 1941) 116 F.(2d) 865; *Bell v. Preferred Life Assurance Society of Montgomery, Ala*. (1943) 320 U.S. 238.

The addition at the end of subdivision (b) makes it clear that on a motion under Rule 12(b)(6) extraneous material may not be considered if the court excludes it, but that if the court does not exclude such material the motion shall be treated as a motion for summary judgment and disposed of as provided in Rule 56. It will also be observed that if a motion under Rule 12(b)(6) is thus converted into a summary judgment motion, the amendment insures that both parties shall be given a reasonable opportunity to submit affidavits and extraneous proofs to avoid taking a party by surprise through the conversion of the motion into a motion for summary judgment. In this manner and to this extent the amendment regularizes the practice above described. As the courts are already dealing with cases in this way, the effect of this amendment is really only to define the practice carefully and apply the requirements of the summary judgment rule in the disposition of the motion.

*Subdivision (c)*. The sentence appended to subdivision (c) performs the same function and is grounded on the same reasons as the corresponding sentence added in subdivision (b).

*Subdivision (d)*. The change here was made necessary because of the addition of defense (7) in subdivision (b).

*Subdivision (e)*. References in this subdivision to a bill of particulars have been deleted, and the motion provided for is confined to one for a more definite statement, to be obtained only in cases where the movant cannot reasonably be required to frame an answer or other responsive pleading to the pleading in question. With respect to preparations for trial, the party is properly relegated to the various methods of examination and discovery provided in the rules for that purpose. *Slusher v. Jones* (E.D.Ky. 1943) 7 Fed.Rules Serv. 12e.231, Case 5, 3 F.R.D. 168; *Best Foods,*

*Inc. v. General Mills, Inc.* (D.Del. 1943) 7 Fed.Rules Serv. 12e.231, Case 7, 3 F.R.D. 275; *Braden v. Callaway* (E.D.Tenn. 1943) 8 Fed.Rules Serv. 12e.231, Case 1 (". . . most courts . . . conclude that the definiteness required is only such as will be sufficient for the party to prepare responsive pleadings"). Accordingly, the reference to the 20 day time limit has also been eliminated, since the purpose of this present provision is to state a time period where the motion for a bill is made for the purpose of preparing for trial.

Rule 12(e) as originally drawn has been the subject of more judicial rulings than any other part of the rules, and has been much criticized by commentators, judges and members of the bar. See general discussion and cases cited in 1 *Moore's Federal Practice* (1938), Cum.Supplement §12.07, under "Page 657"; also, Holtzoff, *New Federal Procedure and the Courts* (1940) 35–41. And compare vote of Second Circuit Conference of Circuit and District Judges (June 1940) recommending the abolition of the bill of particulars; *Sun Valley Mfg. Co. v. Mylish* (E.D.Pa. 1944) 8 Fed.Rules Serv. 12e.231, Case 6 ("Our experience . . . has demonstrated not only that 'the office of the bill of particulars is fast becoming obsolete' . . . but that in view of the adequate discovery procedure available under the Rules, motions for bills of particulars should be abolished altogether."); *Walling v. American Steamship Co*. (W.D.N.Y. 1945) 4 F.R.D. 355, 8 Fed.Rules Serv. 12e.244, Case 8 (". . . the adoption of the rule was ill advised. It has led to confusion, duplication and delay.") The tendency of some courts freely to grant extended bills of particulars has served to neutralize any helpful benefits derived from Rule 8, and has overlooked the intended use of the rules on depositions and discovery. The words "or to prepare for trial"—eliminated by the proposed amendment—have sometimes been seized upon as grounds for compulsory statement in the opposing pleading of all the details which the movant would have to meet at the trial. On the other hand, many courts have in effect read these words out of the rule. See *Walling v. Alabama Pipe Co*. (W.D.Mo. 1942) 6 Fed.Rules Serv. 12e.244, Case 7; *Fleming v. Mason & Dixon Lines, Inc*. (E.D.Tenn. 1941) 42 F.Supp. 230; *Kellogg Co. v. National Biscuit Co*. (D.N.J. 1941) 38 F.Supp. 643; *Brown v. H. L. Green Co*. (S.D.N.Y. 1943) 7 Fed.Rules Serv. 12e.231, Case 6; *Pedersen v. Standard Accident Ins. Co*. (W.D.Mo. 1945) 8 Fed.Rules Serv. 12e.231, Case 8; *Bowles v. Ohse* (D.Neb. 1945) 4 F.R.D. 403, 9 Fed.Rules Serv. 12e.231, Case 1; *Klages v. Cohen* (E.D.N.Y. 1945) 9 Fed.Rules Serv. 8a.25, Case 4; *Bowles v. Lawrence* (D.Mass. 1945) 8 Fed.Rules Serv. 12e.231, Case 19; *McKinney Tool & Mfg. Co. v. Hoyt* (N.D.Ohio 1945) 9 Fed.Rules Serv. 12e.235, Case 1; *Bowles v. Jack* (D.Minn. 1945) 5 F.R.D. 1, 9 Fed.Rules Serv. 12e.244, Case 9. And it has been urged from the bench that the phrase be stricken. *Poole v. White* (N.D.W.Va. 1941). 5 Fed.Rules Serv. 12e.231, Case 4, 2 F.R.D. 40. See also *Bowles v. Gabel* (W.D.Mo. 1946) 9 Fed.Rules Serv. 12e.244,

Case 10 ("The courts have never favored that portion of the rules which undertook to justify a motion of this kind for the purpose of aiding counsel in preparing his case for trial.").

