# Exhibit "2"

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

FILIBERTO J. GARZA MORENO )(
    Plaintiff )(
     )(
VS. )( CIVIL ACTION NO.
     )( 7:21-cv-00247
ALLEGIANT TRAVEL COMPANY, )(
ALLEGIANT AIR LLC, AND )(
AIRPORT TERMINAL SERVICES, )(
INC. )(
    Defendants )(

ORAL DEPOSITION OF
FILIBERTO J. GARZA MORENO
FEBRUARY 18, 2022

ORAL DEPOSITION OF FILIBERTO J. GARZA MORENO, produced as a witness at the instance of the Defendant Airport Terminal Services, Inc., taken in the above-styled and numbered cause on FEBRUARY 18, 2022, between the hours of 12:04 p.m. and 3:47 p.m., reported stenographically by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at Bryant & Stingley, Inc., 2010 East Harrison Avenue, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached therein.

## Page 2

APPEARANCES
COUNSEL FOR PLAINTIFF:
  MICHAEL J. CISNEROS
  CISNEROS LAW FIRM, LLP
  312 Lindberg Street
  McAllen, Texas 78501

COUNSEL FOR DEFENDANT AIRPORT TERMINAL SERVICES, INC.:
  DAVID A. JOHNSON
  COWLES & THOMPSON, P.C.
  901 Main Street, Suite 3900
  Dallas, Texas 75202

  ROBERT L. GUERRA
  THORNTON BIECHLIN REYNOLDS & GUERRA
  418 East Dove Avenue
  McAllen, Texas 78504

COUNSEL FOR DEFENDANT ALLEGIANT TRAVEL COMPANY AND ALLEGIANT AIR, LLC:
  DON SWAIM
  CUNNINGHAM SWAIM, LLP
  7557 Rambler Road, Suite 400
  Dallas, Texas 75231

INDEX
                                         PAGE
Appearances ........................................ 2

FILIBERTO J. GARZA MORENO
Examination by Mr. Johnson ...................... 4
Examination by Mr. Swaim ........................ 81
Examination by Mr. Cisneros ..................... 125
Examination by Mr. Johnson ...................... 132

Errata Sheet/Signature Page ..................... 134

Reporter's Certificate .......................... 136

Attached to the end of the transcript: Stipulations

## Page 3

EXHIBITS
NUMBER  DESCRIPTION                              PAGE
  3    Photograph ............................. 41
  6    Boarding Passes ........................ 110

## Page 4

        1  FILIBERTO J. GARZA MORENO,
        2  having been duly sworn, testified as follows:
        3      EXAMINATION
        4  BY MR. JOHNSON:
12:04  5    Q.  Can you please state your full name for the
12:04  6  record.
12:04  7    A.  Filiberto Garza Moreno.
12:04  8    Q.  Okay.  Mr. Garza, my name is David Johnson.
12:04  9  I'm an attorney representing ATS in a lawsuit that
12:04 10  you've brought against both ATS and Allegiant.
12:04 11      Do you understand who I am and who I
12:04 12  represent?
12:04 13    A.  Yes, sir.
12:04 14    Q.  Okay.  I'm going to be asking you some
12:04 15  questions today.  If at any point you want to take a
12:04 16  break, please tell me, and we can take a break.  No
12:04 17  questions asked.  Okay?
12:04 18    A.  Yes, sir.
12:04 19    Q.  If at any point you don't understand a question
12:04 20  I ask you, please ask me to rephrase or repeat it, and
12:04 21  I will.
12:04 22    A.  Yes, sir.
12:04 23    Q.  Is this the first time you've ever given a
12:04 24  deposition?
12:04 25    A.  Yes, sir.

