# Exhibit "3"

## Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

FILIBERTO J. GARZA MORENO )
                          )
VS.                       ) C.A. NO. 7-21-CV-247
                          )
ALLEGIANT TRAVEL COMPANY, )
ALLEGIANT AIR LLC, AND    )
AIRPORT TERMINAL SERVICES )
INC.                      )

---

ORAL AND VIDEOTAPED DEPOSITION OF
DORA RODRIGUEZ
MAY 18, 2022

---

   ORAL AND VIDEOTAPED DEPOSITION OF DORA RODRIGUEZ, produced as a witness at the instance of the Plaintiff, taken in the above-styled and numbered cause on May 18, 2022, from 10:36 a.m. to 1:01 p.m., by Renee W. Crouch, Certified Court Reporter No. 5645, in and for the State of Texas, at the offices of Thornton, Biechlin, Reynolds & Guerra, 418 East Dove Avenue, McAllen, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached therein.

## Page 2

APPEARANCES

COUNSEL FOR THE PLAINTIFF:
   Michael J. Cisneros
   THE CISNEROS LAW FIRM, L.L.P.
   312 Lindberg
   McAllen, Texas 78501

COUNSEL FOR THE DEFENDANT, ALLEGIANT TRAVEL COMPANY AND ALLEGIANT AIR, LLC:

   Don Swaim
   CUNNINGHAM SWAIM, LLP
   4015 Main Street, Suite 200
   Dallas, Texas 75226

COUNSEL FOR THE DEFENDANT, AIRPORT TERMINAL SERVICES, INC.:
   Robert L. Guerra
   THORNTON, BIECHLIN, REYNOLDS & GUERRA
   418 East Dove Avenue
   McAllen, Texas 78504

   and

   David A. Johnson
   (Appearing Via Zoom)
   COWLES & THOMPSON, P.C.
   901 Main Street, Suite 9300
   Dallas, Texas 75202

ALSO PRESENT: Mark Longoria, Videographer
              Anna Solis, Paralegal

## Page 3

          INDEX
                                          PAGE
Appearances ......................................2
DORA RODRIGUEZ
  Examination by Mr. Cisneros .....................4
  Changes/Signature Page ........................111
  Court Reporter's Certificate ..................113
  Attached to the end of the transcript: Stipulations

          EXHIBITS

EXHIBIT      DESCRIPTION              PAGE
  1     Ops Worksheet                  31
  2     6.13.2019 Typed Statement      69
  3     Delay Comments                 80
  4     One Color Photo                92
  5     One Color Photo                93
  6     One Color Photo                93
  7     ATS Policies and Procedures    97
  8     Allegiant Policies and         97
        Procedures

## Page 4

1      (The reading of Federal Rule 30(b)(5)(A) into
2   the record was waived by all parties present.)
3 10:36      THE VIDEOGRAPHER: Today's date,
4 10:36  Wednesday, May the 18th, 2022. The time is 10:37 a.m.
5 10:36  Deposition of Dora Rodriguez. We're on the record.
6 10:36  Whereupon,
7 10:36           DORA RODRIGUEZ,
8 10:36  having been duly sworn, testified as follows:
9 10:36              EXAMINATION
10 10:36 BY MR. CISNEROS:
11 10:37    Q  Good morning, ma'am.
12 10:37    A  Good morning.
13 10:37    Q  Will you state your name for the record.
14 10:37    A  Dora Delia Rodriguez.
15 10:37    Q  Okay. Are you married?
16 10:37    A  No.
17 10:37    Q  Okay. I can call you Ms. Rodriguez?
18 10:37    A  Yes.
19 10:37    Q  Okay. My name is Mike Cisneros. I'm with the
20 10:37 Cisneros Law Firm here in McAllen, and we represent
21 10:37 Filiberto Garza Moreno in a personal injury lawsuit that
22 10:37 he has brought against the Allegiant Travel Company,
23 10:37 Allegiant Air, LLC, and Airport Terminal Services,
24 10:37 Incorporated. Do you understand that?
25 10:37    A  Yes, sir.

1 (Pages 1 to 4)

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755            McAllen (956) 618-2366

## Page 5

```
10:37  1    Q  If I refer to Allegiant today, I'm referring to
10:37  2  Allegiant Travel Company and Allegiant Air, LLC.  Do you
10:37  3  understand that?
10:37  4    A  Yes.
10:37  5    Q  Okay.  So if I say Allegiant, you know who that
10:37  6  means.
10:37  7    A  Uh-huh.
10:37  8    Q  And if I say ATS, that means Airport Terminal
10:37  9  Services, Incorporated, okay.
10:37 10    A  Yes, sir.
10:37 11    Q  Okay.  A little bit about you, ma'am.  How old
10:37 12  are you?
10:37 13    A  52.
10:37 14    Q  Okay.  You're about my age.
10:37 15       Okay.  What's the extent of your
10:37 16  education, ma'am?
10:37 17    A  I have some college.
10:38 18    Q  Okay.  How much?
10:38 19    A  Two years.
10:38 20    Q  Two years?  Where did you go to college?
10:38 21    A  I went to STC and Pan Am -- was then.
10:38 22    Q  Good.  STC is a good school, isn't it?
10:38 23    A  Yes, sir.
10:38 24    Q  Okay.  Ma'am, you're not under the influence of
10:38 25  any prescription drugs or illegal drugs or alcohol that
```