*Subdivision (f)*. This amendment affords a specific method of raising the insufficiency of a defense, a matter which has troubled some courts, although attack has been permitted in one way or another. See *Dysart v. Remington-Rand, Inc.* (D.Conn. 1939) 31 F.Supp. 296; *Eastman Kodak Co. v. McAuley* (S.D.N.Y. 1941) 4 Fed.Rules Serv. 12f.21, Case 8, 2 F.R.D. 21; *Schenley Distillers Corp. v. Renken* (E.D.S.C. 1940) 34 F.Supp. 678; *Yale Transport Corp. v. Yellow Truck & Coach Mfg. Co.* (S.D.N.Y. 1944) 3 F.R.D. 440; *United States v. Turner Milk Co.* (N.D.Ill. 1941) 4 Fed.Rules Serv. 12b.51, Case 3, 1 F.R.D. 643; *Teiger v. Stephan Oderwald, Inc.* (S.D.N.Y. 1940) 31 F.Supp. 626; *Teplitsky v. Pennsylvania R. Co.* (N.D.Ill. 1941) 38 F.Supp. 535; *Gallagher v. Carroll* (E.D.N.Y. 1939) 27 F.Supp. 568; *United States v. Palmer* (S.D.N.Y. 1939) 28 F.Supp. 936. And see *Indemnity Ins. Co. of North America v. Pan American Airways, Inc.* (S.D.N.Y. 1944) 58 F.Supp. 338; Commentary, *Modes of Attacking Insufficient Defenses in the Answer* (1939) 1 Fed.Rules Serv. 669 (1940) 2 Fed.Rules Serv. 640.

*Subdivision (g)*. The change in title conforms with the companion provision in subdivision (h).

The alteration of the "except" clause requires that other than provided in subdivision (h) a party who resorts to a motion to raise defenses specified in the rule, must include in one motion all that are then available to him. Under the original rule defenses which could be raised by motion were divided into two groups which could be the subjects of two successive motions.

*Subdivision (h)*. The addition of the phrase relating to indispensable parties is one of necessity.

### Notes of Advisory Committee on Rules—1963 Amendment

This amendment conforms to the amendment of Rule 4(e). See also the Advisory Committee's Note to amended Rule 4(b).

### Notes of Advisory Committee on Rules—1966 Amendment

*Subdivision (b)(7)*. The terminology of this subdivision is changed to accord with the amendment of Rule 19. See the Advisory Committee's Note to Rule 19, as amended, especially the third paragraph therein before the caption "Subdivision (c)."

*Subdivision (g)*. Subdivision (g) has forbidden a defendant who makes a preanswer motion under this rule from making a further motion presenting any defense or objection which was available to him at the time he made the first motion and which

he could have included, but did not in fact include therein. Thus if the defendant moves before answer to dismiss the complaint for failure to state a claim, he is barred from making a further motion presenting the defense of improper venue, if that defense was available to him when he made his original motion. Amended subdivision (g) is to the same effect. This required consolidation of defenses and objections in a Rule 12 motion is salutary in that it works against piecemeal consideration of a case. For exceptions to the requirement of consolidation, see the last clause of subdivision (g), referring to new subdivision (h)(2).

*Subdivision (h)*. The question has arisen whether an omitted defense which cannot be made the basis of a second motion may nevertheless be pleaded in the answer. Subdivision (h) called for waiver of "* * * defenses and objections which he [defendant] does not present * * * by motion * * * or, if he has made no motion, in his answer * * *." If the clause "if he has made no motion," was read literally, it seemed that the omitted defense was waived and could not be pleaded in the answer. On the other hand, the clause might be read as adding nothing of substance to the preceding words; in that event it appeared that a defense was not waived by reason of being omitted from the motion and might be set up in the answer. The decisions were divided. Favoring waiver, see *Keefe v. Derounian*, 6 F.R.D. 11 (N.D.Ill. 1946); *Elbinger v. Precision Metal Workers Corp*., 18 F.R.D. 467 (E.D.Wis. 1956); see also *Rensing v. Turner Aviation Corp*., 166 F.Supp. 790 (N.D.Ill. 1958); *P. Beiersdorf & Co. v. Duke Laboratories, Inc*., 10 F.R.D. 282 (S.D.N.Y. 1950); *Neset v. Christensen*, 92 F.Supp. 78 (E.D.N.Y. 1950). Opposing waiver, see *Phillips v. Baker*, 121 F.2d 752 (9th Cir. 1941); *Crum v. Graham*, 32 F.R.D. 173 (D.Mont. 1963) (regretfully following the Phillips case); see also *Birnbaum v. Birrell*, 9 F.R.D. 72 (S.D.N.Y. 1948); *Johnson v. Joseph Schlitz Brewing Co*., 33 F.Supp. 176 (E.D.Tenn. 1940); cf. *Carter v. American Bus Lines, Inc*., 22 F.R.D. 323 (D.Neb. 1958).