Page 5

| Time | Line | |
|---|---|---|
| 12:04 | 1 | Q. Okay. What's your current address? |
| 12:04 | 2 | A. 4674 Main Avenue, Brownsville, Texas 78521. |
| 12:04 | 3 | Q. How long have you lived at that address in |
| 12:05 | 4 | Brownsville? |
| 12:05 | 5 | A. For about 30-some years, 35 years. |
| 12:05 | 6 | Q. What's your date of birth, sir? |
| 12:05 | 7 | A. November 23, 1981. |
| 12:05 | 8 | Q. And what's your Social Security number? |
| 12:05 | 9 | A. 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. |
| 12:05 | 10 | Q. You mentioned that you've lived at this address |
| 12:05 | 11 | for 35 years. Who do you live with at the address? |
| 12:05 | 12 | A. My parents, mom and dad. |
| 12:05 | 13 | Q. Other than your mother and your father, does |
| 12:05 | 14 | anybody else live at that address? |
| 12:05 | 15 | A. Currently, my brother is living there upstairs. |
| 12:05 | 16 | It's like a duplex. He lives upstairs. |
| 12:05 | 17 | Q. And when you say your brother, you're referring |
| 12:05 | 18 | to Aaron? |
| 12:05 | 19 | A. Aaron Garza, correct. |
| 12:05 | 20 | Q. It's my understanding you have another brother |
| 12:05 | 21 | as well? |
| 12:05 | 22 | A. Alex Garza, correct. |
| 12:05 | 23 | Q. And has Alex ever lived in the same house with |
| 12:06 | 24 | you since this accident occurred back in -- |
| 12:06 | 25 | A. No, sir. |

Page 6

| Time | Line | |
|---|---|---|
| 12:06 | 1 | Q. And when I say "the accident," I'm talking in |
| 12:06 | 2 | 2007 when you had a motorcycle accident. |
| 12:06 | 3 | A. No, sir. |
| 12:06 | 4 | MR. CISNEROS: Let him finish. Okay? |
| 12:06 | 5 | Q. One -- one rule that I forgot to tell you early |
| 12:06 | 6 | on, and we were horrible at it with your brother's |
| 12:06 | 7 | deposition, but if you could do me a favor and wait |
| 12:06 | 8 | until I finish a question before answering -- |
| 12:06 | 9 | A. Most definitely. |
| 12:06 | 10 | Q. -- it will help her out tremendously, and I |
| 12:06 | 11 | will try to do the same with your answers. |
| 12:06 | 12 | Also, because there's a written transcript |
| 12:06 | 13 | being taken of your testimony, if you can make sure to |
| 12:06 | 14 | answer questions verbally as opposed to head nods or |
| 12:06 | 15 | "uh-huhs" or "huh-uhs." Okay? |
| 12:06 | 16 | A. Yes, sir. |
| 12:06 | 17 | Q. Where were you born? |
| 12:06 | 18 | A. I was born in Matamoros, Mexico. |
| 12:06 | 19 | Q. And when did you come over from Matamoros? |
| 12:06 | 20 | A. Immediately. |
| 12:06 | 21 | Q. And so you spent your entire life in the United |
| 12:06 | 22 | States? |
| 12:06 | 23 | A. Yes, sir. |
| 12:06 | 24 | Q. Are you a U.S. citizen? |
| 12:07 | 25 | A. I'm a U.S. resident, permanent resident. |

Page 7

| Time | Line | |
|---|---|---|
| 12:07 | 1 | Q. Where did you go to school? |
| 12:07 | 2 | A. I went to elementary in Buttonwillow, |
| 12:07 | 3 | California and middle school in Perkins here in |
| 12:07 | 4 | Brownsville and high school and college and university |
| 12:07 | 5 | in Brownsville. |
| 12:07 | 6 | Q. Okay. What year did you graduate from high |
| 12:07 | 7 | school? |
| 12:07 | 8 | A. High school was in 1999. |
| 12:07 | 9 | Q. And after graduating from high school, you |
| 12:07 | 10 | mentioned college. Where did you go to college? |
| 12:07 | 11 | A. I went for a semester at U of H, Houston. Then |
| 12:07 | 12 | came back and went to UTRGV, then took a long break and |
| 12:07 | 13 | finished after my accident. In 2015 is when I went |
| 12:07 | 14 | back and finished. |
| 12:07 | 15 | Q. So let me kind of break that down if you |
| 12:08 | 16 | wouldn't mind. |
| 12:08 | 17 | You graduated from high school in '99. |
| 12:08 | 18 | Did you immediately go to U of H? |
| 12:08 | 19 | A. Yes, sir. |
| 12:08 | 20 | Q. You said you spent a semester there. Why did |
| 12:08 | 21 | you move back? |
| 12:08 | 22 | A. It wasn't for me. I didn't like it. |
| 12:08 | 23 | Q. Okay. When you moved back into the -- the |
| 12:08 | 24 | Valley, did you start at UTRGV at that point? |
| 12:08 | 25 | A. Correct. |