## Page 6

```
10:38  1  might affect you being able to testify today, correct?
10:38  2    A  No, sir.
10:38  3    Q  Okay.  Let's talk about your employment
10:38  4  history.  Since getting out of college -- or maybe you
10:38  5  worked during college -- tell me where you've worked
10:38  6  over the last, say, 20, 25 years.
10:38  7    A  I had a day care for 13 years.  Worked at Texas
10:38  8  Youth Commission.  I was there for five years, five and
10:38  9  a half.  I worked for two attorneys, one immigration
10:39 10  attorney and another attorney here in McAllen.  And I'm
10:39 11  going on five years with ATS.
10:39 12    Q  Okay.  And so when did you begin working for
10:39 13  ATS?
10:39 14    A  November, 2017.
10:39 15    Q  Okay.  So if the incident made the basis of
10:39 16  this lawsuit occurred in June of 2019, how long had you
10:39 17  been working for ATS during that period of time?
10:39 18    A  About a year and a half, more or less.
10:39 19    Q  Okay.  And up to the point of the incident,
10:39 20  what type of job duties were you performing for ATS?
10:39 21    A  I'm a CSA, a customer service agent, so I
10:39 22  assist checking in passengers, checking in bags.  I also
10:39 23  assist at the gate, boarding passengers, assisting with
10:40 24  passengers boarding and needs that they have.
10:40 25    Q  Okay.  During -- in June of 2019, how many
```

## Page 7

```
10:40  1  employees did ATS have working at the McAllen
10:40  2  International Airport, if you know?
10:40  3    A  I don't know.
10:40  4    Q  Were there more than four?
10:40  5    A  I don't know.  Yes, more than four.
10:40  6    Q  Okay.  How many employees were performing the
10:40  7  duties that you performed at McAllen International
10:40  8  Airport, if you know?
10:40  9       MR. SWAIM:  Just for clarification
10:40 10  purposes, at one time?
10:40 11       MR. CISNEROS:  Yeah.  No.  We're talking
10:40 12  about during June of 2019.
10:40 13    Q  (BY MR. CISNEROS)  So let me rephrase, ma'am.
10:40 14       The incident happened, again -- you're
10:40 15  aware that the incident made the basis of this lawsuit
10:40 16  occurred in June of 2019, correct?
10:40 17    A  Correct.
10:40 18    Q  So in June, right, early June when this
10:40 19  incident occurred, do you know how many employees for
10:41 20  ATS were performing the same duties that you were
10:41 21  performing at McAllen International Airport?
10:41 22    A  Can you be more specific as to airline,
10:41 23  airport.
10:41 24    Q  Okay.  We'll get to that.  Let me go back a
10:41 25  little bit.  You are aware that the incident made the
```

## Page 8

```
10:41  1  basis of this lawsuit occurred at the McAllen
10:41  2  International Airport, right?
10:41  3    A  Yes, sir.
10:41  4    Q  And if it happened on June the 13th, 2019, you
10:41  5  were working for ATS at the McAllen International
10:41  6  Airport on that date, correct?
10:41  7    A  Yes, sir.
10:41  8    Q  Okay.  And you've explained your duties, right,
10:41  9  to us today, correct?
10:41 10    A  Correct.
10:41 11    Q  Meaning you've explained the duties that you
10:41 12  were performing on that date, correct?
10:41 13    A  Correct.
10:41 14    Q  Okay.  Were there any other employees
10:41 15  performing those same duties and responsibilities on
10:41 16  June the 13th, 2019 at the airport?
10:41 17    A  Yes.
10:41 18    Q  Who were they?  Can you give me their names?
10:42 19    A  Can you be -- please be more specific as to
10:42 20  what, because there's several functions for different
10:42 21  people.
10:42 22    Q  Okay.  Well, specifically the duties that you
10:42 23  told us that you were responsible for.
10:42 24    A  There was four of us.
10:42 25    Q  Okay.  There was the two gentlemen that helped
```

2 (Pages 5 to 8)

Page 9

```
10:42  1   you with the plaintiff, correct, with Mr. Moreno?  Tell
10:42  2   me the four, ma'am.
10:42  3      A   So you're talking at the gate.
10:42  4      Q   ATS does -- performs a lot of services at the
10:42  5   airport, correct?
10:42  6      A   Correct.
10:42  7      Q   And give me just a minute, ma'am.
10:42  8          Do you know all the services that ATS
10:43  9   provides -- does at the airport or was doing at that
10:43 10   time?
10:43 11      A   It's a wide variety, sir.
10:43 12      Q   I know.  Can you tell us what they are?
10:43 13      A   The agents?  I can't understand what you're
10:43 14   saying --
10:43 15      Q   Well --
10:43 16      A   -- what you're asking.  I'm sorry.
10:43 17      Q   Yeah.  ATS performs a lot of services at the
10:43 18   airport, right?
10:43 19      A   Right.
10:43 20      Q   Okay.  And you told us the limited duties and
10:43 21   responsibilities that you did at that particular time,
10:43 22   correct?
10:43 23      A   Yes, sir.
10:43 24      Q   That's what I'm interested in.  Were there any
10:43 25   other employees doing what you did; loading passengers
```