Amended subdivision (h)(1)(A) eliminates the ambiguity and states that certain specified defenses which were available to a party when he made a preanswer motion, but which he omitted from the motion, are waived. The specified defenses are lack of jurisdiction over the person, improper venue, insufficiency of process, and insufficiency of service of process (see Rule 12(b)(2)–(5)). A party who by motion invites the court to pass upon a threshold defense should bring forward all the specified defenses he then has and thus allow the court to do a reasonably complete job. The waiver reinforces the policy of subdivision (g) forbidding successive motions.

By amended subdivision (h)(1)(B), the specified defenses, even if not waived by the operation of (A), are waived by the failure to raise them by a motion under Rule 12 or in the responsive pleading or any amendment thereof to which the party is entitled as

a matter of course. The specified defenses are of such a character that they should not be delayed and brought up for the first time by means of an application to the court to amend the responsive pleading.

Since the language of the subdivisions is made clear, the party is put on fair notice of the effect of his actions and omissions and can guard himself against unintended waiver. It is to be noted that while the defenses specified in subdivision (h)(1) are subject to waiver as there provided, the more substantial defenses of failure to state a claim upon which relief can be granted, failure to join a party indispensable under Rule 19, and failure to state a legal defense to a claim (see Rule 12(b)(6), (7), (f)), as well as the defense of lack of jurisdiction over the subject matter (see Rule 12(b)(1)), are expressly preserved against waiver by amended subdivision (h)(2) and (3).

### Notes of Advisory Committee on Rules—1987 Amendment

The amendments are technical. No substantive change is intended.

### Notes of Advisory Committee on Rules—1993 Amendment

Subdivision (a) is divided into paragraphs for greater clarity, and paragraph (1)(B) is added to reflect amendments to Rule 4. Consistent with Rule 4(d)(3), a defendant that timely waives service is allowed 60 days from the date the request was mailed in which to respond to the complaint, with an additional 30 days afforded if the request was sent out of the country. Service is timely waived if the waiver is returned within the time specified in the request (30 days after the request was mailed, or 60 days if mailed out of the country) and before being formally served with process. Sometimes a plaintiff may attempt to serve a defendant with process while also sending the defendant a request for waiver of service; if the defendant executes the waiver of service within the time specified and before being served with process, it should have the longer time to respond afforded by waiving service.

The date of sending the request is to be inserted by the plaintiff on the face of the request for waiver and on the waiver itself. This date is used to measure the return day for the waiver form, so that the plaintiff can know on a day certain whether formal service of process will be necessary; it is also a useful date to measure the time for answer when service is waived. The defendant who returns the waiver is given additional time for answer in order to assure that it loses nothing by waiving service of process.

### Committee Notes on Rules—2000 Amendment

Rule 12(a)(3)(B) is added to complement the addition of Rule 4(i)(2)(B). The purposes that underlie the requirement that service be made on the United States in an action that asserts individual liability of a United States officer or employee for acts

occurring in connection with the performance of duties on behalf of the United States also require that the time to answer be extended to 60 days. Time is needed for the United States to determine whether to provide representation to the defendant officer or employee. If the United States provides representation, the need for an extended answer period is the same as in actions against the United States, a United States agency, or a United States officer sued in an official capacity.

An action against a former officer or employee of the United States is covered by subparagraph (3)(B) in the same way as an action against a present officer or employee. Termination of the relationship between the individual defendant and the United States does not reduce the need for additional time to answer.

*GAP Report*. No changes are recommended for Rule 12 as published.

### COMMITTEE NOTES ON RULES—2007 AMENDMENT

The language of Rule 12 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 12(a)(4)(A) referred to an order that postpones disposition of a motion "until the trial on the merits." Rule 12(a)(4) now refers to postponing disposition "until trial." The new expression avoids the ambiguity that inheres in "trial on the merits," which may become confusing when there is a separate trial of a single issue or another event different from a single all-encompassing trial.

*Changes Made After Publication and Comment*. See Note to Rule 1, supra.

### COMMITTEE NOTES ON RULES—2009 AMENDMENT

The times set in the former rule at 10 or 20 days have been revised to 14 or 21 days. See the Note to Rule 6.