Page 8

| Time | Line | |
|---|---|---|
| 12:08 | 1 | Q. And how long did you go to school at UTRGV |
| 12:08 | 2 | during that period? |
| 12:08 | 3 | A. For a year. |
| 12:08 | 4 | Q. And what was your major? |
| 12:08 | 5 | A. I was undecided at the time. |
| 12:08 | 6 | Q. Did you complete your education at UTRGV during |
| 12:08 | 7 | that time? |
| 12:08 | 8 | A. No, sir. |
| 12:08 | 9 | Q. Okay. At what year did you cease going to |
| 12:08 | 10 | school at UTRGV during this time period? |
| 12:08 | 11 | A. When I came back, it was 2000 is when I stopped |
| 12:08 | 12 | going. |
| 12:08 | 13 | Q. Okay. |
| 12:08 | 14 | A. When I came back again after my accident was |
| 12:09 | 15 | back in 2000 -- I started in 2010 and finished in 2015. |
| 12:09 | 16 | Q. Okay. During that time period between 2000 and |
| 12:09 | 17 | 2007, were you employed? |
| 12:09 | 18 | A. Yes, sir. |
| 12:09 | 19 | Q. Okay. After stopping your studies at UTRGV, |
| 12:09 | 20 | where were you employed first? |
| 12:09 | 21 | A. My first employment was working at Greyhound, |
| 12:09 | 22 | the bus stop -- the bus station. I'm sorry. |
| 12:09 | 23 | Q. Okay. Here in -- in -- |
| 12:09 | 24 | A. Brownsville, correct. |
| 12:09 | 25 | Q. Okay. And how long did you work at Greyhound? |