Page 10

```
10:43  1   seeing to their needs before boarding, things of that
10:43  2   nature?
10:43  3          MR. GUERRA:  On that date.
10:43  4          MR. CISNEROS:  Yeah.  Yeah.  I already
10:43  5   said that, on that date.
10:43  6          MR. GUERRA:  Yeah.
10:43  7      Q   (BY MR. CISNEROS)  Yeah.  It's not a trick
10:43  8   question, ma'am.  I'm not trying to ...
10:43  9      A   It was just me.  At the gate it was just me.
10:43 10      Q   Okay.  And so did you have -- you had a
10:44 11   supervisor, did you not?  Was there somebody --
10:44 12      A   I was the lead.
10:44 13      Q   Okay.  And when the incident occurred, Aaron
10:44 14   Garza was assisting you, correct?  Excuse me.  Not him.
10:44 15   There were two individuals assisting you, Robert
10:44 16   Castillo, and who else?
10:44 17      A   Robert Reyes.
10:44 18      Q   Okay.  The two Roberts?
10:44 19      A   Uh-huh.
10:44 20      Q   Okay.  And did they have the same
10:44 21   responsibilities and duties as you or different?
10:44 22      A   They had different responsibilities.
10:44 23      Q   Do you know what they were?
10:44 24      A   They're ramp agents.
10:44 25      Q   Okay.  What do ramp agents do?
```

Page 11

```
10:44  1      A   They're in charge mostly with bags, taking in
10:44  2   bags, bringing -- marshaling the aircraft --
10:45  3          THE REPORTER:  I'm sorry?
10:45  4          THE WITNESS:  Marshaling the aircraft when
10:45  5   walking.  Just any duties below the wing.
10:45  6      Q   (BY MR. CISNEROS)  Okay.  How much were you
10:45  7   getting paid in June of 2019, ma'am?
10:45  8      A   I believe it was 10.50.
10:45  9      Q   10.50 an hour?
10:45 10      A   Yes, sir.
10:45 11      Q   How many hours would you work a week, ma'am?
10:45 12      A   It varies.  Between 20 and 35.
10:45 13      Q   Okay.  And would you ever work overtime?
10:45 14      A   I have worked overtime.
10:45 15      Q   Was it -- is it a common occurrence or common
10:45 16   thing for you to work overtime?
10:45 17      A   No.
10:45 18      Q   Okay.  So most of the time, you'd work 35 hours
10:45 19   a week?
10:46 20      A   Between 20 and 35, yes.
10:46 21      Q   Okay.  And were you ever provided with any
10:46 22   bonuses or increases in pay for, you know, planes
10:46 23   leaving on time or no accidents occurring on the
10:46 24   airplane, anything of that nature?
10:46 25      A   We get an annual raise.
```

Page 12

```
10:46  1      Q   Very good.  But the lack of accidents occurring
10:46  2   did not have an effect on increases in pay, then,
10:46  3   correct?
10:46  4      A   It's an annual raise, sir.
10:46  5      Q   Okay.  Do you know how much money the -- these
10:46  6   other individuals who were working, the Roberts?
10:46  7      A   No.
10:46  8      Q   You don't know?
10:46  9      A   (Nodding)
10:46 10      Q   Okay.  Would you ever have any safety meetings
10:46 11   that were either conducted by Allegiant or ATS?
10:46 12      A   We do.
10:46 13      Q   And are those -- do those occur regularly?
10:46 14      A   Yes, sir.
10:47 15      Q   How often do they occur?
10:47 16      A   Weekly.
10:47 17      Q   Okay.  After this incident occurred, was there
10:47 18   a safety meeting that took place after June the 19th,
10:47 19   2019?
10:47 20      A   We have weekly meetings.
10:47 21      Q   Was there a meeting that took place
10:47 22   specifically because this incident occurred?
10:47 23      A   Not necessarily.
10:47 24      Q   Okay.  What day of the week would the meetings
10:47 25   occur?
```

3 (Pages 9 to 12)

BRYANT & STINGLEY, INC.

Harlingen (956) 428-0755    McAllen (956) 618-2366

Page 25

```
11:00  1    names, correct? Let me rephrase.
11:01  2         I told you that there were Allegiant
11:01  3    Airline policies and procedures, correct?
11:01  4    A   Correct.
11:01  5    Q   And I gave you the titles -- or we talked --
11:01  6    we -- you described those for me, correct? We talked
11:01  7    about the module.
11:01  8    A   The module, yes.
11:01  9    Q   And then we talked about the 14 CFR Part 382
11:01 10    and the ACAA, that -- those laws are not -- pertain to
11:01 11    the nondiscrimination of passengers with disabilities,
11:01 12    correct?
11:01 13    A   Correct.
11:01 14    Q   After you were hired five years ago, were you
11:01 15    given an opportunity to review these, to go through the
11:01 16    module and then review the policies and procedures
11:01 17    pertaining to passengers with disabilities?
11:01 18         MR. GUERRA: On the Allegiant policies.
11:01 19         MR. CISNEROS: Yes, sir, in the binder.
11:01 20    A   Yes, sir.
11:01 21    Q   (BY MR. CISNEROS) Okay. Do you know how soon
11:01 22    after you were employed did you have an opportunity to
11:01 23    review those?
11:01 24    A   Immediately.
11:01 25    Q   Okay. And did you also a few weeks ago or a
```