‹ Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions up Rule 13. Counterclaim and Crossclaim ›

## Learn How You Can Quickly and Efficiently Pivot to a Remote-First Workforce Model.



OPEN

💼 Federal Rules of
Civil Procedure
Toolbox

- Wex: Civil

<u>Procedure:</u>

<u>Overview</u>

1K





[LII]

Abogados de negocio, derecho civil, c
criminales, accidentes, inmigracion y r

LII  > Federal Rules of Civil Procedure  > **Rule 56. Summary Judgment**

# Rule 56. Summary Judgment

(a) MOTION FOR SUMMARY JUDGMENT OR PARTIAL SUMMARY JUDGMENT. A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

(b) TIME TO FILE A MOTION. Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.

(c) PROCEDURES.

   (1) Supporting Factual Positions. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

      (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

      (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

   (2) *Objection That a Fact Is Not Supported by Admissible Evidence.* A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.

   (3) *Materials Not Cited.* The court need consider only the cited materials, but it may consider other materials in the record.

(4) *Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

(d) WHEN FACTS ARE UNAVAILABLE TO THE NONMOVANT. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

　　(1) defer considering the motion or deny it;

　　(2) allow time to obtain affidavits or declarations or to take discovery; or

　　(3) issue any other appropriate order.

(e) FAILING TO PROPERLY SUPPORT OR ADDRESS A FACT. If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

　　(1) give an opportunity to properly support or address the fact;

　　(2) consider the fact undisputed for purposes of the motion;

　　(3) grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it; or

　　(4) issue any other appropriate order.

(f) JUDGMENT INDEPENDENT OF THE MOTION. After giving notice and a reasonable time to respond, the court may:

　　(1) grant summary judgment for a nonmovant;

　　(2) grant the motion on grounds not raised by a party; or

　　(3) consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute.

(g) FAILING TO GRANT ALL THE REQUESTED RELIEF. If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact — including an item of damages or other relief — that is not genuinely in dispute and treating the fact as established in the case.

(h) AFFIDAVIT OR DECLARATION SUBMITTED IN BAD FAITH. If satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court — after notice and a reasonable time to respond — may order the submitting party to

pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions.

(As amended Dec. 27, 1946, eff. Mar. 19, 1948; Jan. 21, 1963, eff. July 1, 1963; Mar. 2, 1987, eff. Aug. 1, 1987; Apr. 30, 2007, eff. Dec. 1, 2007; Mar. 26, 2009, eff. Dec. 1, 2009; Apr. 28, 2010, eff. Dec. 1, 2010.)

### NOTES OF ADVISORY COMMITTEE ON RULES—1937

This rule is applicable to all actions, including those against the United States or an officer or agency thereof.

Summary judgment procedure is a method for promptly disposing of actions in which there is no genuine issue as to any material fact. It has been extensively used in England for more than 50 years and has been adopted in a number of American states. New York, for example, has made great use of it. During the first nine years after its adoption there, the records of New York county alone show 5,600 applications for summary judgments. *Report of the Commission on the Administration of Justice in New York State* (1934), p. 383. See also *Third Annual Report of the Judicial Council of the State of New York* (1937), p. 30.

In England it was first employed only in cases of liquidated claims, but there has been a steady enlargement of the scope of the remedy until it is now used in actions to recover land or chattels and in all other actions at law, for liquidated or unliquidated claims, except for a few designated torts and breach of promise of marriage. *English Rules Under the Judicature Act* (The Annual Practice, 1937) O. 3, r. 6; Orders 14, 14A, and 15; see also O. 32, r. 6, authorizing an application for judgment at any time upon admissions. In Michigan (3 Comp.Laws (1929) §14260) and Illinois (Ill.Rev.Stat. (1937) ch. 110, §§181, 259.15, 259.16), it is not limited to liquidated demands. New York (N.Y.R.C.P. (1937) Rule 113; see also Rule 107) has brought so many classes of actions under the operation of the rule that the Commission on Administration of Justice in New York State (1934) recommend that all restrictions be removed and that the remedy be available "in any action" (p. 287). For the history and nature of the summary judgment procedure and citations of state statutes, see Clark and Samenow, *The Summary Judgment* (1929), 38 Yale L.J. 423.

*Note to Subdivision (d)*. See Rule 16 (Pre-Trial Procedure; Formulating Issues) and the *Note* thereto.

*Note to Subdivisions (e) and (f)*. These are similar to rules in Michigan. Mich.Court Rules Ann. (Searl, 1933) Rule 30.