2 (Pages 5 to 8)

```
                                                   Page 105
15:06  1      A.  I don't recall.  I want to say Anglo, but I --
15:06  2   I know she had, like, blondish hair.
15:06  3      Q.  Well, we know she had a walkie-talkie.
15:07  4      A.  We know she had a walkie-talkie, yes.
15:07  5      Q.  Okay.  As it relates to your discussion about
15:07  6   not wanting to be manhandled, you had that discussion
15:07  7   with her; is that right?
15:07  8      A.  Yes.  Her and both the -- anybody that asked me
15:07  9   that wanted.  I don't remember.  I think it was the --
15:07 10   it was her and the other -- the gentlemen that were
15:07 11   wanting to load me.
15:07 12      Q.  Okay.
15:07 13      A.  That was one of their, you know, questions.
15:07 14   And I -- I just said it out loud to everybody, that
15:07 15   that was out of the question for me to be manhandled
15:07 16   like that in that way.
15:07 17      Q.  You didn't want four people picking you up and
15:07 18   putting you down.  You wanted to be picked up with
15:07 19   the --
15:07 20      A.  Something, yeah.
15:07 21      Q.  -- the sling?
15:07 22      A.  Yeah.  With, you know, something -- I mean,
15:07 23   there's different ways.  You know, people -- they train
15:07 24   people how to -- you know, they trained my brother.
15:07 25   You know, they train people on how to do certain
```

```
                                                   Page 106
15:08  1   things, you know, but I thought maybe somebody --
15:08  2   that's why I asked them if they had been trained before
15:08  3   and if they had any ways of -- of transporting me, and
15:08  4   they said no.
15:08  5      Q.  They hadn't been trained to use your Hoyer
15:08  6   lift.  Is that what you're saying?
15:08  7      A.  Or you just practice on how to, you know, move
15:08  8   somebody from -- from a -- like from a wheelchair.
15:08  9   That was my concern.  You know, and that's when they
15:08 10   said that, no, that they -- they only loaded the
15:08 11   baggage, that that's what their job was.
15:08 12      Q.  Okay.  From -- after being loaded onto the
15:08 13   aisle chair, you were taken down the -- the ramp
15:08 14   towards the aircraft; is that right?
15:08 15      A.  After -- I'm sorry.  Can you repeat?
15:08 16      Q.  You were loaded -- you were loaded on the aisle
15:09 17   chair --
15:09 18      A.  Uh-huh.
15:09 19      Q.  -- and then you were taken down the -- the
15:09 20   gangway or the ramp to the aircraft; is that correct?
15:09 21      A.  Correct.
15:09 22      Q.  And you were pushed by one of the two men, and
15:09 23   then your aisle -- the aisle chair was put into the
15:09 24   aircraft; is that true?
15:09 25      A.  The men didn't get there until once I was
```

```
                                                   Page 107
15:09  1   inside.  So the one that was pushing was the lady with
15:09  2   the walkie-talkie.
15:09  3      Q.  Okay.  The lady with the walkie-talkie pushed
15:09  4   you?
15:09  5      A.  Yeah.  She was the one that was guiding, and my
15:09  6   family was behind.  And once we got into the -- that
15:09  7   hallway, whatever, to load, the -- what is it?  The --
15:09  8      Q.  The ramp way or the jet bridge?
15:09  9      A.  Yeah, the bridge.  Once we were at the end,
15:09 10   that's when they were figuring out how to get me in
15:09 11   there.  And that's when they called backup or those two
15:10 12   gentlemen come and help.
15:10 13      Q.  Okay.  How did the chair get into the airplane,
15:10 14   the aisle chair?
15:10 15      A.  They pushed me.
15:10 16      Q.  Okay.  Where were the flight attendants, if you
15:10 17   recall?
15:10 18      A.  They were out -- I mean, most of us were
15:10 19   outside trying to figure out a plan.  So she was in and
15:10 20   out.  It was a lady that was in and out.
15:10 21      Q.  Okay.  Do you recall ever seeing the pilots?
15:10 22      A.  He came out once, yes.  He came out and also
15:10 23   tried to figure it out, you know, what was going on.
15:10 24   And he wasn't -- he wasn't much help.
15:10 25      Q.  Okay.  Pilot wasn't really involved?
```

```
                                                   Page 108
15:10  1      A.  No.
15:10  2      Q.  Okay.  As it relates to you getting into the
15:11  3   chair, the seat, I got your records here, and the
15:11  4   records indicate you were originally in seat 4 -- 4A;
15:11  5   is that correct?
15:11  6      A.  Yeah.  They had to switch me, because when I
15:11  7   was booking the flight, I guess somebody had already
15:11  8   picked those -- those -- they were already picked.  So
15:11  9   when I called, they said, well, just pick anything, and
15:11 10   then when you're there, they'll -- they'll arrange the
15:11 11   seating, so...
15:11 12      Q.  Okay.  Did you want to be in 3A, the front row?
15:11 13      A.  No.  That's where they told me I had to be in
15:11 14   one of those seats.
15:11 15      Q.  Who told you you had to be in 3A?
15:11 16      A.  Well, the stewardess.  Is that what they call
15:12 17   them?  The --
15:12 18      Q.  Flight attendant?
15:12 19      A.  Yes, yeah.
15:12 20      Q.  Okay.  You're saying that she told you you had
15:12 21   to be in 3A?
15:12 22      A.  Well, I mean, they -- they said that that would
15:12 23   be the -- she's, like, "This is going to be the only
15:12 24   chair where it make sense for him to sit."  So she -- I
15:12 25   guess whoever was originally going to be there, she
```

Page 109

15:12  1   spoke to them and made accommodations for them and gave
15:12  2   them free drinks and everything, and the guy was cool
15:12  3   with it. So she made all the -- she made -- yeah, she
15:12  4   made all those arrangements with him.
15:12  5        Q. I get it. She -- she made 3A available for
15:12  6   you. Is that the place you wanted to sit?
15:12  7        A. Well, I just -- no. I mean, I didn't pick it.
15:12  8   I mean, it was --
15:12  9        Q. Did you want to sit next to a relative?
15:12 10        A. I asked, yeah, my mom, because -- since I
15:12 11   needed -- I can't drink for myself. So I needed
15:12 12   somebody to -- that -- to be with me.
15:13 13        Q. And that was the problem. You were in 4A and
15:13 14   your mom was in 5 and you weren't together and you
15:13 15   wanted to be together; is that correct?
15:13 16        A. No, that wasn't a problem. I don't matter
15:13 17   where, but my thing is I needed somebody to be with me,
15:13 18   you know.
15:13 19        Q. I'm sorry. That's what I was trying to say.
15:13 20   I'm not trying to put words in your mouth, but you
15:13 21   wanted somebody next to you?
15:13 22        A. Yeah. Like I said, I didn't care where. I
15:13 23   just -- yeah, I needed somebody to be with me. And
15:13 24   like I said, when I called, I asked, because I remember
15:13 25   they told me -- I mean, from the previous before that,