Page 26

```
11:02  1    week ago have an opportunity to go through the module
11:02  2    and review the law pertaining to passengers with
11:02  3    disabilities?
11:02  4    A   Yes, sir.
11:02  5    Q   Okay. And even though you reviewed them,
11:02  6    though, you're not an expert on these policies and
11:02  7    procedures, correct?
11:02  8    A   I'm not an expert.
11:02  9    Q   Or are you?
11:02 10    A   No.
11:02 11    Q   But are you pretty familiar with them?
11:02 12    A   Yes, sir.
11:02 13    Q   Are you familiar with them as they pertain to
11:02 14    loading a passenger onto a seat on the airplane who has
11:02 15    a disability?
11:02 16    A   Am I familiar?
11:02 17    Q   Yeah. Generally familiar.
11:02 18    A   Yes, sir.
11:02 19    Q   Okay. But you're not here testifying as an
11:02 20    expert with regard to these policies and procedures,
11:02 21    correct?
11:02 22    A   Correct.
11:02 23    Q   But you generally understand them, correct?
11:02 24    A   Yes, sir.
11:02 25    Q   Okay. Do you know how it was that you and/or
```

Page 27

```
11:02  1    ATS became aware that Mr. Moreno had a physical
11:03  2    disability and he was going to need assistance with
11:03  3    boarding the plane?
11:03  4    A   Can you repeat that.
11:03  5    Q   Yes, ma'am. At what -- if Mr. Moreno purchases
11:03  6    his ticket online, okay, and there was some kind of a
11:03  7    box or indication there that he checked that --
11:03  8    notifying Allegiant that he was going to -- he was
11:03  9    disabled and going to need assistance boarding the
11:03 10    plane, how does ATS or you become aware of that that is the
11:03 11    case with regard to him?
11:03 12    A   They put -- or they check off the SSR box.
11:03 13    Q   Okay. And who checks that off?
11:03 14    A   The passenger.
11:03 15    Q   Okay. So -- but that's through Allegiant's
11:03 16    website. Say in this situation, how would you, as an
11:03 17    employee for ATS, become aware of that?
11:03 18    A   When we see them coming in, we review the
11:03 19    manifest.
11:03 20    Q   Okay. So upon reviewing the manifest way
11:04 21    before he even gets to the airport, ATS would have known
11:04 22    that he was going to need assistance, correct?
11:04 23         Let me go back a little bit, ma'am. Do
11:04 24    you know when the manifest was reviewed by someone
11:04 25    working for ATS on June the 19th of 2019 or before?
```

Page 28

```
11:04  1         MR. GUERRA: I think you said June 13th of
11:04  2    2019.
11:04  3         MR. CISNEROS: Yeah, June the 13th. I'm
11:04  4    sorry.
11:04  5         MR. SWAIM: Objection, form.
11:04  6    Q   (BY MR. CISNEROS) Let me rephrase the
11:04  7    question, ma'am. I want to make sure. I get June 3 and
11:04  8    June 13 confused. She was telling me June 3 yesterday.
11:04  9         Yeah, June the 13th. So he was scheduled
11:04 10    to fly out June the 13th --
11:04 11    A   Yes, sir.
11:04 12    Q   -- of 2019.
11:04 13         Do you know when anybody for ATS became
11:04 14    aware that he was going to need assistance boarding the
11:04 15    plane due to a disability that he had?
11:04 16         MR. SWAIM: Objection, form.
11:04 17    A   We usually review manifest 24 hours before.
11:05 18    Q   (BY MR. CISNEROS) Okay. So no one would have
11:05 19    had to have told you that he needed assistance, because
11:05 20    it's policy and procedure for you and/or employees of
11:05 21    ATS to review the manifest 24 hours before.
11:05 22    A   Correct.
11:05 23    Q   Okay. You work at -- ATS works -- set up at --
11:05 24    let me rephrase that.
11:05 25         ATS performs services for airlines at the
```

7 (Pages 25 to 28)

BRYANT & STINGLEY, INC.