### NOTES OF ADVISORY COMMITTEE ON RULES—1946 AMENDMENT

*Subdivision (a)*. The amendment allows a claimant to move for a summary judgment at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party. This will normally operate to permit an earlier motion by the claimant than under the original rule, where the phrase "at any time after the pleading in answer thereto has been served" operates to prevent a claimant from moving for summary judgment, even in a case clearly proper for its exercise, until a formal answer has been filed. Thus in *Peoples Bank v. Federal Reserve Bank of San Francisco* (N.D.Cal. 1944) 58 F.Supp. 25, the plaintiff's counter-motion for a summary judgment was stricken as premature, because the defendant had not filed an answer. Since Rule 12(a) allows at least 20 days for an answer, that time plus the 10 days required in Rule 56(c) means that under original Rule 56(a) a minimum period of 30 days necessarily has to elapse in every case before the claimant can be heard on his right to a summary judgment. An extension of time by the court or the service of preliminary motions of any kind will prolong that period even further. In many cases this merely represents unnecessary delay. See *United States v. Adler's Creamery, Inc*. (C.C.A.2d, 1939) 107 F.(2d) 987. The changes are in the interest of more expeditious litigation. The 20-day period, as provided, gives the defendant an opportunity to secure counsel and determine a course of action. But in a case where the defendant himself serves a motion for summary judgment within that time, there is no reason to restrict the plaintiff and the amended rule so provides.

*Subdivision (c)*. The amendment of Rule 56(c), by the addition of the final sentence, resolves a doubt expressed in *Sartor v. Arkansas Natural Gas Corp*. (1944) 321 U.S. 620. See also Commentary, *Summary Judgment as to Damages* (1944) 7 Fed.Rules Serv. 974; *Madeirense Do Brasil S/A v. Stulman-Emrick Lumber Co*. (C.C.A.2d, 1945) 147 F.(2d) 399, cert. den. (1945) 325 U.S. 861. It makes clear that although the question of recovery depends on the amount of damages, the summary judgment rule is applicable and summary judgment may be granted in a proper case. If the case is not fully adjudicated it may be dealt with as provided in subdivision (d) of Rule 56, and the right to summary recovery determined by a preliminary order, interlocutory in character, and the precise amount of recovery left for trial.

*Subdivision (d)*. Rule 54(a) defines "judgment" as including a decree and "any order from which an appeal lies." Subdivision (d) of Rule 56 indicates clearly, however, that a partial summary "judgment" is not a final judgment, and, therefore, that it is not appealable, unless in the particular case some statute allows an appeal from the interlocutory order involved. The partial summary judgment is merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case. This adjudication is more nearly akin to the preliminary order under Rule 16, and likewise serves the purpose of speeding up litigation by eliminating before trial

matters wherein there is no genuine issue of fact. See *Leonard v. Socony-Vacuum Oil Co*. (C.C.A.7th, 1942) 130 F.(2d) 535; *Biggins v. Oltmer Iron Works* (C.C.A.7th, 1946) 154 F.(2d) 214; 3 *Moore's Federal Practice* (1938). 3190–3192. Since interlocutory appeals are not allowed, except where specifically provided by statute (see 3 *Moore, op. cit. supra*, 3155–3156) this interpretation is in line with that policy, *Leonard v. Socony-Vacuum Oil Co., supra*. See also *Audi Vision Inc., v. RCA Mfg. Co*. (C.C.A.2d, 1943) 136 F.(2d) 621; *Toomey v. Toomey* (App.D.C. 1945) 149 F.(2d) 19; *Biggins v. Oltmer Iron Works, supra; Catlin v. United States* (1945) 324 U.S. 229.

### Notes of Advisory Committee on Rules—1963 Amendment

*Subdivision (c)*. By the amendment "answers to interrogatories" are included among the materials which may be considered on motion for summary judgment. The phrase was inadvertently omitted from the rule, see 3 Barron & Holtzoff, *Federal Practice and Procedure* 159–60 (Wright ed. 1958), and the courts have generally reached by interpretation the result which will hereafter be required by the text of the amended rule. See Annot., 74 A.L.R.2d 984 (1960).

*Subdivision (e)*. The words "answers to interrogatories" are added in the third sentence of this subdivision to conform to the amendment of subdivision (c).

The last two sentences are added to overcome a line of cases, chiefly in the Third Circuit, which has impaired the utility of the summary judgment device. A typical case is as follows: A party supports his motion for summary judgment by affidavits or other evidentiary matters sufficient to show that there is no genuine issue as to a material fact. The adverse party, in opposing the motion, does not produce any evidentiary matter, or produces some but not enough to establish that there is a genuine issue for trial. Instead, the adverse party rests on averments of his pleadings which on their face present an issue. In this situation Third Circuit cases have taken the view that summary judgment must be denied, at least if the averments are "well-pleaded," and not suppositious, conclusory, or ultimate. See *Frederick Hart & Co., Inc. v. Recordgraph Corp*., 169 F.2d 580 (3d Cir. 1948); *United States ex rel. Kolton v. Halpern*, 260 F.2d 590 (3d Cir. 1958); *United States ex rel. Nobles v. Ivey Bros. Constr. Co., Inc*., 191 F.Supp. 383 (D.Del. 1961); *Jamison v. Pennsylvania Salt Mfg. Co*., 22 F.R.D. 238 (W.D.Pa. 1958); *Bunny Bear, Inc. v. Dennis Mitchell Industries*, 139 F.Supp. 542 (E.D.Pa. 1956); *Levy v. Equitable Life Assur. Society*, 18 F.R.D. 164 (E.D.Pa. 1955).