Page 110

15:13  1   I had to be up front in one of those chairs, but when
15:13  2   I -- when you book the flights, that one was already --
15:13  3   they were already booked.
15:13  4        Q. Can I go around and stand next to you?
15:14  5        A. Yes, sir.
15:14  6        Q. I want to show you what I marked as Exhibit
15:14  7   No. 6, and I will represent to you this is --
15:14  8        A. Move it a little bit.
15:14  9        Q. Sure. Can you see it?
15:14 10        A. Okay.
15:14 11        Q. This is some of the information regarding your
15:14 12   ticket originally, and you did that online; is that
15:15 13   right?
15:15 14        A. Yes, sir.
15:15 15        Q. Okay. And if you look at the second page of
15:15 16   this document, this shows your flight on June 13th,
15:15 17   which was a Thursday, and this is from McAllen to
15:15 18   McCarran, which is Las Vegas. And this shows seats
15:15 19   that you -- you had selected 4A and 5C; is that right?
15:15 20        A. Uh-huh.
15:15 21        Q. Yes?
15:15 22        A. Yes.
15:15 23        Q. Okay. Now, as I understand it, you picked
15:15 24   those seats, but you wanted to sit next to either your
15:15 25   mother or another family member because you can't drink

Page 111

15:15  1   by yourself?
15:15  2        A. Correct.
15:15  3        Q. And so when you got to the airport that day on
15:15  4   the flight, you arranged it with the flight attendant
15:15  5   so you could be on the same row with a family member;
15:16  6   is that right?
15:16  7        A. Correct.
15:16  8        Q. And they accommodated you and moved people
15:16  9   around so you could be together on 3A; is that right?
15:16 10        A. Correct.
15:16 11        Q. Okay. And the flight attendant did that for
15:16 12   you at your request; is that right?
15:16 13        A. Yeah.
15:16 14        Q. Okay. Now, we sort of described you being --
15:16 15   is it easier for me to stand over here?
15:16 16        A. Don't matter.
15:16 17        Q. So you can see me. I hate to be behind the
15:16 18   court reporter.
15:16 19             MR. SWAIM: Okay with you?
15:16 20             THE COURT REPORTER: Yeah, you're fine.
15:16 21        Q. When you were being put in the airplane, as I
15:16 22   appreciate it, they get you in the aisle chair, and
15:16 23   four of you -- or four of -- four people get the -- the
15:17 24   sling to put you into the seat; is that correct?
15:17 25        A. Yes, sir.

Page 112

15:17  1        Q. Your brother was on your left side in the back;
15:17  2   is that correct?
15:17  3        A. In the back?
15:17  4        Q. He was behind you.
15:17  5        A. While they were loading me?
15:17  6        Q. Yeah. Into the -- from the aisle chair into
15:17  7   the airplane.
15:17  8        A. Yes.
15:17  9        Q. There are four positions.
15:17 10        A. Yeah. So, yes.
15:17 11        Q. One person is behind you on your left arm, and
15:17 12   one person is behind you on your right side, and then
15:17 13   one person was at your left foot, and one person was at
15:17 14   your right foot?
15:17 15        A. Yes. So, yeah, my brother was over here.
15:17 16        Q. Okay. So your brother was behind you. There
15:17 17   was a man in the uniform on your right arm; is that
15:17 18   right?
15:17 19        A. Correct.
15:17 20        Q. Then your dad was on the left, or was he on
15:18 21   your right foot?
15:18 22        A. Right.
15:18 23        Q. He was on your right foot. And another man
15:18 24   from one of the companies was on your left foot?
15:18 25        A. Correct.