Harlingen (956) 428-0755                McAllen (956) 618-2366

Electronically signed by Renee Crouch (501-178-759-2734)                c6c18a21-7499-4117-9b7b-c0b3dff36b94

```
                                                      Page 29                                                       Page 31
11:05  1   McAllen International Airport, correct?              11:08  1       A   Yes.
11:05  2       A   Correct.                                     11:08  2       Q   What is her name?
11:05  3       Q   And we've already established that's where this  11:08  3   A   Irma Hernandez.
11:05  4   incident occurred, correct?                          11:08  4       Q   Was Irma at the airport at the time that the
11:05  5       A   Correct.                                     11:08  5   incident occurred?
11:05  6       Q   But ATS provides services not only for       11:08  6       A   No, sir.
11:05  7   Allegiant but other airlines.  Is that also correct? 11:08  7       Q   Okay.  The incident happened in the evening,
11:05  8       A   Correct.                                     11:09  8   correct?
11:05  9       Q   Okay.  And there are a lot of services that ATS 11:09  9   A   That's correct.
11:05 10   provides those airlines, correct?                    11:09 10       Q   Okay.  Okay.  So let's back up a little bit.
11:06 11       A   Can you elaborate, please.                   11:09 11   Let me see here.  Do you know what time the flight
11:06 12       Q   Yeah, sure, ma'am.  Give me just a minute.   11:09 12   coming in from Las Vegas was scheduled to arrive at the
11:06 13           MR. GUERRA:  Do you have her mic mixed so    11:09 13   airport that evening?
11:06 14   that her low voice is loud enough on the recording?  11:09 14       A   No, sir.
11:06 15   Okay.                                                11:09 15       Q   Okay.  Let me hand you what's been marked as
11:06 16       Q   (BY MR. CISNEROS)  Is it true or not true that 11:09 16  Exhibit 1 for your deposition.  And this document is
11:06 17   some of the services that ATS provides Allegiant and 11:09 17   entitled Ops Worksheet.
11:07 18   other airlines at the McAllen International Airport are 11:10 18         MR. SWAIM:  Exhibit 1?
11:07 19   liaison with local authorities, administrative      11:10 19           MR. CISNEROS:  Yes, sir.
11:07 20   functions, passenger services, arrange for special  11:10 20           MR. SWAIM:  Thank you.
11:07 21   equipment, facilities, specially trained personnel for 11:10 21         MR. CISNEROS:  Uh-huh.
11:07 22   assistance for disabled passengers, handle lost and 11:10 22       Q   (BY MR. CISNEROS)  Do you remember --
11:07 23   found issues, report to the carrier irregularities,  11:10 23          MR. GUERRA:  Hold on.  David, it's Bates
11:07 24   matters concerning departure, baggage, check-in,     11:10 24   No. 003 -- ATS 003.
11:07 25   arrival, handling bags, things of that nature?       11:10 25          MR. JOHNSON:  Okay.  Thanks.

                                                      Page 30                                                       Page 32
11:07  1       A   Yes, sir.                                    11:10  1       Q   (BY MR. CISNEROS)  Do you know, ma'am, if the
11:07  2       Q   Okay.  There are a lot of duties and         11:10  2   flight coming in from Las Vegas was a full flight?  Or
11:07  3   responsibilities and services -- let me rephrase that. 11:10  3  do you --
11:07  4           There are a lot of services that ATS         11:10  4       A   I don't recall, sir.
11:08  5   provides these airlines, including Allegiant; is that 11:10  5       Q   Okay.  Yeah.  What is an Ops Worksheet, ma'am?
11:08  6   correct?                                             11:10  6       A   It's Operations Worksheet.
11:08  7       A   Can you repeat that.                         11:10  7       Q   Okay.  And who fills out this worksheet?
11:08  8       Q   Yeah.  It's just not loading passengers on the 11:10  8      A   The gate agent.
11:08  9   plane that ATS does, correct?                        11:10  9       Q   Okay.  Have you ever seen this worksheet
11:08 10       A   Correct.                                     11:10 10   before?
11:08 11       Q   I mean, there are a lot of other things that 11:10 11       A   Yes, sir.
11:08 12   ATS does for Allegiant and other airlines at the     11:10 12       Q   Okay.  Do you know what time the flight leaving
11:08 13   airport, correct?                                    11:10 13   to Las Vegas was scheduled to depart?
11:08 14       A   That's correct.                              11:11 14       A   I don't recall the exact time.
11:08 15       Q   And so I know that you mentioned that you and 11:11 15      Q   You don't.  Okay.  Well, if you look here at
11:08 16   the Roberts -- employees named Robert that we were   11:11 16   the -- this document, ma'am, the flight coming -- is it
11:08 17   talking about earlier -- you know, were assisting you 11:11 17   true, ma'am, that at that particular time, the flight
11:08 18   with boarding Mr. Moreno.  But there's many other    11:11 18   coming in from Las Vegas arrives in McAllen and then
11:08 19   employees that work at the airport, correct?         11:11 19   deplanes, and then boarding occurs and then the plane
11:08 20       A   Correct.                                     11:11 20   goes back to Las Vegas; is that correct?
11:08 21       Q   Just not you three, right?                   11:11 21       A   Yes, sir.
11:08 22       A   Correct.                                     11:11 22       Q   Okay.  And so the ETA, as noted on this
11:08 23       Q   Okay.  And you still -- the name of your     11:11 23   document here -- estimated time of arrival -- for the
11:08 24   supervisor -- you don't know who that is?  Is there a 11:11 24   flight coming in from Las Vegas was 8:27; is that
11:08 25   head lady at the airport in charge?                  11:11 25   correct?
```

8 (Pages 29 to 32)