The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial. The Third Circuit doctrine, which permits the pleadings themselves to stand in the way of

granting an otherwise justified summary judgment, is incompatible with the basic purpose of the rule. See 6 *Moore's Federal Practice* 2069 (2d ed. 1953); 3 Barron & Holtzoff, supra, §1235.1.

It is hoped that the amendment will contribute to the more effective utilization of the salutary device of summary judgment.

The amendment is not intended to derogate from the solemnity of the pleadings. Rather it recognizes that, despite the best efforts of counsel to make his pleadings accurate, they may be overwhelmingly contradicted by the proof available to his adversary.

Nor is the amendment designed to affect the ordinary standards applicable to the summary judgment motion. So, for example: Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate. Where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented. And summary judgment may be inappropriate where the party opposing it shows under subdivision (f) that he cannot at the time present facts essential to justify his opposition.

### NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The amendments are technical. No substantive change is intended.

### COMMITTEE NOTES ON RULES—2007 AMENDMENT

The language of Rule 56 has been amended as part of the general restyling of the Civil Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic only.

Former Rule 56(a) and (b) referred to summary-judgment motions on or against a claim, counterclaim, or crossclaim, or to obtain a declaratory judgment. The list was incomplete. Rule 56 applies to third-party claimants, intervenors, claimants in interpleader, and others. Amended Rule 56(a) and (b) carry forward the present meaning by referring to a party claiming relief and a party against whom relief is sought.

Former Rule 56(c), (d), and (e) stated circumstances in which summary judgment "shall be rendered," the court "shall if practicable" ascertain facts existing without substantial controversy, and "if appropriate, shall" enter summary judgment. In each place "shall" is changed to "should." It is established that although there is no discretion to enter summary judgment when there is a genuine issue as to any material fact, there is discretion to deny summary judgment when it appears that

there is no genuine issue as to any material fact. *Kennedy v. Silas Mason Co.*, 334 U.S. 249, 256 –257 (1948). Many lower court decisions are gathered in 10A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d, §2728. "Should" in amended Rule 56(c) recognizes that courts will seldom exercise the discretion to deny summary judgment when there is no genuine issue as to any material fact. Similarly sparing exercise of this discretion is appropriate under Rule 56(e)(2). Rule 56(d)(1), on the other hand, reflects the more open-ended discretion to decide whether it is practicable to determine what material facts are not genuinely at issue.

Former Rule 56(d) used a variety of different phrases to express the Rule 56(c) standard for summary judgment—that there is no genuine issue as to any material fact. Amended Rule 56(d) adopts terms directly parallel to Rule 56(c).

### Committee Notes on Rules—2009 Amendment

The timing provisions for summary judgment are outmoded. They are consolidated and substantially revised in new subdivision (c)(1). The new rule allows a party to move for summary judgment at any time, even as early as the commencement of the action. If the motion seems premature both subdivision (c)(1) and Rule 6(b) allow the court to extend the time to respond. The rule does set a presumptive deadline at 30 days after the close of all discovery.

The presumptive timing rules are default provisions that may be altered by an order in the case or by local rule. Scheduling orders are likely to supersede the rule provisions in most cases, deferring summary-judgment motions until a stated time or establishing different deadlines. Scheduling orders tailored to the needs of the specific case, perhaps adjusted as it progresses, are likely to work better than default rules. A scheduling order may be adjusted to adopt the parties' agreement on timing, or may require that discovery and motions occur in stages—including separation of expert-witness discovery from other discovery.

Local rules may prove useful when local docket conditions or practices are incompatible with the general Rule 56 timing provisions.

If a motion for summary judgment is filed before a responsive pleading is due from a party affected by the motion, the time for responding to the motion is 21 days after the responsive pleading is due.

### Committee Notes on Rules—2010 Amendment

Rule 56 is revised to improve the procedures for presenting and deciding summary-judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no

genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

*Subdivision (a).* Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word — genuine "issue" becomes genuine "dispute." "Dispute" better reflects the focus of a summary-judgment determination. As explained below, "shall" also is restored to the place it held from 1938 to 2007.

The first sentence is added to make clear at the beginning that summary judgment may be requested not only as to an entire case but also as to a claim, defense, or part of a claim or defense. The subdivision caption adopts the common phrase "partial summary judgment" to describe disposition of less than the whole action, whether or not the order grants all the relief requested by the motion.