28 (Pages 109 to 112)

```
                                                      Page 129                                                       Page 131
15:42  1   supplies, what equipment we need.  So, again, they --    15:45  1   -- the incident that happened on 2019?
15:42  2   they set me up with -- with the prescription for an air  15:45  2   A. Correct.
15:43  3   mattress.  So the mattress is an air mattress also by    15:45  3          MR. JOHNSON:  Objection, leading.
15:43  4   ROHO.  They set me up with a chair.  This chair, it      15:45  4   Q. Have they helped since 2019?
15:43  5   tilts, it reclines, it elevates.  So it's got four       15:45  5   A. Not really.  I mean, it's been the same.
15:43  6   functions and all that is -- is to relieve sores and     15:45  6   Q. When you -- when you purchased the airline
15:43  7   for me not to -- to develop them.                        15:45  7   tickets online, were you the one that filled out --
15:43  8          The bed also does that.  It also tilts.           15:45  8   answered all the questions?
15:43  9   It also reclines.  So it's got a lot of functions for    15:46  9   A. Yes.
15:43 10   me to move around my sores.  It has another function     15:46 10   Q. Was there a section on the website that allowed
15:43 11   where the air moves so I don't have too much pressure    15:46 11   you to notify or let Allegiant know that you were
15:43 12   on one side.  That's the bed.                            15:46 12   handicapped?
15:43 13          They -- for transporting, they -- they            15:46 13   A. Yes.
15:43 14   showed us how to use the Hoyer, the lift, a shower       15:46 14   Q. And was there a section there that you had to
15:43 15   chair that's special also that also reclines and stuff.  15:46 15   fill out describing what your handicap or your
15:44 16   So all this stuff that they provided was for that,       15:46 16   condition was, or did you have to check something off?
15:44 17   for -- for me not to get hurt, for me not to develop     15:46 17   A. Just check if you're handicapped.
15:44 18   sores.  So since then, I haven't had a problem with --   15:46 18   Q. Okay.
15:44 19   with bedsores at all whatsoever.                         15:46 19   A. And equipment -- special equipment that we
15:44 20   Q. And -- and as a result of all of that, the            15:46 20   needed to transport.
15:44 21   instruction and the products and the items and           15:46 21   Q. But Allegiant became aware of that certainly
15:44 22   teachings that were provided to you by DARS and TIRR,    15:46 22   when you got to the ticket counter, correct?
15:44 23   in your opinion, did that help with the healing of the   15:46 23   A. Yes.
15:44 24   wounds?                                                  15:46 24          MR. SWAIM:  Objection, form.
15:44 25   A. Oh, most definitely, yeah.                            15:46 25   Q. And when you got to -- to the gate?

                                                      Page 130                                                       Page 132
15:44  1   Q. And have you -- have you continued using those        15:46  1   A. Yes, sir.
15:44  2   products and following those instructions after they     15:46  2   Q. You and your family were there with your --
15:44  3   healed?                                                  15:46  3   with your equipment and your wheelchair, correct?
15:44  4   A. Most definitely, yes.                                 15:46  4   A. Correct.
15:44  5   Q. What about after the incident that occurred on        15:46  5   Q. And they saw you in your wheelchair?
15:44  6   the Allegiant airplane in 2019?  Did you continue?       15:46  6   A. Yes, sir.
15:44  7   A. Continue, yeah.                                       15:46  7          MR. CISNEROS:  Okay.  Pass.
15:44  8          We didn't change anything.  Nothing               15:46  8                 EXAMINATION
15:44  9   changed as far as my basic daily routine.                15:46  9   BY MR. JOHNSON:
15:45 10   Q. As taught to you by TIRRs --                          15:46 10   Q. Mr. Garza, just one quick point of
15:45 11   A. Correct.                                              15:46 11   clarification.
15:45 12   Q. -- or TIRR and -- and DARS?                           15:46 12          For DARS, which office of DARS do you deal
15:45 13   A. Yeah, TIRR.  Yeah, DARS -- DARS is a supplier.        15:47 13   with?
15:45 14          They're the ones that help me with -- with        15:47 14   A. Brownsville offices.
15:45 15   financing and providing, and, yeah, the doctors and --   15:47 15   Q. Okay.  And who in the Brownsville office do you
15:45 16   Q. DARS helps you -- helped you purchase the             15:47 16   primarily work with?
15:45 17   wheelchair.                                              15:47 17   A. Like I said in the past, since I've been with
15:45 18   A. Correct, yeah.                                        15:47 18   them, I think I've had, like, nine counselors, but I
15:45 19   Q. Anything else?                                        15:47 19   want to say at the time when all this happened, Lorena.
15:45 20   A. The wheelchair and the -- anything that               15:47 20   I want to say Vega is her last name, V-E-G-A, is the
15:45 21   Medicare does not provide, they're the ones that help    15:47 21   counselor I was -- I was seeing at the time.
15:45 22   me out.                                                  15:47 22   Q. And have you received any equipment -- and when
15:45 23   Q. So none of that has helped heal the wounds that       15:47 23   I'm talking equipment, I'm specifically referring to
15:45 24   came about after the --                                  15:47 24   your wheelchair, your -- the Hoyer lift and Hoyer sling
15:45 25   A. No, sir.                                              15:47 25   and then your bed.
```