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755                         McAllen (956) 618-2366

Page 57

```
11:37  1     Q   Okay.  In this case when you transferred
11:37  2   Mr. Moreno, okay, from an aisle wheelchair to a seat on
11:37  3   the airplane, that process was not used, correct?
11:37  4     A   That's correct.
11:37  5     Q   And that was a violation of the policies and
11:37  6   procedures set out by Allegiant and ATS, correct?
11:37  7         MR. GUERRA:  Objection, form.
11:37  8     A   Not necessarily.
11:37  9     Q   (BY MR. CISNEROS)  Is it -- what do you call it
11:37 10   again?  You or the other ATS employees, you didn't grab
11:37 11   Mr. Moreno under the armpits and under the legs,
11:37 12   correct?
11:37 13     A   Correct.
11:37 14     Q   Okay.  So if that's set out in the policies,
11:37 15   okay, the policies were violated, were they not?
11:37 16         MR. GUERRA:  Objection, form.
11:37 17     A   Not necessarily, sir.
11:37 18     Q   (BY MR. CISNEROS)  Why do you say that?
11:38 19     A   That's when -- that's why we ask the passengers
11:38 20   how may we best assist them.  If they refuse our
11:38 21   assistance, then we listen to them because we're not
11:38 22   going to -- we're not going to touch them if they refuse
11:38 23   that.
11:38 24     Q   Ma'am, Mr. Moreno didn't work for ATS, correct?
11:38 25     A   No, he didn't.
```

Page 58

```
11:38  1     Q   He didn't work for Allegiant, correct?
11:38  2     A   Correct.
11:38  3     Q   He was simply a disabled, incapacitated
11:38  4   passenger that wanted to fly an Allegiant flight, okay,
11:38  5   to Vegas, correct?
11:38  6     A   That's correct.
11:38  7     Q   And he was a paying customer, was he not?
11:38  8     A   Yes, sir.
11:38  9     Q   Okay.  And you're telling me that it was his
11:38 10   fault, then, okay, if he requested something different
11:38 11   than as was required by the policies and procedures with
11:38 12   regard to how to transfer him from an aisle wheelchair
11:38 13   to a seat on the airplane.
11:38 14         MR. GUERRA:  Objection, form.
11:38 15         Don't answer that question.
11:38 16     Q   (BY MR. CISNEROS)  Okay.  Well, either way,
11:38 17   ma'am, this process of lifting him, okay, under the
11:38 18   armpits and under the legs was not used, correct?
11:39 19     A   Correct.
11:39 20     Q   All right.  What happens -- what occurs, ma'am,
11:39 21   if a passenger who's disabled weighs 220 pounds, okay?
11:39 22     A   Then we have a four-on-one.
11:39 23     Q   Four-on-one.  What is a four-on-one?
11:39 24     A   It's similar to the two-on-one, only that
11:39 25   there's one person on each arm and one person on each
```

Page 59

```
11:39  1   leg.
11:39  2     Q   And the four-on-one was not used either,
11:39  3   correct?
11:39  4     A   That's correct.
11:39  5     Q   But the four-on-one is not described in the
11:39  6   policies and procedures, is it?
11:39  7         MR. GUERRA:  Objection, form.
11:39  8     A   Yes.  Yes, it is.
11:39  9     Q   (BY MR. CISNEROS)  I went through them last
11:39 10   night, ma'am.  Are you sure -- without having to go
11:39 11   through them, you want to make sure -- can you tell me
11:39 12   now whether the four-on-one is in the policies and
11:39 13   procedures?
11:39 14         MR. GUERRA:  Objection, form; objection,
11:39 15   sidebar.
11:39 16     Q   (BY MR. CISNEROS)  So we won't waste time.
11:39 17   I've never come across the four-on-one.  I've come
11:40 18   across the two-on-none.
11:40 19     A   Okay.
11:40 20     Q   So do you know whether or not there is a
11:40 21   four-on-one process or procedure as set out by the
11:40 22   policies and procedures of ATS and Allegiant?
11:40 23     A   I don't know.
11:40 24     Q   Okay.  It's important, again, ma'am, to talk to
11:40 25   a disabled individual before you get them on the plane,
```

Page 60

```
11:40  1   right?
11:40  2     A   Yes, sir.
11:40  3     Q   Okay.  And it is true that the -- that
11:40  4   Mr. Moreno and the family wanted you to use his portable
11:40  5   lift and transfer hoist, correct?
11:40  6     A   That's correct.
11:40  7     Q   And it was not -- it was not used, correct?
11:40  8     A   Not in the aircraft, no.
11:40  9     Q   No.  In fact, the ATS employees didn't even try
11:41 10   to use that device, did they?
11:41 11     A   We never touched it.
11:41 12     Q   No.  And there wasn't one available on the
11:41 13   plane either, correct?
11:41 14     A   Correct.
11:41 15     Q   There wasn't one available at the airport
11:41 16   either, correct?
11:41 17     A   That's correct.
11:41 18     Q   Did Allegiant ever provide you with a lift and
11:41 19   transfer hoist to use?
11:41 20         MR. SWAIM:  Object -- objection, form.
11:41 21     A   No.
11:41 22     Q   (BY MR. CISNEROS)  Who provided you with the
11:41 23   equipment that was necessary to transfer disabled and
11:41 24   incapacitated people from an aisle wheelchair to a seat
11:41 25   on the airplane?
```

15 (Pages 57 to 60)

BRYANT & STINGLEY, INC.