"Shall" is restored to express the direction to grant summary judgment. The word "shall" in Rule 56 acquired significance over many decades of use. Rule 56 was amended in 2007 to replace "shall" with "should" as part of the Style Project, acting under a convention that prohibited any use of "shall." Comments on proposals to amend Rule 56, as published in 2008, have shown that neither of the choices available under the Style Project conventions — "must" or "should" — is suitable in light of the case law on whether a district court has discretion to deny summary judgment when there appears to be no genuine dispute as to any material fact. Compare *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case in which there is reason to believe that the better course would be to proceed to a full trial. *Kennedy v. Silas Mason Co.*, 334 U.S. 249 * * * (1948)),″ with *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Eliminating "shall" created an unacceptable risk of changing the summary-judgment standard. Restoring "shall" avoids the unintended consequences of any other word.

Subdivision (a) also adds a new direction that the court should state on the record the reasons for granting or denying the motion. Most courts recognize this practice. Among other advantages, a statement of reasons can facilitate an appeal or

subsequent trial-court proceedings. It is particularly important to state the reasons for granting summary judgment. The form and detail of the statement of reasons are left to the court's discretion.

The statement on denying summary judgment need not address every available reason. But identification of central issues may help the parties to focus further proceedings.

*Subdivision (b).* The timing provisions in former subdivisions (a) and (c) are superseded. Although the rule allows a motion for summary judgment to be filed at the commencement of an action, in many cases the motion will be premature until the nonmovant has had time to file a responsive pleading or other pretrial proceedings have been had. Scheduling orders or other pretrial orders can regulate timing to fit the needs of the case.

*Subdivision (c).* Subdivision (c) is new. It establishes a common procedure for several aspects of summary-judgment motions synthesized from similar elements developed in the cases or found in many local rules.

Subdivision (c)(1) addresses the ways to support an assertion that a fact can or cannot be genuinely disputed. It does not address the form for providing the required support. Different courts and judges have adopted different forms including, for example, directions that the support be included in the motion, made part of a separate statement of facts, interpolated in the body of a brief or memorandum, or provided in a separate statement of facts included in a brief or memorandum.

Subdivision (c)(1)(A) describes the familiar record materials commonly relied upon and requires that the movant cite the particular parts of the materials that support its fact positions. Materials that are not yet in the record — including materials referred to in an affidavit or declaration — must be placed in the record. Once materials are in the record, the court may, by order in the case, direct that the materials be gathered in an appendix, a party may voluntarily submit an appendix, or the parties may submit a joint appendix. The appendix procedure also may be established by local rule. Pointing to a specific location in an appendix satisfies the citation requirement. So too it may be convenient to direct that a party assist the court in locating materials buried in a voluminous record.

Subdivision (c)(1)(B) recognizes that a party need not always point to specific record materials. One party, without citing any other materials, may respond or reply that materials cited to dispute or support a fact do not establish the absence or presence of a genuine dispute. And a party who does not have the trial burden of production may rely on a showing that a party who does have the trial burden cannot produce admissible evidence to carry its burden as to the fact.

Subdivision (c)(2) provides that a party may object that material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence. The objection functions much as an objection at trial, adjusted for the pretrial setting. The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated. There is no need to make a separate motion to strike. If the case goes to trial, failure to challenge admissibility at the summary-judgment stage does not forfeit the right to challenge admissibility at trial.

Subdivision (c)(3) reflects judicial opinions and local rules provisions stating that the court may decide a motion for summary judgment without undertaking an independent search of the record. Nonetheless, the rule also recognizes that a court may consider record materials not called to its attention by the parties.

Subdivision (c)(4) carries forward some of the provisions of former subdivision (e)(1). Other provisions are relocated or omitted. The requirement that a sworn or certified copy of a paper referred to in an affidavit or declaration be attached to the affidavit or declaration is omitted as unnecessary given the requirement in subdivision (c)(1)(A) that a statement or dispute of fact be supported by materials in the record.

A formal affidavit is no longer required. 28 U.S.C. § 1746 allows a written unsworn declaration, certificate, verification, or statement subscribed in proper form as true under penalty of perjury to substitute for an affidavit.

*Subdivision (d).* Subdivision (d) carries forward without substantial change the provisions of former subdivision (f).

A party who seeks relief under subdivision (d) may seek an order deferring the time to respond to the summary-judgment motion.

*Subdivision (e).* Subdivision (e) addresses questions that arise when a party fails to support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c). As explained below, summary judgment cannot be granted by default even if there is a complete failure to respond to the motion, much less when an attempted response fails to comply with Rule 56(c) requirements. Nor should it be denied by default even if the movant completely fails to reply to a nonmovant's response. Before deciding on other possible action, subdivision (e)(1) recognizes that the court may afford an opportunity to properly support or address the fact. In many circumstances this opportunity will be the court's preferred first step.