33 (Pages 129 to 132)

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755     McAllen     Harlingen     Brownsville     McAllen (956) 618-2366

Electronically signed by Donna McCown (101-253-986-8079)                              6fd197d9-3aac-431d-a212-001f7f2cd94e

## Page 133

```
15:47  1        Have you received any equipment from
15:47  2   anybody other than DARS that you use?
15:47  3        A.  No, sir.
15:47  4        MR. JOHNSON:  I'll pass the witness.
15:47  5        MR. SWAIM:  We'll reserve ours.
15:47  6        (Deposition concluded)
       7
       8
       9
      10
      11
      12
      13
      14
      15
      16
      17
      18
      19
      20
      21
      22
      23
      24
      25
```

## Page 134

```
 1              CHANGES AND SIGNATURE
 2   WITNESS NAME: FILIBERTO J. GARZA MORENO
     DATE OF DEPOSITION:  FEBRUARY 18, 2022
 3
     PAGE LINE  CHANGE                 REASON
 4   _____
 5   _____
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25
```

## Page 135

```
 1        I, FILIBERTO J. GARZA MORENO, have read the
     foregoing transcript and hereby affix my signature that
 2   same is true and correct, except as noted above.
 3
 4        _____
             FILIBERTO J. GARZA MORENO
 5
 6   THE STATE OF TEXAS     )(
     COUNTY OF _____  )(
 7
 8
              Before me, _____,
 9   on this day personally appeared FILIBERTO J. GARZA
     MORENO, known to me (or proved to me under oath or
10   through _____) (description of identity card
     or other document) to be the person whose name is
11   subscribed to the foregoing instrument and acknowledged
     to me that they executed the same for the purposes and
12   consideration therein expressed.
13        Given under my hand and seal of office
     this _____ day of _____, 2022.
14
15
16
17        _____
             Notary Public in and for
18           The State of Texas
19
20
21
22
23
24
25
```

## Page 136

```
 1        IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  McALLEN DIVISION
 3   FILIBERTO J. GARZA MORENO   )(
          Plaintiff       )(
 4                        )(
     VS.                  )(  CIVIL ACTION NO.
 5                        )(  7:21-cv-00247
     ALLEGIANT TRAVEL COMPANY,   )(
 6   ALLEGIANT AIR LLC, AND      )(
     AIRPORT TERMINAL SERVICES   )(
 7   INC.                 )(
          Defendants      )(
 8
 9             REPORTER'S CERTIFICATE
10        I, DONNA McCOWN, Certified Court Reporter,
     certify that the witness, FILIBERTO J. GARZA MORENO,
11   was duly sworn by me, and that the deposition
     transcript is a true and correct record of the
12   testimony given by the witness on FEBRUARY 18, 2022,
     and that the deposition was reported by me in
13   stenograph and was subsequently transcribed under my
     supervision.
14        Pursuant to Federal Rule 30(e)(2), a review of
     the transcript was requested.
15
          I FURTHER CERTIFY that I am not a relative,
16   employee, attorney or counsel of any of the parties,
     nor a relative or employee of such attorney or counsel,
17   nor am I financially interested in the action.
18        WITNESS MY HAND on this the _____ day of
     _____, 2022.
19
20
21   _____
     DONNA McCOWN, Texas CSR 6625
22   Expiration Date: 01-31-24
     Bryant & Stingley, Inc., CRN No. 41
23   2010 East Harrison
     Harlingen, Texas  78550
24   (956) 428-0755
25
```

34 (Pages 133 to 136)

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755    McAllen    Harlingen    Brownsville    McAllen (956) 618-2366