Harlingen (956) 428-0755        McAllen (956) 618-2366

Page 61

```
11:41  1              MR. SWAIM:  Objection, form.
11:41  2         A    Are we just talking about Mr. Moreno?
11:41  3         Q    No.  In general.
11:41  4              MR. SWAIM:  Same objection.
11:41  5         A    The equipment, we have it at the airport.
11:41  6    It's -- which is the aisle chair.
11:41  7         Q    (BY MR. CISNEROS)  Okay.  And who provided you
11:41  8    with the aisle chair?
11:42  9         A    ATS.
11:42 10         Q    Okay.  Did any of the seats on the airplane
11:42 11    where -- in which the incident occurred have any
11:42 12    armrests that moved up and down?
11:42 13         A    Can you repeat, please.
11:42 14         Q    Did any of the seats on the airplane in
11:42 15    which -- or on which the incident occurred have any
11:42 16    armrests that moved up and down, that were adjustable?
11:42 17         A    The aircraft has moveable armrests, yes.
11:42 18         Q    Okay.  Where do those seats begin?
11:42 19         A    The second row, usually.
11:42 20         Q    The second row?
11:42 21         A    (Nodding)
11:42 22         Q    Okay.  If Mr. Moreno's seat was in 3D, where
11:43 23    was that seat positioned on the plane?
11:43 24         A    It was the first row.
11:43 25         Q    And did that seat have armrests that were
```

Page 62

```
11:43  1    stationary, meaning did not move, or were they
11:43  2    adjustable?
11:43  3         A    They were stationary.
11:43  4         Q    And were they -- what were they made of?
11:43  5         A    I don't know the material, what the --
11:43  6         Q    Were they --
11:43  7              THE REPORTER:  I'm sorry.  "I don't
11:43  8    know" ...
11:43  9              THE WITNESS:  I don't know the material.
11:43 10         Q    (BY MR. CISNEROS)  Were they made of metal?
11:43 11         A    Yes, I think.
11:43 12         Q    Okay.  So they were made of metal, and they
11:43 13    were stationary and did not move, correct?
11:43 14         A    Correct.
11:43 15         Q    And that was the seat that you and the other
11:43 16    ATS employees were going to transfer him into from the
11:43 17    aisle wheelchair, correct?
11:43 18              MR. SWAIM:  Objection, form.
11:43 19         A    That was the decision his brother made.
11:43 20         Q    Oh, so it's the brother's fault.
11:43 21              MR. GUERRA:  Objection, form.
11:43 22         Q    (BY MR. CISNEROS)  Did he work for ATS or
11:44 23    Allegiant?
11:44 24         A    No, sir, but the brother was very much in
11:44 25    charge of the transition.
```

Page 63

```
11:44  1         Q    Are you aware that the policies and procedures
11:44  2    state that an individual like Mr. Moreno is not to be
11:44  3    placed in a seat with stationary arms?
11:44  4              MR. GUERRA:  Objection, form.
11:44  5         A    Not necessarily.
11:44  6         Q    You're not aware of that?
11:44  7              MR. SWAIM:  Objection, form.
11:44  8         Q    (BY MR. CISNEROS)  At any time that he was
11:44  9    being transferred to a seat on the airplane, was any
11:44 10    assistance provided to you by any of the Allegiant
11:44 11    employees who were on the airplane?
11:44 12         A    No.
11:44 13         Q    Okay.  Let's talk about the incident, ma'am.
11:44 14    Mr. Moreno and his brother testified that he -- that
11:45 15    either they were required that -- well, let me rephrase
11:45 16    the question.
11:45 17              Testified -- Mr. Moreno and his brother
11:45 18    testified that two employees of ATS and his father and
11:45 19    his brother were the ones that transferred him from the
11:45 20    aisle wheelchair to a seat on the airplane.  Is that
11:45 21    true or untrue?
11:45 22         A    Can you repeat.
11:45 23         Q    Yeah.  Who was involved in transferring
11:45 24    Mr. Moreno from the aisle wheelchair to a seat on the
11:45 25    airplane?
```

Page 64

```
11:45  1         A    It was his brother, another gentleman, and
11:45  2    Robert Castillo and Robert Reyes.
11:45  3         Q    Were you involved in transferring him as well,
11:45  4    or no?
11:45  5         A    No, sir.
11:45  6         Q    You were not involved?
11:45  7         A    No.
11:45  8         Q    Okay.  Were you present from the time that
11:45  9    Mr. Moreno got to the doorway of the plane to the time
11:46 10    that the incident happened?
11:46 11         A    Yes, sir.
11:46 12         Q    Do you know why -- well, let me ask you this:
11:46 13    He -- a -- the sling of his lift was used to transfer
11:46 14    him from the aisle wheelchair to a seat on the airplane,
11:46 15    correct?
11:46 16         A    That's correct.
11:46 17         Q    Okay.  And he got to the airport in his lift,
11:46 18    did he not?
11:46 19              MR. SWAIM:  Objection, form.
11:46 20         Q    (BY MR. CISNEROS)  Or was he in a wheelchair?
11:46 21         A    He was in a wheelchair.
11:46 22         Q    Okay.  The sling was under the -- was -- he was
11:46 23    sitting on the sling in the wheelchair when he got to
11:46 24    the doorway leading into the airplane, correct, or of
11:46 25    the airplane?
```