Subdivision (e)(2) authorizes the court to consider a fact as undisputed for purposes of the motion when response or reply requirements are not satisfied. This approach reflects the "deemed admitted" provisions in many local rules. The fact is

considered undisputed only for purposes of the motion; if summary judgment is denied, a party who failed to make a proper Rule 56 response or reply remains free to contest the fact in further proceedings. And the court may choose not to consider the fact as undisputed, particularly if the court knows of record materials that show grounds for genuine dispute.

Subdivision (e)(3) recognizes that the court may grant summary judgment only if the motion and supporting materials — including the facts considered undisputed under subdivision (e)(2) — show that the movant is entitled to it. Considering some facts undisputed does not of itself allow summary judgment. If there is a proper response or reply as to some facts, the court cannot grant summary judgment without determining whether those facts can be genuinely disputed. Once the court has determined the set of facts — both those it has chosen to consider undisputed for want of a proper response or reply and any that cannot be genuinely disputed despite a procedurally proper response or reply — it must determine the legal consequences of these facts and permissible inferences from them.

Subdivision (e)(4) recognizes that still other orders may be appropriate. The choice among possible orders should be designed to encourage proper presentation of the record. Many courts take extra care with pro se litigants, advising them of the need to respond and the risk of losing by summary judgment if an adequate response is not filed. And the court may seek to reassure itself by some examination of the record before granting summary judgment against a pro se litigant.

*Subdivision (f).* Subdivision (f) brings into Rule 56 text a number of related procedures that have grown up in practice. After giving notice and a reasonable time to respond the court may grant summary judgment for the nonmoving party; grant a motion on legal or factual grounds not raised by the parties; or consider summary judgment on its own. In many cases it may prove useful first to invite a motion; the invited motion will automatically trigger the regular procedure of subdivision (c).

*Subdivision (g).* Subdivision (g) applies when the court does not grant all the relief requested by a motion for summary judgment. It becomes relevant only after the court has applied the summary-judgment standard carried forward in subdivision (a) to each claim, defense, or part of a claim or defense, identified by the motion. Once that duty is discharged, the court may decide whether to apply the summary-judgment standard to dispose of a material fact that is not genuinely in dispute. The court must take care that this determination does not interfere with a party's ability to accept a fact for purposes of the motion only. A nonmovant, for example, may feel confident that a genuine dispute as to one or a few facts will defeat the motion, and prefer to avoid the cost of detailed response to all facts stated by the movant. This

position should be available without running the risk that the fact will be taken as established under subdivision (g) or otherwise found to have been accepted for other purposes.

If it is readily apparent that the court cannot grant all the relief requested by the motion, it may properly decide that the cost of determining whether some potential fact disputes may be eliminated by summary disposition is greater than the cost of resolving those disputes by other means, including trial. Even if the court believes that a fact is not genuinely in dispute it may refrain from ordering that the fact be treated as established. The court may conclude that it is better to leave open for trial facts and issues that may be better illuminated by the trial of related facts that must be tried in any event.

*Subdivision (h).* Subdivision (h) carries forward former subdivision (g) with three changes. Sanctions are made discretionary, not mandatory, reflecting the experience that courts seldom invoke the independent Rule 56 authority to impose sanctions. *See* Cecil & Cort, Federal Judicial Center Memorandum on Federal Rule of Civil Procedure 56 (g) Motions for Sanctions (April 2, 2007). In addition, the rule text is expanded to recognize the need to provide notice and a reasonable time to respond. Finally, authority to impose other appropriate sanctions also is recognized.

*Changes Made After Publication and Comment*

**Subdivision (a):** "[S]hould grant" was changed to "shall grant."

"[T]he movant shows that" was added.

Language about identifying the claim or defense was moved up from subdivision (c)(1) as published.

**Subdivision (b):** The specifications of times to respond and to reply were deleted.

Words referring to an order "in the case" were deleted.

**Subdivision (c):** The detailed "point-counterpoint" provisions published as subdivision (c)(1) and (2) were deleted.

The requirement that the court give notice before granting summary judgment on the basis of record materials not cited by the parties was deleted.

The provision that a party may accept or dispute a fact for purposes of the motion only was deleted.

**Subdivision (e):** The language was revised to reflect elimination of the point-counterpoint procedure from subdivision (c). The new language reaches failure to properly support an assertion of fact in a motion.

**Subdivision (f):** The provision requiring notice before denying summary judgment on grounds not raised by a party was deleted.

**Subdivision (h):** Recognition of the authority to impose other appropriate sanctions was added.

**Other changes:** Many style changes were made to express more clearly the intended meaning of the published proposal.

‹ Rule 55. Default; Default Judgment up Rule 57. Declaratory Judgment ›



💼 Federal Rules of Civil Procedure Toolbox

- Wex: <u>Civil Procedure: Overview</u>





Guide to Finding Global Talent

The guide to finding
Global Talent

Where to Look for International
Candidates in 2022-2023

Open

Rio Grande City   OPEN 09.00 — 17.00
200 Britton Avenue, Rio Grande City

Abogados de negocio derecho civil e