16 (Pages 61 to 64)

Electronically signed by Renee Crouch (501-178-759-2734)          c6c18a21-7499-4117-9b7b-c0b3dff36b94

Page 109

```
12:59  1    there, ma'am, then?
12:59  2    A  Yes, sir.
12:59  3    Q  I mean, these people don't have any experience
12:59  4    loading pass -- do you know whether or not these people
12:59  5    had any prior experience on loading their brother on a
01:00  6    plane using a sling?
01:00  7    A  I have to go based on what his brother said.
01:00  8    His brother said that he did that all the time.
01:00  9    Q  Okay, ma'am.  So whatever happened on the plane
01:00 10    that day is the brother, again?  Is it the brother's --
01:00 11    you know, are you putting the responsibility on the
01:00 12    brother or what?
01:00 13    A  I'm not saying that.
01:00 14    Q  You're not?
01:00 15    A  No.
01:00 16    Q  If one of the ATS employees would have let go
01:00 17    of the sling at the time of the incident, that wouldn't
01:00 18    have been the cause of him falling?
01:00 19         MR. GUERRA:  Objection, form.  Assumes
01:00 20    fact not in evidence.
01:00 21         Don't answer that question.
01:00 22    Q  (BY MR. CISNEROS)  Well, Mr. Moreno's brother
01:00 23    testified that one of the employees, you know, let go of
01:00 24    the sling, and then he fell.  Do you agree or disagree
01:00 25    with that?
```

Page 110

```
01:00  1    A  I disagree.
01:00  2    Q  Okay.
01:00  3         MR. GUERRA:  Okay.  It's 1 o'clock, Mike.
01:00  4    We've got to stop.  If you want, we'll provide her for a
01:00  5    subsequent --
01:00  6         MR. CISNEROS:  Yeah, yeah.
01:00  7         MR. GUERRA:  -- deposition then.
01:00  8         MR. CISNEROS:  That's fine.  That's fine.
01:00  9         MR. GUERRA:  Okay.  You can go, Dora.
01:01 10         THE VIDEOGRAPHER:  Going off the record.
01:01 11    The time is 1:01 p.m.
01:01 12         (Proceedings recessed)
```

Page 111

```
1       CHANGES AND SIGNATURE
2   WITNESS: DORA RODRIGUEZ    DATE: MAY 18, 2022
3   PAGE  LINE  CHANGE           REASON
4   _____
5   _____
...
25  _____
```

Page 112

I, DORA RODRIGUEZ, have read the foregoing transcript and hereby affix my signature that same is true and correct, except as noted above.

_____
DORA RODRIGUEZ

THE STATE OF _____)
COUNTY OF _____)

Before me, _____, on this day personally appeared DORA RODRIGUEZ, known to me (or proved to me under oath or through _____) (description of identity card or other document) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.

Given under my hand and seal of office this _____ day of _____, _____.

_____
Notary Public in and for
The State of Texas

28 (Pages 109 to 112)

BRYANT & STINGLEY, INC.

Harlingen (956) 428-0755            McAllen (956) 618-2366

Page 113

```
 1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF TEXAS
 2                  McALLEN DIVISION
 3   FILIBERTO J. GARZA MORENO )
                               )
 4   VS.                       ) C.A. NO. 7-21-CV-247
                               )
 5   ALLEGIANT TRAVEL COMPANY, )
     ALLEGIANT AIR LLC, AND    )
 6   AIRPORT TERMINAL SERVICES )
     INC.                      )
 7
 8            REPORTER'S CERTIFICATION
 9       I, RENEE W. CROUCH, Certified Shorthand
     Reporter, CSR No. 5645, in and for the State of Texas,
10   certify that the witness, DORA RODRIGUEZ, was duly sworn
     by me, and that the deposition transcript is a true and
11   correct record of the testimony given by the witness on
     MAY 18, 2022; that the deposition was reported by me in
12   stenograph and was subsequently transcribed by me or
     under my supervision.
13
         Pursuant to Rule 30(e)(2), a review of the
14   transcript was requested.
15       I FURTHER CERTIFY that I am not a relative,
     employee, attorney or counsel of any of the parties, nor
16   a relative or employee of such attorney or counsel, nor
     am I financially interested in the action.
17
         WITNESS MY HAND on this the _____ day
18   _____, 2022.
19
20   _____
21
         Renee W. Crouch
22       Texas CSR 5645
         Expiration: 1/31/2024
23       BRYANT & STINGLEY, INC.
         2010 East Harrison Avenue
24       Harlingen, Texas 78550
         (956) 428-0755
25       Firm Number 41
```